# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| KENNETH Z. SLATER, AS MANAGER OF KT INVESTMENTS, LLC, on behalf of himself and all others similarly situated, | Civil Action No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| vs. | |
| GARRETT THORNBURG, LARRY A. GOLDSTONE, CLARENCE G. SIMMONS, ANN-DRUE M. ANDERSON, DAVID A. ATER, JOSEPH H. BADAL, ELIOT R. CUTLER, MICHAEL B. JEFFERS, IKE KALANGIS, OWEN M. LOPEZ, FRANCIS I. MULLIN, III, STUART C. SHERMAN and THORNBURG MORTGAGE, INC., | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff, Kenneth Z. Slater, as Manager of KT Investments, LLC ("Slater"), on behalf of himself and a Class (defined below) comprised of all other persons similarly situated, alleges upon the investigation made by and through his counsel, which includes, *inter alia*, a review of relevant public filings made by Thornburg Mortgage, Inc. ("TMI" or the "Company") with the Securities and Exchange Commission ("SEC"), as well as teleconferences, press releases, news articles, analysts' reports, and media reports concerning the Company. This Complaint is based upon plaintiff's personal knowledge as to his own acts, and upon information and belief as to all other matters, based upon the aforementioned investigation.

## I.     SUMMARY OF ACTION

1.     This is a class action on behalf of all persons, other than defendants, who purchased TMI common stock between October 6, 2005, and August 17, 2007, inclusive (the

"Class Period"), to recover damages caused by defendants' violations of the federal securities laws.

2.  TMI operates as a single-family residential mortgage lending company. It originates, acquires, and retains investments in adjustable and variable rate mortgage (ARM) assets. Its ARM assets comprise of purchased ARM assets and ARM loans, including traditional ARM assets and hybrid ARM assets. The Company acquires and originates assets, through correspondent lending, wholesale lending, direct retail lending, and bulk acquisition programs from investment banking firms, broker-dealers, mortgage bankers, mortgage brokerage firms, banks, savings and loan institutions, credit unions, home builders, and other entities involved in originating, securitizing, packaging, and selling mortgage-backed securities and mortgage loans. The Company operates as an externally advised real estate investment trust (REIT). It has elected to be treated as a real estate investment trust for federal income tax purposes. As a REIT, the Company would not be subject to federal corporate income tax, provided it distributes at least 85% of taxable income by the end of each calendar year. TMI was founded in 1992 and is based in Santa Fe, New Mexico.

3.  Throughout the Class Period, defendants issued numerous, positive financial statements, annual and quarterly financial reports filed with the SEC, press releases, and other public statements that described the Company's financial performance. These public statements were materially false and misleading because they misrepresented and failed to disclose the following adverse facts, among others: (a) that the Company was facing increasing margin calls; (b) that its available leverage had significantly diminished; (c) that its financial situation had deteriorated to the point where it must sell certain assets; and, (d) that as a result of the foregoing the Company reported overstated financial results.

4.     As a result of defendants' false statements, TMI's stock traded at artificially inflated price during the Class Period, reaching a high of $30.64 per share on June 17, 2005.

5.     On Tuesday, August 14, 2007, TMI shocked the markets by issuing a series of disclosures.  In particular, TMI reported in a press release that the book value of the Company's mortgage-securities portfolio had fallen to $14.28 per share as of August 13 from $19.38 at the end of June.  TMI also delayed payment of its second-quarter dividend until mid-September after scheduled monthly mortgage payments for August have been received, citing a "difficult environment."

6.     As a result of these disclosures, the Company's stock plummeted to a 52 week low of $7.61 per share as the Company disclosed its true financial condition, postponed its quarterly dividend and lowered its book value.

## II.     <u>JURISDICTION AND VENUE</u>

7.     This Court has subject-matter jurisdiction pursuant to Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

8.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  TMI maintains its corporate headquarters in this judicial district at 150 Washington Ave, Santa Fe, New Mexico.  In addition, many of the acts and practices complained of herein occurred in substantial part in this judicial district.

