IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN RE THORNBURG MORTGAGE, INC. SECURITIES LITIGATION | Case No. 1:07-cv-00815-JB/WDS |

### OPPOSED MOTION BY MAY/JUNE 2007 UNDERWRITER DEFENDANTS TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Defendants A.G. Edwards & Sons, Inc., BB&T Capital Markets, a division of Scott & Stringfellow, Inc., Citigroup Global Markets Inc., Oppenheimer & Co., Inc., RBC Dain Rauscher Inc., and Stifel Nicolaus & Company, Incorporated, (the "May/June 2007 Underwriter Defendants") hereby move for an order dismissing Plaintiffs' Consolidated Amended Class Action Complaint ("CAC") pursuant to Fed. R. Civ. P. 12(b)(6), 9(b), 8(a)(2), the provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 77m, 77k, 77l, 77m, 77z-2, and Article III to the U.S. Constitution.

The grounds for this motion are that a) Plaintiffs lack standing to sue under either Section 11 or 12(a)(2) of the Securities Act of 1933 ("1933 Act"); b) the CAC fails to state a claim against the May/June 2007 Underwriter Defendants, for the reason that the CAC fails to allege facts sufficient to demonstrate that any statements of fact were materially false when made; and c) the May/June 2007 Underwriter Defendants are not liable to purchasers of Thornburg securities after the Company's disclosures in August 2007.

This Motion is made based on this Motion and the Memorandum of Points and Authorities in support thereof, the concurrently filed Defendants' Joint Request for Judicial

Notice, and all papers, pleadings, documents, arguments of counsel, and other materials presented before or during the hearing on this motion, and any other evidence and argument the Court may consider. The May/June 2007 Underwriter Defendants also join in the arguments set forth in memoranda in support of motions to dismiss by Defendant Thornburg Mortgage, Inc. and by the other underwriter defendants as such arguments are applicable to them.

Due to the nature of the Motion, it is deemed opposed by Plaintiffs. DNMLR 7.1.

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................................1

I.    INTRODUCTION ................................................................................................1

II.   STATEMENT OF FACTS .................................................................................3

III.  ARGUMENT.....................................................................................................11

     A.    THE SECTION 12(A)(2) CLAIMS MUST BE DISMISSED FOR
          LACK OF STANDING..................................................................................11

          1. Plaintiff Betty Manning Fails to Allege That She Purchased in
             the May 2007 Offering From Any of the May/June 2007
             Underwriter Defendants, and Therefore Lacks Standing to
             Sue Under Section 12(a)(2) .................................................................11

          2. No Court-Appointed Plaintiff Has Standing to Sue on the June
             2007 Offering, and Plaintiff John Learch has No Standing to
             Sue Under Section 12(a)(2) .................................................................12

     B.    THE CAC FAILS TO STATE A CLAIM AGAINST THE
          MAY/JUNE 2007 UNDERWRITER DEFENDANTS.......................................13

          1.    Plaintiffs Must Meet Heightened Pleading Requirements For
              Their Section 11 and 12(a)(2) Claims ....................................................13

          2.    Plaintiffs' Section 11 and 12(a)(2) Claims Fail to Allege The
               Existence of Actionable Misstatements in the May/June
               Offering Documents .............................................................................14

     C.    THE PUTATIVE CLASS PERIOD IS UNSUSTAINABLE AS A
          MATTER OF LAW GIVEN THE MANY CURATIVE
          DISCLOSURES MADE IN AUGUST 2007. ................................................21

IV.  CONCLUSION ................................................................................................22

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Bell Atlantic Corp. v. Twombly,*
127 S. Ct. 1955 (2007) ................................................................................................12, 13

*In re Levi Strauss & Co. Sec. Litig.,*
527 F. Supp. 2d 965 (N.D. Cal. 2007)..................................................................17

*In re McKesson HBOC Inc., Sec. Litig.,*
126 F. Supp. 2d 1248 (N.D. Cal. 2000)................................................................19

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
272 F. Supp. 2d 243 (S.D.N.Y. 2003) ..................................................................19

*In re Select Comfort Corp. Sec. Litig.,*
2000 U.S. Dist. LEXIS 22697 (D. Minn. 2000)...................................................11

*In re Stac Elecs. Sec. Litig.,*
89 F.3d 1399 (9th Cir. 1996)................................................................................12

*In re Sun Healthcare Group, Inc. Sec. Litig.,*
181 F. Supp. 2d 1283 (D.N.M. 2002)...................................................................18

*In re Wet Seal Sec. Litig.,*
518 F. Supp. 2d 1148 (C.D. Cal. 2007).................................................................18

In re Worldcom, Inc. Sec. Litig.,
346 F. Supp. 2d 628 (S.D.N.Y. 2004) ..................................................................16

*Kogan v. Robinson,*
432 F. Supp. 2d 1075 (S.D. Cal. 2006) .................................................................18

*Perdroli v. Bartek,*
2008 U.S. Dist. LEXIS 26041 (E.D. Tex. 2008)...................................................18

*Pinter v. Dahl,*
486 U.S. 622 (1988) .............................................................................................10

*Rosenzweig v. Azurix Corp.,*
332 F.3d 854 (5th Cir. 2003) ...............................................................................11

*Schwartz v. Celestial Seasonings, Inc.,*
124 F.3d 1246 (10th Cir. 1997) ...........................................................................12

# Table of Authorities
## (Continued)

Page(s)

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,*
    2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001) .......................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    127 S. Ct. 2499 (2007) .......................................................................................17

*Twombly in Bryson v. Gonzales,*
    534 F.3d 1282 (10th Cir. 2008) ....................................................................13, 14

