# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

IN RE THORNBURG MORTGAGE, INC.                    No. CIV 07-0815  JB/WDS
SECURITIES LITIGATION

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion to Dismiss Consolidated Amended

Complaint by Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Joseph

H. Badal, Paul G. Decoff, Clarence D. Simmons, Ann-Drue M. Anderson, David A. Ater, Eliot R.

Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman, filed September

22, 2008 (Doc. 126).   The Court held a hearing on April 22, 2009.  The primary issues are: (i)

whether the Plaintiffs sufficiently allege facts giving rise to the strong inference of scienter

necessary to support liability under the Securities Exchange Act of 1934 ("Exchange Act"), 15

U.S.C. §§ 78a-78oo; (ii) whether the Plaintiffs adequately allege any false or misleading statements

of fact to support liability under the Exchange Act; (iii) whether any of the Defendants are subject

to control-person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); (iv) whether,

under the facts alleged, Paul G. Decoff, Defendant Thornburg Mortgage, Inc.'s ("TMI's") Senior

Executive Vice President and Chief Lending Officer, and/or Defendant Clarence D. Simmons,

TMI's Senior Executive Vice President and Chief Financial Officer, are proper parties defendant

to the Plaintiffs' claim under Section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.

§ 77k; (v) whether, under the facts alleged, any of the Defendants are proper parties defendant to

the Plaintiffs' claim under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2); and (vi)

whether the Plaintiffs properly allege control-person liability against any Defendant under Section

15 of the Securities Act, 15 U.S.C. § 77o.  Because TMI is in the midst of a pending bankruptcy

proceeding, the Court will reserve judgment as to the claims against TMI and the claims that are dependent upon TMI's liability.  Otherwise, the motion is granted in part and denied in part.  The Court dismisses the Plaintiffs' claims based on the Securities Act of 1933 against all of the Defendants.  The Court also dismisses the Plaintiffs' Section 10(b) claims against Defendants Garrett Thornburg, Joseph H. Badal, Decoff, Simmons, Ann-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr.,[1] and Stuart C. Sherman.  The Court dismisses the Plaintiffs' Section 20(a) claims against Thornburg, Badal, Anderson, Ater, Cutler, Kalangis, Lopez, Mullin, and Sherman.  The Court reserves ruling on this motion as to the Plaintiffs' Section 10(b) claim against TMI and the Plaintiffs' Section 20(a) claims against Goldstone, Simmons, and Badal.

### FACTUAL BACKGROUND

This case arises from what the Plaintiffs refer to as "a campaign of selective disclosure characterized by half-truths, outright falsehoods and strategic omissions."  Plaintiffs' Opposition to Defendants' Motion to Dismiss Consolidated Amended Complaint Filed by Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Joseph H. Badal, Paul G. Decoff, Clarence D. Simmons, Anne-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman at 3, filed December 22, 2008 (Docs. 154, 155, 156, 157)("1934 Act Response").  The Plaintiffs' Consolidated Class Action Complaint, filed May 27, 2008 (Doc. 68)("CCAC") , describes a series of public statements and filings dating back to early 2006 that the Plaintiffs assert were fraudulent material misrepresentations.  The Court draws the

---

[1] Mullin is listed as Francis I. Mullin, Jr. in the caption of this motion, but described as Francis I. Mullin, III in the CCAC.  See Consolidated Class Action Complaint ¶ 527, at 162, filed May 27, 2008 (Doc. 68). The Court believes that the two names refer to the same person, and therefore will refer to him as "Mullin."

following statement of facts from the well-pleaded, non-conclusory allegations of the CCAC, as the Court must when analyzing the propriety of a motion to dismiss under rule 12(b)(6) of the Federal Rules of Civil Procedure.

1.     **The Parties.**

This consolidated action is brought by Lead Plaintiffs (i) W. Allen Gage, individually and on behalf of J. David Wrather; (ii) Harry Rhodes; (iii) FFF Investments, LLC; (iv) Robert Ippolito, individually and as Trustee for the Family Limited Partnership Trust; (v) Nicholas F. Aldrich, Sr., individually and on behalf of the Aldrich Family, as well as by the Plaintiffs (vi) Betty L. Manning; and (vii) John Learch (collectively "the Plaintiffs").  The Plaintiffs all purchased shares of TMI stock during the Class Period[2] at prices that they allege were artificially inflated.  They assert that they were damaged as a result of these inflated-price purchases, now that the truth has been revealed. See CCAC ¶ 53, at 15-16.  Manning acquired 550 shares of TMI common stock during the May 2007 Offering.  See id. ¶ 54, at 16.  She bought them on May 4, 2007 and paid $27.05 per share. See id.  Learch, as trustee for the Learch trust, acquired 400 shares of 7.5% Series E Cumulative Convertible Redeemable Preferred Stock in the June 2007 Offering.  See id. ¶ 55, at 16.  He bought his shares on June 19, 2007 and paid $25.00 per share.  See id.

The sole institutional defendant involved in this motion is TMI. Founded in 1993, TMI is a publicly traded residential-mortgage lender that focuses primarily on "jumbo" and "super-jumbo" segment, i.e., loans totaling over $417,000.00, of the adjustable-rate mortgage ("ARM") market.[3]

---

[2] The proposed Class Period is from April 19, 2007 to March 19, 2008, inclusive.

[3] An ARM is "[a] mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index."   Black's Law Dictionary 1102 (9th ed. 2009).

-3-

See CCAC ¶ 5, at 2.  In essence, TMI generates business by loaning and borrowing money, and charging a higher interest rate on the money that it loans to others than its sources charge it on the money that it borrows.  See id. ¶ 5, at 2-3.  As the Plaintiffs put it, "[TMI] generates income from the small, net spread between the interest income it earns on its assets and the cost of its borrowings."  Id.

TMI was formed under the laws of the State of Maryland, and has its principal place of business in Santa Fe, New Mexico.  See id. ¶ 57, at 16.  At all relevant times, TMI's securities have been traded on the New York Stock Exchange ("NYSE") under the symbol "TMA."  Id.  For federal income tax purposes, TMI is classified as a Real Estate Investment Trust, which means that, so long as TMI meets certain requirements, it is exempt from federal and state income tax at the corporate level.  The requirements to maintain this tax exemption are that TMI must: (i) distribute at least eighty-five percent of its taxable income by the end of each calendar year; (ii) declare dividends of at least ninety percent of its income by the time it files its tax returns for such year; and (iii) pay such dividends no later than the date of the first regular dividend payment after such declaration.  See id. ¶ 71, at 20-21.

There are also twelve individuals named as Defendants in this action.  Thornburg was TMI's founder.  See id. ¶ 58, at 17.  At all relevant times, he served as Chairman of the Board of Directors and, until December 18, 2007, acted as Chief Executive Officer.  See id.  Goldstone has served as President, Chief Operating Officer, and a director since June 1993.  See id. ¶ 59, at 17. Goldstone became CEO on December 18, 2007.  See id.  Badal served as a director, the Chief Lending Officer, and Executive Vice President until his retirement on December 31, 2007.  See id. ¶ 60, at 17.  Decoff has served as Senior Executive Vice President and Chief Lending Officer since January 1, 2008.  See id. ¶ 61, at 17.  Simmons has served as Senior Executive Vice President since March 2005, and

Chief Financial Officer since April 2005.  See id. ¶ 62, at 17-18.  These Defendants -- TMI, Thornburg, Goldstone, Simmons, Badal, and Decoff -- will be referred to as "the Thornburg Defendants."  The CCAC describes the remaining individual Defendants, Anderson, Ater, Cutler, Kalangis, Lopez, Mullin and Sherman ("the Director Defendants") only as directors during the Class Period.  See id. ¶¶ 522-28, at 162-63.  When discussing the arguments made in the Defendants' briefs, the Court will refer to them collectively as "the Defendants."

    **2.**    **The Claims.**

This case is a federal securities class action that sets forth claims under the Securities Act and under the Exchange Act.  The Plaintiffs allege that "certain defendants acted knowingly or with recklessness in issuing materially false or misleading statements and/or failing to disclose facts concerning [TMI]'s business and financial condition between April 19, 2007 and March 19, 2008, inclusive."  CCAC ¶ 2, at 1-2.  Thus, the Plaintiffs assert, the Defendants are liable for violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77(o), respectively.

    **3.**    **The Condition of the Housing Market in 2006-2007.**

In 2006 and 2007, real-estate values began to falter, resulting in an increased rate of mortgage defaults.  See CCAC ¶¶ 92-93, 96, at 27-29.  As a result, by early 2007, the market for Alt-A[4] mortgages, mortgage-backed securities ("MBSs"),[5] and asset-backed commercial paper

---

[4] The Plaintiffs define Alt-A loans as "mortgage loans to borrowers who do not qualify for a conventional, prime mortgage loan."  CCAC ¶ 97, at 29.

[5] The Plaintiffs describe MBSs as "a series of fixed-income assets that [a]re bundled and sold as securities."  CCAC ¶ 12, at 5.

("ABCP")[6] shrunk.  See id. ¶¶ 100-03, at 30-31.  The result, according to the Plaintiffs, was three-fold: (i) reduced demand for Alt-A MBSs; (ii) increased cost of obtaining capital; and (iii) decreased revenues from ARM mortgages.  See 1934 Act Response at 7 (citing CCAC ¶¶ 13, 129-33, at 5, 38-39).  Large mortgage lenders began to announce staggering losses coupled with a bleak outlook for the future.  See CCAC ¶¶ 13, 96-103, at 5, 29-31.  TMI, however, continued to deny that the deteriorating mortgage market was affecting it, appearing to report that its superior underwriting standards insulated it from such effects.  See id. ¶¶ 79, 213-14, at 24, 63.

4.      **Problems for Thornburg Mortgage, Inc. -- the Exchange Act Claims.**

According to the Plaintiffs, to show profitability, TMI must continuously increase the totals on its balance sheet by buying and originating mortgage-backed assets.  See id. ¶ 5, at 3.  This business model requires TMI to have continuous access to capital.  See id.  TMI has, historically, acquired capital through public offerings of its securities, short-term borrowings – including reverse repurchase agreements ("RPAs")[7] -- the issuance of asset-backed commercial paper ("ABCP"), and

_____

[6] The CCAC does not appear to define this term.  The phrase refers to "[a]n instrument, other than cash, for the payment of money," Black's Law Dictionary 1220 (9th ed. 2009), that is securitized by some asset, see Investopedia.com Financial Dictionary, Asset-Backed Commercial Paper (ABCP), http://www.investopedia.com/terms/a/asset_backed_commercial_paper.asp (last visited January 14, 2010)("A short-term investment vehicle [that] is typically issued by a bank or other financial institution. The notes are backed by physical assets such as trade receivables, and are generally used for short-term financing needs.").

[7] The Plaintiffs describe a reverse repurchase agreements as follows:

RPAs involve a simultaneous sale of pledged securities to a lender at an agreed-upon price in return for an agreement to repurchase the same securities at a future date (the maturity of the borrowing) at a higher price.  Most RPAs, including the mortgage backed security RPAs that TMI entered into during the Class Period, could require the borrower (in this case TMI) to post additional collateral should the value of the original collateral decline.

CCAC ¶ 74, at 22.

the issuance of collateralized-debt obligations ("CDOs").[8]  See id. ¶ 6, at 3.  TMI was "heavily

leveraged" -- meaning that it borrowed a large amount of money compared to the money that it had.

For example, depository banks are subject to Federal Reserve rules, which mandate ten percent cash

reserves -- for every $10.00 of money that the bank borrows from outside sources, it must retain

$1.00 of actual cash available at all times.  See CCAC ¶ 7, at 3.  TMI's internal policy allows it to

borrow $12.50 for every $1.00 it holds in equity -- an eight-percent equity-reserve position.  See

CCAC ¶ 7, at 3.  Throughout the Class Period, beginning in December 2006, analysts asked TMI

whether its limited equity provided sufficient insurance against a real-estate market downturn.  See

id. ¶ 82, at 24.

In the face of this inquiry, TMI recognized the potential risk of the real-estate market going

south, but repeatedly reassured analysts and its investors that its liquidity position -- its ability to

satisfy debt obligations as they arise -- was not at risk.  See id. ¶¶ 7, 82, at 3, 24-25.  As late as July

20, 2007, TMI reported that its unencumbered assets securing its highly leveraged financing were

at their highest level "in the history of the organization."  Id. ¶ 7, at 3.

> From a leverage perspective, our adjusted equity to asset ratio was 8.19%, up from
> 8.01% in the first quarter, so we did deleverage a little bit during the quarter, and my
> suspicion is that we will deleverage a little bit further as we move -- as we go
> through the second quarter.  We are a little bit nervous about the liquidity issues and
> the skittishness in the mortgage market, and this might just be an environment to be

---

[8] CDOs, also referred to as Collateralized Mortgage Debt, are:

a form of long-term, non-recourse financing, issued by trusts and secured by ARM
Loans originated or purchased by TMI.  CDOs are constructed from a portfolio of
fixed income assets and divide the credit risk among different tranches: senior
tranches (rated "AAA"), mezzanine tranches ("AA" to "BB"), and equity tranches
(unrated).  Losses are applied in reverse order of seniority, so junior tranches offer
higher coupons (interest rates) to compensate for the added risk.

CCAC ¶ 75, at 22.

a little bit more cautious and a little more prudent.

> *However, our unencumbered asset portfolio continues to be very, very strong. That number is, I think we have closed the quarter with the highest level of unencumbered assets in the history of the organization, $1.6 billion of unencumbered assets, so we have plenty of liquidity* as our hedge strategy, our duration management and interest rate risk strategy, and the high credit quality of our portfolio performs as we would have expected it to perform.

Id. ¶ 83, at 25 (emphasis in CCAC).

TMI repeatedly stated in its filings with the Securities and Exchange Commission ("SEC") that its focus was to acquire and originate high quality, highly liquid mortgage assets such that sufficient assets could be readily converted to cash, if necessary, to meet its financial obligations. See id. ¶ 9, at 4. The Defendants -- or, at least Goldstone -- stated throughout the Class Period that TMI was "exclusively" focused on the "prime" loan mortgage market, which is characterized by loans made to borrowers with a credit score above 620, a debt-to-income ratio no greater than seventy-five percent, and a combined loan-to-value ratio of ninety percent. Id. ¶ 10, at 4.

TMI's highest-ranking executives repeatedly denied that TMI originated lower-quality "subprime"[9] or Alt-A loans and, as a result, represented that TMI's asset base and earnings potential were not financially exposed to the decline in the subprime and Alt-A mortgage markets. Id. ¶ 11, at 4. "Alt-A loans are 'alternatives' to the gold standard of conforming, GSE-backed mortgages. Often an Alt-A borrower is unable to provide the proof of income or the verification of assets necessary to obtain a prime mortgage, but has a satisfactory credit score, or vice versa. In other words, Alt-A or 'alternative' loans are associated with and defined by a higher level of risk than

---

[9] The Plaintiffs define "subprime" loans as mortgage loans to individuals with credit scores that would otherwise disqualify them from receiving a conforming mortgage loan. "Loans made to such individuals were termed 'subprime' mortgages. Because the borrowers' low credit scores made subprime loans riskier investments, lenders generally charged subprime borrowers higher interest rates." CCAC ¶ 89, at 26-27.

prime loans due to a borrower's inability to provide these fundamental guarantees." Id. ¶ 98, at 29. See id. ¶ 11, at 4. TMI's multi-billion dollar asset portfolio during the Class Period was comprised of various mortgage-related assets. See id. ¶ 12, at 4. TMI's mortgage-based holdings include both loans it originates, and loans it acquires or purchases. See id. ¶ 12 at 4-5. TMI also purchased MBSs, which it frequently posted as the collateral under its many short-term borrowing agreements. See id. TMI would originate loans, securitize them, and sell off interests in the securitized assets to obtain additional financing. See id.

In 2006 and 2007, as the markets for subprime and Alt-A mortgages began to decline, and subprime and Alt-A borrowers began to default with increased frequency, many mortgage lenders, such as Countrywide, announced that they were experiencing serious financial and operational problems. See CCAC ¶ 13, at 5. The Defendants, however, insisted that TMI's stringent underwriting standards and "high quality" assets insulated it from the market downturn and, in fact, positioned TMI to benefit from the economic environment. Id. As early as April 2007, however, TMI acknowledged burgeoning concerns with the Alt-A mortgage market, but assured its investors that TMI was different than the typical mortgage company and, thus, shareholders' investments in TMI were safe. See id. As the prices for MBSs backed by Alt-A loans as collateral declined throughout 2007, the Defendants never disclosed that TMI was holding billions of dollars worth of MBSs backed by Alt-A collateral on its balance sheets. See id. ¶ 14, at 5. Notwithstanding the Defendants' repeated representations that TMI's focus is on originating prime -- rather than subprime or Alt-A -- loans, several confidential witnesses with direct knowledge of TMI's internal practices state that TMI originated Alt-A loans during the Class Period.[10] See CCAC ¶ 14, at 5-6.

_____

[10] A number of courts have determined that, subsequent to the Supreme Court of the United States' opinion in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007), district courts

During the Class Period, the inclusion of Alt-A assets in TMI's investment portfolio was adversely affecting its balance sheet by (i) being illiquid/non-salable; and (ii) declining in value, which triggered margin calls[11] from RPA counter-parties on RPAs in which the Alt-A assets were being held as collateral. See id. ¶ 15, at 6. Nevertheless, on June 6, 2007, Goldstone stated during a North America REIT's Investor Forum, that TMI occupied a niche in the mortgage-finance market, focusing "exclusively on prime mortgage loan originations, as opposed to subprime." Id. ¶ 76, at 22-23. He further stated:

> [U]nderwriting a $100,000 loan and underwriting a $1 million loan is essentially the

---

should discount the statements of confidential sources in determining whether plaintiffs have shown a strong inference of scienter, as securities-fraud claims require. See Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Group, Inc., 537 F.3d 527, 535 (5th Cir. 2008)("Following Tellabs, courts must discount allegations from confidential sources. Such sources afford no basis for drawing the plausible competing inferences required by Tellabs."); Higginbotham v. Baxter Int'l Inc., 495 F.3d 753, 756-57 (7th Cir. 2007)("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist."). On the other hand, other courts have concluded that the discount might not be particularly steep where, as in this case, the informant's information is sufficiently detailed and details of the informant's position, if not his or her true identity, are revealed. See Inst. Investors Group v. Avaya, Inc., 564 F.3d 242, 263 (3d Cir. 2009). The Court agrees with the United States Court of Appeals for the Third Circuit's practice in Inst. Investors Group v. Avaya, Inc. The Court does not believe it is prudent to completely ignore the anonymous-source information. When a complaint is filed, a court has no way of knowing whether even named witnesses have axes to grind, are lying, and/or exist; indeed, the Court has to assume what named witnesses say is true when ruling on a motion to dismiss. Nevertheless, the Court will decide what weight to give such statements based upon the information the Plaintiffs give about the source and the detail of the information. The Court will therefore consider the informant's anonymity, but will also consider the Complaint's detail regarding the basis of the informant's knowledge and the knowledge itself.

[11] "Margin calls" are demands for funds. The Court interprets this phrase as meaning that people from whom TMI had borrowed money in exchange for securities were asking for some or all of their money back. See Black's Law Dictionary 232 (9th ed. 2009)(defining "call"); Oxford English Dictionary Online, "margin call, n." (2d ed. 1989, Oxford University Press), available at http://dictionary.oed.com/cgi/entry/00301984 (last accessed Dec. 14, 2009)(". . . a demand by a broker that an investor deposit further cash or securities to guarantee the margin . . . on an investment.")(emphasis in original).

-10-

> same process.  So if you can spread your underwriting costs over a $1 million loan
> as opposed to over a $100,000 loan, you've got a more profitable transaction . . . .
> [TMI] actually spend[s] more money than most people in the industry on
> underwriting loans [to] get the credit quality and the portfolio correct, [and] to do
> [its] due diligence [it] can justify that incremental or additional expense from an
> underwriting perspective because [it is] amortizing or capitalizing that expense
> against a much larger average loan size.  So consequently, it actually end[s] up with
> a competitive advantage as it relates to everybody else in the industry.

Id. (alterations in original).  Also, throughout the Class Period, TMI's SEC filings asserted that its

assets are concentrated in "prime" and "high quality" ARM securities that meet TMI's "High

Quality" criteria.  CCAC ¶ 77, at 23.  The SEC filings also insisted that TMI's "primary focus is to

acquire and originate high quality, highly liquid mortgage assets such that sufficient assets could be

readily converted to cash, if necessary, in order to meet our financial obligations."  Id. ¶ 79, at 24.

Notwithstanding these statements, the Defendants -- or, at least Goldstone -- knew by no

later than June of 2007, but did not disclose, that the ABCP market was shrinking rapidly and, by

July 2007, had more or less dried up.  See id. ¶ 15, at 6; id. ¶¶ 131-32, 134, 250, 263, 288, at 38-40,

74-75, 88.  Goldstone allegedly admitted this shrinking market to certain confidential sources during

a private meeting on August 8, 2007.  See id.  ¶ 15, at 6.  Goldstone also reassured the confidential

sources that, notwithstanding the problems in the ABCP market, TMI's relationships with its lender

banks "were fine."  Id. ¶ 131, at 38-39.  Also by July of 2007, the RPA market became an

increasingly more costly source of financing as a result, in part, of a combination of declining asset

values and the illiquidity of the ABCP market.  See id. ¶ 16, at 6.  After early July, TMI was unable

to complete any securitization transaction "based on a lack of buyers in the marketplace."  Id.

