**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

IN RE THORNBURG MORTGAGE, INC.          No. CIV 07-0815  JB/WDS
SECURITIES LITIGATION

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on: (i) the Opposed Motion by May/June 2007

Underwriter Defendants to Dismiss Consolidated Class Action Complaint; Memorandum of Points

and Authorities in Support Thereof, filed September 22, 2008 (Doc. 128)("May/June Underwriters'

Motion"); (ii) the Opposed Motion to Dismiss of Underwriter Defendants UBS Securities LLC and

Bear Stearns & Co., Inc., filed September 22, 2008 (Doc. 130)("UBS Motion"); and (iii) the Motion

of Friedman, Billings, Ramsey & Co, Inc. to Dismiss and Memorandum of Points and Authorities

in Support Thereof, filed September 22, 2008 (Doc. 132)("FBR Motion").  The Court held a hearing

on April 22, 2009.  The primary issue is whether the Plaintiffs have pled any false or misleading

statements or omissions in the offering documents underlying Thornburg Mortgage, Inc.'s

("TMI's") May 2007, June 2007, September 2007, or January 2008 public stock offerings.  Because

the Court finds that none of the documents contained material misstatements or omissions as to

which the underwriters had a duty to disclose, the Court grants all three motions.

**FACTUAL BACKGROUND**[1]

This case -- so far as is relevant to the disposition of this motion -- involves four public

offerings that, the Plaintiffs allege, were made pursuant to false or misleading offering documents.

---

[1] The Court draws its statement of facts from the well-pleaded, non-conclusory allegations
of the Consolidated Class Action Complaint, filed  May 27, 2008 (Doc. 68)("CCAC"), as the Court
must when analyzing the propriety of a motion to dismiss filed under rule 12(b)(6) of the Federal
Rules of Civil Procedure.  Furthermore, the Court recites herein only the facts relevant to the
disposition of these motions.  The Court's Memorandum Opinion and Order, filed January 27, 2010
(Doc. 249), sets forth a more in-depth review of the case's facts.

This consolidated action is brought by Lead Plaintiffs (i) W. Allen Gage, individually and on behalf of J. David Wrather; (ii) Harry Rhodes; (iii) FFF Investments, LLC; (iv) Robert Ippolito, individually and as Trustee for the Family Limited Partnership Trust; and (v) Nicholas F. Aldrich, Sr., individually and on behalf of the Aldrich Family, as well as the Plaintiffs (vi) Betty L. Manning and (vii) John Learch (collectively "the Plaintiffs"). The Lead Plaintiffs all purchased shares of TMI stock during the Class Period -- from April 19, 2007 to March 19, 2008, inclusive -- at prices that they allege were artificially inflated. They assert that they were damaged as a result of these inflated-price purchases, now that the truth has been revealed. See Consolidated Class Action Complaint ¶ 53, at 15-16, filed May 27, 2008 (Doc. 68)("CCAC"). Manning acquired 550 shares of TMI common stock during the May 2007 Offering. See id. ¶ 54, at 16. She bought them on May 4, 2007 and paid $27.05 per share. See id. Learch, as trustee for the Learch trust, acquired 400 shares of 7.5% Series E Cumulative Convertible Redeemable Preferred Stock in the June 2007 Offering. See id. ¶ 55, at 16. He bought his shares on June 19, 2007 and paid $25.00 per share. See id. No particular Plaintiff alleges to have purchased any TMI stock in the September 2007 or January 2008 offerings.

      1.    **The Defendants.**

      TMI, one of the Defendants in the underlying action and the company whose securities are at the heart of this action, is a publicly traded residential-mortgage lender that represents that it focuses primarily on the "jumbo" and "super-jumbo" segment, i.e., loans totaling over $417,000.00, of the adjustable-rate mortgage ("ARM") market.[2]  See CCAC ¶ 5, at 2. As the Plaintiffs put it,

---

[2] Adjustable-rate mortgage can be described as "[a] mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Black's Law Dictionary 1102 (9th ed. 2009).

"[TMI] generates income from the small, net spread between the interest income it earns on its assets and the cost of its borrowings." Id. TMI was formed under the laws of the State of Maryland, and has its principal place of business in Santa Fe, New Mexico. See CCAC ¶ 57, at 16. At all relevant times, TMI's securities have been traded on the New York Stock Exchange ("NYSE") under the symbol "TMA." Id. For federal income tax purposes, TMI is classified as a Real Estate Investment Trust.

The Defendants relevant to these motions are nine: (i) AG Edwards & Sons, Inc.; (ii) BB&T Capital Markets; (iii) UBS Securities, LLC; (iv) Citigroup Global Markets, Inc.; (v) Friedman, Billings, Ramsey & Co., Inc. ("FBR"); (vi) Oppenheimer & Company, Inc.; (vii) RBC Dain Rauscher Corp.; (viii) Stifel, Nicolaus & Company, Inc. ("SNC"); and (ix) Bear, Stearns & Co., Inc. The Court will refer to them as "the Underwriter Defendants." These Defendants are all underwriters of TMI's public offerings -- in other words, these Defendants each bought TMI stock and sold that stock to other investors, implementing TMI's public offerings. Citibank, AG Edwards, and SNC underwrote the May 2007 offering, see CCAC ¶ 532, at 163; SNC, AG Edwards, RBC, BB&T, and Oppenheimer underwrote the June 2007 offering, see CCAC ¶ 535, at 164; FBR underwrote the September 2007 offering, see CCAC ¶ 538, at 164; and FBR, UBS, Bear Stearns, and SNC all underwrote the February 2008 offering, see CCAC ¶ 541, at 165.

## 2.   **The Claims.**

This federal-securities class action sets forth claims under the Securities Act of 1933, 15 U.S.C. §§ 77a to 77aa ("Securities Act") and under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a to 78oo ("Exchange Act"). Only the Securities Act claims are relevant to this motion, however, because the Plaintiffs assert only violations of the Securities Act against the Underwriter Defendants. See CCAC ¶¶ 551-21, at 157-62. Specifically, the Plaintiffs assert that the Underwriter

Defendants are liable for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77(o).  See CCAC ¶¶ 598-620, at 181-86.

      **3.**      **Problems for Thornburg Mortgage, Inc.**

TMI has, historically, acquired capital through public offerings of its securities, short-term borrowings -- including reverse repurchase agreements ("RPAs")[3] -- the issuance of asset-backed commercial paper ("ABCP"),[4] and the issuance of collateralized debt obligations ("CDO").[5]  See id. ¶ 6, at 3.  TMI was "heavily leveraged" -- meaning that it borrowed a large amount of money

---

[3] The Plaintiffs allege that:

> RPAs involve a simultaneous sale of pledged securities to a lender at an agreed-upon price in return for an agreement to repurchase the same securities at a future date (the maturity of the borrowing) at a higher price.  Most RPAs, including the mortgage backed security RPAs that TMI entered into during the Class Period, could require the borrower (in this case TMI) to post additional collateral should the value of the original collateral decline.

CCAC ¶ 74, at 22.

[4] The CCAC does not appear to define this term.  The phrase refers to "[a]n instrument, other than cash, for the payment of money," Black's Law Dictionary 1220 (9th ed. 2009), that is securitized by some asset, see Investopedia.com Financial Dictionary, Asset-Backed Commercial Paper (ABCP), http://www.investopedia.com/terms/a/asset_backed_commercial_paper.asp (last visited January 14, 2010)("A short-term investment vehicle [that] is typically issued by a bank or other financial institution. The notes are backed by physical assets such as trade receivables, and are generally used for short-term financing needs.").

[5] CDOs, also referred to as Collateralized Mortgage Debt, are

> a form of long-term, non-recourse financing, issued by trusts and secured by ARM Loans originated or purchased by TMI.  CDOs are constructed from a portfolio of fixed income assets and divide the credit risk among different tranches: senior tranches (rated "AAA"), mezzanine tranches ("AA" to "BB"), and equity tranches (unrated).  Losses are applied in reverse order of seniority, so junior tranches offer higher coupons (interest rates) to compensate for the added risk.

CCAC ¶ 75, at 22.

-4-

compared to the amount of money that it had available to it.

TMI recognized the potential risk of the real-estate market going south, but repeatedly reassured analysts and its investors that its liquidity position -- its ability to satisfy debt obligations as they arise -- was not at risk.  See id. ¶¶ 7, 82, at 3, 24-25.  As late as July 20, 2007, TMI reported that its unencumbered assets securing its highly-leveraged financing were at their highest level "in the history of the organization."  Id. ¶ 7, at 3.  TMI repeatedly stated in its filings with the Securities and Exchange Commission ("SEC") that its focus was to acquire and originate high quality, highly liquid mortgage assets such that sufficient assets could be readily converted to cash, if necessary, to meet its financial obligations.  See id. ¶ 9, at 4.

