**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

IN RE THORNBURG MORTGAGE, INC.                    No. CIV 07-0815  JB/WDS
SECURITIES LITIGATION

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Opposed Motion for Leave to

Amend Consolidated Class Action Complaint to Add Additional Representative Plaintiff, filed

January 27, 2009 (Doc. 160).  The Court held a hearing on April 22, 2009.  The primary issue is

whether the Court should permit the Plaintiffs to amend their Consolidated Class Action Complaint,

filed May 27, 2008 (Doc. 68), to add an additional representative plaintiff.  Because the Court finds

that the prejudice to the Defendants is minimal, because the amendment is a response to a perceived

deficiency to which the Defendants objected, and because it is too soon to argue in great detail about

whether the proposed class will contain members with opposing interests, the Court will grant the

motion and allow the Plaintiffs to add the new representative plaintiff.

<u>**FACTUAL BACKGROUND**</u>

This case arises from what the Plaintiffs refer to as "a campaign of selective disclosure

characterized by half-truths, outright falsehoods and strategic omissions."  Plaintiffs' Opposition to

Defendants' Motion to Dismiss Consolidated Amended Complaint Filed by Thornburg Mortgage,

Inc., Garrett Thornburg, Larry A. Goldstone, Joseph H. Badal, Paul G. Decoff, Clarence D.

Simmons, Anne-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangus, Owen M. Lopez,

Francis I. Mullin, Jr., and Stuart C. Sherman at 3, filed December 22, 2008 (Docs. 154, 155, 156,

157).  The Consolidated Class Action Complaint, filed May 27, 2008 (Doc. 68)("CCAC") describes

a series of public statements and filings dating back to early 2006 that the Plaintiffs assert were

fraudulent material misrepresentations.  The suit itself is a consolidated action which sets forth claims under the Securities Act of 1933, 15 U.S.C. §§ 77a to 77aa ("Securities Act"), and under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a to 78oo ("Exchange Act").  Lead Plaintiffs (i) W. Allen Gage, individually and on behalf of J. David Wrather; (ii) Harry Rhodes; (iii) FFF Investments, LLC; (iv) Robert Ippolito, individually and as Trustee for the Family Limited Partnership Trust; and (v) Nicholas F. Aldrich, Sr., individually and on behalf of the Aldrich Family, as well as the Plaintiffs (vi) Betty L. Manning and (vii) John Learch (collectively "the Plaintiffs"), represent the class and bring these claims.  The Plaintiffs all purchased shares of Thornburg Mortgage, Inc. ("TMI") stock during the Class Period -- from April 19, 2007 to March 19, 2008, inclusive -- at prices that they allege were artificially inflated.  They assert that they were damaged as a result of these inflated-price purchases, now that the truth has been revealed.  See CCAC ¶ 53, at 15-16.  Manning acquired 550 shares of TMI common stock during the May 2007 Offering.  See id. ¶ 54, at 16.  She bought them on May 4, 2007 and paid $27.05 per share.  See id.  Learch, as trustee for the Learch Trust, acquired 400 shares of 7.5% Series E Cumulative Convertible Redeemable Preferred Stock in the June 2007 Offering.  See id. ¶ 55, at 16.  He bought his shares on June 19, 2007 and paid $25.00 per share.  See id.  No particular Plaintiff alleges to have purchased any TMI stock in the September 2007 or January 2008 offerings.

1.    **Problems for TMI.**

TMI has, historically, acquired capital through public offerings of its securities, short-term borrowings -- including reverse repurchase agreements ("RPAs")[1] -- the issuance of asset-backed

---

[1] The Plaintiffs allege that:

RPAs involve a simultaneous sale of pledged securities to a lender at an agreed-upon price in return for an agreement to repurchase the same securities at a future date (the

commercial paper ("ABCP"),[2] and the issuance of collateralized debt obligations ("CDO").[3]  See

CCAC ¶ 6, at 3.  TMI was "heavily leveraged" -- meaning that it borrowed a large amount of money

compared to the amount of money that it had available to it.

TMI recognized the potential risk of the real-estate market going south, but repeatedly

reassured analysts and its investors that its liquidity position -- its ability to satisfy debt obligations

as they arise -- was not at risk.  See id. ¶¶ 7, 82, at 3, 24-25.  As late as July 20, 2007, TMI reported

that its unencumbered assets securing its highly leveraged financing were at their highest level "in

the history of the organization."  Id. ¶ 7, at 3.  TMI repeatedly stated in its filings with the Securities

and Exchange Commission ("SEC") that its focus was to acquire and originate high quality, highly

---

maturity of the borrowing) at a higher price.  Most RPAs, including the mortgage
backed security RPAs that TMI entered into during the Class Period, could require
the borrower (in this case TMI) to post additional collateral should the value of the
original collateral decline.

CCAC ¶ 74, at 22.

[2] The CCAC does not appear to define this term.  The phrase refers to "[a]n instrument, other
than cash, for the payment of money," Black's Law Dictionary 1220 (9th ed. 2009), that is
securitized by some asset, see Investopedia.com Financial Dictionary, Asset-Backed Commercial
Paper (ABCP), http://www.investopedia.com/terms/a/asset_backed_commercial_paper.asp (last
visited January 14, 2010)("A short-term investment vehicle [that] is typically issued by a bank or
other financial institution. The notes are backed by physical assets such as trade receivables, and are
generally used for short-term financing needs.").

[3] CDOs, also referred to as Collateralized Mortgage Debt, are

a form of long-term, non-recourse financing, issued by trusts and secured by ARM
Loans originated or purchased by TMI.  CDOs are constructed from a portfolio of
fixed income assets and divide the credit risk among different tranches: senior
tranches (rated "AAA"), mezzanine tranches ("AA" to "BB"), and equity tranches
(unrated).  Losses are applied in reverse order of seniority, so junior tranches offer
higher coupons (interest rates) to compensate for the added risk.

CCAC ¶ 75, at 22.

liquid mortgage assets such that sufficient assets could be readily converted to cash, if necessary, to meet its financial obligations.  See id. ¶ 9, at 4.

