## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

IN RE THORNBURG MORTGAGE, INC.
SECURITIES LITIGATION

NO. CIV 07-0815 JB/WDS

## <u>MEMORANDUM OPINION</u>[1]

**THIS MATTER** comes before the Court on the Plaintiff's Omnibus Motion of (i) Leave to

Amend the Consolidated Class Action Complaint and (ii) For Reconsideration of the Court's

January 27, 2010 Memorandum Opinion and Orders Granting in Part and Denying in Part

Defendant's Motions to Dismiss the Consolidated Amended Complaint, filed July 9, 2010 (Doc.

309)("Motion").  The Court held a hearing on November 3, 2010.  The primary issues are: (i)

whether the Court should reconsider the Defendants' disclosure obligations under the abstain-or-

disclose doctrine and Item 303 of Regulation S-K, 17 C.F.R. § 229.303; (ii) whether the Court

should reconsider its decision that Defendant Thornburg Mortgage, Inc.'s ("TMI's") 2007 Form 10-

K Report was not actionable; (iii) whether the Court should reconsider its decision that certain of

the Defendants' statement were inactionable puffery; (iv) whether the Court should reconsider

dismissing the Plaintiffs' claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

against Defendants Garrett Thornburg and Joseph H. Badal; (v) whether the Court should reconsider

reserving ruling on the dismissal of the Plaintiffs' claims under Sections 20(a) of the Exchange Act,

15 U.S.C. § 78t(a), against Defendants Larry A. Goldstone, Clarence D. Simmons, and Paul G.

---

[1] Consistent with the Court's Order, filed March 31, 2011 (Doc. 357), granting in part and
denying in part the Plaintiff's Omnibus Motion of (i) Leave to Amend the Consolidated Class
Action Complaint and (ii) For Reconsideration of the Court's January 27, 2010 Memorandum
Opinion and Orders Granting in Part and Denying in Part Defendant's Motions to Dismiss the
Consolidated Amended Complaint, filed July 9, 2010 (Doc. 309), the Court now enters this opinion
fully detailing its rationale for this decision.

Decoff; and (vi) whether the Court should give the Plaintiffs leave to file their Second Amended Complaint ("SAC"), which is attached to their Motion. See Doc. 309-1. After carefully considering the parties' arguments, the Court concludes that: (i) it will reconsider the Defendants' disclosure obligations under the abstain-or-disclose doctrine and Item 303, but that the Defendants' disclosure duties thereunder do not alter that Court's holdings; (ii) the Court will not change its decision that TMI's 2007 Form 10-K was not actionable, because the Plaintiffs present no new law or facts to support their request for a different decision on this matter; (iii) the Court will not alter its decision that certain of the Defendants' statements were inactionable puffery, because the Plaintiffs again present no new law or facts to support their request for a different decision on this matter; (iv) the Court will not change its decision dismissing the Plaintiffs' Section 10(b) claims against Thornburg and Badal, because the disclosure duties under the abstain-or-disclose rule and Item 303 do not alter the Court's analysis; (v) the Court will reconsider reserving ruling on the dismissal of the Plaintiffs' Section 20(a) claims against Goldstone, Simmons, and Decoff, dismissing the Plaintiffs' claims against Decoff, but not dismissing the Plaintiffs' claims against Goldstone and Simmons; and (vi) the Court grants the Plaintiffs' leave to file their SAC, because the SAC cures deficiencies in the Plaintiffs' allegations establishing Section 20(a) liability against Thornburg.

## **FACTUAL BACKGROUND**[2]

The Plaintiffs' Consolidated Class Action Complaint, filed May 27, 2008 (Doc. 68)("CCAC") and SAC, describe a series of public statements and filings dating back to early 2006 that the Plaintiffs assert contain fraudulent material misrepresentations. The Plaintiffs also contend

---

[2] The Court recites herein only the facts relevant to the disposition of these motions. The Court's Memorandum Opinion and Order, filed January 27, 2010 (Doc. 249), sets forth a more in-depth review of the case's facts.

that the Defendants' public statements and filings contain material omissions.  The Court draws the following statement of facts from the well-pleaded, non-conclusory allegations of the CCAC, as the Court must when deciding or reconsidering a motion to dismiss filed under rule 12(b)(6) of the Federal Rules of Civil Procedure.  Where relevant, the Court includes information from TMI's Securities and Exchange Commission ("SEC") filings to which Plaintiffs refer in their CACC.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[C]ourts must consider the complaint in its entirety, as well as other sources . . . , in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."); Litwin v. Blackstone Group, L.P., 634 F.3d 706, 708 (2d Cir. 2011)("[W]e include information from [SEC] filings by the Blackstone Group, L.P. . . . to which plaintiffs refer in their complaint, particularly the Form S–1 Registration Statement . . . and Prospectus filed by Blackstone in connection with its June 21, 2007 initial public offering . . . ."); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007)("[W]e may consider . . . legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

1.     **The Parties.**

This consolidated action is brought by Lead Plaintiffs (i) W. Allen Gage, individually and on behalf of J. David Wrather; (ii) Harry Rhodes; (iii) FFF Investments, LLC; (iv) Robert Ippolito, individually and as Trustee for the Family Limited Partnership Trust; (v) Nicholas F. Aldrich, Sr., individually and on behalf of the Aldrich Family; (vi) Betty L. Manning; (vii) John Learch; and (viii) Boilermakers Lodge 154 Retirement Plan ("Boilermakers Lodge") (collectively "the

Plaintiffs"). The Plaintiffs all purchased shares of TMI stock during the Class Period[3] at prices that they allege were artificially inflated. They assert that they were damaged as a result of these inflated-price purchases. See CCAC ¶ 53, at 15-16. Manning acquired 550 shares of TMI common stock during the May 2007 Offering. See CCAC ¶ 54, at 16. She bought them on May 4, 2007 and paid $27.05 per share. See CCAC ¶ 54, at 16. Learch, as trustee for the Learch trust, acquired 400 shares of 7.5% Series E Cumulative Convertible Redeemable Preferred Stock in the June 2007 Offering. See CCAC ¶ 55, at 16. He bought his shares on June 19, 2007 and paid $25.00 per share. See CCAC ¶ 55, at 16. Boilermakers Lodge purchased TMI stock during the September 2007 Offering. See Plaintiffs' Opposed Motion for Leave to Amend Consolidated Class Action Complaint to Add Additional Representative Plaintiff ¶ 5, at 4, filed January 27, 2009 (Doc. 160). No particular Plaintiff alleges to have purchased any TMI stock in the January 2008 offerings.

TMI, a Defendant whose securities are at the heart of this action, is a publicly traded residential-mortgage lender that represents that it focuses primarily on the "jumbo" and "super-jumbo" segment, i.e., loans totaling over $417,000.00, of the adjustable-rate mortgage ("ARM") market.[4] CCAC ¶ 5, at 2. In essence, TMI generates business by loaning and borrowing money, and charging a higher interest rate on the money that it loans to others than its sources charge it on the money that it borrows. See CCAC ¶ 5, at 2-3. As the Plaintiffs put it, "[TMI] generates income from the small, net spread between the interest income it earns on its assets and the cost of its borrowings." CCAC ¶ 5, at 2-3. TMI was formed under the laws of the State of Maryland and has

---

[3] The proposed Class Period is from April 19, 2007 to March 19, 2008, inclusive.

[4] An adjustable-rate mortgage is "[a] mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index." Black's Law Dictionary 1102 (9th ed. 2009).

its principal place of business in Santa Fe, New Mexico.  <u>See</u> CCAC ¶ 57, at 16.  At all relevant times, TMI's securities have been traded on the New York Stock Exchange ("NYSE") under the symbol "TMA."  CCAC ¶ 57, at 16.  For federal income tax purposes, TMI is classified as a Real Estate Investment Trust.

There are nine Defendants who underwrote TMI's public offerings: (i) AG Edwards & Sons, Inc.; (ii) BB&T Capital Markets; (iii) UBS Securities, LLC; (iv) Citigroup Global Markets, Inc.; (v) Friedman, Billings, Ramsey & Co., Inc. ("FBR"); (vi) Oppenheimer & Company, Inc.; (vii) RBC Dain Rauscher Corp.; (viii) Stifel, Nicolaus & Company, Inc. ("SNC"); and (ix) Bear, Stearns & Co., Inc.  The Court will refer to them as "the Underwriter Defendants."  These Defendants are all underwriters of TMI's public offerings -- in other words, these Defendants each bought TMI stock and sold that stock to other investors, implementing TMI's public offerings.  Citibank, AG Edwards, and SNC underwrote the May 2007 offering, <u>see</u> CCAC ¶ 532, at 163; SNC, AG Edwards, RBC, BB&T, and Oppenheimer underwrote the June 2007 offering, <u>see</u> CCAC ¶ 535, at 164; FBR underwrote the September 2007 offering, <u>see</u> CCAC ¶ 538, at 164; and FBR, UBS, Bear Stearns, and SNC all underwrote the February 2008 offering, <u>see</u> CCAC ¶ 541, at 165.

There are also twelve individuals named as Defendants in this action.  Thornburg was TMI's founder.  <u>See</u> CCAC ¶ 58, at 17.  At all relevant times, he served as Chairman of the Board of Directors and, until December 18, 2007, acted as Chief Executive Officer.  <u>See id.</u>  Goldstone has served as President, Chief Operating Officer, and a director since June 1993.  <u>See id.</u> ¶ 59, at 17.  Goldstone became CEO on December 18, 2007.  <u>See id.</u>  Badal served as a director, the Chief Lending Officer, and Executive Vice President until his retirement on December 31, 2007.  <u>See id.</u> ¶ 60, at 17.  Decoff has served as Senior Executive Vice President and Chief Lending Officer since January 1, 2008.  <u>See id.</u> ¶ 61, at 17.  Simmons has served as Senior Executive Vice President since

March 2005, and Chief Financial Officer since April 2005.  See id. ¶ 62, at 17-18. The Court will refer to these Defendants -- TMI, Thornburg, Goldstone, Simmons, Badal, and Decoff -- as "the Individual Defendants."  The CCAC describes the remaining individual Defendants, Anderson, Ater, Cutler, Kalangis, Lopez, Mullin and Sherman ("the Director Defendants") only as directors during the Class Period.  See CCAC ¶¶ 522-28, at 162-63.  When discussing all Defendants, the Court will refer to them collectively as "the Defendants."

### 2.    **The Claims.**

This federal-securities class action sets forth claims under the Securities Act of 1933, 15 U.S.C. §§ 77a to 77aa ("Securities Act") and under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a to 78oo ("Exchange Act").  The Plaintiffs allege that "certain defendants acted knowingly or with recklessness in issuing materially false or misleading statements and/or failing to disclose facts concerning [TMI]'s business and financial condition between April 19, 2007 and March 19, 2008, inclusive."  CCAC ¶ 2, at 1-2.  Thus, the Plaintiffs assert, the Defendants are liable for violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77(o), respectively.  The Plaintiffs assert that the Underwriter Defendants are liable for violations of Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77(o).  See CCAC ¶¶ 598-620, at 181-86.

### 3.    **The Condition of the Housing Market in 2006-2007.**

In 2006 and 2007, real-estate values began to falter, resulting in an increased rate of mortgage defaults.  See CCAC ¶¶ 92-93, 96, at 27-29.  As a result, by early 2007, the market for Alt-

A[5] mortgages, mortgage-backed securities ("MBSs"),[6] and asset-backed commercial paper ("ABCP")[7] shrunk.  See CCAC ¶¶ 100-03, at 30-31.  The result, according to the Plaintiffs, was three-fold: (i) reduced demand for Alt-A MBSs; (ii) increased cost of obtaining capital; and (iii) decreased revenues from ARM mortgages.  See Plaintiffs' Opposition to Defendants' Motion to Dismiss Consolidated Amended Complaint Filed by Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Joseph H. Badal, Paul G. Decoff, Clarence D. Simmons, Anne-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangus, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman at 7, filed December 22, 2008 (Docs. 154, 155, 156, 157)("1934 Act Response")(citing CCAC ¶¶ 13, 129-33, at 5, 38-39).  Large mortgage lenders began to announce staggering losses coupled with a bleak outlook for the future.  See CCAC ¶¶ 13, 96-103, at 5, 29-31.  TMI, however, continued to deny that the deteriorating mortgage market was affecting it, appearing to report that its superior underwriting standards insulated it from such effects.  See CCAC ¶¶ 79, 213-14, at 24, 63.

### 4.    **Problems for TMI.**

According to the Plaintiffs, to show profitability, TMI must continuously increase the totals

---

[5] The Plaintiffs define Alt-A loans as "mortgage loans to borrowers who do not qualify for a conventional, prime mortgage loan."  CCAC ¶ 97, at 29.

[6] The Plaintiffs describe MBSs as "a series of fixed-income assets that [a]re bundled and sold as securities."  CCAC ¶ 12, at 5.

[7] The CCAC does not appear to define this term.  The phrase refers to "[a]n instrument, other than cash, for the payment of money," Black's Law Dictionary 1220 (9th ed. 2009), that is secured by some asset, see Investopedia.com Financial Dictionary, Asset-Backed Commercial Paper (ABCP), http://www.investopedia.com/terms/a/asset_backed_commercial_paper.asp (last visited January 14, 2010)("A short-term investment vehicle [that] is typically issued by a bank or other financial institution.  The notes are backed by physical assets such as trade receivables, and are generally used for short-term financing needs.").

on its balance sheet by buying and originating mortgage-backed assets.  <u>See</u> CCAC ¶ 5, at 3.  This

business model requires TMI to have continuous access to capital.  <u>See</u> CCAC ¶ 5, at 3.  TMI has,

historically, acquired capital through public offerings of its securities, short-term borrowings --

including reverse repurchase agreements ("RPAs")[8] -- the issuance of asset-backed commercial

paper ("ABCP"), and the issuance of collateralized-debt obligations ("CDOs").[9]  <u>See</u> CCAC ¶ 6, at

3.  TMI was "heavily leveraged" -- meaning that it borrowed a large amount of money compared

to the amount of money available to it.  For example, depository banks are subject to Federal

Reserve rules, which mandate ten percent cash reserves -- for every $10.00 of money that the bank

lends to outside sources, it must retain $1.00 of actual cash available at all times.  <u>See</u> CCAC ¶ 7,

at 3.  TMI's internal policy allows it to borrow $12.50 for every $1.00 it holds in equity -- an eight-

percent equity-reserve position.  <u>See</u> CCAC ¶ 7, at 3.  Throughout the Class Period, beginning in

---

[8] The Plaintiffs describe a reverse repurchase agreements as follows:

> RPAs involve a simultaneous sale of pledged securities to a lender at an agreed-upon
> price in return for an agreement to repurchase the same securities at a future date (the
> maturity of the borrowing) at a higher price.  Most RPAs, including the mortgage
> backed security RPAs that TMI entered into during the Class Period, could require
> the borrower (in this case TMI) to post additional collateral should the value of the
> original collateral decline.

CCAC ¶ 74, at 22.

[9] CDOs, also referred to as collateralized mortgage debt, are:

> a form of long-term, non-recourse financing, issued by trusts and secured by ARM
> Loans originated or purchased by TMI.  CDOs are constructed from a portfolio of
> fixed income assets and divide the credit risk among different tranches: senior
> tranches (rated "AAA"), mezzanine tranches ("AA" to "BB"), and equity tranches
> (unrated).  Losses are applied in reverse order of seniority, so junior tranches offer
> higher coupons (interest rates) to compensate for the added risk.

CCAC ¶ 75, at 22.

December 2006, analysts asked TMI whether its limited equity provided sufficient insurance against a real-estate market downturn.  See CCAC ¶ 82, at 24.

In the face of this inquiry, TMI recognized the potential risk of the real-estate market going south, but repeatedly reassured analysts and its investors that its liquidity position -- its ability to satisfy debt obligations as they arise -- was not at risk.  See CCAC ¶¶ 7, 82, at 3, 24-25.  As late as July 20, 2007, TMI reported that its unencumbered assets securing its highly leveraged financing were at their highest level "in the history of the organization."  CCAC ¶ 7, at 3.

> From a leverage perspective, our adjusted equity to asset ratio was 8.19%, up from 8.01% in the first quarter, so we did deleverage a little bit during the quarter, and my suspicion is that we will deleverage a little bit further as we move -- as we go through the second quarter.  We are a little bit nervous about the liquidity issues and the skittishness in the mortgage market, and this might just be an environment to be a little bit more cautious and a little more prudent.

> *However, our unencumbered asset portfolio continues to be very, very strong. That number is, I think we have closed the quarter with the highest level of unencumbered assets in the history of the organization, $1.6 billion of unencumbered assets, so we have plenty of liquidity* as our hedge strategy, our duration management and interest rate risk strategy, and the high credit quality of our portfolio performs as we would have expected it to perform.

CCAC ¶ 83, at 25 (emphasis in CCAC).

TMI repeatedly stated in its filings with the SEC that its focus was to acquire and originate high quality, highly liquid mortgage assets such that sufficient assets could be readily converted to cash, if necessary, to meet its financial obligations.  See CCAC ¶ 9, at 4.  The Defendants -- or, at least Goldstone -- stated throughout the Class Period that TMI was "exclusively" focused on the "prime" loan mortgage market, which is characterized by loans made to borrowers with a credit score above 620, a debt-to-income ratio no greater than seventy-five percent, and a combined loan-to-value ratio of ninety percent.  CCAC ¶ 10, at 4.

TMI's highest-ranking executives repeatedly denied that TMI originated lower-quality

"subprime"[10] or Alt-A loans, and, as a result, represented that TMI's asset base and earnings potential were not financially exposed to the decline in the subprime and Alt-A mortgage markets. CCAC ¶ 11, at 4. "Alt-A loans are 'alternatives' to the gold standard of conforming, GSE-backed mortgages. Often an Alt-A borrower is unable to provide the proof of income or the verification of assets necessary to obtain a prime mortgage, but has a satisfactory credit score, or vice versa." CCAC ¶ 98, at 29. "In other words, Alt-A or 'alternative' loans are associated with and defined by a higher level of risk than prime loans due to a borrower's inability to provide these fundamental guarantees." CCAC ¶ 98, at 29. See CCAC ¶ 11, at 4. TMI's multi-billion dollar asset portfolio during the Class Period was comprised of various mortgage-related assets. See CCAC ¶ 12, at 4. TMI's mortgage-based holdings include both loans it originates, and loans it acquires or purchases. See CCAC ¶ 12, at 4-5. TMI also purchased MBSs, which it frequently posted as the collateral under its many short-term borrowing agreements. See CCAC ¶ 12, at 4-5. TMI would originate loans, securitize them, and sell off interests in the securitized assets to obtain additional financing. See CCAC ¶ 12, at 4-5.

In 2006 and 2007, as the markets for subprime and Alt-A mortgages began to decline, and subprime and Alt-A borrowers began to default with increased frequency, many mortgage lenders, such as Countrywide, announced that they were experiencing serious financial and operational problems. See CCAC ¶ 13, at 5. The Defendants insisted, however, that TMI's stringent underwriting standards and "high quality" assets insulated it from the market downturn, and, in fact,

---

[10] The Plaintiffs define "subprime" loans as mortgage loans to individuals with credit scores that would otherwise disqualify them from receiving a conforming mortgage loan. "Loans made to such individuals were termed 'subprime' mortgages. Because the borrowers' low credit scores made subprime loans riskier investments, lenders generally charged subprime borrowers higher interest rates." CCAC ¶ 89, at 26-27.

positioned TMI to benefit from the economic environment.  CCAC ¶ 13, at 5.  As early as April 2007, however, TMI acknowledged burgeoning concerns with the Alt-A mortgage market, but assured its investors that TMI was different than the typical mortgage company and, thus, shareholders' investments in TMI were safe.  See CCAC ¶ 13, at 5.  Notwithstanding the Defendants' repeated representations that TMI's focus is on originating prime -- rather than subprime or Alt-A -- loans, several confidential witnesses with direct knowledge of TMI's internal practices state that TMI originated Alt-A loans during the Class Period.[11]  See CCAC ¶ 14, at 5-6.

During the Class Period, the inclusion of Alt-A assets in TMI's investment portfolio was adversely affecting its balance sheet by: (i) being illiquid/non-salable; and (ii) declining in value,

---

[11] A number of courts have determined that, subsequent to the Supreme Court of the United States' opinion in Tellabs, Inc. v. Makor Issues & Rights, Ltd., district courts should discount the statements of confidential sources in determining whether plaintiffs have shown a strong inference of scienter, as securities-fraud claims require.  See Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Group, Inc., 537 F.3d 527, 535 (5th Cir. 2008)("Following Tellabs, courts must discount allegations from confidential sources.  Such sources afford no basis for drawing the plausible competing inferences required by Tellabs."); Higginbotham v. Baxter Int'l Inc., 495 F.3d 753, 756-57 (7th Cir. 2007)("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist."). On the other hand, other courts have concluded that the discount might not be particularly steep where, as in this case, the informant's information is sufficiently detailed and details of the informant's position, if not his or her true identity, are revealed.  See Inst. Investors Group v. Avaya, Inc., 564 F.3d 242, 263 (3d Cir. 2009). The Court agrees with the United States Court of Appeals for the Third Circuit's practice in Inst. Investors Group v. Avaya, Inc.  The Court does not believe it is prudent to completely ignore the anonymous-source information.  When a complaint is filed, a court has no way of knowing whether even named witnesses have axes to grind, are lying, and/or exist; indeed, the Court has to assume what named witnesses say is true when ruling on a motion to dismiss.  Nevertheless, the Court will decide what weight to give such statements based upon the information the Plaintiffs give about the source and the detail of the information. The Court will therefore consider the informant's anonymity, but will also consider the CCAC's detail regarding the basis of the informant's knowledge and the knowledge itself.

which triggered margin calls[12] from RPA counter-parties on RPAs in which the Alt-A assets were being held as collateral.  See CCAC ¶ 15, at 6.  Nevertheless, on June 6, 2007, Goldstone stated, during a North America REIT's Investor Forum, that TMI occupied a niche in the mortgage-finance market, focusing "exclusively on prime mortgage loan originations, as opposed to subprime." CCAC ¶ 76, at 22-23.  He further stated:

> [U]nderwriting a $100,000 loan and underwriting a $1 million loan is essentially the same process.  So if you can spread your underwriting costs over a $1 million loan as opposed to over a $100,000 loan, you've got a more profitable transaction . . . .  [TMI] actually spend[s] more money than most people in the industry on underwriting loans [to] get the credit quality and the portfolio correct, [and] to do [its] due diligence [it] can justify that incremental or additional expense from an underwriting perspective because [it is] amortizing or capitalizing that expense against a much larger average loan size.  So consequently, it actually end[s] up with a competitive advantage as it relates to everybody else in the industry.

CCAC ¶ 76, at 22-23 (alterations in original).  Also, throughout the Class Period, TMI's SEC filings asserted that its assets are concentrated in "prime" and "high quality" ARM securities that meet TMI's "High Quality" criteria.  CCAC ¶ 77, at 23.  The SEC filings also insisted that TMI's "primary focus is to acquire and originate high quality, highly liquid mortgage assets such that sufficient assets could be readily converted to cash, if necessary, in order to meet our financial obligations."  CCAC ¶ 79, at 24.

Notwithstanding these statements, the Defendants -- or, at least Goldstone -- knew by no later than June of 2007, but did not disclose, that the ABCP market was shrinking rapidly and, by

---

[12] "Margin calls" are demands for funds.  The Court interprets this phrase as meaning that people from whom TMI had borrowed money in exchange for securities were asking for some or all of their money back.  See Black's Law Dictionary 232 (9th ed. 2009)(defining "call"); Oxford English Dictionary Online, "margin call, n." (2d ed. 1989, Oxford University Press), *available at* http://dictionary.oed.com/cgi/entry/00301984 (last accessed Dec. 14, 2009)("[A] demand by a broker that an investor deposit further cash or securities to guarantee the margin . . . on an investment.")(emphasis in original).

July 2007, had more or less dried up.  See CCAC ¶ 15, at 6; id. ¶¶ 131-32, 134, 250, 263, 288, at 38-40, 74-75, 88.  Goldstone allegedly admitted this shrinking market to certain confidential sources during a private meeting on August 8, 2007.  See CCAC ¶ 15, at 6.  Goldstone also reassured the confidential sources that, notwithstanding the problems in the ABCP market, TMI's relationships with its lender banks "were fine."  CCAC ¶ 131, at 38-39.  Also by July of 2007, the RPA market became an increasingly more costly source of financing as a result, in part, of a combination of declining asset values and the illiquidity of the ABCP market.  See CCAC ¶ 16, at 6.  After early July, TMI was unable to complete any securitization transaction "based on a lack of buyers in the marketplace."  CCAC ¶ 16, at 6.

Notwithstanding these apparent problems, Goldstone made some comments during the July 20, 2007 earnings conference call to the effect that the forces affecting the mortgage market were not a threat to TMI.  See CCAC ¶ 114, 115, at 34.  Goldstone stated that "[TMI is] behaving substantially different than subprime originators because [it is] not that.  [It is] not an Alt-A originator.  [It is] not -- [It is] a prime adjustable rate mortgage originator . . . ."  CCAC ¶ 114, at 34.  Goldstone further stated that "[t]he current credit crisis in the market environment today, the liquidity issues in the marketplace today, are creating a very, very nice opportunity for [TMI]."  CCAC ¶ 115, at 34.

On August 14, 2007, TMI advised the market, without any warning, that because of liquidity concerns, it was exploring the potential sale of assets.  See CCAC ¶¶ 18, 135, 273-74, at 7, 40, 82.  TMI had, however, already begun a sale of assets by August 10, 2007.  See CCAC ¶¶ 18, 132, 134-35, 137-38, at 7, 39-40.  On August 20, 2007, TMI admitted that it had sold approximately thirty-five percent of its portfolio -- $20.5 billion of its highest-rated mortgage-backed assets -- to meet margin calls on its RPA agreements and to satisfy maturing ABCP obligations.  See id.

Furthermore, TMI had sold those assets at a discount -- approximately ninety-five percent of their face value.  See id. ¶ 265(c), at 79.

On August 14, 2007, the price of TMI common stock fell forty-three percent, from $13.81 per share to $7.89 per share.  See CCAC ¶ 20, at 7.  Also on that day, a substantial volume of shares -- 27,293,100 -- were traded.  See CCAC ¶ 20, at 7.  Allegedly based on the series of false and misleading statements, TMI was able to obtain hundreds of millions of dollars in its securities offerings.  See CCAC ¶ 22, at 8.  Specifically, TMI made one stock offering in early September of 2007, in which it raised $500 million in sales.  See id.  Further, it made two offerings in January of 2008, which gathered an additional $212 million in total proceeds.  See CCAC ¶ 22, at 8.

On February 28, 2008, TMI announced in its 2007 Form 10-K Annual Report that it was forced to meet over $300 million in margin calls under its RPAs.  See CCAC ¶ 23, at 8.  This disclosure was the first time that TMI announced that it owned $2.9 billion in MBSs backed by Alt-A collateral, and that the declining value of its Alt-A-backed MBSs was to blame for the margin calls.  Also on February 28, 2008, upon the release of the above information, TMI's common stock dropped in value again -- this time fifteen percent, from $11.54 per share to $9.86 per share.  See CCAC ¶ 24, at 8.  TMI stock traded heavily that day, with 21,012,500 shares changing hands.  See CCAC ¶ 24, at 8.

TMI had not, however, met all of its margin-call obligations.[13]  On February 28, 2008 -- the same day as the release of TMI's 2007 Form 10-K -- JP Morgan Chase notified TMI that TMI had defaulted on a $320 million loan by failing to meet an earlier margin call of $28 million.  See CCAC

---

[13] On this issue, the Plaintiffs insist that TMI implicitly concealed information by declaring how many of its margin calls it had met, asserting that such a statement implies that TMI met all of its margin call obligations when, in fact, it had not.  See 1934 Act Response at 9.

¶ 25, at 8-9.  On March 3, 2008, TMI disclosed via a press release that it had "been subject to additional margin calls of approximately $270 million as of February 29, 2008,"[14] and that it was "currently in default with one RPA counterparty."  CCAC ¶ 26, 171, at 9, 48.  TMI also stated that "the lender had not yet exercised its right to liquidate pledged collateral," which the Plaintiffs assert was false, and TMI also stated that, "to the extent any other RPA contains a cross-default provision, the related lender could declare an event of default at any time," which the Plaintiffs assert was misleading.  CCAC ¶ 26, at 9; id. ¶ 372, at 113 (quoting TMI's March 3, 2008 Form 8-K).  JP Morgan had already told TMI: (i) that TMI was in default; and (ii) that JP Morgan planned to exercise its rights under the RPA.  See CCAC ¶ 27, at 9.  Also, TMI did not disclose that all of its RPA agreements included cross-default provisions, meaning that any company with which TMI had an RPA could declare a default event and demand buy-back of the TMI RPAs.  See CCAC ¶ 27, at 9.

After that disclosure, TMI's stock price fell yet again.  Between February 29, 2009 and March 3, 2009, the price of TMI common stock decreased from $8.90 per share to $4.32 per share -- a drop of fifty-one percent.  See CCAC ¶ 28, at 9.  Over the course of those three days, investors traded 76,858,800 shares of TMI stock.  See CCAC ¶ 28, at 9.

