# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

IN RE THORNBURG MORTGAGE, INC.    No. CIV 07-0815 JB/WDS
SECURITIES LITIGATION

## MEMORANDUM OPINION

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement and Joint Stipulation of Settlement and Release, filed April 16, 2012 (Doc. 386)("Motion for Preliminary Approval"); and (ii) the Court's Order Preliminarily Approving Settlement and Providing for Notice, filed April 23, 2012 (Doc. 387)("Order"). The primary issue is whether the Court should grant preliminary approval of a cy-pres award to the Center for Civic Values contained in the Stipulation and Agreement of Settlement, filed April 16, 2012 (Doc. 386)("Stipulation"). In its Order, the Court granted the Motion for Preliminary Approval in part. The Court will deny preliminary approval of the cy-pres award and, consistent with its Order, will require that the parties delete the cy-pres provision from the Stipulation and the notices to class members. In its Order, on pages 15 and 16, the Court promised to issue a Memorandum Opinion at a later date to more fully explain its decision. This Memorandum Opinion is the promised explanation.

## FACTUAL BACKGROUND[1]

This case -- so far as is relevant to the disposition of this motion -- involves four public offerings that, the Plaintiffs allege, were made pursuant to false or misleading offering documents. This consolidated action is brought by Lead Plaintiffs (i) W. Allen Gage, individually and on behalf

---

[1] The Court draws its statement of facts from the well-pleaded, non-conclusory allegations of the Consolidated Amended Class Action Complaint, filed June 14, 2011 (Doc. 361)("CCAC").

of J. David Wrather; (ii) Harry Rhodes; (iii) FFF Investments, LLC; (iv) Robert Ippolito, individually and as Trustee for the Family Limited Partnership Trust; and (v) Nicholas F. Aldrich, Sr., individually and on behalf of the Aldrich Family; (vi) Betty L. Manning; (vii) John Learch; and Boilermakers Lodge 154 Retirement Plan (collectively "the Plaintiffs").  The Lead Plaintiffs all purchased shares of Defendant Thornburg Mortgage, Inc. ("Thornburg Mortgage") stock during the Class Period -- from April 19, 2007 to March 19, 2008, inclusive -- at prices that they allege were artificially inflated.  They assert that they were damaged as a result of these inflated-price purchases, now that the truth has been revealed.  See Consolidated Class Action Complaint ¶ 4, at 9, filed June 14, 2011 (Doc. 361)("CCAC").  Manning acquired 550 shares of Thornburg Mortgage common stock during the May 2007 Offering.  See CCAC ¶ 56, at 25.  She bought them on May 4, 2007, and paid $27.05 per share.  See CCAC ¶ 56, at 25.  Learch, as trustee for the Learch trust, acquired 400 shares of 7.5% Series E Cumulative Convertible Redeemable Preferred Stock in the June 2007 Offering.  See CCAC ¶ 57, at 25.  He bought his shares on June 19, 2007 and paid $25.00 per share.  See CCAC ¶ 57, at 2.  Boilermakers Lodge purchased 860 shares of Thornburg Mortgage Series F Preferred Stock in the September 2007 Offering.  See CCAC ¶ 58, at 25.  Boilermakers Lodge purchased these shares on August 30, 2007, and paid $25.00 per share.  See CCAC ¶ 58, at 25.

      1.    **The Defendants.**

      Thornburg Mortgage, the company whose securities are at the heart of this action, is a publicly traded residential-mortgage lender that represents that it focuses primarily on the "jumbo" and "super-jumbo" segment, i.e., loans totaling over $417,000.00, of the adjustable-rate mortgage ("ARM") market.[2]  See CCAC ¶ 6, at 10.  "[Thornburg Mortgage] generates income from the small,

_____

[2]An adjustable-rate mortgage is "[a] mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index."  Black's

net spread between the interest income it earns on its assets and the cost of its borrowings." CCAC ¶ 6, at 10.  Thornburg Mortgage was formed under the laws of the State of Maryland and has its principal place of business in Santa Fe, New Mexico.  See CCAC ¶ 60, at 26.  At all relevant times, Thornburg Mortgage's securities have been traded on the New York Stock Exchange under the symbol "TMA."  CCAC ¶ 60, at 26.  For federal income tax purposes, Thornburg Mortgage is classified as a Real Estate Investment Trust.  See CCAC ¶ 115, at 44.

The "Individual Defendants" are: (i) Garrett Thornburg, the Chairman of Thornburg Mortgage's Board of directors; (ii) Larry A. Goldstone who served as the President and a Director of Thornburg Mortgage; (iii) Joseph H. Badal who served as a Director, Chief Lending Officer, and Executive Vice President of Thornburg Mortgage until his 2007 retirement; (iv) Paul G. Decoff who serves as Senior Executive Vice President and Chief Lending Officer; and (v) Clarence D. Simmons who served as Senior Executive Vice President and Chief Financial Officer until he left the company in 2009.  See CCAC ¶¶ 60-66, at 26-27.  The following Defendants constitute the "Underwriter Defendants," which are all nationally recognized investment banking and asset management firms: (i) A.G. Edwards, Inc.; (ii) Bear Sterns & Co., Inc.; (iii) BB&T Capital Markets, a division of Scott & Stringfellow, Inc.; (iv) Citigroup Global Markets, Inc.; (v) Friedman Billings Ramsey & Co.; (vi) Oppenheimer & Co. Inc.; (vii) RBC Dain Rauscher Inc.; (viii) Stifel Nicolaus & Company, Inc.; and (ix) UBS Securities LLC.  CCAC ¶¶ 460-69, at 154-57.  The "Director Defendants" include: (i) Anne-Drue M. Anderson; (ii) David A. Alter; (iii) Eliot R. Cutler; (iv) Ike Kalangis; (v) Owen M. Lopez; (vi) Francis I. Mullin, III; and (vii) Stuart C. Sherman.  CCAC ¶¶ 470-77, at 157-58.

### 2.    The Claims.

―――――――――――――――――

Law Dictionary 1102 (9th ed. 2009).

This federal-securities class action sets forth claims under the Securities Act of 1933, 15 U.S.C. §§ 77a to 77aa ("Securities Act"), and under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a to 78oo ("Exchange Act").  CCAC ¶ 1, at 8.  The Lead Plaintiff allege that "certain defendants acted knowingly or with recklessness in issuing materially false or misleading statements and/or failing to disclose material facts concerning the Company's business and financial condition Between April 19, 2007 and March 19, 2008."  CCAC ¶ 2, at 1.

