# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

IN RE THORNBURG MORTGAGE, INC.                No. CIV 07-0815 JB/WDS
SECURITIES LITIGATION

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Motion for Final Approval

of Proposed Settlement, Plan of Allocation and Certification of Class for Settlement Purposes, filed

July 23, 2012 (Doc. 391)("Motion for Final Approval"); and (ii) Co-Lead Counsel's Motion for an

Award of Attorneys' Fees and Expenses and Memorandum of Law in Support of Approval of Co-

Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses, filed July 23, 2012 (Doc.

392)("Motion for Attorneys' Fees"). The Court held a hearing on August 27, 2012. The primary

issues are: (i) whether the proposed Class meets the requirements of rule 23 of the Federal Rules of

Civil Procedure and may be certified for settlement purposes; (ii) whether the proposed Settlement

of $2,000,000.00 is fair and reasonable; and (iii) whether the requested attorneys' award for twenty-

percent of the $2,000,000.00 recovery, in addition to costs, is reasonable. The Court determines that

the proposed Class meets rule 23's requirements and will certify the Class for settlement purposes

only. The Court finds that the Settlement will be fair and reasonable, and will address the concerns

of the objectors thereto, if: (i) a second distribution of the un-cashed checks is made to Class

members who cashed their checks in the first distribution; and (ii) a judgment reduction provision

is added to the Settlement Order. The Court cannot order the parties to agree to a settlement over

their objection. If the parties do not agree to these revisions, the Court believes that the Settlement

would not be fair and reasonable, and will not approve the Settlement. If there is no approved

settlement, the parties are free to negotiate different settlement terms and petition the Court for

approval in the future, or the parties may proceed to trial.  The Court believes that the requested

attorneys' award is reasonable, and thus approves the award.

## FACTUAL BACKGROUND[1]

This case -- so far as is relevant to the disposition of this motion -- involves four public

offerings that, the Plaintiffs allege, were made pursuant to false or misleading offering documents.

This consolidated action is brought by (i) W. Allen Gage, individually and on behalf of J. David

Wrather, and Robert Ippolito, individually and as Trustee for the Family Limited Partnership Trust,

and Nicholas F. Aldrich, Sr., individually and on behalf of the Aldrich Family ("Lead Plaintiffs");

and (ii) Betty L. Manning; (iii) John Learch; and (iv) Boilermakers Lodge 154 Retirement Plan.

(collectively, with the Lead Plaintiffs, "the Plaintiffs").  Consolidated Amended Class Action

Complaint at 1, filed June 14, 2011 (Doc. 361)("CACAC").  The Plaintiffs purchased shares of

Defendant Thornburg Mortgage, Inc. ("Thornburg Mortgage") stock during the class period -- from

April 19, 2007 to March 19, 2008, inclusive -- at prices that they allege were artificially inflated.

They assert that they were damaged as a result of these inflated-price purchases, now that the truth

has been revealed.  See CACAC ¶¶ 55-59, at 25-26.  Manning acquired 550 shares of Thornburg

Mortgage common stock during the May, 2007 Offering.  See CACAC ¶ 56, at 25.  She bought them

on May 4, 2007, and paid $27.05 per share.  See CACAC ¶ 56, at 25.  Learch, as trustee for the

Learch trust, acquired 400 shares of 07.5% Series E Cumulative Convertible Redeemable Preferred

Stock in the June, 2007 Offering.  See CACAC ¶ 57, at 25.  He bought his shares on June 19, 2007,

and paid $25.00 per share.  See CACAC ¶ 57, at 2.  Boilermakers Lodge purchased 860 shares of

Thornburg Mortgage Series F Preferred Stock in the September, 2007 Offering.  See CACAC ¶ 58,

---

[1] The Court draws its statement of facts from the well-pleaded, non-conclusory allegations
of the Consolidated Amended Class Action Complaint, filed June 14, 2011 (Doc. 361).

at 25.  Boilermakers Lodge purchased these shares on August 30, 2007, and paid $25.00 per share.

See CACAC ¶ 58, at 25.

      **1.**    **The Defendants.**

      Thornburg Mortgage, the company whose securities are at the heart of this action, is a

publicly traded residential-mortgage lender that represents that it focuses primarily on the "jumbo"

and "super-jumbo" segment, i.e., loans totaling over $417,000.00, of the adjustable-rate mortgage

("ARM") market.[2]  CACAC ¶ 6, at 10.  "[Thornburg Mortgage] generates income from the small,

net spread between the interest income it earns on its assets and the cost of its borrowings."

CACAC ¶ 6, at 10.  Thornburg Mortgage was formed under the laws of the State of Maryland and

has its principal place of business in Santa Fe, New Mexico.  See CACAC ¶ 60, at 26.  At all

relevant times, Thornburg Mortgage's securities have been traded on the New York Stock Exchange

under the symbol "TMA."  CACAC ¶ 60, at 26.  For federal income tax purposes, Thornburg

Mortgage is classified as a Real Estate Investment Trust.  See CACAC ¶ 115, at 44.

      The "Individual Defendants" are: (i) Garrett Thornburg, the Chairman of Thornburg

Mortgage's Board of Directors; (ii) Larry A. Goldstone who served as the President and a Director

of Thornburg Mortgage; (iii) Joseph H. Badal who served as a Director, Chief Lending Officer, and

Executive Vice President of Thornburg Mortgage until his 2007 retirement; (iv) Paul G. Decoff who

serves as Senior Executive Vice President and Chief Lending Officer; and (v) Clarence D. Simmons

who served as Senior Executive Vice President and Chief Financial Officer until he left the company

in 2009.  See CACAC ¶¶ 61-66, at 26-27.  The following Defendants constitute the "Underwriter

---

     [2]An adjustable-rate mortgage is "[a] mortgage in which the lender can periodically adjust the mortgage's interest rate in accordance with fluctuations in some external market index."  Black's Law Dictionary 1102 (9th ed. 2009).

Defendants," which are all nationally recognized investment banking and asset management firms: (i) A.G. Edwards, Inc.; (ii) Bear Sterns & Co., Inc.; (iii) BB&T Capital Markets, a division of Scott & Stringfellow, Inc.; (iv) Citigroup Global Markets, Inc.; (v) Friedman Billings Ramsey & Co.; (vi) Oppenheimer & Co. Inc.; (vii) RBC Dain Rauscher Inc.; (viii) Stifel Nicolaus & Company, Inc.; and (ix) UBS Securities LLC. CACAC ¶¶ 460-69, at 154-57. The "Director Defendants" include: (i) Anne-Drue M. Anderson; (ii) David A. Ater; (iii) Eliot R. Cutler; (iv) Ike Kalangis; (v) Owen M. Lopez; (vi) Francis I. Mullin, III; and (vii) Stuart C. Sherman. CACAC ¶¶ 470-77, at 157-58.

## 2. The Claims.

This federal-securities class action sets forth claims under the Securities Act of 1933, 15 U.S.C. §§ 77a to 77aa ("Securities Act"), and under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a to 78oo ("Exchange Act"). CACAC ¶ 1, at 8. The Plaintiffs allege that "certain defendants acted knowingly or with recklessness in issuing materially false or misleading statements and/or failing to disclose material facts concerning the Company's business and financial condition between April 19, 2007 and March 19, 2008." CACAC ¶ 2, at 1.

## 3. Problems for Thornburg Mortgage.

Thornburg Mortgage has, historically, acquired capital through public offerings of its securities, short-term borrowings -- including reverse repurchase agreements ("RPAs")[3] -- the

---

[3]The Plaintiffs allege that

RPAs involve a simultaneous sale of pledged securities to a lender at an agreed-upon price in return for an agreement to repurchase the same securities at a future date (the maturity of the borrowing) at a higher price. Most RPAs, including the mortgage backed security RPAs that Thornburg Mortgage entered into during the Class Period, could require the borrower (in this case Thornburg Mortgage) to post additional collateral should the value of the original collateral decline.

CACAC ¶ 118, at 46.

issuance of asset-backed commercial paper ("ABCP"),[4] and the issuance of collateralized debt obligations ("CDO").[5] CACAC ¶ 7, at 10. Thornburg Mortgage was heavily leveraged -- meaning that it borrowed a large amount of money compared to the amount of money that it had available to it. See CACAC ¶ 8, at 10.

Thornburg Mortgage publicly recognized the potential risk of the real-estate market going south, but repeatedly reassured analysts and its investors that its liquidity position -- its ability to satisfy debt obligations as they arise -- was not at risk. See CACAC ¶ 8, at 10-11; id. ¶ 126, 48. As late as July 20, 2007, Thornburg Mortgage reported that its unencumbered assets securing its highly leveraged financing were at their highest level "in the history of the organization." CACAC ¶ 8, at 11. Thornburg Mortgage repeatedly stated in its filings with the Securities and Exchange Commission ("SEC") that its focus was to acquire and originate high quality, highly liquid mortgage assets such that sufficient assets could be readily converted to cash, if necessary, to meet its financial obligations. See CACAC ¶ 10, at 11.

---

[4]The CACAC does not define this term. The phrase refers to "[a]n instrument, other than cash, for the payment of money," Black's Law Dictionary 1220 (9th ed. 2009), that is securitized by some asset, see Asset-Backed Commercial Paper (ABCP), Investopedia.com Financial Dictionary, http://www.investopedia.com/terms/a/asset_backed_commercial_paper.asp (last visited January 14, 2010)("A short-term investment vehicle [that] is typically issued by a bank or other financial institution. The notes are backed by physical assets such as trade receivables, and are generally used for short-term financing needs.").

[5]CDOs, also referred to as Collateralized Mortgage Debt, are

a form of long-term, non-recourse financing, issued by trusts and secured by ARM Loans originated or purchased by Thornburg Mortgage. CDOs are constructed from a portfolio of fixed income assets and divide the credit risk among different tranches: senior tranches (rated "AAA"), mezzanine tranches ("AA" to "BB"), and equity tranches (unrated). Losses are applied in reverse order of seniority, so junior tranches offer higher coupons (interest rates) to compensate for the added risk.

CACAC ¶ 119, at 46.

One of the primary allegations that the Plaintiffs level against all of the Defendants is that they improperly omitted any statement that Thornburg Mortgage held substantial "Alt-A" mortgage assets. CACAC ¶¶ 12-13, at 12. The Plaintiffs explain:

> Alt-A loans are "alternatives" to the gold standard of conforming, GSE-backed mortgages. Often an Alt-A borrower is unable to provide the proof of income or the verification of assets necessary to obtain a prime mortgage, but has a satisfactory credit score, or vice versa. In other words, Alt-A or "alternative" loans are associated with and defined by a higher level of risk than prime loans due to a borrower's inability to provide these fundamental guarantees.[6]

CACAC ¶ 142, at 53. Thornburg Mortgage's multi-billion dollar asset portfolio during the class period was comprised of various mortgage-related assets. See CACAC ¶ 14, at 12. Thornburg Mortgage's mortgage-based holdings include both loans it originates, and loans it acquires or purchases. See CACAC ¶ 14, at 12. Thornburg Mortgage also purchased mortgage-backed securities ("MBS"), which are "a series of fixed-income assets that [a]re bundled and sold as securities." CACAC ¶ 14, at 12. Thornburg Mortgage frequently posts these MBS assets as the collateral under its many short-term borrowing agreements. See CACAC ¶ 14, 12. Thornburg Mortgage would originate loans, securitize them, and sell off interests in the securitized assets to obtain additional financing. See CACAC ¶ 14, at 12.

In 2006 and 2007, as the markets for subprime and Alt-A mortgages began to decline, and subprime and Alt-A borrowers began to default with increased frequency, many mortgage lenders announced that they were experiencing serious financial problems. See CACAC ¶ 15, at 13. Thornburg Mortgage represented, however, that its stringent underwriting standards and "high quality" assets insulated it from the market downturn. CACAC ¶ 15, at 13. As the prices for MBSs

---

[6]The Plaintiffs use the acronym "GSE" to refer to a Government-Sponsored Entity, specifically Fannie Mae and Freddie Mac, in the CACAC. CACAC ¶ 141, at 53.

backed by Alt-A loans as collateral declined throughout 2007, Thornburg Mortgage never disclosed that it was holding billions of dollars worth of MBS backed by Alt-A collateral on its balance sheets. See CACAC ¶ 15, at 13. Notwithstanding the representations of Goldstone, President, Chief Operating Officer, and director of Thornburg Mortgage,[7] that Thornburg Mortgage's focus is on originating prime -- rather than subprime or Alt-A -- loans, several confidential witnesses state that Thornburg Mortgage originated Alt-A loans during the Class Period. See CACAC ¶ 16, at 13.

On May 4, 2007, Thornburg Mortgage had its first public offering, selling 4,500,000 shares of Thornburg Mortgage common stock for a total of $121,700,000.00. See CACAC ¶ 501, at 164. Shortly thereafter, Thornburg Mortgage had its second offering, wherein it sold 2,750,000 shares of 07.5% Series E Cumulative Convertible Redeemable Preferred Stock at a price of $25.00 per share. See CACAC ¶ 508, at 166. In that offering, Thornburg Mortgage made $68,750,000.00. See CACAC ¶ 508, at 166.

Goldstone allegedly knew, by no later than June of 2007, but did not disclose, that the ABCP market was shrinking rapidly and, by July 2007, had more or less dried up. See CACAC ¶ 17, at 14; CACAC ¶¶ 175-76, 178, at 64-65. Goldstone allegedly admitted this shrinking market to certain confidential sources during a private meeting on August 8, 2007. See CACAC ¶ 15, at 6. Goldstone reassured the confidential sources, however, that Thornburg Mortgage's relationships with its lender banks "were fine." CACAC ¶ 175, at 64. Also by July of 2007, the RPA market became an increasingly more costly source of financing as a result, in part, of a combination of declining asset values and the illiquidity in the ABCP market. See CACAC ¶ 18, at 14. After early July, Thornburg Mortgage could not complete any securitization transaction "based on a lack of buyers in the

---

[7] Goldstone was also the Chief Executive Officer of Thornburg Mortgage starting December 18, 2007. See CACAC ¶ 62, at 26.

marketplace." CACAC ¶ 18, at 14.

On August 14, 2007, Thornburg Mortgage advised the market that, because of liquidity concerns, it was exploring the potential sale of assets.  See CACAC ¶ 20, at 15; id. ¶ 179, at 65. Thornburg Mortgage had, however, already begun a sale of assets by August 10, 2007.  See CACAC ¶ 20, at 15.  On August 20, 2007, Thornburg Mortgage admitted that it had sold approximately thirty-five percent of its portfolio -- $20,500,000,000.00 of its highest-rated mortgage-backed assets -- to meet margin calls on its RPA agreements and to satisfy maturing ABCP obligations.  See CACAC ¶ 20, at 15. Furthermore, Thornburg Mortgage had sold those assets at a discount, approximately ninety-five percent of their face value.  See CACAC ¶ 20, at 15; id. ¶ 272, 95. Thornburg Mortgage did not disclose that it owned MBSs which were backed by Alt-A collateral. See CACAC ¶ 21, at 15.

On August 14, 2007, the price of Thornburg Mortgage common stock fell forty-three percent, from $13.81 per share to $7.89 per share.  See CACAC ¶ 22, at 15.  Also on that day, a substantial volume of shares -- 27,293,100 -- were traded.  See CACAC ¶ 22, at 15.  Allegedly based on the series of false and misleading statements, Thornburg Mortgage was able to obtain hundreds of millions of dollars in its securities offerings.  See CACAC ¶ 24, at 16.  Specifically, Thornburg Mortgage made one stock offering in early September of 2007, in which it raised $500,000,000.00 in sales, and two offerings in January of 2008, which garnered an additional $212,000,000.00 in total proceeds.  See CACAC ¶ 24, at 16.

Over the next few months, however, a series of disclosures by Thornburg Mortgage caused the stock price to fall dramatically.  On February 28, 2008, Thornburg Mortgage announced in its 2007 Form 10-K Annual Report that it was forced to meet over $300,000,000.00 in margin calls under its RPAs, that it owned $2,900,000,000.00 in MBSs that were backed by Alt-A collateral, and

that the declining value of its Alt-A-backed MBSs was to blame for the margin calls.  See CACAC ¶ 25, at 16.  On the same day, Thornburg Mortgage's common stock dropped in value fifteen percent, from $11.54 per share to $9.86 per share.  See CACAC ¶ 26, at 16.

On March 3, 2008, Thornburg Mortgage disclosed via a press release that it had "been subject to additional margin calls of approximately $270,000,000.00 as of February 29, 2008,"[8] and that it was "currently in default with one RPA counter party."  CACAC ¶ 28, at 17.  See id. ¶ 202, at 72; id. ¶ 204, at 72.  After this disclosure, Thornburg Mortgage's stock price fell again.  Between February 29, 2009, and March 3, 2009, the price of Thornburg Mortgage common stock decreased from $8.90 per share to $4.32 per share -- a drop of fifty-one percent.  See CACAC ¶ 26, at 17.  Over the course of those three days, investors traded 76,858,800 shares of Thornburg Mortgage's stock.  See CACAC ¶ 30, at 17.

On March 5, 2008, Thornburg Mortgage disclosed to its investors that the February 28, 2009 JP Morgan default had triggered cross-defaults in all of Thornburg Mortgage's RPAs.  See CACAC ¶ 34, at 18.  On the same day, the price of Thornburg Mortgage's common stock fell again, from $3.40 per share to $1.26 per share -- a 54.4% drop.  See CACAC ¶ 35, at 18.

On March 7, 2008, Thornburg Mortgage disclosed to the public that it had received a letter from KPMG, LLP withdrawing KPMG's previous unqualified audit opinion, and further announced that it would restate its financial statements for 2007 -- but not for 2006.  See CACAC ¶ 37, at 19.  Thornburg Mortgage stated that the restatement was necessary, because of "a significant deterioration of prices of MBS[s], combined with a liquidity position under unprecedented pressure from increased margin calls[,] a portion of which [Thornburg Mortgage] has been unable to meet."

_____

[8] The year 2008 was a leap year, so there was a February 29.

-9-

CACAC ¶ 37, at 19 (alteration omitted).  Between March 7, 2008, and March 10, 2008, Thornburg Mortgage's stock price fell another thirty-six percent, from $1.08 to $0.69, during which time 34,591,800 shares were traded.  See CACAC ¶ 39, at 20.

On April 4, 2008, the SEC initiated an investigation into Thornburg Mortgage and informed Thornburg Mortgage that the SEC would be looking into the margin calls that Thornburg Mortgage received in March, 2008, which had pushed Thornburg Mortgage to the brink of bankruptcy.  See CACAC ¶ 393, at 136.  Thornburg Mortgage revealed the SEC investigation to the market on April 28, 2008.  See CACAC ¶ 394, at 136.  On May 1, 2009, Thornburg Mortgage's financial woes came to a climax.  Thornburg Mortgage filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-113, on May 1, 2009.  See CACAC ¶ 402, at 138.

With respect to the Exchange Act claims, the Plaintiffs allege that Thornburg Mortgage and the Individual Defendants schemed to "create and/or maintain artificial inflation in the price of Thornburg Mortgage common stock throughout the class period, to the detriment of ordinary investors who were damaged when the truth began to be revealed to the market."  CACAC ¶ 4, at 9.  They assert that Thornburg Mortgage and the Individual Defendants made a "series of affirmative statements during the class period, in Thornburg Mortgage's SEC filings, prospectuses and registration statements, and during Thornburg Mortgage conference calls with analysts and investors, that were materially false and misleading when made."  CACAC ¶ 5, at 9.  They further assert that Thornburg Mortgage and the Individual Defendants "omitted material information regarding the litany of liquidity issues facing Thornburg Mortgage that they were required to disclose."  CACAC ¶ 5, at 9-10.  With respect to the Securities Act, the Plaintiffs allege that the Individual Defendants, Director Defendants, and Underwriter Defendants are strictly liable for omissions and material misstatements in connection with Thornburg Mortgage's:

(1) May 4, 2007, public offering of 4.5. million shares of common stock at $27.05 per share for gross proceeds of $121.7 million (the "May 2007 Offering"); (2) June 19, 2007, public offering of 2.75 million shares of 7.5% Series E Cumulative Convertible Redeemable Preferred Stock ("Series E Preferred Stock") at $25 per share for gross proceeds of $68.8 million (the "June 2007 Offering"); (3) September 7, 2007, public offering of 20 million shares of 10% Series F Cumulative Convertible Redeemable Preferred Stock ("Series F Preferred Stock") at $25 per share, for gross proceeds of $500 million (the "September 2007 Offering"); and (4) January 15, 2008, concurrent public offerings of 8,000,000 shares of Series F Preferred at $19.50 per share, for gross proceeds of $156 million, and 7,000,000 shares of common stock at $8.00 per share for gross proceeds of $56 million (the "January 2008 Offerings").

CACAC ¶ 42, at 20-21.

## PROCEDURAL BACKGROUND

This proceeding is four cases that have all been consolidated. Kenneth Slater, manager of KT Investments, LLC, filed the initial Complaint on August 21, 2007. See Class Action Complaint, filed Aug. 21, 2007 (Doc. 1)("Initial Complaint"). In the Initial Complaint, Slater sought to assert class claims against Thornburg Mortgage for violations of the Exchange Act, but did not assert any claims under the Securities Act. See Initial Complaint ¶¶ 101-117, at 33-38. On February 8, 2008, pursuant to a stipulation, the Court consolidated the action that Slater brought with several other actions -- namely, Snydman v. Thornburg Mortgage, Inc., No. CIV 07-1025 JEC/RHS, Gonsalves v. Thornburg, No. CIV 07-1069 MV/WDS, and Smith v. Thornburg Mortgage, Inc., No. CIV 07-1115 MCA/RLP. See Order Consolidating Related Actions, Appointing Lead Plaintiff, and Approving Lead Plaintiff's Selection of Lead Counsel and Liaison Counsel at 2-3, filed Feb. 8, 2008 (Doc. 49)("Consolidation Order"). At that same time, the Court selected Lead Plaintiffs, named the firms of Kessler, Topaz, Meltzer & Check, LLP[9] and Wolf, Haldenstein, Adler, Freeman

---

[9]The Court's Consolidation Order appointed Barroway, Topaz, Kessler, Meltzer & Check, LLP, as one of the Co-Lead Counsel. See Consolidation Order at 3. Barroway, Topaz, Kessler, Meltzer & Check, LLP, changed its name to Kessler, Topaz, Meltzer & Check, LLP on May 15,

& Hertz, LLP, as Co-Lead Counsel, and named the Branch Law Firm as Liaison Counsel.  See Consolidation Order at 3.

      **1.**    **Consolidated Class Action Complaint.**

      After the Consolidation Order, the Plaintiffs filed a Consolidated Class Action Complaint. See Consolidated Class Action Complaint, filed May 27, 2008 (Doc. 68)("CAC").  In the CAC, the Plaintiffs alleged five claims.  The Plaintiffs' first claim for relief was for a violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and rule 10b-5, 17 C.F.R. § 240.10b-5 (2012), and was alleged against the Individual Defendants and Thornburg Mortgage.  See CAC ¶ 496, at 162. The Plaintiffs' second claim for relief was for a violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and was alleged against the Individual Defendants.  See CAC ¶ 507, at 165-166. The Plaintiffs' third claim for relief was for a violation of Section 11 of the Securities Act, 15 U.S.C. § 77k, and was alleged against the Individual Defendants, the Director Defendants, Thornburg Mortgage, and the Underwriter Defendants.  See CAC ¶¶ 598-606, at 182-183.  The Plaintiffs fourth claim for relief was for a violation of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), and was alleged against the Individual Defendants, the Director Defendants, Thornburg Mortgage and the Underwriter Defendants.  See CAC ¶¶ 607-617, at 183-184.  Lastly, the Plaintiffs alleged, as their fifth claim for relief, a violation of Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Individual Defendants.  See CAC ¶¶ 618-620, at 185-186.

---

2011.  See Barroway Topaz Changes Name to Kessler Topaz Meltzer & Check, May 16, 2011, http://www.lexisnexis.com/community/litigationresourcecenter/blogs/peopleinthenews/archive/2011/05/16/barroway-topaz-changes-name-to-kessler-topaz-meltzer-amp-check.aspx. The Court thus refers to the firm by its current name.

2. **Thornburg Mortgage, the Individual Defendants, and the Director Defendants' Motion to Dismiss the CAC.**

On September 22, 2008, Thornburg Mortgage, the Individual Defendants, and the Director Defendants (collectively, "the Thornburg Defendants") moved to dismiss the CAC.  See Motion to Dismiss Consolidated Amended Complaint by Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A. Goldstone, Joseph H. Badal, Paul G. Decoff, Clarence D. Simmons, Anne-Drue M. Anderson, David A. Ater, Eliot R. Cutler, Ike Kalangis, Owen M. Lopez, Francis I. Mullin, Jr., and Stuart C. Sherman, Filed Sept. 22, 2008 (Doc. 126)("Thornburg Mortgage MTD").  The Thornburg Defendants argued that the Court should dismiss the Plaintiffs' claims under the Exchange Act because the Plaintiffs failed to allege "with particularity facts supporting a strong inference that each of the defendants . . . acted with intent to deceive, manipulate, or defraud," Thornburg Mortgage MTD ¶ 1, at 2, and because the Plaintiffs failed to allege "with particularly facts demonstrating that each of the defendants . . . made statements during the class period regarding Thornburg or its securities that were materially false or misleading when made," Thornburg Mortgage MTD ¶ 2, at 2.  The Thornburg Defendants argued that the Court should dismiss the Plaintiffs' claims under the Securities Act for failing to allege sufficient causation, failing to show that any Plaintiff has standing, and because the Plaintiffs did not demonstrate that any Defendant was responsible for the allegedly materially false statement or material omission. See Thornburg Mortgage MTD ¶¶ 3-5, at 2.

3. **The Underwriter Defendants' Motion to Dismiss.**

The Underwriter Defendants moved to dismiss the CAC on September 22, 2008. See Opposed Motion by May/June 2007 Underwriter Defendants to Dismiss Consolidated Class Action Complaint; Memorandum of Points and Authorities in Support Thereof, filed Sept. 22, 2008 (Doc.

128)("Underwriter MTD").  The Underwriter Defendants argued that: (i) the Plaintiffs lacked standing to sue under the Securities Act; (ii) the CAC failed to state a claim against the Underwriter Defendants, because the CAC did not "allege facts sufficient to demonstrate that any statements of fact were materially false when made;" and (iii) the Underwriter Defendants "are not liable to purchasers of Thornburg securities after the Company's disclosures in August 2007."  Underwriter MTD at 1.

### 4.     The Court's Order on the Thornburg Motion to Dismiss.

The Court granted in part, denied in part, and reserved judgment in part on the Thornburg MTD.  See Amended Memorandum Opinion and Order, filed Jan. 27, 2010 (Doc. 252)("Thornburg MTD MOO").  The Court ruled that the Plaintiffs' claim under rule 10b-5 of the Exchange Act survived, but only as to Goldstone.  See Thornburg MTD MOO at 36-74.  The Court also ruled that the Plaintiffs had successfully alleged a claim under Section 20(a) of the Exchange Act against Goldstone.  See Thornburg MTD MOO at 75.

Regarding the alleged violation of Section 20(a) of the Exchange Act against the other Individual Defendants, the Court found that the claim could possibly survive against Simmons and Decoff, who were, under Section 20(a) of the Exchange Act, control-persons.  See Thornburg MTD MOO at 76.  The Court found that the Plaintiffs had failed to allege sufficient facts for liability against the Individual Defendants Badal and Thornburg, as the only allegedly misleading acts or omissions by Thornburg Mortgage did not occur at the time when those Individual Defendants were in control of Thornburg Mortgage, an essential element for liability under Section 20(a).  See Thornburg MTD MOO at 76-77.  The Court also found that the Plaintiffs failed to plead sufficient facts to show liability under Section 20(a) against the Director Defendants, as the only document attributable to those Defendants had no materially false or misleading statements upon which to base

liability.  See Thornburg MTD MOO at 77.  Because allegedly materially false or misleading statements or omissions were made while Goldstone was chief executive officer and chief operating officer of Thornburg Mortgage, the Court found that the Plaintiffs had successfully pled a violation as to him under Section 20(a).  Further, Simmons, as chief financial officer when allegedly false or misleading statements were made, could also be liable under the facts in the Plaintiffs' CAC.  Lastly, because Decoff was the chief lending officer when, the Plaintiffs alleged, a report reflecting Thornburg Mortgage's financial performance was issued, the Court found that Decoff could be liable under Section 20(a) based upon the facts in the CAC.  See Thornburg MTD MOO at 77-78. The Court reserved judgment on the Plaintiffs' claims for violations of Section 10(b) and 20(a) as to Thornburg Mortgage, Goldstone, Simmons, and Decoff, because the Court found it could not determine whether Thornburg Mortgage had violated Section 10(b) by making materially false or misleading statement at the present time, when Thornburg Mortgage was in bankruptcy.  See Thornburg Mortgage MTD MOO at 75.

The Court thus dismissed the Exchange Act claims against the Director Defendants and the Individual Defendants, except for the alleged violation of rule 10b-5 as to Goldstone, and the alleged violation of Section 20(a) as to Simmons and Decoff.

The Court also found that the Plaintiffs had failed to allege sufficient facts to show liability under the Securities Act against the Individual Defendants, Director Defendants, and Thornburg Mortgage.  The Court thus dismissed all of the Plaintiffs' claims under the Securities Act against Thornburg Mortgage, the Individual Defendants, and the Underwriter Defendants.  See Thornburg Mortgage MTD MOO at 78-79.

5.      **The Court's Order on the Underwriter Motion to Dismiss.**

On January 27, 2012, the Court ruled on the Underwriter MTD.  See Memorandum Opinion

and Order, filed Jan. 27, 2010 (Doc. 251)("Underwriter MTD MOO").  Although the Court ruled that the Plaintiffs' claims need not be dismissed for lack of standing, as the claims fall within the Court's supplemental jurisdiction, the Court nonetheless dismissed the claims against the Underwriter Defendants.  See Underwriter MTD MOO at 25-26.  The Court examined the Plaintiffs' CAC, and found that the Plaintiffs had failed to show how any statement or omission attributable to the Underwriter Defendants was materially false or misleading such as to give rise to liability under the Securities Act.  See Underwriter MTD MOO at 28-36.  Section 11 and Section 12(a)(2) of the Securities Act require a showing that a defendant made a materially false or misleading statement or omission to trigger liability.   See Underwriter MTD MOO at 36.  Section 15 of the Securities Act is derivative in nature, in that "a person who controls a party that commits a violation of the securities laws may be held jointly and severally liable with the primary violator," liability can only be found under that section if: the plaintiff establishes that: "(1) a primary violation of the securities laws" occurred; and (2) the alleged violator had "'control' over the primary violator." Maher v. Durango Metals, Inc., 144 F.3d 1302, 1304-05 (10th Cir. 1998).  The Court thus explained that, because the Plaintiffs had failed to show that the Underwriter Defendants were liable under Section 11 or 12(a)(2) of the Securities Act, the Underwriter Defendants could not be liable under Section 15 either.  See Underwriter MTD MOO at 36.  On that basis, the Court dismissed all of the Plaintiffs' claims against the Underwriter Defendants.

        6.      **The Plaintiffs' Motion for Reconsideration.**

        On July 9, 2010, the Plaintiffs filed a motion requesting the Court to "reconsider certain portions of its" Thornburg Mortgage MTD MOO and Underwriter MTD MOO, and requested leave to amend the CAC.  Plaintiff's Omnibus Motion for (i) Leave to Amend the Consolidated Class Action Complaint and (ii) for Reconsideration of the Court's January 27, 2010 Memorandum

Opinions and Orders Granting in Part and Denying in Part Defendants' Motions to Dismiss the Consolidated Amended Complaint, filed July 9, 2010 (Doc. 309)("Motion for Reconsideration"). In support, the Plaintiffs filed the Plaintiffs' Memorandum of Law in Support of Omnibus Motion for (i) Leave to Amend the Consolidated Class Action Complaint (ii) for Reconsideration of the Court's January 27, 2010 Memorandum Opinions and Orders Granting in Part and Denying in Part Defendants' Motions to Dismiss the Consolidated Amended Complaint, filed July 9, 2010 (Doc. 309)("Memo. in Support of Reconsideration").