9.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### III.    PARTIES

10.    Plaintiff purchased the common stock of TMI as set forth more fully in the annexed certificate, and suffered economic damages.

11.    TMI is a Maryland corporation with its principal place of business at 150 Washington Ave, Santa Fe, New Mexico.  At all relevant times, the Company's securities traded in an orderly and efficient market on the New York Stock Exchange (NYSE).

12.    Defendant Garrett Thornburg, ("Thornburg") founded the Company in 1993 and at all relevant times has served as the Chairman of the Board of Directors and Chief Executive Officer.

13.    Defendant Larry A. Goldstone, ("Goldstone") has served as President, Chief Operating Officer and a director of TMI since June 1993.

14.    Defendant Clarence G. Simmons, ("Simmons") has served as has served as the Senior Executive Vice President of TMI since March 2005 and the Chief Financial Officer of TMI since April 2005.

15.    Defendant Ann-Drue M. Anderson, ("Anderson") has served as a director of TMI since December 2003.

16.    Defendant David A. Ater, ("Ater") has served as a director of TMI since March 1995.

17.    Defendant Joseph H. Badal, ("Badal") has served as a director of TMI since June 1993 and has been an Executive Vice President since December 2001.

18.    Defendant Eliot R. Cutler, ("Cutler") has served as a director of TMI since December 2003.

19.    Defendant Michael B. Jeffers, ("Jeffers") has served as a director of TMI since

January 2006.

20.     Defendant Ike Kalangis, ("Kalangis") has served as a director of TMI since January 2001.

21.     Defendant Owen M. Lopez, ("Lopez") has served as a director of TMI since December 1996.

22.     Defendant Francis I. Mullin, III, ("Mullin") has served as a director of TMI since January 2001.

23.     Defendant Stuart C. Sherman ("Sherman") has served as a director of TMI since June 1993.

24.     Defendants Thornburg, Goldstone, Simmons, Anderson, Ater, Badal, Cutler, Jeffers, Kalangis, Lopez, Mullin and Sherman are sometimes referred to herein as the "Individual Defendants." Because of the Individual Defendants' positions as directors or senior officers of the Company, each had access to the material adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

25.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of them,

by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Each was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, was aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

26. As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, was traded on the NYSE, and is governed by the provisions of the federal securities laws, each defendant had a duty to disseminate timely, accurate, and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that became materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27. The Individual Defendants participated in the drafting, preparation, or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership or executive and managerial positions with TMI, each of the Individual

Defendants had access to the adverse undisclosed information about the Company's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations, made by or about TMI and its business, issued or adopted by the Company, materially false and misleading.

28.     The Individual Defendants, because of their positions of control and authority as officers or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.

29.     Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases alleged herein, and is therefore primarily liable for the representations contained therein.

30.     Each of the defendants is also liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of TMI securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme (a) deceived the investing public regarding the Company's business, operations, and the intrinsic value of TMI's publicly traded securities, and (b) caused plaintiffs and other members of the Class to purchase TMI's publicly traded securities and to do so at artificially inflated prices.

### IV.     PLAINTIFF'S CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all those persons who purchased TMI securities during

the Class Period and who suffered damages thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

32.     The members of the Class are so numerous that joinder of all members is impracticable.  According to the Company's most recent quarterly financial statement filed with the SEC on Form 10-Q, on August 8, 2007 TMI had 122,858,409 shares of common stock outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

34.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

            a.      whether the federal securities laws were violated by defendants' acts as alleged herein;

b. whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and financial condition of the Company;

c. whether defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

d. whether the market prices of the Company's common stock were artificially inflated or distorted during the Class Period because of defendants' conduct complained of herein; and

e. to what extent the members of the Class have sustained damages and the proper measure of damages.

36. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.     BACKGROUND

37. TMI operates as a single-family residential mortgage lending company. It originates, acquires, and retains investments in adjustable and variable rate mortgage (ARM) assets. Its ARM assets comprise of purchased ARM assets and ARM loans, including traditional ARM assets and hybrid ARM assets. TMI acquires and originates assets, through correspondent lending, wholesale lending, direct retail lending, and bulk acquisition programs from investment banking firms, broker-dealers, mortgage bankers, mortgage brokerage firms, banks, savings and

loan institutions, credit unions, home builders, and other entities involved in originating, securitizing, packaging, and selling mortgage-backed securities and mortgage loans.

38.     The Company operates as an externally advised real estate investment trust (REIT).  It has elected to be treated as a real estate investment trust for federal income tax purposes.  As a REIT, the company will not be subject to federal corporate income tax so long as it distributes at least 85% of taxable income by the end of each calendar year.

## Substantive Allegations

39.     On October 6, 2005, after market close, TMI issued a press release announcing a higher than expected earnings forecast for the third quarter of 2005.  Specifically, the Company reported:

> It expects to report earnings per share for the third quarter of 2005 that will modestly exceed First Call's mean earnings per share estimate of $0.68, which is also the amount of the company's current quarterly dividend. Further, the company said the quarterly financial results were generated from ongoing operations and without the benefit of asset sales.

On this news, the following day the stock climbed over 6% on unusually heavy trading volume to close at $24.13 per share.

40.     On October 17, 2005, after market close, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2005.  The Company reported net income of $74 million, total assets of $39.6 billion, and a book value of $21.09 per share.  The Company also declared a third quarter dividend of $0.68 per share.  In the press release, defendant Thornburg was quoted as stating:

> Our performance during the quarter remained strong despite the current challenges confronting the mortgage industry. While the Fed Funds rate has increased 275 basis points since mid 2004, our earnings have remained fairly constant. Our business model protects our profitability during periods of rising interest rates or flattening yield curves by requiring that we fund our hybrid

adjustable-rate mortgage (ARM) portfolio with fixed-rate borrowings of comparable maturity. This strategy clearly reduced our net interest income and earnings in prior years, but has been instrumental in allowing us to maintain our earnings through this rising interest rate cycle.

41.     On November 8, 2005, the Company filed with the SEC its Form 10-Q for the third quarter of 2005, which included the same financial results previously reported.  The Form 10-Q also included a certification by defendant Thornburg, as TMI's CEO, that stated:

I, Garrett Thornburg, certify that:

1.  I have reviewed this report on Form 10-Q of Thornburg Mortgage, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)), and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

42.     Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-Q.

43.     On January 24, 2006, TMI issued a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2005. The Company reported net income of $282 million for the year and $72.8 million for the fourth quarter, a book value of $20.00 per share and total assets of $42.5 billion. The Company also reported a dividend of $0.68 per share. In the press release, defendant Thornburg was quoted as stating:

The company's performance was solid in 2005 despite an environment that has continued to erode our portfolio margin. Our earnings results confirm the strength of our diversified business model and the benefit of focusing on high credit quality assets and interest rate risk management, both key contributors to our stable net interest income. We also attribute our results to the successful execution of financing and alternative capital raising transactions

that augment our core spread lending business. The issuance of common and preferred stock, junior subordinated debt, the completion of collateralized debt obligation (CDO) financings, as well as deploying some of our excess liquidity, all contributed to balance sheet growth and earnings stability during the year. We believe these strategies are critical to ensuring current and future dividend coverage regardless of a potential worsening interest rate or mortgage market environment.

44.     On March 7, 2006, TMI filed with the SEC its Form 10-K for the fiscal year ended December 31, 2005, which included the same financial results previously reported.  The Form 10-K also included a certification by defendant Thornburg, as TMI's CEO, that stated:

I, Garrett Thornburg, certify that:

1. I have reviewed this report on Form 10-K of Thornburg Mortgage, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

45.     Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-K.