*Wenger v. Lumysis, Inc.,*
    2 F. Supp. 2d 1231 (N.D. Cal. 1998)..................................................................18

*Yuan v. Bayard Drilling Techs., Inc.,*
    96 F. Supp. 2d 1259 (W.D. Okla. 1999)..............................................................12

## STATUTES

15 U.S.C. § 77k(b)(3)(B)...........................................................................................16

15 U.S.C.A. § 77k(e) ................................................................................................19

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants A.G. Edwards & Sons, Inc., BB&T Capital Markets, a division of Scott & Stringfellow, Inc., Citigroup Global Markets Inc., Oppenheimer & Co., Inc., RBC Dain Rauscher Inc., and Stifel Nicolaus & Company, Incorporated (collectively the "May/June 2007 Underwriter Defendants"), submit the following Memorandum of Points and Authorities in support of their Motion to Dismiss.

## I.    INTRODUCTION

In this class action, putative class plaintiffs contend that Defendant Thornburg Mortgage, Inc. ("Thornburg" or the "Company"), along with the Company's officers and directors (collectively the "Thornburg Defendants"), and its underwriters and auditors, engaged in a fraudulent course of conduct from April of 2007 through March of 2008, by which Thornburg allegedly misled investors concerning the Company's liquidity and credit risks, during a period of increasing turmoil in the mortgage industry due to the onset of the "credit crunch."   Ignoring the fact that Thornburg made a series of public warnings in the first half of 2007, and then made direct disclosures in August 2007 that the Company was experiencing adversity due to the volatility in the mortgage market, Plaintiffs purport to sue the May/June 2007 Underwriter Defendants on behalf of a class of investors who purchased securities all the way to March 2008, on the dubious theory that Thornburg investors were not already aware of the serious financial problems Thornburg was facing until then.

The "May/June 2007 Underwriter Defendants" who bring this motion are so named because collectively they comprise all of the underwriters of the first two securities offerings that are challenged in the Consolidated Amended Complaint ("CAC"):  a May 2007 offering of common stock, and a June 2007 offering of preferred stock (collectively the "May/June 2007

Offerings").[1] Plaintiffs allege only Section 11 and 12(a)(2) claims (the "1933 Act Claims") against these Movants. As will be demonstrated below, the CAC must be dismissed as to them because:

- Plaintiffs lack standing to sue the May/June 2007 Underwriter Defendants under Section 12(a)(2) of the Securities Act of 1933 (as discussed in Section III(A) below);

- Plaintiffs fail to state a claim that any of the Offering Documents in connection with the May/June Offerings contained any materially false statements (as discussed in Section III(B) below); and

- Plaintiffs' class claims on behalf of purchasers of common stock or preferred stock after August 2007 are unsustainable as a matter of law (as discussed in Section III(C) below).

With regard to the standing issue, neither of the Plaintiffs who purport to sue on the May/June Offerings, Betty Manning and John Learch, allege any facts indicating that either of them purchased any securities directly from any of the May/June 2007 Underwriter Defendants. The absence of such allegations is fatal to their Section 12(a)(2) claims, under controlling United States Supreme Court precedent.

With respect to the merits of the 1933 Act claims, Plaintiffs seek to hold the May/June 2007 Underwriter Defendants responsible for a handful of allegedly misleading statements in the

---

[1] One of the May/June 2007 Underwriter Defendants, Stifel, Nicolaus & Co., was also a participant in the January 2008 offering, with respect to which other underwriter defendants have moved to dismiss. Stifel, Nicolaus joins in those motions, and incorporates the arguments of those underwriter defendants as though fully set forth herein.

Offering Documents for the May/June 2007 Offerings—none of which, however, were materially false when made. The Thornburg Defendants' memorandum of law in support of their motion to dismiss ("Thornburg Defendants' Motion") powerfully demonstrates that Plaintiffs have failed to plead any materially false statements in connection with *any* of the four public offerings at issue in this case. The May/June 2007 Underwriter Defendants join in the Thornburg Defendants' Motion, and further demonstrate below that the alleged false statements in the *May and June* offerings are barely pled at all—certainly not with the particularity required by either Rule 9(b) or 8(a) of the Federal Rules of Civil Procedure.[2]

Finally, Plaintiffs improperly seek to represent a class of investors who purchased Thornburg securities following a series of negative public announcements, stock price drops, and shareholder litigation—all of which Plaintiffs admit in the CAC. As pled, the class claims for purchasers of Thornburg securities after August 14, 2007 are unsustainable as a matter of law.

Despite Plaintiffs' thinly-veiled attempt to bring additional "deep pocket" defendants into this proceeding some nine months after the fact, the securities fraud claims against the May/June 2007 Underwriter Defendants are meritless, and should be dismissed.

## II.    STATEMENT OF FACTS

Thornburg is a publicly-traded residential mortgage lender with an emphasis on the "jumbo" (over $417,000) segment of the adjustable-rate mortgage ("ARM") market. Thornburg both originated mortgage loans and held "mortgage backed securities" ("MBS") that were collateralized by mortgages of various types, including "prime," "Alt-A" and other alternative

---

[2]  The May/June 2007 Underwriter Defendants also move to dismiss the 1933 Act claims to the extent they are based upon statements that are not contained within, or incorporated by reference into, the Offering Documents.

loan products. As Thornburg publicly disclosed, its portfolio of loans and MBS spanned the range of credit ratings, from AAA to BB/Ba and below.[3]

*The May and June 2007 Offering Documents.* The May/June 2007 Offering Documents consisted of a) the May 2005 "shelf" registration statement; b) a "base prospectus" issued on June 16, 2005; c) supplemental prospectuses issued on May 7 and June 18, 2007; and d) three SEC periodic reports that were incorporated by reference into the May/June 2007 Offering Documents, specifically the 2006 annual report on Form 10-K, the April 16, 2007 Form 8-K (containing Thornburg's Q1 2007 earnings press release), and the Q1 2007 Form 10-Q, the substance of which was largely duplicative of the Q1 2007 earnings release.