Notwithstanding these apparent problems, Goldstone made some comments during the July

20, 2007 earnings conference call to the effect that the forces affecting the mortgage market were

not a threat to TMI.  See id. ¶ 114, 115, at 34.  Goldstone stated that "[TMI is] behaving

substantially different that subprime originators because [it is] not that. [It is] not an Alt-A originator. [It is] not -- [It is] a prime adjustable rate mortgage originator . . . ." Id. ¶ 114, at 34. Goldstone further stated that "[t]he current credit crisis in the market environment today, the liquidity issues in the marketplace today, are creating a very, very nice opportunity for [TMI]." Id. ¶ 115, at 34.

On August 14, 2007, TMI advised the market, without any warning, that because of liquidity concerns, it was exploring the potential sale of assets. See id. ¶¶ 18, 135, 273-74, at 7, 40, 82. TMI had, however, already began a sale of assets by August 10, 2007. See id. ¶¶ 18, 132, 134-35, 137-38, at 7, 39-40. On August 20, 2007, TMI admitted that it had sold approximately thirty-five percent of its portfolio -- $20.5 billion of its highest-rated mortgage-backed assets -- to meet margin calls on its RPA agreements and to satisfy maturing ABCP obligations. See id. Furthermore, TMI had sold those assets at a discount -- approximately ninety-five percent of their face value. See id.; id. ¶ 265(c), at 79. The company did not disclose that its balance sheets contained billions of dollars worth of MBSs that were backed by Alt-A collateral. See id. ¶ 19, at 7.

On August 14, 2007, the price of TMI common stock fell forty-three percent, from $13.81 per share to $7.89 per share. See id. ¶ 20, at 7. Also on that day, a substantial volume of shares -- 27,293,100 -- were traded. See id. Allegedly based on the series of false and misleading statements, TMI was able to obtain hundreds of millions of dollars in its securities offerings. See id. ¶ 22, at 8. Specifically, TMI made one stock offering in early September of 2007, in which it raised $500 million in sales. See id. Further, it made two offerings in January of 2008, which gathered an additional $212 million in total proceeds. See id.

On February 28, 2008, TMI announced in its 2007 Form 10-K Annual Report that it was forced to meet over $300 million in margin calls under its RPAs. See id. ¶ 23, at 8. This disclosure

was the first time that TMI announced that it owned $2.9 billion in MBSs that were backed by Alt-A collateral, and that the declining value of its Alt-A-backed MBSs was to blame for the margin calls. Also on February 28, 2008, upon the release of the above information, TMI's common stock dropped in value again -- this time fifteen percent, from $11.54 per share to $9.86 per share.  See id. ¶ 24, at 8.  TMI stock traded heavily that day, with 21,012,500 shares changing hands.  See id.

TMI had not, however, met all of its margin-call obligations.[12]  On February 28, 2008 -- the same day as the release of TMI's 2007 Form 10-K -- JP Morgan Chase notified TMI that TMI had defaulted on a $320 million loan by failing to meet an earlier margin call of $28,000,000.00.  See id. ¶ 25, at 8-9.  On March 3, 2008, TMI disclosed via a press release that it had "been subject to additional margin calls of approximately $270 million as of February 29, 2008,"[13] and that it was "currently in default with one RPA counterparty."  Id. ¶ 26, at 9; id. ¶ 171, at 48.  TMI also stated that "the lender had not yet exercised its right to liquidate pledged collateral," which the Plaintiffs assert was false, and TMI also stated that, "to the extent any other RPA contains a cross-default provision, the related lender could declare an event of default at any time," which the Plaintiffs assert was misleading.  CCAC ¶ 26, at 9; id. ¶ 372, at 113 (quoting TMI's March 3, 2008 Form 8-K). JP Morgan had already told TMI (i) that the TMI was in default; and (ii) that JP Morgan planned to exercise its rights under the RPA.  See CCAC ¶ 27, at 9.  Also, TMI did not disclose that all of its RPA agreements included cross-default provisions, meaning that any company with which TMI had an RPA could declare a default event and demand buy-back of the TMI RPAs.  See id.

_____

[12] On this issue, the Plaintiffs insist that TMI implicitly concealed information by declaring how many of its margin calls it had met, asserting that such a statement implies that TMI met all of its margin call obligations when, in fact, it had not.  See 1934 Act Response at 9.

[13] The year 2008 was a leap-year, so there was a February 29.

Nevertheless, after the disclosure that occurred, TMI's stock price fell yet again.  Between February 29, 2009 and March 3, 2009, the price of TMI common stock decreased from $8.90 per share to $4.32 per share -- a drop of fifty-one percent.  <u>See</u> <u>id.</u> ¶ 28, at 9.  Over the course of those three days, investors traded 76,858,800 shares of TMI stock.  <u>See</u> <u>id.</u>

On March 4, 2008, TMI's auditor, KPMG, LLP send TMI a letter informing TMI that it was withdrawing its unqualified audit opinion contained in TMI's Form 10-K for 2007.  <u>See</u> CCAC ¶ 29, at 9-10.  KPMG stated that, "due to conditions and events that were known or should have been known to the company," the 2006 and 2007 year-end financial statements "contain material misstatements associated with available for sale securities," and that "substantial doubt exists relative to [TMI]'s ability to continue as a going concern."  CCAC ¶ 29, at 9-10 (alterations omitted).  KPMG demanded that TMI "make appropriate disclosure of the newly discovered facts" and that its previous opinion letter "could no longer be relied upon."  CCAC ¶ 29, at 9-10.  Only one week earlier, KPMG had issued an unqualified audit opinion for TMI.  <u>See</u> CCAC ¶ 30, at 10.

On March 5, 2008, TMI disclosed to its investors that the February 28, 2009 JP Morgan default had triggered cross-defaults in all of TMI's RPAs.  <u>See</u> <u>id.</u> ¶ 32, at 10.  On the same day, the price of TMI's common stock fell again, from $3.40 per share to $1.26 per share -- a 54.4% drop.  <u>See</u> <u>id.</u> ¶ 33, at 10.

On March 6, 2008, TMI received a letter from the NYSE informing TMI that the NYSE had commenced an investigation into transactions in TMI's common stock in January of 2008.  <u>See</u> CCAC ¶ 34, at 10-11.  The investigation was ostensibly regarding the impact of recent market events in the mortgage industry on TMI's book value.  <u>See</u> <u>id.</u> ¶ 178, at 51.  TMI did not disclose the existence of the letter or the investigation that day.  <u>See</u> <u>id.</u> ¶ 34, at 11.

On March 7, 2008, TMI disclosed to the public that it received the letter from KPMG and

further announced that it would restate its financial statements for 2007 -- but not for 2006.  See CCAC ¶ 35, at 11.  TMI stated that the restatement was necessary because of "a significant deterioration of prices of MBS[s], combined with a liquidity position under unprecedented pressure from increased margin calls[,] a portion of which [TMI] has been unable to meet."  See CCAC ¶ 35, at 11 (alterations omitted).  TMI also stated that its restatement would result in a $427.8 million impairment charge[14] on its balance sheet to reflect the fact that it may not have the ability to hold certain ARM assets to maturity.  See id.  Between March 7, 2008 and March 10, 2008, TMI's stock price fell another thirty-six percent, from $1.08 to $0.69.  See id. ¶ 37, at 11-12.[15]  Between March 7, 2008 and March 10, 2008, 34,591,800 shares were traded.  See id. ¶ 394, at 120.

On March 11, 2008, TMI filed the restatement of its financials.  See CCAC ¶ 35, at 11.  The impairment charge listed on the restated financial statement was actually $676.6 million.  See CCAC ¶ 35, at 11.  The restatement resulted in a $300,000.00 reduction in management fees and a $5.4 million reduction in fourth-quarter performance fees.  See id.  The Plaintiffs allege that the

---

[14] An "impairment charge" is most often defined as:

A specific reduction on a company's balance sheet that adjusts the value of a company's goodwill.  Due to accounting rules, a company must monitor and test the value of its goodwill, to determine if it is overvalued.  If it is, the company must issue an impairment charge on its balance sheet, to take into account the reduced value of the goodwill.

Impairment Charge Definition, http://www.investorwords.com/6840/impairment_charge.html (last visited December 14, 2009).  In the context of this lawsuit, the Court believes that the impairment charge represents a decrease in TMI's value for which the balance sheet does not otherwise account.

[15] Paragraphs 11 and 12 are inconsistent with paragraph 394, cited in the 1934 Act Response.  Paragraphs 11 and 12 indicate that the stock dropped to $0.69 per share by the close of the market on March 10, 2008, while paragraph 394 cites to a closing price of $0.71.  Construing the CCAC in the light most favorable to the Plaintiffs, for the purpose of this motion, the Court will assume the closing price was $0.69 on March 10, 2008.

restatement reflected an impairment to TMI's asset portfolio as of December 31, 2007 and not as of March, 2008.

Problems continued to pile on TMI. On March 12, 2008, TMI announced that it had defaulted on a $49,000,000.00 RPA with Morgan Stanley because it could not meet a $9,000,000.00 margin call. See id. ¶ 38, at 12. This default allegedly led to a further decrease in TMI's stock price. See id.

On March 19, 2008, TMI announced that it had entered into a bailout agreement with five of its remaining lenders to obtain approximately $5.8 billion in financing. See CCAC ¶ 39, at 12. Goldstone admitted that the deal would significantly dilute the value of TMI common stock, and that the deal was the only way to "give the company the liquidity and staying power to remain afloat." Id. On the same day, the price of TMI stock fell again. See id. The price per share of TMI common stock dropped fifty percent, from $3.00 per share to $1.50 per share. See id.[16]

On April 28, 2008 -- seven weeks after TMI received the NYSE letter -- TMI informed the investing public that the NYSE had commenced an investigation of some of its January 2008 trading. See CCAC ¶ 178, at 51. Likely because April 28, 2008 is outside the Class Period, the Plaintiffs do not attempt to causally tie any particular adverse effect to this disclosure. They emphasize, however, how long it took -- seven weeks -- for TMI to disclose that the NYSE had commenced this investigation. See id. During those seven weeks, the Plaintiffs point out, TMI issued nine SEC filings and press releases, none of which mentioned the investigation. See 1934 Act Response at 10.

---

[16] The Court notes that, though the CCAC does not address it, TMI stock must have risen in value substantially, from $0.69 per share to $3.00 per share, between March 10, 2008 and March 19, 2008.

4.      **TMI's Public Offerings and SEC Filings**.

The Plaintiffs allege that the Defendants relevant to this motion are strictly liable for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77(o), respectively. See CCAC ¶ 40, at 12. The allegations arise out of four events: (i) the May 4, 2007 public offering of 4,500,000 shares of common stock at $27.05 per share, which resulted in gross proceeds of $121.7 million; (ii) the June 19, 2007 public offering of 2,750,000 shares of 7.5% Series E Cumulative Convertible Redeemable Preferred Stock ("Series E Stock") at $25.00 per share, which resulted in gross proceeds of $68,800,000.00; (iii) the September 7, 2007 public offering of 20,000,000 shares of 10% Series F Cumulative Convertible Redeemable Preferred Stock ("Series F Stock") at $25.00 per share, which resulted in gross proceeds of $500 million; and (iv) the January 15, 2008 concurrent public offering of eight million shares of Series F Stock at $19.50 per share, which resulted in gross proceeds of $156 million, and seven million shares of common stock at $8.00 per share, which resulted in gross proceeds of $56,000,000.00. See id. All of these public offerings were made pursuant to a Shelf Registration Statement ("SRS"), filed with the SEC on Form S-3 on May 20, 2005, and a Prospectus that became effective on June 16, 2005. See CCAC ¶ 42, at 13. The SRS prospectively incorporates by reference:

> any documents [the Company] file[s] pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this prospectus and prior to the termination of the offering of the securities to which this prospectus relates will automatically be deemed to be incorporated by reference in this prospectus and to be part hereof from the date of filing those documents.

CCAC ¶ 42, at 13 (presumably quoting the SRS). Thus, the SRS incorporates by reference certain of the quarterly, annual, and current reports. See CCAC ¶ 42, at 13.

The May 2007 Offering was made pursuant to: (i) the SRS; (ii) a Preliminary Prospectus Supplement filed with the SEC on form 424B5 on May 3, 2007; and (iii) a Prospectus Supplement

filed with the SEC on Form 424B2 on May 7, 2007.  See CCAC ¶ 43, at 13.  The June 2007

Offering was made pursuant to: (i) the SRS; (ii) a Preliminary Prospectus Supplement, filed on Form

424B5 on June 11, 2007; (iii) a Final Term Sheet, filed with the SEC as a Free Writing Prospectus

on June 15, 2007; and (iv) a Definitive Prospectus Supplement, filed with the SEC on Form 424B2

on June 18, 2007.  See CCAC ¶ 44, at 13-14.  The September 2007 Offering was made pursuant to:

(i) the SRS; (ii) a Free Writing Prospectus filed with the SEC on August 30, 2007; (iii) a Preliminary

Prospectus Supplement dated and filed with the SEC on Form 424B5 on August 30, 2007; (iii) a

Final Term Sheet dated August 30, 2007; and (iv) a Prospectus Statement dated August 30, 2007,

and filed with the SEC on Form 424B2 on September 4, 2007.  See CCAC ¶ 45, at 14.  The January

2008 Offerings were made pursuant to: (i) the SRS; (ii) two Preliminary Prospectus Supplements

filed on Forms 424B5 on January 9, 2008; and (iii) two Prospectus Supplements filed on Forms

424B2 on January 15, 2008.  See CCAC ¶ 46, at 14.

     **5.**      **How TMI Makes Money.**

     TMI is not a bank or savings-and-loan institution, but its business purpose, strategy, and

methods of operation are very similar to those of banks and savings-and-loans.  The primary

distinction is that, unlike a bank, TMI finances the purchase and origination of its ARM assets with

equity capital, unsecured debt, CDOs, and short-term borrowing, instead of deposits or federal

advances.  Goldstone, during a November 27, 2007 earnings conference, explained:

> We are a portfolio lender.  I would contrast that with a mortgage banking strategy.
> By mortgage banker, I mean that's a company who is in the business of originating
> mortgages and they then turn around and sell them to third parties and they book
> gain on sale, present value future cash flows as part of that gain on sale.
>
> That's not the business that we are in.  We're a portfolio lender.  We originate loans
> and acquire assets principally to hold on our balance sheet and our income and
> profitability is generated by the spread or the net difference between the income that
> we earn, or the interest that we earn on our assets, and our cost of funds.

CCAC ¶ 72, at 21-22.  The Plaintiffs insist that this business model results in a need to continuously acquire capital and increase the magnitude of its balance sheet.  See CCAC ¶ 73, at 22.  They further insist that the model requires TMI to have ready access to cash to achieve growth and to maintain stability during market downturns.  See id.  The composition of TMI's asset portfolio was a significant aspect of its business plan throughout the Class Period.  See id. ¶ 78, at 23.

TMI acquires cash needed to fund its operation in three primary ways: (i) equity offerings, including selling of preferred and common stock; (ii) short-term borrowing, such as RPAs and ABCP; and (3) CDOs.  See id. ¶ 73, at 22.  Sale of CDOs were a significant source of funding, but became more difficult to consummate as the mortgage financing market declined during the Class Period, particularly for those securities rated less than AAA.  See id. ¶ 75, at 22.  TMI even encountered difficulties selling its AAA-rated CDOs during the Class Period.  See id.

**6.    The Plaintiffs' Motive-Based Facts.**

Another business entity, Thornburg Mortgage Advisory Corporation ("TMAC"), is TMI's manager and runs TMI.  See id. ¶ 193, at 57-58.  Thornburg is the CEO of TMAC.  See id.  Of the other individuals that run TMAC, many are also TMI executives, including Goldstone and Senior Vice Presidents Nathan Fellers and Ann Beckett.  See id.  TMAC executives[17] were paid from management fees that TMAC earned under its Management Agreement with TMI.  TMAC's management fee was based on TMI's "Average Historical Equity," i.e., the difference between total assets and total liabilities calculated each month.  Id. ¶ 194, at 58.  The Plaintiffs insist that this fee structure provided an incentive to grow the size of TMI's asset base to get more income for TMAC

---

[17] Although ¶ 193 of the CCAC refers to "TMI executives," it appears that the Plaintiffs probably meant "TMAC executives," given the context and the fact that ¶ 195 discusses how this structure "incentivized TM[A]C executives."

-19-

and, therefore, more executive compensation.  See id.[18]  At least one analyst has concluded that "this

management structure could produce a potential conflict of interest between the external manager

and shareholders, particularly about the appropriate size of assets during different phases of a

business cycle."  Id. ¶ 195, at 58.

**PROCEDURAL BACKGROUND**

This case is four cases that have all been consolidated before this Court.  Kenneth Slater,

manager of KT Investments, LLC, filed an initial Complaint on August 21, 2007.  See Class Action

Complaint, filed August 21, 2007 (Doc. 1).  In that Complaint, Slater sought to assert class claims

against TMI for violations of the Exchange Act, but did not assert any claims under the Securities

Act.  See Doc. 1.  On February 8, 2008, pursuant to a stipulation, the Court consolidated the action

that Slater brought with three other actions -- namely, Snydman v. Thornburg Mortgage, Inc., No.

CIV 07-1025 JEC/RHS, Gonsalves v. Thornburg, No. CIV 07-1069 MV/WDS, and Smith v.

Thornburg Mortgage, Inc., No. CIV 07-1115 MCA/RLP.  See Order Consolidating Related Actions,

Appointing Lead Plaintiff, and Approving Lead Plaintiff's Selection of Lead Counsel and Liaison

Counsel at 2-3, filed February 8, 2008 (Doc. 49).  At that same time, the Court selected Lead

Plaintiffs, named the firms of Schiffrin Barroway Topaz & Kessler, LLP and Wolf Haldenstein

Adler Freeman & Hertz, LLP, as Co-Lead Counsel, and named the Branch Law Firm as Liaison

Counsel.  See id. at 3.

On May 27, 2008, the Plaintiffs filed the CCAC, alleging violations of the Securities Act and

the Exchange Act.  Specifically, the Plaintiffs assert that the Defendants are liable for violations of

---

[18] The Plaintiffs point out that, during fiscal years 2006 and 2007, respectively, TMI paid
TMAC and its management team approximately $24,700,000.00 and $26,100,000.00 in management
fees, and $34,700,000.00 and $23,100,000.00 in performance-based fees.  See CCAC ¶ 194, at 58.

Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, respectively.  See CCAC ¶¶ 2-3, at 1-2.  The CCAC makes class-action allegations on behalf of a class defined as "all persons and entities who purchased or otherwise acquired TMI common stock and/or securities in the open market and/or in or traceable to the Offerings during the Class Period and who were damaged thereby," but excluding "the Defendants, the directors and officers of TMI, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest."  Id. ¶ 486-87, at 151. In support of their Securities Act claims, the Plaintiffs allege that the offering documents for all four of TMI's public offerings were materially false and/or misleading because: (i) they incorporated TMI's 2006 financial results which, as KPMG determined, were materially false and required restatement; and (ii) they failed to disclose that TMI originated Alt-A mortgage loans and possessed a multi-billion-dollar MBS portfolio backed by Alt-A loans that, the Plaintiffs assert, exposed TMI to financial peril in the declining mortgage-financing market.  See CCAC ¶ 48, at 15.

The Defendants move the Court for an order dismissing the CCAC in its entirety.  The Defendants base their motion on rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedures, and the provisions of the Exchange Act, the Securities Act, and the Private Securities Litigation Reform Act of 1995.  The Plaintiffs filed two responses on December 22, 2008.  See 1934 Act Response; Plaintiffs' Opposition to the Motions to Dismiss Plaintiffs' Securities Act Claims Submitted By: 1) Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Joseph H. Badal, Paul G. Decoff, Clarence D. Simmons, Anne-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman; 2) The May/June 2007 Underwriter Defendants; 3) Friedman, Billings, Ramsey & Co., Inc.; 4) UBS

Securities LLC and Bear Stearns & Co, Inc.; and 5) Stifel, Nicolaus & Company, Incorporated, filed December 22, 2008 (Docs. 152, 153)("1933 Act Response").  The Defendants filed their reply on February 5, 2009.  See Reply Memorandum in Support of Motion to Dismiss Consolidated Amended Complaint by Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Joseph H. Badal, Paul G. Decoff, Clarence D. Simmons, Anne-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman, filed February 5, 2009 (Doc. 168)("Reply").