One of the primary allegations that the Plaintiffs level against all of the Defendants is that they improperly withheld that TMI held substantial "Alt-A" mortgage assets.  The Plaintiffs explain that:

> Alt-A loans are 'alternatives' to the gold standard of conforming, GSE-backed mortgages.  Often an Alt-A borrower is unable to provide the proof of income or the verification of assets necessary to obtain a prime mortgage, but has a satisfactory credit score, or vice versa.  In other words, Alt-A or 'alternative' loans are associated with and defined by a higher level of risk than prime loans due to a borrower's inability to provide these fundamental guarantees

Id. ¶ 98, at 29.  See id. ¶ 11, at 4.  TMI's multi-billion dollar asset portfolio during the Class Period was comprised of various mortgage-related assets.  See id. ¶ 12, at 4.  TMI's mortgage-based holdings include both loans it originates, and loans it acquires or purchases.  See id. ¶ 12 at 4-5.  TMI also purchased mortgage-backed securities ("MBS"), which the Plaintiffs describe as "a series of fixed-income assets that [a]re bundled and sold as securities."  Id. ¶ 12, at 5.  TMI frequently posts these MBS assets as the collateral under its many short-term borrowing agreements.  See id.  TMI would originate loans, securitize them, and sell off interests in the securitized assets to obtain

additional financing.  See id.

In 2006 and 2007, as the markets for subprime and Alt-A mortgages began to decline, and subprime and Alt-A borrowers began to default with increased frequency, many mortgage lenders announced that they were experiencing serious financial problems.  See id. ¶ 13, at 5.  TMI, however, represented that its stringent underwriting standards and "high quality" assets insulated it from the market downturn.  Id.  As the prices for MBSs backed by Alt-A loans as collateral declined throughout 2007, TMI never disclosed that it was holding billions of dollars worth of MBSs backed by Alt-A collateral on its balance sheets.  See id. ¶ 14, at 5.  Notwithstanding the representations of Defendant Larry A. Goldstone, President, Chief Operating Officer, and director of TMI,[6] that TMI's focus is on originating prime -- rather than subprime or Alt-A -- loans, several confidential witnesses state that TMI originated Alt-A loans during the Class Period.  See CCAC ¶ 14, at 5-6.[7]

On May 4, 2007, TMI had its first public offering, selling 4,500,000 shares of TMI common stock for a total of $121.7 million.  See id. ¶ 532, at 163.  Shortly thereafter, TMI had its second offering wherein it sold 2,750,000 shares of 7.5% Series E Cumulative Convertible Redeemable Preferred Stock at a price of $25.00 per share.  See id. ¶ 535, at 164.  In that offering, TMI made $68.75 million.  See id.

_____

[6] Goldstone was also the Chief Executive Officer of TMI starting December 18, 2009.  See CCAC ¶ 59, at 17.

[7] In the Court's prior Memorandum Opinion and Order, the Court expressed concerns about the weight to be given confidential witness testimony.  That concern, however, was only in the context of using confidential witness testimony to help establish a strong inference of scienter.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 316-320 (2007); Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Group, Inc., 537 F.3d 527, 535 (5th Cir. 2008).  In this Memorandum Opinion and Order, dealing with claims under the Securities Act that have no scienter requirement, the Court will give the statements of these confidential sources full weight.

Goldstone allegedly knew, by no later than June of 2007, but did not disclose, that the ABCP market was shrinking rapidly and, by July 2007, had more or less dried up. See id. ¶ 15, at 6; id. ¶¶ 131-32, 134, 250, 263, 288, at 38-40, 74-75, 88.  Goldstone allegedly admitted this shrinking market to certain confidential sources during a private meeting on August 8, 2007.  See id.  ¶ 15, at 6. Goldstone, however, reassured the confidential sources that TMI's relationships with its lender banks "were fine."  Id. ¶ 131, at 38-39.  Also by July of 2007, the RPA market became an increasingly more costly source of financing as a result, in part, of a combination of declining asset values and the illiquidity in the ABCP market.  See id. ¶ 16, at 6.  After early July, TMI could not complete any securitization transaction "based on a lack of buyers in the marketplace."  Id.

On August 14, 2007, TMI advised the market that, because of liquidity concerns, it was exploring the potential sale of assets.  See id. ¶¶ 18, 135, 273-74, at 7, 40, 82.  TMI had, however, already begun a sale of assets by August 10, 2007.  See id. ¶¶ 18, 132, 134-35, 137-38, at 7, 39-40. On August 20, 2007, TMI admitted that it had sold approximately thirty-five percent of its portfolio -- $20,500,000,000.00 of its highest-rated mortgage-backed assets -- to meet margin calls on its RPA agreements and to satisfy maturing ABCP obligations.  See id.  Furthermore, TMI had sold those assets at a discount, approximately ninety-five percent of their face value.  See id.; id. ¶ 265(c), at 79.  TMI did not disclose that it owned MBSs which were backed by Alt-A collateral.  See id. ¶ 19, at 7.

On August 14, 2007, the price of TMI common stock fell forty-three percent, from $13.81 per share to $7.89 per share.  See id. ¶ 20, at 7.  Also on that day, a substantial volume of shares -- 27,293,100 -- were traded.  See id.  Allegedly based on the series of false and misleading statements, TMI was able to obtain hundreds of millions of dollars in its securities offerings.  See id. ¶ 22, at 8. Specifically, TMI made one stock offering in early September of 2007, in which it raised $500

million in sales, see id., and two offerings in January of 2008, which garnered an additional $212 million in total proceeds, see id.

Over the next few months, however, a series of disclosures by TMI caused the stock price to fall dramatically. On February 28, 2008, TMI announced in its 2007 Form 10-K Annual Report that it was forced to meet over $300 million in margin calls under its RPAs, and that it owned $2,900,000,000.00 in MBSs that were backed by Alt-A collateral, and that the declining value of its Alt-A-backed MBSs was to blame for the margin calls. See id. ¶ 23, at 8. On the same day, TMI's common stock dropped in value fifteen percent, from $11.54 per share to $9.86 per share. See id. ¶ 24, at 8.

On March 3, 2008, TMI disclosed via a press release that it had "been subject to additional margin calls of approximately $270 million as of February 29, 2008,"[8] and that it was "currently in default with one RPA counterparty." Id. ¶ 26, at 9; id. ¶ 171, at 48. After this disclosure, TMI's stock price fell again. Between February 29, 2009 and March 3, 2009, the price of TMI common stock decreased from $8.90 per share to $4.32 per share -- a drop of fifty-one percent. See id. ¶ 28, at 9. Over the course of those three days, investors traded 76,858,800 shares of TMI stock. See id.

On March 5, 2008, TMI disclosed to its investors that the February 28, 2009 JP Morgan default had triggered cross-defaults in all of TMI's RPAs. See id. ¶ 32, at 10. On the same day, the price of TMI's common stock fell again, from $3.40 per share to $1.26 per share -- a 54.4% drop. See id. ¶ 33, at 10.

On March 7, 2008, TMI disclosed to the public that it had received a letter from KPMG withdrawing KPMG's previous unqualified audit opinion, and further announced that it would

---

[8] The year 2008 was a leap-year, so there was a February 29.

restate its financial statements for 2007 -- but not for 2006.  See CCAC ¶ 35, at 11.  TMI stated that

the restatement was necessary because of "a significant deterioration of prices of MBS[s], combined

with a liquidity position under unprecedented pressure from increased margin calls[,] a portion of

which [TMI] has been unable to meet."  CCAC ¶ 35, at 11 (alterations omitted).  Between March

7, 2008 and March 10, 2008, TMI's stock price fell another thirty-six percent, from $1.08 to $0.69,

see id. ¶ 37, at 11-12,[9] during which time 34,591,800 shares were traded, see id. ¶ 394, at 120.

### 4.     TMI's Public Offerings and SEC Filings.

The Plaintiffs allege that the Underwriter Defendants are strictly liable for violations of

Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77(o),

respectively.  See CCAC ¶ 40, at 12.  The allegations arise out of four stock offerings: (i) the May

4, 2007 public offering of 4,500,000 shares of common stock at $27.05 per share, which resulted

in gross proceeds of $121.7 million; (ii) the June 19, 2007 public offering of 2,750,000 shares of

7.5% Series E Cumulative Convertible Redeemable Preferred Stock ("Series E Stock") at $25.00

per share, which resulted in gross proceeds of $68,800,000.00; (iii) the September 7, 2007 public

offering of 20,000,000 shares of 10% Series F Cumulative Convertible Redeemable Preferred Stock

("Series F Stock") at $25.00 per share, which resulted in gross proceeds of $500 million; and (iv) the

January 15, 2008 concurrent public offering of 8,000,000 shares of Series F Stock at $19.50 per

share, which resulted in gross proceeds of $156 million, and 7,000,000 shares of common stock at

$8.00 per share, which resulted in gross proceeds of $56,000,000.00.  See id.  All of the public

---

[9] Paragraphs 11 and 12 are inconsistent with paragraph 394, cited in the 1934 Act Response.
Paragraphs 11 and 12 indicate that the stock dropped to $0.69 per share by the close of the market
on March 10, 2008, while paragraph 394 cites to a closing price of $0.71.  Construing the CCAC
in the light most favorable to the Plaintiffs, for the purpose of this motion, the Court will assume the
closing price was $0.69 on March 10, 2008.

offerings at issue were made pursuant to a Shelf Registration Statement ("SRS"), filed with the SEC on Form S-3 on May 20, 2005, and a Prospectus that became effective on June 16, 2005.  See CCAC ¶ 42, at 13.  The SRS prospectively incorporates by reference

> any documents [the Company] file[s] pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this prospectus and prior to the termination of the offering of the securities to which this prospectus relates will automatically be deemed to be incorporated by reference in this prospectus and to be part hereof from the date of filing those documents.