One of the primary allegations that the Plaintiffs level against all of the Defendants is that they improperly withheld that TMI held substantial "Alt-A" mortgage assets.  The Plaintiffs explain that:

> Alt-A loans are 'alternatives' to the gold standard of conforming, GSE-backed mortgages.  Often an Alt-A borrower is unable to provide the proof of income or the verification of assets necessary to obtain a prime mortgage, but has a satisfactory credit score, or vice versa.  In other words, Alt-A or 'alternative' loans are associated with and defined by a higher level of risk than prime loans due to a borrower's inability to provide these fundamental guarantees

Id. ¶ 98, at 29.  See id. ¶ 11, at 4.  TMI's multi-billion dollar asset portfolio during the Class Period was comprised of various mortgage-related assets.  See id. ¶ 12, at 4.  TMI's mortgage-based holdings include both loans it originates, and loans it acquires or purchases.  See id. ¶ 12 at 4-5.  TMI also purchased mortgage-backed securities ("MBS"), which the Plaintiffs describe as "a series of fixed-income assets that [a]re bundled and sold as securities."  Id. ¶ 12, at 5.  TMI frequently posts these MBS assets as the collateral under its many short-term borrowing agreements.  See id.  TMI would originate loans, securitize them, and sell off interests in the securitized assets to obtain additional financing.  See id.

In 2006 and 2007, as the markets for subprime and Alt-A mortgages began to decline, and subprime and Alt-A borrowers began to default with increased frequency, many mortgage lenders announced that they were experiencing serious financial problems.  See id. ¶ 13, at 5.  TMI, however, represented that its stringent underwriting standards and "high quality" assets insulated it from the market downturn.  Id.  As the prices for MBSs backed by Alt-A loans as collateral declined throughout 2007, TMI never disclosed that it was holding billions of dollars worth of MBSs

-4-

backed by Alt-A collateral on its balance sheets.  See id. ¶ 14, at 5.  Notwithstanding the representations of Defendant Larry A. Goldstone, President, Chief Operating Officer, and director of TMI,[4] that TMI's focus was on originating prime -- rather than subprime or Alt-A -- loans, several confidential witnesses stated that TMI originated Alt-A loans during the Class Period.  See CCAC ¶ 14, at 5-6.

On May 4, 2007, TMI had its first public offering, selling 4,500,000 shares of TMI common stock for a total of $121.7 million.  See id. ¶ 532, at 163.  Shortly thereafter, TMI had its second offering wherein it sold 2,750,000 shares of 7.5% Series E Cumulative Convertible Redeemable Preferred Stock at a price of $25.00 per share.  See id. ¶ 535, at 164.  In that offering, TMI received $68.75 million.  See id.

By no later than June of 2007, Goldstone allegedly knew, but did not disclose, that the ABCP market was shrinking rapidly and, by July 2007, had more or less dried up.  See id. ¶ 15, at 6; id. ¶¶ 131-32, 134, 250, 263, 288, at 38-40, 74-75, 88.  Goldstone allegedly admitted this shrinking market to certain confidential sources during a private meeting on August 8, 2007.  See id.  ¶ 15, at 6.  Goldstone, however, reassured the confidential sources that TMI's relationships with its lender banks "were fine."  Id. ¶ 131, at 38-39.  Also by July of 2007, the RPA market became an increasingly more costly source of financing as a result, in part, of a combination of declining asset values and the illiquidity in the ABCP market.  See id. ¶ 16, at 6.  After early July, TMI could not complete any securitization transaction "based on a lack of buyers in the marketplace."  Id.

On August 14, 2007, TMI advised the market that, because of liquidity concerns, it was exploring the potential sale of assets.  See id. ¶¶ 18, 135, 273-74, at 7, 40, 82.  TMI had, however,

_____

[4] Goldstone was also the Chief Executive Officer of TMI starting December 18, 2009.  See CCAC ¶ 59, at 17.

already begun a sale of assets by August 10, 2007.  See id. ¶¶ 18, 132, 134-35, 137-38, at 7, 39-40.

On August 20, 2007, TMI admitted that it had sold approximately thirty-five percent of its portfolio

-- $20,500,000,000.00 of its highest-rated mortgage-backed assets -- to meet margin calls on its RPA

agreements and to satisfy maturing ABCP obligations.  See id.  Furthermore, TMI had sold those

assets at a discount, approximately ninety-five percent of their face value.  See id.; id. ¶ 265(c), at

79.  TMI did not disclose that it owned MBSs which were backed by Alt-A collateral.  See id. ¶ 19,

at 7.

On August 14, 2007, the price of TMI common stock fell forty-three percent, from $13.81

per share to $7.89 per share.  See id. ¶ 20, at 7.  Also on that day, a substantial volume of shares --

27,293,100 -- were traded.  See id.  Allegedly based on a series of false and misleading statements,

TMI was able to obtain hundreds of millions of dollars in its securities offerings.  See id. ¶ 22, at 8.

Specifically, TMI made one stock offering in early September of 2007, in which it raised $500

million in sales, see id., and two offerings in January of 2008, which garnered an additional $212

million in total proceeds, see id.

Over the next few months, however, a series of disclosures by TMI caused the stock price

to fall dramatically.  On February 28, 2008, TMI announced in its 2007 Form 10-K Annual Report:

(i) that it was forced to meet over $300 million in margin calls under its RPAs; (ii) that it owned

$2,900,000,000.00 in MBSs that were backed by Alt-A collateral; and (iii) that the declining value

of its Alt-A-backed MBSs was to blame for the margin calls.  See id. ¶ 23, at 8.  On the same day,

TMI's common stock dropped in value fifteen percent, from $11.54 per share to $9.86 per share.

See id. ¶ 24, at 8.

On March 3, 2008, TMI disclosed via a press release that it had "been subject to additional

margin calls of approximately $270 million as of February 29, 2008,"[5] and that it was "currently in default with one RPA counterparty."  Id. ¶ 26, at 9; id. ¶ 171, at 48.  After this disclosure, TMI's stock price fell again.  Between February 29, 2008 and March 3, 2008, the price of TMI common stock decreased from $8.90 per share to $4.32 per share -- a drop of fifty-one percent.  See id. ¶ 28, at 9.  Over the course of those three days, investors traded 76,858,800 shares of TMI stock.  See id.

On March 5, 2008, TMI disclosed to its investors that the February 28, 2008 JP Morgan default had triggered cross-defaults in all of TMI's RPAs.  See id. ¶ 32, at 10.  On the same day, the price of TMI's common stock fell again, from $3.40 per share to $1.26 per share -- a 54.4% drop.  See id. ¶ 33, at 10.

On March 7, 2008, TMI disclosed to the public that it had received a letter from KPMG withdrawing KPMG's previous unqualified audit opinion, and further announced that it would restate its financial statements for 2007 -- but not for 2006.  See CCAC ¶ 35, at 11.  TMI stated that the restatement was necessary because of "a significant deterioration of prices of MBS[s], combined with a liquidity position under unprecedented pressure from increased margin calls[,] a portion of which [TMI] has been unable to meet."  CCAC ¶ 35, at 11 (alterations omitted).  Between March 7, 2008 and March 10, 2008, TMI's stock price fell another thirty-six percent, from $1.08 to $0.69, see id. ¶ 37, at 11-12, during which time 34,591,800 shares were traded, see id. ¶ 394, at 120.