On March 4, 2008, TMI's auditor, KPMG, LLP sent TMI a letter informing TMI that it was withdrawing its unqualified audit opinion contained in TMI's Form 10-K for 2007.  See CCAC ¶ 29, at 9-10.  KPMG stated that, "due to conditions and events that were known or should have been known to the company," the 2006 and 2007 year-end financial statements "contain material misstatements associated with available for sale securities," and that "substantial doubt exists

---

[14] The year 2008 was a leap-year, so there was a February 29.

relative to [TMI]'s ability to continue as a going concern."  CCAC ¶ 29, at 9-10 (alterations omitted).  KPMG demanded that TMI "make appropriate disclosure of the newly discovered facts" and that its previous opinion letter "could no longer be relied upon."  CCAC ¶ 29, at 9-10.  Only one week earlier, KPMG had issued an unqualified audit opinion for TMI.  See CCAC ¶ 30, at 10.

On March 5, 2008, TMI disclosed to its investors that the February 28, 2009 JP Morgan default had triggered cross-defaults in all of TMI's RPAs.  See CCAC ¶ 32, at 10.  On the same day, the price of TMI's common stock fell again, from $3.40 per share to $1.26 per share -- a 54.4% drop.  See CCAC ¶ 33, at 10.

On March 6, 2008, TMI received a letter from the NYSE informing TMI that the NYSE had commenced an investigation into transactions in TMI's common stock in January of 2008.  See CCAC ¶ 34, at 10-11.  The investigation was ostensibly regarding the impact of recent market events in the mortgage industry on TMI's book value.  See CCAC ¶ 178, at 51.  TMI did not disclose the existence of the letter or the investigation that day.  See CCAC ¶ 34, at 11.

On March 7, 2008, TMI disclosed to the public that it received the letter from KPMG and further announced that it would restate its financial statements for 2007 -- but not for 2006.  See CCAC ¶ 35, at 11.  TMI stated that the restatement was necessary because of "a significant deterioration of prices of MBS[s], combined with a liquidity position under unprecedented pressure from increased margin calls[,] a portion of which [TMI] has been unable to meet."  CCAC ¶ 35, at 11 (alterations omitted).  TMI also stated that its restatement would result in a $427.8 million impairment charge[15] on its balance sheet to reflect the fact that it may not have the ability to hold

_____

[15] An "impairment charge" is most often defined as:

A specific reduction on a company's balance sheet that adjusts the value of a company's goodwill.  Due to accounting rules, a company must monitor and test the

certain ARM assets to maturity.  See CCAC ¶ 35, at 11.  Between March 7, 2008 and March 10, 2008, TMI's stock price fell another thirty-six percent, from $1.08 to $0.69.  See CCAC ¶ 37, at 11-12.[16]  Between March 7, 2008 and March 10, 2008, 34,591,800 shares were traded.  See CCAC ¶ 394, at 120.

On March 11, 2008, TMI filed the restatement of its financials.  See CCAC ¶ 35, at 11.  The impairment charge listed on the restated financial statement was $676.6 million.  See CCAC ¶ 35, at 11.  The restatement resulted in a $300,000.00 reduction in management fees and a $5.4 million reduction in fourth-quarter performance fees.  See CCAC ¶ 35, at 11.  The Plaintiffs allege that the restatement reflected an impairment to TMI's asset portfolio as of December 31, 2007 and not as of March, 2008.

Problems continued to pile on TMI.  On March 12, 2008, TMI announced that it had defaulted on a $49,000,000.00 RPA with Morgan Stanley, because it could not meet a $9,000,000.00 margin call.  See CCAC ¶ 38, at 12.  This default allegedly led to a further decrease in TMI's stock price.  See CCAC ¶ 38, at 12.

On March 19, 2008, TMI announced that it had entered into a bailout agreement with five

---

value of its goodwill, to determine if it is overvalued.  If it is, the company must issue an impairment charge on its balance sheet, to take into account the reduced value of the goodwill.

Impairment Charge Definition, http://www.investorwords.com/6840/impairment_charge.html (last visited December 14, 2009).  In the context of this lawsuit, the Court believes that the impairment charge represents a decrease in TMI's value for which the balance sheet does not otherwise account.

[16] Paragraphs 11 and 12 are inconsistent with paragraph 394, which the 1934 Act Response cites.  Paragraphs 11 and 12 indicate that the stock dropped to $0.69 per share by the close of the market on March 10, 2008, while paragraph 394 cites to a closing price of $0.71.  Construing the CCAC in the light most favorable to the Plaintiffs, for the purpose of this motion, the Court will assume the closing price was $0.69 on March 10, 2008.

of its remaining lenders to obtain approximately $5.8 billion in financing.  See CCAC ¶ 39, at 12.

Goldstone admitted that the deal would significantly dilute the value of TMI common stock, and that

the deal was the only way to "give the company the liquidity and staying power to remain afloat."

CCAC ¶ 39, at 12.  On the same day, the price of TMI stock fell again.  See id.  The price per share

of TMI common stock dropped fifty percent, from $3.00 per share to $1.50 per share.  See CCAC

¶ 39, at 12. [17]

On April 28, 2008 -- seven weeks after TMI received the NYSE letter -- TMI informed the

investing public that the NYSE had commenced an investigation of some of its January 2008

trading.  See CCAC ¶ 178, at 51.  Likely because April 28, 2008 is outside the Class Period, the

Plaintiffs do not attempt to causally tie any particular adverse effect to this disclosure.  They

emphasize, however, how long it took -- seven weeks -- for TMI to disclose that the NYSE had

commenced this investigation.  See CCAC ¶ 178, at 51.  During those seven weeks, the Plaintiffs

point out, TMI issued nine SEC filings and press releases, and none of them mentioned the

investigation. See 1934 Act Response at 10.

**5.      TMI's Public Offerings and SEC Filings.**

The Plaintiffs allege that the Defendants are strictly liable for violations of Sections 11,

12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77(o), respectively.  See

CCAC ¶ 40, at 12.  The allegations arise out of four events: (i) the May 4, 2007 public offering of

4,500,000 shares of common stock at $27.05 per share, which resulted in gross proceeds of $121.7

million; (ii) the June 19, 2007 public offering of 2,750,000 shares of 7.5% Series E Cumulative

---

[17] Although the CCAC does not address the increase in stock values, TMI stock must have risen in value substantially, from $0.69 per share to $3.00 per share, between March 10, 2008 and March 19, 2008.

Convertible Redeemable Preferred Stock ("Series E Stock") at $25.00 per share, which resulted in

gross proceeds of $68,800,000.00; (iii) the September 7, 2007 public offering of 20,000,000 shares

of 10% Series F Cumulative Convertible Redeemable Preferred Stock ("Series F Stock") at $25.00

per share, which resulted in gross proceeds of $500 million; and (iv) the January 15, 2008 concurrent

public offering of eight million shares of Series F Stock at $19.50 per share, which resulted in gross

proceeds of $156 million, and seven million shares of common stock at $8.00 per share, which

resulted in gross proceeds of $56,000,000.00.  CCAC ¶ 40, at 12.  All of these public offerings were

made pursuant to a Shelf Registration Statement ("SRS"), filed with the SEC on Form S-3 on May

20, 2005, and a Prospectus that became effective on June 16, 2005.  CCAC ¶ 42, at 13.  The SRS

prospectively incorporates by reference:

> any documents [the Company] file[s] pursuant to Sections 13(a), 13(c), 14 or 15(d)
> of the Exchange Act after the date of this prospectus and prior to the termination of
> the offering of the securities to which this prospectus relates will automatically be
> deemed to be incorporated by reference in this prospectus and to be part hereof from
> the date of filing those documents.

CCAC ¶ 42, at 13 (presumably quoting the SRS).  Thus, the SRS incorporates by reference certain

of the quarterly, annual, and current reports.  See CCAC ¶ 42, at 13.

The May 2007 Offering was made pursuant to: (i) the SRS; (ii) a Preliminary Prospectus

Supplement filed with the SEC on form 424B5 on May 3, 2007; and (iii) a Prospectus Supplement

filed with the SEC on Form 424B2 on May 7, 2007.  See CCAC ¶ 43, at 13.  The June 2007

Offering was made pursuant to: (i) the SRS; (ii) a Preliminary Prospectus Supplement, filed on Form

424B5 on June 11, 2007; (iii) a Final Term Sheet, filed with the SEC as a Free Writing Prospectus

on June 15, 2007; and (iv) a Definitive Prospectus Supplement, filed with the SEC on Form 424B2

on June 18, 2007.  See CCAC ¶ 44, at 13-14.  The September 2007 Offering was made pursuant to:

(i) the SRS; (ii) a Free Writing Prospectus filed with the SEC on August 30, 2007; (iii) a Preliminary

Prospectus Supplement dated and filed with the SEC on Form 424B5 on August 30, 2007; (iii) a

Final Term Sheet dated August 30, 2007; and (iv) a Prospectus Statement dated August 30, 2007,

and filed with the SEC on Form 424B2 on September 4, 2007.  See CCAC ¶ 45, at 14.  The January

2008 Offerings were made pursuant to: (i) the SRS; (ii) two Preliminary Prospectus Supplements

filed on Forms 424B5 on January 9, 2008; and (iii) two Prospectus Supplements filed on Forms

424B2 on January 15, 2008.  See CCAC ¶ 46, at 14.

     **6.**    **How TMI Makes Money.**

     TMI is not a bank or savings-and-loan institution, but its business purpose, strategy, and

methods of operation are very similar to those of banks and savings-and-loans.  The primary

distinction is that, unlike a bank, TMI finances the purchase and origination of its ARM assets with

equity capital, unsecured debt, CDOs, and short-term borrowing, instead of deposits or federal

advances.  Goldstone, during a November 27, 2007 earnings conference, explained:

> We are a portfolio lender.  I would contrast that with a mortgage banking
> strategy.  By mortgage banker, I mean that's a company who is in the business of
> originating mortgages and they then turn around and sell them to third parties and
> they book gain on sale, present value future cash flows as part of that gain on sale.
>
> That's not the business that we are in.  We're a portfolio lender.  We
> originate loans and acquire assets principally to hold on our balance sheet and our
> income and profitability is generated by the spread or the net difference between the
> income that we earn, or the interest that we earn on our assets, and our cost of funds.

CCAC ¶ 72, at 21-22.  The Plaintiffs insist that this business model results in a need to continuously

acquire capital and increase the magnitude of its balance sheet.  See CCAC ¶ 73, at 22.  They further

insist that the model requires TMI to have ready access to cash to achieve growth and to maintain

stability during market downturns.  See CCAC ¶ 73, at 22.  The composition of TMI's asset

portfolio was a significant aspect of its business plan throughout the Class Period.  See CCAC ¶ 78,

at 23.

TMI acquires cash needed to fund its operation in three primary ways: (i) equity offerings, including selling of preferred and common stock; (ii) short-term borrowing, such as RPAs and ABCP; and (iii) CDOs.  See CCAC ¶ 73, at 22.  Sale of CDOs were a significant source of funding, but became more difficult to consummate as the mortgage financing market declined during the Class Period, particularly for those securities rated less than AAA.  See CCAC ¶ 75, at 22.  TMI even encountered difficulties selling its AAA-rated CDOs during the Class Period.  See CCAC ¶ 75, at 22.

7.     **The Plaintiffs' Motive-Based Facts.**

Another business entity, Thornburg Mortgage Advisory Corporation ("TMAC"), manages and runs TMI.  See CCAC ¶ 193, at 57-58.  Thornburg is the CEO of TMAC.  See CCAC ¶ 193, at 57-58.  Of the other individuals that run TMAC, many are also TMI executives, including Goldstone and Senior Vice Presidents Nathan Fellers and Ann Beckett.  See id.  TMAC executives[18] were paid from management fees that TMAC earned under its Management Agreement with TMI.  TMAC's management fee was based on TMI's "Average Historical Equity," i.e., the difference between total assets and total liabilities calculated each month.  CCAC ¶ 194, at 58.  The Plaintiffs insist that this fee structure provided an incentive to grow the size of TMI's asset base to get more income for TMAC and, therefore, more executive compensation.  See CCAC ¶ 194, at 58.[19]  At least one analyst has concluded that "this management structure could produce a potential conflict of interest between

---

[18] Although ¶ 193 of the CCAC refers to "TMI executives," it appears that the Plaintiffs probably meant "TMAC executives," given the context and the fact that ¶ 195 discusses how this structure "incentivized TM[A]C executives."

[19] The Plaintiffs point out that, during fiscal years 2006 and 2007, respectively, TMI paid TMAC and its management team approximately $24,700,000.00 and $26,100,000.00 in management fees, and $34,700,000.00 and $23,100,000.00 in performance-based fees.  See CCAC ¶ 194, at 58.

the external manager and shareholders, particularly about the appropriate size of assets during different phases of a business cycle."  CCAC ¶ 195, at 58.

## PROCEDURAL BACKGROUND

On May 27, 2008, the Plaintiffs filed the CCAC against the Defendants, asserting claims arising under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78jb and 78t(a), and Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o. Specifically, the Plaintiffs asserted: (i) claims against the Individual Defendants for violations of Section 10(b) of the Exchange Act and of Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.1-b-5; (ii) claims against the Individual Defendants for violations of Section 20(a) of the Exchange Act; (iii) claims against the Individual Defendants, the Underwriter Defendants, and the Director Defendants for violations of Sections 11 and 12(a)(2) of the Securities Act; and (iv) claims against the Individual Defendants for violations of Section 15 of the Securities Act.

On September 22, 2008, the Defendants moved to dismiss all of the Plaintiffs' claims.  See Motion to Dismiss Consolidated Amended Complaint by Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Joseph H. Badal, Paul G. Decoff, Clarence D. Simmons, Ann-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman, filed September 22, 2008 (Doc. 126); Opposed Motion by May/June 2007 Underwriter Defendants to Dismiss Consolidated Class Action Complaint; Memorandum of Points and Authorities in Support Thereof, filed September 22, 2008 (Doc. 128); Opposed Motion to Dismiss of Underwriter Defendants UBS Securities LLC and Bear Stearns & Co., Inc., filed September 22, 2008 (Doc. 130); Motion of Friedman, Billings, Ramsey & Co, Inc. to Dismiss and Memorandum of Points and Authorities in Support Thereof, filed September 22, 2008 (Doc. 132).  On December 22, 2008, the Plaintiffs filed briefs in opposition to the Defendants'

motions to dismiss.  See Plaintiffs' Opposition to the Motions to Dismiss Plaintiffs' Securities Act Claims Submitted By: 1) Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Joseph H. Badal, Paul G. Decoff, Clarence D. Simmons, Anne-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman; 2) The May/June 2007 Underwriter Defendants; 3) Friedman, Billings, Ramsey & Co., Inc.; 4) UBS Securities LLC and Bear Stearns & Co, Inc.; and 5) Stifel, Nicolaus & Company, Incorporated, filed December 22, 2008 (Docs. 152, 153); Plaintiffs' Opposition to Defendants' Motion to Dismiss Consolidated Amended Complaint Filed by Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Joseph H. Badal, Paul G. Decoff, Clarence D. Simmons, Anne-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman, filed December 22, 2008 (Docs. 154, 155, 156, 157).  On February 5, 2009, the Defendants filed reply briefs in further support of their motions.  See Reply in Support of Opposed Motion by May/June 2007 Underwriter Defendants to Dismiss Consolidated Class Action Complaint, filed February 5, 2009 (Doc. 165); Joinder of Underwriter Defendant Stifel, Nicolaus & Company, Incorporated in Reply in Support of Motion to Dismiss, filed February 5, 2009 (Doc. 166); Reply Memorandum (and Joinder) in Support of Motion to Dismiss by Underwriter Defendants UBS Securities LLC and Bear, Stearns & Co., Inc., filed February 5, 2009 (Doc. 167); Reply Memorandum in Support of Motion to Dismiss Consolidated Amended Complaint by Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Joseph H. Badal, Paul G. Decoff, Clarence D. Simmons, Anne-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman, filed February 5, 2009 (Doc. 168); Reply in Support of Motion of Friedman, Billings, Ramsey & Co., Inc. to Dismiss, filed February 5, 2009 (Doc. 170).

On April 22, 2009, the Court heard oral argument from the Plaintiffs and the Defendants in connection with the Defendants' motions to dismiss the CCAC. During oral argument on April 22, 2009, counsel for Friedman Billings Ramsey, one of the Underwriter Defendants, conceded that Regulation S-K's disclosure obligations bind the Defendants: "There are two requirements in judging our securities filings. One, we have to say certain things. Reg S-K and S-C provide what we have to say. And then otherwise, we cannot misrepresent what we do say. We cannot say something that's false or would mis-lead." Transcript of Hearing at 38:12-18 (taken April 22, 2009)(Gutman). The Plaintiffs' counsel concurred in the interpretation of the Defendants' disclosure obligations. See id. at 196:24-197:10 (Court, Zivitz).

On January 27, 2010, the Court issued two Memorandum Opinions and Orders, granting in part and denying in part the Defendants' motions to dismiss the CCAC. See Memorandum Opinion and Order at 36, filed January 27, 2010 (Doc. 251)("MOO"); Amended Memorandum Opinion and Order at 90, filed January 27, 2010 (Doc. 252)("Amended MOO"). The Court dismissed the Plaintiffs' claims arising under Sections 11, 12(a)(2), and 15 of the Securities Act against all of the Defendants. The Court dismissed the claims based on Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, against Thornburg, Badal, Decoff and Simmons. The Court dismissed the Section 20(a) claims against Thornburg and Badal. The Court allowed the Section 10(b) claims to proceed against Goldstone, and, because TMI is in bankruptcy and subject to the automatic stay of 11 U.S.C. § 362, the Court reserved ruling on Section 10(b) claims against TMI and on the Section 20(a) claims against Goldstone, Simmons, and Decoff.

In dismissing the Plaintiffs' claims arising under Sections 11 and 12(a)(2) of the Securities Act, the Court noted that liability attaches in two instances: (i) where a defendant omits to disclose information that the law requires the defendant to disclose; or (ii) where a defendant issues a

materially false or misleading statement in a registration statement or prospectus.  <u>See</u> MOO at 17-19.  The Court further held that liability cannot be premised on silence in the absence of a duty to disclose and held that the Plaintiffs "failed to provide the Court with the source of such a duty." Amended MOO at 86 (citation omitted).  <u>See</u> MOO at 32.

In dismissing the Plaintiffs' claims arising under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, the Court noted that the sources of a duty to disclose information under the federal securities laws are found either: (i) in express mandates of the statute and rules promulgated under the statute; or (ii) in the general anti-fraud provisions of the statues and rules.  <u>See</u> Amended MOO at 63.  The Court further stated that the Plaintiffs failed to provide such a source for the Defendants' disclosure duties:

> The Plaintiffs have not pointed to any statute or SEC regulation that demands disclosure of the facts allegedly withheld, nor, after careful review, does the Court find any disclosed facts that were rendered materially false or misleading in the absence of the withheld facts.  As such, the Court finds that the Defendants did not have a duty to disclose these allegedly withheld facts.

Amended MOO at 63.

In analyzing the Plaintiffs' Section 20(a) claims against Thornburg and Badal, the Court noted that "the only articulable act or omission by TMI as an entity, the misleading Form 8-K dated March 3, 2008, was filed after Thornburg's tenure as CEO ended" and after Badal had retired from TMI.  Amended MOO at 77.  As a result, the Court dismissed the Plaintiffs' Section 20(a) claims against these two individuals.

The remedy the Defendants sought in moving to dismiss was a dismissal with prejudice.  In opposing the Defendants' motions to dismiss, however, the Lead Plaintiffs requested leave to amend in the event that the Court found the CCAC to be deficient in any way.  <u>See</u> Plaintiffs' Opposition to Defendants' Motion to Dismiss Consolidated Amended Complaint at 58 n.48; Plaintiffs'

Opposition to the Motions to Dismiss Plaintiffs' Securities Act Claims at 32.  The Memorandum

Opinions and Orders did not state, however, whether the dismissals were with or without prejudice.

On February 5, 2010, the Plaintiffs filed a Motion for Clarification of the Court's January 27, 2010

Memorandum Opinions and Orders Granting in Part and Denying in Part Defendants' Motions to

Dismiss the Consolidated Amended Complaint, see Doc. 254 ("Motion for Clarification"),

ostensibly asking the Court to clarify this apparent ambiguity.  Specifically, the Plaintiffs requested

that the Court: (i) order that the Court issued the Memorandum Opinions and Orders without

prejudice; and (ii) allow the Plaintiffs to amend the CCAC to cure the averments it held to be

deficient.  In their motion, the Lead Plaintiffs asserted that, if permitted, they would amend the

CCAC to address the following: (i) the Court's holding that the Plaintiffs failed to state a claim

under Sections 11 and 12(a) of the Securities Act, to discuss, among other things, the impact of

Regulation S-K, 17 C.F.R. § 229.303, and Regulation S-X, 17 C.F.R. § 210.4-01, on the Defendants'

liability for material omissions from the offering documents; (ii) the Court's implicit finding that

TMI was not liable for Goldstone's misrepresentations in June 2007 and July 2007, insofar as that

finding affects the Individual Defendants' liability under Section 20(a); (iii) the Individual

Defendants' liability under Section 20(a) of the Exchange Act as a result of TMI's failure to comply

with its affirmative duty pursuant to Section 10(b) of the Exchange Act to disclose all material,

nonpublic information in its possession before selling $900 million in TMI securities during the

Class Period; and (iv) the Court's holding that the alleged misstatements in TMI's offering

documents are not actionable.[20]  See Motion for Clarification ¶ 9, at 4.  The Lead Plaintiffs devoted

---

[20] The Lead Plaintiffs recognized that TMI is in bankruptcy and subject to the automatic stay of 11 U.S.C. § 362.  Accordingly, they did not seek relief against TMI in their motion and represented that they intend to move to voluntarily dismiss the case against TMI without prejudice in recognition of the automatic stay.

substantial time and space, however, to arguing the legal merits of their case, and insisted that, if permitted, they would add additional factual and legal assertions to the CCAC from which the Court would conclude that they had stated a proper claim.  See Motion for Clarification ¶¶ 9-29, at 4-12. Specifically, the Lead Plaintiffs represented that they intended to add additional factual and legal allegations to state a claim under Sections 11 and 12(a) of the Securities Act, additional allegations to show that TMI was obligated to disclose all material non-public information in its possession, and additional allegations that would allow it to state a claim under Section 20(a) of the Exchange Act against Thornburg and Badal.

The Defendants opposed the Plaintiffs' Motion for Clarification on February 18, 2010.  See Certain D&O Defendants' Response in Opposition to Plaintiffs' Motion for Clarification of the Court's January 27, 2010 Memorandum Opinions and Orders Granting in Part and Denying in Part Defendants' Motions to Dismiss the Consolidated Amended Complaint, filed February 18, 2010 (Doc. 257); Defendants Joseph H. Badal, Paul Decoff, Michael Jeffers, Owen Lopez and Stuart Sherman's Joinder to Certain D&O Defendants' Response in Opposition to Plaintiffs' Motion for Clarification [Docket No. 257] of the Court's January 27, 2010 Memorandum Opinions and Orders Granting in Part and Denying in Part Defendants' Motions to Dismiss the Consolidated Amended Complaint, filed February 18, 2010 (Doc. 259); Joinder of Defendants Goldstone and Simmons in Certain D&O Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Clarification, filed February 22, 2010 (Doc. 261); Underwriter Defendants' Opposition to Lead Plaintiffs' Motion for Clarification of the Court's January 27, 2010 Memorandum Opinions and Orders Granting in Part and Denying in Part Defendants' Motions to Dismiss the Consolidated Amended Complaint, filed February 18, 2010 (Doc. 258).  The only Defendant who did not appear to oppose the Lead Plaintiffs' motion was TMI, against whom this action is stayed under 11 U.S.C.

§ 362.  The Plaintiffs made clear that their Motion for Clarification sought no relief as to TMI.  On March 4, 2010, the Plaintiffs filed their reply papers.  <u>See</u> Plaintiffs' Reply Memorandum of Law in Further Support of Their Motion for Clarification of the Court's January 27, 2010 Memorandum Opinions and Orders Granting in Part and Denying in Part Defendants' Motions to Dismiss the Consolidated Amended Complaint and in Response to the Underwriter Defendants' Opposition Thereto, filed March 4, 2010 (Doc. 271); Plaintiffs' Reply Memorandum of Law in Further Support of Their Motion for Clarification of the Court's January 27, 2010 Memorandum Opinions and Orders Granting in Part and Denying in Part Defendants' Motions to Dismiss the Consolidated Amended Complaint and in Response to Certain D&O Defendants' Opposition Thereto, filed March 4, 2010 (Doc. 272).

On June 9, 2010, the Court heard oral argument in connection with the Plaintiffs' motion for clarification.  At the hearing, the Court opened up conversation by giving the parties its initial impression of the motion.  The Court stated that, because the issue whether the Lead Plaintiffs could amend was not addressed in the opinion, and the parties seek different outcomes on that point -- the Defendants sought dismissal with prejudice, the Lead Plaintiffs sought leave to amend if the CCAC was found deficient -- the Motion Seeking Clarification was appropriate.  <u>See</u> Transcript of Hearing at 8:17-24 (taken June 9, 2010)("June 9, 2010 Tr.")(Court).  The Court stated that it would thus grant the motion to clarify.  <u>See</u> June 9, 2010 Tr. at 8:17-24 (Court); <u>id.</u> at 30:11-14 (Court).

In granting the Plaintiffs' motion, the Court clarified that, because the lawsuit is still, in many respects, in its infancy, it would be inclined to allow the Lead Plaintiffs to file a motion to amend and/or a motion for reconsideration.  <u>See</u> June 9, 2010 Tr. at 8:25-12:10 (Court).  The Court stated that, at this early stage, it would be inclined to allow the Lead Plaintiffs to amend and that it believed there might exist factual allegations that the Lead Plaintiffs could add to cure their pleading

-28-

deficiencies.  See June 9, 2010 Tr. at 9:7-10:4 (Court).  The Court also said that the Lead Plaintiffs would have to file a motion to amend, not file an amended complaint, so that the Court and the Defendants could decide whether the amendment would be futile.  See June 9, 2010 Tr. at 8:25-9:6 (Court).

The Court then said it thought that most of the Lead Plaintiffs' motion to clarify was not, in fact, a motion to clarify or a motion to amend, but was a motion to reconsider.  See June 9, 2010 Tr. at 9:7-12:10 (Court).  It appeared to the Court that the Lead Plaintiffs disagreed with the Court on some of its rulings.  See June 9, 2010 Tr. at 9:7-15 (Court).  The Court thought that the Lead Plaintiffs needed to file a motion to reconsider on those issues, rather than trying to get such review on a motion to amend, so the Court and the Defendants could see clearly where the Lead Plaintiffs disagree with the Court's legal conclusions on full briefing.  See June 9, 2010 Tr. at 9:7-12:10 (Court).  The Court was concerned that it did not yet have the benefit of a full briefing from the Defendants on the issues on which the Lead Plaintiffs want reconsideration.  See June 9, 2010 Tr. at 12:7-10 (Court).

The Court then allowed the parties to argue, being informed of the Court's inclinations. Benjamin Sweet, attorney for the Lead Plaintiffs, gave some examples of additional factual allegations that the Lead Plaintiffs would add if given the opportunity to amend the CCAC.  See June 9, 2010 Tr. at 15:6-16:7 (Sweet).  Betsy Manifold, also an attorney for the Lead Plaintiffs, suggested allegations that the Lead Plaintiffs would add to further support their control-person claims and the scienter element of their Section 10(b) claims against certain Individual Defendants. See June 9, 2010 Tr. at 18:9-25 (Manifold).  Ms. Manifold admitted, however, that what they sought was a hybrid motion for leave to amend and motion to reconsider.  See June 9, 2010 Tr. at 19:4-11 (Manifold).  Mr. Sweet conceded that he would be satisfied if the Court allowed the Lead Plaintiffs

to file motions to amend and for reconsideration, rather than grant the relief sought in those motions on the motion for clarification.  See June 9, 2010 Tr. at 29:12-15 (Court, Sweet).

Steven Farina, Defendant Friedman, Billings, Ramsey & Co., Inc.'s attorney, argued that any motion to amend or for reconsideration would be futile, because the proposed amendments do not cure the deficiencies that the Court has found in the CCAC and because there exist no grounds for reconsideration.  See June 9, 2010 Tr. at 20:13-23:21 (Court, Farina).  Mr. Farina expressed concerns that the Lead Plaintiffs were blurring the standards used to review those two motions, and conceded that requiring the Lead Plaintiffs to file a written motion would help with that potential problem.  See June 9, 2010 Tr. at 23:14-24:20 (Court, Farina).  David Bohan, the attorney for UBS Securities and Bear, Stearns, argued that the Court should deny the motion to amend, because the Lead Plaintiffs should have brought the motion to amend when the new facts came to their attention, rather than waiting until after the motions to dismiss were granted in part and then challenging whether those dismissals were with or without prejudice.  See June 9, 2010 Tr. at 25:4-27:17 (Court, Bohan).  Jonathan Dickey, counsel for certain Underwriter Defendants, expressed his confidence that the Lead Plaintiffs' motion to amend and motion to reconsider would fail.  See June 9, 2010 Tr. at 28:8-13 (Dickey).  He also reminded the Court that his clients are currently dismissed from the action and stressed that the amendment/reconsideration process should move swiftly, and not become a series of rolling amendments as the Plaintiffs try to mend the CCAC and repair their claims against dismissed Defendants.  See June 9, 2010 Tr. at 27:20-28:25 (Dickey).  At the June 9, 2010 hearing, the Court instructed the Plaintiffs to file their motion within thirty days, orally setting forth detailed instructions on how the Plaintiffs should structure their motion.  Thereafter, on July 5, 2010, the Court issued a Memorandum Opinion and Order granting the Plaintiffs' motion for clarification, and setting forth in writing the instructions the Court had set forth orally.  See Doc.