   **3.**     <u>**Problems for Thornburg Mortgage.**</u>

Thornburg Mortgage has, historically, acquired capital through public offerings of its securities, short-term borrowings -- including reverse repurchase agreements ("RPAs")[3] -- the issuance of asset-backed commercial paper ("ABCP"),[4] and the issuance of collateralized debt obligations ("CDO").[5]  CCAC ¶ 7, at 10.  Thornburg Mortgage was heavily leveraged -- meaning

---

[3]The Plaintiffs allege that

RPAs involve a simultaneous sale of pledged securities to a lender at an agreed-upon price in return for an agreement to repurchase the same securities at a future date (the maturity of the borrowing) at a higher price.  Most RPAs, including the mortgage backed security RPAs that Thornburg Mortgage entered into during the Class Period, could require the borrower (in this case Thornburg Mortgage) to post additional collateral should the value of the original collateral decline.

CCAC ¶ 118, at 46.

[4]The CCAC does not define this term.  The phrase refers to "[a]n instrument, other than cash, for the payment of money," <u>Black's Law Dictionary</u> 1220 (9th ed. 2009), that is securitized by some asset, <u>see</u> <u>Asset-Backed Commercial Paper (ABCP)</u>, Investopedia.com Financial Dictionary, http://www.investopedia.com/terms/a/asset_backed_commercial_paper.asp (last visited January 14, 2010)("A short-term investment vehicle [that] is typically issued by a bank or other financial institution. The notes are backed by physical assets such as trade receivables, and are generally used for short-term financing needs.").

[5]CDOs, also referred to as Collateralized Mortgage Debt, are

a form of long-term, non-recourse financing, issued by trusts and secured by ARM

that it borrowed a large amount of money compared to the amount of money that it had available to it.  See CCAC ¶ 8, at 10.

Thornburg Mortgage recognized the potential risk of the real-estate market going south, but repeatedly reassured analysts and its investors that its liquidity position -- its ability to satisfy debt obligations as they arise -- was not at risk.  See CCAC ¶¶ 8, 126, at 10-11, 48.  As late as July 20, 2007, Thornburg Mortgage reported that its unencumbered assets securing its highly leveraged financing were at their highest level "in the history of the organization."   CCAC ¶ 8, at 11.  Thornburg Mortgage repeatedly stated in its filings with the Securities and Exchange Commission ("SEC") that its focus was to acquire and originate high quality, highly liquid mortgage assets such that sufficient assets could be readily converted to cash, if necessary, to meet its financial obligations.  See CCAC ¶ 10, at 11.

One of the primary allegations that the Plaintiffs level against all of the Defendants is that they improperly withheld that Thornburg Mortgage held substantial "Alt-A" mortgage assets.  CCAC ¶¶ 12-13, at 12.  The Plaintiffs explain:

> Alt-A loans are 'alternatives' to the gold standard of conforming, GSE-backed mortgages.  Often an Alt-A borrower is unable to provide the proof of income or the verification of assets necessary to obtain a prime mortgage, but has a satisfactory credit score, or vice versa.  In other words, Alt-A or 'alternative' loans are associated with and defined by a higher level of risk than prime loans due to a borrower's inability to provide these fundamental guarantees

CCAC ¶ 142, at 53.  Thornburg Mortgage's multi-billion dollar asset portfolio during the Class

---

> Loans originated or purchased by Thornburg Mortgage.  CDOs are constructed from a portfolio of fixed income assets and divide the credit risk among different tranches: senior tranches (rated "AAA"), mezzanine tranches ("AA" to "BB"), and equity tranches (unrated).  Losses are applied in reverse order of seniority, so junior tranches offer higher coupons (interest rates) to compensate for the added risk.

CCAC ¶ 119, at 46.

-5-

Period was comprised of various mortgage-related assets.  <u>See</u> CCAC ¶ 14, at 12.  Thornburg Mortgage's mortgage-based holdings include both loans it originates, and loans it acquires or purchases.  <u>See</u> CCAC ¶ 14, at 12.  Thornburg Mortgage also purchased mortgage-backed securities ("MBS"), which are "a series of fixed-income assets that [a]re bundled and sold as securities." CCAC ¶ 14, at 12.  Thornburg Mortgage frequently posts these MBS assets as the collateral under its many short-term borrowing agreements.  <u>See</u> CCAC ¶ 14, 12.  Thornburg Mortgage would originate loans, securitize them, and sell off interests in the securitized assets to obtain additional financing.  <u>See</u> CCAC ¶ 14, at 12.

In 2006 and 2007, as the markets for subprime and Alt-A mortgages began to decline, and subprime and Alt-A borrowers began to default with increased frequency, many mortgage lenders announced that they were experiencing serious financial problems.  <u>See</u> CCAC ¶ 15, at 13. Thornburg Mortgage represented, however, that its stringent underwriting standards and "high quality" assets insulated it from the market downturn.  CCAC ¶ 15, at 13.  As the prices for MBSs backed by Alt-A loans as collateral declined throughout 2007, Thornburg Mortgage never disclosed that it was holding billions of dollars worth of MBS backed by Alt-A collateral on its balance sheets. <u>See</u> CCAC ¶ 15, at 13.  Notwithstanding the representations of Goldstone, President, Chief Operating Officer, and director of Thornburg Mortgage,[6] that Thornburg Mortgage's focus is on originating prime -- rather than subprime or Alt-A -- loans, several confidential witnesses state that Thornburg Mortgage originated Alt-A loans during the Class Period.  <u>See</u> CCAC ¶ 16, at 13.

On May 4, 2007, Thornburg Mortgage had its first public offering, selling 4,500,000 shares of Thornburg Mortgage common stock for a total of $121.7 million.  <u>See</u> CCAC ¶ 501, at 164.

---

[6] Goldstone was also the Chief Executive Officer of Thornburg Mortgage starting December 18, 2007.  <u>See</u> CCAC ¶ 62, at 26.

Shortly thereafter, Thornburg Mortgage had its second offering, wherein it sold 2,750,000 shares of 7.5% Series E Cumulative Convertible Redeemable Preferred Stock at a price of $25.00 per share. See CCAC ¶ 508, at 166.  In that offering, Thornburg Mortgage made $68.75 million.  See CCAC ¶ 508, at 166.

Goldstone allegedly knew, by no later than June of 2007, but did not disclose, that the ABCP market was shrinking rapidly and, by July 2007, had more or less dried up.  See CCAC ¶ 17, at 14; CCAC ¶¶ 175-76, 178, at 64-65.  Goldstone allegedly admitted this shrinking market to certain confidential sources during a private meeting on August 8, 2007.  See CCAC ¶ 15, at 6.  Goldstone reassured the confidential sources, however, that Thornburg Mortgage's relationships with its lender banks "were fine."  CCAC ¶ 175, at 64.  Also by July of 2007, the RPA market became an increasingly more costly source of financing as a result, in part, of a combination of declining asset values and the illiquidity in the ABCP market.  See CCAC ¶ 18, at 14.  After early July, Thornburg Mortgage could not complete any securitization transaction "based on a lack of buyers in the marketplace."  CCAC ¶ 18, at 14.