The Plaintiffs requested the Court to reconsider portions of its opinions which dismissed the Securities Act Claims against the Thornburg Defendants, Underwriter Defendants, and Director Defendants.  The Plaintiffs argued that the Court should reconsider whether any Defendant had breached a duty to disclose certain information under Item 303 of Regulation S-K, 17 C.F.R. § 229.303, which the Plaintiffs asserted required the Defendants to disclose adverse liquidity trends. See Memo. in Support of Reconsideration at 17.  The Plaintiffs also argued that the Defendants had breached the "abstain or disclose" rule, which, the Plaintiffs asserted, was recognized by the Supreme Court of the United States as creating a duty on the part of insiders who possess material, non-public information, to disclose such information to shareholders, or abstain from trading in the corporation's securities.  See Memo. in Support of Reconsideration at 18 (citing Chiarella v. United States, 445 U.S. 222, 227 (1980)).  The Plaintiffs argued that a violation of the duty to disclose under Item 303 would give rise to a claim under the Securities Act, and, accordingly, if a Defendant breached his, her, or its duty to disclose under Item 303, the Plaintiffs' claims under Section 11 of the Securities Act should be sustained as to that Defendant.  See Memo. in Support of Reconsideration at 19-21.

The Plaintiffs also asked the Court to reconsider its ruling that Thornburg Mortgage's 2007

Form 10-K was materially false or misleading.  See Memo. in Support of Reconsideration at 29.
The Plaintiffs contended that their claims were not subject to the heightened pleading requirements
of rule 9 of the Federal Rules of Civil Procedure, and thus, the facts put forth were sufficient under
the liberal pleading standards of rule 8(a).  See Memo. in Support of Reconsideration at 30.

The Plaintiffs also requested the Court to reconsider whether Regulation S-X, 17 C.F.R. §
210.4-01, imposed an affirmative duty on the Defendants to disclose that Thornburg Mortgage's
portfolio contained Alt-A backed MBS.  See Memo. in Support of Reconsideration at 31.  The
Plaintiffs contended that Regulation S-X requires, among other things, that "disclosures in public
offering documents comply with Generally Accepted Accounting Principles ('GAAP')".  Memo.
in Support of Reconsideration at 32.  The Plaintiffs contended that the Defendants had violated this
requirement by not disclosing the make up of Thornburg Mortgage's portfolio to shareholders.  See
Memo. in Support of Reconsideration at 25.

The Plaintiffs also requested the Court to reconsider whether certain statements that the
Defendants made, which the Court had found were mere puffery, were actionable.  See Memo. in
Support of Reconsideration at 32-33 (citing Underwriter MTD MOO at 34 n.16).  The Court had
found that some of Thornburg Mortgage's assertions regarding its liquidity, portfolio, and
profitability, were "akin to a mission statement or puffery," and thus could not be considered
objectively false or misleading.  Underwriter MTD MOO at 34 n.16.  The Plaintiffs argued that
these statements were "not merely setting forth an aspirational goal," but, rather, "constituted a hard,
affirmative representation that [Thornburg Mortgage]'s focus on high-quality assets created liquidity
by giving the Company access to financing during market downturns."  Memo. in Support of
Reconsideration at 33.

The Plaintiffs also asked the Court to reconsider its decisions to dismiss, or reserve judgment

on the Exchange Act claims.  <u>See</u> Memo. in Support of Reconsideration at 34.  The Plaintiffs argued that Thornburg and Badal had a duty, under Section 10(b) of the Exchange Act, to disclose all "material, nonpublic information" in their possession before buying or selling securities.  Memo. in Support of Reconsideration at 34 (citing 15 U.S.C. § 78j(b); <u>Chiarella v. United States</u>, 445 U.S. at 227-30).  The Plaintiffs asserted that Thornburg Mortgage failed to disclose material nonpublic information in its offering documents before selling $900,000,000.00 of its stock and securities during the Class Period, and that Thornburg and Badal are liable for this nondisclosure.  <u>See</u> Memo. in Support of Reconsideration at 34-35.  The Plaintiffs also argued that their amended complaint contains facts sufficient to establish that Thornburg and Badal had control over Thornburg Mortgage in June - July, 2007, during which time Goldstone made materially false or misleading statements, thus giving rise to control-person liability on the part of Thornburg and Badal.  <u>See</u> Memo. in Support of Reconsideration at 35.

Regarding the Court's decision to reserve judgment on the Plaintiffs' Exchange Act claims against Thornburg Mortgage, Goldstone, Simmons, and Decoff, the Plaintiffs also argued that the Court should not reserve judgment because of Thornburg Mortgage's bankruptcy.  <u>See</u> Memo. in Support of Reconsideration at 35-36 (citing Thornburg Mortgage MTD MOO at 75).  The Plaintiffs argued that, although their claim against Thornburg Mortgage was not actionable because of Thornburg Mortgage's bankruptcy, the Court need not delay a ruling on the control-person liability of the Individual Defendants.  <u>See</u> Memo. in Support of Reconsideration at 36-37.  The Plaintiffs asserted that "the viability of a cause of action which required the pleading of a predicate violation does not turn on whether the predicate violation is, itself, actionable."  Memo. in Support of Reconsideration at 36.  The Plaintiffs thus argued that their claims against Individual Defendants were actionable, as they had pled the requisite violation of Section 10(b), even though the requisite

claim against Thornburg Mortgage, for a violation of Section 10(b), was not actionable at the time. See Memo. in Support of Reconsideration at 36-37.

7.    **The Court's Memorandum Opinion and Order on the Plaintiff's Motion for Reconsideration.**

On June 2, 2011, the Court issued a Memorandum Opinion on the Plaintiffs' Motion for Reconsideration.  See Memorandum Opinion, filed June 2, 2011 (Doc. 360)("Reconsideration Opinion").  The Court found that: (i) the Defendants' duty to disclosure under Item 303 did not alter the Court's holdings; (ii) Thornburg Mortgage's 2007 Form 10-K was not actionable; (iii) certain statements, which the Plaintiffs asked the Court to reconsider as actionable, were puffery; (iv) Thornburg and Badal's duties under Item 303 did not alter the Court's analysis and decision to dismiss the Plaintiffs' Section 10(b) claims against them; (v) it would reconsider reserving ruling on the dismissal of the Plaintiffs' Section 20(a) claims against Goldstone, Simmons, and Decoff, and the Court would dismiss the Plaintiffs' claims against Decoff, but not dismiss the Plaintiffs' claims against Goldstone and Simmons.  See Reconsideration Opinion at 2.

The Court first found that the abstain-or-disclose rule applied in insider trading actions, and not to the Plaintiffs' claims under the Securities Act, as the Plaintiffs had argued.  See Reconsideration Opinion at 51-58.  Regarding the Defendants' duty under Item 303, the Court concluded that a violation of Item 303 could give rise to a cause of action under Section 11 of the Securities Act, but also found that the Plaintiffs had failed to allege facts which showed that the Defendants violated a duty to disclose under Item 303.  See Reconsideration Opinion at 60-77. Regarding whether the 2007 Form 10-K was actionable, the Court found that the Plaintiffs had failed to allege any new facts or change in the controlling law which would justify the Court altering its previous rulings that not only was the Form10-K was not materially false or misleading, but also no

-20-

named Plaintiff had standing to challenge the only offering, January 2008, which the 2007 Form 10-K would implicate.  See Reconsideration Opinion at 78-86.  The Court did not reconsider its ruling that certain statements were inactionable puffery, as the Plaintiffs did not set forth new facts or show an intervening change in the law on which the Court could properly reconsider its previous decision that the statements the Plaintiffs pointed to were akin to "mission statement[s] or puffery."  See Reconsideration Opinion at 86-92 (quoting Thornburg Mortgage MTD MOO at 88 n. 43).

The Court reconsidered its ruling dismissing the Plaintiffs rule 10b-5 claims against Thornburg and Badal, on the Plaintiffs' theory that Thornburg and Badal had a duty to disclose material, nonpublic information.  See Reconsideration Opinion at 88.  The Court found, however, that Thornburg and Badal had complied with their duty to disclose the allegedly material and nonpublic information to which the Plaintiffs pointed, and, also, that the Plaintiffs had failed to plead scienter as to Thornburg and Badal with particularity.  See Reconsideration Opinion at 88-91.

The Court also reconsidered its reservation of a decision of the Section 20(a) of the Exchange Act claims as to Goldstone, Simmons, and Decoff.  See Reconsideration Opinion at 92.  The Court agreed that it did not need to stay its decision as to Goldstone, Simmons, and Decoff, because of Thornburg Mortgage's pending bankruptcy.  See Reconsideration Opinion at 92.  The Court found that it did not need to determine Thornburg Mortgage's liability to determine the liability of Goldstone, Simmons, and Decoff.  See Reconsideration Opinion at 93.  The Court also found that the Plaintiffs' allegations as to Goldstone and Simmons under Section 20(a), as control-persons, were sufficient to survive a motion to dismiss.  See Reconsideration Opinion at 99.  On the other hand, the Court found that the Plaintiffs had failed to sufficiently allege that Decoff had control over Goldstone, or Thornburg Mortgage, when either issued allegedly false or misleading statements, and, thus, Decoff could not be liable under Section 20(a).  See Reconsideration Opinion

at 100.

The Court granted the Plaintiffs leave to amend their CAC, on the basis of the Plaintiffs' showing that they could plausibly allege a claim against Thornburg, as a control-person under Section 20(a) of the Exchange Act.  See Reconsideration Opinion at 106.

### 8.   The Plaintiffs' Consolidated Amended Class Action Complaint.

On June 14, 2011, the Plaintiffs filed the CACAC.  The Plaintiffs assert several claims, including: (i) a claim for violation of Section 10(b) of the Exchange Act and rule 10b-5 against Thornburg Mortgage and the Individual Defendants; (ii) a claim for violation of Section 20(a) of the Exchange Act against the Individual Defendants; (iii) a claim for violation of Section 11 of the Securities Act against Thornburg Mortgage, the Individual Defendants, the Director Defendants, and the Underwriter Defendants; and (iv) a claim for violation of Section 15 of the Securities Act against the Individual Defendants.  See CACAC at ¶ 442, at 148; id. ¶ 456, at 151; id. ¶ 540, at 174; id. ¶¶ 548-550, at 177.  The Plaintiffs ask that the Court certify this case as a class action, award preliminary and injunctive relief against all Defendants, award restitution of investors' money, award compensatory damages, award costs and attorneys' fees, and award any other relief the Court deems proper.  See CACAC at 177-78.

### 9.   Settling Parties' Stipulation and Agreement of Settlement.

Thornburg Mortgage was dismissed voluntarily, with prejudice, on March 2, 2012.  See Notice of Voluntary Dismissal of Thornburg Mortgage, Inc., filed Mar. 2, 2012 (Doc. 384). Plaintiffs dismissed Thornburg Mortgage pursuant to rule 41(a)(1)(A)(i), but did not explain their rationale for dismissing Thornburg Mortgage.  See Notice of Voluntary Dismissal of Thornburg Mortgage, Inc. at 1.

On April 16, 2012, the Settling Parties[10] filed a Stipulation and Agreement of Settlement. See Doc. 386-1 ("Stipulation").[11]   The parties stipulate that "the terms of the Settlement were negotiated at arm's length in good faith by the Settling Parties, and reflect a settlement that was reached voluntarily, after consultation with experienced legal counsel after a full and fair opportunity to review" all the terms and documents of the proposed Settlement.   Stipulation at 40.

The Stipulation "is intended to settle and release all claims against the Settling Defendants and other Released Parties."[12]   Stipulation at 2.   The claims released in the Stipulation are the

_____

[10]"Settling Parties" refers to the Plaintiffs and the Settling Defendants.  Stipulation at 6.  The "Settling Defendants" are the "Individual Defendants" --Thornburg, Goldstone, and Simmons -- and the "Dismissed Defendants" -- Anderson, Ater, Badal, Cutler, Decoff, Jeffers, Kalangis, Lopez, Mullin III, and Sherman.  Stipulation at 1.  The "Non-Settling Defendants" (also referred to in the Stipulation as the "Underwriter Defendants") are not parties to the Stipulation: (i) AG Edwards & Sons, Inc.; (ii) BB&T Capital Markets; (iii) UBS Securities, LLC; (iv) Citigroup Global Markets, Inc.; (v) Friedman, Billings, Ramsey & Co., Inc.; (vi) Oppenheimer & Company, Inc.; (vii) RBC Dain Rauscher Corp.; (viii) Stifel, Nicolaus & Company, Inc.; and (ix) Bear, Stearns & Co., Inc. Stipulation at 2, n.1.

[11]The Stipulation was filed concurrently with several other documents. Many of the documents contain two or three different page numbers, from the document's original pagination, the pagination added by the Settling Parties to denote different exhibits, and the Court's pagination, added upon filing with the Court.  For the documents filed concurrently with the Stipulation, the Court's citations are to the documents' original page numbers, located in the center-bottom of the pages.

[12]"Released Parties" refers to:

[Thornburg Mortgage], the Individual Defendants, the Dismissed Defendants, and any of their current or former, subsidiaries, affiliates, partners, joint ventures, officers, directors, principals, shareholders, members, agents (acting in their capacity as agents, employees, attorneys, insurers, including the Insurer, reinsurers, advisors, accountants, associates, and/or any other individual or entity in which any of [Thornburg Mortgage], the Individual Defendants, or the Dismissed Defendants has a controlling interest or which is related to or affiliates with any of [Thornburg Mortgage], the Individual Defendants, or the Dismissed Defendants, and the current or former legal representatives, heirs, successors in interest or assigns of any [Thornburg Mortgage], the Individual Defendants, or the Dismissed Defendants.

"Settled Claims," which refers to all known and "Unknown Claims" asserted in the litigation by the Plaintiffs and/or Class members against Thornburg Mortgage and the Settling Defendants, as well as any claims that could have been alleged in relation to the purchase or acquisition of Thornburg Mortgage Stock.  Stipulation at 15.  The term "Unknown Claims" in the Stipulation refers to "any and all Settled Claims which [the Class does] not know or suspect to exist as of the Effective Date, which if known by him, her or it, might have affected his, her or its decision(s) with respect to the [s]ettlement."  Stipulation at 18.  The claims released in the Stipulation do not include any claim to enforce the terms of the proposed Settlement or any claims against the Non-Settling Defendants. See Stipulation at 15.  The Settling Defendants "deny any wrongdoing whatsoever and this Stipulation shall in no event be construed or deemed to be evidence of or an admission or concession on the part of any of the Settling Defendants."  Stipulation at 6-7.  The parties also stipulate that the Stipulation, and "all negotiations, statements, and proceedings in connection therewith," are not to be used in any way or construed "as an admission, concession, or evidence of any liability or wrongdoing of any nature," or that the "Plaintiffs, any member of the Class, or any other Person, has or has not suffered any damage."  Stipulation at 8.

The Settling Parties conditionally stipulated, for the purposes of the Stipulation and proposed

---

Stipulation at 15.  Released Parties does not refer to any of the Non-Settling Defendants, or any of their parents, successors, subsidiaries, and affiliates, or any entity in which any of them have or had a controlling interest, and the officers and directors thereof.  See Stipulation at 15. The Stipulation does not release any of the Class' claims against the Non-Settling Defendants.  The Plaintiffs continue to pursue an appeal of the Court's dismissal of their claims against the Underwriter Defendants.  See Memorandum Opinion and Order, filed Jan. 27, 2010 (Doc. 251)(granting Underwriter Defendants' Motion to Dismiss Consolidated Class Action Complaint); Final Judgment Re Underwriter Defendants, filed July 25, 2011 (Doc. 372); Notice of Appeal, filed Aug. 24, 2011 (Doc. 373)(appealing the Court's entry of Final Judgment (Doc. 372) that dismissed all claims against the Underwriter Defendants).

Settlement, that the litigation shall be certified for class treatment under rule 23.  See Stipulation at 8.  The parties have agreed to a "Settlement Amount" of $2,000,000.00 in cash.  See Stipulation at 17.  The Stipulation established that, if any funds remain from the settlement, after reasonable efforts have been made to locate putative class members and after one year has passed, any balance would be distributed to the Center for Civic Values in Albuquerque, New Mexico.  See Stipulation at 27.

        The Settling Parties stipulated that the Order and Final Judgment approving of the settlement must include a bar order,

> as provided by 15 U.S.C. § 78u-4(f)(7) and as broad as permitted by law, that bars all claims by any Person against the Individual Defendants, the Dismissed Defendants, or the Released Parties, or by any of them against Persons, for contribution, indemnification, or under any other theory, based upon, or related to any fact or circumstance involved in or arising out of the Litigation.

Stipulation at 19.  The Settling Parties stipulated that the Plan of Allocation, and any award of attorneys' fees and expenses are subject to Court approval and are neither included nor necessary terms to the proposed Settlement.  See Stipulation at 29-30.  With respect to attorneys' fees, the Stipulation provided that the Plaintiffs' counsel will submit an application for attorneys' fees from the Settlement Fund, subject to Court approval.  See Stipulation at 29-30.

        The Plaintiffs informed putative class members that the Plaintiffs "estimate that approximately 200 million shares of [Thornburg Mortgage] common and preferred stock were purchased or otherwise acquired in the open market and/or traceable to the Offerings during the Class Period and potentially damaged."  Notice of Pendency of Class Action, Proposed Settlement, Settlement Fairness Hearing, and Motion for Attorneys' Fees and Expenses at 3, filed Apr. 16, 2012

-25-

(Doc. 386-3)("Notice").[13]  Accordingly, "if valid claim forms for all damaged shares are submitted, the average recovery per damaged shares will be $.01."  Notice at 3.  Class members have the options of: (i) submitting a claim form to receive payment from the Settlement Fund; (ii) excluding themselves from the Class; (iii) objecting to the proposed Settlement, the Plan of Allocation, or the Co-Lead Counsel's request for attorneys' fees and expenses; (iv) attending the Court's hearing on the Settlement to voice their opinions on the fairness of the Settlement; and (v) doing nothing, receiving nothing from the Settlement Fund, and relinquishing their rights to the claims in the litigation.  See Notice at 4.  The Notice informs putative class members that Co-Lead Counsel "will apply to the court for attorneys' fees not to exceed 25% of the Settlement Amount and reimbursement of $260,000, plus interest earned on both amounts."  Notice at 11.  The attorneys' fees will be paid from the Settlement Fund and the average cost per share will be approximately $.004.  See Notice at 2.

### 10.    The Plan of Allocation.

The Notice described to putative Class members how the Net Settlement Fund would be distributed, as set forth in the Plan of Allocation of Net Settlement Fund Among Class Members. See Notice at 15-23.  The Plan of Allocation provides that:

> Payment pursuant to the Plan of Allocation approved by the Court shall be conclusive against all Authorized Claimants.  No person shall have any claim against the Settling Defendants, Settling Defendants' Counsel, Plaintiffs, Plaintiffs' Counsel, or the Claims Administrator or other agent designated by Co-Lead Counsel based on the distributions made substantially in accordance with the Stipulation and the Settlement contained therein, the Plan of Allocation, or further orders of the Court.

Notice at 15.  The Plan of Allocation explains that the each Class member submitting a claim (an

---

[13]The Notice is broken over two documents in its filing with the Court: pages 12-21 of Doc. 386-3, and all of Doc. 386-4.  The Court's citations are to the page numbers of the original document, in the bottom-center of the page.

"Authorized Claimant") will receive a pro rata share of the Net Settlement Fund, based upon the Authorized Claimant's "Recognized Loss," which is the Authorized Claimant's loss as determined by the Plan of Allocation.  Notice at 15.  The Class Administrator, Strategic Claims Services ("SCS"), will determine the amount of each Authorized Claimant's pro rata share of the Net Settlement Fund.  See Notice at 15.  The Plan of Allocation further explains that the recovery provided therein is "not intended to be an estimate of the amount of what a Class Member might have been able to recover after at trial."  Notice at 15.  Neither is the Recognized Loss formula "an estimate of the amount that will be paid to Authorized Claimants pursuant to the Settlement." Notice at 15.  Authorized Claimants may receive the Recognized Loss amount only if "there are sufficient funds in the Net Settlement Fund."  Notice at 16.  If there are not enough funds in the Net Settlement Fund to distribute the Recognized Loss amount to each Authorized Claimant, "each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's Recognized Loss bears to the total Recognized Losses of all Authorized Claimants." Notice at 16.  This amount is the Authorized Claimant's "pro rata share."   Notice at 16.

An Authorized Claimant's Recognized Loss is calculated based upon the time period in which the Authorized Claimant purchased shares of Thornburg Mortgage stock.  See Notice at 16-22.  The Recognized Loss for Thornburg Mortgage stock purchased or acquired during the Class Period is dependent upon whether the Authorized Claimant purchased and sold the stock during the Class Period, or retained the stock at the close of the Class Period.  See Notice at 16-22.  For stock purchased and sold during the Class Period, the Recognized Loss is the lesser of: (i) the inflation per share upon purchase (as set forth in Inflation Tables A-D in the Plan of Allocation, which vary depending on the share purchased and the time period of purchase); or (ii) the purchase price per share minus the sale price per share.  See Notice at 16-22.  For share purchased and retained during

the Class Period, the Recognized Loss is the lesser of: (i) the inflation price per share upon purchase;

or (ii) the purchase price per share minus the average daily closing price of Thornburg Mortgage

stock during the 90-day look back period described in Section 21(D)(e)(1) of the PSLRA.[14]

The amount of an Authorized Claimant's Recognized Loss is variable. For example, the

inflation price per share purchases of Thornburg Mortgage common stock during the Class Period

is $1.48 per share for shares purchased towards the end of the Class Period, between March 10, 2008

to March 19, 2008,[15] while the inflation price per share for Thornburg Mortgage common stock

purchased between April 19 and August 12, 2007, is $23.83 per share. See Notice at 17, "Inflation

Table A." The inflation price per share for Thornburg Mortgage 8% Series C Cumulative

Redeemable Preferred Stock purchased or acquired during the Class Period varies from $2.08 per

share, at the end of the Class Period, to $25.15 per share at the beginning of the Class Period. See

Notice at 18, "Inflation Table B." The inflation price for other Thornburg Mortgage preferred

---

[14]Section 21(D)(e)(1) of the PSLRA provides:

Except as provided in paragraph (2), in any private action arising under this chapter
in which the plaintiff seeks to establish damages by reference to the market price of
a security, the award of damages to the plaintiff shall not exceed the difference
between the purchase or sale price paid or received, as appropriate, by the plaintiff
for the subject security and the mean trading price of that security during the 90-day
period beginning on the date on which the information correcting the misstatement
or omission that is the basis for the action is disseminated to the market.

15 U.S.C. § 78u-4(e)(1).

[15]The Notice states, in Inflation Table A, that an inflation price of $1.48 per share is available
for shares of Thornburg Mortgage common stock purchased or acquired between March 10, 2010,
and March 19, 2008. See Notice at 17. This later date appears to be a typographical error. In the
Notice provided to the Court after the Plaintiffs requested the Court's final approval of the
Settlement, the period was corrected to "March 10, 2008 to March 19, 2008, inclusive." Notice of
Pendency of Class Action, Proposed Settlement, Settlement Fairness Hearing and Motion for
Attorneys' Fees and Expenses at 12, filed July 23, 2012 (Doc. 393-1).

securities is similar.  <u>See</u> Notice at 19, "Inflation Table C" (providing an inflation price per share for Thornburg Mortgage Series D Adjusting Rate Cumulative Redeemable Preferred Stock from $2.50 to $22.88 per share); Notice at 22, "Inflation Table D" (providing an inflation price per share for Thornburg Mortgage 10% Series F Cumulative Convertible Redeemable Preferred Stock purchased or acquired during the Class Period from $3.27 to $23.79 per share).  <u>See</u> Notice at 19-22.

The Plan of Allocation does not suggest, much less guarantee, that Authorized Claimants will recover the inflation price per share:  they will receive the lesser of that amount, or the difference between the purchase and sale price, or, if the stocks were retained, the lesser of the inflation price per share or the purchase price minus the average daily closing price during the previous ninety-days.  <u>See</u> Notice at 17-22.  Further, Authorized Claimants will receive less than any of those amounts if the Net Settlement Fund is insufficient to provide for the Recognized Loss of each Authorized Claimant, which is almost certainly the case.  <u>See</u> Notice at 16.

## 11. **<u>The Court's Order Preliminarily Approving Settlement and Providing for Notice</u>.**

On April 16, 2012, the Plaintiffs filed the Motion for Preliminary Approval.  <u>See</u> Doc. 386. In the Order, the Court preliminarily approved the proposed Settlement as set forth in the Stipulation.  <u>See</u> Order Preliminarily Approving Settlement and Providing for Notice ¶ 5, at 4, filed Apr. 23, 2012 (Doc. 387)("Order").  The Court preliminarily approved the Settlement with two exceptions.  <u>See</u> Order at 15.  The Court stated that it does not believe that "the cy pres relief is a sound judicial doctrine."  Order at 15.  The Court stated that it would issue an opinion at a later date more fully setting forth its views on the cy pres doctrine and noted that it was not commenting on the Center for Civic Values in any way.  <u>See</u> Order at 15.  The Court also ordered the Settling Parties to delete the provision which established that any remaining balance would be distributed to the

Center for Civic Values.  See Order at 16.  The Court also instructed the parties to delete the sentence: "No distribution will be made on a claim where the potential distribution amount is less than ten dollars ($10.00) in cash."  Order at 16.  The Court stated that, "[i]f someone takes the time and resources to fill out the claim form, the member should be paid."  Order at 16.

The Court issued a Memorandum Opinion on July 24, 2012, explaining its reasoning for its Order.  See Memorandum Opinion, filed July 24, 2012 (Doc. 394).  The Court explained that the provision which distributed the remaining Settlement Funds to a third-party non-profit, not before the Court in this litigation, was inappropriate.  See Memorandum Opinion at 13.  The Court noted that the provision was rooted in the doctrine of cy pres, an equitable doctrine used in trust administration which "allows trust funds to be applied in the next best use that would most closely satisfy the testator's intent."  Memorandum Opinion at 13 (quoting 5 James Wm. Moore et al., Moore's Federal Practice § 23.171, at 23-599 (3d ed. 2012)).  The Court found, as some other courts have, that this doctrine is beyond the scope of a court's permissible actions when determining how to allocate class action settlements.  See Memorandum Opinion at 15-24.  The Court listed several reasons why it did not approve the portion of the Stipulation which provided for remaining Settlement Funds to be given to the Center for Civil Values:

> (i) class actions are disputes between parties and the money damages should remain among the parties, rather than be distributed to some third party; (ii) it is unseemly for judges to engage in the selection of third-party beneficiaries and to distribute class action damages to third parties; (iii) judges are often not in the best position to choose a charitable organization that would best approximate the unpaid class members' interests; and (iv) the doctrine encourages charitable organizations, and plaintiffs' lawyers, to lobby the court for cy pres awards.

Memorandum Opinion at 15.

Regarding the Stipulation's provision that Class Members must have damages of at least $10.00 to recover from the proposed Settlement, the Court stated that, while no award is likely to

be significant, if the smallest shareholders are not allowed to collect then the Center for Civic Values could become the largest recipient of the class action award, a result which would not be appropriate.  See Memorandum Opinion at 24.  The Court further stated that, "[i]f Plaintiffs' attorneys are going to propose a settlement of $.01 per share, and ask for a large award of attorneys' fees, they should not at the same time say that an award of less than ten dollars is too small for them to process."  Memorandum Opinion at 24.  Accordingly, the Court could not and did not approve the provisions of the Stipulation which denied awards to holders of a small number of shares, or which would send funds to a party not before the Court in the litigation.  See Memorandum Opinion at 24-25.

### 12.   Underwriter Defendants' Objection to the Proposed Settlement.

The Non-Settling, Underwriter Defendants object to the Settling Parties' Proposed Order and Final Judgment, included with the Stipulation.  See Objection of Underwriter Defendants to Proposed Order and Final Judgment at 1, filed May 18, 2012 (Doc. 388)("Underwriter Objection"); Proposed Order and Final Judgment at 1-10, filed Apr. 16, 2012 (Doc. 386-3)("Proposed Order & Final Judgment").[16]   The Proposed Order & Final Judgment adopts the terms of the proposed Settlement.  See Proposed Order & Final Judgment ¶¶ 1-22 at 2-10.  The Proposed Order & Final Judgment contains a "bar order," barring

> all claims by any Person against the Settling Defendants and the Released Parties, or by any of them against any Persons, for contribution, indemnification or under any other theory, based upon, or related to any fact or circumstances involved in or arising out of the Litigation, with the scope and preclusive effect of this bar order as broad as that permissible under 15 U.S.C. § 78u-4(f)(7) and the common law.

---

[16]The Proposed Order & Final Judgment comprises pages 1-11 of Document 386-3.  The Notice comprises pages 12-21 of Doc. 386-3.  The Court's citations are to the Proposed Order & Final Judgment's original page numbers, located at the bottom-center of the page.

Proposed Order & Final Judgment ¶14, at 8.  The Underwriter Defendants assert that a "judgment reduction provision" is a term required by law in a settlement with a bar order such as this judgment. Underwriter Objection at 1.  The Underwriter Defendants assert that a judgment reduction provision is required as a matter of law to compensate the Non-Settling Defendants' loss of contribution and indemnification claims.  See Underwriter Objection at 1.  The Underwriter Defendants contend that they have "substantial claims for both indemnification and contribution that purportedly will be eliminated" by the Court's approval of the proposed Settlement, but they also have a "statutory right of contribution against the Released Parties for those parties' proportionate share of any liability ultimately assessed against the Non-Settling Defendants."  Underwriter Objection at 3.  The Underwriter Defendants assert that Section 11 of the Securities Act of 1933, codified at 15 U.S.C. § 77k(f)(1), expressly provides for this right to indemnification and contribution.  See Underwriter Objection at 3.  The Underwriter Defendants further assert that a settlement may only extinguish indemnification or contribution rights if it contains a judgment reduction provision that: "provides for a corresponding reduction in any future judgment against the non-settling defendant to compensate for that party's missing contribution."  Underwriter Objection at 4.  The Underwriter Defendants assert that court approval of a settlement that contains a bar order without a judgment reduction provision is reversible error.  See Underwriter Objection at 4.

The Underwriter Defendants state that the Settling Defendants do not dispute the Underwriter Defendants' legal right to a judgment reduction; rather, Settling Defendants disagree that the Order and Final Judgment must explicitly provide for such a provision.  See Underwriter Objection at 2.  The Underwriter Defendants argue that settled and controlling law requires a court to include a judgment reduction provision in any settlement which purports to bar future claims of indemnification and contribution and settling parties.  See Underwriter Objection at 4.

13.     <u>**Notice to Putative Class Members**</u>.

The Court appointed SCS to be the claims administrator for the Settlement. <u>See</u> Order ¶ 10, at 6. SCS mailed, by first class mail, the Notice to all individuals and organizations identified on the shareholder list that Thornburg Mortgage's transfer agent, American Stock Transfer & Trust Company, LLC provided to SCS. <u>See</u> Decl. of Josephine Bravata Concerning (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ¶ 4, at 3, filed July 23, 2012 (Doc. 393-1)("SCS Decl."). The Notice was mailed to all the brokerage company, banks and trust companies on SCS' master mailing list, a list which includes 1,067 of the largest banks and brokerage companies, as well as 724 mutual funds, insurance companies, pension funds, and money managers which have traded Thornburg Mortgage common and/or preferred stock in their accounts or their client's accounts. <u>See</u> SCS Decl. ¶ 4, at 3. A Summary Notice, filed Apr. 16, 2012 (Doc. 386-6), as approved by the Court, <u>see</u> Order ¶¶ 17-18, at 8-9, was published in <u>Investors' Business Daily</u> and transmitted over <u>PR Newswire</u>[17] on May 30, 2012, <u>see</u> SCS Decl. ¶ 7, at 4.