46.     On April 18, 2006, after market close, TMI issued a press release announcing its earnings for the first quarter ended March 31, 2006.  The Company reported net income of $72.4 million, total assets of $46.1 billion, and a book value of $21.00 per share.  TMI also reported a first quarter dividend of $0.68 per share.  Defendant Thornburg publicly remained optimistic about TMI's outlook despite the poor market conditions, he was quoted in the press release as stating:

As we had anticipated, 2006 has proven to be a challenging year thus far. The interest rate environment and competitive landscape have remained difficult which has impacted our short-term earnings results. Regardless, we are pleased with the strength of our earnings results and anticipate that our prospects should

improve once the market environment changes. In the interim, we believe we can maintain the current dividend level fulfilling our top priority of building long-term wealth for our shareholders by minimizing risk and paying consistent dividends. After the payment of the first quarter dividend, we will have in reserve an estimated $0.38 per share of undistributed taxable income to support the dividend should our future earnings temporarily fall below the current dividend level.

On this news, the Company's stock rose 4% on heavy trading to close at $27.75 per share on April 19, 2006.

47. On May 9, 2006, TMI filed with the SEC its Form 10-Q for the quarter ended March 31, 2006, which included the same financial results previously reported. The Form 10-Q also included a certification by defendant Thornburg, as TMI's CEO, that stated:

I, Garrett Thornburg, certify that:

1. I have reviewed this report on Form 10-Q of Thornburg Mortgage, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the

preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

48.    Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-Q.

49.    On July 20, 2006, TMI issued a press release announcing its second quarter earnings for the quarter ended June 30, 2006. The Company reported net income of $69.6 million, a book value of $21.27 per share, total assets of $49.9 billion and maintained its $0.68 dividend for the quarter. Defendant Thornburg, while acknowledging the poor market conditions, indicated that these conditions would not affect the Company and commented as follows:

The difficult competitive and operating environment facing mortgage portfolio lenders has not abated, which continues to put downward pressure on our portfolio margin and in turn our

earnings results. We remain confident that our earnings over the balance of the year when combined with our undistributed taxable income will be sufficient to cover the dividend at the current level. After the payment of the second quarter dividend, we have in reserve an estimated $0.24 per share of undistributed taxable income.

50.     On August 8, 2006, the Company filed with the SEC its Form 10-Q for the second quarter of 2006, which included the same financial results previously reported. The Form 10-Q also included a certification by Defendant Thornburg that stated:

I, Garrett Thornburg, certify that:

1. I have reviewed this report on Form 10-Q of Thornburg Mortgage, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

51.      Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-Q.

52.      On October 16, 2006, the Company issued a press release announcing its earnings for the third quarter ended September 30, 2006.  TMI reported net income of $75.3 million, total assets of $52.9 billion, and a book value of $20.03 per share.  The Company also reported a dividend of $0.68 per share. The press release also included a statement from defendant Thornburg as follows:

While the environment continues to be challenging, continued execution of our core strategies has allowed us to achieve relative earnings stability and maintain the dividend. After the payment of the third quarter dividend, based on common shares outstanding, we will have remaining an estimated $0.12 per share of undistributed taxable income. We remain confident that this amount, when combined with our fourth quarter earnings, will allow us to maintain the current dividend level through the remainder of this year.

53.      On November 8, 2006, the Company filed with the SEC its Form 10-Q for the Third quarter of 2006, which included the same financial results previously reported.  The Form

10-Q also included a certification by Defendant Thornburg, as CEO of the Company, that stated:

I, Garrett Thornburg, certify that:

1. I have reviewed this report on Form 10-Q of Thornburg Mortgage, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

54.     Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-Q.