*The Alleged Misleading Disclosures in the May and June 2007 Offering Documents*

The 2005 "shelf" registration statement and "base" prospectus say very little, and Plaintiffs do not contend that any false statements actually were made in those documents. Plaintiffs' claims against the May/June 2007 Underwriter Defendants are entirely based on a handful of statements in the two Supplemental Prospectuses, and in the three SEC periodic reports incorporated by reference into the May/June 2007 Offering Documents, as set forth at CAC ¶¶ 553-567. The sum total of the alleged false statements consist of:

- The audited financial statements contained in the 2006 10-K (CAC ¶ 555);

- The statement in the 4/19/07 earnings release that Thornburg would benefit from wider spreads on new prime mortgage assets "caused by concerns concentrated in

---

[3] 2006 10-K, at p. 30 (RJN Ex. A). This and other relevant excerpts from the Company's SEC filings are set forth in the Defendants' Joint Request for Judicial Notice ("RJN"), Exhibits A through NN.

the subprime and Alt-A segments," and that "as a result, our outlook for 2007 and 2008 continues to improve" (CAC ¶ 556);

- The Sarbanes-Oxley "certification" made by Thornburg's Chief Executive Officer and Chief Financial Officer in the Q1 2007 10-Q (CAC ¶ 561);

- The statement in the Q1 2007 10-Q that Thornburg's "interim financial information should be read in conjunction with [Thornburg's] 2006 Annual Report on Form 10-K" (CAC ¶ 562);

- Statements in the Q1 2007 10-Q to the effect that Thornburg had a "focus" on "high credit quality assets to minimize potential credit losses;" that the Company acquired and originated "A quality" ARM loans;" that the Company's focus on high credit quality assets "creates significant portfolio liquidity and low portfolio price volatility…;" and that "we focus on acquiring High Quality assets to minimize potential credit losses…" (CAC ¶ 563, 564)[4]; and

- Statements in the June 2007 Offering Documents that either repeat the same statements outlined in CAC paragraphs 563 and 564, or were statements made in the original "base" prospectus filed with the SEC on June 16, 2005—some *two years* before the June 2007 Offering (CAC ¶¶ 565, 566).[5]

---

[4] This particular statement was *not* incorporated by reference into the May 2007 Offering Documents, since it did not exist at the time of that offering. Therefore the three underwriter defendants involved in the May 2007 Offering (Citigroup, AG Edwards and Stifel) cannot be liable for these statements in connection with the May 2007 Offering.

[5] These statements were *not* made in the May 2007 Offering Documents. Therefore, the three underwriter defendants involved in the May 2007 Offering (Citigroup, A.G. Edwards and Stifel) cannot be liable for these statements in connection with the May 2007 Offering.

These statements fall into four categories, each of which is discussed in greater detail in Section III(B) below: 1) alleged misstatements concerning future credit risk arising from Thornburg's portfolio; 2) alleged misstatements in the 2006 audited financial statements; 3) alleged misstatements concerning the first quarter 2007 operating results; and 4) alleged misstatements in the June 2007 Offering Documents.[6]

### *The Market's Awareness of Risks to Thornburg's Business in 2007*

Although Plaintiffs seek to obscure these facts, the pleadings before this Court and other judicially noticeable facts demonstrates that the market was acutely aware of the risks posed to Thornburg by the "credit crunch" the markets began to experience in 2007, and the particular risk that Thornburg might be exposed to margin calls. Examples of the warnings to Thornburg investors include the following:

- The 2006 10-K, filed before the commencement of the class period, warned that the Company was making exceptions to its underwriting guidelines on a "case-by-case basis," meaning that it was lending to persons who otherwise did not qualify (2006 10-K at p. 8) (RJN Ex. A);[7]

- The 2006 10-K also warned investors that Thornburg's collateralized debt included hundreds of millions of dollars of debt that was rated BB/Ba or below—another sign of risk to the portfolio (2006 10-K at 30) (*Id.*);

---

[6] The May/June 2007 Underwriter Defendants note that defendant Citigroup Global Markets is *only* alleged to have participated in the May 2007 Offering. Accordingly, the *only* allegations that pertain to the claims against Citigroup are the first two bulleted items above.

[7] As set forth in the motion to dismiss filed by the other underwriter defendants, this disclosure also effectively disclosed the fact that Thornburg was holding loans or mortgage-backed securities that were "Alt-A".

- The Company's April 19, 2007 earnings release for Q1 2007 warned that there were "troubles in the mortgage lending industry as credit standards tighten," and that "recent credit problems in the mortgage banking industry are resulting in tighter credit lending practices industry-wide" (RJN Ex. JJ);

- The Company's Q1 2007 10-Q warned that the Company was retaining in its own portfolio classes of ARM Loans Collateralizing Debt that were not AAA-rated—another sign of credit risk to the Company (RJN Ex. D);

- The Company's Q1 2007 10-Q also disclosed that the Company was purchasing third-party ARM loan securitizations that were below Investment Grade, and that the Company has credit exposure on the underlying loans;

- Most importantly, the very risk that led to the onset of Thornburg's financial problems in mid-2007—margin calls—was explicitly set forth in the risk factor disclosures in Thornburg's 2006 10-K. As more fully discussed in the Thornburg Defendants' Motion, that disclosure was directed to the key risk that actually materialized in August 2007.