On May 1, 2009, TMI filed for a petition for voluntary Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Maryland.  See Suggestion of Bankruptcy at 1, filed May 4, 2009 (Doc. 192); Voluntary Petition at 1 (dated May 1, 2009), filed May 4, 2009 (Doc. 192-2). The Suggestion of Bankruptcy asserted that the bankruptcy of TMI operated as an automatic stay of judicial proceedings against TMI under 11 U.S.C. §§ 362(a)(1) and 362(a)(3).  See Suggestion of Bankruptcy at 1.  Beginning on June 1, 2009, the Court filed a series of Minute Orders in which it asked the parties to keep it informed of the status of the pending bankruptcy proceedings and to give it recommendations whether the Court should continue work on the pending motions to dismiss.  On November 16, 2009, after receiving a number of updates as to the status of the pending bankruptcy proceeding in Maryland, the Court issued another Minute Order informing the parties that it would continue work on the motions to dismiss as to the Defendants other than TMI.  See Minute Order, filed November 16, 2009 (Doc. 224).  Because TMI's bankruptcy proceeding continues in the United States Bankruptcy Court in Maryland, the Court decides this motion -- to the extent that it can -- only as to the Defendants other than TMI. See Mason v. Okla. Turnpike Auth., 115 F.3d 1442, 1450 (10th Cir. 1997)("[T]he rule followed by this circuit and the general rule in other circuits is that the stay provision does not extend to solvent codefendants of the

debtor.")(quoting <u>Okla. Federated Gold & Numismatics, Inc. v. Blodgett</u>, 24 F.3d 136, 141 (10th Cir. 1994)); <u>Fortier v. Dona Anna Plaza Partners</u>, 747 F.2d 1324, 1330 (10th Cir. 1984)("The language of [11 U.S.C. § 362] extends stay proceedings only to actions 'against the debtor.' There is nothing in the statute which purports to extend the stay to causes of action against solvent co-defendants of the debtor."); 11 U.S.C. § 362(a) ("[A] petition filed under section 301 [voluntary petition] . . . of this title . . . operates as a stay . . . of . . . the . . . continuation . . . of a judicial . . . proceeding against the debtor that was . . . commenced before the commencement of the case under this title . . . .").

### <u>STANDARD FOR A MOTION TO DISMISS UNDER RULE 12(b)(6)</u>

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." <u>Mobley v. McCormick</u>, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. <u>See</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007); <u>Moore v. Guthrie</u>, 438 F.3d 1036, 1039 (10th Cir. 2006); <u>Hous. Auth. of Kaw Tribe v. City of Ponca</u>, 952 F.2d 1183, 1187 (10th Cir. 1991).[19]

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's burden to set forth the grounds of his or her entitlement to relief

---

[19] Congress augmented this standard in the securities fraud context.

"requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 546 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 545 (internal citation omitted). "[T]he Supreme Court recently . . . prescribed a new inquiry for us to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. at 1967, 1969). "The [Supreme] Court explained that a plaintiff must 'nudge his claims across the line from conceivable to plausible' in order to survive a motion to dismiss." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177 (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. at 1974)(alterations omitted). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177. The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 127 S Ct. at 1974)(internal citations omitted).

## RELEVANT SECURITIES LAW

During the early days of the New Deal, Congress enacted two landmark statutes regulating securities. The [Securities] Act was described as an Act "to provide full and fair disclosure of the character of securities sold in interstate and

> foreign commerce and through the mails, and to prevent frauds in the sale thereof, and for other purposes." The Securities Exchange Act . . . was described as an Act "to provide for the regulation of securities exchanges and of over-the-counter markets operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges and markets, and for other purposes."

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 727-28 (1975). The Securities Act deals with the initial issuance of securities, and with the required contents of registration statements and prospectuses. See id. at 728. The Exchange Act, on the other hand, is primarily known for prohibiting fraud in connection with the purchase or sale of securities. See id. at 728-29. The Plaintiffs accused the Defendants of violating both statutes.

### 1. **Relevant Law Regarding 10b-5 Claims**

"In order to state a claim under 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must allege: (1) a misleading statement or omission of a material fact; (2) made in connection with the purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5) damages." In re Sun Healthcare Group, Inc. Sec. Litig., 181 F. Supp. 2d 1283, 1286-87 (D.N.M. 2002). Furthermore, "[w]hen evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the district court must evaluate 'the totality of the pleadings' to determine if the plaintiffs have stated an actionable claim of securities fraud." Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1092 (10th Cir. 2003).

The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 313. On the other hand, "[p]rivate securities fraud actions, . . . if not adequately contained, can be employed abusively

to impose substantial costs on companies and individuals whose conduct conforms to the law."  Id.  Thus, because a 10b-5 claim is in essence a fraud claim, it is subject to stringent pleading requirements.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1095 (explaining that rule 9(b) alone governed prior to the PSLRA, but that the PSLRA "strengthened what is required adequately to plead two of [the] elements [of a 10b-5 claim]."); Seattle-First Nat. Bank v. Carlstedt, 800 F.2d 1008, 1010 (10th Cir. 1986)("Given the specific reliance on Rule 9(b) in our decision in Utah State University v. Bear, Stearns & Co., [549 F.2d 164, 171 (10th Cir. 1977)], we hold that in this circuit the particularity requirement of Rule 9(b) is applicable generally in securities fraud cases.").  Those requirements extend to the allegations relevant to each defendant's required  mental state.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1095; 15 U.S.C. § 78u-4(b)(2) ("In any private action arising under [Chapter 2B of the Exchange Act] in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.")(emphasis added)

      **a.**      **Pleading Scienter.**

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff must, for each act or omission alleged to violate the Exchange Act, state with particularity facts giving rise to a strong inference that each defendant alleged to be responsible for that act or omission acted with an intent to deceive, manipulate, or defraud -- in other words, acted with a mental state known as scienter.  See City of Phila. v. Fleming Co., Inc., 264 F.3d 1245, 1259 (10th Cir. 2001); 15 U.S.C. § 78u-4(b)(2).  To allege scienter in connection with non-disclosure of material facts, a plaintiff must plead facts demonstrating that (i) the defendant knew of the potentially material fact; and (ii) the defendant knew that failure to reveal the potentially material fact would likely mislead

investors.   See City of Phila. v. Fleming Co., Inc., 264 F.3d at 1261.

Under certain circumstances, recklessness can satisfy the mental-state requirement, although "courts have been cautious about imposing liability for securities fraud based on reckless conduct." Id. at 1260.  "The requirement of knowledge in this context may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." Id. at 1261.  The Tenth Circuit has also described recklessness in a Section 10(b) context as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1232 (10th Cir. 1996).

To create the "strong" inference of scienter that the PSLRA requires, a plaintiff must allege specific facts giving rise to an inference of culpability that is at least as strong as any competing inference of good faith.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 328-29.

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.

Id.  As the Supreme Court expressed:

> [T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2)[, i.e., 15 U.S.C. § 78u-4(b)(2),] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of § 21D(b)(2), we hold, an inference of scienter must be  more than merely plausible or reasonable -- it must be cogent and at least

-27-

as compelling as any opposing inference of nonfraudulent intent.

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 314.  The scienter analysis is holistic, requiring the court to analyze all allegations in the complaint and not view any particular allegation in isolation.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322-23; Adams v. Kinder-Morgan, Inc., 340 F.3d at 1105.  In addition to the complaint's allegations, a court must consider any documents incorporated by reference into the complaint, as well as matters of which a court may take judicial notice.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322-23.

Directors and officers, like all people, tend to act in their own economic self interest.  See In re Sun Healthcare Group, Inc. Sec. Litig., 181 F. Supp. 2d 1283, 1297 (D.N.M. 2002).  Alleging such motives, therefore, does not significantly advance the ball in proving a strong inference of scienter, though a court should not completely ignore such allegations.  See City of Phila. v. Fleming Co., Inc., 264 F.3d at 1262, 1269-70 (discussing the unhelpful nature of "generalized motives shared by all companies and which are not specifically and uniquely related to" a defendant).  Once scienter is successfully alleged against an officer or executive of a corporation, however, that liability may be attributed to the corporation itself, if that officer is a senior controlling officer and was acting within the scope of his or her apparent authority.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1106-07.

### b.    Pleading False or Misleading Statements or Omissions.

"[T]he PSLRA increased the burden on a plaintiff's pleading of . . . the allegation that the defendant made a false or misleading statement, or failed to state a material fact necessary to make statements made not misleading." Adams v. Kinder-Morgan, Inc., 340 F.3d at 1095.  The PSLRA requires:

In any private action arising under this chapter in which the plaintiff alleges that the

defendant --

> (A) made an untrue statement of material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  "A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock," but "[w]hether information is material also depends on other information already available to the market; unless the statement significantly altered the total mix of information available, it will not be considered material." Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976), and Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988))(internal quotation marks omitted).  In other words, materiality depends not only on the importance of the misstated or omitted facts, but also upon the facts about which investing public is already aware.  No matter how material a piece of information may be, however, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5."  Basic v. Levinson, 485 U.S. at 239 n.17.

## 2.      Claims under Section 20(a) of the Exchange Act.

Section 20(a) of the Exchange Act states:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  To establish a defendant's liability as a controlling person, a plaintiff must prove

two things: (i) a primary violation of the securities laws, and (ii) that the defendant had "control" over the primary violator.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1107.  "The second element of the prima facie case [under Section 20(a)] requires that the plaintiffs plead facts from which it can be reasonably be inferred that the individual defendants were control persons."  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (citing Maher v. Durango Metals, Inc., 144 F.3d 1302, 1306 (10th Cir. 1998)).

"The Tenth Circuit observed that § 20(a) 'has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable.'"  Lane v. Page, 649 F. Supp. 2d 1256, 1306 (D.N.M. 2009)(Browning, J.)(quoting Richardson v. MacArthur, 451 F.2d 35, 41 (10th Cir. 1971)).  This showing requires the plaintiff to specify facts that "indicate that the defendants had 'possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1306).  See 17 C.F.R. § 230.405 ("The term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.").

In Adams v. Kinder-Morgan, Inc., the Tenth Circuit addressed whether certain individuals involved in Kinder-Morgan, Inc. qualified as control persons for the purposes of Section 20(a) liability.  First, the Tenth Circuit held that the directors were not, ipso facto, control persons.

> We . . . conclude that the plaintiffs have failed to allege sufficient facts to support the conclusion that Kinder was a control person.  During the period in question, he was not an executive of the company, but simply a member of the board of directors.  The

assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person within the meaning of the Exchange Act. Accordingly, the district court was correct to dismiss the claim of control person liability against Kinder.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (citing Dennis v. Gen. Imaging, Inc., 918 F.2d 496, 509-10 (5th Cir. 1990); Burgess v. Premier Corp., 727 F.2d 826, 832 (9th Cir. 1984); Cameron v. Outdoor Resorts of Am., Inc., 608 F.2d 187, 195 (5th Cir. 1979)). On the other hand, the Tenth Circuit held that being a significant executive within the corporation, with ultimate management authority, is a control person:

> [W]e conclude that the plaintiffs have pled facts supporting the allegation that [Defendant] Hall was a control person. He was the Chairman, President, and CEO of Kinder-Morgan during the relevant period. As President and CEO, Hall would have possessed the ultimate management authority of the corporation on a daily basis. There were no managers higher than Hall. He thus clearly possessed "the power to direct or cause the direction of the management and policies of [Kinder-Morgan]." Hall also had direct control over McKenzie, his chief financial officer and an alleged primary violator of Rule 10b-5.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1305; citing In re Ribozyme Pharms., Inc. Sec. Litig., 119 F.Supp.2d 1156, 1167 (D. Colo. 2000)). A high-ranking position within the corporation, however, standing alone, is unlikely to satisfy the "control" element of a control-person claim, unless the circumstance of the defendant's position and the nature of the underlying violation would lead to an inference that the person had control. See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 (holding that the CFO of Kinder-Morgan, purely based on his position as CFO, was a control person where the securities-fraud violations related specifically to official reports on the company's financial performance). Importantly, it is not necessary that the control person actively participate in the alleged fraudulent activity. See Adams

-31-

v. Kinder-Morgan, Inc., 340 F.3d at 1108.[20]

### 3.     Securities Act of 1933.

Congress put the Securities Act of 1933 in place to provide greater protection to purchasers

of registered securities.  See Herman & MacLean v. Huddleston, 459 U.S. 375, 383 (1983).  Claims

under the Securities Act are much more limited in scope than are those under the Exchange Act.

The Securities Act in not concerned with the "aftermarket."  In a Securities Act claim, the only

pertinent representations are those made within the four corners of the issuers' offering documents

or in documents expressly incorporated therein.  See Blue Chip Stamps v. Manor Drug Stores, 421

U.S. at 752.  Furthermore, the PSLRA does not appear to affect the pleading standards under the

Securities Act, because the heightened pleading requirements of the PSLRA apply only in "private

action[s] arising under this chapter," 15 U.S.C. § 78u-4(b)(1), and "this chapter" refers to Chapter

2B of Title 15.  The Securities Act of 1933, however, is Chapter 2A, see 15 U.S.C. § 77a ("This

subchapter[, subchapter I of Chapter 2A,] may be cited as the 'Securities Act of 1933'."); 15 U.S.C.

§ 78a ("This chapter[, chapter 2B,] may be cited as the 'Securities Exchange Act of 1934'."), and

the parties have shown the Court no binding authority for applying a heightened standard to claims

under the Securities Act.

Under certain circumstances, rule 9(b)'s heightened-pleading requirements might apply to

the allegations of material misstatements under a 1933 Act claim.  See Schwartz v. Celestial

Seasonings, Inc., 124 F.3d 1246, 1251-52 (10th Cir. 1997).  When a plaintiff's 1933 Act is based

on negligent or innocent conduct, rather than fraudulent conduct, however, a court applies the more

---

[20] If a controlling person acted in good faith and did not induce the acts on which the liability
of the controlled person is founded, the controlling person is not liable, but good faith is an
affirmative defense, thus inappropriate for the Court to consider on a motion to dismiss.  See Adams
v. Kinder-Morgan, Inc., 340 F.3d at 1109 n.5.

lenient pleading standards of rule 8(a).  See Schwartz v. Celestial Seasonings, Inc., 124 F.3d at 1251-52.

a.    **Section 11 of the Securities Act.**

Section 11 of the Securities Act imposes liability upon every person who, among other things, (i) signed the registration statement, (ii) was a director of the issuer, (iii) was an underwriter of the offering, or (iv) prepared or certified any report or valuation used in connection with the registration statement, for any materially misleading statements and omissions made therein.  See 15 U.S.C. § 77k.  "The pleading requirements of a § 11 claim are less stringent than that of a § 10(b) claim," and it "imposes strict liability against the issuer of securities where a registration statement contains material misstatements or omits material facts."  Schaffer v. Evolving Sys., Inc., 29 F. Supp. 2d 1213, 1220 (D. Colo. 1998).  Even innocent misrepresentations will subject the issuer of securities to liability.  See Herman & MacLean v. Huddleston, 459 U.S. at 381 ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case.  Liability against the issuer of a security is virtually absolute, even for innocent misstatements.").

A claim under Section 11 must be based on a registration statement filed with the SEC.  See Herman & MacLean v. Huddleston, 459 U.S. at 381; Schaffer v. Evolving Sys., Inc., 29 F. Supp. 2d at 1220.  A Section 11 plaintiff must identify a material misrepresentation within the four corners of the challenged registration statement, or an omission of a material fact required to be stated therein, or necessary to make the statements therein not misleading.  See Hermean & MacLean v. Huddleston, 459 U.S. at 381-82 (constrasting § 11 with § 10(b) of the Exchange Act); Grimm v. Whitney-Fidalgo Seafoods, Inc., No. 73 Civ. 1304, 1973 WL 495, at *2 (S.D.N.Y. Dec. 4, 1973). Corporate insiders potentially face Section 11 liability for material false statements in registration

-33-

statements only if they were directors at the time of the offering or if they personally signed the registration statement at issue.  See In re Williams Sec. Litig., 339 F.Supp. 2d 1242, 1269 (N.D. Okla. 2003).

        **b.**        **Section 12(a)(2) of the Securities Act.**

Section 12(a)(2) of the Securities Act provides that:

> Any person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him . . . .

15 U.S.C. § 77l(a).  A claim under Section 12(a)(2) thus must be based on a prospectus delivered to persons or an entity purchasing securities in a offering, which generally incorporates the SEC registration statement.  Even if a Section 12(a)(2) claim is based on an oral statement, the oral statement must relate to a prospectus.  See Gustafson v. Alloyd Co., 513 U.S. 561, 567-68 (1995). The Section 12(a)(2) claim must identify a material misrepresentation in or omission from either the prospectus or an oral representation directly concerning the prospectus.  See Gustafson v. Alloyd Co., 513 U.S. at 578.  Section 12(a)(2) liability is similar to Section 11 liability, in that "[t]he purchaser need not prove scienter, fraud, or negligence on the part of the seller, nor need he establish that he relied upon the misrepresentation or omission or that his or her loss was a direct or proximate result of the misrepresentation or omission."  Schaffer v. Evolving Systems, Inc., 29 F. Supp. 2d at 1220 (citing MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/American Express Inc., 886 F.2d 1249, 1256-57 (10th Cir. 1989)).  Unlike a Section 11 claim, however, the only proper defendants in a Section 12(a)(2) action are those who "offer or sell" unregistered securities.  Schaffer v.

Evolving Systems, Inc., 29 F. Supp. 2d at 1220 (citing Pinter v. Dahl, 486 U.S. 622, 641 (1988)).

The Tenth Circuit has recognized that liability extends also "to the person who successfully solicits

the purchase, motivated at least in part by a desire to serve his own financial interests or those of the

securities owner." Maher v. Durango Metals, Inc., 144 F.3d at 1307 (quoting Pinter v. Dahl, 486

U.S. at 647).

c.      **Section 15 Control Person Liability.**

Section 15 is a "control person" provision, similar to Section 20(a) of the Exchange Act.  It

states, in relevant part:

> Every person who . . . controls any person liable under sections 77k or 77l of this
> title [i.e., Sections 11 of 12 of the Securities Act], shall also be liable jointly and
> severally . . . to any person to whom such controlled person is liable, unless the
> controlling person had no knowledge of [the] facts [that form the basis of the
> underlying Section 11 or Section 12 claims].

15 U.S.C. § 77o.  "Although worded differently, the control person provision of § 15 and § 20(a)

are interpreted the same." Maher v. Durango Metals, Inc., 144 F.3d at 1305 n.7 (citing First

Interstate Bank v. Pring, 969 F.2d 891, 897 (10th Cir. 1992)).

**ANALYSIS**

The Defendants ask the Court to dismiss the Plaintiffs' claims.  They insist that the losses

suffered by the Plaintiffs are the result of mortgage-market forces beyond the Defendants' control

and not the result of the Defendants' misconduct.  See Motion at 1-5.  The Defendants argue that

TMI's credit portfolio remained strong relative to the remainder of the mortgage-securities market,

but "repeated waves of eroding market confidence have caused the prices of mortgage-backed

securities to plunge *irrespective* of underlying credit performance." Id. at 2 (emphasis in original).

The Plaintiffs, on the other hand, insist that the Defendants were incentivized to overly leverage

TMI and that, when the mortgage crisis hit, the Defendants tried to conceal TMI's financial woes

-35-

from its investors, in violation of the Exchange Act.  See 1934 Act Response at 1-5.  Further, when the Defendants needed more capital to perpetuate their dying company, the Plaintiffs allege, they executed public offerings of TMI securities using false or misleading offering documents.  See 1933 Act Response at 1-2.

## I.    THE PLAINTIFFS STATE A CLAIM UNDER THE EXCHANGE ACT AGAINST GOLDSTONE.

The Defendants contend that the Plaintiffs' first two claims for relief fail because the Plaintiffs have not alleged with particularity facts supporting a strong inference that each of the Defendants sued in connection with those claims acted with intent to deceive, manipulate, or defraud -- i.e., that each Defendant acted with scienter.  See Motion at 5-23.  Second, the Defendants insist that the Plaintiffs have failed to state, with particularity, material misrepresentations.  See Motion at 23-36.  These challenges attack the merits of the Plaintiffs' claims under Section 10(b) and rule 10b-5, and, because Section 20(a) claim requires the plaintiff to prove a predicate Exchange Act violation, attack the Plaintiffs' claim under Section 20(a).  See Motion at 36-37.

### A.    THE PLAINTIFFS' 10b-5 CLAIM SURVIVES ONLY AS TO GOLDSTONE.

In this motion to dismiss, the Defendants attack the Plaintiffs' 10b-5 claim on two fronts. First, the Defendants assert that all of the Plaintiffs' factual allegations, taken in the aggregate, fail to establish the strong inference of scienter that Section 10(b) requires.  Second, they insist that the factual allegations fail to state, with sufficient particularity, the existence of a false or misleading statement or omission. The Plaintiffs, in response, insist that they have properly stated a claim under Section 10(b) and rule 10b-5.  They attempt to walk the Court through the series of statements the Defendants made that would mislead investors, and attempt to show how the Defendants must have known about the truth of those statements and that the statements, as made, would be misleading.