Id. ¶ 42, at 13 (presumably quoting the SRS).  Thus, certain of the quarterly, annual, and current reports were incorporated by reference into the SRS.  See id.

The May 2007 Offering was made pursuant to: (i) the SRS; (ii) a Preliminary Prospectus Supplement filed with the SEC on form 424B5 on May 3, 2007; and (iii) a Prospectus Supplement filed with the SEC on Form 424B2 on May 7, 2007.  See CCAC ¶ 43, at 13.  The June 2007 Offering was made pursuant to: (i) the SRS; (ii) a Preliminary Prospectus Supplement, filed on Form 424B5 on June 11, 2007; (iii) a Final Term Sheet, filed with the SEC as a Free Writing Prospectus on June 15, 2007; and (iv) a Definitive Prospectus Supplement, filed with the SEC on Form 424B2 on June 18, 2007.  See CCAC ¶ 44, at 13-14.  The September 2007 Offering was made pursuant to: (i) the SRS; (ii) a Free Writing Prospectus filed with the SEC on August 30, 2007; (iii) a Preliminary Prospectus Supplement dated and filed with the SEC on Form 424B5 on August 30, 2007; (iii) a Final Term Sheet dated August 30, 2007; and (iv) a Prospectus Statement dated August 30, 2007, and filed with the SEC on Form 424B2 on September 4, 2007.  See CCAC ¶ 45, at 14.  The January 2008 Offerings were made pursuant to: (i) the SRS; (ii) two Preliminary Prospectus Supplements filed on Forms 424B5 on January 9, 2008; and (iii) two Prospectus Supplements filed on Forms 424B2 on January 15, 2008.  See CCAC ¶ 46, at 14.

## PROCEDURAL BACKGROUND

This proceeding is four cases that have all been consolidated.  Kenneth Slater, manager of KT Investments, LLC, filed the initial Complaint on August 21, 2007.  See Class Action Complaint, filed August 21, 2007 (Doc. 1).  In that Complaint, Slater sought to assert class claims against TMI for violations of the Exchange Act, but did not assert any claims under the Securities Act.  See Class Action Complaint ¶¶ 101-117, at 33-38.  On February 8, 2008, pursuant to a stipulation, the Court consolidated the action that Slater brought with several other actions -- namely, Snydman v. Thornburg Mortgage, Inc., No. CIV 07-1025 JEC/RHS, Gonsalves v. Thornburg, No. CIV 07-1069 MV/WDS, and Smith v. Thornburg Mortgage, Inc., No. CIV 07-1115 MCA/RLP.  See Order Consolidating Related Actions, Appointing Lead Plaintiff, and Approving Lead Plaintiff's Selection of Lead Counsel and Liaison Counsel at 2-3, filed February 8, 2008 (Doc. 49).  At that same time, the Court selected Lead Plaintiffs, named the firms of Schiffrin Barroway Topaz & Kessler, LLP and Wolf Haldenstein Adler Freeman & Hertz, LLP, as Co-Lead Counsel, and named the Branch Law Firm as Liaison Counsel.  See id. at 3.

On May 27, 2008, the Plaintiffs filed the CCAC, which alleged violations of the Securities Act and the Exchange Act.  Specifically, the Plaintiffs assert that the Underwriter Defendants are liable for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, respectively.  See CCAC ¶¶ 2-3, at 1-2.  The CCAC makes class-action allegations on behalf of a class defined as "all persons and entities who purchased or otherwise acquired TMI common stock and/or securities in the open market and/or in or traceable to the Offerings during the Class Period and who were damaged thereby," but excluding "the Defendants, the directors and officers of TMI, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or

had a controlling interest." Id. ¶ 486-87, at 151.  In support of their Securities Act claims, the Plaintiffs allege that the offering documents for all four of TMI's public offerings were materially false and/or misleading because, inter alia: (i) they incorporated TMI's 2006 financial results which, as determined by KPMG, were materially false and required restatement; and (ii) they failed to disclose that TMI originated Alt-A mortgage loans and possessed a multi-billion-dollar MBS portfolio backed by Alt-A loans that, the Plaintiffs assert, exposed TMI to financial peril in the declining mortgage financing market.  See CCAC ¶ 48, at 15.

The Underwriter Defendants move the Court for an order dismissing the Plaintiffs' CCAC in its entirety.  The Underwriter Defendants base their motion on rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedures, the provisions of the Securities Act, and Article III of the United States Constitution.

On May 1, 2009, TMI filed for a petition for voluntary Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Maryland.  See Suggestion of Bankruptcy at 1, filed May 4, 2009 (Doc. 192); Voluntary Petition at 1 (dated May 1, 2009), filed May 4, 2009 (Doc. 192-2). The Suggestion of Bankruptcy asserted that the bankruptcy of TMI operated as an automatic stay of judicial proceedings against TMI under 11 U.S.C. §§ 362(a)(1) and 362(a)(3).  See Suggestion of Bankruptcy at 1.  Beginning on June 1, 2009, the Court filed a series of Minute Orders in which it asked the parties to keep it informed of the status of the pending bankruptcy proceedings and to give it recommendations whether the Court should continue work on the pending motions to dismiss.  On November 16, 2009, after receiving a number of updates as to the status of the pending bankruptcy proceeding in Maryland, the Court issued another Minute Order informing the parties that it would continue work on the motions to dismiss as to the Defendants other than TMI.  See Minute Order, filed November 16, 2009 (Doc. 224).

-12-

## STANDARD FOR A MOTION TO DISMISS UNDER RULE 12(b)(6)

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca, 952 F.2d 1183, 1187 (10th Cir. 1991).

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's burden to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 546 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Id. at 545 (internal citation omitted). "[T]he Supreme Court recently . . . prescribed a new inquiry for us to use in reviewing a dismissal: whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. at 1967, 1969). "The [Supreme] Court explained that a plaintiff must 'nudge his claims across the line from conceivable to plausible' in order to survive a motion to dismiss." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at 1177 (quoting Bell Atl. Corp. v.

Twombly, 127 S. Ct. at 1974)(alterations omitted).  "Thus, the mere metaphysical possibility that

some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the

complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of

mustering factual support for these claims." Ridge at Red Hawk, L.L.C. v. Schneider, 493 F.3d at

1177.  The United States Court of Appeals for the Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct, much
> of it innocent, then the plaintiffs "have not nudged their claims across the line from
> conceivable to plausible." The allegations must be enough that, if assumed to be true,
> the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly,

127 S Ct. at 1974)(internal citations omitted).

## RELEVANT SECURITIES LAW

Congress put the Securities Act of 1933 in place to provide greater protection to purchasers

of registered securities than the states and common law provided.  See Herman & MacLean v.

Huddleston, 459 U.S. 375, 383 (1983).  Claims under the Securities Act are much more limited in

scope than are those under the Exchange Act.  The Securities Act is not concerned with the

"aftermarket" -- individuals and entities buying stock from one another; rather, the Securities Act

is concerned only with initial offerings, where a company sells its securities to the public.  In a

Securities Act claim, the only pertinent representations are those made within the four corners of

the issuers' offering documents or in documents expressly incorporated therein.  See Blue Chip

Stamps v. Manor Drug Stores, 421 U.S. 723, 752 (1975).  Furthermore, the Private Securities

Litigation Reform Act ("PSLRA") does not appear to affect the pleading standards under the

Securities Act, because the PSLRA's heightened pleading requirements apply only in "private

action[s] arising under this chapter," 15 U.S.C. § 78u-4(b)(1), and "this chapter" refers to Chapter

-14-

2B of Title 15.  The Securities Act of 1933, however, is Chapter 2A, <u>see</u> 15 U.S.C. § 77a ("This subchapter[, subchapter I of Chapter 2A,] may be cited as the 'Securities Act of 1933'."); 15 U.S.C. § 78a ("This chapter[, chapter 2B,] may be cited as the 'Securities Exchange Act of 1934'."), and the parties have shown the Court no binding authority for applying the PSLRA's heightened standard to claims under the Securities Act.

Under certain circumstances, the heightened-pleading requirements of rule 9(b) of the Federal Rules of Civil Procedure might apply to the allegations of material misstatements under a Securities Act claim.  <u>See</u> <u>Schwartz v. Celestial Seasonings, Inc.</u>, 124 F.3d 1246, 1251-52 (10th Cir. 1997).  When a plaintiff's Securities Act claim is based on negligent or innocent conduct, rather than fraudulent conduct, however, a court applies the more lenient pleading standards of rule 8(a).  <u>See</u> <u>Schwartz v. Celestial Seasonings, Inc.</u>, 124 F.3d at 1251-52.