2.     **TMI's Public Offerings and SEC Filings.**

The Plaintiffs allege that a number of the Defendants are strictly liable for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77(o), respectively.  See CCAC ¶ 40, at 12.  The allegations arise out of four stock offerings: (i) the May

---

[5] The year 2008 was a leap-year, so there was a February 29.

4, 2007 public offering of 4,500,000 shares of common stock at $27.05 per share, which resulted

in gross proceeds of $121.7 million; (ii) the June 19, 2007 public offering of 2,750,000 shares of

7.5% Series E Cumulative Convertible Redeemable Preferred Stock ("Series E Stock") at $25.00

per share, which resulted in gross proceeds of $68,800,000.00; (iii) the September 7, 2007 public

offering of 20,000,000 shares of 10% Series F Cumulative Convertible Redeemable Preferred Stock

("Series F Stock") at $25.00 per share, which resulted in gross proceeds of $500 million; and (iv) the

January 15, 2008 concurrent public offering of 8,000,000 shares of Series F Stock at $19.50 per

share, which resulted in gross proceeds of $156 million, and 7,000,000 shares of common stock at

$8.00 per share, which resulted in gross proceeds of $56,000,000.00.  See id.

## PROCEDURAL BACKGROUND

This proceeding is four cases that have been consolidated.  Kenneth Slater, manager of KT

Investments, LLC, filed the initial Complaint on August 21, 2007.  See Class Action Complaint,

filed August 21, 2007 (Doc. 1).  In that Complaint, Slater sought to assert class claims against TMI

for violations of the Exchange Act, but did not assert any claims under the Securities Act.  See Class

Action Complaint ¶¶ 101-117, at 33-38.  On February 8, 2008, pursuant to a stipulation, the Court

consolidated the action that Slater brought with several other actions -- namely, Snydman v.

Thornburg Mortgage, Inc., No. CIV 07-1025 JEC/RHS, Gonsalves v. Thornburg, No. CIV 07-1069

MV/WDS, and Smith v. Thornburg Mortgage, Inc., No. CIV 07-1115 MCA/RLP.  See Order

Consolidating Related Actions, Appointing Lead Plaintiff, and Approving Lead Plaintiff's Selection

of Lead Counsel and Liaison Counsel at 2-3, filed February 8, 2008 (Doc. 49).  At that same time,

the Court selected Lead Plaintiffs, named the firms of Schiffrin Barroway Topaz & Kessler, LLP

and Wolf Haldenstein Adler Freeman & Hertz, LLP, as Co-Lead Counsel, and named the Branch

Law Firm as Liaison Counsel.  See id. at 3.

On May 27, 2008, the Plaintiffs filed the CCAC, which alleged violations of the Securities Act and the Exchange Act.  The CCAC makes class-action allegations on behalf of a class defined as "all persons and entities who purchased or otherwise acquired TMI common stock and/or securities in the open market and/or in or traceable to the Offerings during the Class Period and who were damaged thereby," but excluding "the Defendants, the directors and officers of TMI, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest."  Id. ¶ 486-87, at 151.  In support of their Securities Act claims, the Plaintiffs allege that the offering documents for all four of TMI's public offerings were materially false and/or misleading because, inter alia: (i) they incorporated TMI's 2006 financial results which, as determined by KPMG, were materially false and required restatement; and (ii) they failed to disclose that TMI originated Alt-A mortgage loans and possessed a multi-billion-dollar MBS portfolio backed by Alt-A loans that, the Plaintiffs assert, exposed TMI to financial peril in the declining mortgage financing market.  See CCAC ¶ 48, at 15.

### 1.    The Motions to Dismiss.

On September 22, 2008, the Defendants filed a total of four motions to dismiss.  See Motion to Dismiss Consolidated Amended Complaint by Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Joseph H. Badal, Paul G. Decoff, Clarence D. Simmons, Anne-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman, filed September 22, 2008 (Doc. 126); Opposed Motion by May/June 2007 Underwriter Defendants to Dismiss Consolidated Class Action Complaint; Memorandum of Points and Authorities in Support Thereof, filed September 22, 2008 (Doc. 128); Opposed Motion to Dismiss of Underwriter Defendants UBS Securities LLC and Bear Stearns & Co., Inc., filed September 22, 2008 (Doc. 130); Motion of Friedman, Billings, Ramsey & Co., Inc. to Dismiss and

Memorandum of Points and Authorities in Support Thereof, filed September 22, 2008 (Doc. 132). These motions, in the aggregate, asked the Court to dismiss all claims against all Defendants. The Court held a hearing on all pending motions on April 22, 2009.

On May 1, 2009, TMI filed for a petition for voluntary Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Maryland. See Suggestion of Bankruptcy at 1, filed May 4, 2009 (Doc. 192); Voluntary Petition at 1 (dated May 1, 2009), filed May 4, 2009 (Doc. 192-2). The Suggestion of Bankruptcy asserted that the bankruptcy of TMI operated as an automatic stay of judicial proceedings against TMI under 11 U.S.C. §§ 362(a)(1) and 362(a)(3). See Suggestion of Bankruptcy at 1. Beginning on June 1, 2009, the Court filed a series of Minute Orders in which it asked the parties to keep it informed of the status of the pending bankruptcy proceedings and to give it recommendations whether the Court should continue work on the pending motions to dismiss. On November 16, 2009, after receiving a number of updates as to the status of the pending bankruptcy proceeding in Maryland, the Court issued another Minute Order informing the parties that it would continue work on the motions to dismiss as to the Defendants other than TMI. See Minute Order, filed November 16, 2009 (Doc. 224).

On January 27, 2010, the Court ruled -- to the extent possible -- on the Defendants' motions to dismiss. See Amended Memorandum Opinion and Order at 90, filed January 27, 2010 (Doc. 252); Memorandum Opinion and Order at 36, filed January 27, 2010 (Doc. 251). The Court reserved ruling on several claims against several Defendants because the pending Maryland bankruptcy proceeding stayed litigation with respect to TMI. See Memorandum Opinion and Order at 36 (Doc. 251). Several of the Plaintiffs' arguments about the motion to amend were based on the Court ruling on this motion before it ruled on the Defendants' motions to dismiss. Because the Court has already ruled on the motions to dismiss, it will not analyze those arguments in depth.