300 (July 5, 2010 MOO).  In its July 5, 2010 MOO, the Court stated:

> The Lead Plaintiffs should submit the motion to amend and the motion to reconsider as one motion.  The motion should have two sections.  Section one should discuss the motion to amend and all the traditional issues that rule 15 of the Federal Rules of Civil Procedure raise.  The Lead Plaintiffs should set forth their new facts -- facts that the Court did not previously have before it -- which, if the Court had known the facts, would have changed the outcome of the motion.  The Lead Plaintiffs should also address precisely how these new facts would have changed the Court's conclusions.  This section should deal only with the new facts and how the new facts would change the analysis as the Court has performed it.  The Court asks the Lead Plaintiffs to be particularly intellectually honest on this point.  This section should not argue that the Court was incorrect on any particular rule of law in its prior opinion, i.e., that the Court failed to consider the abstain-or-disclose rule, that the facts in the CCAC allege violations of Regulations S-X or S-K, or some other issue of law that the Lead Plaintiffs could have argued in response to the motions to dismiss.  The first section should be strictly a motion to amend under rule 15.
>
> . . . .
>
> The second section should encapsulate the proposed motion to reconsider. In writing that section, the Lead Plaintiffs should not assume that the motion to amend will be granted, and so the Lead Plaintiffs should not assume that the Complaint contains facts that it will add in its proposed amendment.  In this section, the Lead Plaintiffs can address the errors of law that they believe the Court made, but must address them in the context of a motion for reconsideration and explain why the alleged errors justify reconsideration under the appropriate legal standard.

July 5, 2010 MOO at 18-20.

The Plaintiffs now request that the Court: (i) grant them leave to amend the CCAC; and (ii) reconsider certain portions of its January 27, 2010 orders granting in part and denying in part the Defendants' motions to dismiss the CCAC.  The Plaintiffs also filed a supporting memorandum. See Plaintiffs' Memorandum of Law in Support of Omnibus Motion for (i) Leave to Amend the Consolidated Class Action Complaint (ii) For Reconsideration of the Court's January 27, 2010 Memorandum Opinions and Orders Granting in Part and Denying in Part Defendants' Motions to Dismiss the Consolidated Amended Complaint, filed January 9, 2010 (Doc. 309)("Memorandum"). The Defendants oppose the Motion.  See Opposition of Defendants Goldstone and Simmons to

Plaintiffs' Motion for Leave to Amend and for Reconsideration, filed August 23, 2010 (Doc. 319)("Goldstone and Simmons Response"); Defendants Badal, Decoff, Lopez, and Sherman's Opposition to Plaintiffs' Omnibus Motion for Leave to Amend and for Reconsideration, filed August 23, 2010 (Doc. 320)("Badal, Decoff, Lopez, and Sherman's Response"); Garrett Thornburg and Certain Director Defendants' Response in Opposition to Lead Plaintiffs' Omnibus Motion for (i) Leave to Amend the Consolidated Class Action Complaint and (ii) for Reconsideration of the Court's January 27, 2010 Memorandum Opinions and Orders Granting in Part and Denying in Part Defendants' Motions to Dismiss the Consolidated Amended Complaint, filed August 23, 2010 (Doc. 327); May/June 2007 Underwriter Defendants' Opposition to Plaintiffs' Motion for Leave to Amend and for Reconsideration, filed August 23, 2010 (Doc. 321); Opposition of FBR Capital Markets & Co. To Plaintiffs' Motion for Leave to Amend and Reconsideration, August 23, 2010 (Doc. 328); Joinder and Supplementary Memorandum of Underwriter Defendants UBS and Bear Stearns in Opposition to Plaintiffs' Omnibus Motion for Leave to Amend and for Reconsideration, filed August 23, 2010 (Doc. 325); May/June 2007 Underwriter Defendants' Request for Judicial Notice in Opposition to Plaintiffs' Motion for Leave to Amend and for Reconsideration, filed August 23, 2010 (Doc. 322).  The September 2007 and January 2008 Underwriter Defendants renew their request that, if the Court reconsiders its decision that TMI's 2007 Form 10-K was not actionable, the Court dismiss the UBS and Bear Stearns, because the Plaintiffs have not cured their lack of statutory standing for their claims based on the January 2008 offering.  On October 22, 2010, the Plaintiffs filed their Omnibus Reply in Further Support of Plaintiffs' Omnibus Motion For: (i) Leave to Amend the Consolidated Class Action Complaint, and (ii) for Reconsideration of the Court's January 27, 2010 Memorandum Opinions and Orders Granting in Part and Denying in Part Defendants' Motions to Dismiss the Consolidated Amended Complaint.  See Doc. 341 ("Reply").

At the November 3, 2010 hearing, the parties agreed that the Court should first decide whether to reconsider its MOO and then decide whether to grant allow the Plaintiffs leave to file an amended complaint.  The Plaintiffs conceded that "there is no Tenth Circuit opinion that's on point with regard to the disclosure or abstain rule," and whether it applies to Securities Act claims.  See Transcript of Hearing at 12:6-8 (taken November 3, 2010)(Sweet).  The Plaintiffs asserted that the Defendants should have disclosed (i) "the presence of the Alt-A assets in the purchased ARM portfolio"; (ii) "the collateralization of the Alt-A and the RPA agreements"; and (iii) "the cross-default provisions.  Tr. at 31:11-32:10 (Sweet).

On February 23, 2011, the Plaintiffs filed their Notice of Supplemental Authority, calling the Court's attention to the United States Court of Appeals for the Second Circuit's recent opinion in Litwin v. Blackstone Group, L.P., 634 F.3d 706 (2d Cir. 2011), which reversed a district court's dismissal of a Securities Act class action complaint, holding that "a violation of Item 303 of Regulation S-K, 17 C.F.R. § 229.303, gives rise to liability under Sections 11, 12(a)(2) and 15 of the Securities Act."  Notice of Supplemental Authority at 1, filed February 23, 2011 (Doc. 353).  On March 3, 2011, the Underwriter Defendants responded, asserting that they "have never contended otherwise; rather, the Underwriters' position from the beginning of this litigation has been that Plaintiffs fail to allege a violation of Item 303 of Regulation S-K."  Response of the Underwriter Defendants to Plaintiffs' Notice of Supplemental Authority at 1, filed March 3, 2011 (Doc. 354).  Also on March 3, 2011, Goldstone and Simmons responded, stating that the Plaintiffs "assert the unremarkable proposition that Litwin holds that a violation of Item 303 of Regulation S-K may give rise to liability under Sections 11, 12(a)(2) and (15) of the Securities Act."  Response of Defendants Goldstone and Simmons to Plaintiffs' Notice of Supplemental Authority at 1, filed March 3, 2011 (Doc. 355).

## LAW REGARDING AMENDMENT OF PLEADINGS

Under rule 15(a) of the Federal Rules of Civil Procedure, the court should freely grant leave to amend a pleading where justice so requires.  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.); Youell v. FNU Russell, No. CIV 04-1396 JB/WDS, 2007 WL 709041, at **1-2 (D.N.M. Feb. 14, 2007)(Browning, J.); Burleson v. ENMR-Plateau Tele. Coop., No. CIV 05-0073 JB/KBM, 2005 WL 3664299, at **1-2 (D.N.M. Sept. 23, 2005)(Browning, J.).  The Supreme Court of the United States has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given. Fomen v. Davis, 371 U.S. 178, 182 (1962).  Furthermore, the United States Court of Appeals for the Tenth Circuit has held that district courts should grant a plaintiff leave to amend when doing so would yield a meritorious claim.  See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001); In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

A court should deny leave to amend under rule 15(a), however, where the proposed "amendment would be futile."  Jefferson County Sch. Dist. v. Moody's Investor's Serv., 175 F.3d 848, 859 (10th Cir. 1999).  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.  An amendment is "futile" if the pleading "as amended, would be subject to dismissal." In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Comm'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)).  A court may also deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed."  In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. West, Inc., 3 F.3d 1357, 1365-66 (10th Cir.

1993)).

## LAW REGARDING MOTION FOR RECONSIDERATION

Under Tenth Circuit case law,

[g]enerally, a "motion for reconsideration, not recognized by the Federal Rules of Civil Procedure, Clough v. Rush, 959 F.2d 182, 186 n. 4 (10th Cir. 1992), may be construed in one of two ways: if filed within 10 days of the district court's entry of judgment, it is treated as a motion to alter or amend the judgment under Rule 59(e); if filed more than 10 days after entry of judgment, it is treated as a motion for relief from judgment under Rule 60(b)." Computerized Thermal Imaging, Inc. v. Bloomberg, L.P., 312 F.3d 1292, 1296 n.3 (10th Cir. 2002). In addition, "every order short of a final decree is subject to reopening at the discretion of the district judge." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 12 . . . (1983); see also Fed.R.Civ.P. 54(b).

Price v. Philpot, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005). In addition, "every order short of a final decree is subject to reopening at the discretion of the district judge." Price v. Philpot, 420 F.3d at 1167 n.9 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 12 (1983))(internal quotation marks omitted). A district court has discretion to revise interlocutory orders before the entry of a final judgment. See Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., 212 F. App'x 760, 765 (10th Cir. 2007). When a plaintiff seeks to obtain reconsideration of a non-final order, his or her motion for reconsideration is considered "an interlocutory motion invoking the district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment." Wagoner v. Wagoner, 938 F.2d 1120, 1122 n.1 (10th Cir. 1991). A motion for reconsideration is an "inappropriate vehicle[ ] to reargue an issue previously addressed by the court when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion." Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000). "Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error

or prevent manifest injustice." Servants of Paraclete v. Does, 204 F.3d at 1012.  "Thus, a motion

for reconsideration is appropriate where the court has misapprehended the facts, a party's position,

or the controlling law." Servants of Paraclete v. Does, 204 F.3d at 1012 (citation omitted).  A

district court has considerable discretion in ruling on a motion to reconsider. See Phelps v.

Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997).

## RELEVANT SECURITIES LAW

> During the early days of the New Deal, Congress enacted two landmark
> statutes regulating securities.  The [Securities] Act was described as an Act "to
> provide full and fair disclosure of the character of securities sold in interstate and
> foreign commerce and through the mails, and to prevent frauds in the sale thereof,
> and for other purposes." The Securities Exchange Act . . . was described as an Act
> "to provide for the regulation of securities exchanges and of over-the-counter
> markets operating in interstate and foreign commerce and through the mails, to
> prevent inequitable and unfair practices on such exchanges and markets, and for
> other purposes."

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723,  727-28 (1975).  The Securities Act deals

with the initial issuance of securities, and with the required contents of registration statements and

prospectuses.  See 421 U.S. at 728.  The Exchange Act, on the other hand, is primarily known  for

prohibiting fraud in connection with the purchase or sale of securities. See 421 U.S. at 728-29.  The

Plaintiffs accused the Defendants of violating both statutes.

1.      **Relevant Law Regarding Rule 10b-5 Claims.**

"In order to state a claim under 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must

allege: (1) a misleading statement or omission of a material fact; (2) made in connection with the

purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5)

damages." In re Sun Healthcare Group, Inc. Sec. Litig., 181 F. Supp. 2d 1283, 1286-87 (D.N.M.

2002).  Furthermore, "[w]hen evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6),

the district court must evaluate 'the totality of the pleadings' to determine if the plaintiffs have stated

an actionable claim of securities fraud." Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1092 (10th Cir. 2003).

The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC)." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 313.  On the other hand, "[p]rivate securities fraud actions, . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 313.  Thus, because a 10b-5 claim is in essence a fraud claim, it is subject to stringent pleading requirements.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1095 (explaining that rule 9(b) alone governed before the PSLRA, but that the PSLRA "strengthened what is required adequately to plead two of [the] elements [of a Rule 10b-5 claim]."); Seattle-First Nat. Bank v. Carlstedt, 800 F.2d 1008, 1010 (10th Cir. 1986)("Given the specific reliance on Rule 9(b) in our decision in Utah State University v. Bear, Stearns & Co., [549 F.2d 164, 171 (10th Cir. 1977)], we hold that in this circuit the particularity requirement of Rule 9(b) is applicable generally in securities fraud cases.").  Those requirements extend to the allegations relevant to each defendant's required mental state.

> In any private action arising under [Chapter 2B of the Exchange Act] in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2)(emphasis added).  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1095.

### a.      Pleading Scienter.

Under PSLRA, a plaintiff must, for each act or omission alleged to violate the Exchange Act,

state with particularity facts giving rise to a strong inference that each defendant alleged to be responsible for that act or omission acted with an intent to deceive, manipulate, or defraud -- in other words, acted with a mental state known as scienter.  See  15 U.S.C. § 78u-4(b)(2); City of Phila. v. Fleming Co., Inc., 264 F.3d 1245, 1259 (10th Cir. 2001).  To allege scienter in connection with non-disclosure of material facts, a plaintiff must plead facts demonstrating that (i) the defendant knew of the potentially material fact; and (ii) the defendant knew that failure to reveal the potentially material fact would likely mislead investors.  See City of Phila. v. Fleming Co., Inc., 264 F.3d at 1261.

Under certain circumstances, recklessness can satisfy the mental-state requirement, although "courts have been cautious about imposing liability for securities fraud based on reckless conduct." Id. at 1260.  "The requirement of knowledge in this context may be satisfied under a recklessness standard by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." Id. at 1261.  The Tenth Circuit has also described recklessness in a Section 10(b) context as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1232 (10th Cir. 1996).

To create the "strong" inference of scienter that the PSLRA requires, a plaintiff must allege specific facts giving rise to an inference of culpability that is at least as strong as any competing inference of good faith.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 328-29.

The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged

facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.

Id. As the Supreme Court expressed:

> [T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2)[, i.e., 15 U.S.C. § 78u-4(b)(2),] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than merely plausible or reasonable -- it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 314. The scienter analysis is holistic, requiring the court to analyze all allegations in the complaint and not view any particular allegation in isolation. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322-23; Adams v. Kinder-Morgan, Inc., 340 F.3d at 1105. In addition to the complaint's allegations, a court must consider any documents incorporated by reference into the complaint, as well as matters of which a court may take judicial notice. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322-23.

Directors and officers, like all people, tend to act in their own economic self interest. See In re Sun Healthcare Group, Inc. Sec. Litig., 181 F. Supp. 2d at 1297. Alleging such motives, therefore, does not significantly advance the ball in proving a strong inference of scienter, though a court should not completely ignore such allegations. See City of Phila. v. Fleming Co., Inc., 264 F.3d at 1262, 1269-70 (discussing the unhelpful nature of "generalized motives shared by all companies and which are not specifically and uniquely related to" a defendant). Once scienter is successfully alleged against an officer or executive of a corporation, however, that liability may be attributed to the corporation itself, if that officer is a senior controlling officer and was acting within the scope of his or her apparent authority. See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1106-07.

### b.   **Pleading False or Misleading Statements or Omissions.**

"[T]he PSLRA increased the burden on a plaintiff's pleading of . . . the allegation that the

defendant made a false or misleading statement, or failed to state a material fact necessary to make

statements made not misleading." Adams v. Kinder-Morgan, Inc., 340 F.3d at 1095.   The PSLRA

requires:

> In any private action arising under this chapter in which the plaintiff alleges that the
> defendant --
>
> > (A) made an untrue statement of material fact; or
> >
> > (B) omitted to state a material fact necessary in order to make the
> > statements made, in the light of the circumstances in which they were
> > made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the
> reason or reasons why the statement is misleading, and, if an allegation regarding the
> statement or omission is made on information and belief, the complaint shall state
> with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).   "A statement or omission is only material if a reasonable investor would

consider it important in determining whether to buy or sell stock," but "[w]hether information is

material also depends on other information already available to the market; unless the statement

significantly altered the total mix of information available, it will not be considered material."

Grossman v. Novell, Inc., 120 F.3d 1112, 1119 (10th Cir. 1997)(quoting TSC Indus., Inc. v.

Northway, Inc., 426 U.S. 438, 449 (1976), and Basic, Inc. v. Levinson, 485 U.S. 224, 231-32

(1988))(internal quotation marks omitted).   In other words, materiality depends, not only on the

importance of the misstated or omitted facts, but also upon the facts about which investing public

is already aware.   No matter how material a piece of information may be, however, "[s]ilence, absent

a duty to disclose, is not misleading under Rule 10b-5." Basic v. Levinson, 485 U.S. at 239 n.17.

-40-

2.     **Claims under Section 20(a) of the Exchange Act**.

Section 20(a) of the Exchange Act provides for control person liability:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  To establish a defendant's liability as a controlling person, a plaintiff must prove two things: (i) a primary violation of the securities laws, and (ii) that the defendant had "control" over the primary violator.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1107.  "The second element of the prima facie case [under Section 20(a)] requires that the plaintiffs plead facts from which it can be reasonably be inferred that the individual defendants were control persons." Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (citing Maher v. Durango Metals, Inc., 144 F.3d 1302, 1306 (10th Cir. 1998)).

"The Tenth Circuit observed that § 20(a) 'has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable.'" Lane v. Page, 649 F. Supp. 2d 1256, 1306 (D.N.M. 2009)(Browning, J.)(quoting Richardson v. MacArthur, 451 F.2d 35, 41 (10th Cir. 1971)).  This showing requires the plaintiff to specify facts that "indicate that the defendants had 'possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1306).  See 17 C.F.R. § 230.405 ("The term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by

-41-

contract, or otherwise.").

In Adams v. Kinder-Morgan, Inc., the Tenth Circuit addressed whether certain individuals involved in Kinder-Morgan, Inc. qualified as control persons for the purposes of Section 20(a) liability. First, the Tenth Circuit held that the directors were not, ipso facto, control persons.

> We . . . conclude that the plaintiffs have failed to allege sufficient facts to support the conclusion that Kinder was a control person. During the period in question, he was not an executive of the company, but simply a member of the board of directors. The assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person within the meaning of the Exchange Act. Accordingly, the district court was correct to dismiss the claim of control person liability against Kinder.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (citing Dennis v. Gen. Imaging, Inc., 918 F.2d 496, 509-10 (5th Cir. 1990); Burgess v. Premier Corp., 727 F.2d 826, 832 (9th Cir. 1984); Cameron v. Outdoor Resorts of Am., Inc., 608 F.2d 187, 195 (5th Cir. 1979)). On the other hand, the Tenth Circuit held that being a significant executive within the corporation, with ultimate management authority over a primary violator, is a control person:

> [W]e conclude that the plaintiffs have pled facts supporting the allegation that [Defendant] Hall was a control person. He was the Chairman, President, and CEO of Kinder-Morgan during the relevant period. As President and CEO, Hall would have possessed the ultimate management authority of the corporation on a daily basis. There were no managers higher than Hall. He thus clearly possessed "the power to direct or cause the direction of the management and policies of [Kinder-Morgan]." Hall also had direct control over McKenzie, his chief financial officer and an alleged primary violator of Rule 10b-5.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1305; citing In re Ribozyme Pharms., Inc. Sec. Litig., 119 F. Supp. 2d 1156, 1167 (D. Colo. 2000)). A high-ranking position within the corporation, however, standing alone, is unlikely to satisfy the "control" element of a control-person claim, unless the circumstance of the defendant's

position and the nature of the underlying violation would lead to an inference that the person had control.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 (holding that the CFO of Kinder-Morgan, purely based on his position as CFO, was a control person where the securities-fraud violations related specifically to official reports on the company's financial performance). Importantly, it is not necessary that the control person actively participate in the alleged fraudulent activity.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108.[21]

### 3.      The Abstain-or-Disclose Rule.

Section 10(b) of the Exchange Act "prohibits the use 'in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe.'"  Chiarella v. United States, 445 U.S. 222, 225 (1980)(quoting 15 U.S.C. § 78j, i.e., Section 10(b)).  Rule 10b-5, promulgated pursuant to Section 10(b), makes it unlawful:

>    (a) To employ any device, scheme, or artifice to defraud,
>
>    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
>    (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  According to the Supreme Court, at least in the context of insider-trading claims under Section 10(b), this rule requires insiders to disclose all material, nonpublic information in its possession before buying or selling securities.  See Chiarella v. United States, 445 U.S. at 227-

---

[21] If a control person acted in good faith and did not induce the acts on which the liability of the controlled person is founded, the control person is not liable, but good faith is an affirmative defense, thus inappropriate for the Court to consider on a motion to dismiss.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 n.5.

30; <u>United States v. Nacchio</u>, 519 F.3d 1140, 1157 (10th Cir. 2008)("It is black-letter law that

insiders must disclose their material information or else abstain [from trading].")(citing <u>Chiarella</u>

<u>v. United States</u>, 445 U.S. at 226-29), <u>vacated in part on other grounds</u>, 555 F.3d 1234 (10th Cir.

2009)(en banc).   In <u>Garcia v. Cordova</u>, 930 F.2d 826 (10th Cir. 1991), addressing claims of

shareholders who sold their stock to a corporate insider, the Tenth Circuit stated:

> Pursuant to Rule 10b-5, insiders involved in securities transactions have a[n]
> affirmative duty to "disclose material facts which are known to them by virtue of
> their position but which are not known to persons with whom they deal and which,
> if known, would affect their investment judgment."  If such disclosure cannot be
> made, the insider is obligated to abstain from trading.

930 F.2d at 828-29.  <u>See</u> <u>Johnson v. Aljian</u>, 394 F. Supp. 2d 1184, 1196 (C.D. Cal. 2004)("In

construing Rule 10b-5, the Supreme Court had held that when a corporate insider trades on the basis

of material, nonpublic information, he or she employs a 'deceptive device' as that term is used in

Rule 10b-5.")(citing <u>United States v. O'Hagan</u>, 521 U.S. 642, 651-52 (1997)).

To properly plead an insider-trading claim, a plaintiff must allege that an insider:

(i) intentionally[22] (ii) failed to disclose (iii) material nonpublic information (iv) in connection with

the purchase and sale of securities, and (v) thereby made a profit.  <u>See</u> <u>Dirks v. SEC</u>, 463 U.S. 646,

653-54 (1983)("[A]n insider will be liable under Rule 10b-5 for inside trading only where he fails

to disclose material nonpublic information before trading on it and thus makes 'secret profits.'");

<u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 & n.7 (1976)(holding that scienter, <u>i.e.</u>, "intent to

deceive, manipulate, or defraud," is an element of a private cause of action for damages under

§ 10(b) and Rule 10b-5); <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. at 735-36 (recognizing

---

[22] Because the intent element represents a "particular state of mind," the Private Securities
Litigation Reform Act of 1995 requires that the plaintiff "state with particularity facts giving rise
to a strong inference that the defendant acted with the required state of mind."  <u>Johnson v. Aljian</u>,
394 F. Supp. 2d at 1197-98.  <u>See</u> 15 U.S.C. § 78u-4(b)(2).

a private cause of action under § 10(b) and Rule 10b-5); <u>SEC v. Tex. Gulf Sulphur Co.</u>, 401 F.2d 833, 848 (2d Cir. 1968)(en banc), <u>cert. denied</u>, 394 U.S. 976 (1969); <u>Johnson v. Aljian</u>, 394 F. Supp. 2d at 1196 ("The Ninth Circuit has articulated the elements for an insider trading claim as the 1) intentional 2) misrepresentation or failure to disclose 3) a material fact 4) in connection with the purchase or sale of securities.").   An insider must thus abstain from trading in the shares of the corporation unless the insider has first disclosed all material nonpublic information in the insider's possession.  <u>See</u> <u>Chiarella v. United States</u>, 445 U.S. at 227.  The doctrine is known as the "abstain or disclose rule."  <u>Chiarella v. United States</u>, 445 U.S. at 227.  The abstain-or-disclose rule applies both to individual insiders and to corporate issuers that engage in a public offerings of securities. <u>See</u> <u>Shaw v. Digital Equip. Corp.</u>, 82 F.3d 1194, 1204 (1st Cir. 1996)(stating that, if corporate issuers of stock were not subject to liability under the insiders-trading law, "a corporate issuer selling its own securities would be left free to exploit its informational trading advantage, at the expense of investors, by delaying disclosure of material nonpublic negative news until after completion of the offering."), <u>superceded by</u> <u>statute</u> <u>on</u> <u>other</u> <u>grounds</u>, 15 U.S.C. § 78u4(b)(l)-(2); <u>McCormick v. Fund. Am. Cos.</u>, 26 F.3d 869, 876 (9th Cir. 1994)("Numerous authorities have held or otherwise stated that the corporate issuer in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information to its shareholders or refrain from trading with them.")(citations omitted); <u>Kohler v. Kohler Co.</u>, 319 F.2d 634, 638 (7th Cir. 1963)("[U]nderlying principles [regarding disclosure of material nonpublic information] apply not only to majority stockholders of corporations and corporate insiders, but equally to corporations themselves,"); <u>Green v. Hamilton Int'l Corp.</u>, 437 F. Supp. 723, 728 (S.D.N.Y. 1977)("[T]here can be no doubt that the prohibition against 'insiders' trading extends to a corporation.").

4.      **Securities Act of 1933.**

Congress put the Securities Act of 1933 in place to provide greater protection to purchasers of registered securities.  See Herman & MacLean v. Huddleston, 459 U.S. 375, 383 (1983).  Claims under the Securities Act are much more limited in scope than are those under the Exchange Act. The Securities Act in not concerned with the "aftermarket."  With a Securities Act claim, the only pertinent representations are those made within the four corners of the issuers' offering documents or in documents expressly incorporated therein.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. at 752.  Furthermore, the PSLRA does not appear to affect the pleading standards under the Securities Act, because the heightened pleading requirements of the PSLRA apply only in "private action[s] arising under this chapter," 15 U.S.C. § 78u-4(b)(1), and "this chapter" refers to Chapter 2B of Title 15.  The Securities Act of 1933, however, is Chapter 2A, see 15 U.S.C. § 77a ("This subchapter[, subchapter I of Chapter 2A,] may be cited as the 'Securities Act of 1933'."); 15 U.S.C. § 78a ("This chapter[, chapter 2B,] may be cited as the 'Securities Exchange Act of 1934'.").

Under certain circumstances, rule 9(b)'s heightened-pleading requirements might apply to the allegations of material misstatements under a 1933 Act claim.  See Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1251-52 (10th Cir. 1997).  When a plaintiff's 1933 Act is based on negligent or innocent conduct, rather than fraudulent conduct, however, a court applies the more lenient pleading standards of rule 8(a).  See Schwartz v. Celestial Seasonings, Inc., 124 F.3d at 1251-52.

a.      **Section 11 of the Securities Act.**

Section 11 of the Securities Act imposes liability upon every person who, among other things, (i) signed the registration statement, (ii) was a director of the issuer, (iii) was an underwriter of the offering, or (iv) prepared or certified any report or valuation used in connection with the

registration statement, for any materially misleading statements and omissions made therein.  <u>See</u> 15 U.S.C. § 77k.  "The pleading requirements of a § 11 claim are less stringent than that of a § 10(b) claim," and it "imposes strict liability against the issuer of securities where a registration statement contains material misstatements or omits material facts."  <u>Schaffer v. Evolving Sys., Inc.</u>, 29 F. Supp. 2d 1213, 1220 (D. Colo. 1998).  Even innocent misrepresentations will subject the issuer of securities to liability.  <u>See</u> <u>Herman & MacLean v. Huddleston</u>, 459 U.S. at 381 ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case.  Liability against the issuer of a security is virtually absolute, even for innocent misstatements.").

A claim under Section 11 must be based on a registration statement filed with the SEC.  <u>See</u> <u>Herman & MacLean v. Huddleston</u>, 459 U.S. at 381; <u>Schaffer v. Evolving Sys., Inc.</u>, 29 F. Supp. 2d at 1220.  A Section 11 plaintiff must identify a material misrepresentation within the four corners of the challenged registration statement, or an omission of a material fact required to be stated therein or necessary to make the statements therein not misleading.  <u>See</u> <u>Hermean & MacLean v. Huddleston</u>, 459 U.S. at 381-82 (contrasting § 11 with § 10(b) of the Exchange Act); <u>Grimm v. Whitney-Fidalgo Seafoods, Inc.</u>, No. 73 Civ. 1304, 1973 WL 495, at *2 (S.D.N.Y. Dec. 4, 1973). Corporate insiders potentially face Section 11 liability for material false statements in registration statements only if they were directors at the time of the offering or if they personally signed the registration statement at issue.  <u>See</u> <u>In re Williams Sec. Litig.</u>, 339 F. Supp. 2d 1242, 1269 (N.D. Okla. 2003).

**b.**     <u>**Section 12(a)(2) of the Securities Act.**</u>

Section 12(a)(2) of the Securities Act provides:

Any person who . . . offers or sells a security . . . by the use of any means or

-47-

> instruments of transportation or communication in interstate commerce or of the
> mails, by means of a prospectus or oral communication, which includes an untrue
> statement of a material fact or omits to state a material fact necessary in order to
> make the statements, in the light of the circumstances under which they were made,
> not misleading . . . and who shall not sustain the burden of proof that he did not
> know, and in the exercise of reasonable care could not have known, of such untruth
> or omission, shall be liable . . . to the person purchasing such security from him . . . .