On August 14, 2007, Thornburg Mortgage advised the market that, because of liquidity concerns, it was exploring the potential sale of assets.  See CCAC ¶¶ 18, at 15.  Thornburg Mortgage had, however, already begun a sale of assets by August 10, 2007.  See CCAC ¶ 18, at 15.  On August 20, 2007, Thornburg Mortgage admitted that it had sold approximately thirty-five percent of its portfolio -- $20,500,000,000.00 of its highest-rated mortgage-backed assets -- to meet margin calls on its RPA agreements and to satisfy maturing ABCP obligations.  See CCAC ¶ 18, at 15.  Furthermore, Thornburg Mortgage had sold those assets at a discount, approximately ninety-five percent of their face value.  See CCAC ¶¶ 20, 272, at 15, 95; CCAC ¶ 265(c), at 79.  Thornburg Mortgage did not disclose that it owned MBSs which were backed by Alt-A collateral.  See CCAC

-7-

¶ 21, at 15.

On August 14, 2007, the price of Thornburg Mortgage common stock fell forty-three percent, from $13.81 per share to $7.89 per share.  See CCAC ¶ 20, at 15.  Also on that day, a substantial volume of shares -- 27,293,100 -- were traded.  See CCAC ¶ 20, at 15.  Allegedly based on the series of false and misleading statements, Thornburg Mortgage was able to obtain hundreds of millions of dollars in its securities offerings.  See CCAC ¶ 22, at 16.  Specifically, Thornburg Mortgage made one stock offering in early September of 2007, in which it raised $500 million in sales, and two offerings in January of 2008, which garnered an additional $212 million in total proceeds.  See CCAC ¶ 22, at 16.

Over the next few months, however, a series of disclosures by Thornburg Mortgage caused the stock price to fall dramatically.  On February 28, 2008, Thornburg Mortgage announced in its 2007 Form 10-K Annual Report that it was forced to meet over $300 million in margin calls under its RPAs, that it owned $2,900,000,000.00 in MBSs that were backed by Alt-A collateral, and that the declining value of its Alt-A-backed MBSs was to blame for the margin calls.  See CCAC ¶ 23, at 16.  On the same day, Thornburg Mortgage's common stock dropped in value fifteen percent, from $11.54 per share to $9.86 per share.  See CCAC ¶ 24, at 16.

On March 3, 2008, Thornburg Mortgage disclosed via a press release that it had "been subject to additional margin calls of approximately $270 million as of February 29, 2008,"[7] and that it was "currently in default with one RPA counterparty."  CCAC ¶ 26, at 17; CCAC ¶ 169, at 48.  After this disclosure, Thornburg Mortgage's stock price fell again.  Between February 29, 2009, and March 3, 2009, the price of Thornburg Mortgage common stock decreased from $8.90 per share to

---

[7] The year 2008 was a leap-year, so there was a February 29.

$4.32 per share -- a drop of fifty-one percent.  See CCAC ¶ 26, at 17.  Over the course of those three days, investors traded 76,858,800 shares of Thornburg Mortgage's stock.  See CCAC ¶ 26, at 17.

On March 5, 2008, Thornburg Mortgage disclosed to its investors that the February 28, 2009 JP Morgan default had triggered cross-defaults in all of Thornburg Mortgage's RPAs.  See CCAC ¶ 34, at 18.  On the same day, the price of Thornburg Mortgage's common stock fell again, from $3.40 per share to $1.26 per share -- a 54.4% drop.  See CCAC ¶ 33, at 18.

On March 7, 2008, Thornburg Mortgage disclosed to the public that it had received a letter from KPMG, LLP withdrawing KPMG's previous unqualified audit opinion, and further announced that it would restate its financial statements for 2007 -- but not for 2006.  See CCAC ¶ 35, at 19.  Thornburg Mortgage stated that the restatement was necessary, because of "a significant deterioration of prices of MBS[s], combined with a liquidity position under unprecedented pressure from increased margin calls[,] a portion of which [Thornburg Mortgage] has been unable to meet."  CCAC ¶ 35, at 19 (alteration omitted).  Between March 7, 2008 and March 10, 2008, Thornburg Mortgage's stock price fell another thirty-six percent, from $1.08 to $0.69, during which time 34,591,800 shares were traded.  See CCAC ¶ 37, at 20.

With respect to the Exchange Act, the Plaintiffs allege that Thornburg Mortgage and the Individual Defendants schemed to "create and/or maintain artificial inflation in the price of TMI common stock throughout the Class Period, to the detriment of ordinary investors who were damaged when the truth began to be revealed to the market."  CCAC ¶ 4, at 9.  They assert that Thornburg Mortgage and the Individual Defendants made a "series of affirmative statements during the class period, in TMI's SEC filings, prospectuses and registration statements, and during TMI conference calls with analysts and investors, that were materially false and misleading when made."  CCAC ¶ 5, at 9.  They further assert that Thornburg Mortgage and the Individual Defendants

-9-

"omitted material information regarding the litany of liquidity issues facing Thornburg Mortgage that they were required to disclose." CCAC ¶ 5, at 9-10. With respect to the Securities Act, the Plaintiffs allege that the Individual Defendants, Director Defendants, and Underwriter Defendants are strictly liable for omissions and material misstatements in connection with Thornburg Mortgage's:

> (1) May 4, 2007, public offering of 4.5. million shares of common stock at $27.05 per share for gross proceeds of $121.7 million (the "May 2007 Offering"); (2) June 19, 2007, public offering of 2.75 million shares of 7.5% Series E Cumulative Convertible Redeemable Preferred Stock ("Series E Preferred Stock") at $25 per share for gross proceeds of $68.8 million (the "June 2007 Offering"); (3) September 7, 2007, public offering of 20 million shares of 10% Series F Cumulative Convertible Redeemable Preferred Stock ("Series F Preferred Stock") at $25 per share, for gross proceeds of $500 million (the "September 2007 Offering"); and (4) January 15, 2008, concurrent public offerings of 8,000,000 shares of Series F Preferred at $19.50 per share, for gross proceeds of $156 million, and 7,000,000 shares of common stock at $8.00 per share for gross proceeds of $56 million (the "January 2008 Offerings").

CCAC ¶ 42, at 20-21.