SCS mailed 212,203 Notice claim forms to potential Class Members and banks or brokerage firms that may contain accounts which traded Thornburg Mortgage stock. <u>See</u> SCS Decl. ¶ 9, at 3-4. Of the 212,203 Notice claim forms mailed, 6,206 were returned as undeliverable. Of those, 556 had forwarding addresses and were forwarded to the potential Class member's updated address. SCS was able to find updated addresses for and mail 2,512 more of potential Class Members' whose first Notice claim form was returned as undeliverable. <u>See</u> SCS Decl. ¶ 10, at 5.

---

[17]PR Newswire is a "global provider of marketing and communications solutions," which allows users to "optimize and distribute multimedia content . . . across digital, social, and mobile channels." <u>PR Newswire</u>, http://prnewswire.mediaroom.com/index.php (last visited Nov. 21, 2012).

As of July 19, 2012, SCS had received fourteen requests for exclusion from the Settlement. See SCS Decl. ¶ 11, at 5.

**14.      Putative Class Members' Objections to the Proposed Settlement.**

Objections to the proposed Settlement were received beginning in July of 2012.  The first objection received is from Frank C. Melfi, of Albuquerque, New Mexico.  See Letter to District Judge James O. Browning from Frank C. Melfi, dated July 5, 2012, filed July 5, 2012 (Doc. 389)("Melfi Letter").  Melfi generally argues that the lawsuit is "bad for business," and that the Court should dismiss the entire action.  Melfi Letter at 2. Melfi asserts that, although shareholders have suffered from investing in Thornburg Mortgage, these losses are part of the risks which comes with investment, and are not losses which necessitate a lawsuit or a court-ordered settlement.  Melfi Letter at 2.  Melfi objects to a factual statement in the proposed Settlement; he argues that it was market conditions, not management actions, which caused Thornburg Mortgage's bankruptcy.  See Melfi Letter at 2.  Melfi further objects to the proposed Settlement,  because it is "favorable" to the attorneys, yet shareholders will "not receive a penny a share."  Melfi Letter at 2.  Melfi asserts that, after attorneys are paid, only $1,200,000.00 will be left to share amongst at least 200,000,000 shares, resulting in shareholders not receiving a penny a share.  See Melfi Letter at 2.  Melfi states that this it is a "fool's errand" to try to divide the Net Settlement Fund amongst such a large Class.  Melfi Letter at 2.  Melfi asserts that "describing a half-penny settlement as 'an immediate benefit to the class' is like a mosquito bragging that he made mad, passionate love to an elephant."  Melfi Letter at 2.  Melfi asserts that, because the shareholder recovery will be so small, this action is a "hit and run" lawsuit which "raises the cost of doing business."  Melfi Letter at 2.  Because shareholders will recover a small amount, Melfi argues that the Court should just dismiss the suit.  See Melfi Letter at 2.

The second objection received is from Joel E. Reed, of Austin Texas.  See Letter from Joel E. Reed, dated July 5, 2012, filed July 5, 2012 (Doc. 390)("Reed Letter").  Reed argues that the proposed attorneys' award is "outrageous" and that the attorneys should not receive an award at all.  Reed Letter at 1.  Reed asserts that the Plaintiffs' Counsel is the only party, and certainly not the "injured class members," making money from the lawsuit.  Reed Letter at 1.  Reed asserts that he lost almost $10.00 per share from investing in Thornburg Mortgage, but his award from the settlement will not be "enough to buy a sandwich."  Reed Letter at 1.  Reed argues that because the Class members will receive "relatively nothing as respect to their losses . . . Plaintiffs' Counsel does not deserve to receive a fee of any magnitude."  Reed Letter at 1.

The third objection received is from Donald E. and Dolores J. Wildner, of Cape Coral, Florida.  See Letter from Donald E. Wildner, dated July 11, 2012, filed July 7, 2011 (Doc. 397)("Wildner Letter").  The Wildners assert that the settlement should be much greater.  See Wildner Letter at 1.  The Wildners assert that Thornburg Mortgage "lost billions of dollars, took enormous salaries, and overextended the company."  Wildner Letter at 1.  The Wildners argue that Thornburg Mortgage "should be held financially responsible for their actions."  Wildner Letter at 1.  The Wildners also attached a copy of their financial statements, indicating their past purchases of Thornburg Mortgage shares.  See Wildner Letter at 2-4.

### 15.    The Plaintiffs' Motion for Final Approval of Proposed Settlement.

On July 23, 2012, the Plaintiffs moved the Court for a final approval of the proposed Settlement.  See Plaintiffs' Motion for Final Approval of Proposed Settlement, Plan of Allocation and Certification of Class for Settlement Purposes and Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Proposed Settlement and Plan of Allocation at 1, filed July

23, 2012 (Doc. 391)("Motion for Final Approval").[18]  The Plaintiffs bring their motion, pursuant to

rule 23(e), for entry of an order: (i) granting final approval to the proposed Settlement of the action

set forth in the Stipulation and Agreement; (ii) approving the proposed plan for allocating the

settlement proceeds to the Class; and (iii) certifying the proposed Class for purposes of settlement.

The Motion for Final Approval is based upon: (i) the Joint Declaration of Benjamin J. Sweet and

Betsy C. Manifold in Support of Final Approval of Settlement, Plan of Allocation and Application

for an Award of Attorneys' Fees and Expenses and the exhibits attached thereto, filed July 23, 2012

(Doc. 393)("Joint Decl."); (ii) the Memorandum of Law in Support of Plaintiffs' Motion for Final

Approval of Proposed Settlement and Plan of Allocation (attached to the Motion for Final Approval,

at 5-35); and (iii) all other pleadings and matters of record; and (iv) the evidence and argument

presented at their hearing on August 27, 2012.  See Motion for Final Approval at 1-2.

    The Plaintiffs assert that they have obtained $2,000,000.00 as a benefit for the Class, in

exchange for a dismissal of all claims brought against the Settling Defendants, and a release of all

claims against the Released Parties.  See Motion for Final Approval at 11-12.  The Plaintiffs state

that the Settlement Fund will be used to pay for "taxes, notice and administrative costs," as well as

the "Court-awarded attorneys' fees and expenses."  Motion for Final Approval at 12.  After those

expenditures, the remaining funds ("Net Settlement Fund") are to be "distributed to [c]lass

[m]embers who are not excluded from the Class and who submit a valid Proof of Claim and Release

---

[18]The Court's citations to the Motion for Final Approval are to the page numbers that the Court assigned when the Motion for Final Approval was entered on the docket.  Although the Motion for Final Approval contains both a Motion for Final Approval and a Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Proposed Settlement and Plan of Allocation, both documents were filed as one with the Court, and thus the pagination run continually through the documents.  The page numbers to which the Court cites are located in the upper-right-hand corner of the document.

to the Claims Administrator and whose claim for recovery has been allowed pursuant to the terms of the Stipulation and by order of the Court ('Authorized Claimants')."  Motion for Final Approval at 12.  Each Authorized Claimant will be allocated a percentage of the Net Settlement Fund based upon the Authorized Claimant's claim.  See Motion for Final Approval at 12.

The Plaintiffs and their counsel believe the proposed Settlement is a "fair, reasonable, and adequate result for the Class."  Motion for Final Approval at 13.  The Plaintiffs state that the proposed Settlement was reached after close to five years of litigation and months of settlement negotiations with "experienced and knowledgeable counsel."  Motion for Final Approval at 13.  The Plaintiffs state that the proposed Settlement provides for recovery where a real risk of no recovery existed; specifically, the Plaintiffs state that the following factors show there was a possibility that the Class would lose on the merits of their claims:

> (i) the absence of the corporate defendant, [Thornburg Mortgage], due to its Chapter 11 bankruptcy filing during the course of the [l]itigation; (ii) the limited amount of insurance proceeds (which were simultaneously being used to pay defense costs) available to fund a settlement with the Individual Defendants or satisfy a future judgment; (iii) the Court's dismissal of the negligence-based Securities Act claims asserted against the Dismissed Defendants and Underwriter Defendants; and (iv) the risks and uncertainty Plaintiffs faced to proving materiality, falsity, scienter and loss causation with respect to their remaining claims against the Individual Defendants if the [l]itigation continued.

Motion for Final Approval at 13.  The Plaintiffs assert that the Class' reaction to the proposed Settlement has been positive "thus far."  Motion for Final Approval at 13.  Copies of the Notice have been mailed to 213,994 potential members of the class or their nominees; the Plaintiffs report that two putative class members have filed objections,[19] and only one of those pertains to the proposed

_____

[19]As of July 23, 2012, the date when the Plaintiffs filed the Motion for Final Approval, the Court had received three objections from putative class members.  The Court does not know why the Plaintiffs do not refer to the third letter, or why the Plaintiffs allege that only two one of the objections is to the Settlement itself.  See Melfi Letter at 2 (filed July 5, 2012, and objecting to the

-37-

Settlement itself, and fourteen putative class members have requested to be excluded.  See Motion

for Final Approval at 14.  The Notice, the Plaintiffs assert,

> contains a detailed description of the nature and procedural history of the [l]itigation,
> as well as the material terms of the Settlement, including: (i) Plaintiffs' estimate of
> the average per share recovery; (ii) the manner in which the Net Settlement Fund .
> . . will be allocated among participating Class Members; (iii) a description of the
> claims that will be released in the Settlement; (iv) the right and mechanism for Class
> Members to exclude themselves from the Class; and (v) the right and mechanism for
> Class Members to object to the Settlement, the Plan of Allocation, and/or Co-Lead
> Counsel's request for attorneys' fees and expenses.

Motion for Final Approval at 14.

The Plaintiffs assert that the proposed Settlement meets the judicial standards for final

approval under rule 23(e), and cite a number of cases in support of their assertion.  See Motion for

Final Approval at 16-18.  The Plaintiffs assert that the "settlement of disputed claims is clearly

favored by the courts . . . especially . . . in complex class actions such as this."  Motion for Final

Approval at 16.  The Plaintiffs assert that the Court should not determine a case on the merits, or

"substitute its judgment for that of the parties who negotiated the settlement," when using its

discretion to grant or deny a proposed Settlement.  Motion for Final Approval at 17.  The Plaintiffs

state that the proposed Settlement satisfies the non-exclusive factors the United States Court of

Appeals for the Tenth Circuit has prescribed to determine if a class-action settlement is "fair,

reasonable and adequate," and the Court should thus approve the Settlement:

> (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether
> serious questions of law and fact exist, placing the ultimate outcome of the litigation
> in doubt; (3) whether the value of an immediate recovery outweighs the mere

---

size of the proposed Settlement as "favorable to the attorneys," while "shareholders will not receive
a penny a share" and criticizing the proposed Settlement for not benefitting the shareholders more);
Reed Letter at 1 (objecting that "the settlement is an insult to the class members and is nothing more
than a waste of time for damages that won't amount to enough to buy a sandwich for the average
class member"); Wildner Letter at 1 (objecting that "the settlement should be much greater").

possibility of future relief after protracted and expensive litigation; (4) the judgment
of the parties that the settlement is fair and reasonable.

Motion for Final Approval at 27-28 (citing <u>Jones v. Nuclear Pharm., Inc.</u>, 741 F.2d 322, 324 (10th

Cir. 1984)).

      The Plaintiffs first argue that because the proposed Settlement is " the product of extensive

arms' length, informed, non-collusive negotiations conducted by capable counsel who are well

experienced in securities litigation," factors which evidence that the proposed Settlement is the

result of fair and honest negotiations.  Motion for Final Approval at 18.  The Plaintiffs point to Co-

Lead Counsel's "solid understanding . . . of the [fact and legal] strengths and weaknesses of the

Class's . . . claims" against the remaining Individual Defendants to show that Co-Lead Counsel were

able to "carefully engage in a rigorous negotiation process with counsel for the Settling Defendants"

during which "Counsel for both sides zealously advocated their respective positions throughout the

settlement process" that lasted several months.   Motion for Final Approval at 19.  The Plaintiffs

thus assert that the settlement process "clearly demonstrates that the [s]ettlement was the result of

fair and honest negotiations."  Motion for Final Approval at 19.

      The Plaintiffs concede that a continued litigation presents numerous risks and uncertainties.

<u>See</u> Motion for Final Approval at 19-20.  The Plaintiffs assert that establishing the Settling

Defendants' liability could be difficult; the Plaintiffs have alleged complex claims for relief under

Sections 10(b) and 20(a) of the Exchange Act.  <u>See</u> Motion for Final Approval at 21.  Further, the

Settling Parties disagree on nearly all factual and legal issues involved in the litigation, and the

Settling Defendants "adamantly deny any liability." Motion for Final Approval at 21.  The Plaintiffs

also concede that establishing causation and damages would be a challenge.  <u>See</u> Motion for Final

Approval at 22.  The Plaintiffs state that proving the connection between Goldstone's allegedly false

and misleading statements and the artificially inflated price of Thornburg Mortgage securities throughout the Class Period would be difficult.  See Motion for Final Approval at 22.  The Plaintiffs would also have to prove the amount of the alleged inflation to succeed on their claims.  See Motion for Final Approval at 22-23.  The Plaintiffs assert that the trial would be reduced to a "battle of the experts," as both sides would be required to present expert testimony to meet their evidentiary burden.  Motion for Final Approval at 23.  Although the Plaintiffs nevertheless assert that their claims are meritorious and could be proved with the use of capable experts, Co-Lead Counsel have advised the Plaintiffs that such an evidentiary battle comes with a "substantial possibility that a trier of fact could be swayed by the defendants' experts, who would seek to minimize or eliminate the amount of Plaintiffs' losses."  Motion for Final Approval at 23-24.  The Plaintiffs argue that, because the proposed Settlement allows for recovery without undertaking these risks, this risk-avoidance supports approval of the proposed Settlement.  See Motion for Final Approval at 24.

The Plaintiffs further assert that the value of the immediate recovery in the proposed Settlement outweighs the possibility of future relief after further litigation.  See Motion for Final Approval at 24.  The $2,000,000.00 that the Plaintiffs have obtained is, according to the Plaintiffs, an immediate benefit, and eliminates any risk that there would be no real recovery.  See Motion for Final Approval at 24.  The Plaintiffs argue that, because the alleged corporate defendant, Thornburg Mortgage, has filed for bankruptcy, limited resources are available to satisfy any future judgment in the Plaintiffs' favor.  See Motion for Final Approval at 25.  The Plaintiffs state that limited insurance proceeds are available to fund a settlement or satisfy a judgment against the Settling Defendants, and any insurance proceeds which remain could be depleted by covering the defense costs necessary to go to trial, including discovery, depositions, and time in court.  See Motion for Final Approval at 25-26.  The Plaintiffs also assert that the proposed Settlement is fair and

reasonable in their judgment.  See Motion for Final Approval at 27.  The Plaintiffs state that Co-Lead Counsel, experienced class-action litigators, have advised the Plaintiffs that they believe the proposed Settlement is fair and reasonable, and the Plaintiffs agree.  See Motion for Final Approval at 27.

As for objections to the proposed Settlement, the Plaintiffs allege that there are only two objections and fourteen requests for exclusion out of 213,994 recipients of the Notice.  See Motion for Final Approval at 28.  The Plaintiffs assert that the small number of objections evidences that the putative Class' reaction is generally positive and in support of the proposed Settlement.  See Motion for Final Approval at 28.  The Plaintiffs concede that the Underwriter Defendants object to the Stipulation, because the Proposed Order & Final Judgment included in the Stipulation does not contain a judgement reduction provision.  See Motion for Final Approval at 28-29.  The Plaintiffs argue that the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.)("PSLRA"), provides the Non-Settling Defendants with a right to claim an offset of the proposed Settlement against any judgment the Plaintiffs may obtain from the Non-Settling Defendants at trial.  See Motion for Final Approval at 28-29.  The Plaintiffs thus assert that the Underwriter Defendants' objection is without merit, as the provision which they request is provided by law in the PSLRA, and therefore need not be included in the terms of the Proposed Order & Final Judgment.  See Motion for Final Approval at 29.

The Plaintiffs also assert that the Plan of Allocation[20] for the Net Settlement Fund is fair, reasonable, and adequate.  See Motion for Final Approval at 30.  The Plaintiffs assert that "a plan that allocates settlement funds to class members based on the extent of their injuries or the strength

_____

[20]"Plan of Allocation" refers to the plan for allocating the Net Settlement Fund, explained in the Notice.  See Stipulation at 14; Notice at 15-23.

of their claims is reasonable."  Motion for Final Approval at 31 (citing Lucas v. Kmart Corp., 234 F.R.D. 688, 695 (D. Colo. 2006)).  The Plaintiffs assert that not a single putative class member has objected to the Plan of Allocation.  See Motion for Final Approval at 31.  The Plaintiffs allege that the Plan, which was prepared with the assistance of a damages consultant, reflects the price of Thornburg Mortgage stock and preferred stock as artificially inflated during the Class Period because of the Defendants' alleged misrepresentations and/or omissions.  See Motion for Final Approval at 31.  The Plaintiffs state that the Plan apportions the Net Settlement Fund based on the manner in which Thornburg Mortgage stock was purchased and when the stock was purchased.  See Motion for Final Approval at 31.  The Plan also takes into account the PSLRA's ninety-day look back period, which requires that a private action under the PSLRA that also requires an award to a plaintiff under that statute must calculate the award based off of the difference between the purchase price paid or received by the plaintiff, and the "'mean trading price of that security during the 90-day period beginning on the date the allegedly false or misleading statement was made.'"  See Motion for Final Approval at 31 n.22 (quoting Section 21(D)(e)(1) of the PSLRA).

Lastly, the Plaintiffs assert that the Court should certify the Class.  See Motion for Final Approval at 32-33.  The Plaintiffs argue that "nothing has changed" since the Court preliminarily certified the litigation as a class action and now, and thus the proposed Class meets the requirements for certification.  Motion for Final Approval at 33.

### 16.    Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses.

Concurrently with the Motion for Final Approval, Co-Lead Counsel moves the Court to enter an order: "(i) awarding attorneys' fees in the amount of twenty percent (20%) of the Settlement Fund recovered on behalf of the Class; and (ii) awarding reimbursement of $243,145.93 in

expenses" incurred in bringing this litigation, plus interest.  Motion for Attorneys' Fees 1.[21]  Co-Lead Counsel's request for attorneys' fees is five-percent less than the amount of attorneys' fees set forth in the Notice -- twenty-percent.  See Motion for Attorneys' Fees at 14.

Co-Lead Counsel asserts that they have obtained a recovery of $2,000,000.00 for the Plaintiffs "due to considerable effort against overwhelming odds."  Motion for Attorneys' Fees at 13.[22]  Co-Lead Counsel alleges that only two objections to the amount of attorneys' fees listed in the Notice had been received as of July 23, 2012, although the time for objections to be filed was still ongoing at that date.  See Motion for Attorneys' Fees at 14.  Co-Lead Counsel asserts that the proposed Settlement avoids the "very real risk of no recovery," given that Thornburg Mortgage is in bankruptcy, there is limited insurance overage to fund a settlement with the Individual Defendants, a trial may result in a summary judgment for the Defendants -- leaving the Class with nothing -- or, even if the Plaintiffs win at trial, the ultimate amount awarded may be less than the

---

[21]Document 392 on the Court's docket includes the Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses, and Memorandum of Law in Support of Approval of Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses.  The pagination the Court assigned when both of these documents were filed as "Document 392" with the Court runs continuously through both documents.  The Court treats these two documents as one document, the "Motion for Attorneys' Fees," and cites to the Court's pagination, in the upper-right-hand corner of the document.

[22]Liaison Counsel Branch Law Firm's "attorney and support staff time has been captured in the lodestar submission" of Co-Lead Counsel.  Decl. of Turner W. Branch in Support of Co-Lead Counsel' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses Filed on Behalf of the Branch Law Firm, ¶ 3, at 2, filed July 23, 2012 (Doc. 393-7)("Branch Motion for Attorneys' Fees").  The Branch Law Firm "adopts, as applicable, the lodestar submission" of Co-Lead Counsel, and does not submit a separate lodestar calculation.  Branch Motion for Attorneys' Fees ¶ 3, at 2.  The Branch Law Firm has "executed a separate firm-to-firm agreement as to attorney and support staff fees and expenses" with Co-Lead Counsel.  Branch Motion for Attorneys' Fees ¶ 4, at 2.

proposed Settlement.  Motion for Attorneys' Fees at 14-15.[23]  Co-Lead Counsel alleges that the Settlement Amount of $2,000,000.00 "essentially exhausts the available insurance proceeds for the remaining claims."  Motion for Attorneys' Fees at 15.

Co-Lead Counsel alleges that the only issue regarding their request for twenty-percent of the $2,000,000.00 recovery is whether the request is reasonable.  See Motion for Attorneys' Fees at 15. Co-Lead Counsel asserts that the Tenth Circuit prefers the percentage-of-the-fund method, as opposed to the lodestar plus multiplier method used to calculate attorneys' fees in common fund cases.  See Motion for Attorneys' Fees at 17 (citing Gottlieb v. Barry, 43 F.3d 474, 482 (10th Cir. 1994)).

Co-Lead Counsel asserts that the requested award is reasonable under the factors set forth in Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), factors that Co-Lead Counsel asserts are used in the Tenth Circuit when setting attorneys' fees.  See Motion for Attorneys' Fees at 17-18.  Co-Lead Counsel alleges that the likelihood of any award would be risky if the litigation were to proceed to trial, making the fact that Co-Lead Counsel has secured any recovery weigh in favor of approving the requested fees.  See Motion for Attorneys' Fees at 20-21. Co-Lead Counsel alleges that the requested award of twenty-percent of the settlement for attorneys' fees is "well within" the appropriate benchmark in the Tenth Circuit, a benchmark that Co-Lead Counsel alleges is twenty-five percent.  Motion for Attorneys' Fees at 21 (citing Milsap v. McDonnell Douglas Corp., Case No. CIV 94-633, 2003 WL 21277124 (N.D. Okla. 2003)).  Co-

---

[23]At the hearing, the Plaintiffs explained that the Settlement exhausted Thornburg Mortgage's available directors' and officers' insurance ("D&O insurance").  See Transcript of Hearing at 9:1-5, taken August 27, 2012 (Manifold)("Tr.").  D&O insurance, is "an agreement to indemnify corporate directors and officers against judgments, settlements, and fines arising from negligence suits, shareholder actions, and other business-related suits."  Black's Law Dictionary at 872 (9th ed. 2009).

Lead Counsel asserts that they have "vigorously prosecuted this [l]itigation against multiple sets of defendants for five years," conducting extensive research and accumulating a total of 11,362 hours of work for the Plaintiffs' case.  Motion for Attorneys' Fees at 22-23.  Co-Lead Counsel alleges that the total amount of expenses used and hours accrued in the litigation would result in a lodestar award of $5,409,776.75.  See Motion for Attorneys' Fees at 11.  Co-Lead Counsel asserts that the requested award, of approximately $400,000.00 in fees, is less than the alleged lodestar by a negative multiplier of 0.074.  See Motion for Attorneys' Fees at 24.  Co-Lead Counsel alleges that their requested award is thus a "very substantial discount" on the time actually spent litigating this matter.  Motion for Attorneys' Fees at 24.  Co-Lead Counsel asserts that, because their requested award is comparable to fees arising from less than ten-percent of the time spent on the litigation, and because the requested award is a negative multiplier of the lodestar, the requested fee award is reasonable.  See Motion for Attorneys' Fees at 24.

Co-Lead Counsel further alleges that the matter litigated is novel and difficult, as a class action securities case with numerous defendants, multiple securities offerings at issue, and a corporate defendants who went bankrupt.  See Motion for Attorneys' Fees at 25-26.  Co-Lead Counsel asserts that the Court has written "365 pages of decisional authority in at least eight separate Memorandum Opinions 'demonstrates the complexity of the case.'"  Motion for Attorneys' Fees at 26 (quoting Lane v. Page, No. CIV 06-1071, 2012 WL 1940574, at *63 (D.N.M. 2012)(Browning, J.)).  Co-Lead Counsel alleges that establishing the Settling Defendants' liability would be difficult, as issues of fact and law are disputed, and the Settling Defendants adamantly deny liability.  See Motion for Attorneys' Fees at 28.  The Settling Defendants allege that establishing causation would also be difficult, because the Plaintiffs would be "required to prove that three allegedly false and misleading statements attributed to Goldstone artificially inflated the price of [Thornburg Mortgage]

-45-

securities from June 6, 2007, until the end of the Class Period," and Co-Lead Counsel would be required to prove that the later correction of these allegedly false and misleading statements caused the stock price for Thornburg Mortgage to drop.  Motion for Attorneys' Fees at 28-29.  Co-Lead Counsel also asserts that proving the amount of artificial inflation, and the connection between that inflation and the Plaintiffs' harm, would also be difficult.  See Motion for Attorneys' Fees at 29.  Co-Lead Counsel argues that the trial would become a "battle of the experts," as both the Settling Defendants and the Plaintiffs would bring in their expert witnesses to prove these difficult issues.  Motion for Attorneys' Fees at 29.

Co-Lead Counsel allege that they are "among the nation's preeminent law firms in class action securities litigation and have successfully litigated these actions in courts throughout the country," evidencing that their skill and expertise warrants the requested award.  Motion for Attorneys' Fees at 29-30.  Co-Lead Counsel also asserts that the opposing counsel comprise "some of the largest and [most] well-respected defense firms in the world," a factor which Co-Lead Counsel asserts is evidence of their high-quality legal services expended in obtaining the Plaintiffs' settlement award.  Motion for Attorneys' Fees at 30.

Co-Lead Counsel also states that they have litigated this matter for five years on an entirely contingent basis, bearing all of the risk of a non-recovery, a factor which weighs in favor of awarding their requested fee.  See Motion for Attorneys' Fees at 31.  Co-Lead Counsel asserts that a change in the law can cause years of class action litigation to be futile, and asserts that the Supreme Court has taken an interest in class actions, which makes the possibility of a legal change defeating the purpose of a class action all the more realistic.  See Motion for Attorneys' Fees at 31-32.  Co-Lead Counsel states that securities cases are often characterized as "'undesirable,' due to the financial burden on counsel, and the time demands of litigating class actions" of the size and

complexity as this litigation.  Motion for Attorneys' Fees at 32.

Co-Lead Counsel further states that there have been "minimal" objections to their requested fees, a factor which Co-Lead Counsel admits the Court is not required to weigh, but which Co-Lead argues supports the approval of their requested award.  Motion for Attorneys' Fees at 33.

With respect to their expenses, Co-Lead Counsel asserts that they are "entitled to receive reimbursement of all reasonable costs incurred."  Motion for Attorneys' Fees at 33.  Co-Lead Counsel asserts that they have expended $243,145.93 in out-of-pocket expenses for the Plaintiffs' cause.  See Motion for Attorneys' Fees at 33.  Co-Lead Counsel submitted to the Court expense reports and time sheets in support of the Motion for Attorneys' Fees.  See Kessler, Topaz, Meltzer & Check, LLP Time Report, filed July 23, 2012 (Doc. 393-3);[24] Wolf, Haldenstein, Adler, Freeman & Herz, LLP Time Report, filed July 23, 2012 (Doc. 393-5).[25] Co-Lead Counsel once again contends that because there are only two objections, as of July 23, 2012, to the proposed attorneys' fees and expenses in the Notice, the small number of objectors supports Court approval of the requested award.  See Motion for Attorneys' Fees at 34.

### 17.   Further Objections to the Proposed Settlement.

Two further objections to the proposed Settlement have been received.[26]  Dale Crane, of

---

[24]Topaz, Meltzer & Check, LLP's Time Report was filed, with multiple other documents in support of the firms' request for attorneys' fees, as Doc. 393-3.  The Court's page number references are to the page numbers included with the electronic filing of Doc. 393-3, and are located in the upper-right-hand corner.

[25]Wolf, Haldenstein, Adler, Freeman & Herz LLP's Time Report was filed, with multiple other documents in support of the firms' request for attorneys' fees, as Doc. 393-5.  The Court's page number references are to the page numbers included with the electronic filing of Doc. 393-5, and are located in the upper-right-hand corner.

[26]On July 25, 2012, John F. Isenman of Festus, Missouri informed the Court that, although he qualifies to be a Class Member, he has chosen to be excluded from this litigation.  See Letter

-47-

Southlake, Texas,  wrote in objection to the proposed Settlement on July 31, 2012.  See Letter from

Dale Crane, dated July 31, 2012, filed July 31, 2012 (Doc. 402)("Crane Letter").  Crane argues that

the proposed Settlement's provision of $0.01 per share is "so pathetically small that it shouts that

the action should not have been brought in the first place."  Crane Letter at 1.  Crane lost money in

several of his investment accounts that contained shares of Thornburg Mortgage securities.[27]  See

Crane Letter at 1-2.  Crane argues that the Co-Lead Counsel's request for fees and expenses is too

high.  Crane Letter at 1.  Crane urges the Court to weigh whether the greater threat to the

"Commonwealt[h] is from: (i) such contingent fee-driven suits tenuously alleging violations of

securities laws; or (ii) actual violations of securities laws."  Crane Letter at 1.  Crane urges the Court

to "provide discipline to the securities bar by allowing [Co-Lead Counsel] neither fees nor

expenses."  Crane Letter at 1-2.

    Brian W. Berman and Tierza Amizur-Berman, of Media, Pennsylvania, submitted an

objection to the settlement on August 21, 2012.[28]  See Settlement Objections by Brian Wayne

Berman & Tierza Amizur-Berman, filed Aug. 21, 2012 (Doc. 406)("Berman Letter").  The Bermans

object to April 19, 2007, as the commencement date of the Class Period.  See Berman Letter at 2.

The Bermans assert that earlier purchases should be included to account for the "well known 'price

run-up phenomenon' prior to a stock offering, which in this case is the [Thornburg Mortgage]

---

from John F. Isenman, (undated), filed July 24, 2012 (Doc. 396)("Isenman Letter").

    [27]Crane does not allege that he qualifies as a class member, he purchased his shares of
Thornburg Mortgage securities in March, 2007, before the Class Period began on April 19, 2007.
See Crane Letter at 2.

    [28]The Berman's submitted their objection after the deadline for receipt of objections --
August 6, 2012 -- 21 days before the final settlement hearing on August 27, 2012.  See Berman
Letter at 1; Joint Decl. at 5 n. 5 (referencing the Notice that was mailed to putative class members,
and stating that the deadline to file objections was August 6, 2012).

offering of May, 2007." Berman Letter at 1.  The Bermans assert that it is "well-known in the

Securities industry" that intensified investor activity occurs before a stock offering, thus, the

Berman's assert, it is very possible that prior to the May, 2007, offering of Thornburg Mortgage

stock, an artificial price run-up preceded April 19, 2007, by a "material time period." Berman Letter

at 1.  The Bermans purchased Thornburg Mortgage stock on April 18, 2007, at a price of $26.75,

which the Bermans assert is "clear evidence of the stock price run-up." Berman Letter at 1.  The

Bermans assert that they were subscribers to an investment newsletter that recommended buying

Thornburg Mortgage stock before the May, 2007, stock offering, without mentioning any upcoming

stock offering.  See Berman Letter at 1-2.  The Bermans thus allege that investor activity before the

May, 2007, stock offering likely inflated the stock price even before the Class Period

commencement date of April 19, 2007.  See Berman Letter at 1-2.  On this basis, the Bermans state,

the April 19, 2007, commencement date "detrimentally excludes a class of [Thornburg Mortgage]

stock purchasers relevant to this litigation."  Berman Letter at 2.  The Bermans thus argue that all

those who purchased stock during an "extended period prior to April 19, 2007 and subsequently

suffered losses," should be eligible to participate in the Class Action.  Berman Letter at 2.