55.     On January 23, 2007, after market close, TMI issued a press release announcing its earnings for the fiscal year and fourth quarter ended December 31, 2006.  The Company reported net income of $297.7 million for the fiscal year and $80.3 million for the fourth quarter. It also reported total assets of $52.7 billion, a book value of $18.92 per share and a dividend of $0.68 per share.  Defendant Thornburg, as the Company's CEO, again denied the effect the down market had on TMI's business and commented on its earnings as follows:

> While 2006 was a challenging year for the mortgage industry as a whole, Thornburg Mortgage once again proved the strength of our exceptional business model. Our strategy has always been to maintain a focus on only originating and/or acquiring excellent credit quality adjustable-rate mortgage (ARM) assets, hedging our borrowings to offset interest rate fluctuations, and utilizing an array of asset acquisition, financing and capital strategies. As a result, our 2006 performance was solid and we sustained the dividend. Looking ahead, the likelihood that we can maintain the current dividend has improved as our fourth quarter results increased our undistributed taxable income. Presently, based on common shares outstanding, we have an estimated $0.22 per share of undistributed taxable income, some of which could be used to support the current quarterly dividend of $0.68 per share.

On this news, the stock immediately climbed 8% to close at 25.99 on January 24, 2007.  Over the next couple of days, the stock continued to climb to $26.75 per share by January 26, 2007 on unusually heavy trading over the three day period.

56.     On March 1, 2007, the Company filed with the SEC its Form 10-K for the fiscal

year ended December 31, 2006, which included the same financial results previously reported.

The Form 10-K also included a certification by defendant Thornburg, as TMI's CEO, that stated:

I, Garrett Thornburg, certify that:

1. I have reviewed this report on Form 10-K of Thornburg Mortgage, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the

audit committee of the registrant's board of directors (or persons performing the equivalent function):

> a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

57.     Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-K.

58.     On April 19, 2007, after market close, TMI issued a press release announcing its earnings for the first quarter ended March 31, 2007. The Company reported net income of $75 million, total assets of $55.2 billion and a book value of $18.76 per share. TMI also reported a dividend of $0.68 per share. Defendant Thornburg again emphasized the Company's allegedly rosy outlook, and even indicated that the Company could benefit from the troubles in the mortgage industry by stating:

> The year 2007 is off to a better start than we had anticipated. Our disciplined approach to interest rate and credit risk management continues to allow us to report earnings above consensus earnings estimates. We anticipate that we will further benefit from the troubles in the mortgage lending industry as credit standards tighten and investment returns on new mortgage assets improve. As a result, our first quarter earnings were solid and we sustained the dividend. And, as we look ahead we are increasingly confident that we may not need to make a downward adjustment in the current dividend rate in 2007. After payment of the first quarter dividend, we will have an estimated $0.11 per share of undistributed taxable income to support future quarterly dividends.

On this news, stock rose 4% to close at $27.91 on April 20, 2007 and continued to climb to $28.05 by April 23, 2007 on unusually heavy trading volume.

59.     On May 9, 2007, TMI filed with the SEC its Form 10-Q for the quarter ended

March 31, 2007, which included the same financial results previously reported. The Form 10-Q

also included a certification by defendant Thornburg, as TMI's CEO, that stated:

> I, Garrett Thornburg, certify that:
>
> 1. I have reviewed this report on Form 10-Q of Thornburg Mortgage, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:
>
>> a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>>
>> c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>>
>> d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the

audit committee of the registrant's board of directors (or persons performing the equivalent function):

> a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

60.    Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-Q.

61.    On July 19, 2007, after market close, the Company issued a press release to announce its earnings for the second quarter ended June 30, 2007.  TMI reported net income of $83.4 million, total assets of $57.5 billion, a book value of $19.38 per share and a dividend of $0.68 per share.  Defendant Thornburg, as the Company's CEO, also continued to deny that the negative market conditions would effect TMI's business:

> The second quarter continued the strong earnings trend that we set in the first quarter. For the second quarter in a row, our earnings were above consensus estimates on the strength of improved margins. And, despite all the headline news regarding credit problems in the mortgage lending industry, the credit performance of our prime quality mortgage loan portfolio remained exceptional because of our unwavering focus on high quality lending practices. As a result, our second quarter earnings remained solid and we maintained our dividend at $0.68 per common share.