All of the risks set forth above were incorporated by reference into the May/June 2007 Offering Documents.

### Thornburg's Adverse Disclosures in 2007

The CAC attributes much of the financial turmoil that befell Thornburg to the fact that the commercial paper market "dried up." (CAC ¶ 130-32). Notably, however, Plaintiffs say that this lack of liquidity caused by the drying up of the ABCP market "began to affect the Company in *July 2007*" (CAC ¶ 130)—in other words, *after* the May/June 2007 Offerings already had been consummated. Elsewhere, Plaintiffs claim that the commercial paper market "sputtered to a

halt" no later than July 2007 (CAC ¶ 133)—again, *after* the May and June Offerings were completed.

On August 14 and 20 2007, Thornburg disclosed the "sudden and unprecedented decline in market prices of its AAA-rated mortgage securities that began on August 9, 2007 and subsequent increase in margin calls related to its repurchase agreement financings on those securities."[8] On August 20, 2007, the Company announced that it was forced to sell over $20 billion of mortgage backed securities. Plaintiffs quote from the Company's 2007 correspondence to the SEC on this subject, in which Thornburg stated that "*in early August 2007, the secondary market for financing prime quality mortgage assets and rated mortgage-backed securities came under severe pressure...*" (CAC ¶ 150).

Following Thornburg's adverse disclosures, Wall Street analysts and rating agencies issued reports that confirmed the materialization of the risks about which Thornburg previously had warned—the high risk of margin calls if mortgage values dropped materially.[9] Indeed, research analysts employed by several of the May/June 2007 Underwriter Defendants

---

[8] *See* Thornburg's August 14, 2007 press release (RJN Ex. M).

[9] For example, on August 14, 2007, analysts at AG Edwards noted its concerns that "TMI could see additional negative marks in its portfolio" and the increased probability that Thornburg would have to liquidate assets rather than "successfully navigat[e] the current liquidity crisis." (CAC ¶279.) A contemporaneous report from Deutsche Bank pointed to "[d]ifficult conditions in the mortgage market" and their impact on Thornburg's business, as well as their prediction that conditions would "remain difficult." (*Id.* ¶ 280.)

*downgraded the stock* in August 2007, as it became clear that Thornburg would face margin calls and other adverse impacts on its business.[10]

### History of the Litigation

The first class action suit was commenced on August 21, 2007, one day after the disclosures that, according to Plaintiffs, "stunned the market" (CAC ¶ 135), and "shocked investors" (*Id.* ¶¶ 198, 273). Plaintiffs in the original suit also admitted that Thornburg's stock price "plummeted" after the Company's "true financial condition" was revealed.[11] Indeed, the judicially noticeable stock price history for Thornburg during the Class Period reveals that in August 2007, the Company suffered material stock price declines on the three consecutive

---

[10] On August 10, 2007, Moody's, Standard & Poor's ("S&P") and AG Edwards downgraded Thornburg, in part out of concern that the Company faced increasing margin calls. Soon thereafter, on August 14, 2007, Piper Jaffray, Jefferies & Co., Friedman Billings Ramsey & Co., RBC Capital Markets and Credit Suisse downgraded Thornburg's stock to "underperform"—the lowest possible rating-- and Moody's further downgraded its credit ratings to B2, leaving the ratings on review for further downgrade. (CAC ¶¶ 267, 268, 271.) The RBC report specifically reported that Thornburg "is likely to feel the sting" of margin calls, which were "likely draining cash," and that "we now expect TMA to cut its dividend" (RJN Ex. LL). Likewise, the Credit Suisse report stated that as a result of margin calls, "we expect TMA to have to cut its dividend significantly, and that the lack of liquidity "has eroded the overall value of TMA's portfolio." Credit Suisse also stated that it had "heightened concerns surrounding liquidity at the company" (RJN Ex. MM).

After Thornburg disclosed the delay of payment of its second quarter dividend and reported a decline in book value on August 14, 2007, AG Edwards further downgraded the Company's stock to "Sell/Speculative." The next day, Deutsche Bank issued an analyst report reducing its 2007 and 2008 EPS estimates for the Company and maintained its "Sell" recommendation. (CAC ¶¶ 279, 280.)

[11] *Slater v. Thornburg, et al,* Complaint ¶ 5. (RJN Ex. AA.)

trading days of August 10, 13 and 14, dropping from a closing price of $20.72 on August 9 to just $7.43 on August 14, on huge trading volume.[12]

Since the filing of the original complaint, and as this Court already has been apprised, the CAC filed in May 2008 extended the class period by many months, added several new plaintiffs, and added the many underwriter defendants who are now before the Court. The original action made no allegations about "fraud" in connection with the May/June 2007 Offerings, and included no allegations about any of the May/June Underwriter Defendants.

### The Restatement of 2007 Financial Results

Well after the original lawsuit was filed, Thornburg announced that it was restating its 2007—*not 2006*—financial statements. For purposes of the instant motion, the restatement of the 2007 financial statements is an irrelevancy. That is because the May/June Offerings did not include the audited 2007 financial statements—they did not yet exist—and the May/June 2007 Underwriter Defendants have no liability for any false accounting in the 2007 financial statements. To the extent that Plaintiffs argue that claims concerning the 2007 financial statements somehow are actionable against the May/June 2007 Underwriter Defendants, Movants hereby incorporate by reference the discussion in the Thornburg Defendants' Motion concerning the 2007 financial statements, and the reasons why Plaintiffs have failed to state a claim based on alleged GAAP violations therein.[13]

---

[12] Chart of NYSE Trading Data (RJN Ex. KK.)