After considering the CCAC in its entirety, as well as the news reports and press releases that the CCAC references, see Adams v. Kinder-Morgan, Inc., 340 F.3d at 1092, the arguments of counsel, and the authorities cited, the Court finds that the Plaintiffs have satisfied the PSLRA's requirements with respect to Goldstone.[21]

### 1.    The Plaintiffs' Allegations, Taken as a Whole, Support A Strong Inference of Scienter as to Goldstone.

The Defendants argue that the most plausible inference from all of the Plaintiffs' allegations -- together with matters subject to judicial notice -- is that each of the Exchange Act Defendants at all times acted and spoke in good faith, attempting honestly -- if imperfectly, in hindsight -- to deal with rapidly changing circumstances and market conditions never before seen.  See Motion at 6. The Defendants contend that inference is far stronger than any possible inference suggesting fraud. See Motion at 6-7.  The Plaintiffs disagree.  See 1934 Act Response at 33-56.  In the CCAC, the Plaintiffs paraphrase their scienter allegations as follows:

The Thornburg Defendants, *inter alia*:

(a) falsely stated that TMI was not an Alt-A originator when in fact several confidential witnesses with direct knowledge of TMI's loan activity confirm that the Company did in fact underwrite Alt-A loans during the Class Period . . . ;

(b) falsely stated that the Company was in a position to benefit from the credit and liquidity crisis plaguing the mortgage financing market, that it was in a superior cash position, that its unencumbered assets were at the best level "in the history of the organization" on July 20, 2007, when, in fact, the Thornburg Defendants admitted that the "current credit crisis in the market environment today [and] the liquidity issues in the market place today," were "not a big surprise to us," and that "[w]e've been talking about this and anticipating this for a while" and the Company began to effectuate the sale of more than one-third of its total assets just three weeks later;

(c) failed to disclose that the Company was experiencing significant and material

---

[21] Again, based on TMI's pending bankruptcy case, the Court reserves judgment on this issue as to TMI.

liquidity problems in the 2Q07 10-Q, filed with the SEC on August 8, 2007, such that it would begin to sell more than third of its total assets within two days, in violation of GAAP and SEC regulations, as described below;

(d) falsely touted the "salability" of the Company's asset portfolio at the same time it sold its highest-rated mortgage assets at discount prices, indicating the illiquid nature of the Company's remaining portfolio;

(e) failed to disclose an SEC inquiry into the Company's accounting in September 2007;

(f) failed to disclose that a default in one of its RPA agreements immediately triggered cross-defaults in all of its RPA agreements, causing the Company exponential liquidity concerns . . . ;

(g) failed to disclose the JP Morgan default notice that the Company received on February 28, 2008, while on the same day falsely stating that the Company had met all of its margin call obligations;

(h) failed to disclose the NYSE investigation into transactions in the Company's common stock prior to the January 2008 Offerings, as described above;

(i) failed to timely disclose that KPMG demanded that the Company restate its FY 2006 and FY 2007 financial statements;

(j) mischaracterized the nature of TMI's restatement by implying that it was due to events occurring as of March 5, 2008, and not due to events as of December 31, 2007, as demanded by KPMG; and

(k) failed to disclose that the Company had billions in MBS backed by Alt-A collateral that would expose TMI to margin calls in 2008, as this MBS was used as collateral to secure financing, as described in detail above.

CCAC ¶ 191, at 55-57. Many of the alleged material omissions are ones as to which there was no

duty to disclose. See Basic v. Levinson, 485 U.S. at 239 n.17. Others are irrelevant or unsupported

by the alleged facts and materials that the CCAC incorporates. Ultimately, however, the Court finds

that the Plaintiffs have adequately pled scienter as to Goldstone.

### a.   The Defendants' Trading Patterns During the Class Period Do Not Negate Scienter.

The Defendants argue that individuals seldom fraudulently inflate or depress stock prices

unless they intend to buy stock at artificially low prices, or sell it at artificially high prices.  See id. Yet, in this case, the Defendants argue, there are no allegations that they gained anything from their supposed fraud.  See id.  They contend that this fact negates the strong inference of scienter necessary to sustain the Plaintiffs' 10b-5 claim.  See id. at 7-10.  They further point out that they, collectively, bought more than $25,000,000.00 worth of TMI securities during the Class Period, most while the price of those securities was at its peak.  See id. at 7-9.

"[A] lack of motive is an element of the 'totality of the pleadings' which the Court must consider."  Id. at 7 (quoting In re Sun Healthcare Group, Inc. Sec. Litig., 181 F. Supp. 2d at 1296). The Court does not believe, however, that a lack of insider trading always negates or weakens an inference of scienter.  See Motion at 7-8 ("Where a defendant holds or purchases stock, the strongest inference is that the defendant did not believe the stock price was wrongfully inflated.")(citing In re Sun Healthcare Group, Inc. Sec. Litig., 181 F. Supp. 2d at 1297).  A lack of motive is not fatal to an allegation of scienter under the PSLRA and, even if it were, there is not a lack of motive in this case.  The financial crisis facing the United States around the time of the alleged fraudulent conduct provides the Defendants with another motive that adequately fills the gap left by a lack of suspicious insider-trading activity: survival.  The economy in 2007 and early 2008 was a ferocious beast that devoured many mortgage lending companies.  The Defendants point to their alleged purchases of TMI stock during the class period[22] as negating any inference that they would be artificially inflating

---

[22] The Court refers to "alleged purchases" because it would not take judicial notice of the truth of the Forms 3, 4, and 5 that the Defendants proffered to the Court.  See Memorandum Opinion and Order at 7, filed December 21, 2009 (Doc. 246).  The Court therefore knows only that such forms were filed and not whether the information on the forms was true.  The Court also notes that there is a dispute whether the stock purchases allegedly made during that time were voluntary or the result of pre-arranged instructions with brokers and/or trust managers.  See 1934 Act Response at 55-56.  These are factual issues that the Court need not resolve at this point.  The Court will resolve doubts and make inferences largely in the Plaintiffs' favor, while remembering to weigh competing

their stock price. See Motion at 9. The Court could draw the inference that the Defendants who purchased TMI stock held a genuine belief that TMI would continue to be profitable. See id. at 9-10. On the other hand, the Court could also infer that, especially during the mortgage crisis period, the Thornburg Defendants -- many of whom were already holders of a substantial interest in TMI and whose careers were intertwined with it -- sought to infuse TMI with more cash in hopes of increasing public confidence and giving TMI the capital it needed to ride out the crisis. While, in In re Sun Healthcare Group, Inc. Sec. Litig., it may have been "difficult to discern how Defendants could be acting in their self-interest by holding or purchasing artificially inflated . . . stock," 181 F. Supp. 2d at 1297, it is not so difficult to discern self-interest in this case. The Court will not guess at which inference is more plausible, but notes that both are possible. The Defendants, in their reply brief, argue that the Plaintiffs have failed to allege an economically rational scheme. See Reply at 5-6. Even if the Plaintiffs did not plead an economic scheme, the Court has found one while holistically considering the CCAC and the numerous competing inferences it generates. And, while the Defendants insist that it does not make sense for the Defendants to buy fraudulently inflated stock to wait out the mortgage crisis, see Reply at 6 n.5, when one considers that many of these individuals were inextricably financially intertwined with the continued vitality of TMI, the Court finds method to their alleged conduct.

The Court is not dissuaded from its analysis by the handful of cases that the Defendants provide, which seem to stand for the blanket proposition that a lack of insider trading allegations negates the strong inference of scienter. In Andropolis v. Red Robin Gourmet Burgers, Inc., 505 F. Supp. 2d 662 (D. Colo. 2007), the Honorable Edward Nottingham, Jr., United States District

_____

inferences, as the Supreme Court mandated in Tellabs, Inc. v. Makor Issues & Rights, Ltd.

Judge for the District of Colorado, found that a lack of insider-trading allegations and an alleged motive simply to maintain an appearance of stability and success failed to adequately allege scienter. Id. at 677-78.  If that was all that this Court had, it might conclude as did Judge Nottingham.  There are, however, more allegations in this case, and the additional circumstance that the mortgage market, unlike the restaurant market in Andropolis v. Red Robin Gourmet Burgers, Inc., was in particular danger during the relevant time period.  While the Court might not find a strong inference of scienter based solely on an allegation of a motive to keep TMI afloat, the Court does not find that the lack of allegations that the Defendants profited from insider trading of TMI stock is fatal to its pleadings of scienter.  See Pugh v. Tribune Co., 521 F.3d 686, 695 (7th Cir. 2008)(finding that "the fact that the defendants are not alleged to have sold the stock at the inflated prices" negated the inference of scienter when the motive alleged was unlawful profit); In re K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 894 (8th Cir. 2002)(stating that "evidence that the individual defendants abstained from trading may undercut allegations of motive.")(emphasis added).  Not every case of securities fraud must have an allegation of profitable insider trading to be actionable.

> **b.      The Plaintiffs Do Not Allege Facts Supporting Each Defendant's Scienter, But That Is Not Fatal to the Plaintiffs' Claims.**

The Defendants next attack the Plaintiffs' scienter allegations on the basis that those allegations are not sufficiently granulated:

> Obviously, the mental state required for a 10b-5 claim can exist in one defendant and not another.  A plaintiff must therefore plead facts supporting an inference that each specific defendant acted with the requisite intent.  Plaintiffs here do not even try to do this.
>
> * * * *
>
> The complaint did not specify which documents were attributable to each individual defendant, or which portions or statements within the documents were assignable to each individual defendant, but instead merely alleged that the individual defendants

> "each controlled the contents of and participated in writing [TMI's] SEC filings, reports, and releases"

Motion at 11-12 (citing Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 365 (5th Cir. 2004)).  They insist that, although group pleading was acceptable before the passage of the PSLRA, scienter pleadings must now be broken out by Defendant, and that the Plaintiffs' failure to do so means that their Section 10(b) claims fail.  See Motion at 11.  The Plaintiffs do not appear to address this argument in its briefing, and it was not discussed at any length during the hearing.

Before the passage of the PSLRA, Schwartz v. Celestial Seasonings, Inc. governed this issue: "Identifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents such as annual reports, which presumably involve collective actions of corporate directors or officers."  124 F.3d at 1254.  The Tenth Circuit found that "[t]he Complaint . . . adequately identifies the Celestial defendants it alleges are responsible for Celestial's statements, thereby putting them on notice sufficient to satisfy Rule 9(b)."  124 F.3d at 1254.  Schwartz v. Celestial Seasonings, Inc., however, is a pre-PSLRA case.  The Tenth Circuit issued its opinion in 1997, but the events underlying the district court case occurred in 1993 and 1994, before the PSLRA was promulgated.  See Schwartz v. Celestial Seasonings, Inc., 904 F. Supp. 1191, 1194-95 (D. Colo. 1995)(describing events occurring largely between December 15, 1993 and December 12, 1994).  See also Grossman v. Novell, Inc., 120 F.3d at 1118 n.4 ("The PSLRA applies only to cases filed after December 22, 1995, the date the statute was enacted."); Schwartz v. Celestial Seasonings, Inc., 124 F.3d at 1252 (not discussing the PSLRA and stating that "Rule 9(b) . . . does not require any particularity in connection with an averment of intent, knowledge or condition of mind."); 15 U.S.C.A. § 78u-4 Historical and Statutory Notes ("This section shall not affect or apply to any private action . . . commenced before and pending on

-42-

Dec. 22, 1995[.]").  The Court must consider whether the PSLRA changed this aspect of pleading securities-fraud claims in the Tenth Circuit.  The Court believes it did.

So far as the Court has discerned, the Tenth Circuit has not addressed the problem of pleading group allegations since Congress passed the PSLRA.  As the United States Court of Appeals for the Third Circuit has recognized, however, "[t]he . . . courts of appeals to have directly addressed the survival of the group pleading doctrine post-PSLRA have abolished the doctrine." Winer Family Tr. v. Queen, 503 F.3d 319, 336-37 (3d Cir. 2007)(citing Fin. Acquisition Partners L.P. v. Blackwell, 440 F.3d 278, 287 (5th Cir. 2006), and Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 602-03 (7th Cir. 2006), rev'd on other grounds, 551 U.S. 308 (2007)). See Phillips v. Scientific-Atlanta, Inc., 374 F.3d 1015, 1018 (11th Cir. 2004)(acknowledging that "the most plausible reading in light of congressional intent is that a plaintiff, to proceed beyond the pleading stage, must allege facts sufficiently demonstrating each defendant's state of mind regarding his or her alleged violations")(emphasis added); Southland Sec. Corp. v. INSpire Ins. Solutions Inc., 365 F.3d at 365 ("[T]he PSLRA requires . . . plaintiffs to distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud.").  While the United States Court of Appeals for the Ninth Circuit did not answer the question, its analysis in Glazer Capital Management, LP v. Magistri, 549 F.3d 736 (9th Cir. 2008),  indicates that it would at least find that applicability of the group-pleading doctrine requires special circumstances.

> We are . . . not faced with whether, in some circumstances, it might be possible to plead scienter under a collective theory. . . . Rather, given the limited nature and unique context of the alleged misstatements in this case, we hold that the PSLRA requires Glazer to plead scienter with respect to those individuals who actually made the false statements in the merger agreement.

549 F.3d at 744-45

The case that first announced that so-called group pleading would not be allowed in the

scienter-pleading context was the United States Court of Appeals for the Fifth Circuit's opinion in Southland Securities Corp. v. INSpire Insurance Solutions, Inc. 365 F.3d at 363-65. That case dealt with a large securities class action, much like this case. The Fifth Circuit first described the "group pleading" or "group published" doctrine as one that "allows plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information are the collective work of those individuals with direct involvement in the everyday business of the company." Id. at 363 (quoting In Re Oxford Health Plans, Inc., 187 F.R.D. 133, 142 (S.D.N.Y. 1999))(internal quotation marks omitted). See Winer Family Trust v. Queen, 503 F.3d at 335 ("The group pleading doctrine is a judicial presumption that statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations."). "Instead of being required to plead that a defendant actually made, authored or approved an offending statement in a corporate communication, the 'group pleading' doctrine in its broadest form allows unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles." Southland Securities Corp. v. INSpire Insurance Solutions, Inc. 365 F.3d at 363. The problem that the Fifth Circuit found was that "the 'group pleading' doctrine as so applied would allow the plaintiff to plead the first element of a section 10(b) case against an individual defendant without citing particular facts connecting the defendant to the alleged fraud." 365 F.3d at 363. The Fifth Circuit found this result would be inconsistent with the PSLRA's intentionally challenging pleading standards:

> The PSLRA requires first, that the complaint must "specify" "each" statement alleged to have been misleading, and the reason or reasons why that statement is misleading. Second, as to allegations made upon information and belief, the complaint must "state with particularity all facts" on which the belief is formed. Finally, as to "each" allegedly misleading statement, the complaint must "state with

particularity facts giving rise to a strong inference that *the* defendant acted with the required state of mind."

* * * *

. . . While the PSLRA does not explicitly abolish the [group-pleading] doctrine, it was not necessary to do so because Congress never made this judicial creation law to begin with.  Even prior to the PSLRA, section 10(b) and Rule 10b-5 required plaintiffs to identify the roles of the individual defendants, and describe their involvement, if any, in preparing the misleading statements.  [The doctrine] cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to "the defendant" and that scienter be pleaded with regard to "each act or omission" sufficient to give "rise to a strong inference that the defendant acted with the required state of mind."  These PSLRA references to "the defendant" may only reasonably be understood to mean "each defendant" in multiple defendant cases, as it is inconceivable that Congress intended liability of any defendants to depend on whether they were all sued in a single action or were each sued alone in several separate actions. . . .

* * * *

Therefore, we agree with the district court that the PSLRA requires the plaintiffs to "distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud." As such, corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded. However, corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. Such specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement.

Id. at 364-65 (internal citations omitted).  The other circuits largely mimic this analysis.  See Winer

Family Trust v. Queen, 503 F.3d at 335 (citing 3 T. Hazen, Treatise on the Law of Securities

Regulation § 12.13 (5th ed. 2006)); Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d at 602-03;

Phillips v. Scientific-Atlanta, Inc., 374 F.3d at 1017-18; Southland Sec. Corp. v. INSpire Ins.

Solutions Inc., 365 F.3d at 364-65.

The Court finds that the debate whether the PSLRA abolished the group-pleading doctrine

somewhat misses the mark. Statements that the PSLRA abolished the group-pleading doctrine are not particularly helpful to the district courts' often-delicate task of determining in a sensitive and careful way whether the pleadings meet the new standards that Congress has developed. A court's task is to be faithful to what Congress intended without creating a host of new judge-made rules that become a labyrinth of pitfalls for securities-action plaintiffs. Congress' goal was to eliminate complaints that do not clearly show scienter, not to focus on the technicalities of how scienter is shown in particular cases. The Court can envision a situation wherein securities-fraud plaintiffs now do not refer to individual defendants as a collective, but rather list each individual defendant before every allegation to avoid being accused of "group pleading." Or, in a less space-saving approach, the plaintiffs might repeat each allegation with a different individual defendant listed in the paragraphs until it has made individualized allegations against each defendant. In response, courts might then attempt to adapt the no-group-pleadings rule to foreclose this conduct, assuming that when the plaintiff makes the exact same factual allegations against each defendant, that the defendant is unraveling a group-pled allegation, which is likewise forbidden. Nevertheless, the PSLRA's particularity requirement appears to foreclose plaintiffs from pleading that facts about the defendants, as a group, are sufficient to give rise to a strong inference of scienter. See 15 U.S.C. § 78u-4(b)(2) (dictating that, where the plaintiff must prove a particular state of mind, "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.")(emphasis added).[23] In other words, the facts must give rise to a strong

---

[23] Some district courts within the Tenth Circuit have come to a different conclusion. See, e.g., In re Qwest Comms. Int'l, Inc. Sec. Litig., 387 F. Supp. 2d 1130, 1145 (D. Colo. 2005) ("[S]ome courts have concluded that the group publication doctrine was rendered invalid by the PSLRA. . . . However, I conclude that the group publication doctrine was not abrogated by the PSLRA.")(citing Schaffer v. Evolving Systems, Inc., 29 F. Supp. 2d 1213, 1225 (D. Colo. 1998), and In re American Bank Note Holographics Inc. Securities Litigation, 93 F. Supp. 2d 424, 442

inference that each individual defendant acted with scienter, and not only that the group of defendants, taken together, acted with scienter.

It is important to recognize that Congress did not expressly prohibit group pleading in the PSLRA.  The Court, therefore, is not prepared to judicially declare that the PSLRA forbids all instances of group pleading.  The reasoning underlying the various circuits' finding that the PSLRA has abolished group-pleading in the scienter context is founded on the language of 15 U.S.C. § 78u-4(b)(2) that the plaintiffs must "state <u>with particularity</u> facts giving rise to a strong inference that <u>the defendant</u> acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added).  Circuit courts have determined that the use of the singular noun, "the defendant," indicates that the plaintiff must plead facts supporting a strong inference of scienter as to each defendant, and that group allegations, <u>i.e.</u>, that "the defendants said such-and-such," is insufficient to meet that burden.  <u>Winer Family Trust v. Queen</u>, 503 F.3d at 335; <u>Makor Issues & Rights, Ltd. v. Tellabs, Inc.</u>, 437 F.3d at 602-03; <u>Phillips v. Scientific-Atlanta, Inc.</u>, 374 F.3d at 1017-18; <u>Southland Sec. Corp. v. INSpire Ins. Solutions Inc.</u>, 365 F.3d at 364-65.  Thus, when the allegations do not relate to the mental state of a particular defendant, the justification for abolishing the group-pleading doctrine dissolve.  When the Court faced a related issue as to PSLRA pleading standards in a Section 14(a) action in <u>Lane v. Page</u>, 581 F. Supp. 2d 1094 (D.N.M. 2008)(Browning, J.), the Court held that the

_____

(S.D.N.Y. 2000)).  Most of the district court's finding no change in the law rely on a district court opinion that was filed before any circuit court had addressed the issue of group-pleading post-PSLRA.  <u>See</u> <u>In re Williams Sec. Litig.</u>, 339 F. Supp. 2d at 1259-60 ("[W]hether the group pleading doctrine is still viable after the PSLRA's enactment is currently a matter of debate. No federal court of appeals has addressed the issue. Nevertheless, a majority of the district courts addressing the issue have found that the group pleading doctrine survives the PSLRA.")(quoting an adopted Report and Recommendation by a magistrate judge in the Northern District of Oklahoma).  The Court is persuaded, however, that, even though Congress, through the PSLRA, may not have abolished the group-pleading doctrine, a plaintiff must state with particularity facts giving rise to a strong inference of scienter as to each defendant and not just to the aggregate group of defendants.

plaintiff's group-pled allegations were permissible.  See 581 F. Supp. 2d at 1109, 1117-18.  Before

finding that group pleading was appropriate, however, the Court found that there is no mental-state

requirement in a Section 14(a) action, and thus Section 78u-4(b)(2) was did not apply.  See 581 F.

Supp. 2d at 1109 ("[T]he Tenth Circuit has held, albeit in a different context, that 'negligence is

conduct, and not a state of mind.'")(quoting United States v. Ortiz, 427 F.3d 1278, 1283 (10th Cir.

2005)).  The Court thus did not think it was necessary or prudent to find that the PSLRA eliminates

group-pleading when a plaintiff is trying to describe conduct.  The reality is that individuals in a

corporation often act collectively, and there is no reason to ban good, succinct prose when reviewing

the allegations of conduct and omissions that the defendants did collectively.