### 1.     <u>Section 11 of the Securities Act</u>.

Section 11 of the Securities Act imposes liability upon every person who, among other things, (i) signed the registration statement, (ii) was a director of the issuer, (iii) was an underwriter of the offering, or (iv) prepared or certified any report or valuation used in connection with the registration statement, for any materially misleading statements and omissions made therein.  <u>See</u> 15 U.S.C. § 77k.  "The pleading requirements of a § 11 claim are less stringent than that of a § 10(b) claim," and it "imposes strict liability against the issuer of securities where a registration statement contains material misstatements or omits material facts."  <u>Schaffer v. Evolving Sys., Inc.</u>, 29 F. Supp. 2d 1213, 1220 (D. Colo. 1998)(citing <u>Herman & MacLean v. Huddleston</u>, 459 U.S. at 381). Even innocent misrepresentations will subject the issuer of securities to liability.  <u>See</u> <u>Herman & MacLean v. Huddleston</u>, 459 U.S. at 381 ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima

facie case.  Liability against the issuer of a security is virtually absolute, even for innocent misstatements.").

A claim under Section 11 must be based on a registration statement filed with the SEC.  <u>See Herman & MacLean v. Huddleston</u>, 459 U.S. at 381; <u>Schaffer v. Evolving Sys., Inc.</u>, 29 F.Supp. 2d at 1220.  A Section 11 plaintiff must identify a material misrepresentation within the four corners of the challenged registration statement, or an omission of a material fact required to be stated therein or necessary to make the statements therein not misleading.  <u>See Hermean & MacLean v. Huddleston</u>, 459 U.S. at 381-82 (constrasting § 11 with § 10(b) of the Exchange Act); <u>Grimm v. Whitney-Fidalgo Seafoods, Inc.</u>, No. 73 Civ. 1304, 1973 WL 495, at *2 (S.D.N.Y. Dec. 4, 1973).  Corporate insiders potentially face Section 11 liability for material false statements in registration statements only if they were directors at the time of the offering or if they personally signed the registration statement at issue.  <u>See In re Williams Sec. Litig.</u>, 339 F.Supp. 2d 1242, 1269 (N.D. Okla. 2003).

2.      <u>**Section 12(a)(2) of the Securities Act.**</u>

Section 12(a)(2) of the Securities Act provides that:

> Any person who . . . offers or sells a security . . . by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading . . . and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him . . . .

15 U.S.C. § 77l(a).  A claim under Section 12(a)(2) must be based on a prospectus delivered to persons or an entity purchasing securities in a offering, which generally incorporates the SEC registration statement.  Even if a Section 12(a)(2) claim is based on an oral statement, the oral

statement must relate to a prospectus.  See Gustafson v. Alloyd Co., 513 U.S. 561, 567-68 (1995).

The Section 12(a)(2) claim must identify a material misrepresentation in or omission from either the

prospectus or an oral representation directly concerning the prospectus.  See Gustafson v. Alloyd

Co., 513 U.S. at 577-78.  Section 12(a)(2) liability is similar to Section 11 liability, in that "[t]he

purchaser need not prove scienter, fraud, or negligence on the part of the seller, nor need he establish

that he relied upon the misrepresentation or omission or that his or her loss was a direct or proximate

result of the misrepresentation or omission."  Schaffer v. Evolving Systems, Inc., 29 F. Supp. 2d at

1220 (citing MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/American Express Inc., 886 F.2d

1249, 1256-57 (10th Cir. 1989)).  Unlike a Section 11 claim, however, the only proper defendants

in a Section 12(a)(2) action are those who "offer or sell" unregistered securities.  Schaffer v.

Evolving Systems, Inc., 29 F. Supp. 2d at 1220 (citing Pinter v. Dahl, 486 U.S. 622, 641 (1988)).

The Tenth Circuit has recognized that liability also extends "to the person who successfully solicits

the purchase, motivated at least in part by a desire to serve his own financial interests or those of the

securities owner."  Maher v. Durango Metals, Inc., 144 F.3d at 1307 (quoting Pinter v. Dahl, 486

U.S. at 647).

### 3.    **The Material Statement or Omission Requirement.**

There can be no liability under Section 11 or 12(a)(2) of the Securities Act unless the

plaintiff can identify, within the four corners of the offering documents, some false or misleading

material statement or omission.  See 15 U.S.C. § 77k (creating a cause of action where a registration

statement "contained an untrue statement of a material fact or omitted to state a material fact

required to be stated therein or necessary to make the statements therein not misleading"); 15 U.S.C.

§ 77l(a) (creating a cause of action where the documents "include[] an untrue statement of a material

fact or omit[] to state a material fact necessary in order to make the statements, in the light of the

-17-

circumstances under which they were made, not misleading ").  The statement or omission must not merely be false now; rather, it must have been false at the time that the document containing it was created.  See Grossman v. Novell, Inc., 120 F.3d 1112, 1124 (10th Cir. 1997)("What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation"); 15 U.S.C. § 77k(a)(creating a claim when "any part of the registration statement, when such part became effective, contained an untrue statement")(emphasis added).

A statement of fact is material if "a reasonable person would consider it important in determining whether to buy or sell" securities.  Schaffer v. Evolving Systems, Inc., 29 F. Supp. at 1220-21 (citing Grossman v. Novell, Inc., 120 F.3d at 1119).  In a similar context -- a claim under Section 14 of the Securities Exchange Act of 1934 -- the Supreme Court of the United States has said that a statement or omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the public.  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).  Courts in the Tenth Circuit should "not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial."  McDonald v. Kinder-Morgan, Inc., 287 F.3d at 997 (quoting Grossman v. Novell, Inc., 120 F.3d at 1118).  The Tenth Circuit, in the context of securities-fraud claims under Section 10(b) of the Exchange Act and SEC rule 10b-5, has identified two categories of statements that are, as a matter of law, not materially misleading: vague statements of corporate optimism and "statements considered immaterial because other documents available to the investing public 'bespoke caution' about the subject matter of the alleged misstatement at issue."  Grossman v. Novell, 120 F.3d at 1120.

Alleged omissions create another hurdle for the plaintiff.  Unlike statements, omissions are actionable only if the plaintiff can establish that the defendant had a duty to disclose the omitted information. See McDonald v. Kinder-Morgan, Inc., 287 F.3d 992, 998 (10th Cir. 2002)(stating that, in the context of the Exchange Act, "a duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement.").  See also Basic v. Levinson, 485 U.S. 224, 239 n.17 (1988)("To be actionable, of course, a statement must also be misleading.  Silence, absent a duty to disclose, is not misleading under Rule 10b-5.");  Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 (1st Cir. 1996)(stating that, in the context of Section 11 and 12(a)(2) claims, "[t]he proposition that silence, absent a duty to disclose, cannot be actionably misleading, is a fixture in federal securities law.").  That principle is also found in the language of the two sections of the Securities Act at issue.  Section 11 creates liability where a registration statement "omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k.  Section 12(a)(2), likewise, creates a cause of action where the documents "omit[] to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77l(a).  A defendant can therefore only be liable under these sections if he or she omitted material, required information from the offering documents or made incomplete disclosures that would give leave the reader with a material false impression.

**4.      Section 15 Control-Person Liability.**

Section 15 is a "control person" provision, similar to Section 20(a) of the Exchange Act.  It states, in relevant part: "Every person who . . . controls any person liable under sections 77k or 77l of this title [i.e., Sections 11 of 12 of the Securities Act], shall also be liable jointly and severally . . . to any person to whom such controlled person is liable, unless the controlling person had no

knowledge of [the] facts" that form the basis of the underlying Section 11 or Section 12 claims. 15

U.S.C. § 77o. "Although worded differently, the control person provision of § 15 and § 20(a) are

interpreted the same." Maher v. Durango Metals, Inc., 144 F.3d at 1305 n.7 (citing First Interstate

Bank v. Pring, 969 F.2d 891, 897 (10th Cir. 1992)). Thus, the following authority on Section 20(a)

liability applies equally to Section 12 claims.

> Section 20(a) of the Exchange Act states:

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such controlled person is liable,
> unless the controlling person acted in good faith and did not directly or indirectly
> induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To establish a defendant's liability as a controlling person, a plaintiff must prove

two things: (i) a primary violation of the securities laws, and (ii) that the defendant had "control"

over the primary violator. See Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1107 (10th Cir.

2003). The first element is fairly straightforward. The second element, that the defendant have

control over the primary violator, requires more analysis.

"The second element of the *prima facie* case [under Section 20(a)] requires that the plaintiffs

plead facts from which it can be reasonably be inferred that the individual defendants were control

persons." Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (citing Maher v. Durango Metals, Inc.,

144 F.3d 1302, 1306 (10th Cir. 1998)). "The Tenth Circuit observed that § 20(a) 'has been

interpreted as requiring only some indirect means of discipline or influence short of actual direction

to hold a controlling person liable.'" Lane v. Page, 649 F. Supp. 2d 1256, 1306 (D.N.M.

2009)(Browning, J.)(quoting Richardson v. MacArthur, 451 F.2d 35, 41 (10th Cir. 1971)). The

plaintiff must specify facts that "indicate the defendants had 'possession, direct or indirect, of the

power to direct or cause the direction of the management and policies of a person, whether through

ownership of voting securities, by contract, or otherwise.'" Adams v. Kinder-Morgan, Inc., 340 F.3d

at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1306). See 17 C.F.R. § 230.405 ("The

term control (including the terms controlling, controlled by and under common control with) means

the possession, direct or indirect, of the power to direct or cause the direction of the management

and policies of a person, whether through the ownership of voting securities, by contract, or

otherwise.").