      2.      **Arguments on this Motion.**

On January 27, 2009, the Plaintiffs filed this motion for leave to amend the CCAC to add an additional representative plaintiff: Boilermakers Lodge 154 Retirement Plan ("Boilermakers Lodge"). See Motion at 2. The Plaintiffs point to an argument in the Defendants' motions to dismiss that the Plaintiffs lack standing to assert claims based on the September 2007 and January 2008 offerings because no representative plaintiff alleged to have purchased shares of TMI stock in those offerings. They assert that Boilermakers Lodge qualifies as a class member and that Boilermakers Lodge has standing to pursue claims related to the September 2007 offering. "Boilermakers (1) bought shares of Thornburg Series F preferred stock, on the date of the September 2007 Offering, at the Offering price, pursuant to the alleged misleading Offering Materials; and (2) purchased shares directly from FBR [Friedman, Billings, Ramsey & Co., Inc., an underwriter of the September 2007 offering]." Motion ¶ 5, at 4. See id. ¶ 9, at 6. The Plaintiffs insist that their motion demonstrates "that there are additional class members who have been directly harmed by Defendants' conduct and would be willing to serve as class representatives if called upon to do so." Id. They argue that rule 15(a) of the Federal Rules of Civil Procedure, which governs pretrial amendments to pleadings, says that leave to amend should be freely given when justice so requires, and that justice so requires in this case. See id. ¶¶ 6-8, at 5-6. The Plaintiffs contend that the addition of Boilermakers Lodge would not prejudice the Defendants, will not cause undue delay in this case, will protect some potential claimants from having their claims time-barred by the statute of limitations, is not made in bad faith or to cure any deficiency that could have been cured by previous amendment, and would not be futile. See id. ¶¶ 10-14, at 6-8.

The Defendants disagree on almost all fronts. See FBR's Opposition to Lead Plaintiffs' Opposed Motion for Leave to Amend Consolidated Class Action Complaint to Add Additional

Representative Plaintiff, filed February 13, 2009 (Doc. 172)("Response").[6]  They raised a plethora

of arguments against granting leave to amend: (i) judicial economy and the interest of justice will

be served by refusing to allow joinder of claims by plaintiffs who owned stock before any negative

facts about TMI were disclosed, and those who bought stock after some facts about TMI's tenuous

financial position became public;[7] (ii) the Plaintiffs unduly delayed in seeking the amendment, with

no explanation for the delay; (iii) the Defendants would be unduly prejudiced by the amendment

because they have just spent large amounts of attorneys fees litigating why the Plaintiffs' claims

relating to the September 2007 and January 2008 offerings should be dismissed for lack of a proper

representative plaintiff;[8] (iv) the Plaintiffs have already had an opportunity to cure this deficiency

by a prior amendment and did not do so; (v) the proposed amendment would be futile because the

Plaintiffs' claims will fail on the merits; (vi) seeking this amendment is a thinly veiled attempt to

circumvent the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA")

_____

    [6] All other interested Defendants, rather than filing their own responses in opposition, merely joined in the opposition of FBR.  See Joinder of May/June Underwriter Defendants in Opposition to Lead Plaintiffs' Motion for Leave to Amend the Consolidated Class Action Complaint to Add Additional Representative Plaintiff, filed February 13, 2009 (Doc. 173); The Thornburg Defendants' Joinder in FBR's Opposition to Lead Plaintiffs' Opposed Motion for Leave to Amend Consolidated Class Action Complaint to Add Additional Representative Plaintiff, filed February 13, 2009 (Doc. 174); Joinder of January 2008 Underwriter Defendants UBS Securities LLC and Bear, Stearns & Co. Inc. in Opposition to Lead Plaintiffs' Motion for Leave to Amend Complaint, filed February 17, 2009 (Doc. 175).

    [7] The Defendants draw a distinction between "original" investors -- those who bought TMI stock before TMI began disclosing facts about its tenuous financial position -- and "recapitalization" investors -- those who bought stock in public offerings wherein information about TMI's financial troubles was available.

    [8] The Defendants also assert that granting the Plaintiffs' motion would prejudice the Plaintiffs.  While that position is arguable -- and, indeed, the Plaintiffs argue to the contrary -- a party is free to make bad litigation decisions, and the Court does not feel compelled to deny the Plaintiffs' request solely because the Defendant asserts that it would be in the Plaintiffs' best interest to do so.

by appointing their own Lead Plaintiff, rather than doing so through the proper judicial appointment

process; and (vii) the September 2007 and January 2008 offerings are not of the "same transaction

or occurrence" as the May/June offerings, because they are "the inverse of those transactions," and

thus that Boilermakers Lodge is not properly joined under rule 20(a) of the Federal Rules of Civil

Procedure.  Response at 1-13.

## RELEVANT LAW REGARDING MOTIONS TO AMEND

Rule 15(a) of the Federal Rules of Civil Procedure provides:

> **(1)** ***Amending as a Matter of Course***.  A party may amend its pleading once as a
> matter of course within:
>
> > **(A)** 21 days after serving it, or
> >
> > **(B)** if the pleading is one to which a responsive pleading is required, 21 days
> > after service of a responsive pleading or 21 days after service of a motion
> > under Rule 12(b), (e), or (f), whichever is earlier.
>
> **(2)** ***Other Amendments***.  In all other cases, a party may amend its pleading only with
> the opposing part''s written consent or the court's leave.  The court should freely
> give leave when justice so requires.

Fed. R. Civ. P. 15(a) (bold and italics in original).

> Refusing leave to amend is generally only justified upon a showing of undue delay,
> undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure
> deficiencies by amendments previously allowed, or futility of amendment.  It is well
> settled in this circuit that untimeliness alone is a sufficient reason to deny leave to
> amend, especially when the party filing the motion has no adequate explanation for
> the delay.  Furthermore, where the party seeking amendment knows or should have
> known of the facts upon which the proposed amendment is based but fails to include
> them in the original complaint, the motion to amend is subject to denial.

Frank v. U.S. West, Inc., 3 F.3d 1357, 1365-66 (10th Cir. 1993)(internal citations, quotation marks,

and bracket omitted).  See Duncan v. Manager, Dep't of Safety, City & County of Denver, 397 F.3d

1300, 1315 (10th Cir. 2005)(quoting Frank v. U.S. West, Inc. and stating that resolving the issue

whether to allow a plaintiff to file a supplement to his complaint is "well within the discretion of the

district court"). "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" B.T. ex rel. G.T. v. Santa Fe Pub. Schs., No. CIV 05-1165 JB/RLP, 2007 WL 1306814, at *2 (D.N.M. Mar. 12, 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)). "Specifically, the . . . Tenth Circuit has determined that district courts should grant leave to amend when doing so would yield a meritorious claim." Burleson v. ENMR-Plateau Tel. Co-op., No. CIV 05-0073 JB/KBM, 2005 WL 3664299, at *2 (D.N.M. Sept. 23, 2005)(Browning, J.)(citing Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001)).