15 U.S.C. § 77l(a).  A claim under Section 12(a)(2) thus must be based on a prospectus delivered to persons or an entity purchasing securities in a offering, which generally incorporates the SEC registration statement.  Even if a Section 12(a)(2) claim is based on an oral statement, the oral statement must relate to a prospectus.  See Gustafson v. Alloyd Co., 513 U.S. 561, 567-68 (1995). The Section 12(a)(2) claim must identify a material misrepresentation in or omission either from the prospectus or from an oral representation directly concerning the prospectus.  See Gustafson v. Alloyd Co., 513 U.S. at 578.  Section 12(a)(2) liability is similar to Section 11 liability, in that "[t]he purchaser need not prove scienter, fraud, or negligence on the part of the seller, nor need he establish that he relied upon the misrepresentation or omission or that his or her loss was a direct or proximate result of the misrepresentation or omission."  Schaffer v. Evolving Sys., Inc., 29 F. Supp. 2d at 1220 (citing MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/Am. Express Inc., 886 F.2d 1249, 1256-57 (10th Cir. 1989)).  Unlike a Section 11 claim, however, the only proper defendants in a Section 12(a)(2) action are those who "offer or sell" unregistered securities.  Schaffer v. Evolving Sys., Inc., 29 F. Supp. 2d at 1220 (citing Pinter v. Dahl, 486 U.S. 622, 641 (1988)).  The Tenth Circuit has recognized that liability extends also "to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  Maher v. Durango Metals, Inc., 144 F.3d at 1307 (quoting Pinter v. Dahl, 486 U.S. at 647).

### c.      Section 15 Control Person Liability.

Section 15 is a "control person" provision, similar to Section 20(a) of the Exchange Act.  It

states, in relevant part:

> Every person who . . . controls any person liable under sections 77k or 77l of this title [i.e., Sections 11 of 12 of the Securities Act], shall also be liable jointly and severally . . . to any person to whom such controlled person is liable, unless the controlling person had no knowledge of [the] facts [that form the basis of the underlying Section 11 or Section 12 claims].

15 U.S.C. § 77o. "Although worded differently, the control person provision of § 15 and § 20(a) are interpreted the same."  Maher v. Durango Metals, Inc., 144 F.3d at 1305 n.7 (citing First Interstate Bank v. Pring, 969 F.2d 891, 897 (10th Cir. 1992)).

**5.      Item 303 of Regulation S-K and Regulation S-X.**

Item 303 of Regulation S-K, 17 C.F.R. § 229.303, and Regulation S-X, 17 C.F.R. § 210.4-01, require the disclosure of specific information in prospectuses and registration statements.  Item 303 of Regulation S-K requires the disclosure of, among other things, "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way," and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §§ 229.303(a)(1) & (a)(3)(ii).  Some courts have held that a registrant's violation of Item 303 of Regulation S-K can give rise to liability under the federal securities laws.  See Steckman v. Hart Brewing, Inc., 143 F.3d 1293, 1296 (9th Cir. 1998)("[A]llegations which sufficiently state a claim under Item 303 also state a claim under section 11 [of the Securities Act and a]llegations which would support a claim under Item 303(a)(3)(ii) are sufficient to support a claim under section 12(a)(2)."); In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 70-73 (2d Cir. 2001)(reversing dismissal of claims arising under Section 10(b) of the Exchange Act where the plaintiffs adequately pled violation of Item 303 of Regulation S-K); J&R Marketing, SEP v. Gen. Motors Corp., 549 F.3d 384,

392 (6th Cir. 2008)(holding that registrants' disclosure obligations under Section 11 include duty under Item 303 to make forward-looking projections regarding information known to registrant); Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 611 (S.D.N.Y. 2008)("An omission of fact 'required to be stated' under Item 303 will generally produce liability under section 11.")(quoting In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d 189, 211 (S.D.N.Y. 2004)); Milman v. Box Hill Sys. Corp., 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999)(denying motion to dismiss the plaintiffs' claims under Sections 11 and 12(a)(2) of Securities Act where the plaintiffs sufficiently pled violation of Item 303).

Similarly, Regulation S-X, 17 C.F.R. § 210.4-01 requires financial statements which are filed with the SEC to be in compliance with Generally Accepted Accounting Principles ("GAAP").  17 C.F.R. § 210.4-01(a)(1)("Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed misleading or inaccurate, despite footnotes or other disclosures, unless the Commission has otherwise provided."). One such GAAP provision, Financial Account Standards ("FAS") 107, at ¶ 15A, Disclosures About Fair Value of Financial Instruments, as amended by FAS 161, Disclosures About Derivative Instruments and Hedging Activities (2008), requires the disclosure of "significant concentrations of credit risk arising from *all* financial instruments, whether from an individual counterparty or groups of counterparties." (emphasis in original, footnote omitted).

## ANALYSIS

The Plaintiffs ask the Court to reconsider portions of its January 27, 2010 orders and to grant them leave to file their SAC.  The Defendants oppose the Motion.  After carefully reviewing the parties' briefs and oral arguments at the hearing, the Court will reconsider portions of its orders. The Court will reconsider what disclosure obligations Item 303 and the abstain-or-disclose rule

impose, and reserving ruling on the motion to dismiss the Section 20(a) claims against Goldstone, Simmons, and Decoff, dismissing the Plaintiffs' claims against Decoff, but not dismissing the Plaintiffs' claims against Goldstone and Simmons.  The Court also grants the Plaintiffs leave to file their SAC, which cures pleading deficiencies for its Section 20(a) claims against Thornburg.

**I.  THE COURT WILL RECONSIDER ITS FAILURE TO ADDRESS THE DISCLOSURE DUTIES THAT THE ABSTAIN-OR-DISCLOSE RULE AND ITEM 303 IMPOSE, BUT WILL NOT CHANGE ITS DECISION TO DISMISS THE PLAINTIFFS' SECURITIES ACT CLAIMS AGAINST THE UNDERWRITER DEFENDANTS.**

The Court will reconsider whether Regulation S-K and Item 303 impose a duty on the Defendants to disclose adverse liquidity trends afflicting TMI during the offerings period.  The Court concludes that the abstain-or-disclose rule does not apply to Section 11 claims.  Additionally, the Plaintiffs have not set forth allegations establishing a violation of the Defendants' disclosure duty under Item 303.  Neither the abstain-or-disclose rule nor Item 303 therefore alter the Court's decision to dismiss the Plaintiffs' claims against the Underwriter Defendants.

**A.  THE COURT WILL RECONSIDER WHETHER THE ABSTAIN-OR-DISCLOSE RULE IMPOSES DISCLOSURE DUTIES ON THE DEFENDANTS.**

The Plaintiffs contend that the "Defendants are . . . subject to the broad affirmative disclosure obligations of the 'abstain or disclose' rule" under Section 11 of the Securities Act.  Memorandum at 11 ("The 'abstain or disclose' rule applies with equal force to corporate issuers like TMI that engage in a public offering of securities.").  See Reply at 52 n.35 ("[T]he 'disclose or abstain' rule applies equally to matters arising under section 10(b) of the Exchange Act and section 11 of the Securities Act."  (citations omitted)).  The authority which the Plaintiffs cite in support of their contention does not support their assertion.  The Plaintiffs cite the United States Court of Appeals for the Ninth Circuit's opinion in McCormick v. Fund American Companies, Inc. for the proposition

that the refrain or disclose standard from insider trading cases under § 10(b) applies to the Securities

Act claims.   In <u>McCormick v. Fund American Companies, Inc.</u>, the Ninth Circuit addressed a

situation where a company purchased shares from the former CEO of Fireman's Fund Insurance

Company ("FFIC"), a wholly-owned subsidiary of defendant Fund American Companies ("FAC").

At the time FFIC purchased McCormick's securities, it was involved in negotiations for the sale of

FFIC to a large foreign insurer.

> Before the buyout of McCormick's securities was completed, company officials told McCormick about the pending discussions with the foreign insurer, and about the likely increase in the value of FAC stock if the sale were made.   After the sale, McCormick claimed that the officials had misrepresented or omitted many material facts.   <u>He brought suit against FAC under § 10(b) of the Securities Exchange Act of 1934</u>, and also alleged various related state statutory and common-law claims.

26 F.3d at 872-73 (emphasis added).   The Ninth Circuit affirmed the district court's grant of

summary judgment in favor of FAC on all claims.   The Ninth Circuit began by holding that

disclosure duties under § 10b apply to corporate insider traders as well as individual inside traders:

> To make out a claim under § 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, plaintiff must show that there has been a misstatement or omission of material fact, made with scienter, which proximately caused his or her injury.   <u>McGonigle v. Combs</u>, 968 F.2d 810, 817 (9th Cir.), <u>cert. dismissed</u>, 506 U.S. 948 . . . (1992).   In addition, the misstatement or omission complained of must be misleading; in the case of an omission, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 239 n. 17 . . . (1988).

A. Duty to Disclose

> FAC's conduct on May 16, 1990 indicated that at that time it recognized a duty either to disclose to McCormick material nonpublic information relating to the transaction it was about to engage in with him, or to refrain from repurchasing his securities.   FAC's brief, however, together with counsel's comments at oral argument, suggests that in the course of litigation FAC has distanced itself from that position.

> The original position was the correct one.   *Numerous authorities have held or otherwise stated that the corporate issuer in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information*

*to its shareholders or refrain from trading with them.* Smith v. Duff & Phelps, Inc., 891 F.2d 1567, 1572–75 (11th Cir. 1990) (duty to disclose merger negotiations to an employee who departs voluntarily and cashes in his shares as a condition of termination); Jordan v. Duff & Phelps, Inc., 815 F.2d 429, 435–39 (7th Cir. 1987) (same), cert. dismissed, 485 U.S. 901 . . . (1988); Kohler v. Kohler Co., 319 F.2d 634, 638 (7th Cir. 1963) ("underlying principles [mandating disclosure of material nonpublic information] apply not only to majority stockholders of corporations and corporate insiders, but equally to corporations themselves"); Green v. Hamilton Internat'l Corp., 437 F. Supp. 723, 728 (S.D.N.Y. 1977) ("there can be no doubt that the prohibition against 'insider' trading extends to a corporation"); VII Louis Loss & Joel Seligman, Securities Regulation 1505 (3d ed. 1991) ("When the issuer itself wants to buy or sell its own securities, it has a choice: desist or disclose"); Richard Jennings & Harold Marsh, Securities Regulation 1044 n.12 (6th ed. 1987) ("the issuer itself is, of course, also covered [by insider trading laws]"); Daniel J. Winnike, Rule 10b-5's Effect on Employer Stock Repurchases and Option Cancellations on Termination of Employment, 19 Sec. Reg. L. J. 227, 237-38 (1991) ("there is little doubt that the relationship between a corporation and its shareholders engenders the type of trust and confidence" necessary to trigger the duty to disclose or abstain); see also Levinson v. Basic, Inc., 786 F.2d 741, 746 (6th Cir. 1986) ("courts have held that a duty to disclose [merger] negotiations arises in situations such as where the corporation is trading in its own stock"), vacated on other grounds, 485 U.S. 224 . . . (1988); Arber v. Essex Wire Corp., 490 F.2d 414, 418 (6th Cir.), cert. denied, 419 U.S. 830 . . . (1974); Grigsby v. CMI Corp., 590 F. Supp. 826, 830 (N.D. Cal. 1984), aff'd, 765 F.2d 1369 (9th Cir. 1985). Cf. Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992) (publicly-held corporation had no duty to disclose because there was no suggestion that corporation was trading in its own stock); Backman v. Polaroid Corp., 910 F.2d 10, 13 (1st Cir. 1990) (same).

This hardly resolves the issues presented by this lawsuit, however. FAC was required to disclose only material information, and to avoid material misrepresentations. McGonigle, 968 F.2d at 817. Materiality is a separate inquiry, and the crux of this case.

26 F.3d at 875-76 (italicization added). The Plaintiffs' rely on the Ninth Circuit's statement that "[n]umerous authorities have held or otherwise stated that the corporate issuer in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information to its shareholders or refrain from trading with them" in support of their assertion that TMI must abstain or disclose under Section 11 of the Securities Act. The Ninth Circuit, however, was discussing disclosure duties under § 10(b) in the insider trading context of a company

repurchasing its stock, as were the cases upon which it relied, and not the disclosure duties of a company engaged in a public offering.  See, e.g., Smith v. Duff & Phelps, Inc., 891 F.2d at 1572-75 (addressing a company's repurchase of a terminated employee's stock: "Smith stated causes of action pursuant to section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 . . . ."); Jordan v. Duff & Phelps, Inc., 815 F.2d at 435-39 (holding in the § 10(b) and Rule 10b-5 context that "[c]lose corporations buying their own stock, like knowledgeable insiders of closely held firms buying from outsiders, have a fiduciary duty to disclose material facts"; "[I]nsiders in closely held firms may not buy stock from outsiders in person-to-person transactions without informing them of new events that substantially affect the value of the stock" (emphasis added)); Kohler v. Kohler Co., 319 F.2d at 638 (addressing a plaintiff's Rule 10b-5 action seeking "damages arising out of a sale of Kohler Co. common stock which he sold to the company": "It is clear that the statute [§ 10(b)] was intended to create a form of fiduciary relationship between so-called corporate 'insiders' and 'outsiders' with whom they deal in company securities which places upon the insider duties more exacting than mere abstention from what generally is thought to be fraudulent practices."); Green v. Hamilton Int'l Corp., 437 F. Supp. at 728-29 (addressing claims arising from the plaintiffs' redemption of convertible debentures: "Furthermore, there can be no doubt that [Rule 10b-5's] prohibition against 'insider' trading extends to a corporation.").  All of these cases involve a corporation purchasing securities from other parties, and do not involve the disclosure duties of a corporation engaged in a public offering or Security Act claims.

The Plaintiffs also rely on Shaw v. Digital Equipment Corp., to argue that the "abstain or disclose" rule applies under Sections 11 of the Securities Act.  While the United States Court of Appeals for the First Circuit "analogiz[ed]" to the abstain-or-disclose rule to elaborate on the policy underlying Securities Act's disclosure requirements, it did not incorporate the doctrine into the

Securities Act; rather, it "look[ed] to the explicit statutory and regulatory framework to determine whether the Securities Act provides such a mechanism [as the abstain-or-disclose rule of insider trading law]":

1. The Insider Trading Analogy

In understanding the nature of the disclosure requirements attending a public offering of stock, it is helpful to conceptualize DEC (the corporate issuer) as an individual insider transacting in the company's securities, and to examine the disclosure obligations that would then arise.

There is no doubt that an individual corporate insider in possession of material nonpublic information is prohibited by the federal securities laws from trading on that information unless he makes public disclosure. He must disclose or abstain from trading. A central justification for the "disclose or abstain" rule is to deny corporate insiders the opportunity to profit from the inherent trading advantage they have over the rest of the contemporaneously trading market by reason of their superior access to information. The rule eliminates both the incentives that insiders would otherwise have to delay the disclosure of material information, and minimizes any efficiency losses associated with the diversion of resources by insiders to "beating the market."

The policy rationale for the "disclose or abstain" rule carries over to contexts where a corporate issuer, as opposed to an individual, is the party contemplating a stock transaction. Courts, including this one, have treated a corporation trading in its own securities as an "insider" for purposes of the "disclose or abstain" rule. See, e.g., McCormick v. Fund American Cos., Inc., 26 F.3d 869, 876 (9th Cir. 1994) (collecting cases) ("[T]he corporate issuer in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information to its shareholders or refrain from trading with them."); Rogen v. Ilikon Corp., 361 F.2d 260, 268 (1st Cir. 1966)[(addressing "defendant's motion for summary judgment in a suit brought to recover damages for non-disclosure of material facts in connection with the sale of plaintiff's stock to defendant corporation")]; Kohler v. Kohler Co., 319 F.2d 634, 638 (7th Cir. 1963)

Just as an individual insider with material nonpublic information about pending merger or license negotiations could not purchase his company's securities without making disclosure, the company itself may not engage in such a purchase of its own stock, if it is in possession of such undisclosed information. See, e.g., Rogen, 361 F.2d at 268. By extension, a comparable rule should apply to issuers engaged in a stock offering. Otherwise, a corporate issuer selling its own securities would be left free to exploit its informational trading advantage, at the expense of investors, by delaying disclosure of material nonpublic negative news until after

completion of the offering.  Cf. Ian Ayres, Back to Basics: Regulating How Corporations Speak to the Market, 77 Va. L. Rev. 945, 959-60 (1991) (describing the argument that securities laws impose needed discipline, because companies do not always internalize the costs of failing to provide the market with accurate information that would lower stock prices).

2. The Statutory and Regulatory Scheme

Analogizing a corporate issuer to an individual insider subject to the "disclose or abstain" rule of insider trading law illustrates the policy reasons supporting a comparably strong disclosure mechanism in the context of a public offering.  We look to the explicit statutory and regulatory framework to determine whether the Securities Act provides such a mechanism, and whether the Wilensky complaint states a legally cognizable claim for nondisclosure under Section 11.

Section 11 by its terms provides for the imposition of liability if a registration statement, as of its effective date: (1) "contained an untrue statement of material fact"; (2) "omitted to state a material fact required to be stated therein"; or (3) omitted to state a material fact "necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).  The plaintiffs' claim of nondisclosure relies on the second of these three bases of liability.  That predicate is unique to Section 11; neither Section 12(2) of the Securities Act nor Section 10(b) or Rule 10b-5 under the Exchange Act contains comparable language.

82 F.3d at 1203-04 (other citations omitted)(emphasis added).  The First Circuit held that, pursuant to Section 11, an issuer in possession of nonpublic information was required to disclose interim financial information where, at the time the prospectus became effective, the interim results represented "an extreme departure from the range of results which could be anticipated based on currently available information.'" Shaw v. Digital Equip. Corp., 82 F.3d at 1210.  See In re Turkcell Iletisim Hizmetler A.S. Sec. Litig., 202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001)(quoting the same statement from Shaw v. Digital Equipment Corp.).

Thus, contrary to the Plaintiffs' argument that the abstain-or-disclose rule applies to Section 11 and public offerings, the First Circuit "look[ed] to the explicit statutory and regulatory framework to determine" the defendants' disclosure duties.  Accordingly, in J&R Marketing, SEP v. General Motors Corp., the United States Court of Appeals for the Sixth Circuit observed that "the First

-56-

Circuit went on to do what we have done above: look to the statutes and regulations detailing what must be included in a registration statement and determine whether the information plaintiffs claim should have been included falls under those rules."  549 F.3d at 397.  The Sixth Circuit in J&R Marketing, SEP v. General Motors Corp. made explicit what is implicit in the First Circuit's reasoning in Shaw v. Digital Equipment Corp., concluding that courts are "not authorized to impose a wide-ranging duty to disclose anything that a person can allege was nonpublic, material information."  549 F.3d at 397.  The Plaintiffs in essence ask the Court to extend the abstain-or-disclose rule outside of the insider trading context to all securities sales, which would in effect require the disclosure of all material information.  Neither the Securities Act, nor the Exchange Act, nor courts impose such a broad requirement.  See Shaw v. Digital Equip. Corp., 82 F.3d at 1202 ("[T]he mere possession of material nonpublic information does not create a duty to disclose it."); Glazer v. Formica Corp., 964 F.2d 149, 156 (2d Cir. 1992)("The materiality of the information claimed not to have been disclosed . . . is not enough to make out a sustainable claim of securities fraud.  Even if information is material, there is no liability under Rule 10b-5 unless there is a duty to disclose it.")(quoting Blackman v. Polaroid Corp., 910 F.2d 10, 12 (1st Cir. 1990)); In re Craftmatic Sec. Litig., 890 F.2d 628, 641 n.17 (3d Cir. 1989)("Disclosures mandated by law are presumably material. . . .  However, when defendants voluntarily disclose information, they have a duty to disclose additional material facts only to the extent that the volunteered disclosure was misleading as to a material fact."); Harborview Master Fund, LP v. Lightpath Techs., Inc., 601 F. Supp. 2d 537, 543-44 (S.D.N.Y. 2009)([T]he mere possession of material non-public information does not create a disclosure duty."); SEC v. Autocorp Equities, Inc., No. 2:98-CV-00562 PGC, 2004 WL 1771608, at *3 (D. Utah Aug. 4, 2004)(finding, in a 10b-5 case, certain information material and then analyzing whether there was a duty to disclose it); Karacand v. Edwards, 53 F. Supp. 2d

1236, 1245 (D. Utah 1999)("Materiality alone is not sufficient to place a company under a duty to disclose")(citing In re Sofamor Danek Group, Inc., 123 F.3d 394, 400 (6th Cir. 1997)).  See also D. Langevoort & G. Gulati, The Muddled Duty to Disclose Under Rule 10b-5, 57 Vand. L. Rev. 1639, 1645 (2004)("[N]ot all material information has to be disclosed.").  Moreover, such a broad standard would render nugatory the statutes and regulations dictating with specificity what information a securities issuers must disclose.  So broad a standard would also ignore the Supreme Court's analysis in Basic v. Levinson expressing concern that "[d]evising two different standards of materiality, one for situations where insiders have traded in abrogation of their duty to disclose or abstain . . . , and another covering affirmative misrepresentations by those under no duty to disclose . . . , would effectively collapse the materiality requirement into the analysis of defendant's disclosure duties."  485 U.S. at 241 n.18 (emphasis added).  The Court therefore rejects the Plaintiffs' argument that the abstain-or-disclose rule applies here.

**B.    THE COURT WILL RECONSIDER WHETHER ITEM 303 OF REGULATION S-K IMPOSES A DISCLOSURE DUTY ON THE DEFENDANTS.**

The Plaintiffs assert that,

> [i]n dismissing Plaintiffs' Securities Act claims, the Court focused exclusively on the issue of whether affirmative statements in the Offering Documents were materially false, but declined to consider certain alleged omissions because it stated that Plaintiffs failed to identify the source of any duty that compelled Defendants to disclose certain material information omitted from the Offering Documents.

Memorandum at 9.  The Plaintiffs request the Court to "reconsider its silence on the affirmative disclosure obligations imposed on Defendants by Regulation S-K."  Memorandum at 9.  The Court will reconsider the obligations that Regulation S-K imposes on the Defendants.

Regulation S-K governs the disclosure requirements of registration statements, periodic reports, and annual reports filed with the SEC.  See 17 C.F.R. § 229.10.  Item 303 of Regulation S-

K, 17 C.F.R. § 229.303, requires the independent disclosure of specific information in prospectuses and registration statements.  Item 303 of Regulation S-K requires the disclosure of, among other things, "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way," and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §§ 229.303(a)(1) & (a)(3)(ii).  Breaching the duty to disclose under Item 303 of Regulation S-K can give rise to a claim under the Securities Act.  See Steckman v. Hart Brewing, Inc., 143 F.3d at 1296 ("[A]llegations which sufficiently state a claim under Item 303 also state a claim under section 11 [of the Securities Act and a]llegations which would support a claim under Item 303(a)(3)(ii) are sufficient to support a claim under section 12(a)(2)."); In re Scholastic Corp. Sec. Litig., 252 F.3d at 70-73 (reversing dismissal of claims arising under Section 10(b) of the Exchange Act where the plaintiffs adequately pled violation of Item 303 of Regulation S-K); J&R Marketing, SEP v. Gen. Motors Corp., 549 F.3d at 392 (holding that registrants' disclosure obligations under Section 11 include duty under Item 303 to make forward-looking projections regarding information known to registrant); Garber v. Legg Mason, Inc., 537 F. Supp. 2d at 611 ("An omission of fact 'required to be stated' under Item 303 will generally produce liability under section 11.")(quoting In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d at 211); Milman v. Box Hill Sys. Corp., 72 F. Supp. 2d at 231 (denying motion to dismiss the plaintiffs' claims under Sections 11 and 12(a)(2) of Securities Act where the plaintiffs sufficiently pled violation of Item 303).

    In a recent case, the Second Circuit reversed a district court's dismissal of a securities class action complaint.  The Second Circuit stated:

Plaintiffs principally contend that Item 303 of SEC Regulation S–K, 17 C.F.R. § 229.303(a)(3)(ii), provides the basis for Blackstone's disclosure obligation. Pursuant to Subsection (a)(3)(ii) of Item 303, a registrant must "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a) instruction 3. The SEC's interpretive release regarding Item 303 clarifies that the Regulation imposes a disclosure duty "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989).

Although the District Court opinion and the parties on appeal primarily focus on the materiality of Blackstone's alleged omissions, Blackstone does urge that plaintiffs' complaint fails to adequately allege that Blackstone was required by Item 303 to disclose trends in the real estate market for the purpose of Sections 11 and 12(a)(2). We disagree. Plaintiffs allege that the downward trend in the real estate market was already known and existing at the time of the IPO, and that the trend or uncertainty in the market was reasonably likely to have a material impact on Blackstone's financial condition. Therefore, plaintiffs have adequately pleaded a presently existing trend, event, or uncertainty, and the sole remaining issue is whether the effect of the "known" information was "reasonably likely" to be material for the purpose of Item 303 and, in turn, for the purpose of Sections 11 and 12(a)(2).

Litwin v. Blackstone Group, L.P., 634 F.3d at 716. Accordingly, the Court concludes that a violation of the duty to disclose under Item 303 may be actionable under Section 11 of the Security Act. Because the Plaintiffs have not established a violation of Item 303, the Court need not decide whether every violation is necessarily also a violation of Section 11. To state a claim based on Item 303, a plaintiff must make a plausible showing that (i) there exists a (i) known (ii) "trend, event, or uncertainty" (iii) that is "reasonably likely" to be material under Item 303, and in turn the Securities Act. While the Court reconsiders the duties Regulation S-K imposes, those duties do not alter the Court's holdings in its orders.

-60-

**C.   THE PLAINTIFFS HAVE NOT ALLEGED FACTS ESTABLISHING THAT THE DEFENDANTS VIOLATED THEIR DUTY TO DISCLOSE UNDER ITEM 303.**

The Plaintiffs ask the Court to reconsider portions of its orders based on their allegations that the Defendants violated their duties under Item 303 of Regulation S-K. The Plaintiffs argue that the Defendants' failure to disclose trends that were reasonably likely to have a material adverse impact on TMI's liquidity violates Item 303 of Regulation S-K, and gives rise to liability under the Securities Act and the Exchange Act. The Plaintiffs contend that: (i) the "Defendants had an affirmative duty under Item 303 of Regulation S-K to disclose the litany of liquidity problems then facing the Company which, individually and collectively, had a material adverse impact on TMI's liquidity position"; and (ii) the "Defendants' failure to disclose these known adverse liquidity trends constituted a breach of that duty." Memorandum at 10. Specifically, the Plaintiffs assert that Item 303 of Regulation S-K required the Defendants to disclose: (i) TMI's increased reliance on RPA financing; (ii) TMI's $2.9 billion dollar portfolio of purchased MBS backed by Alt-A mortgages, which was used as collateral to secure TMI's RPAs -- and therefore raised the likelihood of margin calls as a result of unprecedented deterioration in the Alt-A market; and (iii) the existence of cross-default provisions in its RPA contracts, and the likelihood that such provisions would be triggered as a result of the deterioration in the market value of the toxic Alt-A-backed assets used to secure these agreements during a time when the Alt-A market was under severe distress. The Plaintiffs contend that TMI's SEC filings represented that it financed its ARM assets through CDOs, ABCP, and RPAs, and that historically the diversity of TMI's funding sources gave it flexibility in maintaining the liquidity it business model demanded. See TMI, 2007 Form 10-K Annual Report, at 21 (dated February 28, 2008)(noting that, if TMI was unable to refinance its ABCP and RPA facilities, its "liquidity and capital resources could be materially adversely affected"). The Plaintiffs

argue that these alleged violations are actionable under the Securities Act and the Exchange Act.

See Memorandum at 12-22, 30-31.  The Court concludes, however, that the Defendants did not

violate their disclosure obligations under Item 303.

> ### 1.   TMI Did Not Have a Duty to Disclose its Alleged Increased Reliance on RPA Financing.

Relying on facts in the SAC, the Plaintiffs assert that "by May 26, 2007 there existed such

severe disruption in the ABCP markets that Thornburg Mortgage Finance, LLC, a subsidiary TMI

formed in 2007 to purchase whole loans and issue ABCP, never became operational."

Memorandum at 15.  The Plaintiffs further contend in their Memorandum that, "[u]nbeknownst to

investors, by the time of the June 2007 Offering, the Company had completely lost access to the

ABCP market."  Memorandum at 15.  In essence, the Plaintiffs contend that TMI failed to disclose

a trend of an unspecified "severe disruption in the ABCP markets" in "[t]he June 2007 Offering

Documents, which became effective on or about June 19, 2007."  Memorandum at 16.