## PROCEDURAL BACKGROUND

This proceeding is four cases that have all been consolidated. Kenneth Slater, manager of KT Investments, LLC, filed the initial Complaint on August 21, 2007. See Class Action Complaint, filed August 21, 2007 (Doc. 1)("Initial Complaint"). In the Initial Complaint, Slater sought to assert class claims against Thornburg Mortgage for violations of the Exchange Act, but did not assert any claims under the Securities Act. See Initial Complaint ¶¶ 101-117, at 33-38. On February 8, 2008, pursuant to a stipulation, the Court consolidated the action that Slater brought with several other actions -- namely, Snydman v. Thornburg Mortgage, Inc., No. CIV 07-1025 JEC/RHS, Gonsalves v. Thornburg, No. CIV 07-1069 MV/WDS, and Smith v. Thornburg Mortgage, Inc., No. CIV 07-1115 MCA/RLP. See Order Consolidating Related Actions, Appointing Lead Plaintiff, and

-10-

Approving Lead Plaintiff's Selection of Lead Counsel and Liaison Counsel at 2-3, filed February

8, 2008 (Doc. 49)("Consolidation Order").  At that same time, the Court selected Lead Plaintiffs,

named the firms of Schiffrin Barroway Topaz & Kessler, LLP and Wolf Haldenstein Adler Freeman

& Hertz, LLP, as Co-Lead Counsel, and named the Branch Law Firm as Liaison Counsel.  See

Consolidation Order at 3.

On June 14, 2011, the Plaintiffs filed the CCAC.  The Plaintiffs assert several claims,

including: (i) a claim for violation of Section 10(b) of the Exchange Act and Rule 10b-5 against

Thornburg Mortgage and the Individual Defendants; (ii) a claim for violation of Section 20(a) of the

Exchange Act against the Individual Defendants; (iii) a claim for violation of Section 11 of the

Securities Act against Thornburg Mortgage, the Individual Defendants, the Director Defendants, and

the Underwriter Defendants; and (iv) a claim for violation of Section 15 of the Securities Act against

the Individual Defendants.  See CCAC at 148, 151, 174, 177.  The Plaintiffs ask that the Court

certify this case as a class action, award preliminary and injunctive relief against all Defendants,

award restitution of investors' money, award compensatory damages, award costs and attorney's

fees, and award any other relief the Court deems proper.  See CCAC at 177-78.

On April 16, 2012, the parties[8] filed the Stipulation.  See Doc. 386-1.  The Stipulation,

subject to Court approval, "is intended to settle and release all claims against the Settling Defendants

and other Released Parties."  Stipulation at 3.  The Settling Defendants "deny any wrongdoing

whatsoever and this Stipulation shall in no event be construed or deemed to be evidence of or an

admission or concession on the part of any of the Settling Defendants."  Stipulation at 7-8.  The

settling parties conditionally stipulate, for the purposes of the Stipulation and settlement, that the

---

[8]The Underwriter Defendants do not join in the Stipulation.  See Stipulation at 3 n.1.  The remaining Defendants will be referred to as the Settling Defendants.

litigation shall be certified for class treatment under rule 23 of the Federal Rules of Civil Procedure. See Stipulation at 9.   The Stipulation provides for a settlement of $2,000,000.00 in cash. See Stipulation at 18, 21.  The Plaintiffs "estimate that approximately 200 million shares of TMI common and preferred stock were purchased or otherwise acquired in the open market and/or traceable to the Offerings during the Class Period and potentially damaged."  Notice of Pendency of Class Action, Proposed Settlement, Settlement Fairness Hearing, and Motion for Attorneys' Fees and Expenses at 15, filed April 16, 2012 (Doc. 386-3)("Notice").  Accordingly, "if valid claim forms for all damaged shares are submitted, the average recovery per damaged shares will be $.01." Notice at 15.  The Stipulation establishes that, if any funds remain from the settlement, after reasonable efforts have been made to locate class members and after one year has passed, any balance shall be distributed to the Center for Civic Values in Albuquerque, New Mexico.  See Stipulation at 28.  With respect to attorney's fees, the Stipulation provides that plaintiffs' counsel will submit an application for attorney's fees from the settlement fund, subject to Court approval. See Stipulation at 30-31.  Lead counsel "will apply to the court for attorneys' fees not to exceed 25% of the Settlement Amount and reimbursement of $260,000, plus interest earned on both amounts." Notice at 14.  The attorneys' fees will be paid from the settlement fund and the average cost per share will be approximately $.004.  See Notice at 14.

On April 16, 2012, the Plaintiffs filed the Motion for Preliminary Approval.  See Doc. 386. In the Order, the Court preliminarily approved the settlement as set forth in the Stipulation. See Order ¶ 5, at 4.  The Court preliminarily approved the settlement with two exceptions.  See Order at 15.  The Court stated that it does not believe that "the cy pres relief is a sound judicial doctrine."  Order at 15.  The Court stated that it would issue an opinion at a later date more fully setting forth its views on the cy pres doctrine and noted that it was not commenting on the Center

-12-

for Civic Values in any way.  <u>See</u> Order at 15.  The Court ordered that the parties delete the

provision which establishes that any remaining balance should be distributed to the Center for Civic

Values.  <u>See</u> Order at 16.  The Court also instructed the parties to delete the sentence: "No

distribution will be made on a claim where the potential distribution amount is less than ten dollars

($10.00) in cash."  Order at 16.  The Court stated that, "[i]f someone takes the time and resources

to fill out the claim form, the member should be paid."  Order at 16.

## ANALYSIS

The Court does not believe that the class action should be a free-standing device to do

justice.  Rule 23 of the Federal Rules of Civil Procedure is meant to provide a vehicle to compensate

class members and to resolve disputes.  Accordingly, the Court does not believe that it is appropriate

to distribute the balance of any remaining settlement funds to the Center for Civic Values, which

is not a party to this case and which does not represent the parties' interests.

The cy pres doctrine is an equitable doctrine under which courts "distribute unclaimed

portions of a class-action judgment or settlement funds to a charity that will advance the interests

of the class.  <u>Black's Law Dictionary</u> 444 (9th ed. 2009).  It derives from the French expression "cy

pres comme possible," which means "as near as possible," and developed out of the law of trusts.

M. Redish, P. Julian, & S. Zyontz, <u>Cy Pres Relief and the Pathologies of the Modern Class Action:</u>

<u>a Normative and Empirical Analysis</u>, 62 Fla. L. Rev. 617, 624 (2010).

> "Cy pres" is an equitable doctrine, designed to save testamentary charitable trusts
> that would otherwise fail because their beneficiaries are no longer capable of
> receiving the funds the trust held for them.  The Cy pres doctrine allows trust funds
> to be applied to the next best use that would most closely satisfy the testator's intent.