> ## 18.   The Plaintiffs' Supplemental Memorandum of Law in Further Support of Final Approval of Proposed Settlement and Award of Attorneys' Fees and Expenses to Co-Lead Counsel.

The Plaintiffs' filed a supplemental memorandum of law to support the Court's approval of

the proposed Settlement and an award of attorneys' fees and expenses to Co-Lead Counsel after the

deadline passed for putative class members to object to the proposed Settlement.  Plaintiffs'

Supplemental Memorandum of Law in Further Support of Plaintiffs' Motions for Final Approval

of Proposed Settlement and Award of Attorney' Fees and Expenses to Co-Lead Counsel at 1-2, filed

Aug. 20, 2012 ("Supplemental Memorandum").  The Plaintiffs state that there are only five

objections and forty-nine requests for exclusion, representing only 0.02 percent of the notice recipients as of August 20, 2012, a "diminutive" amount of objections. Supplemental Memorandum at 2; id. at  8 (citing In re Qwest Communs. Int'l, Inc., Sec. Litig., No., 625 F. Supp. 2d 1133 (D. Colo. 2009)).  The Plaintiffs argue that the number of Class members who have opted for exclusion from the proposed Settlement is small, that individual objections are "meritless," and that the Court should overrule the objections and grant the Motion for Final Approval.   Supplemental Memorandum at 6.

The Plaintiffs re-assert their belief that the proposed Settlement is fair, reasonable, and adequate.  See Supplemental Memorandum at 7.  The Plaintiffs argue that the objections provide no basis to disapprove the settlement.  See Supplemental Memorandum at 8.  The Plaintiffs assert that Crane's, Melfi's, and the Wildners' objection, to the size of the settlement being  too small, at $0.01 per share, "ignore . . . the specific risks and circumstances present in the [l]itigation." Supplemental Memorandum at 9.  The Plaintiffs assert that the objections do not address the substantial risk that the class may not recovery any amount if the matter proceeds to trial.  See Supplemental Memorandum at 9.  The Plaintiffs argue that the monetary award "must be viewed in light of the risks of litigation and the specific circumstances of the case."   Supplemental Memorandum at 10 (citing Lane v. Page, 2012 WL 1940575, at *66).  The Plaintiffs allege that the risk of no recovery was heightened when Thornburg Mortgage declared bankruptcy, and when the Court dismissed the Securities Act claims against the Dismissed Defendants and the Underwriter Defendants.  See Supplemental Memorandum at 10.  The Plaintiffs argue that the Settlement Amount is an exhaustion of "almost all of the remaining available" insurance for the Class. Supplemental Memorandum at 11.

The Plaintiffs also argue that Melfi's and Crane's objections regarding the merits of the

-50-

litigation are "baseless."  Supplemental Memorandum at 12.  The Plaintiffs assert that they would not have brought this case had they not believed the claims were viable, and that they would have continued to prosecute their claims were the available insurance funds not diminished and likely to be depleted before trial completed.  See Supplemental Memorandum at 12.

In regard to Co-Lead Counsel's request for attorneys' fees and expenses, the Plaintiffs argue that the request is justified and that the objections to the award are not sound.  See Supplemental Memorandum at 13.  The Plaintiffs argue that the objections, received from Reed, Melfi, and Crane, fail to provide any support for the contention that the Co-Lead Counsel's request is "too high" or "outrageous." Supplemental Memorandum at 13.  The Plaintiffs counter that Co-Lead Counsel have provided ample case law in support of their request.  See Supplemental Memorandum at 13.  The Plaintiffs point to Co-Lead Counsel having "vigorously" worked on this matter for five years against multiple sets of Defendants, totaling 11,362 billable hours of work on the Plaintiffs' behalf. Supplemental Memorandum at 14.  The Plaintiffs state that Co-Lead Counsel's request for twenty-percent of the Settlement Fund would be compensation for less than ten-percent of the time Co-Lead Counsel have expended on this case.  See Supplemental Memorandum at 14.  The Plaintiffs assert that an award of twenty-percent is at the "lower end" of the fees usually acquired in common-fund cases.  Supplemental Memorandum at 15.  The Plaintiffs argue that Co-Lead Counsel have been successful in obtaining an award for the class where a substantial risk of no recovery is present, which warrants approval of their requested, reasonable award.  See Supplemental Memorandum at 15-16.

19. **The Court's Hearing on the Motion for Final Approval and Motion for Attorneys' Fees.**

The Court held a hearing on the Motion for Final Approval and the Co-Lead Counsel's

Request for Attorneys' Fees.  The Plaintiffs began  with an overview of the Settlement and specifically discussed the reasonableness and adequacy of the award.  See Tr. at 7:22-8:18 (Manifold, Court).  The Plaintiffs told the Court that Thornburg Mortgage carries a "nominal" D&O insurance of $10,000,000.00.  Tr. at 8:23-9:5 (Manifold).  The Plaintiffs asserted that, in their opinion, even a small company would normally have four to five times the D&O insurance that Thornburg Mortgage had.  See Tr. at 9:14-16 (Manifold).  The Plaintiffs stated that they were unaware that Thornburg Mortgage had such "nominal" D&O insurance until 2009 or 2010, several years into the lawsuit and after Thornburg Mortgage had already declared bankruptcy.  Tr. at 10:12-11:1 (Manifold).  The Plaintiffs stated that a company's D&O insurance is not information generally available to the public, either through SEC filings or other documents.  See Tr. at 10:24-11:1 (Manifold).  The Court asked how the $10,000,000.00 available in insurance coverage dropped to the $2,000,000.00 to which the Settling Parties have agreed to; the Plaintiffs asserted that, in their understanding, the other insurance proceeds went to cover Thornburg Mortgage's representation in other matters, such as for a SEC investigation and in bankruptcy court.  See Tr. at 17:2-24 (Court, Manifold).

The Court inquired what the Plaintiffs intend to do with any residual, unclaimed funds, given that the Court did not approve of the award of remaining funds to the Center for Civic Values, as initially provided in the proposed Settlement.  See Tr. at 24:17-21 (Court).  The Plaintiffs first stated that, after all claims are processed and checks are issued to Class members, the Plaintiffs anticipate returning to the Court to inquire what the Court believes should be done with the remainder, a decision that may be influenced by the amount of funds remaining at the time.  See Tr. at 24:22-25:18 (Manifold).  The Court asked if it would be possible to truncate that process by allocating excess funds from uncashed checks to the class, so that Class members would receive more money.

See Tr. at 25:22-26:7 (Court).  The Plaintiffs asserted that, not only do they suspect the remaining funds to be between $5,000.00 and $10,000.00, but they also believe issuing a second round of checks would be cost-prohibitive.  See Tr. at 27:13-15, 28:19-24 (Manifold).  The Court suggested that Co-Lead Counsel estimate the number of uncashed checks, and with that estimate, one round of checks could be distributed, with an increase in the amount per share by the estimated amount of uncashed checks.  See Tr. at 28:18-23, 29:5-13 (Court).  The Court suggested that the estimate would operate as a "guarantee," such that shareholders would get everything above the twenty-percent to be awarded to Co-Lead Counsel, but if Co-Lead Counsel estimates wrong, then anything over eighty-percent of the Net Settlement Fund that was distributed to the Class would come out of the Co-Lead Counsel's award.  See Tr. at 29:5-13 (Court).  The Court asked Co-Lead Counsel if they would accept a reduction in their current award of twenty-percent if their estimate was wrong and less checks came back uncashed.  See Tr. at 29:5-13 (Court).  Betsy Manifold and Benjamin Sweet, speaking on behalf of Co-Lead Counsel, said they would be willing to make such an estimate and take such a risk.  See Tr. at 28:24-29:1 (Sweet, Manifold); id. at 29:4 (Manifold).  Ms. Manifold indicated that they would like to discuss the estimated number of uncashed checks with the claims administrator, but that they share the Court's concern and would rather have all the funds go to the class than any go back to the Defendants.  See Tr. at 29:14-21, 30:1-5 (Manifold).  The Court asked if it would be possible for the claims administrator to count the claims received thus far, so that the claims administrator could estimate how much of the Settlement Amount will be used to cover claims, and how much will be left over from uncashed checks that may be distributed to claimants to increase their award from the Settlement.  See Tr. at 31:25-32:7, 33:9-13, 33:21-34:3 (Court).  Ms. Manifold asserted that assessing the claims filed thus far, before the period for filing claims has transpired, may be cost prohibitive, because the formula used for calculating individual awards is

complicated and varies with each claim filed.  See Tr. at 31:9-14, 33:14-17 (Manifold).  Ms. Manifold further asserted that it would not be possible to process all of the claims, and know the amount to be distributed and the amount remaining, until nearly one year after all claims have been received.  See Tr. at 34:4-10 (Manifold).

The Court then asked the Plaintiffs to respond to Melfi's objection that the Settlement would amount to less than a penny a share after the attorneys receive their award and the funds are divided amongst the Class members.  See Tr. at 34:11-17 (Court).  The Plaintiffs responded that, while the raw mathematics of the Settlement would seem to indicate that $2,000,000.00 will be divided amongst 200,000 Class members and amount to $0.01 per share, the actual amount received by Class members should be higher, because not everybody will submit a claim.  See Tr. at 35:2-16 (Manifold).  Ms. Manifold, on behalf of Co-Lead Counsel, asserted that it was their responsibility to give a worst-case scenario to putative class members, rather than have a Class member receive less than was expected and feel mistreated.  See Tr. at 35:17-36:3 (Manifold).  The Court responded that putative class members may not feel it is worth their time to file a claim if they believe the amount they receive will be minimal, and the Court noted that such a situation makes approval of the proposed Settlement more difficult.  See Tr. at 36:4-6, 36:11-18 (Court).  The Court asked if Co-Lead Counsel realistically know how many shares they would "actually be dealing with," Tr. at 36:20-25 (Court), and Ms. Manifold responded that "it really is impossible to make that estimate at this time," Tr. at 37:1-7 (Manifold).  Co-Lead Counsel asserted that the number of claims varies case by case.  See Tr. at 37:7 (Manifold).

The Court then asked the Plaintiffs to address the general theme that "this is just so low [the Court] ought to reject it, leave everybody where they are, and send a message to the securities bar not to bring cases like this."  Tr. at 39:21-40:1 (Court).  The Plaintiffs responded that private

-54-

securities class actions contribute to an efficient market system by ensuring compliance with the federal securities law.  See Tr. at 40:2-6 (Manifold).  The Plaintiffs asserted that the recovery of $2,000,000.00 was not a "home run" for either the class or the counsel, but that the amount was the best available under the circumstances -- where a corporate defendant had left the litigation, and the class action had done well enough to survive a motion to dismiss.  Tr. at 40:11-20 (Manifold).

The Court asked the Plaintiffs to respond to an allegation in the Wildner objection that individual officers should be held financially liable, in addition to recovering from the D&O insurance.  See Tr. at 42:15-22 (Court).  The Plaintiffs asserted that they had considered the likelihood of finding liability against the Individual Defendants of Thornburg, Goldstone, and Simmons, but believed they were unlikely to succeed against the Defendants based only on Goldstone's three statements.  See Tr. at 42:23-43:22 (Manifold).  The Plaintiffs asserted that, in light of all the factors, they found taking the $2,000,000.00 out of the D&O insurance would be a better outcome than trying to achieve a summary judgment or success at trial against the Individual Defendants.  See Tr. at 43:23-44:7 (Manifold).

Regarding the mechanics of providing notice, the Plaintiffs explained that around 250,000 notices with claim forms were mailed, and eight-thousand claims had been received as of the hearing date.  See Tr. at 23:9-24 (Manifold).  The Plaintiffs stated that the cut-off date for filing a claim is November, so they anticipate more claims to be received before that date.  See Tr. at 23:21-23 (Manifold).

The Plaintiffs addressed the Bermans' objection that the Class Period should be extended to cover stocks purchased at an earlier date.  See Tr. at 39:9-20 (Manifold).  The Plaintiffs argued that the Class Period was based on Co-Lead Counsel's analysis of when securities prices reached an inflationary level, and thus the Court should overrule the Bermans' objection.  See Tr. at 39:12-

17 (Manifold).  The Plaintiffs also stated that, in a federal securities transaction, there must have been an inflationary statement in the market for there to be a link between inflationary prices and the statement.  See Tr. at 44:19-24 (Manifold).  The Plaintiffs thus asserted that the Class Period could not begin when the Bermans requested, because there were no inflationary statements made on that day or before that day.  See Tr. at 44:19-22 (Manifold).  Ms. Manifold also stated that she spoke with Berman via electronic mail transmission and Berman stated that the only reason he wanted the Class Period to start sooner was so that his purchases could be included in the Class.  See Tr. at 44:25-45:3 (Manifold).

With respect to the class certification, the Plaintiffs asserted that, as set forth in their filings, the Class meets all of rule 23's requirements.  See Tr. at 45:7-12 (Manifold).  The Plaintiffs stated that there are no objections to the certification of the settlement Class.  See Tr. at 45:11-12 (Manifold).

The Court then turned to the Underwriters' Objection.  See Tr. at 45:13-14 (Court).  The Plaintiffs stated that they did not dispute that the Underwriter Defendants are entitled to a judgment reduction, but that they do not believe it is necessary to include the provision in the final judgment and order.  See Tr. at 45:17-21 (Manifold).  The Plaintiffs stated that they spent months negotiating the terms of the proposed Settlement with the Settling Dependants, and that the Settling Defendants did not want the judgment reduction provision to be included in the final judgment and order.  See Tr. at 45:22-46:1 (Manifold).  The Court responded that the Court did not see why the term was not in the proposed Settlement, see Tr. at 46:2-3 (Court), but the Plaintiffs once again stated that they disagreed that it was a necessary term, because the law provides for a judgment reduction, see Tr. at 46:12-14 (Manifold).

Turning to the Motion for Attorneys' Fees, the Court asked Co-Lead Counsel how they had

-56-

expended their time on this matter, and Ms. Manifold replied that they had spent about fifty-percent of their time investigating matters and fifty-percent of their time preparing briefings. See Tr. at 14:22-15:6 (Court, Manifold). The Court asked Co-Lead Counsel why they requested twenty-percent and not some other figure. See Tr. at 46:23-47:2 (Court). Ms. Manifold stated that they had reduced their requested award from the twenty-five percent initially stated in the Notice to only twenty-percent in part because of the objections from putative class members to the request for twenty-five percent. See Tr. at 41:8-13 (Manifold). Ms. Manifold had earlier asserted that the objectors are wrong to characterize the requested award of attorneys' fees and expenses as a "windfall," because Co-Lead Counsel will only be paid for approximately ten-percent of their 11,000 hours spent working on the case. Tr. at 40:21-41:5 (Manifold). Ms. Manifold asserted that their requested award works out to be an hourly rate of approximately $35.00 per hour for the Plaintiffs' attorneys. See Tr. at 41:6-7 (Manifold). Ms. Manifold asserted that they are requesting a smaller percentage and less fees than was indicated in the Notice to which certain putative class members objected -- now Co-Lead Counsel requests twenty, rather than twenty-five, percent of the Settlement Amount, and $243,000.00, rather than $260,000.00 in fees. See Tr. at 41:8-13 (Manifold). Ms. Manifold argued that their requested award is a "substantial haircut." Tr. at 41:18-21(Manifold).

Ms. Manifold also argued that the time and labor they incurred to obtain an award for the class is consistent with all of the Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1975), factors. See Tr. at 41:22-42:14 (Manifold). Ms. Manifold asserted that they litigated novel and difficult issues in a securities case, a case that "only a handful" of plaintiffs' firms could handle. Tr. at 42:2-6 (Manifold). Ms. Manifold asserted that they fronted $5,400,000.00 in fees and were able to secure a recovery for the Plaintiffs, while requesting a fee "below the customary benchmark

-57-

fee in the Tenth Circuit." Tr. at 41:22-42:10 (Manifold).  Ms. Manifold argued that, if the Court looks to attorneys' fees in similar cases, the Court will find that the requested award here is reasonable. See Tr. at 42:11-14 (Manifold).

The Court asked Co-Lead Counsel if they would be willing to accept a reduction in their award of one or two percent, given the objections to the requested attorneys' award. See Tr. at 48:6-10 (Court).  Ms. Manifold objected to that suggestion.  See Tr. at 48:25-49:2 (Manifold).  Ms. Manifold asserted that they believe the reduction from twenty to twenty-five percent already adequately takes into account the objections. See Tr. at 49:2-8 (Manifold). Ms. Manifold stated that they are not benefitting at the expense of shareholders, as Melfi's objection asserts, but rather they have secured a benefit for the class where there otherwise would have been none.  See Tr. at 49:5-50:5 (Manifold).  Ms. Manifold argued that attorneys must be able to receive a twenty-percent recovery as a "bottom line," so that attorneys are willing to take cases and promote a sound public policy, even where settlements are small.  Tr. at 49:21-24 (Manifold).  Ms. Manifold thus argued that Melfi's objection is incorrect.  Ms. Manifold stated that the class is benefitting, even if it is not what the class wants, or what Co-Lead Counsel wants, but nonetheless that does not keep Co-Lead Counsel from being entitled to a portion of the Settlement Amount.  See Tr. at 49:25-50:4 (Manifold).

In response to Reed's objection that Co-Lead Counsel should not recover a significant amount because the Class is not, Ms. Manifold asserted that they are not receiving a significant award. See Tr. at 50:6-9 (Manifold).  Ms. Manifold once again stated that their requested recovery amounts to a rate of $35.00 per hour, and Co-Lead Counsel have expended $5,400,000.00 in fees and litigated the case for over 11,000 hours.  See Tr. at 50:8-11 (Manifold).

Ms. Manifold further argued that the objectors have lost sight of the difficulty of the

litigation; that the Plaintiffs' complaint was "exceptionally well drafted," and unanticipated issues arose after the litigation commenced.  Tr. at 50:12-23 (Manifold).  Ms. Manifold asserted that they did not anticipate that Thornburg Mortgage, with $4,000,000,000.00 in assets, would declare bankruptcy in the middle of the case, or that a company of such a size would have a D&O insurance policy of only $10,000,000.00.  See Tr. at 50:17-21 (Manifold).  Ms. Manifold also asserted that they did not anticipate that the Court would dismiss the Securities Act claims against Underwriter Defendants.  See Tr. at 50:22-23 (Manifold).  In light of these circumstances, Ms. Manifold argued that getting $2,000,000.00 out of the insurance policy was a good result, and thus they are entitled to be adequately compensated.  See Tr. at 50:24-51:4 (Manifold).

In response to Crane's objection that Co-Lead Counsels' expenses are too high, Ms. Manifold argued that "expenses in a federal securities class action are generally high."  Tr. at 51:5-10 (Court, Manifold).  Ms. Manifold asserted that they have itemized their expenses, and that there are very little travel expenses -- mostly the expenses arise from appearing in Court.  See Tr. at 51:11 (Manifold).  Ms. Manifold asserted that their fees for research and briefing are very reasonable in light of the work done.  See Tr. at 51:11-14 (Manifold).  Ms. Manifold stated that she believes the Defendants' counsel has probably accrued expenses three to four times that of Co-Lead Counsel. See Tr. at 51:15-17 (Manifold).

In conclusion, the Court returned to its question whether Co-Lead Counsel would accept a settlement that allowed for one issuance of checks, with any amount over the estimated amount of uncashed checks coming from the attorneys' award.  See Tr. at 51:18-24 (Court).  Ms. Manifold stated that they have no objection with distributing the Settlement Fund in only one check, but that they are concerned with how the Court structures that provision.  See Tr. at 51:25-52:8.  Ms. Manifold stated, on behalf of Co-Lead Counsel, that they want to avoid a situation where there is

a "conflict between the attorneys wanting to collect their fees that they're entitled to with the benefits that are gong to the class."  Tr. at 53:1-6 (Manifold).  Ms. Manifold suggested that perhaps the Court could set aside a portion of the attorneys' fees to cover any overlap between class distributions and the attorneys' award, but that the problem with such a set-aside is that Co-Lead Counsel does not know how much to estimate should be set aside from the attorneys' award.  <u>See</u> Tr. at 53:7-15 (Manifold).  Ms. Manifold stated that Co-Lead Counsel believes the remaining funds would only be between $5,000.00 and $10,000.00, but that there is no way to have a solid number until all the claims are received and processed.  <u>See</u> Tr. at 53:11-151 (Manifold).  The Court inquired whether Co-Lead Counsel believed the Plaintiffs' appeal of the Underwriter Defendants' dismissal would be successful, so that those Defendants would return to this Court and bring more money to be distributed.  <u>See</u> Tr. at 53:22-54:2 (Court).  Ms. Manifold stated that the Plaintiffs plan to return to the Court with the Underwriter Defendants, and "certainly hope that there will be an additional recovery for the class."  Tr. at 54:5-9 (Manifold).

The Court then invited the Settling Defendants to speak in support of the proposed Settlement.  <u>See</u> Tr. at 54:18-19 (Court).  The Settling Defendants asserted that the proposed Settlement is the result of an arm's length process.  <u>See</u> Tr. at 54:22-55:1 (Shapiro).  The Settling Defendants asserted that the there being so few negative responses speaks in "broad and strong terms to the fairness and appropriateness of the settlement."  Tr. at 55:17-24 (Shapiro).

The Court asked the Settling Defendants what their objection was to including the judgment reduction provision in the final order and judgment, and the Settling Defendants responded that they believe it is a "superfluous request."  Tr. at 56:10-20 (Court, Shapiro).  While the Settling Defendants stated that they do not believe it will harm them, they believe the term is unnecessary. <u>See</u> Tr. at 51:19-22 (Shapiro).

The Court asked the Settling Defendants why they believed the insurance proceeds were small, as Co-Lead Counsel contends. See Tr. at 56:23-57:3 (Court). The Settling Defendants stated that the Plaintiffs sued a number of entities, one being a company that devolved into bankruptcy after the suit was filed. See Tr. at 57:16-22 (Shapiro). The Settling Defendants asserted that "everybody lawyered up. So there were a lot of mouths at the table if you will." Tr. at 57:21-22 (Shapiro). The Settling Defendants also asserted that the SEC investigation has been a drain, which has come out of Thornburg Mortgage's insurance policy. See Tr. at 57:23-58:1, 58:7-8 (Shapiro). The Settling Defendants stated that there may be a later policy which covers some of the costs of the SEC investigation, but that policy was issued after the Plaintiffs filed suit and thus would not cover this case. See Tr. at 58:14-23 (Shapiro). The Settling Defendants reported that the $2,000,000.00 is the limit of the liability policy. See Tr. at 58:24-29:3 (Court, Shapiro). The Court inquired whether the Plaintiffs could go after any other set of funds, besides personal assets, and the Settling Defendants responded that settling within the D&O policy's $2,000,000.00 limit was a business judgment decision, and using the insurance proceeds allows the Plaintiffs to recover something without having to continue to trial and risk no recovery at all. See Tr. at 59:8-25 (Court, Shapiro). The Settling Defendants admitted that they would not support the Motion for Final Approval if it was not in their interests. See Tr. at 59:25-60:3 (Shapiro).

The Court then heard from the Underwriter Defendants. See Tr. at 61:1-2 (Court). The Underwriter Defendants argued that the bar order, contained in the Proposed Order & Final Judgment, would extinguish their rights to contribution and indemnification against Thornburg Mortgage. See Tr. at 61:9-17 (Keeley). The Underwriter Defendants argued that the PSLRA is "not clear at all" regarding the requested judgement reduction provision. Tr. at 61:18-62:1 (Keeley). The Court inquired whether the trustee in the bankruptcy proceeding is likely to bring a claim for

indemnification against Thornburg Mortgage, <u>see</u> Tr. at 62:2-5 (Court), and the Underwriter Defendants responded that their claim for indemnification has been filed in bankruptcy court, but has not been determined, <u>see</u> Tr. at 62:6-12 (Keeley).  The Underwriter Defendants asserted that case law is very clear, and that if there is a bar order as "part of a settlement that contains a barred recovery for contribution and indemnification there absolutely must be a judgment recovery."  Tr. at 63:9-12 (Keeley).  The Underwriter Defendants asserted that the way the Proposed Order & Final Judgment is written right now could allow the Plaintiffs to argue later on that they do not have a set-off a verdict as to Thornburg Mortgage, because, without a judgment reduction written into the final judgment, the Plaintiffs could argue that the Underwriter Defendants are not covered by the PSLRA's provision allowing for a judgment reduction.  <u>See</u> Tr. at 63:13-16 (Keeley).  The Underwriter Defendants argued that they have not seen a single case that does not "at least acknowledge and put in the settlement papers a judgment reduction with the disposition of some of the case," and asserted that some cases call it reversible error to not include such a provision.  Tr. at 63:23-64:5 (Keeley).  The Underwriter Defendants argued that the Court would be vulnerable to a reversal on appeal if the provision is not included in the final order.  <u>See</u> Tr. at 64:12-16 (Keeley).

The Court then inquired about the Underwriter Defendants' assessment of their appeal.  <u>See</u> Tr. at 64:17-19 (Court).  The Underwriter Defendants asserted that they expect to prevail on appeal.  <u>See</u> Tr. at 64:20-23 (Keeley).  Nonetheless, the Underwriter Defendants asserted that they are not willing to take the risk that they will have to return to this Court without the ability to seek contribution and indemnification for any judgment against them.  <u>See</u> Tr. at 64:24-65:5 (Keeley).

The Underwriter Defendants further stated that they feel "very strongly that this isn't a matter of . . . superfluous . . .words," but rather this is a matter of fundamental rights.  Tr. at 65:15-17 (Dickey).  The Underwriter Defendants argued that the Settling Defendants' position that the

provision is not necessary is based on outdated case law, and is not in line with Tenth Circuit precedent. <u>See</u> Tr. at 66:8-17.  The Underwriter Defendants argued that because Thornburg Mortgage is left out of the proposed Settlement altogether, as a Released Party, they will be prejudicially harmed if the provision is not included.  <u>See</u> Tr. at 67:4-10 (Dickey).  Counsel for the Underwriter Defendants, Jonathan C. Dickey, further asserted that the Settling Defendants have misused his treatise, Jonathan C. Dickey & Joel A. Feuer, <u>Securities Litigation: A Practitioner's Guide</u> at 13-21 (2009), <u>see</u> Motion for Final Approval at 29, to argue that any reduction credit should be eliminated from settlements.  <u>See</u> Tr. at 67:11-24 (Dickey).  Lastly, the Underwriter Defendants argued that it would be a fundamental unfairness to not include "as simple [a] matter" as a judgment reduction provision.  Tr. at 68:25-69:2 (Dickey).

In closing, the Plaintiffs asserted that the proposed "settlement is fair, reasonable, and adequate." Tr. at 69:4-5 (Manifold).  The Plaintiffs argued that, although not a "home run" in either Co-Lead Counsel's or in the Class' expectation, the proposed Settlement meets the necessary criteria for the Court's approval.  Tr. at 69:5-70:5 (Manifold).  The Plaintiffs argued that because there are no objections to the Class certification and only one objection to the Class Period, the number of objectors evidences Class support for the proposed Settlement. <u>See</u> Tr. at 69:12-19 (Manifold).  Ms. Manifold argued that Co-Lead Counsel are entitled to twenty-percent of the Settlement Amount, a necessary award so that attorneys of "this caliber" continue to be willing to take on the risks of class actions such as the ones presented in this case.  Tr. at 69:15-17 (Manifold).  Ms. Manifold once again requested that the Court grant the Motion for Final Approval and the Motion for Attorneys' Fees.  <u>See</u> Tr. at 70:3-5 (Manifold).

The Court inquired whether there were any specific needs or requests from the parties regarding timing.  <u>See</u> Tr. at 70:8-13 (Court).  The Plaintiffs requested that the Court approve the

proposed Settlement as soon as possible, so that the claims administrator can begin to analyze claims, with the knowledge that the claims can be processed immediately.  See Tr. at 70:14-24 (Manifold).  The Plaintiffs stated that this order would be the most cost-efficient way to handle the claims administration.  See Tr. at 64:22-65:1 (Manifold).  The Plaintiffs stated that the sooner they have final approval of the settlement, the sooner the Class may receive its money.  See Tr. at 71:2-8 (Manifold).  Ms. Manifold, on behalf of Co-Lead Counsel, urged the Court to approve the proposed Settlement even before awarding the attorneys' fees.  See Tr. at 71:16-19 (Manifold).

**20.    Paul Mulholland's Declaration Concerning Distribution of Settlement Proceeds.**

On November 15, 2012, Paul Mulholland, President of SCS, filed a declaration expressing his "independent opinion as to the handling of un-cashed checks after an initial distribution of the settlement proceeds," and his "proposal on how to best handle the disposition of un-cashed checks in a cost efficient and effective manner."  Declaration of Paul Mulholland, CPA, CVA, Concerning Distribution of Settlement Proceeds to Class Members and Handling of Un-Cashed Checks ¶ 1, at 2, filed Nov. 15, 2012 (Doc. 416)("Mulholland Decl.").  Mulholland has administered over 275 class action cases, over 100 of which were securities class-action settlements.  See Mulholland Decl. ¶ 2, at 2.  Mulholland asserts that it is "very difficult to estimate the number of uncashed checks and the total dollar amount of the Funds that will remain as a result of un-cashed checks after an initial distribution."  Mulholland Decl. ¶ 4, at 3.  Mulholland states that, in the last ten securities class-action settlements which SCS administered, the percentage of un-cashed checks ranged from 0.6122% to 4.651%, with the average number of uncashed checks being 2.544%.  See Mulholland Decl. ¶ 4, at 3.  In Mulholland's opinion, the percentage of un-cashed checks in this matter will likely be higher than normal: "since the initial distribution will be sent to claimants with very small recoveries . . . logically, such claimants would seem somewhat less inclined to cash their checks then

recipients with checks for larger amounts." Mulholland Decl. ¶ 4, at 3. As of November 15, 2012, SCS has received 14,000 claims from potential Class members. See Mulholland Decl. ¶ 4, at 3.

Mulholland proposes that the Court consider a second distribution of any un-cashed checks from the initial distribution. See Mulholland Decl. ¶ 5, at 3. Mulholland proposes that the second distribution would go only to those who cashed their check from the initial distribution. Additionally, Mulholland recommends that a de minimis payout be established for the second distribution only. See Mulholland Decl. ¶ 5, at 3. The de minimis payout would, in Mulholland's opinion, "substantially reduce (1) the number of checks that are filed out and mailed; and (2) the fees and expenses incurred to perform a second distribution." Mulholland Decl. ¶ 5, at 3. Mulholland states that this proposal would "provide the maximum amount of Funds to be distributed to valid claimants in a cost efficient and effective manner." Mulholland Decl. ¶ 5, at 4.

## LAW REGARDING CLASS CERTIFICATION UNDER RULE 23

Rule 23 provides the requirements for certifying a class under the federal rules. All classes must satisfy the prerequisites under rule 23(a). Additionally, a class must satisfy one of the three sets of requirements under rule 23(b). The plaintiff bears the burden of showing that the requirements are met. The Court must accept a plaintiff's substantive allegations as true, but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints." Shook v. El Paso Cnty., 386 F.3d 963, 968 (10th Cir. 2004)(citing J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)). See Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000)("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."). "In determining the propriety of a class action, the

-65-

question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir. 1982). See Vallario v. Vandehey, 554 F.3d 1259, 1267 (10th Cir. 2009)("We, of course, adhere to the principle that class certification does not depend on the merits of a suit.").