On this news, the stock price climbed $1.66 (about 6%) to close at $27.19 on July 20, 2007 on very heavy trading volume.

62.    On August 8, 2007, just two days before analysts began to disclose TMI's negative outlook (as further described below), the Company filed with the SEC its Form 10-Q for the quarter ended June 30, 2007, which included the same financial results previously reported.  The Form 10-Q also included a certification by defendant Thornburg, as TMI's CEO,

that stated:

I, Garrett Thornburg, certify that:

1. I have reviewed this report on Form 10-Q of Thornburg Mortgage, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

63.     Defendant Goldstone, as TMI's President and COO, and Defendant Simmons, as TMI's CFO, signed identical certifications that were also included in the Form 10-Q.

64.     All of the foregoing statements, however, were materially false and misleading when made because the Company did not reveal: (a) that the Company was facing increasing margin calls; (b) that its available leverage had significantly diminished; (c) that its financial situation had deteriorated to the point where it must sell certain assets; and, (d) that as a result of the foregoing the Company reported overstated financial results.

**The Truth Slowly Emerges**

65.     On August 10, 2007, without any prior warning from the Company, Moody's Investor Service, disclosed that there was significant funding and valuation volatility within TMI and consequently downgraded its senior unsecured debt to a "Ba3" rating and its preferred stock to a "B2" rating.   Moody's also indicated that the ratings remain under review for possible downgrade.

66.     Standard & Poor's Rating Services also lowered its ratings of TMI securities on August 10, 2007.  It lowered the Company's long-term credit rating to "B" from "BB" and placed the rating on CreditWatch Negative.  Standard & Poor's analyst Adom Rosengarten stated in his report, "While the company's balance sheet is comprised of high-quality assets, dislocation in pricing of all mortgage assets has restricted Thornburg's access to repo funding and the company is facing increasing margin calls."

67.     As a result of this news, the TMI share price dropped from its close on August 9, 2007 of $21.23 to $18.06 on August 10, 2007.

68.     Despite these downgrades, the Company still did not disclose that it was facing significant problems with its business.  Instead, it simply disclosed that it would cease accepting requests for lock-ins for a period of four-days starting August 14, 2007.  The Company described its current situation to be based upon "unprecedented and irrational sentiment in the secondary mortgage market, which has generated conditions of liquidity throughout the industry."

69.     On August 14, 2007, several other ratings agencies lowered their outlooks on TMI securities, including Credit Suisse, RBC Capital Markets, Friedman Billings Ramsey, Jefferies & Co. and Piper Jaffray.  Bose George, an analyst from Keefe, Bruyette & Woods, even indicated that the Company would likely have to sell a fifth of its assets to meet its financing obligations.

70.     Also on August 14, 2007, analysts at Jeffries wrote in a research report, "We believe that margin calls exacerbated by decreased available leverage is forcing asset sales." These analysts added, "[i]n addition, with Thornburg's stock trading at a substantial discount to book value, we believe the company has no opportunity to raise permanent capital to stem the tide."

71.     Piper Jaffray cut TMI stock to underperform from market perform and premised the downgrade on "increased liquidity pressures."

72.     Credit Suisse analysts remarked, "As a result of rising funding costs, margin calls on its short-term funding instruments and the deleveraging of its balance sheet, we expect Thornburg will have to cut its dividend significantly."

73.     Based on all of the negative news surrounding the Company, the stock continued to plummet until trading was halted on the afternoon of August 14, 2007.  By the time trading

was stopped, the Company's stock had dropped nearly 47% to close at the 52 week low of $7.61 per share.