[13] Although the May/June 2007 Offerings included information on one quarter of 2007, there are no allegations of financial misstatements for the first quarter of 2007 that are mentioned anywhere in the Section 11 claim against the May/June 2007 Underwriting Defendants.

# III. ARGUMENT

## A. THE SECTION 12(A)(2) CLAIMS MUST BE DISMISSED FOR LACK OF STANDING

### 1. Plaintiff Betty Manning Fails to Allege That She Purchased in the May 2007 Offering From Any of the May/June 2007 Underwriter Defendants, and Therefore Lacks Standing to Sue Under Section 12(a)(2)

The only potentially viable plaintiff with standing to sue in connection with the May 2007 Offering is Betty Manning, who is alleged to have purchased common stock in that Offering, and who is alleged to have sold her shares in August 2007. Under Section 12(a)(2), a plaintiff must plead with particularity that she purchased her securities from the defendant she is suing. This "purchaser-seller" rule was established by the United States Supreme Court in *Pinter v. Dahl,* 486 U.S. 622 (1988), in which the Court noted that the language of Section 12 "contemplates a buyer-seller relationship not unlike traditional contractual privity." *Id.* at 642. Subsequent decisions have made clear that the purchaser-seller rule applies to Section 12(a)(2) claims in particular. *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 870 (5th Cir. 2003).[14] Manning is not alleged to have purchased her common stock in the May 2007 Offering from any of the May 2007 Underwriter Defendants, and thus she lacks standing to sue under Section 12(a)(2).

---

[14] The purchaser-seller rule has been interpreted by some courts to permit standing if the defendant actively solicited the plaintiffs' purchases of the involved securities. *See, e.g., Steed Fin. LDC v. Nomura Sec. Int'l, Inc.,* 2001 WL 1111508 (S.D.N.Y. Sept. 20, 2001. But no such allegations of active solicitation by any Underwriter Defendant is made in the CAC.

## 2. No Court-Appointed Plaintiff Has Standing to Sue on the June 2007 Offering, and Plaintiff John Learch has No Standing to Sue Under Section 12(a)(2)

The only plaintiff that is alleged to have purchased preferred stock in the June 2007 Offering was John Learch, whose certification indicates that he purchased such securities on June 19, 2007. As the Court will note, however, Mr. Learch was never appointed by this Court to serve as a Lead Plaintiff. The May/June 2007 Underwriter Defendants submit that Learch lacks standing to sue where, as here, he was never designated by this Court to represent a class of persons suing on this offering.[15]

Even if Mr. Learch could overcome his failure to comply with the Lead Plaintiff provisions of the PSLRA, he nevertheless lacks standing to sue under Section 12(a)(2). Like Ms. Manning, Mr. Learch does not allege that he purchased his Series E shares from any of the June 2007 Underwriter Defendants. For the same reasons discussed above with respect to Ms. Manning's Section 12(b)(2) standing, Mr. Learch clearly lacks standing to assert Section 12(a)(2) claims arising out of the June 2007 offering.

---

[15] *See, e.g., In re Select Comfort Corp. Sec. Litig.,* 2000 U.S. Dist. LEXIS 22697 (D. Minn. 2000) (dismissing Section 11 claims brought by individual who was not appointed a Lead Plaintiff in this matter, and therefore was without standing to assert any claims on behalf of the class).

**B.    THE CAC FAILS TO STATE A CLAIM AGAINST THE MAY/JUNE 2007 UNDERWRITER DEFENDANTS**

Based on the facts actually pled in the CAC, and the other judicially noticeable facts discussed above, the conclusion is inescapable that Plaintiffs have failed to allege with particularity how any alleged misrepresentations in the May/June 2007 Offering Documents were *materially false when made*. Accordingly, Plaintiffs' Section 11 and 12(a)(2) claims against the May/June 2007 Underwriter Defendants should be dismissed.

**1.    Plaintiffs Must Meet Heightened Pleading Requirements For Their Section 11 and 12(a)(2) Claims**

It is widely recognized that Rule 9(b) applies when claims are "grounded in fraud." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996) ("[T]he particularity requirements of Rule 9(b) apply to claims brought under Section 11 when . . . they are grounded in fraud."); *see also Yuan v. Bayard Drilling Techs., Inc.*, 96 F. Supp. 2d 1259, 1265-66 (W.D. Okla. 1999) (noting that "[a]lthough the Tenth Circuit has not yet decided this issue, the implication is that the Tenth Circuit will follow the majority [rule that 9(b) applies to Section 11 and Section 12(a)(2) claims sounding in fraud]" (quoting *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1251 (10th Cir. 1997). Federal Rule of Civil Procedure 8(a)(2) *also* requires heightened pleading of the alleged false statements. Under the pleading standards recently enunciated by the U.S. Supreme Court in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), to survive a Rule

12(b)(6) motion to dismiss the plaintiff must allege "enough facts to state a claim to relief that is *plausible on its face.*" *Id.* at 1974 (emphasis added).[16]

In an effort to avoid the application of Rule 9(b), Plaintiffs attempt in paragraphs 598 and 607 to incorporate some, but not all, of the key charging allegations in the CAC into their Section 11 and 12(a)(2) claims. In doing so, Plaintiffs *omit* all the allegations found at CAC pars. 115-485, including the entire Section entitled "Allegations of GAAP Violations" (CAC pars. 417-432), all allegations concerning the Company's failure to disclose "in violation of GAAP" (CAC pars. 433-440), and all allegations concerning the "2008 Restatement" (CAC pars. 442-446). With that sizeable retraction, Plaintiffs then declare that they are not alleging that any Securities Act Defendant "committed fraud or acted with deceitful intent." (CAC ¶ 510).