On the other hand, the Court and plaintiffs must recognize that Congress intended to change

the pleading world when it comes to the scienter element of a securities-fraud claim.  While it may

be acceptable to use group-pleading to describe collaborative actions and omissions, such pleading

may not be sufficient when it comes to the scienter element.  The plaintiff must somehow allege

facts as to each defendant to show that each defendant had the requisite scienter.

The Court thus finds that, while there may not be a wholesale statutory prohibition on group

pleading, the group-pleading doctrine may no longer work well, or at all, in pleading the scienter

requirement.  While group pleading may still be permissible and useful when pleading conduct and

omissions, the plaintiffs run a substantial risk when they rely on group pleading to show scienter.

It may no longer be sufficient for plaintiffs to allege conduct or circumstances as to a group of

individuals, and then to ask the Court to infer that the conduct evinces the necessary scienter as to

all defendants in that group.  In many situations, such allegations may no longer be appropriate.

What is clear, however, and Congressional language indicates it, is that the PSLRA demands that

the facts giving rise to the necessary inference of scienter be pled with particularity as to each

defendant.  The Court will therefore only consider scienter allegations that are specific as to an actor

or allegations as to which the Court can readily discern the actor.

Employing a more nuanced and exacting version of some courts' group-pleading rule is not

fatal to all of the Plaintiffs' allegations because many are not group-pled or can be readily attributed

to particular Defendants.  The Plaintiffs are reasonably clear in alleging which Defendants signed

which documents and which Defendants -- exclusively Goldstone -- made which public statements.

Specifically,

> Thornburg signed the Company's quarterly reports on Forms 10-Q for the periods
> ending March 31, 2007, June 30, 2007 and September 30, 2007; the Company's
> Annual Report on Form 10-K for the year-ended December 31, 2006; and the Shelf
> Registration Statement filed to authorize the issuance and sale of up to
> $1,500,000,000 in TMI securities.

CCAC ¶ 58, at 17.

> Goldstone signed the Company's quarterly reports on Forms 10-Q for the periods
> ending March 31, 2007, June 30, 2007 and September 30, 2007, the Company's
> Annual Report on Forms 10-K for the years-ended December 31, 2006 and 2007, the
> Company's Amended Annual Report on Form 10-K/A for the year-ended December
> 31, 2007, and the Shelf Registration Statement.

CCAC ¶ 59, at 17.  "Badal signed the Shelf Registration Statement," CCAC ¶ 60, at 17, and

"Simmons signed the Company's quarterly reports on Forms 10-Q for the periods ending March 31,

2007, June 30, 2007 and September 30, 2007, the 18 Company's Annual Reports on Forms 10-K

for 2006 and 2007, and the Company's Amended Annual Report on Form 10-K/A for 2007," CCAC

¶ 62, at 17-18.  The Plaintiffs do not allege that Decoff signed any particular document or made any

particular statement.  See CCAC ¶ 62, at 17.

The Plaintiffs make a series of allegations of purported fact that endeavor to impute the

actions of each of the individual Defendants on one another:

> The Individual Defendants, by virtue of their high-level positions within the

Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances, and financial condition.

. . . The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the company, and approved or ratified these statements.

Id. ¶¶ 64-65, at 18. When addressing the scienter element, however, the Court cannot credit such allegations of shared knowledge among the individual Defendants in the face of the PSLRA's particularity requirement. See City of Phila. v. Fleming Companies, Inc., 264 F.3d at 1264 ("[A]llegations that a securities fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.' Generalized imputations of knowledge do not suffice, regardless of defendants' positions within the company.")(quoting In re Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3d Cir. 1999); Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d at 365 ("[C]orporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded."). Even the Ninth Circuit, which refused to abolish the group-pleading rule in Glazer Capital Management, LP v. Magistri, contemplated the rule's use only under "circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication." Glazer Capital Management, LP v. Magistri, 549 F.3d at 744 (citing Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d at 710). The Plaintiffs do not allege such dramatic falsehoods in the CCAC. The Court will therefore,

-50-

for the purpose of its scienter analysis, associate statements only with the individual Defendants who said them, signed them, or as to whom the Plaintiffs specifically allege had knowledge of them.  As such, the Plaintiffs have failed to sufficiently plead a strong inference of scienter as to Decoff, who is not alleged to have signed or said anything during the Class Period.  The Court will therefore grant the Defendants' motion to dismiss as to the Plaintiffs' Section 10(b) and rule 10b-5 claim against Decoff.

> ### c.  The Plaintiffs' Motive Allegations, Standing Alone, Do Not Support a Strong Inference of Scienter, but Must Be Considered in the Totality of Circumstances.

The Defendants next attack the Plaintiffs' allegations of motive.  The CCAC alleges that the Defendants were motivated to conceal and misrepresent the financial condition of the company in three ways: (i) the prospect of ever-greater compensation; (ii) the looming threat of bankruptcy; and (iii) the desire to raise capital through public securities offering.  See CCAC ¶ 192, at 57.  The Defendants argue that these allegations are of motives that are common to all executives and corporations, and therefore cannot give rise to a strong inference of scienter.  While the Court agrees that "courts distinguish motives common to corporations and executives generally from motives to commit fraud," Andropolis v. Red Robin Gourmet Burgers, Inc., 505 F. Supp. 2d at 678 (quoting PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 690 (6th Cir.2004)), the Court also realizes that it should not ignore such motives when considering the totality of factual allegations that might potentially give rise to a strong inference of scienter.  Thus, the Court will not find that the Plaintiffs' scienter allegations fail merely because they allege common motives.  As the Tenth Circuit stated in City of Philadelphia v. Fleming Companies, Inc.:

> Allegations that "merely charge that executives aim to prolong the benefits they hold" are, standing alone, insufficient to demonstrate the necessary strong inference of scienter.  For this reason assertions that a corporate officer or director committed

fraud in order to retain an executive position simply do not, <u>in themselves</u>, adequately plead motive.

264 F.3d at 1270 (quoting <u>Phillips v. LCI Int'l, Inc.</u>, 190 F.3d 609, 622 (4th Cir. 1999))(emphasis added).  Furthermore, the precarious position of mortgage companies around and during the Class Period is a circumstance that adds to the plausibility of the self-preservation motive.  The Court agrees that the alleged motives, and facts underlying them, standing alone, do not establish a strong inference of scienter.  The allegations nudge the ball, however, further toward the Plaintiffs' goal with respect to Thornburg and Goldstone, the only Defendants referenced in the Plaintiffs' motive allegations.  <u>See</u> CCAC ¶¶ 192-207, at 57-61.

**d.      The Restatement of Thornburg's 2007 Financial Statements, <u>Standing Alone, Does Not Support an Inference of Scienter.</u>**

The Defendants next attack the Plaintiffs' allegations that the Defendants' restatement of its 2007 financials allows for a strong inference of scienter.  <u>See</u> Motion at 14-15 (citing CCAC ¶¶ 208-211, at 61-62).  They insist that neither the length of the period covered by the restatement -- two years[24] -- nor the magnitude of the restatement -- $676 million -- indicate that any particular individual had the requisite state of mind.  <u>See id.</u> at 15.  As the Defendants' authority all states, violations of generally accept accounting principles ("GAAP"), standing alone, is not sufficient to

---

[24] The parties dispute whether KPMG demanded that TMI restate both its 2006 and 2007 financials, or only its 2007.  In the hearing, Howard Gutman, former counsel for Defendant Friedman, Billings, Ramsey & Co., represented to the Court that, although KPMG's initial letter withdrew its unqualified audit opinion as to both the 2006 and 2007 financials, KPMG later agreed to TMI's proposed plan to restate only its 2007 financials.  <u>See</u> Transcript of Hearing at 154:17-157:5 (taken April 22, 2009)(Gutman, Court), filed June 9, 2009 (Doc. 195).  That fact is within the documents incorporated into the CCAC.  <u>See</u> TMI's Form 8-K Exhibit 7.2 (dated March 7, 2008), filed September 23, 2008 (Doc. 134-13)("We [KPMG] have read Thornburg Mortgage, Inc.'s statements included [in] its Form 8-K dated March 7, 2008, and we agree with such statements . . . .").  The Court therefore believes that it may consider, as an alleged fact, that KPMG agreed that TMI needed only to restate its 2007 financials.

support a strong inference of scienter.  See City of Phila. v. Fleming Companies, Inc., 264 F.3d at 1261 ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.")(emphasis added); In re MicroStrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 651 (E.D. Va. 2000)("[G]eneral allegations of GAAP and GAAS violations fail to satisfy the scienter requirements of Section 10(b) and Rule 10b-5. The mere misapplication of accounting principles by an independent auditor does not establish scienter.")(quoting Zucker v. Sasaki, 963 F. Supp. 301, 307 (S.D.N.Y. 1997)); In re Int'l Rectifier Corp. Sec. Litig., No. CV 07-02544, 2008 U.S. Dist. LEXIS 44872, at *40-41 (C.D. Cal. May 23, 2008)("GAAP violations, by themselves, are an insufficient basis to infer scienter. . . .  Such violations, even significant ones or ones requiring large or multiple restatements, must be augmented by other specific allegations that defendants possessed the requisite mental state.")(emphasis added).  See also City of Brockton Ret. Sys. v. Shaw Group, Inc., 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008)("[The] mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter."); In re Sun Healthcare Group, Inc. Sec. Litig., 181 F. Supp. 2d at 1297 ("[T]he mere fact that [a company] issued a restatement of its previous financial statements, without further specificity of scienter, cannot constitute an actionable admission of fraud.")(emphasis added).  The Court agrees, and further notes that the Plaintiffs failed to associate this allegation with any particular Defendant.  The Court therefore shall not consider it in the total mix of circumstances when determining whether the Plaintiffs have adequately pled scienter.

> **e.     The Defendants' Frank, Relevant Disclosures Tend to Negate Scienter.**

The Defendants next argue that the facts and circumstances that the Plaintiffs accuse them of concealing were disclosed to the investing public, and that such disclosure negates an inference

of scienter.  See Motion at 16-17.  They point to the annual and quarterly reports that were

incorporated by reference into the CCAC and insist that statements within those documents,

although not using the term "Alt-A," nevertheless disclosed all of the risks that they are accused of

concealing.  See Motion at 16-17  Most notably, they point to two statements that they pull from

TMI's 2006 Form 10-K annual report, filed February 28. 2007.  The first statement relates to the

potential problem that TMI might be at risk for margin calls if something rocks the boat in the

mortgage market:

> We borrow funds based on the fair value of our ARM Assets less a margin amount.
> If either the fair value of our ARM Assets declines, or our margin requirements
> increase, we could be subject to margin calls that would require us to either pledge
> additional ARM Assets as collateral or reduce our borrowings.  If we did not have
> sufficient unpledged assets or liquidity to meet these requirements, we may need to
> sell assets under adverse market conditions to satisfy our lenders.

Thornburg Mortgage, Inc., Form 10-K (Annual Report) at 15 (dated February 28, 2007), filed

September 23, 2008 (Doc. 134-2).  The second statement discusses the fact that, in some cases, TMI

might underwrite an Alt-A mortgage:

> On a case-by-case basis, we may determine that, based upon compensating factors,
> a prospective borrower not strictly qualifying under the applicable underwriting
> guidelines warrants an underwriting exception.  Compensating factors include, but
> are not limited to, low loan-to-value ratios, low debt-to-income ratios, excellent
> credit history, stable employment, financial reserves, and time in residence at the
> applicant's current address.

Id. at 8.[25]  See Motion at 17; CCAC ¶ 98, at 29 ("Often an Alt-A borrower is unable to provide the

---

[25] The Court and the parties discussed this issue at length during the April 22, 2009 hearing.
See, e.g., Transcript of Hearing at 17:20-19:15 (taken April 22. 2009)(Forman, Court); id. at 38:1-
39:13 (Zivitz).  Although the Plaintiffs did not concede that the disclosure in the Form 10-K would
put a reasonable person on notice that TMI occasionally underwrote Alt-A mortgage loans, the
Court finds, from the Plaintiffs' definition of Alt-A and the language of the Form 10-K disclosure,
that an investor would be able to put two and two together, and realize that the "case-by-case"
exceptions that TMI discloses were Alt-A loans.

proof of income or the verification of assets necessary to obtain a prime mortgage, but has a satisfactory credit score, or vice versa.").

Apparently in response, the Plaintiffs argue that, notwithstanding the statements in TMI's SEC filings, the Defendants repeatedly misstated that TMI was not an Alt-A lender and concealed both TMI's Alt-A holdings and the risk that came with those holdings. See 1934 Act Response at 13-14, 37-47. The statements that the Plaintiffs allege are misleading and/or false, and thus support a strong inference of scienter,  include the following:

a)  A statement by Goldstone, on May 15, 2007, during an A.G. Edwards & Sons, Inc. Investment Conference that: "[TMI is] a single-family residential mortgage lender. [It is] exclusively a residential mortgage lender.  But [it is] not all things to all people. [It has] a very niche or focused strategy within the single-family residential space. [Its] focus is on prime origination, not subprime or Alt-A."  CCAC ¶ 112, at 33.

b)  A statement by Goldstone during a June 6, 2007 North America REIT's Investor Forum, that TMI is focusing "exclusively on prime mortgage loan originations, as opposed to subprime" and focusing "on the jumbo sector and in fact super jumbo sector of the mortgage origination space."  CCAC ¶ 76, at 22-23.  He further stated "[t]hat business has not changed in rate," and that TMI has "received more phone calls from more lenders wanting to [do] financing for us in the last three or four months because as the Alt-A and the subprime lending business has sort of gone away, financing opportunities for banking at banks has gone away and they are looking to replace that lost business with a good quality lender and we have probably the premier reputation in the industry today." Id. ¶ 113, at 33-34. Finally, Goldstone asserted that "the subprime meltdown that has been occurring in the marketplace . . . has given us an opportunity to differentiate our strategy from a lot of other lending strategies out there.  Id. ¶ 238, at 71.

c)  A statement by Goldstone at a July 20, 2007 earnings conference that:

[TMI is] behaving substantially differently than subprime originators because we are not that.  We are not an Alt-A originator.  We are not -- we are a prime adjustable rate mortgage originator, but even our delinquency characteristics as compared to other prime adjustable rate mortgage originators are so far superior as to not even be worth a whole lot of conversation.

CCAC ¶ 114, at 34.  Goldstone further stated that "[t]he current credit crisis in the market environment today, the liquidity issues in the marketplace today, are creating a very, very nice opportunity for [TMI]." Id. ¶ 115, at 34.

d)  Statements in a press release issued August 14, 2007, made by Goldstone, disclosed

-55-

that TMI was "exploring" the sale of assets as a "strateg[y] to help preserve shareholder value."
CCAC ¶ 273-78, at 82-84; TMI's Form 8-K Exhibit 99.1 (dated August 15, 2007). The press release
also stated that TMI's AAA-rated securities had begun decreasing in market value as of August 9,
2009, which had resulted in increased margin calls. See id. ¶ 273, at 82.

       e)      TMI's Form 8-K, signed by Goldstone and filed March 3, 2008, stated:

> As of February 27, 2008, we had met all margin calls, including margin calls
> received between February 14 and February 27, 2008 in an amount in excess of $300
> million, on our reverse repurchase agreements, the substantial majority of which
> were related to the decline in valuations placed on these securities. However, after
> February 27, 2008 we saw further and continued deterioration in the prices of
> mortgage securities and we have incurred additional margin calls in an amount in
> excess of $270 million. As a result of margin calls prior to February 27, 2008, we
> have limited available liquidity to meet these recent margin calls as well as any
> future margin calls. Consequently, to date, we have not met the substantial majority
> of the most recent margin calls. On Thursday, February 28, 2008, one lender
> delivered a notice of event of default under a reverse repurchase agreement after we
> failed to satisfy a margin call in the amount of $28 million. We have been
> continuing discussions with this lender, and the lender has not yet exercised its right
> to liquidate pledged collateral. To the extent that any other reverse repurchase
> agreement contains a cross-default provision, the related lender, which may be an
> underwriter or its affiliate, could declare an event of default at any time.

CCAC ¶ 372, at 113.

       The Plaintiffs insist that these statements are materially false and/or misleading, and
therefore evince a strong inference of scienter, because: (i) the Defendants failed to disclose that
TMI owned a portfolio with Alt-A mortgages and MBSs backed with Alt-A loans that totaled at
least $2,900,000,000.00 during the Class Period; (ii) they did not quickly disclose the sale of thirty-
five percent of TMI's highest-rated assets in August of 2007 to meet margin calls; (iii) they did not
disclose that TMI's liquidity was becoming compromised as soon as that information was available
to TMI; (iv) they did not disclose that the $300 million in margin calls that TMI met as of February
27, 2008, was not all of the margin calls that had been made on TMI; and (v) they did not
immediately disclose the KPMG letter withdrawing KPMG's unqualified audit opinion or the NYSE
letter notifying TMI that the NYSE was investigating it. The Court finds that no particular statement

is so obviously false and/or misleading as to, standing alone, support a strong inference of scienter.

According to one of the Plaintiffs' confidential witnesses, "CW3," TMI underwrote a "material amount of Alt-A loans" -- though the witness does not disclose what he or she thinks is a "material amount."   CCAC ¶ 117, at 34-35.   That same witness, however, stated that TMI generally has "more stringent [underwriting requirements for Alt-A loans] than other lenders." CCAC ¶ 118, at 35.   Confidential witnesses four, five, and seven also stated that they witnessed TMI underwriting Alt-A loans as early as 2004.   See CCAC ¶¶ 119-20, 127, at 35, 37.   Notably, only one of those witnesses sought to quantify how many Alt-A loans, as opposed to prime loans, he or she underwrote.   Confidential witness seven, who worked at United Pacific Mortgage, a company from which TMI purchased some mortgages during the Class Period, alleged that approximately twenty-five percent of the roughly fifty loans that he or she underwrote for TMI over a four-year period were "stated income" or "Alt-A."   Id. ¶ 128, at 37-38.[26]   The Defendants insist that these allegations are not news; rather, the statements are in line with the underwriting policy that TMI publicly disclosed.   See Motion at 18.   They also assert that none of the statements of the confidential witnesses are tied to any of the Defendants' statements in any way.   See id. at 19.   They note that none of the confidential witnesses stated that any of the Defendants knew the information about which the confidential witness spoke.   See id.

Assuming the truth of the confidential witnesses' statements, a reasonable person could find Goldstone's statements, that TMI's "focus" was "exclusively" on prime loan origination, to be misleading.   A "focus" is "[a] center of interest or activity."   The American Heritage Dictionary of the English Language at 703 (3d ed. 1992).   On the one hand, the idea of having a focus might imply

---

[26] The Defendants note that this figure amounts only to approximately twelve Alt-A loans over approximately four years, much of which is outside the Class Period.   See Motion at 18.

that there is some other area of interest or activity that is not that upon which the actor is focused. Goldstone's statement that TMI is "focused exclusively on" the prime mortgage area of the market could be a thoughtless exaggeration. Or Goldstone could be using the phrase "focused exclusively" colloquially, to indicate that TMI endeavors to acquire and originate substantially more prime mortgage loans than it does Alt-A or subprime mortgage loans. On the other hand, in conjunction with his disparaging comments about Alt-A and subprime mortgages, the phrase "focused exclusively" could also easily be interpreted as a statement that TMI completely abstains from originating or acquiring Alt-A or subprime loans. The disclosures in TMI's annual statements, while they disclose the possibility that TMI may acquire or originate Alt-A loans, are vague and do not give any indication of the quantity of Alt-A loans in which TMI might deal. Nevertheless, the test at this stage is not whether Goldstone's statements were misleading, but whether they were so clearly false or misleading as to support a strong inference of scienter. At least standing alone, they are not.

Goldstone's statements in TMI's August 14, 2007 press release are, at best, mildly misleading. In an effort to stabilize its liquidity position, TMI had begun selling off its most liquid assets, and had begun that process as early as August 10, 2007. The statement that TMI is "exploring a variety of strategies to help preserve shareholder value, including the opportunistic sale of mortgage assets" does not directly contradict the representation that TMI had begun selling off assets. While one might feel that stating that the company is "exploring" selling assets implies that the company has not yet done so, that conclusion is not necessary. One does not always explore by merely looking; one can also explore by doing. See Oxford English Dictionary Online, "explore, v." (2d ed. 1989, Oxford University Press), *available at* http://dictionary.oed.com/cgi/entry/ 50080551 (last visited Jan. 15, 2010)("1. a. . . .To investigate, seek to ascertain or find out (a fact,

the condition of anything) . . . 2. a. To look into closely, examine into, scrutinize; . . . 3. a. . . . To search into or examine (a country, a place, etc.) by going through it; to go into or range over for the purpose of discovery.").  Furthermore, TMI stated that it was considering selling assets "to help preserve shareholder value."  The sale TMI had already begun was for a different purpose: to improve its liquidity position and meet margin calls.  See  TMI's Form 8-K Exhibit 99.1 (dated August 21, 2007).  The remainder of the press release was rather dire -- dividends were being withheld to help TMI "manage through this difficult [economic] environment." CCAC ¶ 273, at 82. In short, the Court does not feel that the press release was significantly misleading, even in light of the later news that TMI had begun selling a substantial amount of assets.  Likewise, the Court does not find the content of the March 3, 2008 Form 8-K filing misleading, although it does tend to underscore the degree to which Goldstone's comments might potentially have been misleading. Nevertheless, standing alone, the statements in these documents are not so blatantly false or misleading as to establish a strong inference of scienter.