     In Adams v. Kinder-Morgan, Inc., the Tenth Circuit addressed whether certain individuals

involved in Kinder-Morgan, Inc. qualified as control persons for the purposes of Section 20(a)

liability. First, the Tenth Circuit held that the directors were not, ipso facto, control persons.

> We . . . conclude that the plaintiffs have failed to allege sufficient facts to support the
> conclusion that Kinder was a control person. During the period in question, he was
> not an executive of the company, but simply a member of the board of directors. The
> assertion that a person was a member of a corporation's board of directors, without
> any allegation that the person individually exerted control or influence over the
> day-to-day operations of the company, does not suffice to support an allegation that
> the person is a control person within the meaning of the Exchange Act.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (citing Dennis v. Gen. Imaging, Inc., 918 F.2d 496,

509-10 (5th Cir. 1990); Burgess v. Premier Corp., 727 F.2d 826, 832 (9th Cir. 1984); Cameron v.

Outdoor Resorts of Am., Inc., 608 F.2d 187, 195 (5th Cir. 1979)). On the other hand, being a

significant executive with ultimate management authority is sufficient:

> [W]e conclude that the plaintiffs have pled facts supporting the allegation that
> [Defendant] Hall was a control person. He was the Chairman, President, and CEO
> of Kinder-Morgan during the relevant period. As President and CEO, Hall would
> have possessed the ultimate management authority of the corporation on a daily
> basis. There were no managers higher than Hall. He thus clearly possessed "the
> power to direct or cause the direction of the management and policies of
> [Kinder-Morgan]." Hall also had direct control over McKenzie, his chief financial
> officer and an alleged primary violator of Rule 10b-5.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d

at 1305; citing In re Ribozyme Pharms., Inc. Sec. Litig., 119 F. Supp. 2d 1156, 1167 (D. Colo. 2000)).  A high-ranking position within the corporation, however, standing alone, is unlikely to satisfy the "control" element of a control-person claim, unless the circumstance of the defendant's position and the nature of the underlying violation would lead to an inference that the person had control.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 (holding that the Chief Financial Officer of Kinder-Morgan, based solely on his position as CFO, was a control person where the securities-fraud violations related specifically to official reports on the company's financial performance).  Importantly, it is not necessary that the control person actively participate in the alleged fraudulent activity.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108.[10]

## ANALYSIS

Because Securities Act claims can only be based on statements in or relating to a prospectus or registration statement, see Gustafson v. Alloyd Co., 513 U.S. at 577-78 (regarding Section 12(a)(2) claims); Herman & MacLean v. Huddleston, 459 U.S. at 381 (regarding Section 11 claims), almost all of the conference calls and media statements on which the Plaintiffs rely in the Exchange Act part of the case are irrelevant.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. at 752. The Court will therefore analyze those claims with reference only to the contents of the registration statements and the documents incorporated therein.

The Plaintiffs allege that the Underwriter Defendants violated Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.  In doing so, the Plaintiffs point to a series of public offerings -- May 2007, June 2007, September 2007, and January 2008 -- of TMI stock, and a series of representations

_____

[10] If a control person acted in good faith and did not induce the acts on which the liability of the controlled person is founded, the control person is not liable, but good faith is an affirmative defense and thus an inappropriate topic for consideration in a motion to dismiss.  See Adams v. Kinder Morgan, Inc., 340 F.3d at 1109 n.5.

and omissions that they allege are found within the official documentation associated with those offerings.  See CCAC ¶¶ 532-620, at 163-86.  The Underwriter Defendants move to dismiss, raising multiple, overlapping arguments.   The Underwriter Defendants first insist that the Plaintiffs lack standing to assert their Section 11 and Section 12(a)(2) claims, both under Sections 11 and 12(a)(2) of the Securities Act and under Article III of the United States Constitution.  See May/June Underwriters' Motion at 11-13; UBS Motion at 2; FBR Motion at 11-15.  Second, the Underwriter Defendants assert that the Plaintiffs have failed to state a claim insofar as they fail to demonstrate that any of the statements of which they complain were materially false or misleading when made.  See May/June Underwriters' Motion at 13-21; UBS Motion at 2; FBR Motion at 15-38.  Third, they assert that TMI's disclosures in August of 2007 nullify the materiality of any misstatements occurring after that time, and thus that they cannot be liable for harm occurring after that time.  See May/June Underwriters' Motion at 21-22.  Finally, the Underwriter Defendants also insist that Plaintiffs cannot proceed with any claims arising out of the September 2007 and/or January 2008 offerings because the Plaintiffs did not comply with the notice and appointment procedures of the PSLRA.  See UBS Motion at 2-3; FBR Motion at 38-40.  Because the Court finds that none of the statements about which the Plaintiffs complain are actionable, the Court will grant the Underwriter Defendants' motions to dismiss.

## I.      **THERE IS A CONSTITUTIONAL CASE-OR-CONTROVERSY.**

The Defendants assert that the Plaintiffs lack standing under the Constitution of the United States to assert their claims under Sections 11 and 12(a)(2) of the Securities Act.  See May/June Underwriters' Motion at 11-12; UBS Motion at 2-3; FBR Motion at 11-13.  If the argument is correct, the Court would lack jurisdiction over the claims against the Defendants.  See FBR Motion at 11-13.  If the Court lacks subject matter jurisdiction, it may not decide the merits of the Plaintiffs

claims, even if it would otherwise dismiss them.  See Rector v. City and County of Denver, 348 F.3d

935, 942 (10th Cir. 2003)("[Constitutional] [s]tanding . . . raises jurisdictional questions and we are

required to consider 'the issue *sua sponte* to ensure that there is an Article III case or controversy'

before us.").  The Court, however, disagrees that Article III standing prevents the Court from

proceeding to decide this motion.

> As the Supreme Court has stated:
>
> [T]he irreducible constitutional minimum of standing contains three elements. First,
> the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected
> interest which is (a) concrete and particularized, and (b) "actual or imminent, not
> 'conjectural' or 'hypothetical,'" Second, there must be a causal connection between
> the injury and the conduct complained of -- the injury has to be "fairly . . . trace[able]
> to the challenged action of the defendant, and not . . . th[e] result [of] the independent
> action of some third party not before the court."  Third, it must be "likely," as
> opposed to merely "speculative," that the injury will be "redressed by a favorable
> decision."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  There is no dispute that the Plaintiffs

assert that they have suffered some injury in fact that is concrete and particularized: they insist that

they bought stock at inflated prices based on misrepresentations in the offering documents.  The

action is fairly traceable to the actions of some of the Defendants -- those who made the statements

which the Plaintiffs insist were false or misleading.  Finally, because the injury that the Plaintiffs

alleged was financial, a judgment of the Court could redress it.  With respect to some Defendants,

therefore, the Plaintiffs successfully assert standing.

The problem that some of these Defendants point out, however, is that certain Underwriter

Defendants -- FBR, UBS, and Bear Stearns ("the September/January Offering Defendants") --

underwrote only the September 2007 and January 2008 offerings.  The Defendants argue that no

Lead Plaintiff alleges to have purchased any stock in the September 2007 or January 2008 offerings;

therefore, according to the Defendants, no Lead Plaintiff has standing to assert claims against those

Defendants.  They insist that this deprives the Court of subject-matter jurisdiction to hear these claims.

The Defendants do not contest that the Plaintiffs have standing to pursue some of their claims -- those against all other Defendants.  The Court finds that this standing supports the Court's subject-matter jurisdiction.  First, constitutional standing is a doctrine rooted in the Article III requirement that Courts exercise jurisdiction only over cases or controversies, as the Supreme Court has defined that term.  See Lujan v. Defenders of Wildlife, 504 U.S. at 560-61.  Such a case or controversy exists in this proceeding based on the Plaintiffs' claims against the other Defendants.  Compare In re Jupiter Networks, Inc. Sec. Litig., 542 F. Supp. 2d 1037, 1052 (N.D. Cal. 2008)(holding that the lead plaintiffs had standing to assert claims on behalf of noteholders, even though they did not allege to purchase those notes, when the harm that the lead plaintiffs suffered stemmed from the same allegedly false financial statements), with In re Storage Tech. Corp. Sec. Litig., 630 F.Supp. 1072, 1078 (D. Colo. 1978)(dismissing a § 11 claim for failure to state a claim under rule 12(b)(6) when none of the named plaintiffs alleged to have purchased any of the securities sold in the public offerings).  Second, even if the Court were to find that the lack of a Lead Plaintiff with a cognizable claim against the September/January Offering Defendants were a requirement to properly state a claim against those Defendants, the Court is not convinced that lack-of-standing deprives the Court of jurisdiction over those potential claims.  The supplemental jurisdiction statute, 28 U.S.C. § 1367, permits the Court to exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  The claims arising from the September and January offerings appear to be part of the same common nucleus of operative fact as the claims arising from the May and June 2007

-25-

offerings, as all are related to the same series of SEC filings by the same company, and so the claims all appear to be part of the same case or controversy.  See Edwards v. Doe, 331 Fed. Appx. 563, 569 (10th Cir. 2009)(citing Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 335 (2d Cir. 2006), for the "common nucleus of operative fact" standard for defining the reach of 28 U.S.C. § 1367(a)).  Thus, even if the lack of a Lead Plaintiff with a claim against the September/January Offering Defendants would otherwise deprive the Court of subject-matter jurisdiction, the supplemental jurisdiction statute appears to remedy that jurisdictional problem.  The Court may have jurisdiction over the claims, but there may be other problems, for example under rule 23, with a lack of plaintiffs asserting claims against certain defendants.  At this stage, however, on this motion, the Court concludes that, although the Plaintiffs may lack statutory standing under Sections 11 and 12(a)(2) against certain Defendants, an issue the Court does not need to resolve to establish jurisdiction, they do not lack standing under Article III such that the Court would lack subject-matter jurisdiction over these claims.