Although rule 15(a) provides that leave to amend shall be freely given, "the district court may deny leave to amend where amendment would be futile." Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Services, Inc., 175 F.3d 848, 859 (10th Cir. 1999). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." Bradley v. Val-Mejias, 379 F.3d 892, 901 (10th Cir. 2004)(citing Jefferson County Sch. Dist. v. Moody's Investor's Servs., 175 F.3d 848, 859 (10th Cir.1999). The United States Court of Appeals for the Tenth Circuit has not addressed how to treat a motion to amend to assert class claims when it is clear that the proposed amendment would fail as a matter of law at the class-certification stage. Some courts, when contemplating a motion to amend to add a class claim, have undertaken a preliminary rule 23 analysis, even though rule 15(a) does not mention such a layer of review. See Smith v. Transworld Sys., Inc., 953 F.2d 1025, 1033 (6th Cir. 1992)(upholding the district court's denial of plaintiff's motion to amend upon determining that the proposed amended complaint was "insufficient as a matter of law to satisfy the required prerequisites set out in Rule 23(a) necessary to maintain a class action."); Lymon v. Aramark Corp., No. CIV 08-0386 JB/DJS, 2009 WL 5220285, at *1, *7 (D.N.M. Dec. 12, 2009)(Browning, J.); Presser v. Key Food Stores Coop., Inc., 218 F.R.D. 53, 56

-14-

(E.D.N.Y. 2003)(stating that, when the motion to amend seeks to add a class claim, to determine whether the proposed amendment is futile, "it is necessary to evaluate the likelihood that [the] proposed class will be certified pursuant to Fed. R. Civ. P. 23.").  When conducting the analysis, these courts seem to apply a heightened rule 15 standard, because they incorporate a preliminary rule 23 evaluation into it, and a more lenient rule 23 analysis in assessing the futility of the amendment. See Presser v. Key Food Stores Coop., Inc., 218 F.R.D. at 57; Landgraff v. GEMB, No. 06-1703, 2007 U.S. Dist. LEXIS 26907, at **8-9 (E.D. Pa. Apr. 10, 2007).

Undue delay occurs where the plaintiff's amendments "make the complaint 'a moving target.'" Minter v. Prime Equip. Co., 451 F.3d 1196, 1206 (10th Cir. 2006)(quoting Viernow v. Euripides Dev. Corp., 157 F.3d 785, 799-800 (10th Cir. 1998)).  "A party who delays in seeking an amendment is acting contrary to the spirit of the rule and runs the risk of the court denying permission because of the passage of time." Minter v. Prime Equip. Co., 451 F.3d at 1205 (citation omitted).  The longer the delay, "the more likely the motion to amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend." Minter v. Prime Equip. Co., 451 F.3d at 1205 (citing Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004)).  Undue delay may also occur where a plaintiff was aware of all the information on which the proposed amendment is based before the filing of an earlier complaint.  See Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1027 (10th Cir. 1994)(noting motion to amend filed "was not based on new evidence unavailable at the time of the original filing").

## ANALYSIS

The Plaintiffs seek to amend the CCAC to add an additional representative plaintiff who purchased stock during the September 2007 offering.  The Defendants raise numerous objections

to amendment.  Because the Court finds that the policy of allowing plaintiffs to have all of their claims decided on the merits, rather than on procedural barriers, outweighs the Defendants' arguments to the contrary, the Court will allow the amendment.

I.   **THE POTENTIAL CONFLICTING INTERESTS OF THE CLASS MEMBERS IS AN ISSUE BETTER RAISED AT THE CLASS CERTIFICATION STAGE THAN IN RESPONSE TO A MOTION TO AMEND.**

The Defendants' first basis for asking the Court to deny the Plaintiffs' motion to amend is that to do so would not serve the interests of the class members, because "half of the plaintiffs were aware of the very information upon which the other half base their claims of omission."  Response at 1-2.  The Defendants refer to the fact that, over the course of the class period, the Defendants slowly began disclosing the information that the Plaintiffs allege was unlawfully withheld.[9]  See id. at 2.  The Plaintiffs respond that its core averment is that materially false and misleading statements and omissions harmed TMI investors, and that pointing out that there may be conflicts between the class members is an issue to be decided at the class-certification stage.  See Plaintiffs' Reply in Support of Its Opposed Motion for Leave to Amend Consolidated Class Action Complaint to Add Additional Representative Plaintiff, filed March 2, 2009 (Doc. 179)("Reply").

The Court substantially agrees with the Plaintiffs' argument.  The conduct by TMI that the Plaintiffs allege is a continuing course of conduct and the class definition is appropriate at this stage of the proceedings.  The Court is not reviewing the likelihood of the Plaintiffs' success at class certification, or on the merits, in deciding this motion.  That some class members may have differing interests from other class members is an issue better hashed out at the class-certification stage,

---

[9] The Defendants also raise the point that "the interests of the defendants are not served when they must defend themselves against two opposing and inconsistent actions, blurred together." Response at 2.  The Court will address undue prejudice to the Defendants in a later section.

where the Court will decide whether to certify the class, break the class into sub-classes, or deny certification.  See Rodriguez v. West Publ'g Corp., 563 F.3d 948, 959 (9th Cir. 2009); In re Cendent Corp. Litig., 264 F.3d 201, 244 (3d Cir. 2001); In re Alstom SA Sec. Litig., 253 F.R.D. 266, 277 (S.D.N.Y. 2008)("[A]ny future intra-class conflict relating to damages could be mitigated by certifying subclasses pursuant to Rule 23(c)(4)."); In re Honeywell Int'l Inc. Sec. Litig., 211 F.R.D. 255, 261-62 (D.N.J. 2002).