The Plaintiffs' arguments are unavailing for a number of reasons.  First, the new facts are

untimely, because they were available to the Plaintiffs when they filed the CCAC.  See

Memorandum at 3 ("The SAC includes new facts which explain that, by May 2007, extreme

disruptions in the asset-backed commercial paper market ("ABCP") market had already foreclosed

it as a viable financing option for Defendants . . . .").  TMI disclosed the existence and non-use of

Thornburg Mortgage Finance, LLC -- the ABCP facility referred to in the bankruptcy filing --

through its August 8, 2007 Form 10-Q.  See Thornburg Mortgage, Inc., Quarterly Report (Form

10-Q) at 20 (dated August 8, 2007), filed August 23, 2010 (Doc. 327-6)("In the second quarter of

2007, the Company established a $3.5 billion Whole loan-collateralized CP facility . . . .  At June

30, 2007, no such notes had been issued, but the Company expects to utilize the facility prior to

December 31, 2007."). The fact of TMI's non-use of its ABCP facility and whatever implications flow therefrom were thus disclosed and available to the Plaintiffs long before they filed the CCAC. A motion for reconsideration is an "inappropriate vehicle[ ] to reargue an issue previously addressed by the court when the motion merely advances . . . supporting facts which were available at the time of the original motion." <u>Servants of Paraclete v. Does</u>, 204 F.3d at 1012.

Second, despite the Plaintiffs' characterization in their Memorandum that TMI "had completely lost access to the ABCP market" at "the time of the June 2007 Offering," Memorandum at 15, neither the SAC nor the CCAC contain such an allegation. See <u>Issa v. Comp USA</u>, 354 F.3d 1174, 1179 (10th Cir. 2003)("[P]laintiff may not rely on the allegations in his . . . brief to supplement his complaint . . . ."). The Plaintiffs cite in support of their allegation paragraphs 17 and 174 of the SAC. These paragraphs provide:

> 17.     While TMI's Alt-A-backed asset portfolio was, unbeknownst to investors, adversely affecting its balance sheet throughout the Class Period (e.g., TMI's Alt-A backed MBS were illiquid/non-salable, and the decline in the value of the Alt-A assets triggered margin calls from RPA counter-parties on RPAs in which these Alt-A assets were held as collateral), TMI ran into another problem in 2007 -- a key source of TMI's funding, the ABCP market, became illiquid. Indeed, *as early as May 2007, TMI -- through its subsidiary Thornburg Mortgage Finance -- encountered significant disruptions in the ABCP market, according to TMI's bankruptcy court filings.* By no later than June 2007, *TMI and* the *Individual* Defendants knew, but failed to disclose, that <u>the ABCP market was shrinking rapidly</u> and, by July 2007, had completely "dried up." Indeed, Defendant Goldstone admitted as much to Lead Plaintiffs' confidential sources during a private meeting on August 8, 2007. This private admission came just two and a half weeks after the Company represented on July 20, 2007 that its liquidity position was at its highest level "in the history of the organization."

> . . . .

> 174.     Notwithstanding the assurances *by TMI and the Individual Defendants that the Company* was financing itself through the ABCP market and that its ABCP was liquid, TMI has since admitted that the lack of liquidity in the ABCP market began to affect the Company in *early 2007. In its bankruptcy court filings, TMI admitted that by May 26, 2007 there existed disruption in the ABCP markets, such*

*that Thornburg Mortgage Finance, LLC, a subsidiary TMI formed in 2007 to purchase whole loans and issue ABCP, never became operational (i.e., it never purchased any loans from TMI and it never issued any ABCP). See In re Thornburg Mortgage, Inc., Debtor, No. 09-17787 (D. Md. Bankr. Jun. 26, 2009) (Doc. 205). TMI's bankruptcy filings also demonstrate that Thornburg Mortgage Capital Resources, LLC, a subsidiary TMI also formed to issue ABCP, shrunk its ABCP issuance from $9.2 billion to $300 million during the second and third quarters of 2007, thereby reducing TMI's access to this financing source and reducing its liquidity "due to a lack of liquidity in the ABCP market that began in 2Q07." See id. The inability of these subsidiaries to issue ABCP was due, in material part, to TMI's increasing reliance on the acquisition of less-than-prime whole loans during a period when the less-than-prime loan sector was under severe distress, according to TMI's own disclosures. Indeed, TMI's restated 2007 Form 10-K disclosed for the first time that 41% of the whole loans TMI held from acquisition activity during 2007 were less-than-prime, stated income loans.*

SAC ¶¶ 17, 174, at 7, 57-58 (footnotes omitted)(italicized material is new to the SAC). Contrary to the assertion in the Memorandum, nowhere in the SAC do the Plaintiffs allege that TMI faced a "complete loss" of ABCP financing at anytime before the June 19, 2007 offering. The SAC includes only the assertion that a disruption impacted a TMI subsidiary that was never operational, and the threadbare allegation that, "no later than June 2007, TMI and the Individual Defendants knew, but failed to disclose, that the ABCP market was shrinking rapidly." SAC ¶ 17, at 7. Moreover, judicially noticeable documents refute the assertion that TMI faced a "complete loss" of ABCP financing." According to TMI's Form 10-Q for that quarter:

**Asset-Backed CP**

The Company issues Asset-backed CP to investors in the form of secured liquidity notes that are recorded as borrowings on the Company's Consolidated Balance Sheets and are rated P-1 by Moody's Investors Service, F1+ by Fitch Ratings and A-1+ by Standard and Poor's. As of June 30, 2007 and December 31, 2006, the Company had $8.2 billion and $8.9 billion, respectively, of Asset-backed CP outstanding with a weighted average interest rate of 5.33% and 5.34%, respectively, and a weighted average remaining maturity of 36 days and 54 days, respectively. As of June 30, 2007 and December 31, 2006, these notes were collateralized by AAA-rated MBS from the Company's ARM Asset portfolio with a carrying value of $8.7 billion and $9.5 billion, respectively, including accrued interest.

Thornburg Mortgage, Inc., Quarterly Report (Form 10-Q) at 19 (dated August 8, 2007), filed August 23, 2010 (Doc. 321-3)(emphasis added).[23]

Third, even if the Plaintiffs had alleged the Defendants were blocked from accessing the ABCP market before June 19, 2007, it would not save their Complaint.  The Plaintiffs rely on events occurring between May 26, 2007 and June 19, 2007 to establish "an adverse liquidity trend that Item 303 required Defendants to disclose in the June 2007 Offering Documents."[24]  Motion at 16.  Under Item 303, a "trend" requires "an assessment of whether an observed pattern accurately reflects persistent conditions of the particular registrant's business environment."  Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1191 (11th Cir. 2002)("It may be that a particular pattern is, for example,

---

[23] The Defendants also note numerous government sources that indicate that the ABCP market peaked in August 2007, before entering a steep decline.  See May/June 2007 Underwriter Defendants' Opposition to Plaintiffs' Motion for Leave to Amend and for Reconsideration at 5 (citing Finance & Economics Discussion Series, Federal Reserve Board, The Evolution of a Financial Crisis: Panic in the Asset-Backed Commercial Paper Market 1 (Aug. 18, 2009)(Federal Reserve Board members noted that the "substantial contraction in ABCP occurred" from August 2007 through December 2007); Federal Reserve Release, Commercial Paper Rates and Outstanding (Aug. 13, 2010)(a chart published by the Federal Reserve Board shows that the ABCP market collapsed during the third quarter of 2007); Preliminary Staff Report to Financial Crisis Inquiry Commission, Shadow Banking and the Financial Crisis 33-35 (May 4, 2010)(a staff report to Financial Crisis Inquiry Commission stated: "The ABCP market immediately came under stress," the spreads on ABCP widened drastically, "[o]verall issuance dropped sharply," and "[i]nvestors withdrew from ABCP programs in early August [2007]"); The President's Working Group on Financial Markets, Policy Statement on Financial Market Developments 8-9 (Mar. 2008) ("ABCP outstanding declined about one-third, or $370 billion, between early August 2007 and late December 2007."); Office of Thrift Supervision ("OTS"), Monthly Monitor Report 3 (Oct. 29, 2007)(he OTS, TMI's primary banking regulator, published a commentary on October 29, 2007 reporting that the ABCP market shrunk considerably in August 2007)).

[24] The only offering to which the Plaintiffs point with regard to this contention, and the only offering the Plaintiffs' argument implicates, is the June 19, 2007 offering.  The May 4, 2007 Offering predates the alleged May 26, 2007 disruption that the Plaintiffs contend warned of a complete loss of access to the ABCP market, and TMI disclosed the existence and non-use of Thornburg Mortgage Finance, LLC through its August 8, 2007 Form 10-Q, which predated its September 7, 2007 offering.

of such short duration that it will not support any conclusions about the registrant's business environment."). Under caselaw interpreting Item 303, the approximately three-week span between May 26, 2007 and June 19, 2007 is insufficient to establish a trend. See Kapps v. Torch Offshore, Inc., 379 F.3d 207, 221 (5th Cir. 2004)(affirming dismissal, and holding that a 60% decline in natural gas prices occurring five and one-third months immediately preceding an IPO did not establish a trend under Item 303); Blackmoss Investments Inc. v. ACA Capital Holdings, Inc., No. 07 Civ. 10528, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010)("As a matter of law, a two month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303." (citations omitted)); Zucker v. Quasha, 891 F. Supp. 1010, 1015 (D.N.J. 1995)("[D]ata concerning a quarter that is in progress is necessarily incomplete."), aff'd, 82 F.3d 408 (Table)(3d Cir.1996).

In Kapps v. Torch Offshore, Inc., the United States Court of Appeals for the Fifth Circuit rejected the appellant's contention that an issuer should have disclosed a sixty-percent decline in natural gas prices occurring five and one-third months immediately preceding an IPO. The plaintiff argued that the issuer "should have mentioned the noted decrease in the price of natural gas because it was a trend that could reasonably be expected to have a material impact on Torch's operations, and therefore its disclosure was required pursuant to Item 303 of the SEC Regulation S-K; 17 C.F.R. § 229.303." 379 F.3d at 211. The Fifth Circuit stated:

> We must address whether the 60% decrease in the price of natural gas during the months before the prospectus was issued was indeed a trend disclosure of which was required by Item 303. Although the drop continued for five and one-third months before the issuance of the June 7 prospectus, we again note that there was a precipitous drop in the two months immediately following a two month sharp increase; the price dropped the most rapidly in January and February 2001, after which it only gradually declined.

> The prospectus was issued on June 7, 2001, and included the first quarter unaudited returns. We assume that Torch correctly reported first quarter returns, as the appellants alleged no misstatements or misleading information as to those

numbers.  Although it is unclear why, in their response to the motion to dismiss below, the appellants included Torch's form 10-Q, filed with the SEC, for the quarter that ended June 30, 2002.  This form gives the comparable quarter of the previous year.  We know from the prospectus that revenues were $14.49 million for the first quarter of 2001, and from the 10-Q that they were $14.3 million for the second quarter of 2001.  Accordingly, at the time of the IPO, it was not unreasonable to consider the decline in natural gas prices as not yet constituting a trend, having not significantly impacted Torch's gross revenue.

. . . .

In a similar case, Zucker v. Quasha, 891 F. Supp. 1010, 1015 (D.N.J. 1995), aff'd, 82 F.3d 408 (Table)(3d Cir. 1996), a prospectus issued three days before the close of the first quarter of 1994.  The issuer was a retailer whose policy allowed customers to return unsold merchandise, and the prospectus gave the previous year's (1993) rate of returns, which was 13%.  However, plaintiffs claimed that during the first quarter of 1994, the rate of returns had increased to 15%.  The court determined that the retailer did not have to include this information in its prospectus, and dismissed plaintiffs' claim that the accurate representation of the 13% return rate for the last full year before the public offering was misleading.

Though it did not expressly address trends in Item 303, we find Zucker to be informative.  Like Torch's disclosures, the Zucker court noted that the 13% return rate, which was accurate, "was not a prediction but a statement of historical performance. . . .  [The retailer] did not predict future return rates or suggest that the 1993 rate was expected to continue.  Therefore, the subsequent increase in the return rate during the first quarter of 1994, in progress at the time of the Public Offering, did not render this statement of historical fact illegally false or misleading."  891 F.Supp. at 1015.

The court also stated, "data concerning a quarter that is in progress is necessarily incomplete."  Id. at 1016.  Although here the decrease in the price of natural gas had been occurring since December 28, 2000, there was no complete picture, nor did Torch make representations or infer that the price would continue, either up or down, but rather highlighted its volatility.  We hold that the referenced decrease in the price of natural gas was not a trend required to be disclosed by Item 303.  See also In re Worlds of Wonder Securities Litigation, 35 F.3d 1407, 1418-19 (9th Cir. 1994) (court did not impose liability based upon corporate official's failure to disclose financial data for the fiscal quarter in progress where claim alleged that the prospectus failed to disclose how far sales were lagging behind internal sales projections for the quarter in progress during IPO).

379 F.3d at 218, 220-21 (footnotes omitted)(emphasis added).  Similarly, uncontested portions of

TMI's SEC filings reported that, "[a]s of June 30, 2007 and December 31, 2006, the Company had

-67-

$8.2 billion and $8.9 billion, respectively, of Asset-backed CP outstanding." Thornburg Mortgage, Inc., Quarterly Report (Form 10-Q) at 19. The alleged three-week-old disruptions in the ABCP market did not provide a "complete picture," 379 F.3d at 221, that allowed "assessment of whether an observed pattern accurately reflect[ed] persistent conditions of [TMI's] business environment," Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d at 1191.

Finally, the Plaintiffs' fail to allege that the Defendants had actual knowledge of the ABCP market trends. Item 303 requires disclosure only of "known trends, uncertainties, demands, commitments or events." 17 C.F.R. § 229.303(a)(3)(ii)(emphasis supplied). "While it is true that Section 11 claims generally do not require pleading scienter, Item 303's requirement of knowledge requires that a plaintiff plead, with some specificity, facts establishing that the defendant had actual knowledge of the purported trend." Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc., 2010 WL 148617, at *9 (emphasis added). See J & R Mktg. v. Gen. Motors Corp., 549 F.3d at 391 (dismissing complaint where allegations demonstrated information was knowable, not known, to defendants, because "duty of disclosure arising from Item 303 does require knowledge"); Garber v. Legg Mason, Inc., 537 F. Supp. 2d at 614 (holding that Item 303 requires trend to be known and rejecting argument "that pleading a trend's existence is enough to support a claim"); Panther Partners Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d at 673 (S.D.N.Y. 2008)(dismissing claim of noncompliance with Item 303 where "requisite knowledge during the time period in question is clearly absent" (internal quotation marks omitted)).

The Plaintiffs add the allegation to the SAC that, "[b]y no later than June 2007, *TMI and* the *Individual* Defendants knew, but failed to disclose, that the ABCP market was shrinking rapidly and, by July 2007, had completely 'dried up.'" SAC ¶ 17, at 7 (italicized material is new to the SAC). The Plaintiffs fail to differentiate between the Defendants, robbing their assertion of plausibility.

See Atuahene v. City of Hartford, 10 F. App'x 33, 34 (2d Cir. 2001)("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [the] complaint failed to satisfy [the] minimum standard [of Rule 8].");  Lewis v. Strong, No. 09-cv-02861, 2010 WL 2232359, at *2 n.2 (D. Colo. June 2, 2010)("Although the Amended Complaint makes generalized, undifferentiated references to 'defendants,' such global allegations are insufficient to provide fair notice, as required by Fed. R. Civ. P. 8(a), that any particular defendant had actual or constructive knowledge of plaintiff's complaints.");  MSGI Sec. Solutions, Inc. v. Hyundai Syscomm Corp., No. C 09-03330, 2009 WL 4254457, at *3 (N.D. Cal. Nov. 24, 2009)(granting motion to dismiss where, as here, "the undifferentiated incorporation of all the general allegations into each claim and the lumping together of the defendants renders it impossible to determine whether the elements of each claim have been met as to any much less all defendants").  The Court therefore concludes that the Plaintiffs have not set forth allegations establishing that the Underwriter Defendants' failed to disclose a trend towards illiquidity, in violation of Item 303.

### 2.  TMI Adequately Disclosed it Held a $2.9 Billion Dollar Portfolio of Purchased MBS Backed by Alt-A Mortgages.

The Plaintiffs further contend that "TMI's Alt-A holdings and their impact on the Company's RPAs," Memorandum at 18, "constituted trends which were 'reasonably likely' to adversely impact the Company's liquidity, and were required to be disclosed under Item 303 but were not," Memorandum at 18.  The Plaintiffs assert:

> Throughout 2007, the Company's access to funding sources continued to deteriorate. Indeed, by the time of the September 2007 Offering, TMI was unable to access either the ABCP or CDO markets.  Defendants finally admitted as much in the September 2007 Offering Documents.  As a result of the loss of its CDO and ABCP financing, TMI was forced to rely exclusively on RPA financing to finance its operations, which exposed the Company to significant liquidity risks.   Specifically, and unbeknownst to shareholders, the RPAs were collateralized by billions of dollars in high-risk Alt-A assets, which loan market Defendants represented in the September

> 2007 Offering Documents had declined precipitously. Moreover, as Defendants
> acknowledged, RPA financing is dependent to a large extent on the market value of
> assets TMI pledged to its creditors in exchange for funds. Thus, if the value of
> TMI's pledged collateral declined during the term of the RPAs, its lenders had the
> right to institute margin calls and require TMI immediately to pledge additional
> funds or securities to the lender.

Motion at 17-18 (citations to the record omitted). The Plaintiffs further contend that TMI's failure

to disclose the its Alt-A holdings makes the failure to disclose the cross-default provisions in its

RPA agreements actionable under Item 303, because

> TMI's reduced access to financing exposed it to an immediate liquidity crisis in the
> event that: (1) the market value of its Alt-A backed MBS declined; (2) it was unable
> to satisfy a margin call; or (3) its RPA lenders, for one of any number of reasons,
> tightened TMI's RPA terms or ceased doing business with the Company altogether.

Memorandum at 18. The Plaintiffs argue that "[a]ll of these facts constituted trends which were

'reasonably likely' to adversely impact the Company's liquidity, and were required to be disclosed

under Item 303 but were not." Motion at 18.

The Plaintiffs also request that the Court "reconsider its dismissal of Plaintiffs' Securities

Act Claims in light of the affirmative disclosure obligations of Regulation S-X." Memorandum at

24. Regulation S-X, 17 C.F.R. § 210.4-01 requires financial statements which are filed with the

SEC to be in compliance with GAAP. See 17 C.F.R. § 210.4-01(a)(1)("Financial statements filed

with the Commission which are not prepared in accordance with generally accepted accounting

principles will be presumed misleading or inaccurate, despite footnotes or other disclosures, unless

the Commission has otherwise provided."). In part, Regulation S-X requires the disclosure of

"significant concentrations of credit risk arising from *all* financial instruments, whether from an

individual counterparty or groups of counterparties." FAS at ¶ 15A (emphasis in original, footnote

omitted). The Plaintiff contend that "GAAP required the disclosure of TMI's concentration of Alt-A

backed MBS, and Defendants' omission of such information therefore constitutes a violation of

Regulation S-X." Memorandum at 25.

Contrary to the Plaintiffs' assertion, however, TMI disclosed that its ARM portfolio included billions of dollars in Alt-A holdings and that its ARM portfolio secured its RPA financing. The Plaintiffs define "Alt-A loans" as "'alternatives' to the gold standard of conforming, GSE-backed mortgages." CCAC ¶ 98, at 29. They explain that "[o]ften an Alt-A borrower is unable to provide the proof of income or the verification of assets necessary to obtain a prime mortgage, but has a satisfactory credit score, or vice versa." CCAC ¶ 98, at 29; SAC ¶ 13, at 5. See SAC ¶ 162, at 52 (identifying loans for which a borrower is not required to document income as "stated income" loan and labeling such loans as at least one type of "Alt-A" loan). TMI disclosed its acquired and originated "[s]tated income/no ratio" loans to investors. TMI provided charts setting forth detailed information concerning its originated loan portfolio in its quarterly 10-Q filings. See, e.g., First Quarter 2007 10-Q, at 39 (filed May 9, 2007); Second Quarter 2007 10-Q, at 39 (filed Aug. 8, 2007). These charts gave investors detailed information about its ARM portfolios, including data on the percentage of "Full" documentation versus "[s]tated income/no ratio" loans, the loan-to-value ratios of the loans, the FICO scores associated with the loans, and the geographic distribution of the loans. See, e.g., First Quarter 2007 10-Q, at 39; Second Quarter 2007 10-Q, at 39. TMI likewise disclosed the "Alt-A" nature of its acquired loans. As with its originated loans, TMI's quarterly 10-Q filings included charts offering these same, extensive details about the nature of the acquired loans. See, e.g., First Quarter 2007 10-Q at 40; Second Quarter 2007 10-Q at 40. In its Second Quarter 2007 10-Q, TMI disclosed that, as of June 30, 2007, 11.1% of its $17.1 billion in *originated* ARM loans -- equaling $2.7 billion -- and 42.2% of its $7.4 in *acquired* ARM loans -- equaling $3.1 billion -- were "[s]tated income/no ratio" loans. In sum, TMI's Second Quarter 2007 10-Q revealed that its ARM portfolio included $5.8 billion in Alt-A loans. See Second Quarter 2007 10-Q, at 39-40. TMI

further disclosed that it "securitize[d] [its] acquired and originated ARM Loans," e.g., 2006 Annual

10-K at 25 (filed Mar. 1, 2007); First Quarter 2007 10-Q at 27; Second Quarter 2007 10-Q at 26

(filed August 8, 2007), and that "ARM Assets" served as the collateral for its RPAs, e.g., 2006

Annual 10-K at 37 ("[W]e borrow money under reverse repurchase . . . agreements based on the fair

value of our ARM Assets . . . ."; "ARM Assets . . . collateralized the Reverse Repurchase

Agreements . . . ."; "our borrowing ability under these agreements [RPAs] may be limited and

lenders may initiate margin calls in the event . . . the value of our ARM Assets declines . . . .").[25]

Consequently, TMI disclosed its exposure to billions of dollars in Alt-A ARM loans and that those

loans collateralized its RPAs.  The Plaintiffs' claims that are founded on the Defendants' alleged

failure to disclose its Alt-A holdings therefore fail.

> Additionally, TMI notified investors that it might underwrite Alt-A mortgages:
>
> On a case-by-case basis, we may determine that, based upon compensating factors,
> a prospective borrower not strictly qualifying under the applicable underwriting
> guidelines warrants an underwriting exception.  Compensating factors include, but
> are not limited to, low loan-to-value ratios, low debt-to-income ratios, excellent
> credit history, stable employment, financial reserves, and time in residence at the
> applicant's current address.

Thornburg Mortgage, Inc., Form 10-K (Annual Report) at 8 (dated February 28, 2007), filed

September 23, 2008 (Doc. 134-2).  "The Court has already held that TMI's Form 10-K's adequately

placed investors on notice" that "TMI underwrote and acquired some Alt-A assets."  MOO at 32.

---

[25] TMI defined "ARM Assets" to include "all of our ARM Loans," and in turn defined "ARM Loans" to encompass (i) "Securitized ARM Loans" and (ii) "ARM loans held for securitization."  2006 Annual 10-K at G-1 (filed March 1, 2007).  Accord First Quarter 2007 10-Q at 60 (filed May 9, 2007); Second Quarter 2007 10-Q (filed August 8, 2007) at 64.  TMI's filings defined "Securitized ARM Loans" as TMI-issued MBS (that, necessarily, was backed by TMI originated and TMI-acquired ARM loans).  See, e.g., 2006 Annual 10-K at G-5 (filed March 1, 2007).  Moreover, the phrase "ARM loans held for securitization" on its face included TMI-originated and TMI-acquired loans.  See, e.g., 2006 Annual 10-K at 25 (filed Mar. 1, 2007)("We elect to securitize our acquired and originated ARM Loans . . . .").

Moreover, even if TMI had not disclosed its Alt-A holdings, that failure would not have been material in light of its extensive disclosures about its liquidity problems.  TMI disclosed that it was exposed to liquidity constraints and potential shortfalls, and also that it in fact had fallen victim to exactly those financial realities.  TMI disclosed that the "severe pressure" of financing markets, the "not functioning" ABCP market, the "sudden[ ] and unexpected[ ]" decline in MBS market prices, and the "[a]dverse[]" liquidity effects of these "significant" disruptions forced TMI's August 2007 sale of a substantial percentage of its assets and necessitated the September 2007 recapitalization offerings.  September 2007 Prospectus at S-4 (filed September 4, 2007).  As FBR points out, TMI disclosed the following:

> Potential Effect of Decline in Value of TMI's RPA Collateral.  "We borrow funds based on the fair value of our ARM Assets . . . . If . . . the fair value of our ARM Assets declines . . . , we could be subject to margin calls that would require us to either pledge additional ARM Assets as collateral or reduce our borrowings.  If we did not have sufficient unpledged assets or liquidity to meet these requirements, we may need to sell assets under adverse market conditions to satisfy our lenders."  2006 Annual 10-K (filed Mar. 1, 2007) (excerpts attached at Exhibit B hereto) at 16; see also First Quarter 2007 10-Q (filed May 9, 2007) (excerpts attached as Exhibit C hereto) at 35, 45 (same); Second Quarter 2007 10-Q (filed Aug. 8, 2007) (excerpts attached as Exhibit D hereto) at 35, 45 (same); Sept. 2007 Prospectus (filed Sept. 4, 2007) at 9 (same);

> Liquidity Challenges In Fact Had Materialized.  On August 14, 2007, TMI was forced to delay a recently-scheduled dividend payment in light of "significant disruptions in the mortgage market which resulted in the sudden and unprecedented decline in the market prices of its AAA-rated mortgage securities that began on August 9, 2007 and subsequent increase in margin calls related to its repurchase agreement financings on those securities."  Form 8-K (filed Aug. 14, 2007) (attached as Exhibit E hereto) at Ex. 99.1, at 1-2.  TMI also reported on that date "disruptions in the company's ability to fund its mortgage assets in the commercial paper and the asset-backed securities markets."  Id. at 1.  TMI's liquidity situation worsened over the next week, as it disclosed on August 20, 2007 by reporting "unprecedented conditions in the mortgage financing market," "rapidly declining mortgage securities prices," and "simultaneous declines in the value of [TMI's] hedging instruments" such that TMI faced "challenges in meeting its liquidity and financing needs."  Form 8-K (filed Aug. 20, 2007) (attached as Exhibit F hereto) at Ex. 99.1, at 1-5; see also id. ("These rapid declines negatively impacted the

company's ability to continue to support its borrowings collateralized by its high quality mortgage securities portfolio."); Sept. 2007 Prospectus (filed Sept. 4, 2007) at S-5 ("These significant disruptions in our sources of secondary market financing, continued declines in the market value of our securities portfolio, and increases in margin requirements have adversely reduced our cash and liquidity and led to the actions described below . . . .");

TMI Had Resorted to Sale, at a Loss, of Substantial Portion of Its Assets. See Form 8-K (filed Aug. 20, 2007) at Ex. 99.1 at 1-2 (announcing sale of more than $20 billion of TMI assets, out of total pre-sale assets of approximately $56.4 billion, which sale resulted in expected loss of nearly $1 billion); Sept. 2007 Prospectus (filed Sept. 4, 2007) at S-6 (same);

Future Uncertain, at Best. See Sept. 2007 Prospectus (filed Sept. 4, 2007) at S-8 ("[T]he secondary mortgage market continues to be in a constant state of change, and our cash and liquidity situation changes daily. . . . [T]here is a risk that a recovery in the mortgage market will not occur or will be substantially delayed. We may become subject to additional margin calls on our remaining outstanding indebtedness or encounter difficulties in refunding our existing reverse repurchase agreements as they mature. If market conditions do not improve and we are unable to secure additional long-term capital (including, but not limited to, the proceeds from this offering), or secure short-term financing through reverse repurchase agreements, commercial paper or other alternative short-term financing, then we may have to continue selling assets, including our own securitized assets, which could result in the recognition of additional losses that are currently reflected in our GAAP book value or other comprehensive income").

FBR Response at 7-9. Consequently, even if TMI had not disclosed its Alt-A holdings -- which it did -- the failure to disclose would not have been material in light of TMI's disclosures about its liquidity difficulties. See Grossman v. Novell, Inc., 120 F.3d at 1119-20 (stating that an alleged omission is only material where "a reasonable investor would consider it important in determining whether to buy or sell stock"; whether alleged omission material "depends on other information already available to the market," including whether "other documents available to the investing public 'bespoke caution' about the subject matter of the alleged misstatement at issue" (citations omitted)). TMI revealed its actual, realized liquidity issues and that it might not be able to recover from them in the future. In light of these disclosures, there is no "substantial likelihood" that TMI's

-74-

alleged failure to disclose the extent of its Alt-A holdings "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC Indus., Inc. v. Northway, Inc., 426 U.S. at 449.  See McDonald v. Kinder-Morgan, Inc., 287 F.3d at 997 (stating that courts should "not hesitate to dismiss securities claims pursuant to Rule 12(b)(6) where the alleged misstatements or omissions are plainly immaterial" (quotation marks omitted)).  The Plaintiffs' contention that "[i]nvestors were deprived of all of the important details regarding these adverse liquidity trends, and were unable to make informed investment decisions as a result," Memorandum at 4, is unavailing in the face of TMI's disclosure of its Alt-A holdings and its liquidity problems.  For these same reasons, the Court will not reconsider its decision that TMI's "disclosure of 'case by case' underwriting exceptions" sufficiently "warn[ed] investors of the billions of dollars in purchased and/or acquired Alt-A-backed MBS TMI held on its balance sheet."  Memorandum at 19.