5 J. Moore, <u>Moore's Federal Practice</u>, § 23.171, at 23-599 (3d ed. 2012).  "The doctrine, or rather

something parading under its name, has been applied in class action cases . . . , but for a reason

unrelated to the reason for the trust doctrine."  Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 784

(7th Cir. 2004)(Posner, J.).  "Use of the cy pres doctrine in the class action context can be traced

largely to a pioneering student Comment, published in the University of Chicago Law Review in

1972."  M. Redish, P. Julian, & S. Zyontz, supra, at 631 (citing Stewart R. Shepard, Comment,

Damage Distribution in Class Actions: The Cy Pres Remedy, 39 U. Chi. L. Rev. 448 (1972)).  That

student argued that, "[w]hen distribution problems arise in large class actions, courts may seek to

apply their own version of cy pres by effectuating as closely as possible the intent of the legislature

in providing the legal remedies on which the main cause of action was based."  S. Shepard, supra,

at 452.  Courts resort to cy pres where funds remain after distributing a class award and the court

wishes to avoid: (i) returning the funds to a defendant who has been found liable, or agreed it was

liable, in that amount; and (ii) increasing the pro-rata share of the class members who file claims,

potentially giving those class members a windfall.  See  M. Redish, P. Julian, & S. Zyontz, supra

at 619.  In the context of a class action, a court may employ the cy pres doctrine to "put the

unclaimed fund to its next best compensation use, e.g., for the aggregate, indirect, prospective

benefit of the class."  Masters v. Wilhemina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007).

The Court found no case from the Tenth Circuit discussing the validity of the cy pres

doctrine with respect to class actions.  In Robles v. Brake Masters Systems, Inc., No. 10-0135, 2011

U.S. Dist. LEXIS 14432 (D.N.M. Jan. 31, 2011)(Browning, J.), the Court noted that recent academic

debate has "called into question the constitutionality of certain class action remedies, in part because

some remedies transform the underlying substantive law."  2011 U.S. Dist. LEXIS 14432, at *46

(citing M. Gilles & G. Friedman, Exploding the Class Action Agency Costs Myth: the Social Utility

of Entrepreneurial Lawyers, 155 U. Pa. L. Rev. 103 (2006); M. Redish, P. Julian, & S. Zyontz,

supra, at 617; S. Yospe, Cy Pres Distributions in Class Action Settlements, 2009 Colum. Bus. L.

Rev. 1014 (2009)).  In a recent case, Lane v. Page, No. 06-1071, 2012 WL 1940574 (D.N.M. May

22, 2012)(Browning, J.), the Court discussed its views on the cy pres doctrine and rejected requests,

by objectors to the settlement, that the Court distribute the settlement funds to a non-profit

organization.  See 2012 WL 1940574, at *42-46, *60-61.  The Court held that, "[w]hen making a

choice between allocating the funds among those class members who have submitted a claim, and

were wronged, and the Atrisco Foundation, the Court believes the more appropriate decision is to

distribute the funds among the class members." Lane v. Page, 2012 WL 1940574, at *61.  The

Court stated that, even if "the Court found that the Settlement was unfair, the Court would not make

a cy pres award to the Atrisco Foundation and give nothing to the class." Lane v. Page, 2012 WL

1940574, at *61.

The Court has a basic disagreement with the cy pres doctrine for several reasons: (i) class

actions are disputes between parties and the money damages should remain among the parties, rather

than be distributed to some third party; (ii) it is unseemly for judges to engage in the selection of

third-party beneficiaries and to distribute class action damages to third parties; (iii) judges are often

not in the best position to choose a charitable organization that would best approximate the unpaid

class members' interests; and (iv) the doctrine encourages charitable organizations, and plaintiffs'

lawyers, to lobby the court for cy pres awards.

With respect to the Court's first criticism, several Circuit Court Judges have discussed a

similar view.  The Honorable Richard A. Posner, Chief United States Circuit Judge for the United

States Court of Appeals for the Seventh Circuit, has commented on the unsoundness of the rationale

underlying the application of the cy pres doctrine. Writing for the Seventh Circuit, he noted that

"[t]here is no indirect benefit to the class from the defendant's giving the money to someone else"

and noted that the badly named "'cy pres' remedy" is "purely punitive." Mirfasihi v. Fleet Mortg.

Corp., 356 F.3d at 784.  The Honorable Joseph F. Weis, Senior United States Circuit Judge for the

United States Court of Appeals for the Third Circuit, concurring and dissenting in In re Pet Food

Products Liability Litigation, 629 F.3d 333 (3d Cir. 2010), also stated that he was "not persuaded

that application of the cy pres doctrine is appropriate in the class action setting," and that "any funds

remaining at the conclusion of the claims process should be distributed to class members where

possible or escheated to the government."  629 F.3d at 359 (Weis, J., concurring and dissenting).

Discussing the fundamental differences between a testator's wishes -- at which the cy pres doctrine

was originally aimed -- and class actions, Judge Weis noted that "[t]his lawsuit is not charitable,"

and that "[t]here are no individuals whose wishes need to be considered and there is no intent to

benefit charitable purposes that can be attributed to the class members or the lawyers who

established the fund." In re Pet Food Prods. Liab. Litig., 629 F.3d at 363.  He commented that "[w]e

deal here with charitable contributions to which members of the class never voiced any interest or

approval and a procedure subject to criticism as an inappropriate judicial function." In re Pet Food

Prods. Liab. Litig., 629 F.3d at 363 (footnote omitted).  The Court agrees with the position that

Judge Weis advances.  Parties do not initiate class actions so that class action damages can be

distributed to third parties not involved in the litigation and without standing to sue for the damages

they receive through the mechanics of court intervention.  Traditionally, the argument in favor of

cy pres awards has been that it prevents both plaintiffs and defendants from receiving a windfall.