      **1.**      **Class Prerequisites.**

All classes must satisfy the prerequisites under rule 23(a):

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

      (1) the class is so numerous that joinder of all members is impracticable;

      (2) there are questions of law or fact common to the class;

      (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

      (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "A party seeking to certify a class is required to show . . . that all the requirements of [rule 23(a)] are clearly met." Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988). "Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'" Shook v. El Paso Cnty., 386 F.3d 963, 968 (10th Cir. 2004)(quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161 (1982), and citing Reed v. Bowen, 849 F.2d at 1309).

      **a.**      **Numerosity.**

Rule 23(a)(1) requires that the class membership be sufficiently large to warrant a class

-66-

action, because the alternative of joinder is impracticable.  Some courts have held that numerosity may be presumed at a certain number; the Tenth Circuit, however, "has never adopted such a presumption."  Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006).  "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion."  Gonzales v. City of Albuquerque, No. CIV 09-0520, 2010 WL 4053947, at * 7 (D.N.M. 2010)(Browning, J.)(quoting Rex v. Owens, 585 F.2d 432, 436 (10th Cir. 1978)).  Cf. Mullen v. Treasure Chest Casino, L.L.C., 186 F.3d 620, 624 (5th Cir. 1999)(finding that proposed Class consisting of "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement").  In determining whether a proposed Class meets the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable."  Neiberger v. Hawkins, 208 F.R.D. 301, 313 (D. Colo. 2002)(citation omitted).  See Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 884 n.1 (6th Cir. 1997)(noting that rule 23(a)(1) is not a "'strict numerical test'"; holding, however, that where class comprises over 1,100 persons, suggestion that joinder is not impractical is "frivolous")(citation omitted); Robidoux v. Celani, 987 F.2d 931, 936 (2nd Cir. 1993)("[T]he difficulty in joining as few as 40 class members should raise a presumption that joinder is impracticable." (internal citation omitted)).  "Satisfaction of the numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer a strong litigational hardship or inconvenience if joinder is required."  Cook v. Rockwell Int'l Corp., 151 F.R.D. 378, 384 (D. Colo. 1993).  See Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993)("Impracticable does not mean impossible.").  The Court has previously found that joinder of "several hundred tenants and homeowners" would be impracticable, and thus the proposed Class met rule 23(a)(1)'s numerosity requirement.  Lowery v.

City of Albuquerque, 273 F.R.D. 668, 683 (D.N.M. 2011)(Browning, J.).  At the other end of the

spectrum, the Court found that a class of 6,100 members, in a securities action, was so numerous

that joinder was impracticable.  See Lane v. Page, 272 F.R.D. 558, 574 (D.N.M. 2011)(Browning,

J.).  See also Thompson v. Jiffy Lube Intern., Inc., 250 F.R.D. 607, 620 (D.N.M. 2011)(Browning,

J.)(finding that the numerosity requirement is met by a proposed Class seeking injunctive relief

constitutes "at least tens of millions of members," and by a proposed Class seeking damages that

constitutes at least 4,900 members).

### b.    Commonality.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed.

R. Civ. P. 23(a)(2).  Even "factual differences in the claims of the individual class members should

not result in a denial of class certification where common questions of law exist."  In re Intelcom

Group Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996).  See Adamson v. Bowen, 855 F.2d 668, 676

(10th Cir. 1988)("That the claims of individual class members may differ factually should not

preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.");

Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires

only a single issue common to the class, and the fact that 'the claims of individual class members

may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the

application of a common policy.'")(citations omitted).

"The commonality requirement has been applied permissively in securities fraud litigation."

In re Initial Pub. Offering Sec. Litig., 227 F.R.D. 65, 87 (S.D.N.Y. 2004).  "Securities cases often

involve allegations of common courses of fraudulent conduct, which can be sufficient to satisfy the

commonality requirement."  5 Jerold S. Solovy, Ronald L. Marmer, Timothy J. Chorvat, and David

M. Feinberg, Moore's Federal Practice § 23.23[4][b], at 23-77 (3d ed. 2004).  "Where the facts as

alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met." In re Oxford Health Plans, Inc. Sec. Litig., 191 F.R.D. 369, 374 (S.D.N.Y. 2000). Accord Initial Pub. Offering, 227 F.R.D. at 87 ("In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied.").

### c. Typicality.

Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims. See Fed R. Civ. P. 23(a)(3). The typicality requirement ensures that absent class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest. See Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994); Nicodemus v. Union Pac. Corp., 204 F.R.D. 479, 490 (D. Wyo. 2001). The Supreme Court of the United States has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Southwest v. Falcon, 457 U.S. at 157 n. 13. "Provided the claims of Named Plaintiffs and class members are based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality." DG v. Devaughn, 594 F.3d 1188, 1198 (10th Cir. 2010)(citing Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)). "[L]ike commonality, typicality exists where . . . all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." DG v. Devaughn, 594 F.3d at 1199. Factual differences among some of the class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988). See Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975)("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so

long as the claims of Plaintiffs and the other class members are based on the same legal or remedial theory.").  Accordingly, differences in the amount of damages will not defeat typicality.  See Harrington v. City of Albuquerque, 222 F.R.D. 505, 511 (D.N.M. 2004)(Hansen, S.J.).  "The United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact."  Gianzero v. Wal-Mart Stores Inc., No. 09-CV-00656-REB-BNB, 2010 WL 1258071, at *3 (D. Colo. Mar. 29, 2010)(citing Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982)("In determining whether the typicality and commonality requirements have been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient."), cert. denied, 460 U.S. 1069 (1983); Adamson v. Bowen, 855 F.2d at 676 ("[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory."  (citations omitted)).

### d.    Adequacy.

Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requirement protects the due-process interests of unnamed class members -- who are bound by any judgment in the action.  See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 379 n.5 (1996)(characterizing adequacy of representation as a constitutional requirement); Lile v. Simmons, 143 F. Supp. 2d 1267, 1277 (D. Kan. 2001)("Due process requires that the Court 'stringently' apply the competent representation requirement because class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings.").  "The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a) . . . ."  Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d 1286, 1294 (D.N.M. 2006)(Armijo, J.).  See Cobb v. Avon Prods.,

<u>Inc.</u>, 71 F.R.D. 652, 654 (W.D. Pa. 1976)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests . . . ."). The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on the class' behalf. <u>See Rutter & Wilbanks Corp. v. Shell Oil Co.</u>, 314 F.3d 1180, 1187-88 (10th Cir. 2002). In considering this second question, the experience and competence of the attorney representing the class may inform the court's analysis. <u>See Lopez v. City of Santa Fe</u>, 206 F.R.D. at 289-90.

The Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." <u>E. Tex. Motor Freight Sys. Inc. v. Rodriguez</u>, 431 U.S. 395, 403 (1977)(quoting <u>Schlesinger v. Reservists Comm. to Stop the War</u>, 418 U.S. 208, 216 (1974)). Courts have found that intra-class conflicts "may negate adequacy under Rule 23(a)(4)." <u>Langbecker v. Elec. Data Sys. Corp.</u>, 476 F.3d 299, 315 n.28 (5th Cir. 2007)(holding that the district court erred in certifying a class without evaluating intra-class conflicts). <u>See Pickett v. Iowa Beef Processors</u>, 209 F.3d 1276, 1280 (11th Cir. 2000)(finding that representation was inadequate where the class included those "who claim harm from the very acts from which other class members benefitted"); <u>Broussard v. Meineke Discount Muffler Shops, Inc.</u>, 155 F.3d 331, 344 (4th Cir. 1998)(holding that the current franchisees who had an interest in the continued viability of the franchiser had an inherent conflict with former franchisees whose only interest was in the maximization of damages); <u>Alston v. Va. High Sch. League, Inc.</u>, 184 F.R.D. 574, 579 (W.D. Va. 1999)(holding that a class of all high school female athletes could not be certified -- even if the alleged conduct of the defendant school system was discriminatory -- when some female athletes did not share the same goals or interests as the named female plaintiffs,

because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment).

On the other hand, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.  Beyond that straightforward proposition, defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition."  7A Charles Alan Wright, Arthur A. Miller & Mary K. Kane, Fed. Prac. & Proc. § 1768, at 389-93 (3d ed. 2005).  "Though a plaintiff cannot be an adequate representative if he or she has a conflict of interest with class members, not every potential disagreement between a class representative and the class members will stand in the way of a class suit."  Lowery v. City of Albuquerque, 273 F.R.D. at 680 (internal citation omitted).

###    2.    Rule 23(b).

Once the court finds that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)." Adamson v. Bowen, 855 F.2d at 675.  See DG v. Devaughn, 594 F.3d at 1199 ("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23.").  Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

> (b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:
>
> > (1) prosecuting separate actions by or against individual class members would create a risk of:
> >
> > > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).  "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements."  Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *11 (D.N.M. Aug. 21, 2010)(citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions.")).

To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) instructs that the court should consider: (i) the interest of members of the class in individually controlling the prosecution or defense of separate

actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action.  See Fed. R. Civ. P. 23(b)(3)(A)-(D).  When certifying a class for settlement purposes, however, the court need not consider the difficulties that will be encountered in managing the class at trial, as the class action will not go to trial if the court approves the settlement.   See Amchem Prods., Inc., v. Windsor, 521 U.S. 591, 620 (1997)(explaining that a district court need not weigh rule 23(b)(3)(D)'s criteria when determining whether to certify a class action for settlement only, as the class action will not go to trial if the settlement is approved).

The predominance criterion of rule 23(b)(3) is "far more demanding" than rule 23(a)(2)'s commonality requirement. Amchem Prods., Inc. v. Windsor, 521 U.S. at 623-24 ; Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)("Although we do not rest our decision upon Rule 23(a), cases that interpret that the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s 'far more demanding' requirement that common issues predominate.").  In Monreal v. Potter, the Tenth Circuit found: "The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a)."  367 F.3d at 1237.

**3.    Class Order.**

Rule 23(c) provides the requirements for a court order certifying a class:

(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.

    (1) Certification Order.

(A) Time to Issue. At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

(B) Defining the Class; Appointing Class Counsel. An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

(C) Altering or Amending the Order. An order that grants or denies class certification may be altered or amended before final judgment.

Fed. R. Civ. P. 23(c). The United States Court of Appeals for the Third Circuit addressed the requirements of rule 23(c)(1)(B) after the 2003 amendments to the Federal Rules of Civil Procedure, holding that "Rule 23(c)(1)(B) requires district courts to include in class certification orders a clear and complete summary of those claims, issues, or defenses subject to class treatment." Wachtel v. Guardian Life Ins. Co. of America, 453 F.3d 179, 184 (3d Cir. 2006). The Third Circuit "noted that most district court opinions fell short of this standard." Nafar v. Hollywood Tanning Sys., Inc., 339 F. App'x 216, 219 (3d Cir. 2009).

[T]he proper substantive inquiry for an appellate tribunal reviewing a certification order for Rule 23(c)(1)(B) compliance is whether the precise parameters defining the class and a complete list of the claims, issues, or defenses to be treated on a class basis are readily discernible from the text either of the certification order itself or of an incorporated memorandum opinion.

Wachtel v. Guardian Life Ins. Co. of America, 453 F.3d at 185.

**4.     Security Class Actions.**

"[T]he United States Court of Appeals for the Tenth Circuit has endorsed class actions as an appropriate means to resolve claims under the federal securities laws." Lerner v. Haimsohn, 126 F.R.D. 64, 65 (D. Colo. 1989)(citing T.J. Raney & Sons, Inc. v. Fort Cobb, Okla. Irrigation Fuel Auth., 717 F.2d 1330 (10th Cir. 1983)). See In re Ribozyme Pharms., Inc. Sec. Litig., 205 F.R.D. 572, 577 (D. Colo. 2001)("In general, class actions are the favored method of litigating securities

-75-

fraud actions in which numerous plaintiffs are involved."); City P'ship Co. v. Jones Intercable, Inc.,

213 F.R.D. 576, 581 (D. Colo. 2002); Schwartz v. Celestial Seasonings, 178 F.R.D. 545, 550

(D. Colo. 1998); 7 William B. Rubenstein, Alba Conte & Herbert B. Newberg, Newberg on Class

Actions § 22:1, at 4-5 (2004)("Actions under the federal securities laws are particularly well suited

for representative litigation under Rule 23 . . . ."). "Where plaintiffs allege that defendants violated

federal securities laws through a common scheme or mechanism, uniformly perpetrated upon the

shareholders, the action is appropriate for class treatment." Lane v. Page, 272 F.R.D. at 573 (citing

Pellman v. Cinerama, Inc., 89 F.R.D. 386, 390 (S.D.N.Y. 1981)).

## LAW REGARDING CERTIFICATION OF A CLASS FOR SETTLEMENT PURPOSE ONLY

A class certified for settlement purposes only must nonetheless meet rule 23's requirements.

See Anchem Prods., Inc., v. Windsor, 521 U.S. at 620 n. 16.  While the existence of a settlement

is relevant to the class certification, a settlement does "not inevitably signal that a class-action

certification should be granted more readily than it would be were the case to be litigated." Anchem

Prods., Inc., v. Windsor, 521 U.S. at 620 n. 16.  Moreover, settlement classes "sometimes warrant

more, not less, caution on the question of certification." Anchem Prods., Inc., v. Windsor, 521 U.S.

at 620 n. 16.  The concerns that rule 23 addresses are present when certifying a class, whether for

trial or for settlement.  See Anchem Prods., Inc., v. Windsor, 521 U.S. at 621

> [T]he "'class action' to which Rule 23(e) refers is one qualified for certification
> under Rule 23(a) and (b).  Subdivisions (a) and (b) focus court attention on whether
> a proposed Class has sufficient unity so that absent members can fairly be bound by
> decisions of class representatives.  That dominant concern persists when settlement,
> rather than trial, is proposed.

Anchem Prods., Inc., v. Windsor, 521 U.S. at 621.

On the other hand, a district court that is asked to certify a class for settlement purposes need

not inquire whether the case would, if tried, present "intractable management problems," as settlement necessarily means the parties are not proceeding to trial. Anchem Prods., Inc., v. Windsor, 521 U.S. at 620 (citing Fed. R. Civ. P. 23(b)(3)(D)). Rule 23(b)(3)'s other requirements must be examined, and the Supreme Court of the United States has stated that these requirements "demand undiluted, even heightened, attention in the settlement context." Anchem Prods., Inc., v. Windsor, 521 U.S. at 620. The heightened scrutiny demanded for certifying a class for settlement purposes only is necessary, because the court will not have the opportunity, normally provided by trial, to shape the class in accordance with information presented at trial. See Anchem Prods., Inc., v. Windsor, 521 U.S. at 620 (citing Fed. R. Civ. P. 23(c),(d)).

## LAW REGARDING APPROVAL OF CLASS-ACTION SETTLEMENTS

Rule 23 requires judicial approval of a class action settlement. See Fed. R. Civ. P. 23(e)("The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."). A district court considering a proposed Class-action settlement must determine whether the proposed settlement is fair, reasonable, and adequate. See In re Integra Realty Res., Inc., 354 F.3d 1246, 1266 (10th Cir. 2004). "It is well-settled, as a matter of sound policy, that the law should favor the settlement of controversies." Grady v. De Ville Motor Hotel, Inc., 415 F.2d 449, 451 (10th Cir. 1969). The Tenth Circuit, in Jones v. Nuclear Pharmacy, Inc., established a four-factor test for assessing whether a proposed settlement is fair, reasonable, and adequate, which includes: (i) whether the proposed settlement was fairly and honestly negotiated; (ii) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (iii) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (iv) the parties' judgment that the settlement is fair and reasonable. See 741 F.2d at 324. In Rutter & Wilbanks Corp. v. Shell Oil Co.,

314 F.3d 1180 (10th Cir. 2002), the Tenth Circuit addressed objections to a class-action settlement, which the district court had approved.  See 314 F.3d at 1187.  The objectors argued that the class representatives and class counsel failed to adequately represent the class members, and/or suffered conflicts of interest.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1188.  The objectors also challenged the settlements' fairness and reasonableness.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1188.  The Tenth Circuit found that rule 23(a)(4)'s adequacy requirement was satisfied, because each subgroup had its own class representative during settlement negotiations.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1188.  With respect to the settlement's fairness and reasonableness, the Tenth Circuit found that the district court did not abuse its discretion in determining that the settlement, "from which an extremely small percentage of class members opted out, was fair, reasonable, and adequate." Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1189.

In Gottlieb v. Wiles, 11 F.3d 1004 (10th Cir. 1993), the Tenth Circuit ruled on a district court's approval of a class-action settlement, where objectors argued that the district court failed to consider "the ability of the defendants to withstand a greater judgment." 11 F.3d at 1007.  Applying the Jones v. Nuclear Pharmacy, Inc. factors, the Tenth Circuit noted that district courts within the Tenth Circuit are not required to "consider the financial condition of the defendants in assessing the adequacy of the settlement." 11 F.3d at 1014.  The Tenth Circuit explained that the third Jones v. Nuclear Pharmacy, Inc. factor, requiring a court to weigh the "value of an immediate recovery," was an inquiry into the settlements' monetary worth, and the financial condition of the defendant "is irrelevant to a determination of the value of the settlement." 11 F.3d at 1015.  The Tenth Circuit noted that requiring an inquiry into the defendant's financial condition presupposes a belief that "'value' has some metaphysical import aside from its plain meaning," and the Tenth Circuit rejected

the notion "that a settlement cannot have value to Plaintiffs unless it satisfies their desire for retribution by destroying the defendant." 11 F.3d at 1014-15.  The Tenth Circuit explained that the third Jones v. Nuclear Pharmacy, Inc. factor did not weigh the value of the recovery against the defendant's net worth, but rather against the "possibility of some greater relief at a later time, taking into consideration the additional risks and costs that go hand in hand with protracted litigation."  11 F.3d at 1015.  The Tenth Circuit found that the district court had adequately weighed the settlement's value, by considering the defendants' exposure to liability in other lawsuits and the defendants' bankruptcy proceedings, which could reduce the amount of funds available for the class at a later date.  See 11 F.3d at 1015.  The Tenth Circuit explained that a district court need not conduct a "foray into the wilderness in search of evidence that might undermine the conclusion that the settlement is fair," but rather the district court must independently analyze the evidence before it when determining whether to approve a proposed settlement.  11 F.3d at 1015.  As such, the Tenth Circuit found that the district court had not abused its discretion in approving a class-action settlement, because the evidence before the district court showed that the settlement was in line with the Jones v. Nuclear Pharmacy, Inc. factors, and fair, even though the district court had not weighed defendants' ability to pay.  See 11 F.3d at 1015.

In DeJulius v. New England Health Care Emps. Pension Fund, the Tenth Circuit addressed the adequacy of class notice procedures.  It held that due process "does not require actual notice to each party intended to be bound by the adjudication of a representative action."  DeJulius v. New England Health Care Emps. Pension Fund, 429 F.3d at 944 (emphasis in original).  For due-process purposes, Tenth Circuit precedent focuses upon whether the district court gave "the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort."  In re Integra Realty Res., Inc., 262 F.3d at 1110.  With respect to the

settlement's fairness and reasonableness, the Tenth Circuit has held that a district court did not abuse its discretion in approving a class settlement from which an "extremely small percentage of class members opted out." Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1188.

In Robles v. Brake Masters Systems, Inc., No. 10-0135, 2011 U.S. Dist. LEXIS 14432 (D.N.M. Jan. 31, 2011)(Browning, J.), the Court granted in part and denied in part the parties' joint motion for approval of a class action settlement. See 2011 U.S. Dist. LEXIS at *1. The Court denied the distribution of an incentive award to the class representative. See 2011 U.S. Dist. LEXIS at *26. The Court held that the class representative was not entitled to an incentive award, because he did not put forth more effort or incur more risk than any other plaintiff. See 2011 U.S. Dist. LEXIS at *26. The Court found that, other than the incentive award, the class-action settlement was fair and approved the settlement agreement. See 2011 U.S. Dist. LEXIS at *51. Recently, the Court found that a settlement was unfair where the named plaintiffs, who were class representatives, received a large lump sum award of $30,000.00, but the rest of the class received a pro rata award of the remainder that could be as little as $1,066.38. See Lowery v. City of Albuquerque, No. CIV 09-0457, 2012 WL 394392, at *23 (D.N.M. 2012)(Browning, J.). The Court found troubling: (i) the disparity between the amount that the class representatives would receive, as opposed to the rest of the class; (ii) the set amount guaranteed to the class representatives; and (iii) that the amount for the class representatives decreased the award to the other class members and came out of the class fund rather than out of the attorneys' fees. See Lowery v. City of Albuquerque, 2012 WL 394392, at *24.

Another district court in the Tenth Circuit has found that a settlement is fair even though the class received no monetary award. See In Re Motor Fuel Temperature Sales Practices Litig., No. 07-MD-1840-KHV, 2012 WL 1415508 (D. Kan. April 24, 2012)(Vratil, J.). The court had preliminarily approved a settlement between Costco Wholesale Corp. and putative class of plaintiffs

who purchased fuel from Costco in twenty-six states.  See 2012 WL 1415508, at *5, *13.

Approximately 410 putative class members objected to the proposed settlement.  See 2012 WL

1415508, at *6.  Most objectors argued that the settlement was unfair, because it paid no money to

class members.  See 2012 WL 1415508, at *13.  Rather than a monetary award, the settlement

enjoined Costco Wholesale from selling fuel that did not adjust for temperature expansion, the

practice that allegedly caused plaintiffs' financial harm.  See 2012 WL 1415508, at *3, *12.

Nonetheless, the court found that the settlement's award of injunctive relief was fair, given the

uncertainty that plaintiffs could prove liability, and especially because establishing a method for

individual damages would be very difficult.  See 2012 WL 1415508, at *12.  The Court found that

the proposed settlement "fairly responded to plaintiffs' claims" and thus approved the settlement.

See 2012 WL 1415508, at *12, *16-*17.

## LAW REGARDING CLASS ACTIONS AND ATTORNEYS' FEES

"In a certified class action, the court may award reasonable attorneys' fees and nontaxable

costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  "The duty to

investigate the provisions of any proposed compromise or settlement of a class action 'includes the

obligation to explore the manner in which fees of class counsel are to be paid and the dollar amount

for such services.'" 7 Newberg, supra § 14:1, at 506-07.  "A request for attorneys' fees should not

result in a second major litigation.  Ideally, of course, litigants will settle the amount of a fee."

Hensley v. Eckerhart, 461 U.S. 424, 437(1983)(Powell, J.).  "In class actions, the district court has

broad authority over awards of attorneys' fees."  Law v. National Collegiate Athletic Ass'n, 4 F.

App'x. 749, 751 (10th Cir.2001)(unpublished)(citing Hayes v. Haushalter (In re FPI/Agretech Sec.

Litig.), 105 F.3d 469, 472 (9th Cir.1997)).  The Tenth Circuit has adopted a test that the United

States Court of Appeals for the Fifth Circuit adopted in Johnson v. Georgia Highway Express, Inc.,

which analyzes the following twelve factors: (i) the time and labor required; (ii) the novelty and difficulty of the question presented in the case; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment because of acceptance of the case; (v) the customary fee; (vi) whether the fee is fixed or contingent; (vii) any time limitations the client or circumstances imposed; (viii) the amount involved and the results obtained; (ix) the attorneys' experience, reputation, and ability; (x) the undesirability of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases.  See Gottlieb v. Barry, 43 F.3d at 483 & n. 4 (citing Johnson v. Georgia Highway Express, Inc., 488 F.2d at 717-19). "[R]arely are all of the Johnson factors applicable."  Uselton v. Commercial Lovelace Motor Freight, Inc., 9 F.3d 849, 854 (10th Cir.1993).  The Tenth Circuit has also noted that, while the simultaneous negotiation of attorneys' fees and costs and the merits is potentially troubling, courts have focused on the results of those negotiations and the overall fairness to the parties.  See In re Integra Realty Res., Inc., 262 F.3d at 1112.

## LAW REGARDING THE NECESSITY OF A JUDGMENT REDUCTION PROVISION IN A CLASS ACTION SETTLEMENT ORDER

A contribution bar order is a provision in a settlement that bars claims for contribution between settling defendants and non-settling defendants, where the contribution claims are based on, relate to, or arise out of the claims released in the settlement.  See New England Health Care Emps. Pension Fund v. Woodruff, 512 F.3d 1283, 1286 (10th Cir. 2008)(citing 15 U.S.C. § 78u-4). The Tenth Circuit has noted that contribution bar orders are "frequently upheld when they are sought by a settling defendant against a nonsettling defendant in the same case."  F.D.I.C. v. Geldermann, Inc., 975 F.2d 695, 698 (10th Cir. 1992).  In so stating, the Tenth Circuit cited to numerous opinions from other jurisdictions that have upheld such contribution bars:

-82-

> In re Masters Mates & Pilots Pension Plan and IRAP Litigation, 957 F.2d 1020,
> 1031-32 (2d Cir.1992)(holding contribution bar appropriate as a matter of federal
> common law of ERISA but refusing to allow bar where due process rights of third
> parties are not protected and relative fault is not considered); In re Jiffy Lube
> Securities Litigation, 927 F.2d 155, 160 (4th Cir.1991)(stating bar order appropriate
> in partial settlement of securities litigation, but vacating order because district court
> failed to specify setoff method to be used); Franklin v. Kaypro Corp., 884 F.2d 1222,
> 1229 (9th Cir.1989), cert. denied, 498 U.S. 890, 111 S. Ct. 232, 112 L. Ed. 2d 192
> (1990)(stating that contribution right is extinguishable and bar orders appropriate in
> securities class action); McDonald v. Union Carbide Corp., 734 F.2d 182, 184 (5th
> Cir.1984)(per curiam)(finding contribution bar appropriate where interests of
> remaining defendants are protected).

F.D.I.C. v. Geldermann, Inc., 975 F.2d at 698.  The PSLRA requires that a settlement include a

contribution bar order, in accordance with Section 21D:

> (7) Settlement discharge
>
>> (A) In general
>>
>>> A covered person who settles any private action at any time before
>>> final verdict or judgment shall be discharged from all claims for
>>> contribution brought by other persons. Upon entry of the settlement
>>> by the court, the court shall enter a bar order constituting the final
>>> discharge of all obligations to the plaintiff of the settling covered
>>> person arising out of the action. The order shall bar all future claims
>>> for contribution arising out of the action–
>>>
>>> (i) by any person against the settling covered person; and
>>>
>>> (ii) by the settling covered person against any person, other than a
>>> person whose liability has been extinguished by the settlement of the
>>> settling covered person.

15 U.S.C.A. § 78u-4(f)(7)(A).

In a pre-PSLRA case, the Tenth Circuit ruled that "orders barring contribution claims are

permissible only because a court or jury has or will have properly determined proportional fault and

awarded the equivalent of a contribution claim, not because of the compensatory award alone."

TBG, Inc. v. Bendis, 36 F.3d 916, 923 (10th Cir. 1994).  The Tenth Circuit held that the bar order

at issue was beyond the district court's power to grant, because the bar order did not protect the "[d]efendants['] . . . federal right to contribution in Rule 10b-5 actions." 36 F.3d at 923. This holding is consistent with the right to contribution prescribed in the PSLRA:

> (8) Contribution
>
>> A covered person who becomes jointly and severally liable for damages in any private action may recover contribution from any other person who, if joined in the original action, would have been liable for the same damages. A claim for contribution shall be determined based on the percentage of responsibility of the claimant and of each person against whom a claim for contribution is made.

15 U.S.C. § 78u-4(f)(8).[29] Further, the PSLRA provides for "[p]roportionate liability," such that: "a covered person against whom a final judgment is entered in a private action shall be liable solely for the portion of the judgment that corresponds to the percentage of responsibility of that covered person . . . ." 15 U.S.C. § 78u-4(f)(2)(B). The PSLRA contemplates that a jury will determine each covered person's proportionate share of liability. See 15 U.S.C. § 78u-4(f)(3). To protect the defendants settling a securities action, and protect the contribution rights of non-settling parties, the PSLRA provides for a "Reduction":

> (B) Reduction
>
>> If a covered person enters into a settlement with the plaintiff prior to final verdict or judgment, the verdict or judgment shall be reduced by the greater of--
>>
>>> (i) an amount that corresponds to the percentage of responsibility of that covered person; or

---

[29]A "covered person" means: (i) a defendant in any private action arising under this chapter; or (ii) a defendant in any private action arising under section 77k of this title, who is an outside director of the issuer of the securities that are the subject of the action . . . .

15 U.S.C.A. § 78u-4(4)(f)(10(C)(i). Section 77k of the Securities Act provides for civil liability on account of a false registration statement in the acquisition of a security. See 15 U.S.C. 77k (2012).

-84-

(ii) the amount paid to the plaintiff by that covered person.

15 U.S.C.A. § 78u-4(f)(7)(B).  See 7 Newberg, supra, § 12:18, at 325 ("When one of the defendants offers to settle with the class, . . . [t]he nonsettling defendants in these circumstances are entitled to credit any aggregate judgment against them with the value of the settlement proceeds paid by the settling defendant to the class.").

After the passage of the PSLRA, the Tenth Circuit has not held that settlement containing a contribution bar order must explicitly provide for a judgment reduction.  On the other hand, the Tenth Circuit has held that a non-settling defendant has standing to challenge a settlement which purports to bar his rights to contribution and indemnification, without providing a judgment reduction.  See New England Health Care Emps. Pension v. Woodruff, 512 F.3d at 1288-89, 1291 (stating that, because "both Bar Orders strip [the non-settling defendants] of their contribution and indemnification rights, in addition to certain independent claims," the non-settling defendants' had standing to object to proposed settlement).  The Tenth Circuit stated that, "[a]s fail-safe protection for [the settling defendant], Plaintiffs, in addition to obtaining a release from [the non-settling defendants], must lower any agreed settlement amount by the indemnity amount [the non-settling defendants] could receive from [the settling defendant]," because the settlement made "it impossible for [the non-settling defendants] to receive any indemnification from a settlement with Plaintiffs." 512 F.3d at 1289.[30]  Although the particular issue before the Tenth Circuit was whether the non-

_____

[30]The non-settling defendants' indemnification rights in New England Health Care Emps. Pension Fund v. Woodruff were based in contract and not on the PSLRA's judgment reduction provision.  See 512 F.3d at 1285.  The contribution bar order was included in the judgment "as required by Section 21D of the Private Securities Litigation Reform Act of 1995." 512 F.3d at 1285. Because the Tenth Circuit ruled on the relationship between a contribution bar order under the PSLRA, and the preexisting rights of non-settling parties to contribution and indemnification, the Tenth Circuit's holding is applicable when a contribution bar order extinguishes a contribution right

settling defendants in <u>New England Health Care Emps. Pension Fund v. Woodruff</u> had standing to challenge the settlement because it interfered with their contribution and indemnification rights, the Tenth Circuit's reasoning that settlement which contains a contribution bar order under the PSLRA should protect non-settling defendants contribution or indemnification rights is in line with the PSLRA's requirement for a judgment reduction proportionate to a settling defendant's liability for damages caused.  <u>See</u> 512 F.3d at 1285;15 U.S.C.A. § 78u-4(f)(7)(B).

## ANALYSIS

The Court will grant the Plaintiffs' request to certify the Class for settlement purposes.  The Court finds that Settlement is, on the whole, and under the circumstances, fair and reasonable.  The Court will approve the Settlement, if it provides for a second distribution of the uncashed checks to the Class members who cashed their checks in the first distribution.  This revision to the Settlement will address many of the individual objectors' concerns as to the size of the Settlement Fund. Additionally, the Settlement should contain a judgment reduction provision, so that the Underwriter Defendants may offset a future award against them by the amount of the Settlement, to the extent the Underwriter Defendants would, but for the Settlement, be able to seek contribution or indemnification from the Released Parties.

The Court finds that the factors used to assess Co-Lead Counsel's request for attorneys fees, articulated in <u>Johnson v. Georgia Highway Express, Inc</u>, weigh in favor of approving the requested attorneys' award.  Further, Co-Lead Counsel have reduced their requested award by five-percent in light of the individual objections to the award.  Accordingly, the Court finds that the requested award of fees and expenses is reasonable, and the Court overrules individual objections thereto.

without providing for an offset in another form, whether the preexisting right to contribution existed under the PSLRA or under another contractual relationship.