74.     With its stock halted and the market awash with rumors about the Company, the Company issued a press release late in the day on August 14, 2007.  First, it stated that it would delay its dividend until September 17, 2007 as a result of the "difficult environment."  Second, the Company reported that it would decrease its book value from $19.38 to $14.28.  The press release stated follows:

> The Board of Directors said it took this action in response to significant disruptions in the mortgage market which resulted in the sudden and unprecedented decline in the market prices of its AAA-rated mortgage securities that began on August 9, 2007 and subsequent increase in margin calls related to its repurchase agreement financings on those securities. There have also been disruptions in the company's ability to fund its mortgage assets in the commercial paper and the asset-backed securities markets. To date, the company has successfully met all of its commercial paper obligations. Finally, the company has also experienced delays in its ability to fund mortgage loans to its lending partners.

75.     This news caused the Company's stock to rebound slightly when it opened for trading on August 15, 2007.

76.     On August 20, 2007, however, the Company could no longer hide the scope and severity of its myriad problems.

77.     Specifically, before the market opened, the Company published a press release over the Business Wire detailing that it was forced to sell $20.5 billion of its top-rated mortgage backed securities to boost its liquidity.  This announcement was made in the wake of last week's announcement that the Company had to stop funding loans due to the credit crunch.  The Company had been unable to repay nearly $8.4 billion of commercial paper outstanding as of June 30, 2007 because buyers of the paper demanded terms and covenants that the Company was either unwilling or unable to satisfy.

78. In short, the sale came amid slumping mortgage-securities prices and "simultaneous declines in the value of its hedging instruments," according to the Company. The end result was that the Company was unable to support its borrowings by using its mortgage portfolio as collateral.

79. In addition to cutting the size of its mortgage asset portfolio to $36.4 billion as of Friday and reducing its future exposure to margin calls on short-term borrowings, the Company was forced to terminate some $41.1 billion in interest-rate hedges.

80. The fire sale will result in an approximate third-quarter capital loss of $930 million. The securities only fetched approximately 96 cents on the dollar. Ending the hedging program will result in a gain of about $40 million.

81. The Company also stated that "[i][n light of the dramatic reduction in the company's mortgage portfolio over the past week, the company is not yet prepared to offer earnings or dividend guidance regarding the amount of any future dividends" beyond the upcoming September 17, 2007 payment.

82. The Company further stated that its book value continues to fall due to the mortgage-market deterioration and the mortgage securities sales. The estimated book value is now $12.40 a share, compared with an estimated $14.28 on August 13, 2007 and an estimated $19.38 on June 30, 2007.

83. These revelations concerning the Company's precarious position stood in stark contrast to the otherwise positive spin the Company tried to place on the deepening credit crisis.

84. Indeed, the market was shocked that the Company was in such dire straits and its price per share fell an additional $1.73 by midday trading, a 9% decline over Friday's close on extremely heavy volume.

# VI.   UNDISCLOSED MATERIAL, ADVERSE FACTS

85.     The market for TMI's common stock was open, well-developed, and efficient at all relevant times.

86.     As a result of these materially false and misleading statements and failures to disclose, TMI's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired TMI common stock relying upon the integrity of the market price of TMI's common stock and market information relating to TMI, and have been damaged thereby.

87.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of TMI's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

88.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the stock purchases by Plaintiff and other members of the Class.

89.     Each defendant is liable for (i) making false statements, or (ii) failing to disclose adverse facts known to him about TMI. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of TMI common stock was a success, as it (i) deceived the investing public regarding TMI's prospects and business; (ii) artificially inflated the prices of TMI common stock; and (iii) caused plaintiff and other members of the Class to purchase TMI common stock at inflated prices.

# VII. SCIENTER ALLEGATIONS

90.     As alleged herein, defendants acted with scienter, in that they knew the Company's public documents and statements issued or disseminated by or in the name of the Company were materially false and misleading; they knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

91.     As alleged herein in detail, by virtue of their receipt of information reflecting the true facts regarding TMI and its business practices, their control over or receipt of TMI's materially false and misleading statements, or their associations with the Company which made them privy to confidential proprietary information concerning TMI, defendants were active and culpable participants in the fraudulent scheme alleged herein.