What is left from this exercise is a Section 11 claim with almost no content. With regard to the May/June 2007 Offerings, the content is entirely confined to the allegations at CAC pars. 553-567. As discussed below, this skeletal claim simply does not pass muster under either Rule 9(b) or 8(a), and utterly fails to show that any of the challenged statements were *materially false when made.*

2. **Plaintiffs' Section 11 and 12(a)(2) Claims Fail to Allege The Existence of Actionable Misstatements in the May/June Offering Documents**

Plaintiffs' Section 11 and 12(a)(2) claims against the May/June 2007 Underwriter Defendants are entirely based on the handful of statements outlined in Section II above. As

---

[16] The Tenth Circuit recently followed and applied *Twombly* in *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (stating that if a "complaint is sufficiently devoid of facts necessary to establish liability that it encompasses a wide swath of conduct, much of it innocent, a court must conclude that plaintiffs have not nudged their claims across the line from conceivable to plausible").

discussed below, Plaintiffs fail to discharge their burden of pleading falsity with the requisite particularity, even under the pleading standards of Rule 8(a) in light of *Twombly*.

### *Alleged Misstatements Concerning Future Credit Risks to Thornburg's Portfolio.*

Plaintiffs contend that "the Offering Documents represented that the Company was a prime loan originator, and that it possessed High Quality assets and assets underwritten to A Quality standards, while failing to disclose that it originated Alt-A loans, and held billions in MBS backed by risky Alt-A collateral." (*Id.* ¶603(a).) In essence, Plaintiffs' Section 11 claim contends that Thornburg misrepresented the future credit risk to its loan portfolio, due to the fact that an unidentified portion of its portfolio was comprised of Alt-A loans.

As noted in the Thornburg Defendants' Motion, the Company made ongoing disclosures of the composition of its loan and MBS portfolios, including their performance characteristics and credit ratings, all of which are accurate statements of historical fact.[17] *See* Thornburg Defendants' Motion. The May/June 2007 Underwriter Defendants join in those arguments, which demonstrate that none of the challenged statements concerning the composition of the Company's loan portfolio was materially false when made.

In their charging allegations at CAC pars. 553-567, Plaintiffs fail to point to a single representation that Thornburg made in the May/June 2007 Offering Documents to the effect that the Company *did not hold any Alt-A loans* in its mortgage and MBS portfolios. Although Plaintiffs attack Thornburg's statement that it was an originator of primarily jumbo ARM mortgages with a "*focus* [] on prime origination, not subprime or Alt-A" (*Id.* ¶14.), such a

---

[17] By way of example, the Thornburg Defendants point to their disclosures in the 4/19/07 8-K, and state that nothing therein was contradicted by the alleged fact that the Company had some Alt-A loans and some ARM assets backed by Alt-A loans. Thornburg Defendants' Motion.

"focus" cannot fairly be read to constitute an affirmative misrepresentation that Thornburg held no Alt-A loans, much less that whatever Alt-A loans it held posed a material additional credit risk to Thornburg at that time. Plaintiffs, of course, nowhere even attempt to quantify the alleged increased credit risk to the portfolio, or even that it resulted in an actual credit loss. To the extent that Plaintiffs' focus on "Alt-A" is intended to demonstrate that Alt-A loans were by their nature of higher credit risk, Plaintiffs cannot seriously dispute that Thornburg disclosed that it was exposed to such increased credit risk, since it fully disclosed that the Company was holding a variety of differently-rated MBS securities, including securities that were rated BB/Ba and below, and that it was exposed to a serious risk of margin calls. Without more, Plaintiffs simply have failed to plead any statement about the credit risk to the Thornburg portfolio that was *false when made.*

### *Alleged GAAP Violations in the 2006 10-K*

Plaintiffs allege that the May/June 2007 Offerings incorporated by reference the 2006 10-K, and that the 2006 10-K "reported . . . the Company's financial results for the year-ended December 31, 2006." (CAC ¶555.) Plaintiffs likewise allege that the May/June 2007 Underwriter Defendants' Section 11 liability is based in part upon the allegation that "the Offering Documents incorporated the Company's financial results for the year-ended December 31, 2006, which the Company's independent auditors later reported were materially misstated and required restatement." (CAC ¶603(b)).

Here, Plaintiffs utterly have failed to plead how the *2006* financial statements that were included in the May/June 2007 Offerings were materially misstated. In fact, through its effort to avoid incorporating the substance of its accounting fraud allegations into the 1933 Act claims, Plaintiffs have deleted the entirety of their "Allegations of GAAP Violations" from the Section

11 and 12(a)(2) claims, leaving nothing more than the empty allegation that the 2006 financial statements somehow were not prepared in compliance with generally accepted accounting principles ("GAAP") — without any allegations whatsoever as to how that is so. [18]

Even if the Court were to overlook this glaring pleading deficiency, allegations of GAAP violations inherently involve the application of professional judgment. Given the complexity of accounting judgments, courts have required more than generic allegations of financial misstatement, or even restatement, before holding parties responsible for fraudulent misrepresentations. Here, to the extent Plaintiffs have attempted to plead GAAP violations *somewhere* in the CAC, they have failed to do so with the particularity required under controlling case law. The Underwriter Defendants join in the Thornburg Defendants' Motion on this subject, which further demonstrates why the allegations of GAAP violations must be rejected.[19]