> **g.      The Three-Day Period Between KPMG's March 4 Letter and Thornburg's March 7 Public Disclosure Does Not, Standing Alone, Support a Strong Inference of Scienter.**

The Defendants argue that the three-day gap between their receipt of the KPMG letter withdrawing its unqualified audit opinion and the disclosure to the investing public that it had received the letter does not give rise to an inference of scienter.  See Motion at 19-22.  The Court agrees that, standing alone, this delay would not give rise to a strong inference of scienter.  It seems that it would be unwise to publicly disclose potentially damaging information before seeking to confirm whether the letter was sent in error or whether there was some way in which TMI could convince KPMG to reconsider withdrawal of its letter.  A three-day gap between receipt of the letter and public disclosure sounds more like prudent caution than scienter.  See Higginbotham v. Baxter

-59-

Int'l, Inc., 495 F.3d 753, 760-61 (7th Cir. 2007)("Prudent managers conduct inquiries rather than

jump the gun with half-formed stories as soon as a problem comes to their attention.").  As the

Defendants point out, the securities laws mandate a series of periodic disclosures and not continual

disclosure.  See Higginbotham v. Baxter Int'l, Inc., 495 F.3d at 760 ("Firms regularly learn financial

information between quarterly reports, and they keep it under their hats until the time arrives for

disclosure.  Silence is not 'fraud' without a duty to disclose.").  In this case, there was not silence.

There was a detailed Form 8-K dated March 7, 2008.[27]

### h.    Statements Not False When Made Do Not, Standing Alone, Support a Strong Inference of Scienter.

Finally, the Defendants insist that many of the statements that they made, which the Plaintiffs

call false or misleading, were true when made.  For instance, the Plaintiffs point to Goldstone's

statement that TMI was in a position to benefit from the mortgage crisis as being misleading.  The

Defendants, on the other hand, insist that Goldstone believed such statements to be true when he

made them, and the fact that TMI's attempted strategy failed does not make those earlier, truthful

---

[27] It appears that TMI would not have had the option of keeping quiet about the withdrawal of KPMG's audit opinion, but TMI acted more quickly than SEC regulations required it to do, filing its Form 8-K in three days, whereas SEC regulations require that it be filed within four business days.  See General Instructions for Form 8-K (SEC Form 873)  Instruction B-1, at 2, filed September 23, 2008 (Doc. 134-34)(with respect to material events, "[u]nless otherwise specified, a report is to be filed or furnished within four business days after occurrence of the event."); Item 4.02(b), at 13 (requiring disclosure if "the registrant is advised by . . . its independent accountant that disclosure should be made or action should be taken to prevent future reliance on a previously issued audit report . . . .").  Filing of a Form 8-K is required when any number of material adverse events occur, and the instructions exhaustively detail what information must be included in such disclosures.  See id. at 4-19.  Many of those events occurred in this case, and were quickly followed by TMI filing a Form 8-K.  Other than as discussed in this opinion, the Plaintiffs do not contest the validity or comprehensiveness of any of the Form 8-Ks filed because of these other events.  In this instance, the Plaintiffs seem only to assert that TMI could have responded faster.  The Court finds that TMI met its duty to make a timely disclosure of this information, as explained in the SEC's instructions to the Form 8-K.  The Court has found no authority indicating that the General Instructions for Form 8-K create any disclosure duties other than what they expressly set forth.

statements false and misleading in such a way as to establish a strong inference of scienter.

With respect to the bulk of Plaintiffs' allegations of material omissions -- i.e., failure to disclose that the TMI's assets were becoming less liquid,[28] failing to disclose that RPAs contain cross-default provisions,[29] failing to disclose that the SEC had sent them a letter asking them to confirm an estimate in their September 6, 2007 Form 8-K,[30] failing to disclose the NYSE investigation,[31] failing disclose the Alt-A assets in TMI's portfolio[32] -- the Plaintiffs fail to identify the source of a duty to disclose that information, even if it might be considered material, and fail to identify a statement that was materially misleading in the absence of disclosure of that information. See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir. 1996)("[T]he mere possession of material nonpublic information does not create a duty to disclose it."), superceded by statute on other grounds, 15 U.S.C. § 78u4(b)(l)-(2); Glazer v. Formica Corp., 964 F.2d 149, 156 (2d Cir. 1992)("The materiality of the information claimed not to have been disclosed . . . is not enough to make out a sustainable claim of securities fraud.  Even if information is material, there is no liability

---

[28] According to the CCAC, Goldstone disclosed this fact on August 14, 2007, when it advised the market that, because of liquidity concerns, it was exploring the potential sale of assets.  See id. ¶¶ 18, 135, 273-74, at 7, 40, 82.

[29] As the Court will discuss further below, the Plaintiffs have provided the Court with no discernable basis for a duty to disclose this one particular contract provision, out of the dozens or hundreds that make up an RPA.

[30] According to the CCAC, the SEC "inquiry" was a single letter asking TMI to confirm something that it stated in its September 6, 2007 Form 8-K.  CCAC ¶¶ 147-150, at 42-43.

[31] As the Defendants point out, the Plaintiffs identify no SEC requirement that TMI disclose this letter, and it is not clear whether the NYSE's concerns dealt with TMI's conduct or the conduct of a private trader dealing in TMI stock.

[32] As the Court has already found, TMI disclosed this fact to the SEC and the public in its Annual Report on Form 10-K.

-61-

under Rule 10b-5 unless there is a duty to disclose it.")(quoting Blackman v. Polaroid Corp., 910 F.2d 10, 12 (1st Cir. 1990)); In re Craftmatic Sec. Litig., 890 F.2d 628, 641 n.17 (3d Cir. 1989)("Disclosures mandated by law are presumably material. . . .  However, when defendants voluntarily disclose information, they have a duty to disclose additional material facts only to the extent that the volunteered disclosure was misleading as to a material fact."); Harborview Master Fund, LP v. Lightpath Techs., Inc., 601 F. Supp. 2d 537, 543-44 (S.D.N.Y. 2009)("[S]ilence absent a duty to disclose cannot be actionably misleading, and the mere possession of material non-public information does not create a disclosure duty."); SEC v. Autocorp Equities, Inc., No. 2:98-CV-00562 PGC, 2004 WL 1771608, at *3 (D. Utah Aug. 4, 2004)(in a 10b-5 case, finding certain information material and then analyzing whether there was a duty to disclose it); Karacand v. Edwards, 53 F. Supp. 2d 1236, 1245 (D. Utah 1999)("Materiality alone is not sufficient to place a company under a duty to disclose")(citing In re Sofamor Danek Group, Inc., 123 F.3d 394, 400 (6th Cir. 1997)).  See also Basic v. Levinson, 485 U.S. at 241 n.18 (expressing concern that "[d]evising two different standards of materiality, one for situations where insiders have traded in abrogation of their duty to disclose or abstain . . . , and another covering affirmative misrepresentations by those under no duty to disclose . . . , would effectively collapse the materiality requirement into the analysis of defendant's disclosure duties."); D. Langevoort & G. Gulati, The Muddled Duty to Disclose Under Rule 10b-5, 57 Vand. L. Rev. 1639, 1645 (2004)("[N]ot all material information has to be disclosed.").

Courts do not often discuss the sources of duties to disclose under the federal securities laws. It is tempting to find a duty to disclose where information is material and a reasonable investor would be desire the information, but that is not the standard.  See Shaw v. Digital Equip. Corp., 82 F.3d at 1202; Glazer v. Formica Corp., 964 F.2d at 156; In re Craftmatic Sec. Litig., 890 F.2d at 641

n.17; Harborview Master Fund, LP v. Lightpath Techs., Inc., 601 F. Supp. 2d at 543-44; SEC v. Autocorp Equities, Inc., 2004 WL 1771608, at *3; Karacand v. Edwards, 53 F. Supp. 2d at 1245. Rather, "'[t]he sources of a person's duty to disclose information under the federal securities laws are found either in express mandates of the statutes and rules promulgated under them or in the general antifraud provisions of the statutes and rules,' including Rule 10b-5." L.L. Capital Partners, L.P. v. Rockefeller Ctr Props., Inc., 921 F.Supp. 1174, 1179 (S.D.N.Y. 1996)(quoting V. Brudney, A Note on Materiality and Soft Information Under the Federal Securities Laws, 75 Va. L. Rev. 723 (May 1989)).  See In re Alliance Pharms. Corp. Sec. Litig., 279 F. Supp. 2d 171, 182 (S.D.N.Y. 2003); Anserphone of New Orleans, Inc. v. Protocol Commc'ns, Inc., No. Civ. A. 01-3740, 2002 WL 31741254, at *9 (E.D. La. Dec. 5, 2002).  The Plaintiffs have not pointed to any statute or SEC regulation that demands disclosure of the facts allegedly withheld, nor, after careful review, does the Court find any disclosed facts that were rendered materially false or misleading in the absence of the withheld facts.  As such, the Court finds that the Defendants did not have a duty to disclose these allegedly withheld facts.

The Court will not hold that a Defendant's failure to disclose a fact that it has no duty to disclose substantially impacts the scienter analysis.  See In re Centerline Holdings Co. Sec. Litig., No. 08 Civ. 505(SAS), 2009 WL 2391768 (S.D.N.Y. Aug. 4, 2009)(holding that the defendant's conduct in not making a disclosure "cannot be described as 'highly unreasonable' nor can it be said that it 'represents an extreme departure from ordinary standards of care,' particularly when there was no duty to disclose in the first place.").  See also City of Phila. v. Fleming Companies, Inc., 264 F.3d at 1258 (defining scienter as "a mental state embracing intent to deceive, manipulate, or defraud.")(quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976)).  While the Court will not completely discount the omissions in its scienter analysis, it will not weigh them heavily.

The Court is likewise unpersuaded by the allegation that Goldstone's statement that the company was "in a position to benefit from the credit and liquidity crisis," and yet three weeks later the company was forced to begin selling assets to deal with its own liquidity problems, is materially false or misleading so as to establish scienter. A lot can happen in three weeks. Although the facts alleged imply that TMI and Goldstone were overconfident about their ability to weather the growing financial crisis, or perhaps underestimated the severity of the crisis, they are not clearly false and do not substantially support an inference of scienter. Likewise, the Court is unpersuaded that TMI's public statement regarding its August 2007 asset sale was substantially misleading because it emphasized that the sale demonstrated that its assets were liquid. The August 20 press release gave investors all the facts that they might need to assess TMI's position and how the asset sale might affect it. TMI's decision to emphasize the positive -- that TMI's sale of assets indicated that the assets were relatively liquid -- is merely putting a positive spin on a bad situation. Nothing in the securities laws demands that companies be publicly pessimistic. See Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221, 239 (S.D.N.Y. 2006)("The Second Circuit recognizes that up to a point, companies must be permitted to operate with a hopeful outlook, and that as a result, executives are not required to take a gloomy, fearful or defeatist view of the future.")(quoting Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004))(internal quotes and alterations omitted).

The Plaintiffs assertion that TMI "failed to timely disclose that KPMG demanded that the Company restate its FY 2006 and FY 2007 financial statements" is inaccurate. After a material event, such as the withdrawal of an unqualified audit opinion, the company has four business days to file a Form 8-K disclosing the event. See Motion at 22; General Instructions for Form 8-K (SEC Form 873) Instruction B-1, at 2 (with respect to material events, "[u]nless otherwise specified, a report is to be filed or furnished within four business days after occurrence of the event."). TMI

-64-

received the letter on March 4, 2008, and filed its Form 8-K disclosing it -- and the resolution of the issue -- three days later, on March 7, 2008. This disclosure was timely by SEC standards. Thus, most of the statements that the Plaintiffs assert are either true, not misleading, or omissions without a duty to disclose, none of which, standing alone, support a strong inference of scienter. The Court will, however, consider them in the totality of circumstances.

> ### i. The Plaintiffs Have Successfully Pled a Strong Inference of Scienter as to Goldstone, but Not as to Any Other Individual Defendant.

Considering the Plaintiffs' scienter allegations as a whole, combined with the public filings of which the Court has taken judicial notice, the Court is convinced that the Plaintiffs have successfully pled scienter as to Goldstone. Construing the facts in the light most favorable to the Plaintiffs, but also considering the weight of all other opposing inferences, the inference of scienter -- that is, intent to deceive, manipulate, or defraud -- is at least as likely as any other inference with respect to Goldstone. Goldstone, but none of the other individual Defendants, made public statements in which he distanced TMI from the mortgage crisis by insisting that the problem was with "Alt-A" or "subprime" originators. While that statement might be, to some extent, true, Goldstone also sought to differentiate himself and his company from these Alt-A originators, stating "we are not an Alt-A originator" and that TMI's focus is "exclusively" on the prime mortgage market. The allegations of fact sufficiently established that Goldstone, as President and Chief Operating Officer of TMI, was so deeply involved in TMI's operations that he knew that TMI had some quantity -- according to one of the Plaintiffs' confidential witnesses, as much as twenty-five percent of its portfolio -- of Alt-A assets. TMI's Form 10-Ks always included language about underwriting exceptions -- situations in which TMI might underwrite or purchase mortgage assets for borrowers who, for some reason, do not qualify for a prime mortgage loan. The Form 10-K's

language was general, however, and it would be reasonable for an investor to credit the more precise, verbal assurances of the company president more than the generic language of an SEC filing.  Including that language in the Form 10-K protects TMI from liability if it comes to light that TMI makes or purchases Alt-A or subprime loans, i.e., underwriting exceptions, but by no means mandates that it will make or acquire such loans.  The Court believes that this inconsistency gives rise to a strong inference that Goldstone was actively attempting to hide from the market that TMI engaged in Alt-A or subprime lending, and knew, or at least recklessly disregarded, that withholding this information would mislead investors.  See City of Phila. v. Fleming Co., Inc., 264 F.3d at 1261.

Other statements by Goldstone further reinforce this inference.  On August 8, 2007, TMI filed its second quarter 2007 Form 10-Q with the SEC, which stated that TMI had significantly diversified its funding sources by replacing some RPAs with ABCPs.  Yet, at the same time, Goldstone was admitting to investors that the ABCP market had "dried up."  While it does not contradict the TMI's disclosure that it was diversifying to know that it diversified to assets that had become illiquid, it does seem misleading to refer to TMI as diversifying -- a normally positive term -- when the end result is to decrease TMI's overall liquidity position.  TMI did not disclose the August 2007 sale of assets to improve its liquidity position until August 14, 2007, when TMI issued its press release, quoting Goldstone, that it was considering a sale of assets to preserve shareholder value.  While TMI may not have had a duty to disclose its sale of assets, even if that sale was substantial, Goldstone's announcement that it was considering a sale of assets seems to be posturing TMI as being in a more firm financial position than it was.  The magnitude of the asset sale -- $20,500,000.00, approximately thirty-five percent of the company's assets -- gives the Court further reason to suspect that there was motive behind Goldstone's announcement.

TMI's accounting debacle with KPMG does not, in itself, give rise to a strong inference of

scienter, even when the resulting restatement was substantial -- $676 million -- but the fact that such a restatement was necessary tends to reinforce the mounting image of TMI as a company trying to shield its weakening infrastructure from the prying eyes of its investors.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1106; In re Nature's Sunshine Prods. Sec. Litig., 486 F. Supp. 2d 1301, 1311 (D. Utah 2007)(seeming to credit KPMG's decision to withdraw an audit opinion based on misrepresentations as a finding of fraud).  TMI's failure to report in its 2007 Form 10-K that it did not meet a margin call of $28,000,000.00 by JP Morgan reinforces the inference that TMI was concealing information.  It is true that the CCAC does not disclose when on February 28, 2008 TMI received notice of its default from JP Morgan, but interpreting the facts pled in the light most favorable to the Plaintiffs, the Court could assume that the Defendants knew of this default before filing their Form 10-K.  On the other hand, considering reasonable opposing inferences, as the Supreme Court mandated in Tellabs, Inc. v. Makor Issues & Rights, Ltd., the Court must also consider the opposing inference, that TMI received notice of the failure notice on February 28, after it has filed its Form 10-K.  Even if it received the notice after filing, TMI should have known of the $28,000,000.00 margin call, which TMI's failure to pay led to the default notice.  It was not until the following Monday, March 3, 2008, that TMI issued a press release and Current Report on Form 8-K that disclosed its default for failure to satisfy a margin call by JP Morgan.  Finally, Goldstone was one of the two Defendants that is alleged to have financial motive to grow TMI at the risk of investors.

As to the remainder of individual Defendants, the Plaintiffs' allegations fail to establish a strong inference of scienter.  The Court has concluded that the group-pleading doctrine did not survive unscathed the passage of the PSLRA, thus the only statements that the Court can properly attribute to a particular Defendant are those that he or she said, those in documents that he or she

signed, and those in documents about which particular factual allegations aver his or her direct involvement. Goldstone's statements, which appear contrary to the reality of TMI's investment portfolio, went a long way toward establishing scienter with respect to Goldstone. The only Defendant as to whom verbal statements are alleged, however, is Goldstone. Likewise, Goldstone made all of the statements in press releases, and only Goldstone and Stephen E. Newton, who is not named as a defendant in this case, signed the Form 8-K's that contain alleged misstatements and to which the press releases are attached. The Plaintiffs have pled facts with particularity as to Goldstone, but those facts are pled with particularity as to Goldstone only.

The only basis for establishing a strong inference of scienter as to each remaining Defendant is the statements and omissions in public filings that Defendant signed. That leaves only TMI's alleged omissions, the one-business-day delay in disclosing that TMI had failed to meet some margin calls, the financial restatement, the delayed disclosure of the NYSE investigation, and Thornburg's potential motive to grow TMI's assets at the risk of investors. The Court does not believe that, absent Goldstone's false and/or misleading statements, an intent to deceive or defraud is as plausible as other inferences that one might draw from the combination of circumstances and alleged omissions. Rather, when the Court views all of the alleged facts and incorporated documents as a whole, the most plausible inference is that TMI was a sinking ship. It disclosed material facts quickly, after reasonable investigation, but sometimes facts were still in the intelligence pipeline when an SEC filing was made, in which case the fact was quickly disclosed in a Form 8-K. The Defendants tried to stay positive in the face of the mortgage crisis and Goldstone made some statements that crossed the line between optimistic and false and/or misleading, assuming the Plaintiffs' allegations are true. The most seemingly incriminating factor that was not directly attributable to Goldstone was TMI's failure to disclose the situation with JP Morgan, which

arose on February 28, 2008, in TMI's Current Report, filed that same day.  February 28, 2008 was

a Thursday.  The fact was disclosed after a one-business-day gap, and there was no alleged

significant event on the Friday between February 28 and the filing of TMI's Form 8-K on Monday,

March 3, 2008.  Ultimately, there are not allegations sufficient to establish a strong inference of

scienter as to the other individual Defendants.

In sum, the Plaintiffs have not attributed any wrongful conduct or statements to any other

individual Defendant, and the documents that other Defendants have signed -- the Form 10-Q

quarterly reports, the Form 10-K annual reports, the Form 10-K/A amended annual reports, and the

SRS -- contain no statements or omissions that the Court finds establish a strong inference of

scienter.  The Court therefore holds that the Plaintiffs have failed to plead sufficient facts to establish

a strong inference of scienter as to Thornburg, Simmons, Badal, Decoff, Anderson, Ater, Cutler,

Kalangis, Lopez, Mullin, and Sherman.  The Court will therefore grant the Defendants' motion to

dismiss as to those Defendants.

## 2. **The Plaintiffs Have Pled Sufficient False or Misleading Statements and/or Omissions**.

The Defendants argue that the Plaintiffs fail to state, with sufficient particularity, the false

or misleading statements that the Defendants made, and that, as a result, the Plaintiffs' Section 10(b)

claims must fail.  See Motion at 23-36.  They further insist that the statements and omissions alleged

are mere puffery, are conclusory allegations of falsity without reference to the necessary "true"

facts, are forward-looking statements protected under the PSLRA's safe-harbor provisions, are

immaterial, or are false only by hindsight.  See Motion at 23-36.  With respect to alleged omissions,

the Defendants insist that no statement made created a duty to speak, and that therefore omissions

cannot form the basis of Section 10(b) liability.  See id. at 35-36 (citing Grossman v. Novell, Inc.,

120 F.3d at 1125).   The Plaintiffs argue to the contrary.   See 1934 Act Response at 12 ("**1. Plaintiffs Have Pled with Particularity Defendants' False and Misleading Statements and Omissions.**")(emphasis in original).