## II.    THE PLAINTIFFS FAIL TO IDENTIFY MATERIALLY FALSE OR MISLEADING STATEMENTS IN THE REGISTRATION MATERIALS.

The Plaintiffs' allege numerous statements and omissions in the CCAC that they argue support their claims under the Securities Act.  The Underwriter Defendants argue that none of the allegations is sufficient to support a cause of action.  See May/June Underwriters' Motion at 13-21; UBS Motion at 2; FBR Motion at 15-38.  The Underwriter Defendants further insist that the Plaintiffs' claims sound in fraud and therefore the heightened pleading standards of rule 9(b) are applicable to this claim.  See May/June Underwriters' Motion at 13-14 (citing In re Stac Elecs. Sec. Litig., 89 F.3d 1399, 1404-05 (9th Cir. 1996), and Yaun v. Bayard Drilling Techs., Inc., 96 F. Supp. 2d 1259, 1265-66 (W.D. Okla 1999)).  They argue that, under the rule 9(b) standard, the Plaintiffs'

allegations fail to state a cause of action under Section 11 and Section 12(a)(2).[11]   See May/June

Underwriters' Motion at 13-14.  The Court, however, finds that, even though the Securities Act

portion of the CCAC frequently refers to allegations made in its Exchange Act allegations, the core

of the Securities Act claims are pled in terms of negligence:

> [F]or purposes of the Securities Act Action, Plaintiffs are not alleging that the
> Securities Act Defendants (defined above) committed fraud or acted with deceitful
> intent.  To the contrary, Plaintiffs allege that the alleged violations of the Securities
> Act are the result of innocent and negligent conduct that triggers the strict liability
> provisions of the Securities Act.

CCAC ¶ 510, at 158-59.  The Plaintiffs further allege that:

> The Securities Act Defendants each owed to the purchasers of TMI securities in the
> Offerings, including Plaintiffs and the other Class members, the duty to make a
> reasonable and diligent investigation of the statements contained in the Offering
> Documents at the time they became effective. This duty included performing an
> appropriate investigation to ensure that the statements contained therein were true,
> and that there were no omissions of material fact required to be stated in order to
> make the statements contained in the Offering Documents not misleading. As herein
> alleged, each of the Securities Act Defendants failed to fulfill these specific duties
> and obligations. As a result of these failures, the offering prices of TMI securities in
> the Offerings were artificially inflated, and when the truth began to emerge, the stock
> price fell, causing injury to Plaintiffs and the Class.

CCAC ¶ 510, at 163 (emphasis added).  The Court finds "the § 11 [and § 12(a)(2)] claim[s] in the

case at bar [are] not premised on fraud and do[] not trigger Rule 9(b) scrutiny."  Schwartz v.

Celestial Seasonings, Inc., 124 F.3d at 1252.  The Court will instead view the Plaintiffs' allegations

through the lense of rule 8(a) and Twombly v. Bell Atlantic Corp.  Nevertheless, the Twombly v.

Bell Atlantic Corp. standard is itself demanding, requiring the Plaintiffs to state non-conclusory facts

from which it can plausibly be inferred that the Plaintiffs state a valid claim.  See Robbins v.

---

[11] The Court will conduct most of its analysis with regard to both Section 11 and Section 12(a)(2) together because the legal standards regarding them are, in many ways, identical.  Analysis of the Plaintiffs' Section 15 claims, which are derivative claims, will be reserved for the end of this opinion.

Oklahoma, 519 F.3d at 1247-49.

   A.   **THE PLAINTIFFS ALLEGE MISREPRESENTATIONS IN TMI'S 2006 10-K AND 2007 8-K.**

   First, the Plaintiffs allege misrepresentations in TMI's 2006 Form 10-K and April 19, 2007 Form 8-K, which the Shelf Registration Statement incorporates by reference. They allege that these documents are false or misleading because they: (i) reported that the company would be able to benefit from the mortgage crisis affecting Alt-A and subprime mortgages, and yet did not disclose that TMI underwrote Alt-A loans or had Alt-A assets in its portfolio; (ii) incorporated TMI's 2006 financial results, which were later called into question by KPMG's letter; (iii) failed to disclose that TMI's RPAs contained cross-default provisions; and (iv) failed to "adequately advise investors that TMI was materially more vulnerable to the developing Alt-A and subprime mortgage crisis than TMI was reported to be in these documents." CCAC ¶ 557, at 169-70. Next, the Plaintiffs allege that the June 2007 offering incorporated the first quarter 2007 Form 10-Q, and that the 10-Q "portrayed TMI exclusively as a prime loan originator and MBS purchaser." CCAC ¶¶ 563-565, at 170-71. They then assert that the second quarter 2007 Form 10-Q, which was incorporated into the Shelf Registration Statement in time for the September 2007 offering, contained more statements portraying TMI as an exclusively prime mortgage originator. See CCAC ¶¶ 573-577, at 174-75. The Plaintiffs next allege that August 21, 2007 Form 8-K was also incorporated into the Shelf Registration Statement by the September offering and that it stated that TMI sold "approximately 20.5 billion of primarily AAA-rated MBS," and that "the company estimates it will realize an approximate capital loss of $930 million as a result," when it actually sold $22,000,000,000.00 in assets and realized a loss of $1,099,000,000.00. CCAC ¶¶ 580-581, at 176. Finally, the Plaintiffs attack statements in the third quarter 2007 Form 10-Q and a Form 8-K dated October 16, 2007, both

of which were incorporated into the Shelf Registration Statement before the January 2008 offering. Most of those statements either dealt with company's outlook for the future or, the Plaintiffs allege, represented TMI as company that dealt exclusively with prime mortgage assets.

> **B.   NONE OF THE ALLEGED MISREPRESENTATIONS OR OMISSIONS ESTABLISHES SECTION 11 OR SECTION 12(a)(2) LIABILITY.**

The Underwriting Defendants argue that none of the allegations is sufficient to support a cause of action under Section 11 or Section 12(a)(2). The Court agrees. The Plaintiffs first alleged misrepresentation is in TMI's Form 8-K dated April 19, 2007, in which TMI states, in relevant part, that "in the first quarter, we benefitted from wider spreads on new prime quality mortgage assets caused by credit concerns concentrated in the subprime and Alt-A segment of the mortgage market." CCAC ¶ 557(a). As the Defendants point out, however, the Plaintiffs fail to assert how, if at all, this statement is false. The Plaintiffs assert that this statement is misleading because it omits that TMI underwrote Alt-A loans -- a fact that TMI's Form 10-K disclosed -- and that TMI owned billions of dollars of MBSs that are backed by Alt-A collateral -- a fact that could be inferred from the facts disclosed in the Form 10-K.

The Plaintiffs argue that the Form 8-K was materially misleading because it incorporated TMI's 2006 financials, which the Plaintiffs believe contained material misstatements based on the March 4, 2008 letter sent by KPMG to TMI. The Plaintiffs do not take into consideration, however, that KPMG later blessed TMI's use of those 2006 financials in a letter that the CCAC incorporates. See TMI's Form 8-K Exhibit 7.2 ("We have read Thornburg Mortgage, Inc.'s statements included [in] its Form 8-K dated March 7, 2008, and we agree with such statements . . . ."). The Plaintiffs therefore have incorporated into the CCAC a document that says that KPMG suspected problems with the 2006 financials and a subsequent document that says, effectively, that KPMG believed that

the 2006 financials were acceptable.[12]  Furthermore, neither KPMG, in its March 4, 2008 letter, nor

the CCAC explain how the 2006 financials were false or misleading, other than outlining the

absence of an explanatory paragraph regarding TMI's ability to continue as a going concern for a

reasonable period of time.[13]  The Court finds that the incorporation of the 2006 financial statements,

blessed by the same auditor that earlier decried them, is not a materially false statement or omission

warranting Section 11 or Section 12(a)(2) liability.