The United States Court of Appeals for the Sixth Circuit's opinion in Smith v. Transworld Systems, Inc. suggests that a court should do a preliminary rule 23 review when analyzing a motion to amend.  The Court, however, finds Smith v. Transworld Systems, Inc. to be fairly distinguishable from this case.  In Smith v. Transworld Systems, Inc., the Sixth Circuit was reviewing a district judge's decision to deny a motion to amend that sought to add class allegations to what had previously been a single-plaintiff complaint.  See 953 F.2d at 1027-28, 1032-33.  Lymon v. Aramark Corp., a recent case decided by this Court, and Smith v. Transworld Systems, Inc. are similar.  See 2009 WL 5220285, at **1-2.  In Lymon v. Aramark Corp. an inmate sought to amend his civil rights complaint to add class claims on behalf of a class of other inmates.  See id.  The Court denied the motion, finding that the case "presents a situation where it can be confident that, for a number of reasons, it will not allow the case to proceed as a class action."  Id., at *5.  In this case, however, the CCAC already makes class allegations that the Court finds to be at least colorable, and the Plaintiffs request only to add a representative plaintiff to address the Defendants' concern that the Plaintiffs might lack standing to bring claims related to the September 2007 offering.[10]  If there are issues

---

[10] At the hearing, Benjamin Sweet, attorney for the Plaintiffs, reemphasized that the Plaintiffs were not backing down from their position that they had standing to assert all of their claims against all of the Defendants, and it was only in "an abundance of caution" that they sought to add this additional representative plaintiff.  Transcript of Hearing at 140:7-141:4 (taken April 22,

between the so-called "original" and "capitalization" Plaintiffs, the Court may address that issue at the class-certification stage.

## II.      THE PLAINTIFFS DID NOT UNDULY DELAY IN SEEKING THIS AMENDMENT.

The Defendants' second argument is that the Plaintiffs unduly delayed in making this amendment.  See Response at 3.  They argue that the Plaintiffs should have known as of May 27, 2008 -- the day they filed the CCAC -- that they had added claims based on the various public offerings and therefore would need Lead Plaintiffs that had bought TMI stock during each of the offerings.  See Response at 3.  The Defendants point out that the Plaintiffs added Learch and Manning as Lead Plaintiffs, ostensibly because those individuals had bought stock during the May 2007 and June 2007 offerings.  See id.  Now, eight months later, the Defendants insist, the Plaintiffs' attempt to add a representative plaintiff who bought during the September 2007 offering is untimely. See id.

The Plaintiffs argue that the requested amendment will cause no undue delay.  See Reply at 7.  They insist that they only knew of the Defendants' standing argument, at earliest, on September 22, 2008, when the Defendants raised that argument in their motions to dismiss.  See Reply at 7-8.  Finally, they argue that the delay between September 2008 and the filing of this motion in January 2009 occurred because Plaintiffs' counsel was busy preparing responses to the Defendants' motions to dismiss, two of which were filed on September 22, 2008.  See Reply at 8-9.

The Court does not find that the Plaintiffs unduly delayed in moving for leave to amend in this case.  The Court agrees that the period between when the Defendants brought the issue of standing to the Plaintiffs' attention and the Plaintiffs' motion was four months, during which the

2009)(Sweet)("Tr.").

Plaintiffs' counsel were responding to motions to dismiss this case. In the Tenth Circuit, the untimeliness inquiry "focuses primarily on the reasons for the delay. [The Tenth Circuit has] held that denial of leave to amend is appropriate 'when the party filing the motion has no adequate explanation for the delay.'" Minter v. Prime Equipment Co., 451 F.3d at 1206. The Court finds the Plaintiffs' explanation adequate and that the delay for which the Plaintiffs' justifications do not account -- approximately five weeks -- is not "undue." Response at 8-9 ("The mere five-week period between the filing of Plaintiffs' opposition briefs and the motion for leave to amend, which encompassed the holiday season, can hardly be considered an 'undue delay' under Rule 15(a).").

## III.   THE PREJUDICE THAT THE DEFENDANTS ALLEGE IS A NATURAL RESULT OF ENGAGING IN VIGOROUS LITIGATION AND DOES NOT JUSTIFY DENIAL OF A MOTION TO AMEND.

The Defendants' second argument in opposition to amendment of the CCAC is that they would be prejudiced because they "have just completed the expenditure of tens of thousands of dollars litigating the issue of Lead Plaintiffs' standing on the basis of the allegations contained in the CCAC as well as the representations of Lead Plaintiffs' counsel" that the Lead Plaintiffs do not believe they need to add any additional plaintiffs to have standing to bring their claims. See Response at 6-7. The Plaintiffs respond that the Defendants' basis for alleging undue prejudice is "nonsensical," and that there would be no prejudice to the Defendants because "[t]he addition of Boilermakers . . . will raise no new factual issues." Reply at 9-10.[11]

_____

[11] The Defendants also assert that amendment at this stage would cause prejudice to the Plaintiffs. See Response at 7. The Tenth Circuit has not, however, instructed the Court to consider that factor. "Rule 15 . . . was designed to facilitate the amendment of pleadings except where prejudice to the opposing party would result." Minter v. Prime Equip. Co. 451 F.3d at 1207-08 (quoting United States v. Hougham, 364 U.S. 310, 316 (1960))(alterations in original, emphasis in original). The Court generally assumes that competent counsel are a better judge of their client's interests than the Court or opposing party's counsel, and will leave this factor for consideration at later stages of the class proceedings, when the Court has to be concerned about the interests of the

-19-

The Tenth Circuit, in <u>Minter v. Prime Equip. Co.</u>, expressed that undue prejudice to the non-moving party is the most important factor to consider in deciding whether to grant a motion for leave to amend. <u>See</u> 451 F.3d at 1207. In this case, the prejudice of which the Defendants object is that prejudice which is attendant to any litigation -- the payment of attorneys fees to litigate issues that might eventually become moot. The Court does not believe that, in the prejudice analysis, it should weigh heavily the Defendants' outlay of attorneys fees on litigating an alleged pleading deficiency that the Plaintiffs then seek to remedy. The Court will thus decline to deny the Plaintiffs' motion on the basis of undue prejudice to the Defendants.

## IV. THE PLAINTIFFS' PRIOR AMENDMENT WAS FOR THE PURPOSE OF CONSOLIDATION, NOT REMEDYING ALLEGED DEFECTS IN THEIR PLEADINGS.

Next, the Defendants argue that the Plaintiffs failed to cure the alleged deficiency by an amendment previously allowed when they filed the Complaint, at which point they knew or should have known that they would be asserting Securities Act claims and that they therefore might need representative plaintiffs who purchased stock from each of the relevant public offerings. <u>See</u> Response at 8.[12] They also argue that the Plaintiffs' motion to amend is inconsistent with the Plaintiffs' position that it has standing to assert all of the claims that it intends to bring against all

_____

class members in relation to their class counsel.