### 3. TMI Was Not Obligated to Disclose the Existence of Cross-Default Provisions in its RPA Contracts.

The Plaintiffs "request that the Court reconsider its decision, and find that Item 303 required disclosure of the cross-default provisions."  Memorandum at 22.  In its Memorandum Opinions and Orders, the Court held that the Defendants were not required to disclose contractual provisions that the Plaintiffs had not alleged were uncommon:

> The Plaintiffs next insist that the Form 8-K was materially false or misleading because it failed to disclose that all of TMI's RPAs contained cross-default provisions which, if triggered, might subject TMI to immediate liability on billions of dollars in margin calls.  The Court finds that failure to disclose a contract provision, without alleging that the provision is unique, cannot constitute a material omission.  TMI's RPAs likely contain dozens -- if not hundreds -- of individual provisions, any one of which might be crucial depending upon what facts transpire. The Plaintiffs have shown the Court no authority for the proposition that a company is subject to Section 11 or Section 12(a)(2) liability for failure to disclose the entire content of its contracts, nor have they sought to give the Court a rule to apply, other

than viewing the facts of the case in hindsight, for determining which of a contract's provisions are sufficiently important to warrant disclosure. The only reasoning the Court can discern from the Plaintiffs' allegation is that, because the cross-default provision in the RPAs was eventually triggered, the provision was material and thus should have been disclosed. The Defendants further argue that the inclusion of such provisions is commonplace and well known in the investment marketplace, as demonstrated by some of the news reports that the Plaintiffs' incorporated into the CCAC. See CCAC ¶ 279, at 91 ("[W]e are concerned if TMI were to default on one of its covenants all of its lines of credit would be pulled and TMI would be required to liquidate its entire $25 billion repobacked [sic] assets at a single point in time.").[26] The Court finds no legal duty to disclose the existence of cross-default provisions in TMI's RPA contracts, and no statement within the Form 8-K that is misleading without such disclosure.

Individual Defendant MOO at 85. The disclosure obligations Item 303 imposes does not change the Court's analysis. The essence of the Court's holding is that the cross-default provisions are not material, because it is generally unreasonable to demand an issuer disclose every contractual provision in the event that one becomes operative. See Lane v. Page, 581 F. Supp. 2d 1094, 1121 (D.N.M. 2008)(Browning, J.)("A proxy statement need not reveal every detail involved in a transaction; it only needs to paint a 'sufficiently accurate picture so as not to mislead.'" (quoting Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 2000 (2d Cir. 2008))); Lane v. Page, 581 F. Supp. 2d at 1125 ("If every piece of arguably relevant information needed to be disclosed in a proxy statement, investors and shareholders would be flooded with information and the purposes of disclosure would be defeated." (citing In re Ford Motor Co. Secs. Litig., 381 F.3d 563, 569 (6th Cir.2004)). Because the Court held that the omission was not material, it is of no

---

[26] The Plaintiffs argue in a footnote that "the Court accepted as true Defendants [sic] contention that such provisions are commonplace and present in nearly all RPAs. Apart from mere speculation in certain media reports, this fact appears nowhere in the Complaint." Memorandum at 21 n.28. The Court did not accept the Defendants' contention as true; rather, the Court held that a plaintiff's allegation that a defendant "fail[ed] to disclose a contract provision, without alleging that the provision is unique, cannot constitute a material omission." Individual Defendant MOO at 85.

moment whether Item 303 required disclosure.  Moreover, in light of the TMI's extensive disclosures about its liquidity problems, the Defendants failure to disclose all of the provisions in its contracts does not amount to a violation of Item 303 requirement that issuers disclose "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way," and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," 17 C.F.R. §§ 229.303(a)(1) & (a)(3)(ii), because disclosing every contract provision would overwhelm investors, defeating the purpose of the disclosure requirements.  Cf. Grossman v. Novell, Inc., 120 F.3d at 1119-20 (stating that an alleged omission is only material where "a reasonable investor would consider it important in determining whether to buy or sell stock"; whether alleged omission material "depends on other information already available to the market," including whether "other documents available to the investing public 'bespoke caution' about the subject matter of the alleged misstatement at issue"  (citations omitted)).  The Court therefore will not alter its decision that "failure to disclose a contract provision, without alleging that the provision is unique, cannot constitute a material omission."  Amended MOO at 85.

## II.   THE COURT WILL NOT CHANGE ITS DECISION THAT TMI'S 2007 FORM 10-K WAS NOT ACTIONABLE, BECAUSE THE PLAINTIFFS PROVIDE NO BASIS FOR RECONSIDERATION AND NO NAMED PLAINTIFF HAS STATUTORY STANDING TO CHALLENGE THE JANUARY 2008 OFFERING.

The Plaintiffs request that the Court reconsider its holding that TMI's 2007 Form 10-K was not actionable.  "The Court issued this ruling notwithstanding the fact that TMI's internal auditor, KPMG, stated in a March 4, 2008 letter to TMI that its year-end financials contained material misstatements."  Memorandum at 22-23.  The Court held:

The Plaintiffs argue that the Form 8-K was materially misleading because it incorporated TMI's 2006 financials, which the Plaintiffs believe contained material misstatements based on the March 4, 2008 letter sent by KPMG to TMI. The Plaintiffs do not take into consideration, however, that KPMG later blessed TMI's use of those 2006 financials in a letter that the CCAC incorporates. See TMI's Form 8-K Exhibit 7.2 ("We have read Thornburg Mortgage, Inc.'s statements included [in] its Form 8-K dated March 7, 2008, and we agree with such statements . . . ."). The Plaintiffs therefore have incorporated into the CCAC a document that says that KPMG suspected problems with the 2006 financials and a subsequent document that says, effectively, that KPMG believed that the 2006 financials were acceptable.[27] Furthermore, neither KPMG, in its March 4, 2008 letter, nor the CCAC explain how the 2006 financials were false or misleading, other than outlining the absence of an explanatory paragraph regarding TMI's ability to continue as a going concern for a reasonable period of time.[28] The Court finds that the incorporation of the 2006 financial statements, blessed by the same auditor that earlier decried them, is not a

---

[27] The Plaintiffs argue that KPMG might have acquiesced to TMI's decision to restate only its 2007 financials for other reasons, such as believing that nobody was relying on the 2006 financials any longer, rather than because the financials did not contain misstatements. See Plaintiffs' Opposition to the Motions to Dismiss Plaintiffs' Securities Act Claims Submitted By: 1) Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Joseph H. Badal, Paul G. Decoff, Clarence D. Simmons, Anne-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman; 2) The May/June 2007 Underwriter Defendants; 3) Friedman, Billings, Ramsey & Co., Inc.; 4) UBS Securities LLC and Bear Stearns & Co, Inc.; and 5) Stifel, Nicolaus & Company, Incorporated at 15, filed December 22, 2008 (Docs. 152, 153)("Response"). If that were true, KPMG would be tacitly stating that the statements in the 2006 financials were no longer material, even if they are misleading. While the Court realizes that KPMG's opinion of what is or is not material is not conclusive on the legal issue, it is a further reason to find that the Plaintiffs have failed to plead a claim that is plausible on its face.

[28] The relevant portion of that letter states:

Under our professional standards, we have considered conditions and events that were known or should have been known to the Company as of the date of our auditors' report and have concluded that the aforementioned financial statements contain material misstatements associated with available for sale securities and that our auditors' report should have contained an explanatory paragraph indicating that substantial doubt exists relative to the Company's ability to continue as a going concern for a reasonable period of time.

TMI's Form 8-K Exhibit 7.1 (dated March 7, 2008). The follow-up letter, dated three days later, first references the earlier letter and then states: "We have read Thornburg Mortgage, Inc.'s statements included under Item 4.02 of its Form 8-K dated March 7, 2008, and we agree with such statements . . . ." TMI's Form 8-K Exhibit 7.2.

materially false statement or omission warranting Section 11 or Section 12(a)(2) liability.

Memorandum Opinion and Order at 29-30.

The Plaintiffs argue that "the restatement was an acknowledgment by TMI that the Company was experiencing such a severe liquidity crisis by December 31, 2007 that the possibility existed that it would not be able to continue as a going concern." Memorandum at 24. The Plaintiffs assert that this information should have been disclosed before the January 9, 2008 Offering. The Plaintiffs present no new law or facts to support their contention that the Court should reconsider its decision that that TMI's 2007 Form 10-K was not actionable. Rather, the Plaintiffs merely disagree with the Court's holding. Rather than setting forth "[g]rounds warranting a motion to reconsider," such as "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, [or] (3) the need to correct clear error or prevent manifest injustice," Servants of Paraclete v. Does, 204 F.3d at 1012, the Plaintiffs state that they disagree with the Court's conclusion. The Court therefore denies their request that it alter its decision.

Moreover, the Plaintiffs lack statutory standing to challenge the January 2008 offering -- the only offering the Plaintiffs' contention of a December 31, 2007 liquidity crisis would implicate. See Memorandum at 24 ("[B]y TMI's own admission, [it] was required to be disclosed by December 31, 2007 -- prior to the January 9, 2008 Offering."). In their motion to dismiss, the Underwriter Defendants asserted that the Plaintiffs lack standing to assert their Section 11 and Section 12(a)(2) claims, both under Sections 11 and 12(a)(2) of the Securities Act and under Article III of the United States Constitution. See May/June Underwriters' Motion at 11-13; UBS Motion at 2; FBR Motion at 11-15. The Court held that it had subject-matter jurisdiction over the Plaintiffs' claims, because the Plaintiffs had Article III standing. The Court also noted that no Lead Plaintiff had purchased

securities from TMI in the September 2007 or January 2008 offerings.  The Court stated:

> There is no dispute that the Plaintiffs assert that they have suffered some injury in fact that is concrete and particularized: they insist that they bought stock at inflated prices based on misrepresentations in the offering documents.  The action is fairly traceable to the actions of some of the Defendants -- those who made the statements which the Plaintiffs insist were false or misleading.  Finally, because the injury that the Plaintiffs alleged was financial, a judgment of the Court could redress it.  With respect to some Defendants, therefore, the Plaintiffs successfully assert standing.

> The problem that some of these Defendants point out, however, is that certain Underwriter Defendants -- FBR, UBS, and Bear Stearns ("the September/January Offering Defendants") -- underwrote only the September 2007 and January 2008 offerings.  The Defendants argue that no Lead Plaintiff alleges to have purchased any stock in the September 2007 or January 2008 offerings; therefore, according to the Defendants, no Lead Plaintiff has standing to assert claims against those Defendants.  They insist that this deprives the Court of subject-matter jurisdiction to hear these claims.

> The Defendants do not contest that the Plaintiffs have standing to pursue some of their claims -- those against all other Defendants.  The Court finds that this standing supports the Court's subject-matter jurisdiction.  First, constitutional standing is a doctrine rooted in the Article III requirement that Courts exercise jurisdiction only over cases or controversies, as the Supreme Court has defined that term.  See Lujan v. Defenders of Wildlife, 504 U.S. at 560-61.  Such a case or controversy exists in this proceeding based on the Plaintiffs' claims against the other Defendants.  Compare In re Jupiter Networks, Inc. Sec. Litig., 542 F. Supp. 2d 1037, 1052 (N.D. Cal. 2008)(holding that the lead plaintiffs had standing to assert claims on behalf of noteholders, even though they did not allege to purchase those notes, when the harm that the lead plaintiffs suffered stemmed from the same allegedly false financial statements), with In re Storage Tech. Corp. Sec. Litig., 630 F. Supp. 1072, 1078 (D. Colo. 1978)(dismissing a § 11 claim for failure to state a claim under rule 12(b)(6) when none of the named plaintiffs alleged to have purchased any of the securities sold in the public offerings).  Second, even if the Court were to find that the lack of a Lead Plaintiff with a cognizable claim against the September/January Offering Defendants were a requirement to properly state a claim against those Defendants, the Court is not convinced that lack-of-standing deprives the Court of jurisdiction over those potential claims.  The supplemental jurisdiction statute, 28 U.S.C. § 1367, permits the Court to exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  The claims arising from the September and January offerings appear to be part of the same common nucleus of operative fact as the claims arising from the May and June 2007 offerings, as all are related to the

same series of SEC filings by the same company, and so the claims all appear to be part of the same case or controversy.  See Edwards v. Doe, 331 Fed. Appx. 563, 569 (10th Cir. 2009)(citing Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 335 (2d Cir. 2006), for the "common nucleus of operative fact" standard for defining the reach of 28 U.S.C. § 1367(a)).  Thus, even if the lack of a Lead Plaintiff with a claim against the September/January Offering Defendants would otherwise deprive the Court of subject-matter jurisdiction, the supplemental jurisdiction statute appears to remedy that jurisdictional problem.  The Court may have jurisdiction over the claims, but there may be other problems, for example under rule 23, with a lack of plaintiffs asserting claims against certain defendants.  At this stage, however, on this motion, the Court concludes that, although the Plaintiffs may lack statutory standing under Sections 11 and 12(a)(2) against certain Defendants, an issue the Court does not need to resolve to establish jurisdiction, they do not lack standing under Article III such that the Court would lack subject-matter jurisdiction over these claims.

MOO 24-26.  The Court did not address whether it should dismiss the Plaintiffs' claims based on the September 2007 and January 2008 offerings.  The Court did not need resolve the statutory standing issue, because the Court dismissed the claims against the Underwriter Defendants on other grounds.

The Court subsequently granted the Plaintiffs leave to amend their pleading to add an additional class representative, Boilermakers Lodge.  See Memorandum Opinion and Order, filed February 27, 2010 (Doc. No. 266)(Granting Plaintiffs' Opposed Motion for Leave to amend Consolidated Class Action Complaint to Add Additional Representative Plaintiff, filed January 27, 2009 (Doc. 160).  The Plaintiffs added Boilermakers Lodge to the case to address their statutory standing defects that the September 2007 and January 2008 Underwriter Defendants -- FBR, UBS, and Bear Stearns -- noted in their motions to dismiss.  Boilermakers Lodge alleges that it purchased TMI stock directly from FBR as part of the September 2007 Offering.  February 27, 2010 MOO at 11.  Boilermakers Lodge does not allege, however, that it purchased any TMI stock in the January 2008 Offering.  Thus, the addition of Boilermakers Lodge to the case does not cure plaintiffs' lack of statutory standing to sue based on the January 2008 offering, or to sue UBS and Bear Stearns.

UBS, and Bear Stearns renew their request that, if the Court reconsiders its decision that TMI's 2007 Form 10-K was not actionable, the Court dismiss the UBS and Bear Stearns, because the Plaintiffs have not cured their lack of statutory standing for their claims based on the January 2008 offerings.  The Court agrees that the Plaintiffs have failed to add a named plaintiff that purchased securities during the January 2008 offering, and that the Plaintiffs therefore lack statutory standing to bring claims based on the January 2008 offerings.  UBS and Bear Stearns note that, "in the months following this Court's dismissal of the CCAC and Boilermakers Lodge's entry into the litigation, numerous district courts have dismissed purported class claims brought under Section 11 where none of the named plaintiffs purchased securities in one or more of the offerings covered by the complaint."  UBS and Bear Stearns Response at 3-4 (citing In re Wells Fargo Mortgage-Backed Certificates Litig., No. C 09-01376 SI, 2010 WL 1661534, at *3 (N.D. Cal. Apr. 22, 2010)(dismissing Securities Act claims for lack of standing: "[C]ourts considering class action complaints under Section 11 have overwhelmingly held that the lead plaintiffs named in the complaint lack standing to challenge any offering through which no lead plaintiff actually purchased a security." (citations omitted)); In re Lehman Brothers Sec. and ERISA Litig., 684 F. Supp. 2d 485, 491 (S.D.N.Y. 2010)(dismissing for lack of standing Section 11 claims arising out of eighty-five of the ninety-four offerings that the complaint covered, because no named plaintiff purchased securities in those offerings); N.J. Carpenters Vacation Fund v. Royal Bank of Scotland Grp., No. 08 CV 5093(HB), 2010 WL 1172694, at *8 (S.D.N.Y. Mar. 26, 2010)(dismissing Section 11 claims arising out of thirteen of the fifteen securities offerings that the complaint covered where no named plaintiff purchased in those offerings); N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc., No. 08 Civ 5653 (PAC), 2010 WL 1473288, at *4 (S.D.N.Y. Mar. 29, 2010)(dismissing Section 11 claims arising out of three of four offerings); N.J. Carpenters Health Fund v. Residential Capital, LLC, No.

08 CV 8781(HB), 2010 WL 1257528, at *4 (S.D.N.Y. Mar. 31, 2010)(dismissing Section 11 claims: "Plaintiffs were not harmed by alleged misstatements and omissions related to the fifty-five offerings that they did not purchase."); City of Ann Arbor Employees' Retirement Sys. v. Citigroup Mortgage Loan Trust Inc., No. CV 08-1418, 2010 WL 1371417, at *7 (E.D.N.Y. Apr. 6, 2010)(dismissing Section 11 claims relating to "sixteen Prospectus Supplements issued in connection with securities that Plaintiffs did not purchase"); In re Indymac Mortgage-Backed Sec. Litig., No. 09 Civ. 4583(LAK), 2010 WL 2473243, at *3 (S.D.N.Y. June 21, 2010)("[N]amed plaintiffs have standing only with respect to the offerings in which they purchased securities. In consequence, the claims based on the offerings in which named plaintiffs have not purchased are dismissed."); In re Morgan Stanley Mortgage Pass-Through Certifs. Litig., No. 09 Civ. 2137(LTS)(MHD), 2010 WL 3239430, at *5 (S.D.N.Y. Aug. 17, 2010)(dismissing Section 11 claims concerning certificates it did not purchase, noting plaintiff "lacks standing to pursue its claims concerning any certificates other than [the one it purchased]").

The Plaintiffs contend that "the cases cited by UBS and Bear Steams are distinguishable from this matter, because they involve offerings of MBS and other financial products, not common stock offerings by publicly-traded companies." Reply at 45  The Plaintiffs argue that they "possess standing to bring claims in connection with the January 2008 Offerings because the misstatements alleged by Plaintiffs were incorporated by reference into a shelf registration statement that was common to all of the Offerings." Reply at 45. (citing In re Jupiter Networks, Inc. Sec. Litig., 542 F. Supp. 2d 1037, 1052 (N.D. Cal. 2008); Schwartz v. Celestial Seasonings, Inc., 178 F.R.D. 545, 557 (D. Colo. 1998); In re Storage Tech. Corp. Sec. Litig., 630 F. Supp. 1072, 1078 (D. Colo. 1986)).  . The Plaintiffs contend that In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1164 (C.D. Cal. 2008), stands for the proposition that a

plaintiff who purchased securities in one offering had standing to bring claims on behalf of purchasers in other offerings so long as (1) the securities at issue are traceable to the same initial shelf registration statement; and (2) the registration statements for each offering (including any documents incorporated by reference therein) share common parts that were <u>materially false and misleading at each effective date</u>.

Reply at 45 n.32 (emphasis added).

A "shelf registration" is an indication of an issuer's intent to offer a specified number of securities in the future, frequently through a series of incremental offerings.  A shelf registration -- referred to colloquially as a "shelf" -- is accompanied by a "shelf registration statement" which, like any registration statement, provides certain required information to the market about the issuer and the issuance and frequently incorporates, as was true here, the issuer's recent SEC filings, including 10-Q and 10-K forms.  When an issuer is then ready to offer some or all of the securities authorized by the shelf to market, it "pulls down" the shelf registration statement from the shelf and updates it by filing a "supplemental" prospectus.  The "registration statement" for that sale and offering thus constitutes both the initial shelf registration statement and the supplement, along with any SEC filings incorporated by either document.  <u>See</u> <u>In re Countrywide Fin. Corp. Sec. Litig.</u>, 588 F. Supp.2d 1132, 1164 (C.D. Cal.2009); <u>see generally</u> <u>Finkel v. Stratton Corp.</u>, 962 F.2d 169, 174 (2d Cir. 1992).

Each time an issuer makes an offering, it creates a new "registration statement."  <u>See</u> <u>Finkel</u>, 962 F.2d at 174.  However, as noted, all registration statements made for offerings from the same "shelf" contains at least some common information–notably, anything included in or incorporated into the initial shelf registration statement.  Accordingly, at least one court has found that where a plaintiff alleges untrue statements in the shelf registration statement or the documents incorporated therein -- as opposed to an alleged untrue statement in a supplemental prospectus unique to a specific offering -- then that plaintiff has standing to raise claims on behalf of all purchasers from the shelf.  <u>In re Countrywide Fin. Corp.</u>, 588 F. Supp.2d at 1166.  As that court noted, "[i]f the initial shelf registration statement contained an actionable statement or omission that is common to more than one issuance under the shelf registration, then purchasers in those issuances may be able to trace the same injury to the same registration statement."  <u>Id.</u>

<u>In re Citigroup, Inc. Bond Litig.</u>, 723 F. Supp. 2d 568, 584 (S.D.N.Y. 2010).

The Plaintiffs argue that TMI's earlier filing specific to the May, June, and September 2007

offerings were retroactively incorporated into the shelf statement, which was then prospectively

incorporated the January 2008 filing.  The Plaintiffs contend that the May, June, and September

2007 offerings were actionable largely for the reasons that the Court rejected in Section I, supra.

The Plaintiffs' argument is unavailing, because no reasonable investor would rely on TMI's earlier

statements in the face of its intervening disclosures about its financial hardships and in light of the

upsets in the relevant markets.  The Court does not believe that the statements in prior offerings,

although incorporated retroactively into the shelf statement and thereby prospectively into the

January 2008 offering, are "materially false and misleading at each effective date," Reply at 45 n.32

(emphasis added), when a company extensively discloses intervening hardships resulting from well-

known market troubles, see Grossman v. Novell, Inc., 120 F.3d at 1119-20 (stating that an alleged

omission is only material where "a reasonable investor would consider it important in determining

whether to buy or sell stock"; whether an alleged omission is material "depends on other information

already available to the market," including whether "other documents available to the investing

public 'bespoke caution' about the subject matter of the alleged misstatement at issue"  (citations

omitted)).  The Plaintiffs' reliance on cases finding standing to challenge offerings based on

common shelf statements without intervening disclosures of financial hardship of market troubles

are inapposite.  Cf. In re Citigroup, Inc. Bond Litig., 723 F. Supp. 2d at (holding that plaintiffs

possessed statutory standing to assert Section 11 claims in connection with forty-eight public

offerings between May 2006 and August 2008, notwithstanding that they purchased securities in

only nineteen of the forty-eight offerings, where misstatements were traceable to common shelf

registration statement); In re Am. Int'l Grp., Inc. 2008 Sec. Litig., 741 F. Supp. 2d 511, 537

(S.D.N.Y. 2010)(finding that the plaintiffs possessed standing to challenge undisclosed risks in

offerings between March 2006, and September 2008, where claims were "premised on statements

or alleged omissions in company reports that had been incorporated by reference in each of the

registration statements at issue").

The Court therefore will not change its decision that TMI's 2007 Form 10-K is not actionable, because the Plaintiffs set forth no new challenges to its holding.  Moreover, no named plaintiff purchased TMI shares during the January 2008 offering.  Accordingly, the Court also rejects the Plaintiffs' request that it change its decision that TMI's 2007 Form 10-K is not actionable for lack of statutory standing.

## III.   THE COURT WILL NOT RECONSIDER ITS RULING THAT CERTAIN STATEMENTS CONSTITUTED INACTIONABLE PUFFERY.

The Plaintiffs request that the Court reconsider its ruling that certain statements constituted inactionable puffery.  The Plaintiffs considered "most notable" the following conclusion:

> For example, the Plaintiffs argue that TMI's assertion, in its second quarter 2007 Form 10-Q, that "[TMI's strategic focus on high-credit-quality assets] creates significant portfolio liquidity and low portfolio volatility, which gives us access to financing through the credit cycle and contributes to maintaining consistent profitability" is a materially misleading statement.  CCAC ¶ 572, at 174.  The Court sees such statements as akin to a mission statement or puffery.  TMI's plan was to work under a paradigm of maintaining high asset quality to ensure liquidity, and, until the mortgage market began to crumble, that plan appears to have been a success.  There is nothing objectively false about this statement except that it implies that TMI's plan guarantees success.  It is akin to TMI asserting that it has "a cunning plan that cannot fail."  Black Adder, Witchsmeller Pursuivant (BBC2 television broadcast, 1983).  The same is true of the statement that "[a]nother long-term objective is to achieve a more balanced funding mix . . . ." CCAC ¶ 575, at 174

MOO at 88 n.43.  Here again, rather than setting forth "[g]rounds warranting a motion to reconsider," such as "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, [or] (3) the need to correct clear error or prevent manifest injustice," Servants of Paraclete v. Does, 204 F.3d at 1012, the Plaintiffs state only that they disagree with the Court conclusion.  See Memorandum at 26 ("In making the above referenced statement, Defendants were not merely setting forth an aspirational goal; rather, this statement constituted a hard, affirmative

-86-

representation that TMI's focus on high-quality assets created liquidity by giving the Company access to financing during market downturns.").  A motion for reconsideration is an "inappropriate vehicle[ ] to reargue an issue previously addressed by the court."  Servants of Paraclete v. Does, 204 F.3d at 1012.  The Court therefore denies the Plaintiffs request that it reconsider its conclusion that certain statements were in essence puffery.

## IV.    THE COURT WILL RECONSIDER DISMISSING THE PLAINTIFFS' SECTION 20(A) CLAIM AGAINST THORNBURG AND RESERVING JUDGMENT ON THE PLAINTIFFS' SECTION 20(A) CLAIM AGAINST GOLDSTONE, SIMMONS, AND DECOFF.

The Plaintiffs argue that the Court should reconsider portions of its order addressing claims asserted under Section 20(a) of the Exchange Act against the Individual Defendants.  The Plaintiffs request that the Court: (i) "reconsider its failure to address the affirmative duty imposed on Defendants Mr. Thornburg and Badal to disclose material, nonpublic information prior to selling $900 million in Thornburg securities," Memorandum at 27, (ii) "reconsider its dismissal of the Section 20(a) Claims asserted against Defendants Mr. Thornburg and Badal," Memorandum at 28; and (iii) reconsider reserving its "decision on the Section 20(a) claims asserted against Defendants Goldstone, Simmons, and Decoff," Memorandum at 28.  The Court reconsiders the Individual Defendants' disclosure duties, but concludes that Item 303 and the abstain-or-disclose rule provide no basis for it to change its decision.  The Court reconsiders reserving ruling on Goldstone, Simmons, and Decoff, dismissing the Plaintiffs' Section 20(a) claims against Decoff, but not against Goldstone and Simmons.  The Court also grants the Plaintiffs leave to file their SAC, because it sets forth allegations against Thornburg alleging he had control of Goldstone when Goldstone made actionable statements.

**A.     THE COURT WILL RECONSIDER THE AFFIRMATIVE DUTY IMPOSED ON THORNBURG AND BADAL TO DISCLOSE MATERIAL, NONPUBLIC INFORMATION BEFORE SELLING $900 MILLION IN THORNBURG SECURITIES, BUT WILL NOT CHANGE ITS DECISION TO DISMISS THE PLAINTIFFS' RULE 10b-5 CLAIMS AGAINST THEM.**

The Plaintiffs contend that the Court should reconsider its failure to address the affirmative duty imposed on Thornburg and Badal to disclose material, nonpublic information before selling $900 million in Thornburg securities when it dismissed the Plaintiffs' § 10(b) and Rule 10b-5 claims against them.  The Plaintiffs assert:

> As a corporate issuer, TMI was required and failed to disclose the material nonpublic information absent from the Offering Documents prior to selling $900 million of its own stock and securities during the Class Period.  The SAC addresses the foregoing, and asserts that the Individual Defendants are therefore liable as control persons under Section 20(a) for TMI's material omissions.

Memorandum at 26-27.  While the Plaintiffs do not specify which of the allegations in their 172-page SAC "address[ ] the foregoing," the Plaintiffs apparently incorporate the disclosure argument that they waged against the Underwriter Defendants against Thornburg and Badal.  Specifically, the Plaintiffs appear to assert that Thornburg and Badal were obligated to disclose: (i) TMI's increased reliance on RPA financing; (ii) TMI's $2.9 billion dollar portfolio of purchased MBS backed by Alt-A mortgages, which was used as collateral to secure TMI's RPAs; and (iii) the existence of cross-default provisions in its RPA contracts.  For the reasons set forth in Section I.C, supra, where the Court rejected these arguments with regard to the Underwriter Defendants, the Court concludes that TMI fulfilled its disclosure obligations regarding these matters to the extent required, and Thornburg and Badal did not violate their disclosure obligations.

Moreover, in the Amended MOO, the Court also dismissed the Plaintiffs' § 10(b) claims against  Thornburg and Badal in part because "[t]he Plaintiffs ha[d] successfully pled a strong inference of scienter as to Goldstone, but not as to any other Individual Defendant."  Amended

MOO at 65.  Section 78u-4(b)(2) of Title 15 of the United States Code requires that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(emphasis added).  The Court held in its Amended MOO:

> Many of the alleged material omissions are ones as to which there was no duty to disclose.  See Basic v. Levinson, 485 U.S. at 239 n.17.  Others are irrelevant or unsupported by the alleged facts and materials that the CCAC incorporates.  Ultimately, however, the Court finds that the Plaintiffs have adequately pled scienter [only] as to Goldstone.

> . . . .

> The Plaintiffs make a series of allegations of purported fact that endeavor to impute the actions of each of the individual Defendants on one another:

>> The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances, and financial condition.

>> . . . .

>> The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the company, and approved or ratified these statements.