This rationale, however, does not justify an award to parties outside the litigation.  In the Court's

experience, there is unlikely to be a large windfall to the class members, because, even if not all

class members file claims, the class is usually sufficiently numerous that distributing the remaining

class funds to those class members does not substantially increase their individual awards.  Also,

rarely do plaintiffs get one-hundred percent of the damages or losses in a settlement; often they are

dealing with financially strapped defendants, who force the plaintiffs to take a serious haircut in settlement. Moreover, whatever the possibility of a windfall in other cases, the class recovery in this case is estimated to be $.01 per share, which can hardly be considered a windfall, and, thus, the distribution of any remaining class funds are unlikely to result in a disproportionate recovery for class members. See Notice at 14. In fact, the Court has some concerns that the settlement does not justify approval of the settlement and the award of attorney's fees. On the other side of the equation, the defendant's arguably have a strong equitable claim to the funds, as it provided the funds in the expectation that compensating the class would exhaust the funds and, if that purpose is not fulfilled, the defendant does not experience a windfall when the money is returned -- it simply demonstrates that the parties misjudged the class size or interest in recovery. See Wilson v. S.W. Airlines, Inc., 880 F.2d 807, 810-813 (5th Cir. 1989). The Honorable Edith H. Jones, Chief United States Circuit Judge for the United States Court of Appeals for the Fifth Circuit, has expressed similar sentiments. In a concurring opinion, she stated: "It is inherently dubious to apply a doctrine associated with the voluntary distribution of a gift to the entirely unrelated context of a class action settlement, which a defendant no doubt agrees to as the lesser of various harms confronting it in litigation." Klier v. Elf Atochem N. Am., Inc., 658 F.3d at 480 (Jones, J., concurring). The defendant usually just wants to the case to go away and does not care where the money goes if the case will disappear. There is little adversarial process on where the funds go. With cy pres, the plaintiff's lawyers get fees and costs, and if there are remaining funds, a sizable contribution to his or her favorite charity.

The Court also believes that distributions to third parties present issues regarding the appearance of impropriety, because judges are engaging in the selective distribution of funds to parties not before it. There are no principled rationales for how a court goes about choosing from among a spectrum of charitable organizations when there is no indication that the parties

contemplated that these funds might be distributed to a third-party entity.  There is no mechanism for how charitable organizations come before the court to be considered for such an award.  Three national newspapers have indicated the suspect nature of judges engaging in such awards.  In an article for the New York Times, Adam Liptak[9] quoted Samuel Issacharoff, a law professor at New York University, as stating that the practice of awarding cy pres awards is "getting out of hand" and former federal judge David F. Levi, now dean of the Duke University School of Law, as stating that "allowing judges to choose how to spend other people's money 'is not a true judicial function.'" A. Liptak, Doling Out Other People's Money, N.Y. Times, Nov. 26, 2007, at A14.  Liptak noted that "[j]udges are turning into grant administrators, and some of them are starting to enjoy it.  Who wouldn't?"  A. Liptak, supra, at A14.  In an editorial, the Washington Post expressed the opinion that, "[i]n all but the rarest of circumstances, [cy pres] funds should be made available to individual plaintiffs and not to outside organizations -- no matter how worthy," because "giving the money away to favorite charities with little or no relation to the underlying litigation is inappropriate and borders on distasteful."  Editorial, When Judges Get Generous: A Better Way to Donate Surpluses from Class-Action Awards, Wash. Post, Dec. 17, 2007, at A20.  The Wall Street Journal describes cy pres awards as distributing "the money, in an ad hoc manner, to people who are not even in the class, who would not have had standing to sue, and who were never even alleged to have been wronged."  G. Krueger & J. Serotta, Op-Ed., Our Class-Action System is Unconstitutional, Wall St. J., Aug. 6, 2008, at A13.  It noted that "[j]udges, in their unlimited discretion, have occasionally been known to order a distribution to some place like their own alma mater or a public interest

---

[9]Liptak is an attorney and is the Supreme Court correspondent for the New York Times. See Columnist Biography: Adam Liptak, New York Times, http://www.nytimes.com/ref/us/bio-liptak.html (last visited May 19, 2012).

organization that they happen to favor."   G. Krueger & J. Serotta, Wall St. J., Op-Ed.[10]   One

commentator notes that "[j]udges often do not explain or justify their cy pres decision and there are

very few instances in which cy pres distributions have been overturned on appeal," and that the

"broad range of discretionary decisions" involved "gives trial judges enormous power."   S. Yospe,

supra, at 1037.   The broad range of discretion that trial judges have to distribute funds and the

possibility that such distributions will be viewed as selfish decisions made to charitable

organizations with which a judge is involved tarnishes the judiciary's image and creates the

appearance of impropriety.   The class members or public might see that the court may become more

interested in being a bigshot in his or her community than really making certain that the class

members get every penny to which they are entitled.   As these articles indicate, to have judges

making these kinds of decisions is inappropriate, and the Court does not want to engage in such

unlimited, unprincipled decision-making.

      Furthermore, courts are often not in the best position to make these decisions and any efforts

to become better informed about the range of charitable organizations available is likely to result

in lobbying for distributions from the Court.   Courts should not be placed in the tenuous position

---

[10]The Court has heard, but been unable to substantiate, that few now voluntarily give to the Federal Judicial Center Foundation and that almost all of its money comes from cy pres awards. See Nachshin v. AOL, LLC, 663 F.3d 1034, 140 (9th Cir. 2011)(rejecting a cy pres award to the Foundation because it was unrelated to the objectives of the lawsuit); Houck on Behalf of United States v. Folding Carton Admin. Comm., 881 F.2d 494, 502 n.8 (7th Cir. 1989)(recommending that the district court consider a cy pres award to the Foundation); Practising Law Institute, Settlement Issues in Securities Class Actions: the Defense Perspective in 2008, No. 14673 (Sept.-Oct. 2008), 1692 PLI/Corp 667, 678 ("Attempting to capitalize on this opportunity, charities like the Federal Judicial Center Foundation have begun to suggest language to class action attorneys that can be incorporated into settlements that would require counsel to give special consideration to particular causes agreed to by the parties when distributing the remaining funds."). The Foundation subsidizes trips to the Medina School at Princeton, New Jersey, which educates federal judges during an extended workshop on the humanities and science. Thus, cy pres awards could create a conflict of interest, by making judges the ultimate beneficiary of these awards.

of making a false choice about which organizations will convey the greatest "indirect" benefit to class members who are not present and have no real voice in determining who should receive the funds. Judges "often use their discretion to approve charities proposed by class counsel" and "many cy pres distributions are channeled to organizations that support the work done by plaintiffs' attorneys." S. Yospe, supra, at 1028. Moreover, because many corporations, especially national corporations, are incorporated in Delaware or other eastern states, or large states, it may be that class litigation is concentrated in areas like the Southern District of New York of in certain Californian districts; thus, concentrated, urban areas may benefit more from class litigation than more rural, sparsely populated areas, like New Mexico, which have few particularly large corporations and few national class actions. It thus appears that courts do not, in any meaningful way, search for the organization that is the "next-best" recipient of the funds, and are not in the best position to further the unpaid class member's interests, but approve a distribution to the organization whose name is put before it. Courts are likely in the habit of approving distributions to organizations that the class counsel proffer, because courts have limited time and resources to search for alternative options. Also, it looks unseemly to veto the parties' choice and substitute the court's own, which looks like the court prefers its charities; hence, because the defendant often does not care and just wants the case to go away, and the court is reluctant to exercise any independent judgment, the plaintiff's lawyer becomes the biggest or sole voice in the selection of the lucky charity and beneficiary of the judicial. It is unclear how a court, with its limited resources, would solicit charitable organizations that might be the "next-best" recipient without engaging in ex parte shopping.