I.     **COURT WILL OVERRULE THE BERMAN OBJECTION AND CERTIFY THE
       CLASS FOR SETTLEMENT.**

The Settling Parties conditionally stipulate, for the purposes of the Stipulation and proposed

Settlement, that the litigation shall be certified for class treatment under rule 23.  See Stipulation at

8.

"[T]he United States Court of Appeals for the Tenth Circuit has endorsed class actions as

an appropriate means to resolve claims under the federal securities laws." Lerner v. Haimsohn, 126

F.R.D. at 65 (citing T.J. Raney & Sons, Inc. v. Fort Cobb, Okla. Irrigation Fuel Auth., 717 F.2d

1330).  See In re Ribozyme Pharms., Inc. Sec. Litig., 205 F.R.D. at 577 ("In general, class actions

are the favored method of litigating securities fraud actions in which numerous plaintiffs are

involved."); City P'ship Co. v. Jones Intercable, Inc., 213 F.R.D. at 581; Schwartz v. Celestial

Seasonings, 178 F.R.D. at 550; 7 Newberg, supra § 22:1, at 4-5 ("Actions under the federal

securities laws are particularly well suited for representative litigation under Rule 23 . . . .").  The

Plaintiffs allege violations of both the Securities Act and the Exchange Act, making the action

within those that are favored for class treatment.  See Pellman v. Cinerama, Inc., 89 F.R.D. at 390.

A.     **THE CLASS IS SO NUMEROUS THAT JOINDER OF ALL MEMBERS IS
       IMPRACTICABLE.**

The Court finds that the joinder of all potential members of the class is impracticable.  See

Fed R. Civ. P. 23(a)(1).  Co-Lead Counsel estimates the class numbers in the "thousands,"

consisting of all persons who purchased shares of Thornburg Mortgage stock at artificially inflated

prices from April 19, 2007, to March 19, 2008.  Joint Decl. ¶ 49, at 28.  At the time of the hearing,

8,000 claims from putative class members had been received.  See Tr. at 23:24-25 (Court,

Manifold).  See Mullen v. Treasure Chest Casino, L.L.C., 186 F.3d at 624 (finding that proposed

Class consisting of "100 to 150 members -- is within the range that generally satisfies the

numerosity requirement"); <u>Bittinger v. Tecumseh Prods. Co.</u>, 123 F.3d at 884 n.1 (rejecting as "frivolous" the "content[ion] that Plaintiffs failed to address the issue of whether joinder of all [1,100] members of the class [wa]s impracticable"); <u>Robidoux v. Celani</u>, 987 F.2d at 936 ("[T]he difficulty in joining as few as 40 class members should raise a presumption that joinder is impracticable."); <u>Harrington v. City of Albuquerque</u>, 222 F.R.D. at 509 (certifying a class of 300 members); <u>Yazzie v. Ray Vicker's Special Cars, Inc.</u>, 180 F.R.D. 411, 415 (D.N.M. 1998)(Vázquez, J.)(certifying a class of approximately 210 persons who pawned their vehicles with an auto pawn business in Farmington, New Mexico); <u>Olenhouse v. Commodity Credit Corp.</u>, 136 F.R.D. 672, 679 (D. Kan. 1991)(holding that joinder is shown to be impracticable where the class to be represented consisted of at least 50 members).

Moreover, many of the Class members possessed modest holdings of Thornburg Mortgage stock.  The burdens and costs of bringing separate actions outweigh the incentives for each Class member to join in this action.  <u>See</u> <u>Phillips Petroleum Co. v. Shutts</u>, 472 U.S. 797, 809 (1985)("Class actions also may permit Plaintiffs to pool claims which would be uneconomical to litigate individually.").  In light of the large number of Class members, their relatively small individual damages, and the unlikelihood of Class members seeking redress on an individual basis, this action satisfies Rule 23(a)(1).

## B.   THERE ARE QUESTIONS OF LAW AND FACT COMMON TO THE CLASS.

The commonality requirement is also satisfied.  <u>See</u> Fed. R. Civ. P. 23(a)(2).  "[F]actual differences in the claims of the individual class members should not result in a denial of class certification where common questions of law exist." <u>In re Intelcom Group Sec. Litig.</u>, 169 F.R.D. at 148.  "That the claims of individual class members may differ factually should not preclude

certification under Rule 23(b)(2) of a claim seeking the application of a common policy." <u>Adamson v. Bowen</u>, 855 F.2d at 676 (plaintiffs challenged the Secretary of Health and Human Services policy of nonacquiescence to laws of the Tenth Circuit proscribing the weight to be given to reports of treating physicians in social security disability cases). "Commonality requires only a single issue common to the class, and the fact that 'the claims of individual class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'" <u>Lopez v. City of Santa Fe</u>, 206 F.R.D. at 289 (citations omitted). "The commonality requirement has been applied permissively in securities fraud litigation." <u>In re Initial Pub. Offering Sec. Litig.</u>, 227 F.R.D. at 87. "Securities cases often involve allegations of common courses of fraudulent conduct, which can be sufficient to satisfy the commonality requirement." Moore, Coquillette, Joseph, Vairo, Solovy & Schreiber, <u>supra</u> § 23.23[4][b], at 23-77. "Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met." <u>In re Oxford Health Plans, Inc. Sec. Litig.</u>, 191 F.R.D. at 374. <u>Accord</u> <u>Initial Pub. Offering</u>, 227 F.R.D. at 87 ("In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied.").

The Plaintiffs assert that the Settling Defendants "acted knowingly or with recklessness in issuing materially false or misleading statements and/or failing to disclose material facts concerning the [Thornburg Mortgage's] business and financial condition between April 19, 2007 and March 19, 2008," thereby causing the Class members to purchase Thornburg Mortgage stock at an artificially inflated price, and for this damage, the Class Members seek the same relief under the same provisions of the federal securities laws. CACAC ¶ 2, at 8. <u>See</u> <u>Pellman v. Cinerama, Inc.</u>, 89 F.R.D. at 389 (finding it significant for purposes of commonality that plaintiffs' Section14(a)

"claims turn upon one document sent to all shareholders, rather than upon a multiplicity of acts or communications"). The Plaintiffs' "claims involve a common scheme affecting the entire class[,] which is the hallmark of securities fraud actions that are certified as class actions." In re Intelcom Group Sec. Litig., 169 F.R.D. at 148. The Plaintiffs assert claims common to all members of the proposed Class, including: (i) a claim for violation of Section 10(b) of the Exchange Act and rule 10b-5 against Thornburg Mortgage and the Individual Defendants; (ii) a claim for violation of Section 20(a) of the Exchange Act against the Individual Defendants; (iii) a claim for violation of Section 11 of the Securities Act against Thornburg Mortgage, the Individual Defendants, the Director Defendants, and the Underwriter Defendants; and (iv) a claim for violation of Section 15 of the Securities Act against the Individual Defendants. See CACAC at ¶ 442, at 148; id. ¶ 456, at 151; id. ¶ 540, at 174; id. ¶¶ 548-550, at 177. The Court thus finds "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).

### C.   THE PLAINTIFFS' CLAIMS ARE TYPICAL OF THE CLASS' CLAIMS.

The Court finds that the Plaintiffs' claims satisfy Rule 23(a)(3)'s requirement that "the claims . . . of the representative parties are typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement ensures that absent Class members are adequately represented by evaluating whether the class representative's interests are sufficiently aligned with the class's interest. See Baby Neal for & by Kanter v. Casey, 43 F.3d at 57; Nicodemus v. Union Pac. Corp., 204 F.R.D. at 490. The essential characteristics of the class representative's claims must be the same or similar as the class' claims, but they need not be identical. The Tenth Circuit has affirmed that factual differences among some of the Class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d at 676. See Penn v. San Juan Hosp., Inc.,

528 F.2d at 1189 ("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of Plaintiffs and the other class members are based on the same legal or remedial theory."). "So long as there is a nexus between the class representatives' claims . . . and the common questions of fact or law which unite the class, the typicality requirement is satisfied." Neiberger v. Hawkins, 208 F.R.D. at 315.  See Milonas v. Williams, 691 F.2d at 938 ("[E]very member of the class need not be in a situation identical to that of the named plaintiff.").  The Plaintiffs' claims have a close nexus with those of the proposed Class; both the Plaintiffs and the proposed Class challenge certain affirmative statements or omissions that were allegedly materially misleading, made by the Settling Defendants regarding the financial condition of Thornburg Mortgage during the Class Period.  These claims are brought under the same provisions of the federal securities laws which Class members would use to allege their claims, and the Plaintiffs allege that they suffered the same harm as the Class by the Settling Defendant's statements or omissions.

Specifically, the dispositive questions of law and fact upon which the Plaintiffs' claims rest are identical to those upon which the claims of the other Class members depend, namely:

> (i) whether the federal securities laws were violated by the Defendants; (ii) whether Thornburg Mortgage and the Individual Defendants engaged in a fraudulent scheme and omitted and/or misrepresented material facts; (iii) whether Thornburg Mortgage and the Individual Defendants knew or recklessly disregarded that their statements were materially false and/or misleading; (iv) whether the prices of Thornburg Mortgage common stock and Thornburg Mortgage preferred stock were artificially inflated during the Class Period; and (v) whether Thornburg Mortgage and the Individual Defendants' fraudulent scheme, misrepresentations and omissions caused Class Members to suffer economic losses, *i.e.* damages, the extent of those damage and the appropriate measure of damages, if any.

Joint Decl. ¶ 49, at 28.  Moreover, "the Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact." Gianzero v. Wal-Mart Stores Inc., 2010 WL

1258071, at *3 (citing <u>Milonas v. Williams</u>, 691 F.2d at 938; <u>Adamson v. Bowen</u>, 855 F.2d at 676).

"Plaintiffs purchased or otherwise acquired Thornburg Mortgage common and/or preferred stock

in the open market and/or in or traceable to the Offerings during the relevant period, and as a result

of the Defendants' alleged conduct, suffered damages."  Joint Decl. ¶ 49, at 28.  The Court thus

finds that the Plaintiffs' claims or defenses "are typical of the claims or defenses of the class."  Fed.

R. Civ. P. 23(a)(3).

### D.     THE PLAINTIFFS WILL FAIRLY AND ADEQUATELY REPRESENT THE CLASS' INTERESTS.

The Court finds that the Plaintiffs have, and will continue to, fairly and adequately represent

the class in this settlement.  To protect the due-process interests of unnamed Class members – who

are bound by any judgment in the action -- rule 23(a)(4) requires that the named representative

provide fair and adequate protection for the class' interests.  <u>See</u> <u>Matsushita Elec. Indus. Co. v.</u>

<u>Epstein</u>, 516 U.S. at 379 n.5 (characterizing adequacy of representation as a constitutional

requirement); <u>Lile v. Simmons</u>, 143 F. Supp. 2d at 1277 ("Due process requires that the Court

'stringently' apply the competent representation requirement because class members are bound by

the judgment (unless they opt out), even though they may not actually be aware of the

proceedings.").  "The requirement of fair and adequate representation is perhaps the most important

of the criteria for class certification set forth in Rule 23(a) . . . ."  <u>Miller ex rel. S.M. v. Bd. of Educ.</u>,

455 F. Supp. 2d at 1294.  <u>See</u> <u>Cobb v. Avon Prods., Inc.</u>, 71 F.R.D. at 654 ("Adequacy of the

representative is of monumental importance since representation demands undiluted loyalty to the

class interests . . . .").  The Tenth Circuit has identified two questions relevant to the adequacy of

representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with

other Class members; and (ii) will the named plaintiffs and their counsel vigorously prosecute the

action on behalf of the class.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88.

In considering this second question, the experience and competence of the attorney representing the

class may inform the court's analysis.  See Lopez v. City of Santa Fe, 206 F.R.D. at 289-90.  "Any

doubt regarding adequacy of representation should be resolved in favor of . . . upholding the class."

Schwartz v. Celestial Seasonings, Inc., 178 F.R.D. at 552.  Accord Neiberger v. Hawkins, 208

F.R.D. at 316.

        The Plaintiffs interests are aligned with the proposed Class, and the Court has no information

which might lead it to believe that the Plaintiffs could be antagonistic to the interests of the proposed

Class.  Furthermore, the Plaintiffs have vigorously prosecuted this action on behalf of the class, as

the Plaintiffs successfully defended their claims through a motion to dismiss, and successfully

reached a settlement with the Settling Defendants.  Additionally, Co-Lead Counsel are attorneys

with expertise in the field of complex class-action litigation, and the Court has recognized that the

attorneys have put forward consistently high-quality work on behalf of the proposed Class.  See Tr.

at 71:24-72:1 (Court)("I appreciate the high quality of work which you are always giving me and

for the hard work that you've always done on this case.").  See also Kessler, Topaz, Meltzer &

Check, LLP Firm Biography at 8-12,[31] filed July 23, 2012 (noting the firm's success in securities

fraud litigation over the last ten years, and highlighting that the firm secured multiple recoveries

over $100 million for its clients) ; Wolf, Haldenstein, Adler, Freeman & Herz LLP Firm Resume

_____

        [31]Kessler, Topaz, Meltzer & Check LLP's Firm Biography was filed, with multiple other
documents in support of the firms' request for attorneys' fees, as Doc. 393-3.  The Court's page
number references are to the page numbers included with the electronic filing of Doc. 393-3 and are
located in the upper-right-hand corner.

at 4-7,[32] filed July 23, 2012 (Doc. 292-5)(highlighting from judicial opinions that recognize the firm's excellence in litigating cases and securing settlement for its clients).  The quality of the attorneys thus weighs in favor of approving the Plaintiffs as class representatives.  The Court therefore finds that the Plaintiffs will adequately represent the proposed Class in this settlement.

### E.    RULE 23(b)(3)'s REQUIREMENTS ARE SATISFIED.

The Plaintiffs seek class certification of this case under rule 23(b)(3), which permits "class actions for damages designed to secure judgments binding all class members save those who affirmatively elected to be excluded."  Amchem Prods. v. Windsor, 521 U.S. at 614-15.  The Settling Defendants do not dispute that the Class satisfies rule 23(b)(3)'s requirements.  Under this subsection of rule 23, the Court must find that: (i) the questions of law or fact common to class members predominate over any questions affecting only individual members; and (ii) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  See Fed. R. Civ. P. 23(b)(3).  The Court finds that both of these requirements are satisfied here.

### 1.    Common Questions of Fact and Law Predominate.

In Amchem Products. v. Windsor, the Supreme Court held that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud."  521 U.S. at 625.  See Basic Inc. v. Levinson, 485 U.S. 224, 250 (1988)("It is not inappropriate to apply a presumption of reliance supported by the fraud-on-the-market theory[;] [t]hat presumption, however, is rebuttable.");  7 Newberg, supra, § 22:55, at 248-49 ("In most cases, common issues of liability are deemed to predominate even when reliance and damages issues must be individually proved.").  For many of

---

[32]Wolf, Haldenstein, Adler, Freeman & Herz LLP's Firm Biography was filed, with multiple other documents in support of the firms' request for attorneys' fees, as Doc. 393-5.  The Court's page number references are to the page numbers included with the electronic filing of Doc. 393-5 and are located in the upper-right-hand corner.

the same reasons that the class satisfies the commonality requirement, the Court finds that rule 23(b)(3)'s predominance standard is satisfied, as these numerous common questions predominate over any perceived or potential individual issues.  See Amchem Prods. v. Windsor, 521 U.S. at 625. Specifically, the Plaintiffs' allegations present questions of law and fact common to members of the proposed Class, including:

> (i) whether the federal securities laws were violated by the Defendants; (ii) whether Thornburg Mortgage and the Individual Defendants engaged in a fraudulent scheme and omitted and/or misrepresented material facts; (iii) whether Thornburg Mortgage and the Individual Defendants knew or reckless disregarded that their statements were materially false and/or misleading; (iv) whether the prices of Thornburg Mortgage common stock and Thornburg Mortgage preferred stock were artificially inflated during the Class Period; and (v) whether Thornburg Mortgage and the Individual Defendants' fraudulent scheme, misrepresentations and omissions caused Class members to suffer economic losses, *i.e.* damages, the extent of those damage and the appropriate measure of damages, if any.

Joint Decl. ¶ 49, at 28.  The common questions are many.  The only individual question appears to be damages.  The courts have frequently said that individual questions of damages is not enough to defeat class certification in securities cases.  See, e.g., J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1298 (10th Cir. 1999)(noting that the "predomination requirement makes sense in a Rule 23(b)(3) context because these cases generally involve highly individualized claims or require an individualized plaintiff-by-plaintiff determination of money damages"); Esplin v. Hirschi, 401 F.2d 94, 100 (10th Cir. 1968)(noting that, even though individual class members may be required to prove their damages after class certification, "[t]he fact that questions peculiar to each individual may remain after the common questions have been resolved does not dictate the conclusion that a class action is not permissible").  Accordingly, the Court finds that common questions addressed by the settlement predominate over any individual questions.

2.      **A Class Action is Superior to Other Methods for Resolving This Dispute.**

"[T]he superiority of class actions in large securities fraud is well recognized."   In re
Intelcom Group Sec. Litig., 169 F.R.D. at 149.  The Plaintiffs allege that the Settling Defendants
made materially false or misleading statements regarding Thornburg Mortgage's financial condition,
which may have been part of a fraudulent scheme that caused economic harm to Class members.
Under these circumstances, class action treatment is superior to a possible multiplicity of separate
actions.  As the Honorable Chief Judge Babcock, United States District Judge for the District of
Colorado stated when certifying a class in a securities case:

> [T]he class action device is a superior vehicle for adjudicating this case.  Securities
> fraud actions of this type involve geographically disbursed plaintiffs and involve
> such costs that if this litigation was not brought via class action, the costs of
> litigation would likely outweigh any benefit obtained.  Through the class action
> device, I will be able to manage the issues effectively and efficiently and ensure a
> speedy resolution to all issues involved.

In re Ribozyme Pharms., Inc. Sec. Litig., 205 F.R.D. at 579.  Accord Queen Uno Ltd. P'ship v.
Coeur D'Alene Mines Corp., 183 F.R.D. 687, 695 (D. Colo. 1998).  Moreover, class certification
in this case presents substantial efficiencies of time and expense to all parties involved.  See Phillips
Petroleum Co. v. Shutts, 472 U.S. at 809 ("Class actions also may permit Plaintiffs to pool claims
which would be uneconomical to litigate individually.").

> First, relitigation of the same issues and presentation of the same evidence in
> hundreds of individual actions . . . would be grossly inefficient and wasteful of
> judicial resources.  Second, maintenance of individual actions would be prohibitively
> expensive.  Many of the crucial issues in this case will require substantial discovery,
> expert testimony, and trial time, all of which would render uneconomical individual
> actions.

In re Intelcom Group Sec. Litig., 169 F.R.D. at 149 (internal quotation marks and citation omitted).

The Court thus finds that allowing this action to proceed as a class is superior under rule 23(b)(3).

See City P'ship v. Jones Intercable, Inc., 213 F.R.D. at 590 (finding superiority requirement for class

certification was satisfied in securities fraud suit based on false and misleading statements in proxy statements).

### 3.    The Court Will Overrule the Bermans' Objection.

The Court must be particularly vigilant when certifying a class for settlement, because there will not be an opportunity for trial to shape the class.  See Anchem Prods., Inc., v. Windsor, 521 U.S. at 620 (noting that a district court must give "undiluted" and "heightened" attention to rule 23 requirements when certifying a class for settlement purposes, as a court is not afforded an opportunity at trial to let the litigation shape the class).  The Bermans object to the Class Period and argue that the "price run-up phenomenon" in the stock prices before the beginning of the Class Period should be included.  See Berman Letter at 1.   Co-Lead Counsel argues that the Bermans' objection is meritless, as extending the Class Period would extend the period beyond that which the securities laws allow.  See Tr. at 40:2-12 (Manifold).

The Bermans do not offer a legal theory to support their claim that a "price run-up phenomenon" could be the result of an as-of-yet unmade misleading or false statement regarding the financial situation of Thornburg Mortgage.[33]  Although the "run-up" phenomenon may be "well-known," as the Bermans claim, such a phenomenon does not show that the Settling Defendants should be liable based on a material misrepresentation, as the Bermans allege that a misrepresentation was not made during the "run-up" period.  Berman Letter at 1.  The Plaintiffs' claims are all based upon the materially misleading or omitted aspects in the Settling Defendants

---

[33]The Bermans assert that a "price run-up phenomenon . . . . is a well-known practice in the Securities industry" which occurs when "intensified 'Investor Relations' activity is undertaken prior to a stock offering" and the result of this investor activity is a price run-up of a corporation's stocks, as the Bermans assert occurred with Thornburg Mortgage stock before the Class Period.  Berman Letter at 1.

and Released Parties' affirmative statements during the Class Period.  To extend their theory of recovery beyond the Class Period would thus require the Plaintiffs to change their cause of action. See CACAC ¶¶ 2-3, at 8-9 (alleging that the basis for the Plaintiffs' causes of action arises from "materially false or misleading statements and/or failing to disclose material facts concerning [Thornburg Mortgage's] business and financial condition [during the Class Period] . . . .").  The Plaintiffs' causes of action require the existence of a materially false or misleading statement to trigger liability on behalf of the Settling Defendants.  To satisfy the elements of proving liability under rule 10b-5 of the Exchange Act, a plaintiff must first show that a defendant made a "material misrepresentation . . . in connection with the purchase or sale of a security."  SEC v. Maxxon, Inc., 465 F.3d 1174, 1178 (10th Cir. 2006)(delineating the elements for a cause of action under rule 10b-5 of the Exchange Act).  Additionally, Section 11 of the Securities Act provides for a cause of action if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  Thus, because the Bermans have not shown that a materially false or misleading statement existed at the time which they desire the Class Period to cover, their claims are not within the Class' causes of action.

The Court is not commenting on whether the Settling Defendants have any liability to the Bermans.  The Court only states that the Bermans' claim does not fall within those that are under the legal theories brought forth by the Plaintiffs, and thus including the Bermans' claim would require the Plaintiffs to allege a new cause of action.

The Court finds, therefore, that the Bermans' purchases of Thornburg Mortgage stock do not fall within those that are common in law or fact to those of the proposed Class, and including the Bermans' purchase in the Class Period would weigh against certifying the class.  The Court will thus

overrule the Bermans' objection.  To a considerable extent, the Plaintiffs and their counsel are masters of this case; if they do not want to have a bigger class action, they do not have to litigate a case that they do not want to litigate, or do not think is legally or factually sound.  It is not a sound objection to say that the case should have been bigger.  The Bermans present no reason for Plaintiffs to bring claims for the Bermans' alleged damages, other than so that the Bermans may recover before any remaining funds before they are exhausted.  If, however, the Bermans were concerned with that possibility, they should have petitioned the Class earlier to not waste the assets now exhausted in this Settlement, or brought their own claims in a separate lawsuit.

The Court finds that the requirements in rule 23 are satisfied, because common questions of law and fact predominate the allegations, and a class action will efficiently handle the complex securities issues that the allegations raise.

## II.   THE COURT WILL APPROVE THE SETTLEMENT IF THE DISTRIBUTION METHOD IS CHANGED.

The objectors argue, generally, that the proposed Settlement amount is too small.  See Crane Letter at 1, Wildner Letter at 1, Reed Letter at 1, Melfi Letter at 2.  The Underwriter Defendants argue that the settlement should include a "judgment reduction provision," so that the Settlement awarded against the Settling Defendants will offset any verdict against the Underwriter Defendants.  Underwriter Objection at 4.  The Settling Defendants do not dispute that the Underwriter Defendants are entitled to such a set-off; rather, they believe that the judgment reduction provision need not be included in a settlement order.  See Electronic Mail Transmission from Christopher Nelson to Jonathan Dickey at 1, sent May 16, 2012 at 2:03pm, filed May 18, 2012 (Doc. 388-1)("Nelson E-Mail").  With respect to the individual objectors, the Plaintiffs assert that the objections to the size of the Settlement Fund are "meritless."  Supplemental Memorandum at 6.

A district court considering a proposed Class-action settlement must determine whether the proposed settlement is fair, reasonable, and adequate. See In re Integra Realty Res., Inc., 354 F.3d at 1266. The Tenth Circuit, in Jones v. Nuclear Pharmacy, Inc., established a four-factor test for assessing whether a proposed settlement is fair, reasonable, and adequate, which includes: (i) whether the proposed settlement was fairly and honestly negotiated; (ii) whether serious questions of law and fact exist placing the ultimate outcome of the litigation in doubt; (iii) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (iv) the parties' judgment that the settlement is fair and reasonable. See 741 F.2d at 324. Analyzing these factors and the Settlement, the Court concludes that the Settlement is reasonable, but that the allocation of the Settlement Fund may be changed to make the award more adequate for Class members. The Court also believes that the Settlement will be fair if a judgment reduction provision is included, especially because the Settling Parties do not object to the Underwriter Defendants' right to a judgment set-off. The Court will thus approve the Settlement, provided certain revisions are included. The Court cannot force the Settling Parties to accept these revisions. If these revisions are not added, the parties are free to negotiate another settlement that may satisfy the Court's inquiry as fair, reasonable, and adequate, or proceed to trial.

## A.   THE COURT FINDS THAT THE SETTLEMENT WAS FAIRLY AND HONESTLY NEGOTIATED.

When examining whether a settlement was fairly and honestly negotiated, district courts within the Tenth Circuit often examine whether the parties "have vigorously advocated their respective positions throughout the pendency of the case." Wilkerson v. Martin Marietta Corp., 171 F.R.D. 273, 284 (D. Colo. 1997). The Court is also concerned with the protection of Class members whose rights may not have been given "adequate consideration during the settlement negotiations."

Childs v. Unified Life Ins. Co., No. 10-CV-23-PJC, 2011 WL 6016486, at *12 (N.D. Okla. Dec. 2, 2011)(citing Wilkerson v. Martin Marietta Corp., 171 F.R.D. at 283).

      The Settling Parties have informed the Court that the Settlement resulted from extensive, arms'-length and non-collusive negotiation between capable counsel, all of whom are experienced class-actions securities attorneys.  See Joint Decl. ¶ 33, at 20; Tr. at 55:2-9 (Shapiro)(Settling Defendants describing the Settlement as "an arm's length negotiated settlement, but it's also a settlement that's the produce of an informed arm's length negotiation.").  Co-Lead Counsel conducted a thorough review of the alleged claims, which required review of "voluminous public documents" pertaining to Thornburg Mortgage's public offerings and to the other Defendants in this action.  Joint Decl. ¶ 33, at 20.  Co-Lead Counsel worked through 5,000 to 10,000 pages of documents from the Thornburg Mortgage's bankruptcy proceedings and insurance policies in preparing to litigate this case.  See Tr. at 13:11-15 (Manifold).  Co-Lead Counsel informs the Court that they engaged in "rigorous and protracted negotiations process with counsel for the Settling Defendants," during which both sides zealously advocated for their respective positions throughout the course of the settlement.  Joint Decl. ¶ 33, at 20.  Negotiations such as those that occurred here, which were hard-fought over an extended period of time, support a finding that the agreements were reached at arms' length.  Further, the Court believes that adequate consideration is given to Class members who hold even a small interest in the Thornburg Mortgage stocks at play, because the Court has not approved the requirement in the Settlement that claims be above $10.00 for the Class member to be able to recover.  See Order at 16.  The Court thus finds that the Settlement, as the Plaintiffs assert, is the result of a fair and honest negotiations.

**B.      SERIOUS QUESTIONS OF LAW AND FACT EXIST THAT PUT THE ULTIMATE OUTCOME OF THE LITIGATION IN DOUBT.**

No party or objector asserts that success on the merits would be anything but difficult. Although the Plaintiffs survived a motion to dismiss, "that ruling provides no guarantee that the [plaintiff] will ultimately prevail on the merits." McNeely v. Nat'l Mobile Health Care, LLC, 2008 WL 4816510, at *13.   Furthermore, the Settling Defendants have repeatedly asserted that the Plaintiffs' claims lack merit, and the Settling Parties disagree on many factual and legal issues, making the likelihood of prevailing at trial problematic for the Plaintiffs.  See Joint Decl. ¶ 37, at 22.

The Court agrees with the Settling Parties that whether the Plaintiffs would have prevailed on the merits is questionable.  Following the Court's dismissal of the Securities Act claims, the Plaintiffs' remaining claims were based entirely on the falsity of three statements that Goldstone made, thus the scope of claims which could yield relief is narrow.   See CACAC at ¶ 442, at 148; id. ¶ 456, at 151; id. ¶ 540, at 174; id. ¶¶ 548-550, at 177.   Additionally, prevailing against the Settling Defendants would require the Plaintiffs to prove loss causation based on three allegedly false and misleading statements, a "difficult task."  In re Daou Sys., Inc., 411 F.3d 1006, 1026 (9th Cir. 2005).  Damages in this case, as is common in securities class actions, would likely have been reduced to a "battle of the experts," and "it is virtually impossible to predict with any certainty which testimony would be credited."   In re Warner Commc'ns Sec. Litig., 618 F. Supp. at 744.  It is evident from this case's long and complex history that any jury trial could have resulted in many different outcomes, and that a class victory was uncertain.  There were numerous factual and legal questions yet to be addressed in the litigation.

The Court, before it went on the bench, litigated many securities class actions, both on the

plaintiffs' side and on the defendants' side.  It took one to trial which lasted a month.  These are very difficult cases to try, and the Court, as a lawyer, did not always win.  There are many hurdles -- both legal and factual -- to overcome, not the least of which are great attorneys on the defense side.  The suggestion that the Court should force an experienced, seasoned Plaintiffs' class counsel to take the case to trial should not be made lightly, for victory is not assured or even likely except in the very best of cases.  This case is not the best of cases.  This case is one that has gone south in many respects.

### C.    THE VALUE OF IMMEDIATE RECOVERY OUTWEIGHS THE MERE POSSIBILITY OF FUTURE RELIEF.

There is an "overriding Public interested in settling class action litigation," In re Pet Food Prods. Liability Litig., 629 F.3d 333, 351 (3d Cir. 2010), especially where "substantial judicial resources can be conserved by avoiding formal litigation," Ehrheart v. Verizon Wireless, 609 F.3d 590, 595 (3d Cir. 2010).  This litigation has been pending for five years, and all parties have incurred significant expenses in pursuing the litigation thus far.  Pursuing the litigation further would require significant judicial and party resources to complete motions for summary judgment, motions under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993),[34] and motions in limine.  Any of those decisions could then be appealed to the Tenth Circuit along with any jury verdict that might be returned.  See Feerer v. Amoco Prod. Co., 1998 U.S. Dist. LEXIS 22248, at *30 ("[E]ven if a favorable jury verdict had been obtained, inevitably an appeal would have followed and, conservatively, would have resulted in a delay of, at least, two years before any relief would have

---

[34]In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court of the United States held that the Federal Rules of Evidence assign to the trial judge the task of ensuring that scientific evidence is sufficiently reliable such that it will assist a trier of fact.  See 509 U.S. at 592-94.

been available to the class.").  Moreover, given the vigorous nature of the litigation thus far, the Court believes that the pre-trial motions would be numerous and time-consuming.

Additionally, without the Settlement, there is no guarantee that there will be funds available to satisfy any jury verdict that might be returned in the class' favor.  Thornburg Mortgage is in bankruptcy, and the Settlement Fund is exhausting the available D&O insurance.  See Tr. at 13:23-14:20 (Court, Manifold).  The D&O policy is a "pac man" or wasting policy, which means that defense expenses come off the top of the policy limits.  "Insurance policies in which defense costs are included within the policy limits are often referred to as 'wasting' or 'pac-man' policies, because their limits are reduced as defense costs are incurred."  Lane v. Page, 862 F. Supp. 2d 1182, 1219 n.16 (D.N.M. 2012)(Browning, J.)(quoting John M. Palmeri & Franz Hardy, Protecting Your Law Practice: Malpractice Insurance Basics, 34 Apr. Colo. Law 45, 46 (2005)).  Also, the policy limits even before depletion, started relatively small.  The pot of available money in this litigation is small, more so than in other cases.