92.     Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.

93.     The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

94.     In particular, defendants Thornburg, Goldstone and Simmons engaged in such a scheme to inflate the price of TMI securities in order to protect and enhance their executive positions, their own personal wealth in accumulated holdings of TMI stock, and the substantial compensation and prestige they obtained thereby, as demonstrated by the salary and bonuses they earned during the Class Period.

95.     Warning signs of a down-turn or slow-down in the real estate market began appearing as early as the end of 2004 or the beginning of 2005.

96.     According to financial and real estate trade publications, a slow-down began to affect the real estate market as early as the first quarter of 2005.

97.     By the first quarter of 2005, the Morgan Stanley REIT index 30-week moving average showed that the real estate run-up was ending and warned of an impending correction in the real estate market.  However, irrespective of this bad news, TMI continued to trumpet its successes and failed to adequately inform investors of its exposure to this sector of the market.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE FRAUD-ON-THE-MARKET DOCTRINE

98.     At all relevant times, the market for TMI securities was efficient for the following reasons, among others:

a.     TMI's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.     As a regulated issuer, TMI filed periodic public reports with the SEC; and

c.     TMI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

99.     As a result of the foregoing, the market for TMI's securities promptly digested current information regarding TMI from all publicly available sources and reflected such information in TMI's stock price.  Under these circumstances, all purchasers of TMI securities during the Class Period suffered similar injury through their purchase of TMI securities at

artificially inflated prices and a presumption of reliance applies.

## IX.    NO SAFE HARBOR

100.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of TMI who knew that those statements were false when made.

### COUNT ONE

**Violation of Section 10(b) of The Exchange Act And Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

101.    Plaintiff incorporates by reference paragraphs 1 though 91 above as if set forth herein.

102.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (ii) cause plaintiff and other members of the Class to purchase TMI securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them,

took the actions set forth herein.

103.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for TMI securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

104.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of TMI as specified herein.

105.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of TMI value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary to make the statements made about TMI and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of TMI securities during the Class Period.

106.    Each of the Individual Defendants' primary liability, and controlling person

liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

107.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

108.    As a result of the dissemination of the materially false and misleading information

and failure to disclose material facts, as set forth above, the market price of TMI securities was artificially inflated during the Class Period. In ignorance of the fact that the market prices of TMI publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired TMI securities during the Class Period at artificially high prices and were damaged thereby.

109. At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the true financial position and operating conditions that TMI was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their TMI securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

110. By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

111. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### COUNT TWO

**Violation of Section 20(a) of The Exchange Act**
**Against Defendants Thornburg, Goldstone and Simmons**

112. Plaintiff incorporates by reference paragraphs 1 though 111 above as if set forth

herein.

113.    Defendants Thornburg, Goldstone and Simmons acted as controlling persons of TMI within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in or awareness of the Company's operations or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, defendants Thornburg, Goldstone and Simmons had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

114.    Defendants Thornburg, Goldstone and Simmons were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

115.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

116.    As set forth above, defendants TMI, Thornburg, Goldberg and Simmons each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, defendants Thornburg, Goldberg and Simmons are liable pursuant to Section 20(a) of the Exchange Act.

117.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and

other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(a), plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  August 21, 2007                                    **BRANCH LAW FIRM**


By:     _/s/ Richard A. Sandoval_
         Richard A. Sandoval
         2025 Rio Grande Blvd NW
         Albuquerque, NM 87104
         (505) 243-3500
         (505) 243-3534 (Facsimile)

**WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP**

By:   */s/ Richard A. Sandoval*
Gregory M. Nespole
Fred Taylor Isquith
Martin E. Restituyo
Rachel S. Poplock
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile:  (212) 545-4653

/486255