Finally, contrary to the inference Plaintiffs seek to draw, Thornburg's 2006 10-K audited financial statements *have never been restated.* The fact that Thornburg's auditors at one point may have suggested that the 2006 financial statements might need to be restated is not dispositive. In fact, it is clear that from the complaint and Defendants' Joint Request for Judicial

---

[18] A close reading of the "Allegations of GAAP Violations" section reveals that the alleged GAAP violations appear to relate to the financial results for the *second* quarter of 2007 (Complaint ¶¶ 434, 436), and that the Company's accounting was flawed because the Thornburg Defendants "knew, or should have known, *as of the filing of its Form 10-Q on August 8, 2007,* that there were questions regarding the recoverability of the full value of TMI's assets…" (*Id.* ¶ 438) (emphasis added). Obviously, this allegedly "knowing" conduct post-dated the May/June 2007 Offerings, and the May/June 2007 Underwriter Defendants therefore cannot be liable for these alleged misstatements as a matter of law.

[19] The 2006 audited financial statements are deemed "expertised" for Section 11 liability purposes, since the Company's outside auditors consented to be named as experts in the registration statement and prospectus. 15 U.S.C. § 77k(b)(3)(B); *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 662-66 (S.D.N.Y. 2004).

Notice—and Plaintiffs conspicuously fail to mention this fact-- that Thornburg's outside audit firm became comfortable with the 2006 financial statements, that they consented to the restatement of 2007 results only, and that they issued a "clean" audit opinion on the 2006 audited financial statements when Thornburg filed its amended 10-K/A on March 11, 2008.[20]

In light of the above, Plaintiffs simply cannot carry their heavy pleading burden to specify how and to what extent the 2006 financial statements were not prepared in accordance with GAAP, or were otherwise materially misstated.[21]

### *Misstatements in the First Quarter 2007 Results*

Plaintiffs also allege that the May/June 2007 Offering Documents were materially misleading because they incorporated by reference the first quarter 2007 earning release filed on Form 8-K on April 19, 2007 (and the related 10-Q). First, Plaintiffs point once again to statements that the Company had a "focus" on high credit quality loans, which are not actionable for the reasons stated above. Second, Plaintiffs point to the statement in the 4/19/07 earnings release that because of the "wider spreads on new prime mortgage assets," the Company's outlook for 2007-08 "continues to improve." But these statements, and similar statements incorporated by reference into the May/June 2007 Offering Documents to the effect that the Company maintained its "focus" on originating prime mortgage loans and acquiring "high

---

[20] *See* KPMG's "Report of Independent Registered Public Accounting Firm" dated February 27, 2008, at F-3 and F-4 to Thornburg's 10-K/A filing on March 11, 2008. (RJN Ex. C.)

[21] *See In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 985-86 (N.D. Cal. 2007) ("[A]lthough plaintiffs contend that Levi engaged in the purported accounting improprieties, Levi's audited financial statements and filings with the SEC do not reflect any restatements for these purported improprieties and there is otherwise no indication that the financial information is materially false or misleading statements in the manner alleged by plaintiffs." (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007)).

quality" assets, are "general statements of optimism . . . and as such, are simply not actionable." *Wenger v. Lumysis, Inc.,* 2 F. Supp. 2d 1231, 1245-46 (N.D. Cal. 1998).[22] Moreover, to the extent Plaintiffs claim that the "outlook" statement was false, the May/June 2007 Underwriter Defendants are protected by the PSLRA's "safe harbor" for forward-looking statements, and Plaintiffs must plead that the May/June Underwriter Defendants had *actual knowledge* that the "outlook" statement was false when made. *Sun Healthcare,* 181 F. Supp. 2d at 1287. The CAC, however, makes no such allegation.

Finally, to the extent Plaintiffs purport to rely upon the Company's "SOX certification" contained in the first quarter 2007 10-Q (CAC ¶ 561) as somehow actionable against the May/June 2007 Underwriter Defendants, this argument must be rejected since courts have held that there is no private right of action for alleged violations of the SOX certification provisions. *See, e.g., Kogan v. Robinson,* 432 F. Supp. 2d 1075, 1076 (S.D. Cal. 2006) (rejecting argument that "certification" statute in Sarbanes-Oxley Act created a private right of action); *Perdroli v. Bartek,* 2008 U.S. Dist. LEXIS 26041, *5, *6 (E.D. Tex. 2008) (in derivative case, explaining that "the predominant holdings across the country [are] that the [Sarbanes-Oxley] Act does not create a private cause of action under ¶ 304 as well as other sections of the Act").

---

[22] *See also In re Sun Healthcare Group, Inc. Sec. Litig., 181 F. Supp. 2d 1283, 1291-92 (D.N.M. 2002); In re Wet Seal Sec. Litig.,* 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007) ("Statements are not actionable if they are vague and constitute run-of-the-mill corporate optimism on which no reasonable investor would rely" and "[p]redictions and forecasts which are not of the type subject to objective verification are rarely actionable." (internal quotation marks omitted)).

### *Misstatements in the June 2007 Offering Documents*

The alleged misstatements in the June 2007 Offering Documents are not actionable for the same reasons discussed above: either they are accurate statements of historical fact, inactionable statements of opinion, or inactionable forward-looking statements.