To state a claim under the PSLRA, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Adams v. Kinder-Morgan, Inc., 340 F.3d at 1095 (quoting 15 U.S.C. § 78u-4(b)(1)).   The Plaintiffs assert that seven statements and omissions meet this standard:

(1)   Defendants' representation that it was not an Alt-A mortgage originator or purchaser, when, in fact, Thornburg possessed a portfolio of Alt-A mortgages and MBS[s] backed by Alt-A loans totaling at least $2.9 billion during the Class Period;[33]

(2)   Goldstone's claim on July 20, 2007 that Thornburg was "benefitting" from the deteriorating subprime and Alt-A mortgage market in 2007 and 2008 and enjoyed its "highest" ever liquidity position, notwithstanding that it possessed at least $2.9 billion in illiquid Alt-A-backed assets and had to negotiate the sale of nearly 35% of its highest-rated assets at discounted prices beginning on August 10, 2007 to meet margin calls;

(3)   Defendants' claim [in TMI's March 3, 2008 Current Report on Form 8-K] that [TMI] "may" be subject to margin calls, notwithstanding that the Company already had received billions of dollars in margin calls;[34]

(4)   Defendants' concealment of cross-default provisions implicated in [TMI]'s RPAs that subjected [TMI] to billions of dollars in margin calls upon a default under one RPA;

(5)   Defendants' concealment of the need and commencement of a $22 billion

---

[33] The only Defendant that the Plaintiffs tie to these statements is Goldstone.

[34] The only signatory of that Form 8-K is Goldstone.   See TMI's Form 8-K, at 9 (dated March 7, 2008).

fire-sale of assets to satisfy outstanding financial obligations;

(6)     [TMI]'s issuance of financial statements that were inflated by $676.6 million; and

(7)     Defendants' concealment of KPMG's withdrawal of its unqualified audit opinion and the NYSE's investigation for 3 days and seven weeks, respectively.

1934 Act Response at 13-14 (citations omitted).  The Court agrees that two of the above statements are materially false or misleading, and therefore fulfill the Plaintiffs' pleading requirement.  First, Goldstone made statements on at least two occasions that could be construed and reasonably understood as asserting that TMI did not engage in Alt-A lending or purchase Alt-A assets.  He stated on June 6, 2007, that TMI was focused "exclusively" on prime mortgage origination, and he stated on July 20, 2007 that TMI is "not an Alt-A lender."  Given that TMI had a substantial collection of Alt-A assets -- at least $2,900,000,000.00 and as much as twenty-five percent of TMI's holdings -- these statements were false.  Further, given the scare over the crumbling Alt-A market, a fact that is emphasized by the context in which Goldstone made his statements, the Court finds that this false statement is material.

Second, the Court finds materially misleading TMI's public disclosure in its March 3, 2008 Form 8-K -- signed by Goldstone -- that, "[t]o the extent that any other reverse repurchase agreement contains a cross-default provision, the related lender, which may be an underwriter or its affiliate, could declare an event of default at any time."  This statement is misleading because the truth of the matter was that all of TMI's RPAs contained cross-default provisions; thus, news that one of TMI's lenders had declared TMI to be in default meant that potentially all of TMI's lenders could declare TMI to be in default.  If one default were to occur, all of TMI's lenders could demand immediate payment from TMI and, especially considering the amount to which TMI's assets were

leveraged and their relatively illiquid state, TMI would have more immediate obligations than it could pay.  At the hearing on this motion, Jonathan Dickey, attorney for Defendants AG Edwards & Sons, Inc., BB&T Capital Markets, Citigroup Global Markets, Inc., Oppenheimer & Company, Inc., RBC Dain Raucher Corp., and Stifel, Nicolaus & Company, Inc., insisted that TMI should not have had to disclose that all of its contracts contained cross-default provisions because such provisions are "a dime a dozen."  Tr. 186:23-187:14 (Dickey, Court).  In the Court's view, the commonness of these provisions does not help TMI's position.  By using the phrase, "to the extent that any other reverse repurchase agreement contains a cross-default provision," TMI implies that some or all of the other RPAs do not have cross-default provisions, which was false.  The information is material: it would inform investors that, at any moment, TMI could be broke, which would tend to influence how one might invest money.  The Court therefore finds that the Plaintiffs have successfully alleged Section 10(b) claims against Goldstone.

The remaining statements, however, are either not false, not misleading, or not material.  Goldstone's statements on July 20, 2007, that the deteriorating mortgage market was "creating a very, very nice opportunity" for TMI, and that TMI's unencumbered asserts were at the highest level in TMI's history, is not controverted by any facts allegedly known to Goldstone on July 20.  There are no allegations that TMI had not been benefitting, or at least expecting to benefit, from the mortgage decline as of July 20.  There is also no way for the Court to determine the truth or falsity of the statement that the crisis was creating opportunities for TMI.  The Court cannot find those statements to be false or misleading.

The Plaintiffs have a confidential source who states that Goldstone admitted on August 8, 2007, that the ABCP market had dried up -- two and a half weeks after his prior statement -- but the Plaintiffs do not allege that TMI's position was not as Goldstone represented it on July 20.  The

Plaintiffs also point to the sale of assets that occurred "a few days" after Goldstone made this statement.  CCAC ¶ 84, at 25.  First of all, there are a few weeks -- not a few days -- between July 20 and August 10.  Things were moving quickly during the mortgage crisis, and the Court does not find it impossible, or even unlikely, that Goldstone's statements on July 20 were accurate on that day.  Furthermore, unlike the characterization in the Plaintiffs' 1934 Act Response, Goldstone did not say TMI was in its best liquidity position ever; he said that TMI was at its highest level of unencumbered assets, and that TMI had "plenty of liquidity" as of July 20, 2007.   Although there is generally a correlation between unencumbered assets and liquidity, one of the symptoms of the mortgage crisis, as the Court understands it, was that assets were becoming less liquid, even if they were unencumbered.  The Court therefore cannot say that these statements were materially false or misleading when Goldstone made them.

The Court does not find the statement in TMI's March 3, 2008 Form 8-K, that TMI "may" be subject to margin calls, to be misleading.  That same Form 8-K includes statements that TMI is "working to meet all of our outstanding margin calls within a timeframe acceptable to our lenders," and "[i]f we are unable to promptly liquidate assets and satisfy outstanding margin calls, our reverse purchase agreement counterparties, may declare event of default and liquidate the pledged securities."  SEC Form 8-K for Thornburg Mortgage, Inc. at 2 (dated March 3, 2008).  These statements disclose that TMI had additional margin calls that it had not yet met, and that it was working to do so.  The Court likewise does not find materially misleading the alleged misstatement in this Form 8-K that, as of February 27, 2008, TMI had met all outstanding margin calls.  The 8-K also states that, "[o]n Thursday, February 28, 2008, one lender delivered a notice of event of default under a reverse repurchase agreement after we failed to satisfy a margin call in the amount of approximately $28 million."  March 3, 2008 Form 8-K at 2.  One might find it incredible that a

lender would make a margin call and announce an event of default in a single day, thereby making doubtful the statement that TMI had met all outstanding margin calls as of February 27 -- the day before the default notice.  The announcement of the default, however, obviates the materiality of what the Plaintiffs assume to be a false disclosure.  To the extent that TMI's statement regarding the default notice admits that there was an unmet margin call on February 27, 2008, that fact is disclosed in the same document that allegedly concealed it.  The Court will not find that this is a material statement or omission for the purposes of Section 10(b) and rule 10b-5.

The Court has already discussed the final three omissions listed above.  It held that there was no duty to disclose the NYSE investigation during the time period in question, that the misstated financials were properly addressed, and that TMI responded to KPMG's letter withdrawing its audit opinion within the time prescribed by the SEC.  The Court will thus find that the remaining alleged statements and omissions were not materially false and/or misleading so as to support a claim under Section 10(b) and rule 10b-5.  Because the Plaintiffs properly allege material statements and omissions only as to Goldstone, the Court will dismiss the Plaintiffs' Section 10(b) claims against the remaining Defendants.[35]

    **B.**    **THE PLAINTIFFS' CLAIM UNDER SECTION 20(a) OF THE EXCHANGE ACT MIGHT SUCCEED AGAINST GOLDSTONE, SIMMONS, AND DECOFF, BUT NOT AGAINST ANY OTHER DEFENDANT.**

As to each of the Defendants, the Plaintiffs assert liability on the basis of that individual's position as a controlling person within TMI.  See CCAC ¶¶ 506-09, at 157-58.  The Defendants' primary avenue upon which to attack the Plaintiffs' Section 20(a) claim is to insist that there can be

---

[35] Again, the Court is reserving judgment on the claims against TMI because TMI has a bankruptcy case pending in Maryland.  The Court will therefore not dismiss the claims as to TMI at this time.

no Section 20(a) claim if there is no underlying Section 10(b) violation.  <u>See</u> Motion at 36.  They also insist that, should the Court find a violation of Section 10(b), it should still dismiss the Plaintiffs' claims under Section 20(a) because they contain boilerplate allegations and lack any specific allegations of control by the Defendants.  <u>See id.</u> at 37.  The Plaintiffs insist that they have established a Section 10(b) claim and that all of the individual Defendants were control persons within the meaning of Section 20(a).  <u>See</u> 1934 Act Response at 56-58.

To establish their claim for liability under Section 20(a) of the Exchange Act, the Plaintiffs have to allege properly a primary violation of the securities laws, and "facts from which it can reasonably be inferred that the individual defendants were control persons."  <u>Adams v. Kinder-Morgan, Inc.</u>, 340 F.3d at 1108.  The Plaintiffs have successfully pled a primary violation by Goldstone, but the Court is unable to determine at this time whether the Plaintiffs have successfully pled a rule 10b-5 claim against TMI because of TMI's pending bankruptcy.  The Court therefore can grant the Defendants' motion to dismiss as to individual Defendants only if it finds that those Defendants are not control persons of TMI under the Exchange Act.  As to any individual Defendant that is a control person, the Court must reserve judgment on the Plaintiffs' Section 20(a) claims until it has resolved whether the Plaintiffs properly pled their claim against TMI.

The Defendants' argue in their Motion that the Plaintiffs have not alleged, with any specificity, facts from which one could infer that the individual Defendants were controlling persons.  The relevant allegations from the CCAC are:

> 64.    . . . .  The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

> 65.     The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of securities laws.

> 67.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of TMI, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. As such, the Individual Defendants were controlling persons of TMI within the meaning of Section 20(a) of the Exchange Act. . . .

CCAC ¶¶ 64-65, 67, at 18-19.  The Court agrees that these allegations lack any specificity.

Essentially, the Plaintiffs ask the Court to find that each individual Thornburg Defendant is a

controlling person based solely on his or her title and position within TMI.  Of course, a high-

ranking position, standing alone, is unlikely to satisfy the "control" element.  See Adams v. Kinder-

Morgan, Inc., 340 F.3d at 1109.  If the circumstances of the particular defendant's position and the

nature of the underlying claim would lead to an inference that the defendant had such control, the

second element is met.  See id.

Goldstone, Simmons, and Decoff are control persons for the purpose of establishing Section

20(a) liability.  Thornburg is the founder of the company and was the CEO until December 18, 2007,

but the only articulable act or omission by TMI as an entity, the misleading Form 8-K dated March

3, 2008, was filed after his tenure as CEO ended.  There are otherwise no allegations in the CCAC,

other than the conclusory allegations of hands-on management, that could lead to the conclusion that

Thornburg controlled TMI's actions at that time.  Similarly, at the time of the only material

misleading representation by TMI, Badal was retired and no longer Chief Lending Officer of TMI.

The Court will thus find that the Plaintiffs have failed to adequately plead a Section 20(a) violation

against Thornburg and Badal, and dismiss those claims.[36]  The Court will also find that the Plaintiffs have failed to allege Section 20(a) claims against the Director Defendants, as the Plaintiffs allege only that each was a director and signed the SRS, in which no materially false or misleading statement is made.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (holding that a person is not a control person merely because he is a director).

The remaining Thornburg Defendants, however, are potentially subject to Section 20(a) controlling-person liability.  Goldstone, who is liable independently under Section 10(b) and rule 10b-5, was the CEO and COO of TMI at the time of the March 3, 2008 Form 8-K disclosure, which he signed.  Simmons was the Chief Financial Officer of TMI during the entire Class Period, and the Tenth Circuit has held that an allegation that a Defendant is in such a position, without further detail, can support liability under Section 20(a).  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109. Furthermore, in a mortgage-investment firm like TMI, the Chief Lending Officer -- Decoff -- can also be imputed with control when the alleged securities violation is based on misstatements in a report that purported to reflect TMI's financial performance.  See id.

## II.     THE PLAINTIFFS' FAIL TO STATE A CLAIM UNDER THE SECURITIES ACT.

The limitation on what conduct can be the basis for a Securities Act claim means that almost all of the conference calls and media statements on which the Plaintiff rely in the Exchange Act part of the case are irrelevant.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. at 752.  The Court will therefore analyze those claims with reference only to the contents of the registration statements

---

[36] The CCAC is also devoid of any allegation that any of the Defendants directly controlled the acts of Goldstone while he was representing that TMI had no association with the Alt-A market. Because the individual Defendants, except arguably Thornburg, did not hold a position of authority or control over Goldstone, the Court will decline to find any individual Defendant was a controlling person with respect to Goldstone's liability under Section 10(b).

and the documents incorporated therein.

The Plaintiffs allege that the Defendants violated Sections 11, 12(a)(2), and 15 of the Securities Act of 1933. In doing so, the Plaintiffs point to a series of public offerings -- May 2007, June 2007, September 2007, and January 2008 -- of TMI stock, and to a series of representations and omissions that they allege are found within the official documentation associated with those offerings. See CCAC ¶¶ 532-620, at 163-86. The Defendants move to dismiss the Securities Act claims, raising multiple arguments. The Defendants first insist that the Plaintiffs' group allegations -- the failure to specify which Defendants are responsible for which registration statements -- is fatal to the Plaintiffs' Securities-Act claims. See Motion at 38-39. They argue also that none of the registration statements or incorporated SEC filings contain materially false or misleading statements. See id. at 42-47. With respect to the May 2007 offering, the Defendants make an argument about causation. See id. at 40-42. And regarding the September 2007 and January 2008 offerings, the Defendants insist that no named Plaintiff has standing to sue regarding those offerings. See id. at 48-51. The Court first finds that Simmons and Decoff are not proper defendants for a Section 11 claim. The Court also finds none of the Defendants engaged in the kind of active solicitation necessary to state a claim under Section 12(a). Finally, the Court finds that the Plaintiffs have failed to specify any materially false or misleading statements upon which Section 11 or Section 12(a)(2) liability could be premised. The Court therefore will grant the Defendants' motion to dismiss as to all of the Plaintiffs' Securities Act claims.

## A.    DECOFF AND SIMMONS ARE NOT PROPER DEFENDANTS FOR A SECTION 11 CLAIM.

Only four classes of individuals are proper defendants in a Section 11 action: (i) those who signed the registration statement; (ii) directors of the issuer; (iii) underwriters of the offering; and

(iv) those who prepared or certified any report or valuation used in connection with the registration statement. See 15 U.S.C. § 77k(a). The Defendants insist that the Plaintiffs fail to properly allege that Decoff and Simmons fall into any of the above categories. See Reply at 30. The Plaintiffs do not allege that Simmons or Decoff were directors, nor that either were underwriters. They argue in a footnote that, "[o]n information and belief, . . . because Decoff served as the chief lending officer during the January 15, 2008 Offerings, . . . he prepared and/or certified reports with regard to Thornburg's lending practices used in connection with the registration statement and, thus, is a liable party." 1933 Act Response at 8 n.7 (citing CCAC ¶¶ 61, 602). First, this speculative assertion is too conclusory to warrant acceptance. Furthermore, the CCAC does not make these allegations; rather, it alleges only that Decoff was Chief Lending Officer and that all of the Defendants either (i) signed the registration statements; (ii) were directors of TMI; or (iii) were underwriters. See CCAC ¶¶ 602, 61. The Court will therefore grant the Defendants' motion to dismiss the Plaintiffs' Section 11 claim as to Decoff.

Likewise, although Simmons signed a number of the SEC documents that are linked to the public offerings, see 1933 Act Response at 8 n.7 (citing CCAC ¶¶ 62, 227, 257, 324, 534, 540, 543), the Plaintiffs have failed to allege that she signed the registration statement or that she consented to the use of the documents that she signed in connection with the registration statement. Without such an allegation, the Plaintiffs have failed to meet the pleading requirements of Section 11 as to Simmons. The Court will not assume clearly defined statutory elements when the Plaintiffs, outfitted with numerous learned counsel, have omitted to plead them. The Court therefore will grant the Defendants' motion to dismiss as to the Plaintiffs' Section 11 claim against Simmons.

**B.    THE PLAINTIFFS FAIL TO ALLEGE THAT THE DEFENDANTS SOLICITED THE SALES AT ISSUE, THUS THEY FAIL TO ADEQUATELY ALLEGE A SECTION 12(a)(2) CLAIM.**

The only proper defendants in a Section 12(a)(2) action are those who "'offer or sell' unregistered securities." Pinter v. Dahl, 486 U.S. 622, 641 (1988).  The definition of one who "offers or sells" includes "[a] person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." Maher v. Durango Metals, Inc., 144 F.3d at 1307 (quoting Pinter v. Dahl, 486 U.S. at 647).  The Defendants argue that, based on the structure of the offerings at issue, none of the Defendants qualify as ones who offered or sold securities, and that the Plaintiffs fail to allege any acts of solicitation on the part of any of the Thornburg Defendants.  See Motion at 38-39.  The Plaintiffs do not directly respond to these arguments with respect to TMI, see 1933 Act Response at 8-10, and couch their arguments regarding the individual Defendants in terms of "active solicitation," arguing that the individual Defendants' preparation of the offering documents constitutes solicitation under Tenth Circuit law, see 1933 Act Response at 22 & n.20.

The Defendants refer to the structure of these offerings as "firm commitment" offerings, which the Court understands to mean that the underwriters agreed that they would purchase a certain amount of TMI securities and sell them to the final consumer, and therefore there is no privity of contract between TMI and the Plaintiffs, see Motion at 39 n.6, and the Plaintiffs concede this fact, see 1933 Act Response at 22 ("[T]he Offerings arose from firm commitment underwritings.").[37]  The

_____

[37] Black's Law Dictionary defines "firm-commitment underwriting" as "[u]nderwriting in which the underwriter agrees to buy and sell all the shares to be issued and assumes full financial responsible for any unsold securities," and further explains that, "[t]he underwriter, or underwriting group, buys the securities from the issuer and resells them as principal.  In this type of underwriting, securities that are not sold to the public are owned by the underwriter, and the issuer is paid for those securities as well as the others."  Black's Law Dictionary 1665 (9th ed. 2009).  Investopedia defines

Defendants insist that this offering structure means that the issuer -- in this case TMI -- does not "offer or sell" the securities, and is therefore not a proper Section 12(a)(2) defendant.  See Motion at 39; Reply at 31.  The weight of authority falls in favor of the Defendants.  See Pinter v. Dahl, 486 U.S. at 642; Rosenzwig v. Azurix Corp., 332 F.3d 854, 871 (5th Cir. 2003)("[T]o count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer."); Shaw v. Digital Equip. Corp., 82 F.3d at 1214 (recognizing that the language of the statute indicates a direct relationship between buyer and seller); In re Craftmatic Sec. Litig., 890 F.2d at 636 ("[A]lthough an issuer is no longer immunized from § 12 liability, neither is an issuer liable solely on the basis of its involvement in preparing the prospectus.  The purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a § 12[(a)](2) seller.")(emphasis added).  See also In re Westinghouse Sec. Litig., 90 F.3d 696, 716 (3d Cir. 1996)(upholding In re Craftmatic Sec. Litig. and extending it from 12(a)(1) to 12(a)(2) claims); Shaw v. Digital Equip Corp., 82 F.3d at 1214 (holding that the definition of "seller" is the same under 12(a)(1) and 12(a)(2)).

The Court agrees that the language of Section 12(a) demands a buyer-seller relationship: "Any person who . . . offers or sells a security . . . shall be liable . . . to the person purchasing such security from him . . . ."  15 U.S.C. § 77l(a)(emphasis added).  See Pinter v. Dahl, 486 U.S. at 642 ("At the very least . . . the language of § 12(1) contemplates a buyer-seller relationship not unlike

it as "[a]n underwriter's agreement to assume all inventory risk and purchase all securities directly from the issuer for sale to the public at the price specified."  Investopedia.com Financial Dictionary, Firm Commitment, http://www.investopedia.com/terms/f/firmcommitment.asp (last visited Jan. 14, 2010).  See also AllBusiness.com, Firm Commitment Definition, http://www.allbusiness.com/glossaries/firm-commitment/4950756-1.html (last visited Jan. 14, 2010)("**Securities underwriting:** arrangement whereby investment bankers make outright purchases from the issuer of securities to be offered to the public; also called *firm commitment underwriting*.")(emphasis in original).

traditional contractual privity.  Thus, it is settled that § 12(1) imposes liability on the owner who passed title, or other interest in the security, to the buyer for value.").  The question, then, is whether the Defendants "offered" the securities to the Plaintiffs.  As the Tenth Circuit stated in <u>Maher v. Durango Metals, Inc.</u>, the Plaintiffs must "at a minimum allege facts indicating that [the Defendants] solicited [their] purchase."  <u>Maher v. Durango Metals, Inc.</u>, 144 F.3d at 1307.[38]  <u>See</u> <u>Pinter v. Dahl</u>, 486 U.S. at 645-47.  The Plaintiffs have alleged no facts showing solicitation in this case.  The fact that the individual Defendants created the offering documents, many of which were likely made long before the public offerings, does not constitute "direct and active" solicitation of the "immediate sale" that Section 12(a)(2) liability requires.  <u>Maher v. Durango Metals, Inc.</u>, 144 F.3d at 1307 (quoting <u>In re Westinghouse Sec. Litig.</u>, 90 F.3d at 717 n.19).  The Plaintiffs have therefore failed to state a cause of action under Section 12(a)(2) against the Defendants, and the Court will grant the motion to dismiss as to those claims.