The Plaintiffs next insist that the Form 8-K was materially false or misleading because it

failed to disclose that all of TMI's RPAs contained cross-default provisions such that, if triggered,

_____

[12] The Plaintiffs argue that KPMG might have acquiesced to TMI's decision to restate only its 2007 financials for other reasons, such as believing that nobody was relying on the 2006 financials any longer, rather than because the financials did not contain misstatements.  See Plaintiffs' Opposition to the Motions to Dismiss Plaintiffs' Securities Act Claims Submitted By: 1) Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Joseph H. Badal, Paul G. Decoff, Clarence D. Simmons, Anne-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman; 2) The May/June 2007 Underwriter Defendants; 3) Friedman, Billings, Ramsey & Co., Inc.; 4) UBS Securities LLC and Bear Stearns & Co, Inc.; and 5) Stifel, Nicolaus & Company, Incorporated at 15, filed December 22, 2008 (Docs. 152, 153)("Response").  If that were true, KPMG would be tacitly stating that the statements in the 2006 financials were no longer material, even if they are misleading.  While the Court realizes that KPMG's opinion of what is or is not material is not conclusive on the legal issue, it is further reason to find that the Plaintiffs have failed to plead a claim that is plausible on its face.

[13] The relevant portion of that letter states:

Under our professional standards, we have considered conditions and events that were known or should have been known to the Company as of the date of our auditors' report and have concluded that the aforementioned financial statements contain material misstatements associated with available for sale securities and that our auditors' report should have contained an explanatory paragraph indicating that substantial doubt exists relative to the Company's ability to continue as a going concern for a reasonable period of time.

TMI's Form 8-K Exhibit 7.1 (dated March 7, 2008).  The follow-up letter, dated three days later, first references the earlier letter and then states "[w]e have read Thornburg Mortgage, Inc.'s statements included under Item 4.02 of its Form 8-K dated March 7, 2008, and we agree with such statements . . . ."  Id. Exhibit 7.2.

-30-

might subject TMI to immediate liability on billions of dollars in margin calls.  The Court finds that failure to disclose a contract provision, without alleging that the provision is unique, cannot constitute a material omission.  TMI's RPAs likely contain dozens -- if not hundreds -- of individual provisions, any one of which might be crucial depending upon what facts transpire.  The Plaintiffs have shown the Court no authority for the proposition that a company is subject to Section 11 or Section 12(a)(2) liability for failure to disclose the entire content of its contracts, nor have they sought to give the Court a rule to apply, other than viewing the facts of the case in hindsight, for determining which of a contract's provisions are sufficiently important to warrant disclosure.  The only reasoning the Court can discern from the Plaintiffs' allegation is that, because the cross-default provision in the RPAs was eventually triggered, the provision was material and thus should have been disclosed.  The Defendants further argue that the inclusion of such provisions is commonplace and well known in the investment marketplace, as demonstrated by some of the news reports that the Plaintiffs incorporated into the CCAC.  See CCAC ¶ 279, at 91 ("[W]e are concerned if TMI were to default on one of its covenants all of its lines of credit would be pulled and TMI would be required to liquidate its entire $25 billion repobacked [sic] assets at a single point in time.").  The Court finds no legal duty to disclose the existence of cross-default provisions in TMI's RPA contracts, and no statement within the Form 8-K that is misleading without such disclosure.

Next the Plaintiffs argue that the Defendants "failed to adequately advise investors that TMI was materially more vulnerable to the developing Alt-A and subprime mortgage crisis than TMI was reported to be in [the May 2007 offering] documents."  CCAC ¶ 557(d), at 169-70.  The Court finds that this allegation is too vague to constitute a material misstatement or omission to which Section 11 or Section 12(a)(2) liability might attach.  So far as the Court can discern from the parties' allegations, TMI's offering documents contained all information required by the securities laws.

-31-

The allegation points to no particular failing on the part of the Defendants, other than breaching an implicit duty to keep investors informed of shifts in the marketplace.  Liability cannot be premised on silence in the absence of a duty to disclose, see Basic v. Levinson, 485 U.S. at 239 n.17 ("To be actionable, of course, a statement must also be misleading. Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); McDonald v. Kinder-Morgan, Inc., 287 F.3d at 998 ("[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement."), and the Plaintiffs have failed to provide the Court with the source of such a duty, see L.L. Capital Partners, L.P. v. Rockefeller Ctr Props., Inc., 921 F.Supp. 1174, 1179 (S.D.N.Y. 1996)("'The sources of a person's duty to disclose information under the federal securities laws are found either in express mandates of the statutes and rules promulgated under them or in the general antifraud provisions of the statutes and rules,' including Rule 10b-5.")(quoting V. Brudney, A Note on Materiality and Soft Information Under the Federal Securities Laws, 75 Va. L. Rev. 723 (May 1989)).  Furthermore, the Plaintiffs do not allege what information was lacking from TMI's offering documents, other than the fact that they TMI underwrote and acquired some Alt-A assets.  The Court has already held that TMI's Form 10-K's adequately placed investors on notice of those facts by disclosing:

> On a case-by-case basis, we may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the applicable underwriting guidelines warrants an underwriting exception.  Compensating factors may include, but are not limited to, low loan-to-value ratios, low debt-to-income ratios, excellent credit history, stable employment, financial reserves, and time in residence at the applicant's current address.

Annual Report on Form 10-K of Thornburg Mortgage, Inc. at 8 (filed with SEC March 1, 2007),

filed September 23, 2008 (Doc. 134-3).[14]  This allegation therefore fails to establish a materially false or misleading statement or omission.

The Plaintiffs' arguments regarding the materially false or misleading statements or omissions in the June 2007 offering documents largely mimic their arguments regarding the May 2007 offering documents.  For the same reasons as those already stated, the Court finds that there are no materially false or misleading statements or omissions in the June 2007 offering documents. Additionally, the Plaintiffs argue that TMI held itself out as "exclusively" a prime mortgage loan originator and MBS purchaser.  TMI, however, as the Defendants argue, never made that assertion. The closest TMI got to calling itself "exclusively" a prime-mortgage originator or MBS purchaser is to say that it "acquire[s] and originate[s] 'A quality' ARM Loans," and "focus[es] on acquiring High Quality assets."  CCAC ¶ 563, at 171.  See CCAC ¶¶ 563-566, at 171-72 (other similar alleged statements).  The Plaintiffs fail to explain how these statements are materially false or misleading, thus the Court is unpersuaded.  As the Court understands the facts presented, a security could be "Alt-A," and also be "High Quality" or "A quality."  Furthermore, it is not disputed that TMI was focused on prime mortgage assets; the dispute is how focused TMI represented itself to be and how focused it was.  The allegations imply that TMI's portfolio had somewhere between four and twenty-five percent Alt-A assets -- and TMI stated only that it was focused on "A quality" or "High Quality" assets, and not on "non-Alt-A" assets.  The Court believes that, regardless of which percentage number is correct, TMI was "focused" on acquiring prime, high-quality assets, and

---

[14] The same disclosure is contained in the other Form 10-K, filed with the SEC on February 28, 2008, and the Form 10-K/A, filed with the SEC on March 11, 2008, both of which the Court has taken judicial notice.  See Memorandum Opinion and Order at 7, filed December 21, 2009 (Doc. 246).

therefore these statements are neither false nor misleading.[15]

The Plaintiffs again incorporate their arguments regarding the May 2007 financials, and repeat them as to the September 2007 and January 2008 offerings. For the reasons already stated, the Court rejects those arguments as to the September 2007 and January 2008 offerings. The CCAC sets forth a few more statements made in the offering documents that the Plaintiffs insist are materially false or misleading, but the Court again finds that such statements are too vague to support Section 11 or Section 12(a)(2) liability, or accurately state TMI's intent and business model.[16] The Plaintiffs assert that TMI "failed to disclose that [TMI]'s financing sources were becoming increasingly less -- not more -- diversified," CCAC ¶ 577, at 175, but assert insufficient underlying facts to plausibly support the truth of the fact allegedly withheld. They also insist that TMI's Form 8-K dated August 21, 2007, was materially misleading because it stated that TMI sold "approximately 20.5 billion" in assets and expected to realize capital loss of "approximately $930 million," when it suffered loss of $1,099,000,000.00 and sold $22,000,000,000.00 in assets. CCAC

---

[15] In its prior opinion, the Court found that similar statements by Goldstone were false and/or misleading. See Memorandum Opinion and Order at 69-74. Goldstone's statements, however, were more concrete and more absolute. He stated that TMI was "not an Alt-A originator" and that TMI was "exclusively" focused on prime mortgage assets. The offering documents, however, refer only to "high quality" or "A-quality" assets, which, as the Court understands the facts, was TMI's focus.

[16] For example, the Plaintiffs argue that TMI's assertion, in its second quarter 2007 Form 10-Q, that "[TMI's strategic focus on high-credit-quality assets] creates significant portfolio liquidity and low portfolio volatility, which gives us access to financing through the credit cycle and contributes to maintaining consistent profitability" is a materially misleading statement. CCAC ¶ 572, at 174. The Court sees such statements as akin to a mission statement or puffery. TMI's plan was to work under a paradigm of maintaining high asset quality to ensure liquidity, and, until the mortgage market began to crumble, that plan appears to have been a success. There is nothing objectively false about this statement except that it implies that TMI's plan guarantees success. It is akin to TMI asserting that it has "a cunning plan that cannot fail." Black Adder, Witchsmeller Pursuivant (BBC2 television broadcast, 1983). The same is true of the statement that "[a]nother long-term objective is to achieve a more balanced funding mix . . . ." CCAC ¶ 575, at 174.