[12] The Defendants state:

As an initial matter, the Court should consider Lead Plaintiffs' "failure to cure deficiencies by amendments previously allowed," not consider, as Lead Plaintiffs imply, only Lead Plaintiffs' failure to cure deficiencies for which they have once before been granted leave to amend for the specific purpose of addressing that particular deficiency.

Response at 8.

of the Defendants.  See id.  The Plaintiffs respond that they could not have cured these alleged deficiencies by prior amendments because: (i) the Court has never found any standing deficiency; (ii) the Plaintiffs were unaware that the Defendants perceived that the CCAC was deficient before the Defendants' motions to dismiss; and (iii) any deficiency could not have existed before the amendment that added the Securities Act claims, because it is only with respect to those claims that the Defendants raise their standing argument.  See Reply at 10-11.

The Plaintiffs might have been able to foresee that adding their Securities Act claims might require additional representative plaintiffs who purchased at each of the relevant public offerings, and thus might have included those representative plaintiffs in the CCAC.  On the other hand, the Plaintiffs have presented authority for the proposition that they do not need a representative plaintiff for every one of the offerings about which they complain.  See Schwartz v. Celestial Seasonings, 178 F.R.D. 545, 554 n.4 (D. Colo. 1998); In re Enron Corp. Sec. Litig., 206 F.R.D. 427, 444-45 & n.10 (S.D. Tex. 2002)(stating that, when referring to the proposed Lead Plaintiffs, "there is no requirement that the claims of all plaintiffs and class members must be identical").  Under the Plaintiffs' view of the law, there was no defect in the CCAC, so they had no reason to amend it until the Defendants called their view of the law into question.  Now, after the Defendants filed their motions to dismiss and put a potential deficiency in the CCAC under the Court's scrutinizing gaze, the Plaintiffs seek to protect their suit by minimizing the impact of an adverse ruling on the standing issue.  The Plaintiffs' position is not internally inconsistent, nor did the Plaintiffs -- assuming they believed that the CCAC was adequate -- have any reason to make this particular amendment when drafting the CCAC.  The Court will not deny leave to amend on this basis.

**V.    THE PROPOSED AMENDMENT MIGHT NOT BE FUTILE BECAUSE THE COURT MIGHT FIND THAT HIS DISMISSAL OF THE PLAINTIFFS' CLAIMS WAS WITHOUT PREJUDICE.**

The Defendants also assert that this amendment would be futile.  Their argument appears to be that, because they will clearly win their motions to dismiss the Securities Act claims based on a lack of false or misleading statements, there is no reason to allow the amendment to rescue those claims on the issue of standing.  See Response at 8-10.  The Plaintiffs find this argument premature and presumptuous.  See Reply at 11-12.

"[T]he district court may deny leave to amend where amendment would be futile." Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc., 175 F.3d at 859.  "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal."  Bradley v. Val-Mejias, 379 F.3d at 901 (citing Jefferson County Sch. Dist. v. Moody's Investor's Servs., 175 F.3d at 859 (10th Cir. 1999)).

While the Defendants' confidence was apparently well-warranted -- the Court dismissed the Securities Act claims because it found that the Plaintiffs failed to properly plead any false or misleading statements -- the Court will not deny leave to amend based on futility.  The Court is currently entertaining a motion that asks whether the Plaintiffs will have an opportunity to move to replead their factual allegations after the Court's January 27, 2010 dismissal of many of the Plaintiffs' claims.  Because the Court might allow the Plaintiffs to move for such an amendment, the Court cannot now find that the amendment that this motion requests would be futile.

**VI.    BOILERMAKERS LODGE MAY BE AN ADEQUATE REPRESENTATIVE PLAINTIFF AND THE ONLY ONE THAT ANY PARTY HAS IDENTIFIED WHO HAS PURCHASED STOCK IN THE SEPTEMBER 2007 OFFERING.**

The Defendants next contention seems to conflate concepts under the PSLRA.  They appear to allege that the Plaintiffs are attempting to appoint a new Lead Plaintiff without going through the

necessary steps for such an appointment.  See Response at 10-11.  The Defendants argue that the "Lead Plaintiffs themselves have now selected and are essentially attempting to appoint their own Lead Plaintiff for the second lawsuit that they have improperly appended to the original action." Response at 10-11.  The Motion, however, asks only that the Court add Boilermakers Lodge as a new representative plaintiff, not a new Lead Plaintiff.  See Motion 1, 8.[13]

The requirements for representative plaintiffs are found in 15 U.S.C. § 78u-4(a)(2)(A), which demands that "[e]ach plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint . . . ."  15 U.S.C. § 78u-4(a)(2)(A).[14]  Boilermakers Lodge, through its Trustee, Raymond Ventrone, swore out such an affidavit, and the Plaintiffs included it with their motion.  See Certification of Boilermakers Lodge 154 Retirement Plan Pursuant to Federal Securities Law at 2, filed January 27, 2009 (Doc. 161-4).  The Defendants are free to dispute Boilermakers Lodge's adequacy to represent other class members if and when the Plaintiffs move for class certification. The Court will therefore not deny the Plaintiffs' motion for leave to amend based on the Defendants'

---

[13] The Court believes that the Defendants must be assuming that they will eventually succeed at having the present class split into two subclasses, each requiring a Lead Plaintiff, and because Boilermakers Lodge will be the only representative plaintiff from the subclass into which they will be split, Boilermakers Lodge will need to be appointed the Lead Plaintiff of that subclass.  The Court appreciates the Defendants' confidence that it will be successful at every turn, even if this assumption is slightly at odds with the assumption that it will win its motion to dismiss the Securities Act claims.  The Court does not, however, believe that it should prohibit the addition of a representative plaintiff based on the potentiality that the new representative plaintiff will eventually be the Lead Plaintiff -- and, it is argued, the inadequate Lead Plaintiff -- of a subclass that does not yet exist.  The Court will therefore decline to deny the motion for leave to amend on that basis.

[14] The requirements for appointment of a Lead Plaintiff is found in 15 U.S.C. § 78u-4(a)(3), and is unrelated to the determination of which members of the plaintiff class shall be representative plaintiffs.  As such, the provisions related to appointment of a Lead Plaintiff are not at issue in this motion.

PSLRA argument.