Id. ¶¶ 64-65, at 18.  When addressing the scienter element, however, the Court cannot credit such allegations of shared knowledge among the individual Defendants in the face of the PSLRA's particularity requirement.  See City of Phila. v. Fleming Companies, Inc., 264 F.3d at 1264 ("[A]llegations that a securities fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'  Generalized imputations of knowledge do not suffice, regardless of defendants' positions within the company.")(quoting In re Advanta Corp. Sec. Litig.,

180 F.3d 525, 539 (3d Cir. 1999); <u>Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.</u>, 365 F.3d [353, 365 (5th Cir. 2004)]("[C]orporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles, even if their general level of day-to-day involvement in the corporation's affairs is pleaded."). Even the Ninth Circuit, which refused to abolish the group-pleading rule in <u>Glazer Capital Management, LP v. Magistri</u>, contemplated the rule's use only under "circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication." <u>Glazer Capital Management, LP v. Magistri</u>, 549 F.3d at 744 (citing <u>Makor Issues & Rights, Ltd. v. Tellabs, Inc.</u>, 513 F.3d [ 588, 710 (7th Cir. 2006), <u>rev'd on other grounds</u>, 551 U.S. 308 (2007)]). The Plaintiffs do not allege such dramatic falsehoods in the CCAC. The Court will therefore, for the purpose of its scienter analysis, associate statements only with the individual Defendants who said them, signed them, or as to whom the Plaintiffs specifically allege had knowledge of them.

Amended MOO at 38-39, 50-51. Regarding Thornburg, the Court noted that the Plaintiffs alleged that

Thornburg signed the Company's quarterly reports on Forms 10-Q for the periods ending March 31, 2007, June 30, 2007 and September 30, 2007; the Company's Annual Report on Form 10-K for the year-ended December 31, 2006; and the Shelf Registration Statement filed to authorize the issuance and sale of up to $1,500,000,000 in TMI securities.

Amended MOO at 49 (quoting CCAC ¶ 58, at 17). The Court considered the Plaintiffs' contention that Thornburg was motivated to commit securities fraud by the prospect of ever-greater compensation, the looming threat of bankruptcy, and the desire to raise capital through public securities offering, and concluded that "the alleged motives, and facts underlying them, standing alone, do not establish a strong inference of scienter," but that "[t]he allegations nudge the ball, however, further toward the Plaintiffs' goal with respect to Thornburg." Amended MOO at 52. After holding that the Plaintiffs had sufficiently alleged scienter as to GoldStone, the Court held that the Plaintiffs had failed to allege scienter for Thornburg and the other Individual Defendants:

The only basis for establishing a strong inference of scienter as to each remaining Defendant [other that Goldstone] is the statements and omissions in public filings that Defendant signed. That leaves only TMI's alleged omissions, the one-

-90-

business-day delay in disclosing that TMI had failed to meet some margin calls, the financial restatement, the delayed disclosure of the NYSE investigation, and Thornburg's potential motive to grow TMI's assets at the risk of investors.  The Court does not believe that, absent Goldstone's false and/or misleading statements, an intent to deceive or defraud is as plausible as other inferences that one might draw from the combination of circumstances and alleged omissions.  Rather, when the Court views all of the alleged facts and incorporated documents as a whole, the most plausible inference is that TMI was a sinking ship.  It disclosed material facts quickly, after reasonable investigation, but sometimes facts were still in the intelligence pipeline when an SEC filing was made, in which case the fact was quickly disclosed in a Form 8-K.  The Defendants tried to stay positive in the face of the mortgage crisis and Goldstone made some statements that crossed the line between optimistic and false and/or misleading, assuming the Plaintiffs' allegations are true.  The most seemingly incriminating factor that was not directly attributable to Goldstone was TMI's failure to disclose the situation with JP Morgan, which arose on February 28, 2008, in TMI's Current Report, filed that same day.  February 28, 2008 was a Thursday.  The fact was disclosed after a one-business-day gap, and there was no alleged significant event on the Friday between February 28 and the filing of TMI's Form 8-K on Monday, March 3, 2008.  Ultimately, there are not allegations sufficient to establish a strong inference of scienter as to the other individual Defendants.

In sum, the Plaintiffs have not attributed any wrongful conduct or statements to any other individual Defendant, and the documents that other Defendants have signed -- the Form 10-Q quarterly reports, the Form 10-K annual reports, the Form 10-K/A amended annual reports, and the SRS -- contain no statements or omissions that the Court finds establish a strong inference of scienter.  The Court therefore holds that the Plaintiffs have failed to plead sufficient facts to establish a strong inference of scienter as to Thornburg, Simmons, Badal, Decoff, Anderson, Ater, Cutler, Kalangis, Lopez, Mullin, and Sherman.  The Court will therefore grant the Defendants' motion to dismiss as to those Defendants.

Amended MOO at 68-69.  The Plaintiffs do not appear to contend that they have added allegations addressing Thornburg's and Badal's scienter, and the Plaintiffs have not cured this deficiency in the SAC.  Thus, the Court denies the Plaintiffs request that it alter its decision dismissing their Rule 10b-5 claims against Thornburg and Badal, because the Plaintiffs have not set forth a disclosure duty that would undermine the Court's decision, and the Plaintiffs have not cured the deficiencies in showing scienter for these Defendants.

**B.    THE COURT WILL RECONSIDER ITS RESERVATION OF A DECISION ON THE SECTION 20(A) CLAIMS ASSERTED AGAINST GOLDSTONE, SIMMONS, AND DECOFF.**

In its Amended MOO, the Court stated:

> To establish their claim for liability under Section 20(a) of the Exchange Act, the Plaintiffs have to allege properly a primary violation of the securities laws, and "facts from which it can reasonably be inferred that the individual defendants were control persons." Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108. The Plaintiffs have successfully pled a primary violation by Goldstone, but the Court is unable to determine at this time whether the Plaintiffs have successfully pled a rule 10b-5 claim against TMI because of TMI's pending bankruptcy. The Court therefore can grant the Defendants' motion to dismiss as to individual Defendants only if it finds that those Defendants are not control persons of TMI under the Exchange Act. As to any individual Defendant that is a control person, the Court must reserve judgment on the Plaintiffs' Section 20(a) claims until it has resolved whether the Plaintiffs properly pled their claim against TMI.

Amended MOO at 75. The Plaintiffs assert that the bankruptcy stay does not prevent the Court from deciding their Section 20(a) claims against Goldstone, Simmons, and Decoff. While Goldstone and Simmons oppose the Court reconsidering its decision, neither they nor Decoff dispute the Plaintiffs' assertion that the bankruptcy stay does not require the Court to reserve judgment. See Badal, Decoff, Lopez, and Sherman's Response at 18 ("Defendant Decoff takes no position on whether the Court should decide to proceed to rule on this issue. However, to the extent the Court reconsiders this part of its January 27, 2010 Opinion, Decoff requests that the Court dismiss Plaintiffs' Section 20(a) claim against him . . . ."); Goldstone and Simmons Response at 25 ("The Court decided earlier as a matter of prudential case management that it did not need to address the control person claims now.").

The Court agrees that the bankruptcy stay does not require it to reserve judgment on the Plaintiff's Section 20(a) claims against Goldstone, Simmons, and Decoff. To state a claim under Section 20(a) of the Exchange Act, a plaintiff must establish a primary violation of the federal

securities laws and that a defendant exerted control over the primary violator. See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1107.  If determining Section 20(a) liability against the Individual Defendants required the Court to decide liability against TMI, the Court would have to reserve judgment during the pendency of the bankruptcy proceedings. See 11 U.S.C. § 362(a) ("[A] petition filed under section 301 [voluntary petition] . . . of this title . . . operates as a stay . . . of . . . the . . . continuation . . . of a judicial . . . proceeding against the debtor that was . . . commenced before the commencement of the case under this title . . . .").  Because "the liability of the primary violator is simply an element of proof of a section 20(a) claim, . . . liability need not be actually visited upon the primary violator before a controlling person may be held liable for the primary violator's wrong." In re CitiSource, Inc. Sec. Litig., 694 F. Supp. 1069, 1077 (S.D.N.Y. 1988).  See Mason v. Okla. Turnpike Auth., 115 F.3d 1442, 1450 (10th Cir. 1997)("[T]he rule followed by this circuit and the general rule in other circuits is that the stay provision does not extend to solvent codefendants of the debtor.")(quoting Okla. Federated Gold & Numismatics, Inc. v. Blodgett, 24 F.3d 136, 141 (10th Cir. 1994)); Fortier v. Dona Anna Plaza Partners, 747 F.2d 1324, 1330 (10th Cir. 1984)("The language of [11 U.S.C. § 362] extends stay proceedings only to actions 'against the debtor.'  There is nothing in the statute which purports to extend the stay to causes of action against solvent co-defendants of the debtor."); In re Colonial BancGroup, Inc. Secs. Litig., Civ. No. 2:09cv104-MHT, 2010 WL 119290, *2-4 (M.D. Ala. Jan. 7, 2010)(refusing to stay 20(a) claims directors and officers because of bankruptcy stay).  Thus, the viability the Plaintiffs' Section 20(a) claim against the Individual Defendants does not require the Court to hold TMI liable, and courts frequently allow Section 20(a) claims to proceed against individual defendants even where the corporation has filed for bankruptcy.  See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 285-86 (3d Cir. 2006)(finding company officers liable under Section 20(a) notwithstanding

automatic stay on proceedings against bankrupt entity who was not named as a defendant); <u>Howard v. Everex Sys. Inc.</u>, 228 F.3d 1057, 1059-60 (9th Cir. 2000)(reviewing Section 20(a) claims against "Everex's CEO and Chairman of the Board" and its director after "Everex filed for bankruptcy and all actions against it were automatically stayed"); <u>In re Able Labs. Sec. Litig.</u>, No. 05-cv-2681 (JAG), 2008 WL 1967509, at *28-29 (D.N.J. Mar. 24, 2008)(finding company officers liable under Section 20(a) notwithstanding automatic stay on proceedings against bankrupt entity who was not named as a defendant); <u>Schleicher v. Wendt</u>, No. 02-cv-1332, 2005 WL 1656871, at *5-6 (S.D. Ind. July 14, 2005)(rejecting a defendant's argument that, because the defendant company "was discharged in bankruptcy from any potential liability under the Exchange Act . . . , plaintiffs cannot state a claim against them under § 20(a)," because the company "has not been found 'not liable' for securities fraud. Also, it would be inconsistent with the broad remedial purposes of the securities laws to permit senior executives of a bankrupt corporation -- whose actions allegedly contributed to the bankruptcy -- to avoid liability by relying on the corporation's bankruptcy"). The Court will therefore reconsider its decision to reserve judgment against the Plaintiff's Section 20(a) claims against Goldstone, Simmons, and Decoff. <u>See</u> <u>Servants of Paraclete v. Does</u>, 204 F.3d at 1012 ("Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." (citation omitted)).

The Court previously held the Plaintiffs adequately alleged Goldstone made actionable statements and that "Goldstone, Simmons, and Decoff are control persons for the purpose of establishing Section 20(a) liability." Amended MOO at 76. The Plaintiffs assert that, because "corporate entities are liable for materially false and misleading statements made by their highest-ranking executives," and "because TMI as an entity is liable as a matter of law for Defendant Goldstone's actionable statements, the Individual Defendants are also liable for these

statements as control persons under Section 20(a)."  Memorandum at 28.  The Defendants respond

that the Plaintiffs rely on a double-derivative liability theory that is without support in the law.  The

Defendants further respond that the Plaintiffs raise no new factual allegations leading to an inference

that the Individual Defendants could be derivatively liable for Goldstone's alleged misstatements.

        The Court agrees that Section 20(a) does not support a double derivative theory of liability

to the extent that the Plaintiffs contend that all high ranking managers are liable for all Section 10b-5

violations, regardless whether they had control of the primary violators.  Rather, to establish Section

20(a) liability, the Plaintiffs must establish that a Defendant had control over Goldstone.  To

establish a defendant's liability as a controlling person, a plaintiff must prove two things: (i) a

primary violation of the securities laws, and (ii) that the defendant had "control" over the primary

violator.  Adams v. Kinder-Morgan, Inc., 340 F.3d at 1107.  Section 20(a) of the Exchange Act

states:

> Every person who, underlines directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such controlled person is liable,
> unless the controlling person acted in good faith and did not directly or indirectly
> induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a)(emphasis added).  Thus, while "[t]he Tenth Circuit [has] observed that § 20(a)

'has been interpreted as requiring only some indirect means of discipline or influence short of actual

direction to hold a controlling person liable,'" Lane v. Page, 649 F. Supp. 2d at 1306 (quoting

Richardson v. MacArthur, 451 F.2d at 4), it has not held that all officers are liable for all violations

that may be imputed to a company through agency theory, see Adams v. Kinder-Morgan, Inc., 340

F.3d at 1108; rather, the Tenth Circuit requires a plaintiff to specify facts that "indicate that the

defendants had 'possession, direct or indirect, of the power to direct or cause the direction of the

management and policies of a person, whether through the ownership of voting securities, by

contract, or otherwise,'" Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v.

Durango Metals, Inc., 144 F.3d at 1306).  See 17 C.F.R. § 230.405 ("The term control (including

the terms controlling, controlled by and under common control with) means the possession, direct

or indirect, of the power to direct or cause the direction of the management and policies of a person,

whether through the ownership of voting securities, by contract, or otherwise.").

     In Adams v. Kinder-Morgan, Inc., the Tenth Circuit addressed whether certain individuals

involved in Kinder-Morgan, Inc. qualified as control persons for the purposes of Section 20(a)

liability.  First, the Tenth Circuit held that the directors were not, ipso facto, control persons.

> We . . . conclude that the plaintiffs have failed to allege sufficient facts to support the
> conclusion that Kinder was a control person.  During the period in question, he was
> not an executive of the company, but simply a member of the board of directors.  The
> assertion that a person was a member of a corporation's board of directors, without
> any allegation that the person individually exerted control or influence over the
> day-to-day operations of the company, does not suffice to support an allegation that
> the person is a control person within the meaning of the Exchange Act.  Accordingly,
> the district court was correct to dismiss the claim of control person liability against
> Kinder.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (citing Dennis v. Gen. Imaging, Inc., 918 F.2d at

509-10; Burgess v. Premier Corp., 727 F.2d at 832; Cameron v. Outdoor Resorts of Am., Inc., 608

F.2d at 195).  On the other hand, the Tenth Circuit held that being a significant executive within the

corporation, with ultimate management authority, is a control person:

> [W]e conclude that the plaintiffs have pled facts supporting the allegation that
> [Defendant] Hall was a control person.  He was the Chairman, President, and CEO
> of Kinder-Morgan during the relevant period.  As President and CEO, Hall would
> have possessed the ultimate management authority of the corporation on a daily
> basis.  There were no managers higher than Hall.  He thus clearly possessed "the
> power to direct or cause the direction of the management and policies of
> [Kinder-Morgan]."  Hall also had direct control over McKenzie, his chief financial
> officer and an alleged primary violator of Rule 10b-5.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d

at 1305; citing In re Ribozyme Pharms., Inc. Sec. Litig., 119 F. Supp. 2d at 1167).  A high-ranking position within the corporation, however, standing alone, is unlikely to satisfy the "control" element of a control-person claim, unless the circumstance of the defendant's position and the nature of the underlying violation would lead to an inference that the person had control.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 (holding that the CFO of Kinder-Morgan, purely based on his position as CFO, was a control person where the securities-fraud violations related specifically to official reports on the company's financial performance).  Importantly, it is not necessary that the control person actively participate in the alleged fraudulent activity.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108.[29]

With regards to deciding whether the Plaintiffs adequately pled a claim under Section 20(a), the Court first considered whether the Plaintiffs alleged a primary violation.  In its Amended MOO, the Court dismissed the Plaintiffs' primary § 10(b) claims against all Defendants but Goldstone for two reasons: (i) the Plaintiffs failed to establish an inference of scienter against Defendants other than Goldstone; and (ii) the Plaintiffs sufficiently alleged only three material misstatements or omissions -- none of which were attributable to any Defendant other than Goldstone.[30]  See Amended MOO at 74 ("Because the Plaintiffs properly allege material statements and omissions only as to Goldstone, the Court will dismiss the Plaintiffs' Section 10(b) claims against the remaining Defendants.").  Regarding the three material misstatements or omissions, the Court stated:

---

[29] If a control person acted in good faith and did not induce the acts on which the liability of the controlled person is founded, the control person is not liable, but good faith is an affirmative defense, thus inappropriate for the Court to consider on a motion to dismiss.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 n.5.

[30] The Court reserved ruling on whether TMI was liable for any of the primary violations, because of TMI's pending bankruptcy.  See Amended MOO at 74 n.36.

The Court agrees that two . . . statements are materially false or misleading, and therefore fulfill the Plaintiffs' [PLSRA] pleading requirement. First, Goldstone made statements on at least two occasions that could be construed and reasonably understood as asserting that TMI did not engage in Alt-A lending or purchase Alt-A assets. He stated on June 6, 2007, that TMI was focused "exclusively" on prime mortgage origination, and he stated on July 20, 2007 that TMI is "not an Alt-A lender." Given that TMI had a substantial collection of Alt-A assets -- at least $2,900,000,000.00 and as much as twenty-five percent of TMI's holdings -- these statements were false. Further, given the scare over the crumbling Alt-A market, a fact that is emphasized by the context in which Goldstone made his statements, the Court finds that this false statement is material.

Second, the Court finds materially misleading TMI's public disclosure in its March 3, 2008 Form 8-K -- signed by Goldstone -- that, "[t]o the extent that any other reverse repurchase agreement contains a cross-default provision, the related lender, which may be an underwriter or its affiliate, could declare an event of default at any time." This statement is misleading because the truth of the matter was that all of TMI's RPAs contained cross-default provisions; thus, news that one of TMI's lenders had declared TMI to be in default meant that potentially all of TMI's lenders could declare TMI to be in default. If one default were to occur, all of TMI's lenders could demand immediate payment from TMI and, especially considering the amount to which TMI's assets were leveraged and their relatively illiquid state, TMI would have more immediate obligations than it could pay. . . . By using the phrase, "to the extent that any other reverse repurchase agreement contains a cross-default provision," TMI implies that some or all of the other RPAs do not have cross-default provisions, which was false. The information is material: it would inform investors that, at any moment, TMI could be broke, which would tend to influence how one might invest money. The Court therefore finds that the Plaintiffs have successfully alleged Section 10(b) claims against Goldstone.

Amended MOO at 71-72.

Having concluded that only Goldstone's and the March 3, 2008 Form 8's statements are actionable, the Court turned to the question whether the other Individual Defendants were derivatively liable under Section 20(a).

To establish their claim for liability under Section 20(a) of the Exchange Act, the Plaintiffs have to allege properly a primary violation of the securities laws, and "facts from which it can reasonably be inferred that the individual defendants were control persons." Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108. The Plaintiffs have successfully pled a primary violation by Goldstone, but the Court is unable to determine at this time whether the Plaintiffs have successfully pled a rule 10b-5 claim against TMI because of TMI's pending bankruptcy. The Court therefore can

grant the Defendants' motion to dismiss as to individual Defendants only if it finds
that those Defendants are not control persons of TMI under the Exchange Act.  As
to any individual Defendant that is a control person, the Court must reserve judgment
on the Plaintiffs' Section 20(a) claims until it has resolved whether the Plaintiffs
properly pled their claim against TMI.

Amended MOO at 75.  The Court noted that "Goldstone, Simmons, and Decoff are control persons

for the purpose of establishing Section 20(a) liability."  Amended MOO at 76.  The Court stated:

> The remaining Thornburg Defendants, however, are potentially subject to Section
> 20(a) controlling-person liability.  Goldstone, who is liable independently under
> Section 10(b) and rule 10b-5, was the CEO and COO of TMI at the time of the
> March 3, 2008 Form 8-K disclosure, which he signed.  Simmons was the Chief
> Financial Officer of TMI during the entire Class Period, and the Tenth Circuit has
> held that an allegation that a Defendant is in such a position, without further detail,
> can support liability under Section 20(a).  See Adams v. Kinder-Morgan, Inc., 340
> F.3d at 1109.  Furthermore, in a mortgage-investment firm like TMI, the Chief
> Lending Officer -- Decoff -- can also be imputed with control when the alleged
> securities violation is based on misstatements in a report that purported to reflect
> TMI's financial performance.  See id.

Amended MOO at 77-78.

## 1.      The Court Will Not Dismiss the Plaintiffs' Section 20(a) Claims Against Goldstone and Simmons.

Goldstone and Simmons do not contest the Court's analysis of their Section 20(a) liability

in its Amended MOO.  Because the Plaintiffs have alleged that Goldstone was the CEO over and

signer of the March 3, 2008 Form 8-K, under the Tenth Circuit's analysis in Adams v. Kinder-

Morgan, Inc., the Plaintiffs have set forth adequate allegations to survive a motion to dismiss.  See

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 (holding that the CFO of Kinder-Morgan, purely

based on his position as CFO, was a control person where the securities-fraud violations related

specifically to official reports on the company's financial performance).  Similarly, the Plaintiffs'

Section 20(a) claim against Simmons survives a rule 12(b)(6) challenge.  Simmons was the Chief

Financial Officer of TMI when the March 3, 2008 Form 8-K was filed, and the Tenth Circuit has

held that a CFO is liable under Section 20(a) for securities-fraud violations based on statements in official reports on the company's financial performance.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109.  The Court therefore reconsiders its decision to reserve ruling whether to dismiss the Section 20(a) claims against Goldstone and Simmons, and denies the claims.

### 2.   The Court Will Dismiss the Plaintiffs' Section 20(a) Claims Against Decoff.

Decoff contends that the Court should dismiss the Section 20(a) claim against him.  The Plaintiffs' surviving Section 10(b) claims are based on Goldstone's alleged statements about Alt-A assets and TMI's alleged misrepresentations in its March 3, 2008 Form 8-K about the cross-default provisions.  The Plaintiffs' allegations in the SAC do not plausibly suggest that Decoff had control over Goldstone or over the content of TMI's Form 8-K dated March 3, 2008.  On the first score, in its Amended MOO, the Court stated:

> The CCAC is also devoid of any allegation that any of the Defendants directly controlled the acts of Goldstone while he was representing that TMI had no association with the Alt-A market.  Because the individual Defendants, except arguably Thornburg, did not hold a position of authority or control over Goldstone, the Court will decline to find any individual Defendant was a controlling person with respect to Goldstone's liability under Section 10(b).

See Amended MOO at 77 n.37.  While the Plaintiffs assert that "Decoff exerted day-to-day control over TMI's operations at the time of the alleged misstatements," Memorandum 8, the Plaintiffs again fail to allege any facts in the SAC that Decoff controlled Goldstone on June 6, 2007 and July 20, 2007, see SAC ¶¶ 99-111, at 30-36.  The Plaintiffs' allegations do not make plausible that Decoff, "as Director, Chief Lending Officer and Executive Vice President," SAC ¶ 108, at 35, would have "possession, direct or indirect, of the power to direct or cause the direction of" Goldstone, 15 U.S.C. § 78t(a), who as COO, was Decoff's supervisor, if even just through "indirect means of discipline or influence short of actual direction,'" Lane v. Page, 649 F. Supp. 2d at 1306 (quoting Richardson

v. MacArthur, 451 F.2d at 4).  Beyond the conclusory, vague, and threadbare group allegations that

the Court has rejected as inadequate to establish Section 20(a) liability, see SAC ¶ 69, at 21 ("[E]ach

of the Individual Defendants had the opportunity and ability to influence the content of TMI's public

statements and SEC filings, including statements made in conjunction with the Primary

Violations."), the Plaintiffs do not allege that Decoff had any involvement in the June 6, 2007 North

America REIT's Investor Forum or the July 20, 2007 earnings conference at which Goldstone

allegedly made the actionable statements, cf. SAC ¶ 95, at 30 ("Defendant Simmons, side-by-side

with Defendant Goldstone, participated and presented both the June 6, 2008 NAREIT Investor

Forum presentation and the July 20, 2007 TMI second quarter earnings conference call, during

which false and misleading statements were made to investors.").

The Plaintiffs also fail to allege that Decoff had control over the statements in the March 3,

2008 Form 8-K.  Decoff and Badal argue that, as officers in TMI's lending operations, they had no

control over TMI's financing operations, or the financing operations' disclosures in TMI's March

3, 2008 Form 8-K.  Decoff and Badal assert that,

> "[a]s pled by Plaintiffs in the CCAC and accepted as true by the Court, TMI had two
> operational sides: the lending side, and the borrowing (i.e., financing) side. . . .  All
> of the facts that Plaintiffs complain TMI failed to disclose in its offering
> documents . . . had *nothing* to do with the lending side of TMI.  Thus, while, without
> conceding the point, it might be reasonable to assume that Badal [and Decoff] as
> Chief Lending Officer[s] had the power to control what TMI disclosed about its
> *lending* operations, the misstatements Plaintiffs complain of here do not relate to
> TMI's lending operations but to its *financing* operations, and Plaintiffs nowhere raise
> a reasonable inference that Badal had the power to control what TMI disclosed about
> its financing.

Badal, Decoff, Lopez, and Sherman's Response at 15-16 (emphasis in original).  The Plaintiffs do

not contest that TMI's lending and operations are distinct, or that they portrayed them as such in the

CCAC.  Instead, the Plaintiffs reply that Decoff and Badal cannot overcome their allegation in the

SAC that the "Chief Lending Officer had specific authority over the entirety of TMI's mortgage loan portfolio, and had the opportunity and ability to correct misstatements and omissions regarding TMI's mortgage-related assets."  Reply at 26.

The Court agrees that the Plaintiffs' allegations do not establish that Decoff and Badal,[31] as officers in TMI's loan operations, controlled misstatements about its financing operations.  See New Jersey v. Sprint Corp., 314 F. Supp. 2d 1119, 1144 (D. Kan. 2004)(holding that chief financial officer could not be imputed with control-person liability where the alleged misstatements "made in the SEC filings . . . had nothing to do with financial reporting").  Cf. Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 ("As Kinder-Morgan's chief *financial officer*, it is reasonable to infer that McKenzie had at least indirect control over the KM's *financial* reporting." (emphases added)).  In New Jersey v. Sprint Corp., the United States District Court for the District of Kansas addressed whether various officers and directors had control over alleged misstatements in Sprint's SEC filings:

> The court begins with the four individual defendants who were more than mere members of Sprint's board of directors. Clearly, [defendant William T. Esrey, Sprint's Chairman and Chief Executive Officer, and defendant Ronald T. LeMay, Sprint's President and Chief Operating Officer] would not be entitled to dismissal of the control person liability claims and it appears that defendants concede this point at the outset.  See [Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108] (chairman, president and CEO clearly possesses requisite control for control person liability and would have possessed the ultimate management authority of the corporation on a daily basis).  According to the allegations in the first amended complaint, defendant Arthur Krause was Sprint's Chief Financial Officer during the relevant time period and defendant J.P. Meyer was Sprint's Controller during the relevant time period. In those cases in which the securities fraud claims specifically relate to official reports of the company's financial performance, the Tenth Circuit has held that it is reasonable to infer that such officers had at least indirect control over financial

---

[31] The Court's analysis applies to both Badal and Decoff, who were both Chief Lending Officers at different times in the class period.  The Court takes up the Plaintiffs' claims against Badal in Section IV.C.2, infra.

reporting and that such officers were not entitled to dismissal of control person liability claims.  See id. at 1109 (chief financial officer possesses requisite control where actionable claims of securities fraud specifically relate to official reports of the company's financial performance and, thus, it was reasonable to infer that CFO had at least indirect control over financial reporting).  While plaintiffs' highlight specific statements made in Sprint's SEC filings that were allegedly misleading, none of these statements relates to the financial performance of Sprint.  In other words, plaintiffs do not dispute that the financial reports themselves were accurate in all respects.  Unlike the circumstances present in Kinder-Morgan, then, where the claims related to official reports of the company's financial performance, there is no reason here to infer that Mssrs. Krause and Meyer had any control over statements made in the SEC filings that had nothing to do with financial reporting.  Thus, the mere fact that Mssrs. Krause and Meyer held the positions of CFO and Controller is "not likely . . . enough satisfactorily to allege control."  See id. (in absence of securities fraud claims relating specifically to official reports of financial performance, mere fact that individual defendant was the company's CFO would not likely be enough to allege control).

314 F. Supp. 2d at 1143-44 (emphasis added).  The same reasoning defeats the Plaintiffs' Section 20(a) claims against Badal and Decoff, because a loan officer is not a control person over financing operations, which the Plaintiffs do not dispute is a distinct operation.

The Court does not see how Plaintiffs' allegation that the "Chief Lending Officer had specific authority over the entirety of TMI's mortgage loan portfolio, and had the opportunity and ability to correct misstatements and omissions regarding TMI's mortgage-related assets" save their Section 20(a) claim against Decoff.  Reply at 26.  The actionable misrepresentation in TMI's public disclosure in its March 3, 2008 Form 8-K states that, "[t]o the extent that any other reverse repurchase agreement contains a cross-default provision, the related lender, which may be an underwriter or its affiliate, could declare an event of default at any time."  This statement involves the contractual provisions of TMI's RPA contracts.  While the RPAs were collateralized with ARMs, the Court does not believe so attenuated a connection between TMI's loan operations and it financing operations plausibly establishes that a Chief Lending Officer has control over financing operations disclosures about TMI's RPA contracts.  The Plaintiffs thus fail to allege with sufficient

factual detail that Decoff controlled the financing operations' disclosures in the March 3, 2008 Form 8-K.  Because the Plaintiffs fail to sufficiently allege that Decoff controlled Goldstone or financing operations' disclosures in the March 3, 2008 Form 8-K, the Court dismisses the Plaintiffs' Section 20(a) claim against him.