An additional bias that some commentators have noted, with respect to cy pres awards, is a geographic bias. Even where a class is national in scope, cy pres awards tend to be distributed to charities within the district in which the case was brought. See S. Yospe, supra at 1030-31. To put

themselves in a better position to receive awards, groups have now started lobbying for cy pres

distributions where it appears there might be funds remaining.  For example, "the New York Bar

Association recently published a manual promoting the use of cy pres and appointed a working

group 'to develop an effective educational and marketing strategy' with the goal of steering money

awards towards the bar association's legal services departments."  S. Yospe, supra, at 1035.  In his

article, Liptak also noted that "[t]he process is starting to become institutionalized, and legal services

organizations that represent poor people have begun relying on class-action settlements to finance

their work."  A. Liptak, supra, at A14.  This lobbying and reliance on cy pres funding seems far

afield from the purposes of the class action litigation, from the cy pres doctrine, and from the

traditional functions of the courts.[11]  Courts address cases and controversies; they are not fora in

which to reorder society or push social agendas.

Professor Martin H. Redish of Northwestern University School of Law has expressed

concerns about the constitutionality of cy pres awards and, while the Court does not need to rest, and

does not rest, its disapproval on a finding that such practices are unconstitutional,[12] the Court notes

that these concerns may be another problem casting doubt on the validity of cy pres awards.

Professor Redish has said:

---

[11]Many cy pres awards go to law schools, judicial foundations, and organizations connected
to the judicial system.  The more these entities are dependent on cy pres awards, the less likely they
will be to do their independent scholarly roles of criticizing abuses in the system or class actions.
By allowing the plaintiff's lawyers to select the recipient of cy pres awards, they may be squelching
or diluting deliberation on the utility and desirability of class actions in our system.

[12]The Court has an obligation to avoid deciding constitutional issues not necessary to the
disposition of a case.  See Burton v. United States, 196 U.S. 283, 295 (1905)("It is not the habit of
the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of
a case."); United States v. Rodriguez, No. 11-2158, 2011 WL 6739498, at *32 (D.N.M. Dec. 8,
2011)(Browning, J.).

> Use of cy pres simultaneously violates the constitutional dictates of separation of powers by employing a Federal Rule of Civil Procedure to alter the compensatory enforcement mechanism dictated by the applicable substantive law being enforced in the class action proceeding.  It has somehow become common practice among many courts, scholars, and members of the public to view the modern class action as a free-standing device, designed to do justice and police evildoers.  As nothing more than a Federal Rule of Civil Procedure, however, the class action device may do no more than enforce existing substantive law promulgated either by Congress or, in diversity suits, by applicable state statutory or common law.  Yet in no instance of which we are aware does the underlying substantive law sought to be enforced in a federal class action direct a violator to pay damages to an uninjured charity.

M. Redish, P. Julian, & S. Zyontz, supra, at 623 (footnote omitted).  Professor Redish asserts that cy pres distributions violate the Rules Enabling Act, 28 U.S.C. §§ 2071 to 2077, because such distributions use a wholly procedural device to transform substantive law "from a compensatory remedial structure to the equivalent of a civil fine."  M. Redish, P. Julian, & S. Zyontz, supra, at 623. He argues that there is an Article III problem, because cy pres awards transform "the judicial process from a bilateral private rights adjudicatory model into a trilateral process" and violate Article III standing requirements.  M. Redish, P. Julian, & S. Zyontz, supra, at 641.

Ultimately, the Court's rejection of the validity of cy pres awards does not rest on any constitutional holding.  The Court believes, however, the cy pres awards are a bad idea and inappropriate, because they inject a third party into the litigation, do not adequately reflect the best interests of absent class members, create an appearance of impropriety, and are not the best use of the Court's time and resources.  The class action device in twenty-first century American society pushes due process and the conventional civil litigation model to the limits of how to compensate for mass harm.  See Phillip Morris USA Inc. v. Scott, 131 S.Ct. 1, 4 (2010)(Scalia, J.)("The extent to which class treatment may constitutionally reduce the normal requirements of due process is an important question.  National concern over abuse of the class-action device induced Congress to permit removal of most major class actions to federal court . . . .").  While often an unwieldy and

rough mode of delivering justice, see Dukes v. Wal-Mart Stores, Inc., 222 F.R.D. 137, 177 (N.D. Cal. 2004)(noting that "this 'rough justice' is better than the alternative of no remedy at all for any class member"), there are at present no other acceptable substitutes short of special legislation and regulation, which creates other problems and issues.  On the other hand, the class action device should not be expanded to include charitable gifts to non-parties at the expense of the parties and especially the class members.  While the practice of law might at times be more enjoyable for attorneys if they did not have clients, in the end, litigation is not about the bar, but about the client. Cy pres moves the focus too much away from the class members' welfare, which the Court must jealously protect if the class action device is to remain a legitimate means of advancing justice.  The Court can be cautious and prudent in using the class action device without touching the extreme limits of what the judiciary can do.

Here, the Stipulation provides that any balance remaining a year after the initial distribution of settlement funds should be provided to the Center for Civic Values.  See Stipulation at 28.  The Center for Civic Values "envision[s] a society in which all people understand, value and participate in the processes of self-government," and furthers its "vision by providing education and resources to encourage public participation in the law."[13]  It administers the New Mexico Interest on Lawyer Trust Accounts program -- a partnership between attorneys and financial institutions that provide funding for nonprofit organizations statewide -- and a statewide mock trial program.   While the Center for Civic Values may condone noble values, it is not the function of the court system to support community values and programs with money set aside for class members.  The Court does not know why the parties chose to support the Center for Civic values, but the purpose of the

---

[13]Center for Civic Values, http://www.civicvalues.org/ (last visited July 11, 2012).

litigation was to recover damages related to violations of the Exchange Act and the Securities Act.
See CCAC ¶1, at 1.  "This lawsuit is not charitable," and "there is no intent to benefit charitable
purposes that can be attributed to the class members."  In re Pet Food Prods. Liab. Litig., 629 F.3d
at 363 (Weis, J., concurring and dissenting).  Moreover, "[t]here is no indirect benefit to the class
from the defendant's giving the money to someone else."  Mirfasihi v. Fleet Mortg. Corp., 356 F.3d
at 784.  As the Court stated in its Order, the class action is not a "free-standing device to do justice."
Order at 15.  Accordingly, the Court will deny preliminary approval of the cy pres award and order
the parties to remove that provision from the Stipulation and the notice to class members.