Although Melfi, Reed, and Crane object to the size of the Settlement and their anticipated awards, the Court's must weigh the Settlement against the possibility of future recovery.  As the Tenth Circuit has explained, "value" in terms of approving a Settlement is not a metaphysical term that assesses whether a Class will feel that all wrongs have been vindicated.  See Gottlieb v. Wiles, 11 F.3d at 1014-15.  Here, the parties would be without the guarantee of receiving even a dollar if this suit were to be resolved at a later time.  The Settlement provides the class with "substantial, guaranteed relief."  Lucas v. Kmart Corp., 234 F.R.D. at 694.  The uncertainties in this case, which go beyond the normal uncertainties of recovery before a jury, convince the Court that the value of immediate recovery outweighs the mere possibility of future relief.  Thornburg Mortgage's bankruptcy proceedings, or the outcome of the SEC investigation into the Company, could exhaust

-104-

the funds from the insurance policy being used to settle the case. <u>See</u> Tr. at 57:18-22, 58:5-8

(Shapiro)(the Settling Defendants explain that the available funds have been depleted by this lawsuit

and Thornburg Mortgage's bankruptcy, and by the ongoing SEC investigation). Thornburg

Mortgage's bankruptcy and the ongoing SEC investigation have already diminished the

$10,000,000.00 maximum provided in the D&O insurance policy to the $2,000,000.00 in the

Settlement Fund. <u>See</u> Tr. at 17:2-24 (Court, Manifold). These financial difficulties may preclude

the Plaintiffs from recovering anything if they proceed to trial. <u>See</u> <u>Gottlieb v. Wiles</u>, 11 F.3d at

1015 (finding that a district court had properly used its discretion to approve a settlement where the

defendants' exposure to liability in other lawsuit and pending bankruptcy would likely reduce any

award Plaintiffs might attain at trial). Further, although the Plaintiffs could have continued and

attempted to procure more funds by proving that Thornburg, Goldstone, and Simmons were

personally liable, continuing to trial would create more risks and increase the likelihood that the

Class would recover nothing. <u>See</u> Tr. at 42:15-22 (Court); <u>id.</u> at 42:23-44:7 (Manifold). The

Settlement will at least give the Class an award. <u>See</u> <u>In Re Motor Fuel Temperature Sales Practices</u>

<u>Litig.</u>, 2012 WL 1415508 at **12, 16-17 (finding that the value of the settlement outweighed the

possibility of future relief even though many class members received only injunctive relief and no

monetary award). "To most people, a dollar today is worth a great deal more than a dollar ten years

from now." <u>Reynolds v. Beneficial Nat'l Bank</u>, 288 F.3d 277, 284 (7th Cir. 2002). While the class

may not receive everything that it desired, such is the nature of a compromise, and the Court finds

that this factor weighs in favor of approving the Settlement.

### D. THE PARTIES' JUDGMENT IS THAT THE SETTLEMENT IS FAIR AND REASONABLE.

The Honorable Richard D. Rogers, Senior United States District Judge for the District of

Kansas, has noted: "Counsels' judgment as to the fairness of the agreement is entitled to considerable weight." Marcus v. Kan. Dep't of Revenue, 209 F. Supp. 2d 1179, 1183 (D. Kan. 2002). Class counsel has significant experience and expertise in securities and class action litigation. Kessler, Topaz, Meltzer & Check, LLP, and Wolf, Haldenstein, Adler, Freeman & Herz LLP, have both represented plaintiffs in numerous other federal securities cases and class actions. See Kessler, Topaz, Meltzer & Check, LLP Firm Biography at 1-5 (listing, among other victories, that the firm prevailed in obtaining a $2.975 billion settlement with Tyco in In re Tyco Int'l, Ltd. Sec. Litig., No. 02-1335-B (D-N.H. 2002)); Wolf, Haldenstein, Adler, Freeman & Herz LLP Firm Resume at 7-8, (listing sixteen different class actions in which the firm has served as lead counsel, co-lead counsel, or executive committee member). Co-Lead Counsel asserts that, in its experience, the proposed Settlement is fair, reasonable, and adequate for the class. See Joint Decl. ¶ 45, at 26.

### 1.    The Class' Response to the Proposed Settlement.

Notices of the Settlement were mailed to 213,994 potential Class members. See Joint Decl. ¶ 46, at 26. At the current time, only six objections have been received. The small number of objectors , representing less than one-half of one-percent of the 8,000 claims received thus far, weighs in favor of the settlement. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1189 (noting that a settlement "from which an extremely small percentage of class members opted out, was fair, reasonable, and adequate"). The Underwriter Defendants object to the terms of the Settlement and argue that a judgment reduction provision must be included to preserve their right to seek contribution from Released Parties in the future.

The Wildners object to the proposed Settlement on grounds that the Settlement should be larger, and that the Plaintiffs should go after the assets of individual officers, and not just Thornburg Mortgages' insurance policy. See Wildner Letter at 1. At the hearing, the Court inquired why the

Plaintiffs had not tried to recover from the assets of Thornburg Mortgages' directors and officers. See Tr. at 42:15-22 (Court). The Plaintiffs asserted that they had weighed the likelihood of recovery against the Individual Defendants with the guaranteed recovery from the Settlement, and found that the guaranteed recovery from the Settlement was a better option, especially given the hurdles that must be overcome to succeed on a securities fraud allegation at trial. See Tr. at 42:23-44:7 (Court). The Court agrees with Co-Lead Counsel and the Plaintiffs that the guaranteed recovery available now by exhausting Thornburg Mortgage's D&O insurance is a better option for Class members than attempting to proceed in the litigation against the Settling Defendants. Furthermore, proceeding further against the Individual Defendants for their culpable actions strikes at a definition of value which entails satisfaction only when the Class feels vindicated, a definition of value that the Tenth Circuit has rejected. See Gottlieb v. Wiles, 11 F.3d at 1014-15. The value of a class' recovery from a settlement is not determined by whether the award "satisfies their desire for retribution by destroying the defendant." Gottlieb v. Wiles, 11 F.3d at 1015. The nature of a settlement is a give-and-take, and this economic exchange necessarily requires in the class-action context that a tenuous possibility of victory, which may produce more feeling of retribution if obtained, must be exchanged for a certain reward now. In light of Co-Lead Counsel's expertise in class action securities cases, and the preference for recovery in the form of a settlement rather than the risks that trial poses, the Court does not believe that the Settlement is unreasonable, unfair, or inadequate, simply because the source of its funds are Thornburg Mortgage's D&O insurance.

The Court litigated, before it went on the bench, securities cases and once secured a large judgment against the company and an individual employee. The Court learned the hard way the difficulty of collecting on such a judgment: winning securities cases is hard enough, but levying on personal and individual assets to collect a judgment is even more difficult. Little was recovered.

The suggestion that individual defendants should be taken to trial to get a judgment against them and then chase their assets only invokes more concern of a difficult recovery.  It may be the fear of that exercise is better used to convince a party to settle, rather than exhaust the parties and hope that the Plaintiffs see a judgment and collect on it against individuals' assets.

2.     <u>Revisions to the Settlement.</u>

The Court does not have the power to "require the parties to accept a settlement to which they have not agreed."  <u>Evans v. Jeff D.</u>, 475 U.S. 717, 726 (1986).  On the other hand, a district court may advise parties that it will not approve a proposed settlement unless one or more of its provisions are deleted or modified.  <u>See Evans v. Jeff D.</u>, 475 U.S. at 726 (explaining that, rather than requiring parties to accept a settlement to which they have not agreed, "the District Court might have advised petitioners and respondents that it would not approve their proposal unless one or more of its provisions was deleted or modified").  Yet, the Court cannot impose a revised settlement over the objection of a party.  <u>See</u> 475 U.S. at 726-27 ("Rule 23(e) does not give the court power, in advance of trial, to modify a proposed consent decree and order its acceptance over either party's objection.").[35]

a.     <u>Uncashed Checks.</u>

Co-Lead Counsel attained a Settlement of $2,000,000.00 for Class members from the Settling Defendants.  This amount exhausts Thornburg Mortgage's D&O insurance, which Co-Lead Counsel asserts is the only available source of funds for the Class, given Thornburg Mortgage's current bankruptcy.  The Court thus agrees with Co-Lead Counsel that the Settlement amount is fair.  On the other hand, the Court believes that the Settlement may be structured differently, so that

---

[35]The consent decree at issue in <u>Evans v. Jeff D.</u> was an order enforcing the terms of the settlement.  <u>See</u> 475 U.S. at 724.

potentially excess funds are distributed to Class members, which will help to address concerns that

the Settlement Fund is inadequate.  Most of the objections are to the size of the Settlement Fund,

and specifically, the objectors express discontentment with Co-Lead Counsel's estimate that, if

claims are submitted for every damaged share, the recovery will be $0.01 per share, less the

attorneys' fees and expenses.  Compare Notice at 2, with Reed Letter at 1; Melfi Letter at 2; Crane

Letter at 1.  Co-Lead Counsel explained at the hearing that the estimated recovery of $0.01 per share

is based off of the $2,000,000.00 Settlement Fund being divided amongst 200,000 potential Class

members.  See Tr. at 35:2-16 (Manifold).

At the hearing, the Court suggested that Co-Lead Counsel estimate the amount of money that

would remain from uncashed checks, and take that estimated amount and add it to checks distributed

to each Class member in one distribution.  See Tr. at 27:10-30:6 (Court, Manifold).  Thus, rather

than giving the remainder to the Center for Civic Values or doing multiple distributions, which can

be costly, the Plaintiffs could do one distribution with an estimate of the remainder distributed to

the Class in the first and final distribution. The Court suggested that the Co-Lead Counsel could

guarantee that there would be more Settlement Funds, given  their estimate of uncashed checks, by

agreeing to deduct from the attorneys' award any amount of funds that needed to go to the Class to

meet the amount promised in the Notice.  See Tr. at 28:18-29:13 (Court, Manifold).  Co-Lead

Counsel agreed that this plan is possible, but stated that they will need to confer with the claims

administrator to determine the amount of funds that could remain from uncashed checks.  See Tr.

at 29:14-21 (Manifold).  Although the amount of uncashed checks may be small, as the attorneys

estimated the amount would be between $5,000.00 and $10,000.00, giving all the funds possible to

the Class members is likely the best response for the Plaintiffs regarding the objections to the awards

being too small.  See Tr. at 28:2-6 (Court).  The Co-Lead Counsel asked the Court not to put them

in a conflict of interest with the Class regarding the recovery of Co-Lead Counsel's fees and the recovery for the Class.  See Tr. at 53:1-6 (Manifold).

The Court concludes that Mulholland's suggestion that the uncashed checks from the second distribution be distributed to those who cashed checks in the first distribution is reasonable.  See Mulholland Decl. ¶ 4, at 3.  While the Court has gone to great lengths to protect all class members by eliminating the de minimus requirement for recovery in the first round, if someone does not cash his or her first round check, there is no reason to require the class to bear the expense of sending that class member a second check; the money should go, to the extent possible, to people interested in this case and in recovery.  Mulholland has experience in the administration of class action settlements, and the Court believes that his suggestion addresses the concerns of both putative Class members, and Co-Lead Counsel, regarding the Settlement.  See Mulholland Decl. ¶ 2, at 2.  By distributing the uncashed checks in the first distribution to the Class members who cashed their first checks, the size of the reward that each Class member receives will be increased, if the Class member takes the time to file a claim and cash the check.  This procedure will slightly ameliorate the lack of recovery the Class is receiving.  Additionally, by administering a second distribution, rather than requiring Co-Lead Counsel to estimate the amount of uncashed checks and be liable for any amount by which their estimate is wrong, Mulholland's suggestion addresses' Co-Lead Counsel's concern regarding estimating accurately and not placing the counsel in a position of conflict with the interests of the Class.  The Court also believes that Mulholland's suggestion that the second distribution have a de minimis payout threshold is reasonable, and will address the Court's and Co-Lead Counsel's concern that a second distribution would be cost-prohibitive.  By requiring a payout threshold, the number of checks distributed will be less, making the second distribution less costly and get more money into the hands of shareholders.  The Court believes that

-110-

a payout threshold of $10.00 in recovery -- the threshold that the parties proposed for the first distribution -- is a fair threshold for the second distribution. The Plaintiffs initially set this threshold in the Settlement, but the Court did not believe that cutting off claims because of their size alone was fair to Class members who suffered damages, albeit their recovery would be small. See Order at 16. Because a second distribution is necessarily more costly than administering only one distribution, the Court concludes that requiring a payout threshold for Class members seeking to recover will address the concerns of the parties and of the Court that administering two distributions would deplete the minimal funds available to the Class. People below $10.00 have already received some recovery, but in reality, any further recovery will not be great.

Accordingly, the Court will not approve the Settlement in its present form, because it does not deal adequately, if at all, with residual funds. Specifically, it does not deal with uncashed checks. Because the Court wants to maximize the recovery to the Class, it believes that the uncashed checks should go, as much as possible, to the Class.

### b.  Judgment Reduction Provision.

The Underwriter Defendants object to the Settlement, because the Proposed Order & Final Judgment does not include a "judgment reduction provision," such that any verdict against the Underwriter Defendants must be offset by the settlement awarded against the Released Parties, if the injury alleged by the Plaintiffs is common in both actions. The Tenth Circuit has ruled that a contribution bar order cannot extinguish a right to contribution or indemnification that is provided for under law. See TBG, Inc. v. Bendis, 36 F.3d at 923 ("[O]rders barring contribution claims are permissible only because a court or jury has or will have properly determined proportional fault and awarded the equivalent of a contribution claim, not because of the compensatory award alone."). Contribution amongst settling and non-settling defendants is provided for under the PSLRA. See

15 U.S.C. § 78u-4(f)(5) (provided that non-settling defendants may reduce a judgment against them by the amount that corresponds to a settlement reached by other defendants in the matter); 7 Newberg, supra, § 12:18 ("When one of the defendants offers to settle with the class, . . . . [t]he nonsettling defendants in these circumstances are entitled to credit any aggregate judgment against them with the value of the settlement proceeds paid by the settling defendant to the class.").

The Settling Defendants do not object that the Underwriter Defendants are entitled to such a set-off; rather, they believe that the judgment reduction provision need not be included in the Proposed Order & Final Judgment.  See Nelson E-Mail at 1.  Because the parties do not object to a judgment reduction provision in substance, but only in form -- whether the provision needs to be included in the settlement order itself -- the Court will sustain the Underwriter Defendants' objection to the Proposed Final Order & Judgment.  The PSLRA provides that, "[i]f a covered person enters into a settlement with the plaintiff prior to final verdict or judgment, the verdict or judgment shall be reduced by the greater of . . . ."  15 U.S.C. § 78u-4(f)(7)(B)(emphasis added).  There is no sound reason to cut off the Underwriter Defendants' claims, but not give them the benefit of the law.  The Underwriter Defendants should not have a one-sided order.  The plan language of the statute says the Underwriter Defendants are entitled to the reduction; the Court should thus give it.

The Court will approve a Proposed Order & Final Judgment that contains an applicable judgment reduction provision corresponding with the Underwriter Defendants' rights to contribution or indemnification.  See 15 U.S.C.A. § 78u-4(f)(7)(B)(providing a verdict or judgment for a plaintiff in a securities litigation shall be reduced by the amount of a prior settlement attained by the plaintiff with a covered person).  Although the Tenth Circuit has not ruled since the passage of the PSLRA that a settlement that contains a contribution bar order must explicitly provide a judgment reduction, the Tenth Circuit has held that parties are injured when a bar order extinguishes a preexisting right

-112-

to indemnification or contribution without providing for an offset in some fashion.  See New England Health Care Emps. Pension v. Woodruff, 512 F.3d at 1289 ("As fail-safe protection for [the settling defendant], Plaintiffs, in addition to obtaining a release from [the non-settling defendants], must lower any agreed settlement amount by the indemnity amount [the non-settling defendants] could receive from [the settling defendant]," because the settlement made "it impossible for [the non-settling defendants] to receive any indemnification from a settlement with Plaintiffs."). Because the Underwriter Defendants are entitled to a judgment reduction under the PSLRA, the Settlement should include a judgment reduction provision reflecting the Underwriter Defendants' rights to contribution and indemnification in the Settlement Order if it also includes the bar order. They are thus quid pro quo for each other, and should be reflected in the same order.

The Court finds that each of the Jones v. Nuclear Pharmacy, Inc. factors weighs in favor of approving the Settlement, with the added provisions discussed above.  The Court believes that the Settlement will be fair, reasonable, and adequate after the plan for distribution is changed, and a judgment reduction provision is added.  While the recovery is not great, it is the best of a bad situation.  At first blush, a one cent per share settlement may seem ridiculous.  Someone owning 100 shares would receive a dollar, and someone owning 1,000 shares would receive ten dollars.  They attorneys are requesting $400,000.00 in fees and $243,145.93 in expenses.  The Court can understand the criticism that such a settlement benefits only the attorneys.  It is unlikely, however, that Class members will only receive one-cent a share.  Many people will not submit a claim, so the money will go to those who do.  And the Court believes that, as much as possible, the uncashed checks should go to the Class members.  The Court is relatively confident that the distribution will be higher, if not considerably higher, than the Court is having to assume as a worst case scenario.  While the settlement is difficult to swallow assuming the worst case scenario, the Court is relatively

-113-

confident that this settlement will look a lot better and will be perceived as a good one when distribution is done.  And if the Tenth Circuit reverses the Court's Underwriter Defendant MTD MOO, which dismissed the Underwriter Defendants from this matter, the Class may secure more money from much more solvent Defendants.

The Court finds that the Settlement should be approved, especially in light of the parties' vigorous litigation and the concerns regarding possible recovery at a trial.  The Court also concludes that there are not any conflicts between Class members.  Because the Settlement will be fair and reasonable, the Court will approve the Settlement, with the provisions specified herein.  If the parties do not revise the Settlement, the Settlement will not be fair and reasonable, and the Court will accordingly reject the Settlement.

## III.  THE COURT WILL APPROVE THE ATTORNEYS' FEES AND COSTS, AND WILL OVERRULE THE INDIVIDUAL OBJECTIONS THERETO.

Co-Lead Counsel requests an award of twenty-percent of the Settlement Fund -- $400,000.00 in fees and $243,145.93, plus interest, in expenses.  See Motion for Attorneys' Fees at 1.  Several putative class members argue that the attorneys' award is too large, or that the attorneys should receive no fee at all, given the size of the award for the Class.  See Wildner Letter at 1; Melfi Letter at 2; Crane Letter at 1.  Co-Lead Counsel have, because of these objections, reduced its requested award from twenty-five-percent to twenty-percent of the Settlement Fund, and reduced their requested fees from $260,000.00 to the current request of $243,145.93.  See Tr. at 46:23-47:7 (Manifold).

The Tenth Circuit has adopted a test that the Fifth Circuit adopted in Johnson v. Georgia Highway Express, Inc., which analyzes the following twelve factors when requested to award attorneys' fees in a class action: (i) the time and labor required; (ii) the novelty and difficulty of the

-114-

question presented in the case; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment because of acceptance of the case; (v) the customary fee; (vi) whether the fee is fixed or contingent; (vii) any time limitations the client or the circumstances imposed; (viii) the amount involved and the results obtained; (ix) the attorneys' experience, reputation, and ability; (x) the case's undesirability; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases.  See Gottlieb v. Barry, 43 F.3d at 483 & n.4.  "[R]arely are all of the Johnson factors applicable."  Uselton v. Commercial Lovelace Motor Freight, Inc., 9 F.3d at 854.  Applying the relevant factors, the Court finds that it should approve the requested award of attorneys' fees.  The Court also finds that the requested costs are reasonable, and in line with what other courts in the Tenth Circuit have previously approved, and the Court thus approves the requested award of costs.[36]

### A.    THE AMOUNT INVOLVED AND THE RESULTS OBTAINED SUPPORT THE ATTORNEYS' FEES AND COSTS AWARD.

"Courts have consistently held that the most important factor within this analysis is what results were obtained for the class."  Lane v. Page, 2012 WL 1940574, at *65.  Although the Settlement Fund is less than both the parties and the attorneys had hoped for, Co-Lead Counsel worked through significant difficulties in bringing this action to a settlement at all.  See Tr. at 69:5-

---

[36]The Tenth Circuit has not held that the factors set forth in Johnson v. Georgia Highway Express, Inc. do not apply to the Court's analysis of requested costs and expenses.  See Gottlieb v. Barry, 43 F.3d at 482-83 (applying the factors to a requested award of fees, but not using the factors to analyze expenses).  Other courts often rule on requested attorneys fees, under the Johnson v. Georgia Highway Express, Inc., factors, and requested costs, in the same breath, but without requiring the same showing to approve expenses as to approve a requested fee award.  See, e.g, Lane v. Page, 2012 WL 1940574, at ** 61-68; Mishkin v. Zynex, Inc., Nos. 09-CV-00780-REB-KLM, 09-CV-00816-REB-KLM, 09-CV-00829-REB-KLM, 2012 WL 406295, at **2-3 (D. Colo. Sept. 14, 2012).  The Court is not applying the Johnson v. Georgia Highway Express, Inc., factors to its analysis of the requested expenses.  Rather, the Court discusses the requested expenses concurrently with the fees, as applicable, in analyzing whether the requested fees are reasonable.

12 (Manifold)(referring to the Settlement and admitting that, "it's not a home run, it's not as much as the class had hoped for, it's not what the attorneys had hoped for, but under the circumstances . . . the settlement is fair, reasonable, and adequate.").   Additionally, Thornburg Mortgage, the corporate defendant, is absent from this matter and in bankruptcy proceedings, and the only remaining claim arises from three allegedly false or misleading statements made by a single defendant and two other defendants held liable as a "control-person."  Tr. at 69:9-12 (Manifold). That Co-Lead Counsel secured an award at all is impressive, especially in light of Thornburg Mortgage's impending bankruptcy and SEC litigation.

This case involves a case that has gone south on counsel.  Every plaintiffs' counsel has had one.  The public often sees the big attorney awards and imagines that is routine.  Plaintiffs' counsel usually has a portfolio of cases, and a couple will pay off big, a few will break even, and a few will lose money.  This case falls in the latter category.  The question is whether the attorney should receive nothing on such cases, or should receive something, and if something, how much is fair.

Although the $2,000,000.00 Settlement Fund is not as high as members of the class hoped to receive, and is less than Co-Lead Counsel wanted upon filing this action, it is a significant award, all the more so given the real likelihood that the Class could receive nothing.  Class counsel was required to work around Thornburg Mortgage's various financial difficulties.  The Defendants have contentiously fought the litigation, and it is likely that, had the case not settled, the Class may have been unable to enforce any judgment it may have received.  Crane, Melfi, Wildner, and Reed all argue that the award is too small in light of their damages.  Yet, Co-Lead Counsel fought through significant difficulties in securing a recovery for the Class at all.  While no party disputes that the Class hoped to receive more, that the action has been brought at all and has survived to this stage weighs in favor of approving the requested award for attorneys' fees.

-116-

While one-cent per share, at first blush, may appear ridiculous, it is unlikely that the recovery will be that low.  Many Class members will not file a claim, and others may not cash their check. It will likely be more money for each Class member.  There does not seem any sound reason to leave the money with the insurance company.  And it does not seem appropriate to deny a recovery to the attorneys, who have already taken a strategic loss.  It seems appropriate to give them some recovery, and, given that the result has not been good, and keeping in mind that the Court should not make the law and the class action process look like an ass.  "Courts should not reinforce what Charles Dickens said in Oliver Twist -- that the law is an ass."  Thompson v. Intel Corp., No. CIV 12-0620 JB/LFG, 2012 WL 3860748, at *18 (D.N.M. Aug. 27, 2012)(Browning, J.).

## B.   THE TIME AND LABOR INVOLVED IN THIS LAWSUIT SUPPORT THE ATTORNEYS' FEES AND COSTS AWARD.

The litigation has been ongoing for five years.  Over those five years, Co-Lead Counsel prosecuted the litigation without payment and advanced all costs.  Co-Lead Counsel would receive approximately ten-percent of its lodestar if the Court approves their requested award.  See Tr. at 47:8-10 (Manifold).  Co-Lead Counsel asserts that they have devoted over 11,362 hours to the case and incurred $5,409,776.75 in fees from the beginning of the litigation through July 23, 2012.  See Joint Decl. ¶ 56, at 31-32; id. ¶ 59, at 34.  Even if the Court used a more standard New Mexico billing rate -- $300.00 per hour for attorneys, and $85.00 per hour for paralegals -- the fees incurred would be approximately $2,816,246.00.  See Kessler, Topaz, Meltzer & Check, LLP Time Report at 4-5 (listing total hours spent on this matter through July 19, 2012 as 4,963.17 for attorneys, and 1,626 for other staff, including paralegals); Wolf, Haldenstein, Adler, Freeman & Herz, LLP Time Report at 5 (listing total hours spent on this matter through July 1, 2012 as 3,302.1 for attorneys, and 935.2 for other staff, including paralegals); Lowenstein, Sandler PC Time Report

-117-

at 5,[37] filed July 23, 2012 (Doc. 393-8)(listing total hours spent on this matter through July 15, 2012 as 369.4 for attorneys, and 95.8 for paralegals and other staff).[38]   The requested award, of approximately $400,000.00 in fees, is less than the alleged lodestar by a negative multiplier of 0.074, and $400,000.00 is only seven-percent of a lodestar calculated under standard New Mexico billing rates.   See Motion for Attorneys' Fees at 24.

> Co-Lead Counsel's efforts for the litigation include
>
> performing an extensive investigation into the Class's claims; drafting two comprehensive complaints; consulting with experts and bankruptcy counsel; briefing arguments made in several motions, including extensive motions to dismiss filed by defendants and Plaintiffs' Motion for Clarification; and engaging in arm's length settlement negotiations with the Settling Defendants over the course of several months, followed by additional months of negotiating the terms of the Stipulation and drafting the related settlement documents.

Joint Decl. ¶ 59, at 33-34.   Given the complexity of the case and the number of motions, documents, depositions, and hearings, the Court does not believe that 11,362 hours is excessive.[39]

---

[37]Lowenstein, Sandler PC's Time Report was filed, with multiple other documents in support of the firms' request for attorneys' fees, as Doc. 393-8.   The Court's page number references are to the page numbers included with the electronic filing of Doc. 393-8, and are located in the upper-right-hand corner.

[38]Lowenstein, Sandler PC served as bankruptcy counsel in this litigation.   See Decl. of Michael S. Etkin in Support of Co-Lead Counsel's Motion for an Award of Attorneys' fees and Reimbursement of Expenses Filed on Behalf of Lowenstein Sandler PC ¶ 2, at 1, filed July 23, 2012 (Doc. 393-8).   Co-Lead Counsel apparently used Lowenstein, Sandler PC's Time Report rather than a time report from the Branch Law Firm, Liaison Counsel, in calculating the total number of hours spent on this matter.   The Branch Law firm executed a separate agreement, which has not been presented to the Court, for fees with Co-Lead Counsel, and the Branch Law Firm did not submit a time report in support of Co-Lead Counsel's Motion for Attorneys' Fees.   See Branch Motion for Attorneys' Fees ¶ 4, at 2.

[39]The time reports submitted to the Court by the Plaintiffs' Counsel reflect a total of 11,291.67 hours worked by counsel on this matter, not 11,362, as Co-Lead Counsel asserts have been expended for the Plaintiffs.   See Kessler, Topaz, Meltzer & Check, LLP Time Report at 4-5 (listing total hours spent on this matter through July 19, 2012 as 6,589.17); Wolf, Haldenstein, Adler, Freeman & Herz, LLP Time Report at 5 (listing total hours spent on this matter through July

In Anderson v. Merit Energy Co., Nos. 07-CV-00916-LTB-BNB, 07-CV-1025-REB-MJW, 2009 WL 3378526 (D. Colo. Oct. 20, 2009), the United States District Court for the District of Colorado approved attorneys' fees in the amount of $5,900,000.00 where counsel similarly "devoted over ten thousand hours to the prosecution of th[e] Class litigation" and expended similar efforts.  2009 WL 3378526, at *2.  In another case, the United States District Court for the Western District of Oklahoma approved an award of $4,008,103.52 where counsel expended over 15,000 hours on the litigation.  See Ponca Tribe of Indians of Okla. v. Continental Carbon Co., No. 05-445, 2009 WL 2836508, at *3 (W.D. Okla. July 30, 2009).  The Court recently awarded $3,100,000.00 to class counsel in a securities class action where class counsel expended 11,800 hours of work over five years of work on the case.  See Lane v. Page, 862 F. Supp. 2d at 1251-52.  In Robles v. Brake Masters Sys., the Court approved attorneys' award, which included fees, costs, and expenses, that amounted to approximately nineteen-percent of a common fund in a class action settlement.  See 2011 U.S. Dist. LEXIS 14432, at ** 54-56.  Although Co-Lead Counsel's award will amount to more than that which the Court awarded in Robles v. Brake Masters Sys., because Co-Lead Counsel's award -- not including expenses -- will amount to twenty-percent of the Settlement Fund,

---

1, 2012 as 4,237.30); Lowenstein, Sandler PC Time Report at 5 (listing total hours spent on this matter through July 15, 2012 as 465.20).  The difference between the hours reflected in the time reports and the figure put forth by Co-Lead Counsel is 70.33.  See Motion for Attorneys' Fees at 23. Because the requested award is a negative multiplier of Co-Lead Counsel's lodestar using either the hours reflected in the time reports or put forward by Co-Lead Counsel, the Court does not believe that the discrepancy between the hours reflected in the time reports and the hours put forth by Co-Lead Counsel warrants disapproval of the requested award.  Additionally, the time reports did not list hours spent through the filing of the Motion for Attorneys' Fees, and thus, Co-Lead Counsel's figure in the Motion for Attorneys' Fees may reflect hours spent up to that date.  Cf. Motion for Attorneys' Fees at 23 (dated July 23, 2012), with Kessler, Topaz, Meltzer & Check, LLP Time Report at 4-5 (listing total hours spent on this matter through July 19, 2012); Wolf, Haldenstein, Adler, Freeman & Herz, LLP Time Report at 5 (listing total hours spent on this matter through July 1, 2012); Lowenstein, Sandler PC Time Report at 5 (listing total hours spent on this matter through July 15, 2012).

the Court nonetheless believes that Co-Lead Counsel's requested award is reasonable.   The requested award is far less than that which the Court awarded in Lane v. Page, and less than other district courts in this Circuit have awarded for comparable time spent by attorneys in other class actions.

Co-Lead Counsel's requested expenses are also in line with awards the Court has approved in other class-action settlements.   The Court recently ruled, in Lane v. Page, that an award of $650,000.00 in expenses was appropriate where class counsel had expended 11,800 hours litigating a class action.   See 2012 WL 1940574, at *62-63.   The District Court for the Western District of Oklahoma has awarded $1,645,048.45 to class counsel which had spent of 15,000 hours litigating a class action.   See Ponca Tribe of Indians of Okla. v. Continental Carbon Co., 2009 WL 2836508 at **3, 5.   The United States District Court for the District of Colorado has approved an expense award of $578,006.45 to class counsel, where class counsel expended over ten thousand hours litigating a class action.   See Anderson v. Merit Energy Co., 2009 WL 3378526, at **1-2.   Co-Lead Counsel's requested award of $243,145.93 in expenses, accompanying 11,362 hours of work, is well under what the Court has approved, and what other district courts within the Tenth Circuit have approved, when class counsel in other cases have expended similar hours litigating class actions.