CAC paragraph 565 purports to attack two statements in the June 2007 Offering Documents that in fact were statements made *two years earlier,* in the "base" prospectus filed with the SEC in June 2005, and are specifically qualified to say that the statements were made "as of the date of this prospectus"—meaning June 2005. Nothing in the quoted matter, which emphasizes the Company's focus on acquiring "high quality, highly liquid assets," is alleged to have been false as of the date those statements were made in June 2005.[23] Moreover, to the extent Plaintiffs purport to rely upon the statement that the "high quality" assets the Company held "could be readily convertible to cash," that statement is forward-looking, and not actionable because Plaintiffs fail to allege that the May/June 2007 Underwriter Defendants had *actual knowledge* that this statement was *false when made* in June 2005.

---

[23] CAC ¶ 565 quotes two such statements from the June 2005 base prospectus, which was incorporated in the June 2007 Offering Documents:

- "we focus on acquiring high quality assets to minimize potential credit losses and to ensure our access to financing. Similarly, we maintain strict credit underwriting standards and, as of the date of this prospectus, have experienced cumulative credit losses of only $174,000 on our loan portfolio, since we began acquiring loans in 1997"; and

- "Our primary focus is to acquire and originate high quality, highly liquid assets such that sufficient assets could be readily converted to cash, if necessary, in order to meet our financial obligations."

As to the statements in CAC paragraph 566, Plaintiffs do not allege that any of the specific statements quoted were false statements of historical fact (for example, that 95% of the Company's ARM Asset portfolio was High Quality as of March 31, 2007).[24]

## C. THE PUTATIVE CLASS PERIOD IS UNSUSTAINABLE AS A MATTER OF LAW GIVEN THE MANY CURATIVE DISCLOSURES MADE IN AUGUST 2007.

Under Sections 11 and 12 there can be no recovery for alleged losses that are not attributable to the alleged misstatements or omissions in a prospectus, oral communication, or registration statement. *See* 15 U.S.C.A. §§ 77k(e). Any alleged decrease in the value of a security before the disclosure of an alleged misstatement or omission cannot be attributed to the alleged misstatement or omission and such a loss is not actionable under the 1933 Act. *See, e.g.,* *In re McKesson HBOC Inc., Sec. Litig.*, 126 F. Supp. 2d 1248, 1262 (N.D. Cal. 2000) (defendant has "absolute" negative causation defense against plaintiffs who dispose of security prior to the date of curative disclosure); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003) (granting motion to dismiss where alleged losses occurred before public disclosure of the allegedly concealed information).

On its face the CAC reveals that curative disclosures were made in August 2007, and class action lawsuits were filed against the Company immediately after those disclosures. As set

---

[24] "High Quality" was, in fact, a defined term as used in Thornburg's SEC filings. The Company's "Glossary" defines "High Quality" in terms of credit ratings, and that it included ARM Loans "which are rated within one of the two highest rating categories by at least one of the Rating Agencies." Plaintiffs do not allege that Thornburg's statements about its High Quality loans, as so defined, were false as of March 2007.

forth above, Wall Street analysts reacted sharply to these disclosures, downgrading the stock and issuing warnings about the Company's liquidity crisis. (CAC ¶¶279-280 (citing A.G. Edwards and Deutsche Bank downgrades on August 15, 2007).) Following these highly visible adverse disclosures that "shocked the market," and the extreme stock price volatility that followed, any suggestion that Thornburg investors who purchased Thornburg securities thereafter somehow were misled is meritless, and the May/June Underwriter Defendants have established the defense of "negative causation" as a matter of law as to any class members who purchased after August 14, 2007 and purport to trace their shares to either the May or June 2007 Offerings. *In re McKesson*, 126 F. Supp. 2d at 1262; *In re Merrill Lynch*, 272 F. Supp. 2d at 254. Plaintiffs simply cannot turn a blind eye to these disclosures and their alleged effects on the market, most of which are admitted in the CAC itself. As a result, Plaintiffs' attempt to state class claims on behalf of purchasers of Thornburg securities during the period August 14, 2007 through March 19, 2008 must be rejected.

## IV.    CONCLUSION

For all the reasons stated herein, and in the Thornburg Defendants' Motion and the motion to dismiss of the other underwriter defendants, the May/June 2007 Underwriter Defendants respectfully request that the Court dismiss the Section 11 and 12(a)(2) claims against them.

DATED: September 22, 2008

Respectfully submitted,

ATKINSON & THAL, P.C.

By  */s/ Clifford K. Atkinson*
        Clifford K. Atkinson

Albuquerque Plaza
201 Third Street NW, Suite 1850
Albuquerque, New Mexico 87102
Telephone:    (505) 764-8111
Facsimile:    (505) 764-8374

*Attorneys for Defendants A.G. Edwards &
Sons, Inc., BB&T Capital Markets, a
division of Scott & Stringfellow, Inc.,
Citigroup Global Markets Inc.,
Oppenheimer & Co., Inc., RBC Dain
Rauscher Inc., and Stifel, Nicolaus &
Company, Incorporated*

**OF COUNSEL**

GIBSON, DUNN & CRUTCHER LLP
Dean J. Kitchens (*pro hac vice admission pending*)
DKitchens@gibsondunn.com
Lindsay R. Pennington (*pro hac vice admission pending*)
LPennington@gibsondunn.com
333 S. Grand Avenue, 51st Floor
Los Angeles, California 90071
Telephone:    (213) 229-7000
Facsimile:    (213) 229-7520

GIBSON, DUNN & CRUTCHER LLP
Jonathan C. Dickey (*pro hac vice admission pending*)
JDickey@gibsondunn.com
200 Park Avenue
New York, New York 10166
Telephone:    (212) 351-2399
Facsimile:    (212) 351-6399

100519782_1.DOC