### C.   THE PLAINTIFFS FAIL TO IDENTIFY MATERIALLY FALSE OR MISLEADING STATEMENTS IN THE REGISTRATION MATERIALS.

The Plaintiffs allege numerous statements and omissions in the CCAC that they argue support their claims under the Securities Act.  The Defendants argue that none of the allegations is sufficient to support a cause of action.  The Defendants insist that the Plaintiffs' claims sound in fraud and therefore the heightened pleading standard of rule 9(b) is applicable to this claim.  <u>See</u> Reply at 35 (citing <u>Schwartz v. Celestial Seasonings, Inc.</u>, 124 F.3d at 1251-52). They argue that, under the rule 9(b) standard, the Plaintiffs' allegations fail to state a cause of action under Section

---

[38] The Tenth Circuit also quoted approvingly, in parenthetical, the stricter language of the Third Circuit: "An allegation of <u>direct and active participation</u> in the solicitation of the <u>immediate sale</u> is necessary for solicitation liability, <u>i.e.</u>, where the section 12[(a)](2) defendant is not a direct seller."  <u>Maher v. Durango Metals, Inc.</u>, 144 F.3d at 1307 (quoting <u>In re Westinghouse Sec. Litig.</u>, 90 F.3d at 717 n.19)(emphasis added).

11 and Section 12(a)(2).[39]  See id.  The Court, however, finds that, even though the Securities Act

portion of the CCAC frequently refers to allegations made in its Exchange Act allegations, the core

of the Securities Act claims are pled in terms of negligence:

> [F]or purposes of the Securities Act Action, Plaintiffs are not alleging that the
> Securities Act Defendants (defined below) committed fraud or acted with deceitful
> intent.  To the contrary, Plaintiffs allege that the alleged violations of the Securities
> Act are the result of innocent and negligent conduct that triggers the strict liability
> provisions of the Securities Act.

CCAC ¶ 510, at 158-59.  The Plaintiffs further allege that:

> The Securities Act Defendants each owed to the purchasers of TMI securities in the
> Offerings, including Plaintiffs and the other Class members, the duty to make a
> reasonable and diligent investigation of the statements contained in the Offering
> Documents at the time they became effective. This duty included performing an
> appropriate investigation to ensure that the statements contained therein were true,
> and that there were no omissions of material fact required to be stated in order to
> make the statements contained in the Offering Documents not misleading. As herein
> alleged, each of the Securities Act Defendants failed to fulfill these specific duties
> and obligations. As a result of these failures, the offering prices of TMI securities in
> the Offerings were artificially inflated, and when the truth began to emerge, the stock
> price fell, causing injury to Plaintiffs and the Class.

CCAC ¶ 510, at 163.  The Court finds "the § 11 [and § 12(a)(2)] claim[s] in the case at bar [are] not

premised on fraud and do[] not trigger Rule 9(b) scrutiny."  Schwartz v. Celestial Seasonings, Inc.,

124 F.3d at 1252.  The Court will instead view the Plaintiffs' allegations through the lens of rule 8(a)

and Twombly v. Bell Atlantic Corp.  Nevertheless, the Twombly v. Bell Atlantic Corp. standard is

still rather stringent, requiring the Plaintiffs to state non-conclusory facts from which it can plausibly

be inferred that they state a valid claim.  See Robbins v. Oklahoma, 519 F.3d at 1247-49.

    The Plaintiffs first alleged misrepresentation is in TMI's Form 8-K dated April 19, 2007, in

---

[39] The Court will conduct most of its analysis with regard to both Section 11 and Section
12(a)(2) together because the legal standards regarding them are, in many ways, identical.  Analysis
of the Plaintiffs' Section 15 claims, which are derivative claims, will be reserved for the end of this
section of the opinion.

which TMI states, in relevant part, that "in the first quarter, we benefitted from wider spreads on new prime quality mortgage assets caused by credit concerns concentrated in the subprime and Alt-A segment of the mortgage market."  CCAC ¶ 557(a).  As the Defendants point out, however, the Plaintiffs fail to assert how, if at all, this statement is false.  The Plaintiffs assert that this statement is misleading, because it omits that TMI underwrote Alt-A loans -- a fact that TMI's Form 10-K disclosed -- and that TMI owned billions of dollars of MBSs that are backed by Alt-A collateral -- a fact that could be inferred from the facts disclosed in the Form 10-K.

The Plaintiffs argue that the Form 8-K was materially misleading because it incorporated TMI's 2006 financials, which the Plaintiffs believe contained material misstatements based on the March 4, 2008 letter that KPMG sent to TMI.  This allegation does not account for the fact that KPMG later blessed TMI's use of those 2006 financials in a letter that the CCAC incorporates.  See TMI's Form 8-K Exhibit 7.2 ("We have read Thornburg Mortgage, Inc.'s statements included [in] its Form 8-K dated March 7, 2008, and we agree with such statements . . . .").  The Plaintiffs therefore have incorporated into the CCAC a document that says that KPMG suspected problems with the 2006 financials and a subsequent document that says, effectively, that KPMG believed that the 2006 financials were acceptable.  Furthermore, neither KPMG, in its March 4, 2008 letter, nor the CCAC explain how the 2006 financials were false or misleading, other than outlining the absence of a certain explanatory paragraph regarding TMI's ability to continue as a going concern for a reasonable period of time.[40]  The Court finds that the incorporation of the 2006 financial

---

[40] The relevant portion of that letter states:

Under our professional standards, we have considered conditions and events that were known or should have been known to the Company as of the date of our auditors' report and have concluded that the aforementioned financial statements contain material misstatements associated with available for sale securities and that

statements, blessed by the same auditor that allegedly decried them, is not a materially false statement or omission warranting Section 11 or Section 12(a)(2) liability.

The Plaintiffs next insist that the Form 8-K was materially false or misleading because it failed to disclose that all of TMI's RPAs contained cross-default provisions which, if triggered, might subject TMI to immediate liability on billions of dollars in margin calls. The Court finds that failure to disclose a contract provision, without alleging that the provision is unique, cannot constitute a material omission. TMI's RPAs likely contain dozens -- if not hundreds -- of individual provisions, any one of which might be crucial depending upon what facts transpire. The Plaintiffs have shown the Court no authority for the proposition that a company is subject to Section 11 or Section 12(a)(2) liability for failure to disclose the entire content of its contracts, nor have they sought to give the Court a rule to apply, other than viewing the facts of the case in hindsight, for determining which of a contract's provisions are sufficiently important to warrant disclosure. The only reasoning the Court can discern from the Plaintiffs' allegation is that, because the cross-default provision in the RPAs was eventually triggered, the provision was material and thus should have been disclosed. The Defendants further argue that the inclusion of such provisions is commonplace and well known in the investment marketplace, as demonstrated by some of the news reports that the Plaintiffs' incorporated into the CCAC. See CCAC ¶ 279, at 91 ("[W]e are concerned if TMI were to default on one of its covenants all of its lines of credit would be pulled and TMI would be

---

our auditors' report should have contained an explanatory paragraph indicating that substantial doubt exists relative to the Company's ability to continue as a going concern for a reasonable period of time.

TMI's Form 8-K Exhibit 7.1 (dated March 7, 2008). The follow-up letter, dated three days later, first references the earlier letter and then states: "We have read Thornburg Mortgage, Inc.'s statements included under Item 4.02 of its Form 8-K dated March 7, 2008, and we agree with such statements . . . ." Id. Exhibit 7.2.

required to liquidate its entire $25 billion repobacked [sic] assets at a single point in time."). The Court finds no legal duty to disclose the existence of cross-default provisions in TMI's RPA contracts, and no statement within the Form 8-K that is misleading without such disclosure.

Next the Plaintiffs argue that the Defendants "failed to adequately advise investors that TMI was materially more vulnerable to the developing Alt-A and subprime mortgage crisis than TMI was reported to be in [the May 2007 offering] documents." CCAC ¶ 557(d), at 169-70. The Court finds that this allegation is too vague to constitute a material misstatement or omission to which Section 11 or Section 12(a)(2) liability might attach. So far as the Court can discern from the parties' allegations, TMI's offering documents contained all information required by the securities laws. The allegation points to no particular failing on the part of the Defendants other than breaching an implicit duty to keep investors informed of shifts in the marketplace. Liability cannot be premised on silence in the absence of a duty to disclose, see Basic v. Levinson, 485 U.S. at 239 n.17, and the Plaintiffs have failed to provide the Court with the source of such a duty. Furthermore, the Plaintiffs do not allege what information was lacking from TMI's offering documents, other than the fact that TMI underwrote and acquired some Alt-A assets. The Court has already held that TMI's Form 10-K's adequately placed investors on notice of that fact. This allegation therefore fails to establish a materially false or misleading statement or omission.

The Plaintiffs' arguments regarding the materially false or misleading statements or omissions in the June 2007 offering documents largely mimic their arguments regarding the May 2007 offering documents. For the same reasons as those already stated, the Court finds that there are no materially false or misleading statements or omissions in the June 2007 offering documents. Additionally, the Plaintiffs argue that TMI held itself out as "exclusively" a prime mortgage loan originator and MBS purchaser. TMI, however, as the Defendants argue, never made that assertion.

-86-

The closest TMI got to calling itself "exclusively" a prime-mortgage originator or MBS purchaser is to say that it "acquire[s] and originate[s] 'A quality' ARM Loans" and "focus[es] on acquiring High Quality assets."  CCAC ¶ 563, at 171.  See CCAC ¶¶ 563-566, at 171-72 (other similar alleged statements).  The Plaintiffs fail to explain how these statements are materially false or misleading, thus the Court is unpersuaded.  As the Court understands the facts presented, a security could be "Alt-A," and also be "High Quality" or "A quality."  Furthermore, it is not disputed that TMI was indeed focused on prime mortgage assets; the dispute is how focused TMI represented itself to be, and how focused it was.  The allegations imply that TMI's portfolio had somewhere between four and twenty-five percent Alt-A assets -- and TMI alleged only to be focused on "A quality" or "High Quality" assets and not on "non-Alt-A" assets.  The Court believes that, regardless of which percentage number is correct, TMI was "focused" on acquiring prime, high-quality assets, and therefore these statements are neither false nor misleading.[41]

The Plaintiffs again incorporate their arguments regarding the May 2007 financials, and repeat them as to the September 2007 and January 2008 offerings.  For the reasons already stated, the Court rejects those arguments as to the September 2007 and January 2008 offerings.  The CCAC sets forth a few more statements made in the offering documents that the Plaintiffs insist are materially false or misleading, but the Court again finds that such statements are too vague to support Section 11 or Section 12(a)(2) liability, or accurately state TMI's intent and business

---

[41] The Court found that similar statements by Goldstone were false and/or misleading. Goldstone's statements, however, were more concrete and more absolute.  He stated that TMI was "not an Alt-A originator" and that TMI was "exclusively" focused on prime mortgage assets.  The offering documents, however, refer only to "high quality" or "A-quality" assets, which, as the Court understands the facts, was TMI's focus.

model.[42]   The Plaintiffs assert that TMI "failed to disclose that [TMI]'s financing sources were becoming increasingly less -- not more -- diversified," CCAC ¶ 577, at 175, but allege no facts to support this assertion.  They also insist that TMI's Form 8-K dated August 21, 2007, was materially misleading because it stated that TMI sold "approximately 20.5 billion" in assets and expected to realize capital loss of "approximately $930 million," when it suffered loss of $1,099,000,000.00 and sold $22,000,000,000.00 in assets.  CCAC ¶¶ 580-81, at 176.  TMI's disclosures in its Form 8-K were clearly estimates, and the Court does not believe that the discrepancy between the estimate and reality -- less than ten percent -- was unreasonable.  TMI appeared not to be attempting to deceive its investors, but to keep them informed, even if it meant giving estimates that would later be revised upon a full investigation.  The Court therefore does not find that these statements were materially false or misleading.

With respect to the January 2008 offerings, the Plaintiffs identify another series of statements without elaborating why these statements were false or misleading.  See CCAC ¶¶ 587-90, at 178-79.  The Plaintiffs also reiterate many of the allegations that they made regarding the May 2007, June 2007, and September 2007 offerings.  See id. ¶¶ 591-95, at 179-80.  One set of statements, however, is new:

---

[42] For example, the Plaintiffs argue that TMI's assertion, in its second quarter 2007 Form 10-Q, that "[TMI's strategic focus on high-credit-quality assets] creates significant portfolio liquidity and low portfolio volatility, which gives us access to financing through the credit cycle and contributes to maintaining consistent profitability" is a materially misleading statement.  CCAC ¶ 572, at 174.  The Court sees such statements as akin to a mission statement or puffery.  TMI's plan was to work under a paradigm of maintaining high asset quality to ensure liquidity, and, until the mortgage market began to crumble, that plan appears to have been a success.  There is nothing objectively false about this statement except that it implies that TMI's plan guarantees success.  It is akin to TMI asserting that it has "a cunning plan that cannot fail."  Black Adder, Witchsmeller Pursuivant (BBC2 television broadcast, 1983).  The same is true of the statement that "[a]nother long-term objective is to achieve a more balanced funding mix . . . ." CCAC ¶ 575, at 174.

> ***We believe that we have more than sufficient liquidity and cash flow to meet our anticipated cash requirements going forward without needing to sell assets.*** However, there is no assurance that the value of our mortgage portfolio and derivatives portfolio will not decline further, that lenders will not make additional margin calls or that we will be able to satisfy our margin calls, if any.  In addition, our access to commercial paper financing remains unavailable and we have not issued any collateralized mortgage debt since October 2007.  As such we are not depending on the availability of financing opportunities at this time and conduct our operations accordingly.

> * * * *

> ***All of these market value losses are unrealized and there has been no deterioration in the actual credit performance of any of these assets.***  As of the end of 2007, we have not experienced any ratings agency downgrades on any of our mortgage securities.  ***We believe the market value decline experienced in our portfolio is indicative of the opportunities for the Company to acquire higher yielding and more profitable new mortgage assets.***

CCAC ¶ 596, at 180-81 (emphasis in CCAC).  The context of these statements makes it clear that they are beliefs and estimates, and not assertions of fact.  Although the portions emphasized by the Plaintiffs make TMI appear relatively certain that its beliefs will not be disappointed, the Court cannot ignore the qualifying statements that "there is no assurance that the value of our mortgage portfolio and derivatives portfolio will not decline further, that lenders will not make additional margin calls or that we will be able to satisfy our margin calls, if any."  Id.  The Court therefore finds that these statements are not materially false or misleading.  As the Court has found no false or misleading statement upon which to premise Section 11 or Section 12(a)(2) liability, the Court will grant the Defendants' motion to dismiss as to those claims.  Furthermore, because the Section 15 claim is derivative in nature, failure to state a claim under Sections 11 or 12(a)(2) results in a failure to state a claim under Section 15.  See Maher v. Durango Metals, Inc., 144 F.3d at 1305 n.7.  The Court will therefore grant the Defendants' motion as to all of the Securities Act claims.

**IT IS ORDERED** that the Motion to Dismiss Consolidated Amended Complaint by

Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Joseph H. Badal, Paul G. Decoff, Clarence D. Simmons, Ann-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman is granted in part and denied in part.  The Court dismisses the Plaintiffs' claims based on the Securities Act of 1933 against all of the Defendants.  The Court also dismisses the Plaintiffs' Section 10(b) claims against Defendants Garrett Thornburg, Joseph H. Badal, Paul G. Decoff, Clarence D. Simmons, Ann-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman.  The Court dismisses the Plaintiffs' Section 20(a) claims against Thornburg, Badal, Anderson, Ater, Cutler, Kalangis, Lopez, Mullin, and Sherman.  The Court reserves ruling on this motion as to the Plaintiffs' Section 10(b) claim against TMI, and as to the Plaintiffs' Section 20(a) claims against Goldstone, Simmons, and Badal.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Frederick S. Fox
Aviah Cohen Pierson
Kaplan Fox & Kilsheimer
New York, New York

-- and --

Richard A. Lockridge
Nathan D. Prosser
Karen H. Riebel
Lockridge Gindal Nauen & Holstein
Minneapolis, Minnesota

-- and --

Nancy Kaboolian
Abbey Spanier Rodd Abrams & Paradis, LLP
New York, New York

-- and --

Curtis V. Trinko
Law Offices of Curtis V. Trinko, LLP
New York, New York

-- and --

Evan J. Smith
Brodsky & Smith, L.L.C.
Mineola, New York

-- and --

David R. Scott
Scott & Scott, LLC
Colchester, Connecticut

-- and --

Arthur Shingler, III
Scott & Scott, LLP
San Diego, California

-- and –

Charlotte Itoh
Cody Kelley
Kelley Law Offices
Albuquerque, New Mexico

-- and --

Shane C. Youtz
Albuquerque, New Mexico

-- and --

Turner W. Branch
Branch Law Firm
Albuquerque, New Mexico

-- and --

Fred T. Isquith
Rachel S. Poplock
Martin E. Restituyo
Gregory Nespole
Wolf Haldenstein Adler Freeman & Herz, LLP
New York, New York

-- and --

Francis M. Gregorek
Rachele R. Rickert
Patrick Moran
Betsy C. Manifold
Wolf Haldenstein Adler Freeman & Herz, LLP
San Diego, California

-- and --

Andrew Zivitz
Benjamin Sweet
Michelle Newcomer
Richard Russo, Jr.
Sean M. Handler
Stewart L. Berman
D. Seamus Kaskela
Barroway Topaz Kessler Meltzer & Check, LLP
Radnor, Pennsylvania

   *Attorneys for the Plaintiffs*

Amy L. Neuhardt
Boies, Schiller & Flexner, LLP
Washington, District of Columbia

-- and –

Donald L. Flexner
Philip C. Korologos
Boies, Schiller & Flexner, LLP
New York, New York

  *Attorneys for Defendants Garrett Thornburg, Anne-Drue M. Anderson, David A. Ater,*
   *Joseph H. Badal, Eliot R. Cutler, Ike Kalangis, Francis I. Mullin, III, Stuart C.*

*Sherman, and Paul G. Decoff*

Frank T. Herdman
Rubin Katz Law Firm, P.C.
Santa Fe, New Mexico

-- and --

William H. Forman
Scheper Kim & Overland, LLP
Los Angeles, California

-- and --

David F. Cunningham
Thompson, Hickey, Cunningham, Clow & April, P.A.
Santa Fe, New Mexico

> *Attorneys for Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A.*
> *Goldstone, Clarence G. Simmons, Anne-Drue M. Anderson, David A. Ater, Joseph*
> *H. Badal, Eliot R. Cutler, Michael B. Jeffers, Ike Kalangis, Owen M. Lopez, Francis I.*
> *Mullin, III, and Stuart C. Sherman*

Clinton W. Marrs
Tax, Estate & Business Law, N.A., LLC
Albuquerque, New Mexico

> *Attorney for Defendants Larry A. Goldstone and Clarence G. Simmons*

Robert Badal
WilmerHale
Los Angeles, California

> *Attorney for Defendants Thornburg Mortgage, Inc., Larry A. Goldstone, Clarence G.*
> *Simmons, Michael B. Jeffers, and Owen M. Lopez*

Joel Sher
Shapiro Sher Guinot & Sandler
Baltimore, Maryland

-- and --

Mary R. Jenke
Walsh Anderson Brown Aldridge & Gallegos
Albuquerque, New Mexico

    *Attorneys for Thornburg Mortgage, Inc.*

Clifford K. Atkinson
John Thal
Atkinson & Thal, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendants AG Edwards & Sons, Inc., BB&T Capital Markets, UBS*
        *Securities, Citigroup Global Markets Inc., Friedman, Billings, Ramsey & Co.,*
        *Oppenheimer & Company, Inc., RBC Dain Rauscher Corp., Stifel, Nicolaus &*
        *Company, Inc., and Bear Stearns & Co.*

Jonathan C. Dickey
Gibson, Dunn & Crutcher, LLP
New York, New York

-- and --

Dean J. Kitchens
Lindsay R. Pennington
Gibson, Dunn & Crutcher, LLP
Los Angeles, California

    *Attorneys for Defendants AG Edwards & Sons, Inc., BB&T Capital Markets, Citigroup*
        *Global Markets Inc., Oppenheimer & Company, Inc., RBC Dain Rauscher Corp., and*
        *Stifel, Nicolaus & Company, Inc.*

David Bohan
David Stagman
Katten Muchin Rosenman, LLP
Chicago, Illinois

    *Attorneys for Defendants UBS Securities and Bear Stearns & Co.*

William Pittard
Williams & Connolly, LLP
Washington, D.C.

    *Attorney for Defendant Friedman, Billings, Ramsey & Co.*