¶¶ 580-81, at 176.  TMI's disclosures in its Form 8-K were clearly estimates, and the Court does not believe that the discrepancy between the estimate and reality -- less than ten percent -- was unreasonable or materially misleading during the short time between disclosure of the estimate and disclosure of the calculated total.  TMI appeared not to be attempting to deceive its investors, but to keep them informed, even if it meant giving estimates that would later be revised upon a full investigation.  The Court therefore does not find that these statements were materially false or misleading.

With respect to the January 2008 offerings, the Plaintiffs assert another series of statements without elaborating why these statements were false or misleading.  See CCAC ¶¶ 587-90, at 178-79.  The Plaintiffs also reiterate many of the allegations that they made regarding the May 2007, June 2007, and September 2007 offerings.  See id. ¶¶ 591-95, at 179-80.  One set of statements, however, is new:

> *We believe that we have more than sufficient liquidity and cash flow to meet our anticipated cash requirements going forward without needing to sell assets.*  However, there is no assurance that the value of our mortgage portfolio and derivatives portfolio will not decline further, that lenders will not make additional margin calls or that we will be able to satisfy our margin calls, if any.  In addition, our access to commercial paper financing remains unavailable and we have not issued any collateralized mortgage debt since October 2007.  As such we are not depending on the availability of financing opportunities at this time and conduct our operations accordingly.
>
> * * * *
>
> *All of these market value losses are unrealized and there has been no deterioration in the actual credit performance of any of these assets.*  As of the end of 2007, we have not experienced any ratings agency downgrades on any of our mortgage securities.  *We believe the market value decline experienced in our portfolio is indicative of the opportunities for the Company to acquire higher yielding and more profitable new mortgage assets.*

CCAC ¶ 596, at 180-81 (emphasis in CCAC).  The context of these statements indicate that they are

beliefs and estimates, and not assertions of fact.  Although the portions emphasized by the Plaintiffs make TMI appear relatively certain that its beliefs will not be disappointed, the Court cannot ignore the qualifying statements that "there is no assurance that the value of our mortgage portfolio and derivatives portfolio will not decline further, that lenders will not make additional margin calls or that we will be able to satisfy our margin calls, if any."  CCAC ¶ 596, at 180-81.  The Court therefore finds that these statements are not materially false or misleading.  As the Court has found no false or misleading statement upon which to premise Section 11 or Section 12(a)(2) liability, the Court will grant the Defendants' motion to dismiss as to those claims.  Furthermore, because the Section 15 claim is derivative in nature, failure to state a claim under Sections 11 or 12(a)(2) results in a failure to state a claim under Section 15.  See Maher v. Durango Metals, Inc., 144 F.3d at 1305 n.7. The Court will therefore grant the Underwriter Defendants' motions.  Because the Court grants this motion based on the lack of material misleading statements or omissions in TMI's offering documents, it declines to address the additional arguments in the Underwriter Defendants' motions.

    **IT IS ORDERED** that the Opposed Motion by May/June 2007 Underwriter Defendants to Dismiss Consolidated Class Action Complaint; Memorandum of Points and Authorities in Support Thereof, the Opposed Motion to Dismiss of Underwriter Defendants UBS Securities LLC and Bear Stearns & Co., Inc., and the Motion of Friedman, Billings, Ramsey & Co, Inc. to Dismiss and Memorandum of Points and Authorities in Support Thereof are granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Frederick S. Fox
Aviah Cohen Pierson
Kaplan Fox & Kilsheimer
New York, New York

-- and --

Richard A. Lockridge
Nathan D. Prosser
Karen H. Riebel
Lockridge Gindal Nauen & Holstein
Minneapolis, Minnesota

-- and --


Nancy Kaboolian
Abbey Spanier Rodd Abrams & Paradis, LLP
New York, New York

-- and --

Curtis V. Trinko
Law Offices of Curtis V. Trinko, LLP
New York, New York

-- and --

Evan J. Smith
Brodsky & Smith, L.L.C.
Mineola, New York

-- and --

David R. Scott
Scott & Scott, LLC
Colchester, Connecticut

-- and --

Arthur Shingler, III
Scott & Scott, LLP
San Diego, California

-- and –

Charlotte Itoh
Cody Kelley
Kelley Law Offices
Albuquerque, New Mexico

-- and --

Shane C. Youtz
Albuquerque, New Mexico

-- and --

Turner W. Branch
Branch Law Firm
Albuquerque, New Mexico

-- and --

Fred T. Isquith
Rachel S. Poplock
Martin E. Restituyo
Gregory Nespole
Wolf Haldenstein Adler Freeman & Herz, LLP
New York, New York

-- and --

Francis M. Gregorek
Rachele R. Rickert
Patrick Moran
Betsy C. Manifold
Wolf Haldenstein Adler Freeman & Herz, LLP
San Diego, California

-- and --

Andrew Zivitz
Benjamin Sweet
Michelle Newcomer
Richard Russo, Jr.
Sean M. Handler
Stewart L. Berman
D. Seamus Kaskela

Barroway Topaz Kessler Meltzer & Check, LLP
Radnor, Pennsylvania

  *Attorneys for the Plaintiffs*

Amy L. Neuhardt
Boies, Schiller & Flexner, LLP
Washington, D.C.

-- and --

Philip C. Korologos
Boies, Schiller & Flexner, LLP
New York, New York

  *Attorneys for Defendants Garrett Thornburg, Anne-Drue M. Anderson, David A. Ater,
    Joseph H. Badal, Eliot R. Cutler, Ike Kalangis, Francis I. Mullin, III, Stuart C.
    Sherman, and Paul G. Decoff*

Donald L. Flexner
Boies, Schiller & Flexner, LLP
New York, New York

  *Attorney for Defendants Garrett Thornburg, Anne-Drue M. Anderson, David A. Ater,
    Eliot R. Cutler, Ike Kalangis, and Francis I. Mullin, III*

Frank T. Herdman
Rubin Katz Law Firm, P.C.
Santa Fe, New Mexico

-- and --

William H. Forman
Scheper Kim & Overland, LLP
Los Angeles, California

  *Attorneys for Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A.
    Goldstone, Clarence G. Simmons, Anne-Drue M. Anderson, David A. Ater, Joseph
    H. Badal, Eliot R. Cutler, Michael B. Jeffers, Ike Kalangis, Owen M. Lopez, Francis I.
    Mullin, III, and Stuart C. Sherman*

David F. Cunningham
Thompson, Hickey, Cunningham, Clow & April, P.A.
Santa Fe, New Mexico

>  *Attorney for Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A.*
>  *Goldstone, Clarence G. Simmons, Anne-Drue M. Anderson, David A. Ater, Eliot R.*
>  *Cutler, Ike Kalangis, and Francis I. Mullin, III*

Clinton W. Marrs
Tax, Estate & Business Law, N.A., LLC
Albuquerque, New Mexico

>  *Attorney for Defendants Larry A. Goldstone and Clarence G. Simmons*

Robert Badal
Wilmer Cutler Pickering Hale and Dorr, LLP
Los Angeles, California

>  *Attorney for Defendants Thornburg Mortgage, Inc., Larry A. Goldstone, Clarence G.*
>  *Simmons, Michael B. Jeffers, and Owen M. Lopez*

Joseph Goldberg
David A. Freedman
David H. Urias
Freedman Boyd Hollander Goldberg Ices & Duncan, P.A.

>  *Attorneys for Defendants Joseph H. Badal, Paul Decoff, Michael Jeffers, Owen Lopez,*
>  *and Stuart Sherman*

Joel Sher
Shapiro Sher Guinot & Sandler
Baltimore, Maryland

-- and --

Mary R. Jenke
Walsh Anderson Brown Aldridge & Gallegos
Albuquerque, New Mexico

>  *Attorneys for Thornburg Mortgage, Inc.*

Clifford K. Atkinson
John Thal
Atkinson & Thal, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendants AG Edwards & Sons, Inc., BB&T Capital Markets, UBS
> Securities, Citigroup Global Markets Inc., Friedman, Billings, Ramsey & Co.,
> Oppenheimer & Company, Inc., RBC Dain Rauscher Corp., Stifel, Nicolaus &
> Company, Inc., and Bear Sterns & Co.*

Jonathan C. Dickey
Gibson, Dunn & Crutcher, LLP
New York, New York

-- and --

Dean J. Kitchens
Lindsay R. Pennington
Gibson, Dunn & Crutcher, LLP
Los Angeles, California

> *Attorneys for Defendants AG Edwards & Sons, Inc., BB&T Capital Markets, Citigroup
> Global Markets Inc., Oppenheimer & Company, Inc., RBC Dain Rauscher Corp., and
> Stifel, Nicolaus & Company, Inc.*

David Bohan
David Stagman
Katten Muchin Rosenman, LLP
Chicago, Illinois

> *Attorneys for Defendants UBS Securities and Bear Sterns & Co.*

William Pittard
Williams & Connolly, LLP
Washington, D.C.

> *Attorney for Defendant Friedman, Billings, Ramsey & Co.*