## VII.    **ALL PARTIES ARE PROPERLY JOINED UNDER RULE 20(a).**

The Defendants' final argument asserts that "[t]he recapitalization offerings . . . are not part of the same transaction as the May/June offerings, but are, rather, the inverse of those transactions." Response at 13.  The Defendants thus conclude that neither the underwriters responsible for the September 2007 and January 2008 offerings, nor Boilermakers Lodge, are properly joined under rule 20(a).  See Response at 13.  While the Court does not completely understand what the Defendants mean when they say that one transaction is the inverse of another, it understands the minimal requirements for party joinder under rule 20(a).  Such joinder requires only (i) that the claims by or against the party to be joined arise from the same transaction, occurrence, or series of transactions or occurrences underlying the claims by or against the party with which it seeks to join; and (ii) the claims by or against the party to be joined share at lease one question of law or fact with the claims by or against the party with which it seeks to join.  See Fed. R. Civ. P. 20(a).  The series of public offerings using the same core of offering materials appears to constitute a series of transactions or occurrences that will share the common issue whether those materials contain false or misleading statements.  The Court finds that the parties would all be properly joined after the proposed amendment.  The Court will therefore grant the Plaintiffs' motion for leave to amend to add Boilermakers Lodge as a representative plaintiff in this case.

**IT IS ORDERED** that the Plaintiffs' Opposed Motion for Leave to Amend Consolidated Class Action Complaint to Add Additional Representative Plaintiff is granted.

_____
UNITED STATES DISTRICT JUDGE

-24-

*Counsel*:

Frederick S. Fox
Aviah Cohen Pierson
Kaplan Fox & Kilsheimer
New York, New York

-- and --

Richard A. Lockridge
Nathan D. Prosser
Karen H. Riebel
Lockridge Gindal Nauen & Holstein
Minneapolis, Minnesota

-- and –

Nancy Kaboolian
Abbey Spanier Rodd Abrams & Paradis, LLP
New York, New York

-- and --

Curtis V. Trinko
Law Offices of Curtis V. Trinko, LLP
New York, New York

-- and --

Evan J. Smith
Brodsky & Smith, L.L.C.
Mineola, New York

-- and --

David R. Scott
Scott & Scott, LLC
Colchester, Connecticut

-- and --

Arthur Shingler, III
Scott & Scott, LLP
San Diego, California

-- and –

Charlotte Itoh
Cody Kelley
Kelley Law Offices
Albuquerque, New Mexico

-- and --

Shane C. Youtz
Albuquerque, New Mexico

-- and --

Turner W. Branch
Branch Law Firm
Albuquerque, New Mexico

-- and –

Fred T. Isquith
Rachel S. Poplock
Martin E. Restituyo
Gregory Nespole
Wolf Haldenstein Adler Freeman & Herz, LLP
New York, New York

-- and --

Francis M. Gregorek
Rachele R. Rickert
Patrick Moran
Betsy C. Manifold
Wolf Haldenstein Adler Freeman & Herz, LLP
San Diego, California

-- and --

Andrew Zivitz
Benjamin Sweet
Michelle Newcomer
Richard Russo, Jr.
Sean M. Handler
Stewart L. Berman
D. Seamus Kaskela
Barroway Topaz Kessler Meltzer & Check, LLP
Radnor, Pennsylvania

   *Attorneys for the Plaintiffs*

Amy L. Neuhardt
Boies, Schiller & Flexner, LLP
Washington, D.C.

-- and --

Philip C. Korologos
Boies, Schiller & Flexner, LLP
New York, New York

   *Attorneys for Defendants Garrett Thornburg, Anne-Drue M. Anderson, David A. Ater,*
   *Joseph H. Badal, Eliot R. Cutler, Ike Kalangis, Francis I. Mullin, III, Stuart C.*
   *Sherman, and Paul G. Decoff*

Donald L. Flexner
Boies, Schiller & Flexner, LLP
New York, New York

   *Attorney for Defendants Garrett Thornburg, Anne-Drue M. Anderson, David A. Ater,*
   *Eliot R. Cutler, Ike Kalangis, and Francis I. Mullin, III*

Frank T. Herdman
Rubin Katz Law Firm, P.C.
Santa Fe, New Mexico

-- and --

William H. Forman
Scheper Kim & Overland, LLP
Los Angeles, California

>    *Attorneys for Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Clarence G. Simmons, Anne-Drue M. Anderson, David A. Ater, Joseph H. Badal, Eliot R. Cutler, Michael B. Jeffers, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, III, and Stuart C. Sherman*

David F. Cunningham
Thompson, Hickey, Cunningham, Clow & April, P.A.
Santa Fe, New Mexico

>    *Attorney for Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Clarence G. Simmons, Anne-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, and Francis I. Mullin, III*

Clinton W. Marrs
Tax, Estate & Business Law, N.A., LLC
Albuquerque, New Mexico

>    *Attorney for Defendants Larry A. Goldstone and Clarence G. Simmons*

Robert Badal
Wilmer Cutler Pickering Hale and Dorr, LLP
Los Angeles, California

>    *Attorney for Defendants Thornburg Mortgage, Inc., Larry A. Goldstone, Clarence G. Simmons, Michael B. Jeffers, and Owen M. Lopez*

Joseph Goldberg
David A. Freedman
David H. Urias
Freedman Boyd Hollander Goldberg Ices & Duncan, P.A.

>    *Attorneys for Defendants Joseph H. Badal, Paul Decoff, Michael Jeffers, Owen Lopez, and Stuart Sherman*

Joel Sher
Shapiro Sher Guinot & Sandler
Baltimore, Maryland

-- and --

Mary R. Jenke
Walsh Anderson Brown Aldridge & Gallegos
Albuquerque, New Mexico

    *Attorneys for Thornburg Mortgage, Inc.*

Clifford K. Atkinson
John Thal
Atkinson & Thal, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendants AG Edwards & Sons, Inc., BB&T Capital Markets, UBS*
       *Securities, Citigroup Global Markets Inc., Friedman, Billings, Ramsey & Co.,*
       *Oppenheimer & Company, Inc., RBC Dain Rauscher Corp., Stifel, Nicolaus &*
       *Company, Inc., and Bear Stearns & Co.*

Jonathan C. Dickey
Gibson, Dunn & Crutcher, LLP
New York, New York

-- and --

Dean J. Kitchens
Lindsay R. Pennington
Gibson, Dunn & Crutcher, LLP
Los Angeles, California

    *Attorneys for Defendants AG Edwards & Sons, Inc., BB&T Capital Markets, Citigroup*
       *Global Markets Inc., Oppenheimer & Company, Inc., RBC Dain Rauscher Corp., and*
       *Stifel, Nicolaus & Company, Inc.*

David Bohan
David Stagman
Katten Muchin Rosenman, LLP
Chicago, Illinois

    *Attorneys for Defendants UBS Securities and Bear Stearns & Co.*

William Pittard
Williams & Connolly, LLP
Washington, D.C.

    *Attorney for Defendant Friedman, Billings, Ramsey & Co.*