### C.   THE COURT WILL GRANT THE PLAINTIFFS LEAVE TO FILE THEIR SAC, BECAUSE IT ADEQUATELY ALLEGES A SECTION 20(A) CLAIM AGAINST THORNBURG, BUT THE PLAINTIFFS DO NOT ADEQUATELY ALLEGE A SECTION 20(a) CLAIM AGAINST BADAL.

The Plaintiffs contend that

> in light of the newly-pled facts set forth in the SAC, which describe the prominent roles played by Defendants Mr. Thornburg and Badal during the June/July 2007 timeframe, Plaintiffs have now easily plead enough to establish, for pleading purposes, these individuals' control over TMI at the time in which Defendant Goldstone's actionable statements were made.

Memorandum at 28.  The Court held in its Amended MOO that the allegations in the CCAC failed to establish control person liability against Thornburg and Badal or that either of them had control over Goldstone:

> The Defendants argue in their Motion that the Plaintiffs have not alleged, with any specificity, facts from which one could infer that the individual Defendants were controlling persons.  The relevant allegations from the CCAC are:
>
> > 64.    . . . .  The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances, and financial condition, as alleged herein.
>
> > 65.    The Individual Defendants were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of securities laws.

67.     The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of TMI, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  As such, the Individual Defendants were controlling persons of TMI within the meaning of Section 20(a) of the Exchange Act. . . .

CCAC ¶¶ 64-65, 67, at 18-19.  The Court agrees that these allegations lack any specificity.  Essentially, the Plaintiffs ask the Court to find that each individual Thornburg Defendant is a controlling person based solely on his or her title and position within TMI.  Of course, a high-ranking position, standing alone, is unlikely to satisfy the "control" element.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109.  If the circumstances of the particular defendant's position and the nature of the underlying claim would lead to an inference that the defendant had such control, the second element is met.  See id.

. . . .

Thornburg is the founder of the company and was the CEO until December 18, 2007, but the only articulable act or omission by TMI as an entity, the misleading Form 8-K dated March 3, 2008, was filed after his tenure as CEO ended.  There are otherwise no allegations in the CCAC, other than the conclusory allegations of hands-on management, that could lead to the conclusion that Thornburg controlled TMI's actions at that time.  Similarly, at the time of the only material misleading representation by TMI, Badal was retired and no longer Chief Lending Officer of TMI.  The Court will thus find that the Plaintiffs have failed to adequately plead a Section 20(a) violation against Thornburg and Badal, and dismiss those claims.[FN37]  The Court will also find that the Plaintiffs have failed to allege Section 20(a) claims against the Director Defendants, as the Plaintiffs allege only that each was a director and signed the SRS, in which no materially false or misleading statement is made.  See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (holding that a person is not a control person merely because he is a director).

[FN 37] The CCAC is also devoid of any allegation that any of the Defendants directly controlled the acts of Goldstone while he was representing that TMI had no association with the Alt-A market.  Because the individual Defendants, except arguably Thornburg, did not hold a position of authority or control over Goldstone, the Court will decline to find any individual Defendant was a controlling person with respect to Goldstone's liability under Section 10(b).

Amended MOO at 76-79 & n.37.

The Plaintiffs contend that they have added sufficient allegations of control to establish

-105-

control person liability against Thornburg and Badal.  See Memorandum at 28.  The Plaintiffs

contend that, "because Defendants Mr. Thornburg, CEO (see SAC ¶¶ 72-83), and Badal, Chief

Lending Officer and Executive Vice President (see SAC ¶¶ 99-105), were control persons of TMI

at the time Defendant Goldstone's actionable statements were made, a Section 20(a) claim against

each is sufficiently established." Memorandum at 30.[32]  The Court concludes that the Plaintiffs have

set forth allegations in the SAC plausibly establishing that Thornburg controlled Goldstone, and

accordingly grant the Plaintiffs leave to file their SAC.  The Plaintiffs, however, have not pled

allegations establishing Badal had control over any primary violations, so it will not alter its decision

to dismiss the Plaintiffs' claims against him.

### 1.  The Plaintiffs Have Adequately Alleged That Thornburg Was a Control Person.

The Plaintiffs' surviving Section 10(b) claims are based on Goldstone's alleged statements

about Alt-A assets and TMI's alleged misrepresentations about the cross-default provisions in its

March 3, 2008 Form 8-K.  In response to the Court's holding that the Plaintiffs had failed to plead

Section 20(a) liability against Thornburg, the Plaintiffs attempted to add the allegations to the SAC

that Thornburg was responsible for the statements in TMI's filings and that he had control over

Goldstone when Goldstone allegedly made his actionable statements.  They allege in relevant part:

---

[32] In addition to the paragraphs the Plaintiffs cite that are specific to Thornburg and Badal, the Plaintiffs also restate their group pled allegations in paragraphs 68 to 70 of the SAC that are substantively identical to paragraphs 64, 65, and 67 of the CACC that the Court found to be insufficient in its Amended MOO.  The Court previously held "that these allegations lack any specificity."  Amended MOO at 78.  Because the Court has previously addressed these allegations, because the Plaintiffs do not challenge this point in the Court's opinion, and because the Plaintiffs do not rely on their group pleading in support of their contention that "the newly-pled facts set forth in the SAC" establish Thornburg and Badal "were control persons of TMI at the time Defendant Goldstone's actionable statements were made," Memorandum at 30 (citing SAC ¶¶72-83, 99-105, at 22-25, 30-34), the Court will not retread these grounds.

72.     Throughout the Class Period, Defendant Mr. Thornburg, as Chairman of the Board and/or CEO, exerted day-to-day control over the entirety of the operations at TMI.  Further, at all times relevant to this Complaint, Defendant Mr. Thornburg had -- and routinely exercised -- the ability to influence the employees and operations of TMI.

. . . .

78.     In 2007, as market conditions for began to worsen, Defendant Mr. Thornburg was still firmly in control of the day-to-day operations of TMI.  Indeed, a number of filings late into 2007 bear Defendant Mr. Thornburg's signature, such as TMI's August 8, 2007 Quarterly Report.  See Thornburg Mortgage, Inc., Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-Q), at *62 (Aug. 8, 2007) (bearing the signature of "Garrett Thornburg, Chairman of the Board and Chief Executive Officer (Principal Executive Officer)."  Moreover, at all times relevant to this Complaint, Defendant Mr. Thornburg was Defendant Goldstone's direct superior.  Accordingly, not only was Defendant Mr. Thornburg personally responsible for TMI's public statements to investors, he was a controlling person -- with *direct managerial authority* over TMI -- during the time when the Primary Violations occurred in 2007.

79.     It was not until December 17, 2007 that TMI announced that Defendant Goldstone would be assuming the duties of CEO of TMI.  Nonetheless, even the press release and corresponding Current Report, filed with the SEC, announcing Defendant Mr. Thornburg's relinquishment of the CEO title stated that he would "remain Chairman of the Board of Directors and continue to be actively involved with the Company."  Thornburg Mortgage, Inc., Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 8-K), at *2 (Dec. 20, 2007) (emphasis added).

80.     Defendant Mr. Thornburg did remain actively involved with TMI after December 17, 2007 and through TMI's filing for bankruptcy.  Evidence submitted in conjunction with TMI's bankruptcy suggests that Defendant Mr. Thornburg continued to exert considerable day-to-day control over TMI employees, directors and executives even after the Company had entered bankruptcy.  For example, Defendant Mr. Thornburg routinely intervened in the day-today running of TMI, going so far as to make calls concerning internal TMI operations from Paris, where he was vacationing:

> Q [question by Mr. Gendron of Venable, LLP] Ma'am, taking you back to September 2nd, please tell the Court how it was that you came to be involved on a daily basis with the affairs of the debtors on that date?
>
> A [by witness Defendant Anderson] On September the 2nd, when I

woke up, I had a -- an urgent message from -- at 5 A.M. from Garrett
Thornburg asking -- he was in -- he lives for much of the year in
Paris, and he was on Paris time, and he was asking me to get in touch
with him immediately.

Q [Mr. Gendron] And what did Mr. Thornburg wish to discuss with
you?

A [Defendant Anderson] He wanted to talk with me about taking
over the day-to-day management of the debtor.

See In re TMST, Inc., Case No. 09-17787-DWK, DKT. No. 496-3, at p. 185 (D. Md.
Bankr. Oct. 20, 2009) ("Transcript of Motion to Appoint Trustee").

81.     Moreover, as testimony in the bankruptcy proceedings reflects,
Defendant Mr. Thornburg was intimately involved in the day-to-day management
of Thornburg's operations.  This includes, inter alia: (1) ensuring the payment of
management fees to TMAC by resisting the implementation of additional controls
which would have put future payments to TMAC under more scrutiny; (2) taking a
salary for his day-to-day duties at TMI, legal expenses and various other expenses
(airfare, tax preparation fees, etc) related to his involvement in routine TMI business;
and (3) maintaining an office at the TMI headquarters on Ridge Top Road.  See id.
at 33-34, 106-07, 111-12, 115-16, 185-86, 190.

82.     Indeed, it was commonplace for persons at TMI -- even as late as
postbankruptcy -- to refer to Defendants Mr. Thornburg, Goldstone and Simmons
specifically as the "management" at TMI.  See id. at 190 ("she felt that it was
appropriate for management to -- and in that case, she meant Garrett [Thornburg],
Larry [Goldstone], and Clay [Simmons].").

83.     Accordingly, throughout the Class Period, at the time of the Primary
Violations and at all times relevant to this Complaint, Defendant Mr. Thornburg was
a control person within the meaning of § 20(a) of the Exchange Act.

SAC ¶¶ 72, 78-83, at 23-25.

The Plaintiffs thus allege that Thornburg was TMI's CEO and "Goldstone's direct superior"

in June and July 2007, when Goldstone allegedly made material misstatements that the Court has

found to be actionable under the Exchange Act.  SAC ¶ 78, at 23.  These allegations are sufficient

to establish Section 20(a) liability for the purposes of withstanding a motion to dismiss.

> [The Court] conclude[s] that the plaintiffs have pled facts supporting the allegation that [Thornburg] was a control person. He was the Chairman . . . and CEO of [TMI] during the relevant period. As . . . CEO, [Thornburg] would have possessed the ultimate management authority of the corporation on a daily basis. There were no managers higher than [Thornburg]. He thus clearly possessed "the power to direct or cause the direction of the management and policies of [TMI]." [Thornburg] also had direct control over [Goldstone], his chief [operations] officer and an alleged primary violator of Rule 10b-5.

Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 (quoting Maher v. Durango Metals, Inc., 144 F.3d at 1305; citing In re Ribozyme Pharms., Inc. Sec. Litig., 119 F. Supp. 2d at 1167). See First Interstate Bank v. Pring, 969 F.2d at 898 (stating that allegations that a defendant had the ability to exert control over the circumstances of the primary violation, i.e., indirect control, are sufficient to state a claim under Section 20(a)); New Jersey v. Sprint Corp., 314 F. Supp. 2d at 1143 ("Clearly, [a CEO] would not be entitled to dismissal of the control person liability claims."). The Court concludes that the allegations in the Plaintiffs' SAC establish a Section 20(a) claims against Thornburg, and the Court grants the Plaintiffs leave to file their SAC.

## 2. The Plaintiffs Have Not Adequately Alleged That Badal Was a Control Person.

The Plaintiffs also attempt to add allegations to the SAC that Badal was responsible for the statements in TMI's filings and that he had direct managerial authority over TMI and Goldstone. They allege in relevant part:

### Section 20(a) Allegations Concerning Defendant Badal

99. Throughout the Class Period, Defendant Badal, as Senior Executive Vice President and Chief Lending Officer, exerted day-to-day control over the entirety of the operations at TMI. Further, at all times relevant to this Complaint, Defendant Badal had -- and routinely exercised -- the ability to influence the direction and operations of TMI, including the decision, among other things, to originate risky Alt-A loans.

100. In addition to being a Senior Executive Vice President and Chief Lending Officer, Defendant Badal was also a member of the TMI Board. As such,

he was required to stand for election before the shareholders of TMI.  The following is Defendant Badal's biography from a proxy filed on March 13, 2007 with the SEC:

> Joseph H. Badal has been one of our directors since we commenced operations in June 1993.  In December 2001, he became our Executive Vice President/Single Family Residential Lending and the Chief Executive Officer of Thornburg Mortgage Home Loans, Inc. ("TMHL"), our wholly-owned mortgage loan origination and acquisition subsidiary. In July 2004, he was promoted to Senior Executive Vice President, Chief Lending Officer. He is also a Managing Director of the Manager [sic]. From 1994 through 2001, Mr. Badal was Senior Vice President of Residential Loan Production with Charter Mortgage Company, headquartered in Albuquerque, New Mexico. From 1980 to 1994, Mr. Badal was the President of Merit Southwest Development Company, Inc., a consulting and commercial and industrial real estate development firm headquartered in Albuquerque, New Mexico.  He also worked with Norwest Mortgage in Albuquerque from 1992 to 1994.  Mr. Badal is a former member of the New Mexico House of Representatives and former Chairman of the New Mexico Mortgage Finance Authority. Mr. Badal is a graduate of Temple University, B.S., and the University of New Mexico, M.B.A.

Thornburg Mortgage, Inc., Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Schedule 14A), at *8 (Mar. 13, 2007)

101.    At all times relevant to this Complaint, Defendant Badal -- as Director, Chief Lending Officer and Senior Executive Vice President -- was a primary decision maker at TMI, with specific authority over the entirety of TMI's mortgage loan portfolio.  Indeed, Defendant Badal often held himself out as an "expert" on the home loan and mortgage industry, authoring and contributing to articles on the subject in a variety of news sources.  See, e.g., Badal Joseph, "Mortgage Matters: Is this 2007 . . . or 1929?", Santa Fe New Mexican Real Estate Guide, at RE-17 (Oct. 17, 2007) ("There is no question that there have been abuses in the sub-prime arena, and curtailing funds to that sector makes sense.").  Some of these articles, such as one authored in the midst of the 'mortgage meltdown' in August of 2007, encouraged real estate agents to help sell more mortgages (for companies such as Thornburg) by being "creative" and encouraging the acquisition of property with "no money down" and with a "second mortgage." Badal, Joseph, Mortgage Matters: "In Hard Times, What's a Realtor to do?", Santa Fe New Mexican Real Estate Guide, at RE-82 (Aug. 5, 2007) ("It's markets like this that differentiate the creative agents from the mere ordertakers."); see also Badal, Joseph, "Mortgage Matters: Using Home Equity Wisely," Santa Fe New Mexican Real Estate Guide, at RE-126 (June 3, 2007) ("For a self-employed borrower or a savvy investor, using mortgage debt to finance the borrower's personal business or to

finance an investment can be very economical methods of generating investible funds.").

102.     Also, as a top executive at TMI, Defendant Badal was listed among TMI's key executives in official SEC filings which were disseminated to investors. As TMI's annual report for fiscal year 2006 states:

> We are dependent upon the efforts of Garrett Thornburg, the Chairman of our Board of Directors and our Chief Executive Officer, Larry A. Goldstone, our President and Chief Operating Officer, Clarence G. Simmons, III, our Senior Executive Vice President and Chief Financial Officer and Joseph H. Badal, our Senior Executive Vice President and Chief Lending Officer, all of whom are also key officers and employees of the Manager. The loss of any of their services could have an adverse effect on our operations.

Thornburg Mortgage, Inc., Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Form 10-K), at *18 (Mar. 1, 2007) (emphasis added).

103.     The Primary Violations which occurred in 2007 -- prior to Defendant Badal's retirement -- constituted false and misleading statements relating to TMI's portfolio of loans, i.e., whether those loans were "exclusively" prime and not "Alt-A" as was falsely stated. See infra ¶¶ 286, et seq. This is a subject over which Defendant Badal would have had primary responsibility as Chief Loan Officer. Accordingly, Defendant Badal not only would have known the falsity of the statements constituting the Primary Violations, but would have had the opportunity and ability to correct those statements or prevent them from being made in the first instance.

104.     In addition, Defendant Badal, along with Defendants Mr. Thornburg and Goldstone, Simmons was -- at all relevant times a Managing Director of TMAC. A 2007 proxy filing by TMI described Defendant Simmons' position with TMAC and the conflicts of interests in which that relationship resulted:

> In addition to being our Chairman of the Board, our Chief Executive Officer and one of our directors, Mr. Thornburg is Chairman of the Board, Chief Executive Officer and sole director of the Manager and owns all of the voting shares of the Manager. Mr. Goldstone, in addition to being our President, our Chief Operating Officer and one of our directors, is a Managing Director of the Manager.  Mr. Badal, one of our Senior Executive Vice Presidents, our Chief Lending Officer and one of our directors, is also a Managing Director of the Manager.  Mr. Simmons, one of our Senior Executive Vice Presidents and our Chief Financial Officer, is

also a Managing Director of the Manager.  As such, Messrs. Thornburg, Goldstone, Badal and Simmons are paid employees of the Manager.  Messrs. Goldstone, Badal and Simmons own minority interests in the Manager.  Mr. Jeffers, one of our non-management directors, also owns a minority interest in the Manager.

We pay the Manager an annual base management fee based on average shareholders' equity, adjusted for liabilities that are not incurred to finance assets ("Average Historical Equity" as defined in the Management Agreement) payable monthly in arrears as follows: 1.3636% of the first $300 million of Average Historical Equity, plus 1.00% of that portion above $300 million but less than $1.5 billion. The additional fee earned on Average Historical Equity over $1.5 billion is limited to 0.88% with the fee decreasing an additional 0.05% for each additional $0.5 billion in Average Historical Equity thereafter until reaching a fee of 0.72% on any Average Historical Equity greater than $3.0 billion. These percentages are subject to annual inflation adjustments. For the year ended December 31, 2006, the Manager earned $24,698,032 in base management fees in accordance with the terms of the Management Agreement. In addition, our wholly-owned subsidiaries, including TMHL and its wholly-owned subsidiaries, have entered into separate management agreements with the Manager for additional management services for a combined amount of $850 per month, paid in arrears.

Thornburg Mortgage, Inc., Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Schedule 14A), at *15 (Mar. 13, 2007).

105.    Accordingly, throughout the Class Period, at the time of the 2007 Primary Violations and at all relevant times, Defendant Badal was a control person within the meaning of § 20(a) of the Exchange Act.

SAC ¶¶ 99-105, at 30-34.

The Plaintiffs' additional allegations in the SAC do not plausibly suggest that Badal had control over Goldstone or over the content of TMI's March 3, 2008 Form 8-K.  First, as to Goldstone, while the Plaintiffs assert that the SAC contains new facts alleging that "Badal . . . exerted day-to-day control over TMI's operations at the time of the alleged misstatements," Memorandum at 8, the Plaintiffs fail to allege any facts in the SAC that Badal controlled Goldstone at the time of the alleged misstatements on June 6, 2007 and July 20, 2007.

See SAC ¶¶ 99-111, at 30-36.  While the Plaintiffs allege that Badal could "influence the direction and operations of TMI, including the decision, among other things, to originate risky Alt-A loans," SAC ¶ 99, at 31, that he had "primary responsibility" and "specific authority over the entirety of TMI's mortgage loan portfolio," SAC ¶ 101, 103 at 31, 33, the conclusion does not plausibly follow that he had direct or indirect control over Goldstone, who, as COO, was his superior.  Beyond the conclusory, vague, and threadbare group allegations the Court has rejected as inadequate to establish Section 20(a) liability, see SAC ¶ 69, at 21 ("[E]ach of the Individual Defendants had the opportunity and ability to influence the content of TMI's public statements and SEC filings, including statements made in conjunction with the Primary Violations."), the Plaintiffs do not allege that Badal had any involvement in the June 6, 2007 North America REIT's Investor Forum or the July 20, 2007 earnings conference at which Goldstone allegedly made the actionable statements. Cf. SAC ¶ 95, at 30 ("Defendant Simmons, side-by-side with Defendant Goldstone, participated and presented both the June 6, 2008 NAREIT Investor Forum presentation and the July 20, 2007 TMI second quarter earnings conference call, during which false and misleading statements were made to investors.").

Moreover, the actionable statements in TMI's March 3, 2008 Form 8-K were published after Badal retired.  The Court held in it Amended MOO that, "at the time of the only material misleading representation by TMI, Badal was retired and no longer Chief Lending Officer of TMI."  Amended MOO at 79.  See SAC ¶ 63, at 20 ("Defendant Joseph H. Badal ('Badal') has served as a Director, Chief Lending Officer and Executive Vice President of the Company throughout the Class Period until his retirement on December 31, 2007.").  The Plaintiffs' new allegations do not make plausible that Badal, "as Director, Chief Lending Officer and Senior Executive Vice President," would have "possession, direct or indirect, of the power to direct or cause the direction of the management and

policies of" publication of financial information after his retirement, 15 U.S.C. § 78t(a), even through "indirect means of discipline or influence short of actual direction,'" Lane v. Page, 649 F. Supp. 2d at 1306 (quoting Richardson v. MacArthur, 451 F.2d at 4). The Plaintiffs' allegation that Badal was a director after he retired does not save their Section 20(a) claim, because an allegation that a defendant is a director, without more, does not establish control person liability. See Adams v. Kinder-Morgan, Inc., 340 F.3d at 1108 ("The assertion that a person was a member of a corporation's board of directors, without any allegation that the person individually exerted control or influence over the day-to-day operations of the company, does not suffice to support an allegation that the person is a control person within the meaning of the Exchange Act." (citing Dennis v. Gen. Imaging, Inc., 918 F.2d at 509-10; Burgess v. Premier Corp., 727 F.2d at 832; Cameron v. Outdoor Resorts of Am., Inc., 608 F.2d at 195)). Moreover, as discussed with regard to Decoff in Section IV.B.2, supra, the Plaintiffs have not pled allegations plausibly establishing that TMI's lending officers had control over its financing operations' disclosures about RPA provisions in TMI's March 3, 2008 Form 8-K. See New Jersey v. Sprint Corp., 314 F. Supp. 2d at 1144 (holding that chief financial officer could not be imputed with control-person liability where the alleged misstatements "made in the SEC filings . . . had nothing to do with financial reporting"). Cf. Adams v. Kinder-Morgan, Inc., 340 F.3d at 1109 ("As Kinder-Morgan's chief *financial officer*, it is reasonable to infer that McKenzie had at least indirect control over the KM's *financial* reporting." (emphases added)). The Court therefore will not change its decision to dismiss the Plaintiffs' Section 20(a) claims against Badal.

   **IT IS ORDERED** that Plaintiff's Omnibus Motion of (i) Leave to Amend the Consolidated Class Auction Complaint and (ii) For Reconsideration of the Court's January 27, 2010 Memorandum Opinion and Orders Granting in Part and Denying in Part Defendant's Motions to

Dismiss the Consolidated Amended Complaint, filed July 9, 2010 (Doc. 309) is granted in part and denied in part.  The Court orders that: (i) the Court will reconsider the Defendants' disclosure obligations under the abstain-or-disclose doctrine and Item 303 of Regulation S-K, 17 C.F.R. § 229.303, but the Defendants' disclosure duties thereunder do not alter the Court's holdings; (ii) the Court will not change its decision that TMI's 2007 Form 10-K was not actionable, because the Plaintiffs present no new law or facts to support their request for reconsideration on this matter; (iii) the Court will not change its decision that certain of the Defendants' statement were inactionable puffery, because the Plaintiffs again present no new law or facts to support their request for reconsideration on this matter; (iv) the Court will not change its decision to dismiss the Plaintiffs' Section 10(b) claims against Defendants Garrett Thornburg and Joseph H. Badal, because the disclosure duties under the abstain-or-disclose rule and Item 303 do not alter the Court's analysis; (v) the Court will reconsider reserving ruling on the dismissal of the Plaintiffs' Section 20(a) claims against Defendants Larry A. Goldstone, Clarence D. Simmons, and Paul G. Decoff, dismissing the Plaintiffs' claims against Decoff, but not dismissing the Plaintiffs' claims against Goldstone and Simmons; and (vi) the Court grants the Plaintiffs leave to file their Second Amended Complaint, see Doc. 309-1, because the SAC cures deficiencies in the Plaintiffs' allegations establishing Section 20(a) liability against Thornburg.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Frederick S. Fox
Aviah Cohen Pierson
Kaplan Fox & Kilsheimer, LLP
New York, New York

-- and --

Richard A. Lockridge
Karen H. Riebel
Nathan D. Prosser
Lockridge Gindal Nauen, PLLP
Minneapolis, Minnesota

-- and --

Nancy Kaboolian
Abbey Spanier Rodd Abrams & Paradis, LLP
New York, New York

-- and --

Curtis V. Trinko
Law Offices of Curtis V. Trinko, LLP
New York, New York

-- and --

Evan J. Smith
Brodsky & Smith, L.L.C.
Mineola, New York

-- and --

David R. Scott
Scott & Scott, LLC
Colchester, Connecticut

-- and --

Arthur Shingler, III
Scott & Scott, LLP
San Diego, California

-- and --

Cody Kelley
 Charlotte Itoh
Kelley Law Offices
Albuquerque, New Mexico

-- and --

Shane C. Youtz
Youtz & Valdez, P.C.
Albuquerque, New Mexico

-- and --

Turner W. Branch
Branch Law Firm
Albuquerque, New Mexico

-- and --

Fred T. Isquith
Gregory Nespole
Rachel S. Poplock
Martin E. Restituyo
Wolf Haldenstein Adler Freeman & Herz, LLP
New York, New York

-- and --

Betsy C. Manifold
Francis M. Gregorek
Rachele R. Rickert
Patrick Moran
Wolf Haldenstein Adler Freeman & Herz, LLP
San Diego, California

-- and --

Andrew Zivitz
Benjamin Sweet
Michelle Newcomer
Richard Russo, Jr.
Sean M. Handler
Stewart L. Berman
D. Seamus Kaskela
Barroway Topaz Kessler Meltzer & Check, LLP
Radnor, Pennsylvania

    *Attorneys for the Plaintiffs*

Amy L. Neuhardt
Boies, Schiller & Flexner, LLP
Washington, D.C.

-- and --

Donald L. Flexner
Philip C. Korologos
Boies, Schiller & Flexner, LLP
New York, New York

    *Attorneys for Defendants Garrett Thornburg, Anne-Drue M. Anderson, David A. Ater,*
       *Joseph H. Badal, Eliot R. Cutler, Ike Kalangis, Francis I. Mullin, III, Stuart C.*
       *Sherman, and Paul G. Decoff*

William H. Forman
Overland, Borenstein, Scheper & Kim, LLP
Los Angeles, California

-- and --

David F. Cunningham
Thompson, Hickey, Cunningham, Clow, April & Dolan, P.A.
Santa Fe, New Mexico

    *Attorneys for Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A.*
       *Goldstone, Clarence G. Simmons, Anne-Drue M. Anderson, David A. Ater, Joseph*
       *H. Badal, Eliot R. Cutler, Michael B. Jeffers, Ike Kalangis, Owen M. Lopez, Francis I.*
       *Mullin, III, and Stuart C. Sherman*

Clinton W. Marrs
Tax, Estate & Business Law, N.A., LLC
Albuquerque, New Mexico

-- and --

Elizabeth H. Skey
Jonathan A. Shapiro
Wilmer Cutler Pickering Hale and Dorr, LLP
Palo Alto, California

    *Attorney for Defendants Larry A. Goldstone and Clarence G. Simmons*

Robert Badal
P. Patty Li
Wilmer Cutler Pickering Hale and Dorr, LLP
Los Angeles, California

    *Attorney for Defendants Thornburg Mortgage, Inc., Larry A. Goldstone, Clarence G.*
       *Simmons, Michael B. Jeffers, and Owen M. Lopez*

Joel Sher
Shapiro Sher Guinot & Sandler
Baltimore, Maryland

-- and --

Mary R. Jenke
Walsh Anderson Brown Gallegos & Green, P.C.
Albuquerque, New Mexico

    *Attorneys for Thornburg Mortgage, Inc.*

Clifford K. Atkinson
John Thal
Atkinson, Thal & Baker, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendants AG Edwards & Sons, Inc., BB&T Capital Markets, UBS*
       *Securities, Citigroup Global Markets Inc., Friedman, Billings, Ramsey & Co.,*
       *Oppenheimer & Company, Inc., RBC Dain Rauscher Corp., Stifel, Nicolaus &*
       *Company, Inc., and Bear Sterns & Co.*

Jonathan C. Dickey
Gibson, Dunn & Crutcher, LLP
New York, New York

-- and --

Dean J. Kitchens
Lindsay R. Pennington
Gibson, Dunn & Crutcher, LLP
Los Angeles, California

> Attorneys for Defendants AG Edwards & Sons, Inc., BB&T Capital Markets, Citigroup
> Global Markets Inc., Oppenheimer & Company, Inc., RBC Dain Rauscher Corp., and
> Stifel, Nicolaus & Company, Inc.

David Bohan
David Stagman
Katten Muchin Rosenman, LLP
Chicago, Illinois

> Attorneys for Defendants UBS Securities and Bear Sterns & Co.

William Pittard
Steven M. Farina
Williams & Connolly, LLP
Washington, D.C.

> Attorney for Defendant Friedman, Billings, Ramsey & Co.