The Court is also troubled by the concomitant provision that damages must amount to ten
dollars before a plaintiff recovers from the settlement fund.  At $.01 in damages per share, the
plaintiff must own over 1000 shares to get any money.  While no check is likely to be significant,
except to the largest shareholders, if significant even to them, if a good chunk of the shares belongs
to small investors, the Center for Civic Values might be the single largest recipient of the class
action award.  That result would not be appropriate.  Moreover, if a small shareholder takes the time
to and effort to sent in an claim, he or she should be entitled to their damages, even if it may not be
efficient or cost effective.  If the Plaintiffs' attorneys are going to propose a settlement of $.01 per
share, and ask for a large award of attorney's fees, they should not at the same time say that an
award of less than ten dollars is too small for them to process.  The settlement will not include a
minimum settlement amount, before a plaintiff can recover.

**IT IS ORDERED** that the Plaintiffs' Unopposed Motion for Preliminary Approval of
Settlement and Joint Stipulation of Settlement and Release, filed April 16, 2012 (Doc. 386), is
granted in part and denied in part.  The Court orders the parties to remove provisions relating to the
cy pres award to the Center for Civic Values from the Stipulation and Agreement of Settlement,

filed April 16, 2012 (Doc. 386), and from any class notice.



_____
UNITED STATES DISTRICT JUDGE


*Counsel*:

Frederick S. Fox
Aviah Cohen Pierson
Kaplan Fox & Kilsheimer
New York, New York

-- and --

Richard A. Lockridge
Nathan D. Prosser
Karen H. Riebel
Lockridge Gindal Nauen & Holstein
Minneapolis, Minnesota

-- and --

Nancy Kaboolian
Abbey Spanier Rodd Abrams & Paradis, LLP
New York, New York

-- and --

Curtis V. Trinko
Law Offices of Curtis V. Trinko, LLP
New York, New York

-- and --

Evan J. Smith
Brodsky & Smith, L.L.C.
Mineola, New York

-- and --

David R. Scott
Scott & Scott, LLC
Colchester, Connecticut

-- and --

Arthur Shingler, III
Scott & Scott, LLP
San Diego, California

-- and --

Charlotte Itoh
Cody Kelley
Kelley Law Offices
Albuquerque, New Mexico

-- and --

Shane C. Youtz
Albuquerque, New Mexico

-- and --

Turner W. Branch
Branch Law Firm
Albuquerque, New Mexico

-- and --

Fred T. Isquith
Gregory Nespole
Rachel S. Poplock
Martin E. Restituyo
Wolf Haldenstein Adler Freeman & Herz, LLP
New York, New York

-- and --

Betsy C. Manifold
Francis M. Gregorek
Rachele R. Rickert
Patrick Moran
Wolf Haldenstein Adler Freeman & Herz, LLP
San Diego, California

-- and --

Andrew Zivitz
Benjamin Sweet
Michelle Newcomer
Richard Russo, Jr.
Sean M. Handler
Stewart L. Berman
D. Seamus Kaskela
Barroway Topaz Kessler Meltzer & Check, LLP
Radnor, Pennsylvania

  *Attorneys for the Plaintiffs*

Amy L. Neuhardt
Boies, Schiller & Flexner, LLP
Washington, District of Columbia

-- and --

Donald L. Flexner
Philip C. Korologos
Boies, Schiller & Flexner, LLP
New York, New York

  *Attorneys for Defendants Garrett Thornburg, Anne-Drue M. Anderson, David A. Ater,*
   *Joseph H. Badal, Eliot R. Cutler, Ike Kalangis, Francis I. Mullin, III, Stuart C.*
   *Sherman, and Paul G. Decoff*

Frank T. Herdman
Rubin Katz Law Firm, P.C.
Santa Fe, New Mexico

-- and --

William H. Forman
Scheper Kim & Overland, LLP
Los Angeles, California

-- and --

David F. Cunningham
Thompson, Hickey, Cunningham, Clow & April, P.A.
Santa Fe, New Mexico

*Attorneys for Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A.*
   *Goldstone, Clarence G. Simmons, Anne-Drue M. Anderson, David A. Ater, Joseph*
   *H. Badal, Eliot R. Cutler, Michael B. Jeffers, Ike Kalangis, Owen M. Lopez, Francis I.*
   *Mullin, III, and Stuart C. Sherman*

Clinton W. Marrs
Tax, Estate & Business Law, N.A., LLC
Albuquerque, New Mexico

   *Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons*

Robert Badal
Wilmer Cutler Pickering Hale and Dorr LLP
Los Angeles, California

   *Attorneys for Defendants Thornburg Mortgage, Inc., Larry A. Goldstone, Clarence G.*
      *Simmons, Michael B. Jeffers, and Owen M. Lopez*

Joel Sher
Shapiro Sher Guinot & Sandler
Baltimore, Maryland

-- and --

Mary R. Jenke
Walsh Anderson Brown Aldridge & Gallegos
Albuquerque, New Mexico

   *Attorneys for Thornburg Mortgage, Inc.*

Clifford K. Atkinson
John Thal
Atkinson & Thal, P.C.
Albuquerque, New Mexico

   *Attorneys for Defendants A.G. Edwards & Sons, Inc., BB&T Capital Markets, UBS*
      *Securities, Citigroup Global Markets Inc., Friedman, Billings, Ramsey & Co.,*
      *Oppenheimer & Company, Inc., RBC Dain Rauscher Corp., Stifel, Nicolaus &*
      *Company, Inc., and Bear Stearns & Co.*

Jonathan C. Dickey
Gibson, Dunn & Crutcher, LLP
New York, New York

-- and --

Dean J. Kitchens
Lindsay R. Pennington
Gibson, Dunn & Crutcher, LLP
Los Angeles, California

> *Attorneys for Defendants A.G. Edwards & Sons, Inc., BB&T Capital Markets, Citigroup Global Markets Inc., Oppenheimer & Company, Inc., RBC Dain Rauscher Corp., and Stifel, Nicolaus & Company, Inc.*

David Bohan
David Stagman
Katten Muchin Rosenman, LLP
Chicago, Illinois

> *Attorneys for Defendants UBS Securities and Bear Sterns & Co.*

William Pittard
Williams & Connolly, LLP
Washington, D.C.

> *Attorneys for Defendant Friedman, Billings, Ramsey & Co.*