Objections have been submitted to Co-Lead Counsel's requested award for fees and expenses.   Crane objects that Co-Lead Counsel's initial request is too high -- for twenty-five percent of the Settlement in fees and $260,000.00 in expenses, as too high.   See Crane Letter at 1-2. Melfi argues that requested award makes the "settlement [] favorable to the attorneys," who were aware of the risks entailed with taking on this case.   Melfi letter at 2.   The Wildners similarly object that the "ones benefitting from this settlement are the attorneys."   Wildner Letter at 1.   Reed argues

-120-

that Co-Lead Counsel's requested award is "outrageous."  Reed Letter at 1.  Regarding the objections to the requested expenses, the individual objectors, do not point to any particular expense that was unreasonable or unjustifiable in light of the five years of work the attorneys have put into a class action securities case that involves multiple parties.  Co-Lead Counsel's requested award, both in fees and expenses, is less than what is commonly awarded to attorneys who have expended similar hours litigating class actions within the Tenth Circuit.  Moreover, Co-Lead Counsel reduced their award by five-percent, and their requested fees by close to $17,000.00, to $243,145.93, pursuant to these objections.  See Tr. at 46:23-47:7 (Manifold).  Co-Lead Counsel also agreed to distribute a greater amount to the Class, even if the distribution resulted in a reduction of their requested award.  The Court has recognized in other cases that "[f]ees in the range of 30-40% of any amount recovered are common in complex and other cases taken on a contingent fee basis."  Robles v. Brake Masters Sys., Inc., 2011 U.S. Dist. LEXIS 14432, at *55.  Co-Lead Counsel's total award of fees and expenses is $643,145.93 and amounts to approximately thirty-two percent of the total recovery for the Class.  The time and labor expended in pursuit of the litigation were extensive and justifiable.

The Court does not believe that Co-Lead Counsel should go uncompensated, particularly when their requested award is a negative multiplier of their lodestar.  Accordingly, the Court finds that this factor weighs in favor of the requested attorney's fee award.

## C.   THE NOVELTY AND DIFFICULTY OF THE QUESTIONS PRESENTED SUPPORT THE ATTORNEYS' AWARD.

There are "few simple class action cases involving securities law," and this case is no exception.  In re Qwest Commc'n Int'l, Inc. Sec. Litig., 625 F. Supp. 2d 1143, 1149 (D. Colo. 2009).  The Honorable Robert E. Blackburn, United States District Judge for the District of

Colorado, has concluded that securities law is "complex and difficult," and noted that the "PSLRA requires great specificity in pleading such claims." In re Qwest Commc'n Int'l Inc. Sec. Litig., 625 F. Supp.2d at 1149.

Similarly, this case involves complex federal securities law issues and multiple defendants. See Motion for Attorneys' Fees at 25-27. That the Court has written over 365 pages of decisional authority in at least eight separate memorandum opinions and orders addressing the issues involved in the case also demonstrates the complexity of the case. See Motion for Attorneys' Fees at 26. The Court's decisions in this case have been widely cited, both within the Tenth Circuit, and beyond. See, e.g., In re Countrywide Fin. Corp. Mort.-Backed Secs. Litig. v. Countrywide Fin. Corp., Nos. 2:11-ML-02265-MRP, 2:11-CV-10414 MRP, 2012 U.S. Dist. LEXIS 59620, at ** 18-19 (C.D. Cal. Apr. 16, 2012)(noting that In re Thornburg Mortg., Inc. Secs. Litig., 695 F. Supp. 2d 1165, 1220-21 (D.N.M. 2010)(Browning, J.), has been cited in support of dismissing allegations in securities cases where "plaintiffs failed to include specific allegations of solicitation, including direct communication with Plaintiffs" (internal citations omitted)); Philco Invs., Ltd. v. Martin, No. C 10-02785 CRB, 2011 U.S. Dist. LEXIS 114314, at *6 n.1 (N.D. Cal. Oct. 4, 2011)(quoting In re Thornburg Mortg., Inc. Secs. Litig., 695 F. Supp. 2d at 1208 ("Statements Not False When Made Do Not, Standing Alone, Support a Strong Inference of Scienter.")); Me. State Ret. Sys. v. Countrywide Fin. Corp., No. 2:10-CV-0302 MRP, 2011 U.S. Dist. LEXIS 125203, at ** 38-39 (C.D. Cal. May 5, 2011)(citing In re Thornburg Mortg., Inc. Secs. Litig., 695 F. Supp. 2d at 1220-21, in support of the conclusion that "Plaintiffs must include very specific allegations of solicitation, including direct communication with Plaintiffs"); Winslow v. BancorpSouth, Inc., No. 3:10-00463, 2011 U.S. Dist. LEXIS 45559, at *36 (M.D. Tenn. Apr. 26, 2011)(citing In re Thornburg Mortg., Inc. Secs. Litig., 695 F. Supp. 2d at 1214, in support of a finding that statements

-122-

made in preliminary or unaudited financial reports may still be materially misleading, because the statements are modes of reporting material events or corporate changes ); Wilms. v. Laughlin, No. 10-CV-01761, 2011 U.S. Dist. LEXIS 32776, at **3-4 n.9 (D. Colo. Mar. 28, 2011)(quoting In re Thornburg Mortg., Inc. Secs. Litig., 796 F. Supp. 2d at 1186 ("The Securities Act deals with initial issuance of securities, and with the required contents of registration statements and prospectuses.")); Philco Invs., Ltd. v. Martin, No. C 10-02785 CRB, 2011 U.S. Dist. LEXIS 12951, at *19 n.9 (N.D. Cal. Feb. 9, 2011)(quoting In re Thornburg Mortg., Inc. Secs. Litig., 695 F. Supp. 2d at 1208 ("Statements Not False When Made Do Not, Standing Alone, Support a Strong Inference of Scienter.")); Wilms v. Laughlin, No. 10-CV-01671-ZLW-BNB, 2011 U.S. Dist. LEXIS 1220 (D. Colo. Jan. 6, 2011)(quoting In re Thornburg Mortg. Inc. Secs. Litig., 695 F. Supp. 2d at 1186 ("The Securities Act deals with the initial issuance of securities, and with the required contents of registration statements and prospectuses." (alterations omitted)); United Food & Commercial Workers Union v. Chesapeake Energy Corp., No. CIV-09-1114-D, 2010 U.S. Dist. LEXIS 92208 (W.D. Okla. Sept. 2, 2010)(citing In re Thornburg Mortg., Inc. Secs. Litig., 695 F. Supp. 2d at 1187, in support of the rule that a securities claim alleging fraud must plead fraud with particularity to satisfy the pleading requirements of the federal rules and the PSLRA); Boilermakers Nat. Annuity Trust Fund v. WaMu Mortg. Pass, No. C09-0037 MJP, 2009 WL 5170186, at *2 (citing In re Thornburg Mortg. Secs. Litig, 629 F. Supp. 2d 1233, 1241 (D.N.M. 2009)(Browning, J.), in support of finding that new notice is not required when an amendment to a class action complaint only extends the class period and adds defendants).

The changing economic background against which this case was litigated also increased the case's complexity.  See In re Smith, 435 B.R. 637, 643 (9th Cir. 2010)("These appeals have arisen during the current difficult economic time which is being referred to as 'The Great Recession.'").

Co-Lead Counsel was therefore faced with the difficulties and novelties of a securities action which was being litigated during "The Great Recession," when many corporations declared bankruptcy because of the economic downturn.  More specifically, the collapse of the real estate market, and the concurrent value of mortgage backed securities, was regarded as, by most government regulations and private interest, unexpected.  Additionally, Co-Lead Counsel grappled with the Plaintiffs' significant risks in moving forward with this litigation, not only because the Plaintiffs and Settling Defendants "disagree on nearly all factual and legal issues and, to this day, the Settling Defendants adamantly deny any liability," but also because the elements that must be proven to establish liability under the Securities Act and Exchange Act would require proving loss causation, a "difficult task."  In re Daou Sys., Inc., 411 F.3d at 1026.  "Loss causation refers to the causal connection between the wrongful conduct and the economic loss for which the plaintiff seeks relief, and resembles a form of proximate cause."  Lane v. Page, 727 F. Supp. 2d 1214, 1227 (D.N.M. 2010)(Browning, J.)(internal citation omitted).  Liability under the Securities Act and Exchange Act are complex and difficult matters of which to convince a jury.  Motion for Attorneys' Fees at 28-29.  In Lane v. Page, the Court found that a securities class action was novel and difficult, in part, because the class counsel would have to prove loss causation to succeed against the defendants.[40]  See 862 F. Supp. 2d, at 1252-53.  Loss causation would have been difficult to prove in this case, given that Plaintiffs' claims coincide with a period when real estate-backed securities lost value across the nation.  See Lane v. Page, 862 F. Supp. 2d at 1248 (noting that the plaintiffs faced a difficult task of proving loss causation in a securities class action, because the merger that

---

[40]"Loss causation" is the demonstration that "the defendant's deceptive conduct caused [the plaintiffs'] claimed economic loss."  Erica P. John Fund., Inc. v. Halliburton, Co. 131 S. Ct. 2179, 2183 (2011).

allegedly led to a drop in the plaintiffs' shares occurred "at the peak of the real estate market bubble").  The Court believes that these complexities and this factor weigh in favor of the attorney's fee and expenses award.

### D.    THE SKILL REQUISITE TO PERFORM THE LEGAL SERVICES PROPERLY, AND THE EXPERIENCE AND SKILL OF CLASS COUNSEL, SUPPORT THE ATTORNEYS' FEES AND COSTS AWARD.

Because factors three and nine are closely related, the Court analyzes together the skill requisite to perform the legal services properly, and the experience and skill of class counsel. See In re Qwest Commc'ns Int'l, Inc. Sec. Litig., 625 F. Supp. 2d at 1150.

Co-Lead Counsel are highly skilled and specialized attorneys who use their substantial experience and expertise to prosecute complex securities class actions.  Co-Lead Counsel have extensive experience in litigating securities class actions nationwide.  See Kessler, Topaz, Meltzer & Check, LLP Firm Biography at 8-12, filed July 23, 2012 (noting the firm's success in securities fraud litigation over the last ten years, and highlighting that the firm secured multiple recoveries over $100 million for its clients); Wolf, Haldenstein, Adler, Freeman & Herz LLP Firm Resume at 4-7, filed July 23, 2012 (Doc. 292-5)(highlighting from judicial opinions that recognize the firm's excellence in litigating cases and securing settlement for its clients).  Accordingly, the Court finds that class counsel's skill and reputation weigh in favor of the requested attorneys' fee and expense award.  Co-Lead Counsel brought their skill and experience to this case, successfully litigating many motions.  The Court noted Co-Lead Counsel's skill at the hearing, when the Court stated that it "appreciate[s] the high quality of work which you are always giving me and for the hard work that you've [] done on this case [in the] past."  Tr. at 66:1-4 (Court).  It is unlikely that many other counsel would have been able to continue funding the litigation for it to reach this point or that many other counsel would have been able to so successfully prosecute the litigation.  See In

-125-

re Qwest Commc'ns Int'l, Inc. Sec. Litig., 625 F. Supp. 2d at 1150 ("This factor carries significant weight because the plaintiff class likely would not have obtained any relief . . . without the assistance of counsel with a high level of skill and expertise.  Further, lead counsel should be rewarded for the successful application of their skill and expertise.").  While there are other national and local firms that do securities class actions work, the number of firms doing this work is relatively small, and requires specialized knowledge and skill, and the willingness to front expenses and staff salaries for years.  Where "Class Counsel's knowledge and experience . . . significantly contributed to a fair and reasonable settlement," this factor supports a request for a large amount of attorneys' fees.  Anderson v. Merit Energy Co., 2009 WL 3378526, at *3.  Given the high quality of defense counsel,  "there was simply no way that this case could have been prosecuted successfully without a high level of skill exhibited on the part of Class Counsel."  Feerer v. Amoco Prod. Co., 1998 U.S. Dist. LEXIS 22248, at *31.  Accordingly, the Court finds that these two factors weigh in favor of the requested attorneys' fees.  Co-Lead Counsel are both skilled and experienced, and used those skills and experience for the Class' benefit.

E.    **THE ATTORNEYS' FEES ARE IN ACCORDANCE WITH CUSTOMARY ATTORNEY'S FEE AWARDS AND AWARDS, IN SIMILAR CASES, AND WERE CONTINGENT.**

The attorneys' fees in this case were contingent.  This factor weighs in favor of the requested attorneys' fees award, because "[s]uch a large investment of money [and time] place[s] incredible burdens upon . . . law practices and should be appropriately considered."  Feerer v. Amoco Prod. Co., 1998 U.S. Dist. LEXIS 22248, at *33.  See Been v. O.K. Indus., Inc., No. CIV-02-285-RAW, 2011 WL 4478766, at *9 (E.D. Okla. Aug. 16, 2011)("Courts agree that a larger fee is appropriate in contingent matters where payment depends on the attorney's success.").  Co-Lead Counsel assumed the risk that the litigation would yield no recovery, and for five years have

-126-

received no compensation for the time and expenses they have spent during the course of the litigation.  The Court has recognized in other cases that "[f]ees in the range of 30-40% of any amount recovered are common in complex and other cases taken on a contingent fee basis."  Robles v. Brake Masters Sys., Inc., 2011 U.S. Dist. LEXIS 14432, at *55.

The Court examines the requested award in relation to the Settlement.  Although the attorneys' award will come from the Settlement Fund, Co-Lead Counsel have addressed some of the objectors' concerns to the size of the award by reducing their requested award to twenty-percent.  The Court finds that Co-Lead Counsel was able to obtain a significant benefit for the class, which may have gone without a recovery at all, in light of the financial difficulties facing the Settling Defendants.  Twenty-percent in fees is below the average percentage of the class fund that courts award.  "Fees in the range of 30-40% of any amount recovered are common in complex and other cases taken on a contingency fee basis."  Robles v. Brake Masters Sys., Inc., 2011 U.S. Dist. LEXIS 14432, at *55.  See Anderson v. Merit Energy Co., 2009 WL 3378526, at *3 ("The customary fee to class counsel in a common fund settlement is approximately one-third of economic benefit bestowed on the class.").  Furthermore, the Court finds that the award is comparable to other awards where similar hours have been expended.  See Anderson v. Merit Energy Co., 2009 WL 3378526, at *2; Ponca Tribe of Indians of Okla. v. Continental Carbon Co., 2009 WL 2836508, at *3.

At the hearing, the Court suggested that it might reduce the attorneys fees in response to the Reed, Melfi, Wildner and Crane objections.  See Tr. at 48:6-10 (Court).  After the Plaintiffs objected, see Tr. at 48:25-49:2 (Manifold), and having given the matter further thought, the Court decided to overrule the objections to the fees.  A reduction of one- or two-percent would be a reduction of $4,000.00 to $8,080.00.  That amount would largely be symbolic.  It would not be

much more money for the Class, and only punishes the counsel, who has already taken a hit from the case.  The right thing to do is not to start splitting the baby, but bit the bullet, and help the class and its counsel get as much as they can from limited funds.

Moreover, when the Court examines the requested attorneys' fees in the context of how much Co-Lead Counsel put into the case, the Court finds that the requested attorneys' fees are appropriate.  Even if every attorney and paralegal who worked on this case billed at the relatively low blended rate of $200.00 per hour,[41] the attorneys' fees would be in excess of the attorney's fee

---

[41]While the Court realizes that paralegals do not routinely charge $200.00 per hour in New Mexico, the state's top attorneys charge above that amount, see Jackson v. Los Lunas Center, 489 F. Supp. 2d 1267, 1273 & n.4 (D.N.M. 2007)(Parker, S.J.)(discussing fees of up to $305.25 per hour and finding those fees reasonable); Kelley v. City of Albuquerque, No. 03-5007, 2005 WL 3663515, at *16 (D.N.M. Oct. 24, 2005)(Browning, J.)(finding that $250 per hour for Albuquerque attorneys is a reasonable fee), and New Mexico is a relatively poor state, with some of the lowest hourly rates in the country.  The Court has previously stated that $200.00 per hour is a "relatively low rate" for attorneys in New Mexico.  Lane v. Page, 862 F. Supp. 2d 1182, 1257(D.N.M. 2012)(Browning, J.).  See also Copar v. Pumice Co., Inc., v. Morris, No. CIV 07-0079 JB/ACT, 2012 WL 2383667, at *19, *21 (D.N.M. Jan. 13, 2012)(Browning, J.)(finding that "(i) $235.00 per hour for partners; (ii) $200.00 per hour for senior associates; (iii) $150.00 per hour for other associates; and (iv) $75.00 per hour for paralegals," are reasonable rates in New Mexico); Avendano v. Smith, No. CIV 11-0556, 2011 WL 5822733, at *2 (D.N.M. Nov. 3, 2011)(Browning, J.)(finding rates of $180.00 per hour reasonable); Pedroza v. Lomas Auto Mall, Inc., 716 F. Supp. 2d 1031, 1050 - 51 (D.N.M. 2010)(Browning, J.)(finding that $150.00 per hour is a "very reasonable" rate for commercial litigators in New Mexico); Mountain Highlands, LLC v. Hendricks, No. CIV 08-0239, 2010 WL 1631856, at **9-10 (D.N.M. Apr. 2, 2010)(Browning, J.)(approving an hourly rate of $170.00 to $210.00 per hour as reasonable for commercial litigation); Wiatt v. State Farm Ins. Cos., No. CIV 07-0526 JB/KBM, 2008 WL 2229630, at **4-5 (D.N.M. Mar. 24, 2008)(Browning, J.)(holding that a fee of $200.00 per hour for insurance defense work was reasonable); Allahverdi v. Regents of Univ. of N.M., No. CIV 05-0277, 2006 WL 1304874, at *2 (D.N.M. Apr. 25, 2006)(Browning, J.)(finding hourly rate of $225.00 reasonable in a public-employment dispute); Two Old Hippies, LLC, v. Catch the Bus, LLC, 277 F.R.D. 448, 465 (D.N.M. 2011)(Browning, J.)(finding that $275.00 per hour is a reasonable rate for an attorney who is "one of the more seasoned and experienced commercial litigators in the District of New Mexico," and $195.00 is a reasonable rate for an "excellent associate.").  The Honorable William P. Johnson, District Judge for the United States District Court for the District of New Mexico, has found that a rate of $350.00 per hour is appropriate for one of "one of New Mexico's preeminent trial lawyers," who has demonstrated "superb trial advocacy skills" in a police misconduct civil rights case.  Martinez v. Carson, No. 08-CV-1046 WJ/LFG, Mem. Op. and Order Granting in Part Plaintiff's Motion for Attorney Fees and

award requested.  The requested award amounts to an hourly rate of $35.00 per hour for the

attorneys working on this case.  <u>See</u> Tr. at 47:8-10 (Manifold).  This hourly rate is a substantial

discount for the attorneys, as their normal rates are in the range of $375.00-$865.00 per hour.  <u>See</u>

Kessler, Topaz, Meltzer & Check, LLP Time Report (listing hourly rates for attorneys in the range

of $345.00-$745.00); Wolf, Haldenstein, Adler, Freeman & Herz, LLP Time Report (listing hourly

rates for attorneys in the range of $375.00-$865.00).

---

Expenses (Doc. 231), at 7 (D.N.M. Aug. 11, 2011)(Johnson, J.)  Judge Johnson has also found that a rate of $175.00 per hour is reasonable for an attorney who has been practicing law for five years. <u>See</u> No. 08-CV-1046, Mem. Op. and Order Granting in Part Plaintiffs' Motion for Attorney Fees and Expenses (Doc. 231) at 8.  The Honorable Judith C. Herrera, District Judge for the United States District Court for the District of New Mexico, has approved fee awards of:

> $350 per hour for lawyers who graduated from law school before 1996; $300 per hour for lawyers who graduated between 1996 and 2000; $225 per hour for lawyers how graduated between 2001 and 2006; and $150 per hour for lawyers who graduated in 2007 and afterwards. . . . [and] $95 per hour for legal interns and legal support staff.

<u>Valdez v. Herrera</u>, No. 09-CV-0668 JCH/DJS, Order Granting Attorneys' Fees at 3 (Doc. 149)(D.N.M. Mar. 21, 2011)(Herrera, J.).  <u>See</u> <u>Mackey v. Staples, Inc.</u>, No. 09-CV-0023 JCH/WPL, Order Granting Attorneys' Fees and Costs (Doc. 199) at 5 (D.N.M. Mar. 4, 2011)(Herrera, J.)(awarding fees at a rate of $350.00 per hour to civil rights litigators with thirty-seven years of experience); <u>Johnson v. Life Ins. Co. of N. Am.</u>, No. 05-CV-0357 JCH/RLP, Memorandum Opinion and Order (Doc. 127) at 4 (D.N.M. Mar. 13, 2009)(Herrera, J.)(finding that $105.00 per hour is a reasonable rate for a paralegal with nine years of experience).  The Honorable John E. Conway, Senior District Judge for the United States District Court for the District of New Mexico, has awarded fees  in the range of $200.00 to $300.00 for attorneys in a police misconduct case.  <u>See</u> <u>Avila v. Ratchner</u>, No. 01-CV-0349 JC/LAM, Memorandum Opinion and Order (Doc. 214) at 6-7 (D.N.M. Sept. 27, 2010)(Conway, S.J.).  Five years ago, the Honorable Robert C. Brack, District Judge for United States District Court for the District of New Mexico, found that $175.00 per hour was a reasonable rate for an associate attorney with five years of experience who took an active role in a litigation.  <u>See</u> <u>Rivera v. Smith's Food & Drug Centers</u>, No. 05-CV-1049 RB/ACT, Memorandum Opinion and Order (Doc. 177) at 10-12 (D.N.M. June 28, 2007)(Brack, J.).  The Honorable Robert H. Jacobvitz, Bankruptcy Judge for the United States Bankruptcy Court for the District of New Mexico, found that hourly rates of $60.00 for paralegals is reasonable.  <u>See</u> <u>In re Fincher</u>, No. 13-08-11454 JA, 2012 WL 1155719, at *5 (Bankr. D.N.M. Apr. 5, 2012)(Jackobvitz, J.)

Circumstances forced the Plaintiffs to be more realistic in terms of what damages it would likely receive, and Co-Lead Counsel have likewise discounted their services to bring the further in line with the recovery.  This case has not been a home run for Co-Lead Counsel, even though the dollar amount of the fees is significant.  Because the fees were contingent, and are at or below the customary fee and awards for costs in similar cases, the Court finds that this factor weighs in favor of the requested attorneys' fees and costs.

F.      **THE UNDESIRABILITY OF THE CASE SUPPORTS THE ATTORNEYS' FEES AND COSTS AWARD.**

The time and effort that this case has taken would make it undesirable to many attorneys. See Been v. O.K. Indus., Inc., 2011 WL 4478766, at *10 (finding that the time and effort expended in an expensive litigation made a class action undesirable for class counsel).  Further, the Court cannot assume that receiving an award that equals approximately $35.00 per hour, after five years of litigation, is a desirable outcome for experienced class-action attorneys such as Co-Lead Counsel.  While Crane objects to the Settlement and argues that the Court should send a message to the securities bar by not granting the requested award for fees or expenses, the Court finds, rather, that Co-Lead Counsel's efforts have served to vindicate the Class' interests, where no other recovery was likely possible.  The Court should be cautious, as a single federal judge, especially in New Mexico, who receives relatively few securities class actions because the state has few publicly held corporations, about sending messages to the national securities bar.  The low recovery in this case is deterrent enough to securities lawyers bringing and litigating bad cases; there is little to no incentive to practice that law in the first place.  The myth of the strike suit is greatly exaggerated, with good defense counsel usually able to sniff it out before vigorously arguing those. Securities cases often are wiped out at the motion to dismiss stage, and there is no recovery at all.

See, e.g., Prissert v. Emcore Corp., No. 08-CV-1190 MV/KBM, Memorandum Opinion and Order, filed Sept. 28, 2012 (Doc. 19)(dismissing the plaintiffs' securities class action on the defendant's motion).  Single cases are usually poor vehicles for sending national messages, and often show the judge expressing his or her frustrations about personal preference, or a temper tantrum, rather than principled, dispassionate judgment.  The Court thinks it is better for the Court to stay steady, and award the attorneys in a reasonable way, even if the total recovery is disappointing.  The Plaintiffs' case was undoubtedly undesirable, because, "[a]t minimum, this case required lead counsel to advance large amounts of time, money, and other resources to determine if any recovery might be had."  In re Qwest Commc'ns Int'l, Inc. Sec. Litig., 625 F. Supp. 2d at 1152-53.  The Court accordingly finds that this factor weighs in favor of approving the requested award for attorneys' fees and costs.

##        H.     THE COURT FINDS THAT THE ATTORNEYS' FEES AND EXPENSES ARE APPROPRIATE.

The Court will award attorneys' fees of $400,000.00 and expenses of $243,145.93.  The relevant Johnson v. Georgia Highway Express, Inc. factors all counsel, to some extent, in favor of the fee award.  The individual objectors have not made any specific objections to billing rates, times, or costs.  The attorneys' fees represent a negative multiplier of the total lodestar amount and are an acceptable percentage of the Class' award.  This litigation has been vigorously litigated over a period of five years.  The Court finds that the attorneys' fees and expenses are reasonable and fair.  While the attorneys' fees are substantial in isolation, in comparison to what Co-Lead Counsel put into the case, they did not hit a home run.  The Court agrees with Co-Lead Counsel that a reasonable award of attorneys' fees is necessary to further the public policy behind the securities laws and will incentivize high-caliber attorneys to take on risky cases to vindicate the rights of

shareholders.   See Tr. at 63:23-64:5 (Manifold).   Accordingly, the Court approves Co-Lead Counsel's requested award of attorneys' fees and expenses.

**IT IS ORDERED** that: (i) the Plaintiffs' Motion for Final approval of Proposed Settlement, Plan of Allocation and Certification of Class for Settlement Purposes, filed July 23, 2012 (Doc. 391); and (ii) Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Memorandum of Law in Support of Approval of Co-Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses, filed July 23, 2012 (Doc. 392), are granted in part.   The parties shall file no later than Thursday, November 29, 2012, a brief or letter stating whether the conditions for approval that the Court set forth here are acceptable and, if so, a new settlement or at the least the pages reflecting the changes and highlighting the changes, so that the Court can enter the final judgment.   The parties shall also submit, if moving, the order of final judgment that must be entered to reflect the Court's decision and the parties' agreement.   If more time is needed, the parties are, of course, free to report this to the Court.   After the distributions are made, the parties shall file a report stating precisely who received what and how much.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Frederic S. Fox
Aviah Cohen Pierson
Kaplan, Fox & Kilsheimer
New York, New York

-- and --

-132-

Richard A. Lockridge
Nathan D. Prosser
Karen H. Riebel
Lockridge, Gindal, Nauen & Holstein
Minneapolis, Minnesota

-- and --

Nancy Kaboolian
Abbey, Spanier, Rodd, Abrams & Paradis, LLP
New York, New York

-- and --

Curtis V. Trinko
Law Offices of Curtis V. Trinko, LLP
New York, New York

-- and –

Evan J. Smith
Brodsky & Smith, L.L.C.
Mineola, New York

-- and --

David R. Scott
Scott & Scott, LLC
Colchester, Connecticut

-- and --

Arthur Shingler, III
Scott & Scott, LLP
San Diego, California

-- and --

Charlotte Itoh
Fine Law Firm
Albuquerque, New Mexico

-- and --

Cody Kelley
Kelley Law Offices
Albuquerque, New Mexico

-- and --

Shane C. Youtz
Albuquerque, New Mexico

-- and --

Turner W. Branch
Branch Law Firm
Albuquerque, New Mexico

-- and --

Fred T. Isquith
Gregory M. Nespole
Rachel S. Poplock
Martin E. Restituyo
Wolf Haldenstein Adler Freeman & Herz, LLP
New York, New York

-- and --

Betsy C. Manifold
Francis M. Gregorek
Rachele R. Rickert
Patrick H. Moran
Wolf, Haldenstein, Adler, Freeman & Herz, LLP
San Diego, California

-- and --

Andrew L. Zivitz
Benjamin J. Sweet
Michelle M. Newcomer
Richard Russo, Jr.
Sean M. Handler
Stewart L. Berman
D. Seamus Kaskela
Kessler, Topaz, Meltzer & Check, LLP
Radnor, Pennsylvania

*Attorneys for Plaintiffs*

David A. Freedman
Joseph Goldberg
David H. Urias
Freedman, Boyd, Hollander, Goldberg, Urias & Ward, P.A.
Albuquerque, New Mexico

 *Attorney for Defendants Joseph H. Badal, Michael B. Jeffers, Owen M. Lopez, Stuart C.*
  *Sherman, Paul G. Decoff*

Amy L. Neuhardt
Boies, Schiller & Flexner, LLP
Washington, District of Columbia

-- and --

Donald L. Flexner
Philip C. Korologos
Boies, Schiller & Flexner, LLP
New York, New York

 *Attorneys for Defendants Garrett Thornburg, Anne-Drue M. Anderson, David A. Ater,*
  *Joseph H. Badal, Eliot R. Cutler, Ike Kalangis, Francis I. Mullin, III, Stuart C.*
  *Sherman, and Paul G. Decoff*

William H. Forman
Scheper, Kim & Overland, LLP
Los Angeles, California

-- and --

David F. Cunningham
Thompson, Hickey, Cunningham, Clow, April & Doran, P.A.
Santa Fe, New Mexico

 *Attorneys for Defendants Thornburg Mortgage, Inc., Garrett Thornburg, Larry A.*
  *Goldstone, Clarence G. Simmons, Anne-Drue M. Anderson, David A. Ater, Joseph*
  *H. Badal, Eliot R. Cutler, Michael B. Jeffers, Ike Kalangis, Owen M. Lopez, Francis I.*
  *Mullin, III, and Stuart C. Sherman*

Clinton W. Marrs
Tax, Estate & Business Law, N.A., LLC
Albuquerque, New Mexico

-- and --

Peiyin Patty Li
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Los Angeles, California

-- and --

Jonathan A. Shapiro
Elizabeth H. Skey
Wilmer, Cutler, Pickering, Hale & Dorr, LLP
Palo Alto, California

     *Attorneys for Defendants Larry A. Goldstone and Clarence G. Simmons*

Joel Sher
Shapiro, Sher, Guinot & Sandler
Baltimore, Maryland

-- and --

Mary R. Jenke
Walsh, Anderson, Brown, Aldridge & Gallegos
Albuquerque, New Mexico

     *Attorneys for Thornburg Mortgage, Inc.*

Clifford K. Atkinson
John S. Thal
Atkinson, Thal & Baker, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendants A.G. Edwards & Sons, Inc., BB&T Capital Markets, UBS Securities, Citigroup Global Markets Inc., Friedman, Billings, Ramsey & Co., Oppenheimer & Company, Inc., RBC Dain Rauscher Corp., Stifel, Nicolaus & Company, Inc., and Bear Sterns & Co., Inc.*

Jonathan C. Dickey
Gibson, Dunn & Crutcher, LLP
New York, New York

-- and --

Dean J. Kitchens
Lindsay R. Pennington
Gibson, Dunn & Crutcher, LLP
Los Angeles, California

   *Attorneys for Defendants A.G. Edwards & Sons, Inc., BB&T Capital Markets, Citigroup
    Global Markets Inc., Oppenheimer & Company, Inc., RBC Dain Rauscher Corp., and
    Stifel, Nicolaus & Company, Inc.*

David C. Bohan
David J. Stagman
Katten, Muchin, Rosenman, LLP
Chicago, Illinois

   *Attorneys for Defendants UBS Securities and Bear Sterns & Co., Inc.*

Steven M. Farina
William Pittard
Margaret A. Keeley
Williams & Connolly, LLP
Washington, District of Columbia

   *Attorneys for Defendant Friedman, Billings, Ramsey & Co.*